IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.   3:22-cv-686-HTW-LGI |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| THE CITY OF JACKSON, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

Plaintiff the United States of America ("United States"), by the authority of the Attorney General and at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.  This is a civil action concerning the failure of the City of Jackson, Mississippi ("City"), to provide drinking water that is reliably compliant with the Safe Drinking Water Act ("SDWA") to the City's residents.

2.  During the week of August 29, 2022, multiple raw water intake pumps failed at one of the City's two surface water treatment plants, impacting its ability to produce adequate quantities of water and causing a catastrophic loss of pressure in the distribution system.  As a result of this pressure drop, many residents had no running water and thus lost the ability to use water for basic safety and hygiene purposes such as washing hands, showering, flushing toilets, fighting fires, and washing dishes.  During this period of low pressure, affected residents were dependent

on bottled water and other alternative water sources supplied by the City and state and federal agencies or procured elsewhere.

3.   Even beyond this event and continuing through the present, contaminants are in or are likely to enter the City's public water system that may present an imminent and substantial endangerment within the meaning of the SDWA.  The City has also violated various specific requirements of the SDWA and administrative orders issued by EPA concerning the City's public water system.

4.   This action thus requests relief under Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, including to require the City to:

  a.   perform corrective measures to protect the health of residents and consumers served by the City's public drinking water system;

  b.   achieve and maintain compliance with the SDWA, 42 U.S.C. § 300f *et seq.*, the National Primary Drinking Water Regulations, 40 C.F.R. Part 141, and the Mississippi Primary Drinking Water Regulations, promulgated pursuant to the Mississippi Safe Drinking Water Act of 1997, Miss. Code Ann § 41-26-1 *et seq.*; and

  c.   achieve and maintain compliance with administrative orders issued under the SDWA by EPA on April 2, 2020 (Emergency Administrative Order, Docket No. SDWA-04-2020-2300), as amended by Docket No. SDWA-04-2020-2300, and July 1, 2021 (Administrative Compliance Order on Consent, Docket No. SDWA-04-2020-2301) (collectively the "EPA Orders").

5.   Authority to bring this action is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519 and by 42 U.S.C. §§ 300g-3 and 300i.

2

## JURISDICTION AND VENUE

6.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§§ 1331, 1345, and 1355, and under 42 U.S.C. §§ 300g-3 and 300i.

7.   Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1395(a) and

under 42 U.S.C. §§ 300g-3(b) and 300i(b) because the events giving rise to the claims in this

action arose within this judicial district.

## STATUTORY AND REGULATORY FRAMEWORK

### EPA's Powers to Address Imminent and Substantial Endangerment to Health

8.   Under Section 1431 of the SDWA, EPA is authorized to commence a civil action and to

issue an administrative order when it receives information that a contaminant "is present in or is

likely to enter a public water system or an underground source of drinking water . . . which may

present an imminent and substantial endangerment to the health of persons," and where the

"appropriate State and local authorities have not acted to protect the health of such persons."  42

U.S.C. § 300i(a).

### National Primary Drinking Water Regulations and
### Mississippi Primary Drinking Water Regulations

9.   The SDWA was enacted to ensure that public water supply systems meet minimum

national standards for the protection of public health.  Under the authority of Section 1412 of the

SDWA, 42 U.S.C. § 300g-1, EPA has promulgated National Primary Drinking Water

Regulations ("National Regulations") at 40 C.F.R. Part 141 to establish contaminant limitations,

monitoring requirements, public notification requirements, and other requirements for regulated

drinking water systems.

10. The National Regulations apply to all public water systems, unless exempted under the

SDWA.  The SDWA and National Regulations define the term "public water system" as "a

3

system for the provision to the public of water for human consumption through pipes or . . . other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals."  42 U.S.C. § 300f(4); 40 C.F.R. § 141.2.  The term includes "any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system."  42 U.S.C. § 300f(4); 40 C.F.R. § 141.2.

11. Mississippi enacted the Mississippi Safe Drinking Water Act of 1997 ("Mississippi SDWA") at Miss. Code Ann. § 41-26-1 *et seq*.  Under the authority of this statute, *see* Miss. Code Ann. § 41-26-5, Mississippi has promulgated Mississippi Primary Drinking Water Regulations ("State Regulations"), codified at Miss. Admin. Code § 15-20-72.

12. A public water system is classified as either a "community water system" or a "noncommunity water system."  A community water system is a public water system that (a) serves at least 15 service connections used by year-round residents of the area served by the system or (b) regularly serves at least 25 year-round residents.  42 U.S.C. § 300f(15); 40 C.F.R. § 141.2; Miss. Code Ann. § 41-26-3(c); Miss. Admin. Code § 15-20-72-2.2.2.4.

13. A public water system that is a community water system must comply with the requirements of the National Regulations and the State Regulations.  40 C.F.R. § 141.1; 40 C.F.R. Part 141 *passim* (imposing requirements on community water systems); Miss. Code Ann. § 41-26-5(2)(a); Miss. Admin Code § 15-20-72-1.1.4.

14. Any person who owns or operates a public water system is a "supplier of water."  42 U.S.C. § 300f(5); 40 C.F.R. § 141.2; Miss. Code Ann. § 41-26-3(s) ("supplier of water" means any person who owns or controls a public water system).

15. A supplier of water must comply with the National Regulations and the State Regulations.  40 C.F.R. Part 141 *passim* (imposing requirements on suppliers of water); Miss. Code Ann. § 41-26-15(b); Miss. Admin. Code § 15-20-72 *passim* (same).

16. Under the State Regulations, a Class A system is a system "with surface water treatment, groundwater under the direct influence of surface water, lime softening, or coagulation and filtration for the removal of constituents other than iron or manganese."  Miss. Admin. Code § 15-20-72.2.2.1(5).  "A certified class A operator shall be onsite whenever the treatment plant for a Class A public water system treating surface water is in operation.  The certified operator in responsible charge shall be available twenty-four (24) hours per day to address system needs and problems as they occur."  *Id.*; *see also* Miss. Admin. Code. § 15-20-72.1.1.6.11 (compelling compliance with same requirement in Mississippi State Department of Health Public Water Supply Operations Manual).

### Enforcement of the SDWA

17. Section 1413 of the SDWA, 42 U.S.C. § 300g-2, provides that "a State has primary enforcement responsibility for public water systems during any period for which the [EPA] Administrator determines . . . that such State" has met various requirements, including "adopt[ing] drinking water regulations that are no less stringent than the national primary drinking water regulations," "implementing adequate procedures for the enforcement of such State regulations," and keeping such records and reports "as the Administrator may require by regulation."  42 U.S.C. § 300g-2(a).

18. Under SDWA Section 1413 and the Mississippi SDWA, the State of Mississippi (the "State") has "primacy," meaning it has primary enforcement responsibility for public water systems in Mississippi.  Under the Mississippi SDWA, the State Health Officer or the Health

Officer's designee holds the authority to "exercise general supervision over the administration and enforcement of this chapter and applicable rules and regulations," "enforce the laws, rules and regulations governing safe drinking water," and "perform all acts necessary to carry out this chapter or the federal [SDWA]."  26 Miss. Code Ann. § 41-26-7(1)(a), (h), and (k) (describing the powers and duties of the "director"); *see also* 26 Miss. Code Ann. § 41-26-3(h) (defining "director").

19. The Mississippi State Department of Health ("MSDH") is the primacy agency, meaning the state agency with primary enforcement authority under the SDWA.

20. SDWA Section 1414 authorizes EPA to issue administrative orders and bring civil actions under certain circumstances, independent of EPA's emergency powers under SDWA Section 1431 to address an imminent and substantial endangerment.

21. When the EPA Administrator finds that a public water system does not comply with any "applicable requirement" or with any schedule or other requirement imposed thereto during a period in which the state has primary enforcement authority, the EPA Administrator shall issue an administrative order under Section 1414(g) or commence a civil action under Section 1414(b) of the SDWA.  42 U.S.C. § 300g-3(a)(1).

22. Under SDWA Section 1414(b), 42 U.S.C. § 300g-3(b), the EPA Administrator may bring a civil action in the appropriate district court to require compliance with any "applicable requirement" and with any administrative order issued under Section 1414(g) if authorized under Section 1414(a) or if requested by the state primacy agency or the state's chief executive officer.

23. Under SDWA Section 1414(i), 42 U.S.C. § 300g-3(i), "applicable requirement" means:

    a.  any requirement of SDWA Sections 1412 (National Regulations),

        1414 (enforcement of drinking water regulations), 1415 (variances),

1416 (exemptions), 1417 (prohibition on use of lead pipes, solder and flux),

1433 (community water system risk and resilience), 1441 (assurances of

availability of adequate supplies of chemicals necessary for treatment of

water), and 1445 (records and inspections);

b.   any regulation promulgated under the sections cited above;

c.   any schedule or requirement imposed pursuant to a section cited above; and

d.   any requirement of, or permit issued under, an applicable State program for

which the EPA has made a determination that the requirements of Section

1413 of the SDWA have been satisfied, or an applicable State program

approved under Section 1414.

24. The court may enter "such judgment as protection of public health may require, taking

into consideration the time necessary to comply and the availability of alternative water

supplies." 42 U.S.C. § 300g-3(b).  The court may impose a civil penalty for each violation under

Section 1414.  *Id.*  The court may also impose a civil penalty for each violation of an EPA

administrative order issued under SDWA Section 1431(a)(1).  42 U.S.C. § 300i(b).

## FACTUAL BACKGROUND

### The City's Drinking Water System

25. The City's public drinking water system (referred to herein as the "System") consists of a

surface water system identified as Public Water System No. MS0250008, a groundwater system

identified as Public Water System No. MS0250012, and appurtenant treatment, storage, and

distribution facilities.

7

26. The System includes but is not limited to two surface water treatment plants—O.B. Curtis Water Treatment Plant ("O.B. Curtis") and J.H. Fewell Water Treatment Plant ("J.H. Fewell")—a series of elevated storage tanks, and a series of distribution pipes or "lines."

27. The City, through its Department of Public Works, operates and maintains the System.

28. O.B. Curtis is located at 100 O.B. Curtis Drive, Ridgeland, Madison County, Mississippi.

29. J.H. Fewell is located at 2302 Laurel Street, Jackson, Hinds County, Mississippi.

30. The System's surface water system serves drinking water to approximately 143,445 people and has approximately 71,486 service connections.

31. The System's groundwater system serves drinking water to approximately 16,555 people and has approximately 5,762 service connections.

32. Therefore, in total, the System serves drinking water to approximately 160,000 people and has approximately 77,248 service connections.

33. The surface water sources of the System are the Ross Barnett Reservoir, which serves O.B. Curtis, and the Pearl River, which serves J.H. Fewell.

34. O.B. Curtis uses both conventional filtration and membrane filtration in parallel tracks to treat water.  J.H. Fewell uses conventional filtration to treat water.

35. Conventional filtration treatment is "a series of processes including coagulation, flocculation, sedimentation, and filtration resulting in substantial particulate removal."  40 C.F.R. § 141.2.

36. Membrane filtration is a pressure- or vacuum-driven separation process in which particulate matter larger than 1 micrometer is rejected by an engineered barrier, primarily through a size-exclusion mechanism, and which has a measurable removal efficiency of a target organism that can be verified through the application of a direct integrity test.  40 C.F.R. § 141.2.

8

Membrane filtration includes microfiltration, ultrafiltration, nanofiltration, and reverse osmosis. *Id.*

37. Both treatment plants' filtration systems utilize UV disinfection treatment on each individual effluent flow to inactivate pathogens, such as viruses, *Cryptosporidium*, and *Giardia*. Finished water at both plants are also disinfected using chloramines.  The treated water is then pumped to storage tanks.

38. Sufficient volumes of water are required to create enough pressure within the distribution system.  When adequate water pressure is maintained in the System, the pressure exerted from within the distribution lines keeps contaminants outside the lines from entering into the System. If a plant cannot produce sufficient amounts of treated water to fill the tanks, then the System's pressure may be low.

39. When inadequate or low water pressure is present in the System, negative pressure may pull water from outside a distribution line to inside the distribution line through cracks, breaks, or joints in the distribution lines that are common in all drinking water systems.  This phenomenon is sometimes referred to as "back siphonage."  Back siphonage can introduce contaminants into treated, potable water inside the lines downstream of the water treatment plant, before the water is delivered to users.

**Problems with the System and EPA Enforcement Efforts**

<u>Line Breaks and Boil Water Notices</u>

40. The System experienced over 7,300 distribution line breaks from 2017 through 2021. These line breaks occurred at an average annual rate of 55 breaks per 100 miles of line per year. By comparison, one industry benchmark goal is no more than 15 breaks per 100 miles of line per year.  The number of annual reported line breaks from 2017 to 2021 is as follows:

| Year | Line breaks |
|------|------------:|
| 2017 | 1627 |
| 2018 | 2085 |
| 2019 | 1226 |
| 2020 | 962 |
| 2021 | 1421 |
| **Total** | **7321** |

While these line breaks occurred in every zone of the City, a spatial analysis of water line breaks conducted by EPA showed distinct areas within the City distribution systems with a high number of breaks, including the North Jackson and Seneca Street areas.  These areas correspond to locations where small-diameter, pre-1910 cast iron pipe is still in use.  These lines are susceptible to breakage due to their age and likelihood of corrosion.

41. Controlling for corrosion is critical for lines that are susceptible to breakage and for lines, connectors, or pipe fittings that may contain lead.

42. Since May 1, 2020, more than 320 boil-water notices ("BWNs") have been issued for the System.  Attachment A to this Complaint provides a detailed summary of the BWNs issued for the System in 2020, 2021, and 2022.

43. For just the surface water portion of the System, which relies on treated water from O.B. Curtis and J.H. Fewell, nearly 280 BWNs were issued between May 1, 2020, and October 21, 2022.  Based on the City's data, the City deemed 80 of these surface water BWNs "system wide."  Below is an overview of the surface water BWNs by year:

| Time Period | Number of Surface Water BWNs | Average Number of Days to Lift | Number of Surface Water Systemwide BWNs | Percentage of Surface Water BWNs Attributable to Low- or Loss-of-Pressure Events |
|---|---|---|---|---|
| 2020 (May 1 to Dec. 31) | 83 | 3.1 | 0 | 98.8% |
| 2021 (Jan. 1 to Dec. 31) | 108 | 3.6 | 78 | 96.3% |
| 2022 (Jan. 1 to Oct. 21) | 88 | 3.9 | 2 | 97.7% |
| **OVERALL** | **279** | **3.6** | **80** | **97.6%** |

44. Either the City or MSDH may issue a BWN.  Circumstances necessitating a BWN can include loss of pressure in the distribution system caused by distribution line breaks, decreased water pressures at the entry point to the distribution system, or planned service outages.  In addition, BWNs can be issued as a result of water treatment failures leading to the potential for microbial contamination in the distribution system.

45. In Mississippi, MSDH may issue an immediate state-imposed BWN in certain circumstances, including (1) when a water system loses pressure or is compromised, there is a significant probability that contamination can or will enter the system, and the operator of the system has not issued an alert or (2) a catastrophic event or natural disaster occurs.  *See* MSDH, Guidelines for Issuing a Boil-Water Notice (Dec. 1, 2016), *available at* https://msdh.ms.gov/ msdhsite/_static/resources/3850.pdf (accessed Sept. 15, 2022).

46. Low pressure and loss of pressure in a drinking water distribution system may cause back siphonage, as described above, which may introduce contaminants, including but not limited to total coliform bacteria and other bacteria, parasites, viruses, or pathogens, to the System.

47. Total coliforms are a group of related bacteria, some of which are harmful to humans.

11

48. EPA considers total coliforms an indicator of the presence of other pathogens in a drinking water system, and their presence is used to determine the adequacy of water treatment and the integrity of a distribution system. *See* Final Rule: National Primary Drinking Water Regulations: Revisions to the Total Coliform Rule, 78 Fed. Reg. 10,270, 10,271 (Feb. 13, 2013).

49. Among the pathogens that may be indicated by the presence of total coliforms are fecal contamination (*E. coli*) and waterborne pathogens (including *Cryptosporidium*, *Giardia*, *Legionella*, and certain viruses), all of which can cause diarrhea, abdominal discomfort, nausea, vomiting, cramps, headaches, or other symptoms, if ingested.  Other more severe illnesses that can be caused by exposure to such pathogens include hemolytic uremic syndrome (kidney failure), hepatitis, and bloody diarrhea.  Infection by a waterborne pathogen can also result in chronic conditions such as irritable bowel syndrome, renal impairment, hypertension, cardiovascular disease, and reactive arthritis.

50. Pathogens may pose a greater health risk for infants, young children, the elderly, and people with severely compromised immune systems.

51. Turbidity is a measure of the cloudiness or opaqueness of water and is used to indicate water quality and filtration effectiveness.  Turbidity in water may indicate the presence of pathogens because particles of matter can interfere with disinfection of water and provide a medium for microbial growth.  High levels of turbidity indicate the increased likelihood that drinking water may contain disease-causing organisms, such as total coliforms (including *E. coli*), *Cryptosporidium*, *Giardia*, *Legionella*, and other viruses, pathogens, or bacteria.

52. The National Regulations recommend that systems conduct "[p]roper maintenance of the distribution system including appropriate pipe replacement and repair procedures, main flushing programs, proper operation and maintenance of storage tanks and reservoirs, cross connection

control, and continual maintenance of positive water pressure in all parts of the distribution system." 40 C.F.R. § 141.63(e)(3). Among other things, failure to heed these treatment techniques can result in the presence of potentially harmful bacteria, indicated by total coliform sampling.

53. The ability of the System to reliably maintain positive water pressure depends largely on the City's ability to timely complete necessary repairs and routine maintenance at O.B. Curtis and J.H. Fewell so that the plants produce adequate volumes of treated water.

54. The City has deferred critical repairs and maintenance at O.B. Curtis and J.H. Fewell and in the distribution system, impairing the System's ability to maintain sufficient pressure.

<u>Timeline of Recent Events and Compliance Efforts</u>

55. At the request of EPA Region 4 and as part of EPA's National Compliance Initiative to Reduce Noncompliance with Drinking Water Standards at Community Water Systems, EPA's National Enforcement Investigations Center conducted a SDWA compliance inspection of the System on February 3-7, 2020. EPA's investigation report was provided to the City on March 30, 2020. Among other observations, EPA's inspectors noted operator staffing shortages and operation and maintenance issues at O.B. Curtis, J.H. Fewell, and the groundwater system. EPA's inspectors also noted turbidity exceedances at O.B. Curtis and J.H. Fewell reported by the City in January and February 2020.

*The Emergency Order*

56. Based on EPA's observations during the February 2020 inspection and documents provided by the City—including evidence of turbidity exceedances, concerns regarding the disinfection treatment of the water, and the condition of the distribution system—EPA issued an Emergency Administrative Order ("Emergency Order") to the City under Section 1431, 42

13

U.S.C. § 300i, of the SDWA effective April 2, 2020 (Emergency Administrative Order, Docket No. SDWA-04-2020-2300).  In the Emergency Order, EPA determined that existing conditions in the System presented an imminent and substantial endangerment to persons served by the System, giving rise to the potential presence of, *inter alia*, *E. Coli*, *Cryptosporidium*, and *Giardia* in the drinking water.  The Emergency Order is attached to this Complaint as Attachment B.

57. Based on information provided by the City, information collected during EPA's February 2020 inspection, information provided by MSDH and the City, and information reported in EPA's Safe Drinking Water Information System database, EPA determined that the System was noncompliant with the SDWA, the National Regulations, and the State Regulations.  During an April 28, 2020, meeting between EPA and the City held pursuant to the Emergency Order, EPA provided the City with notice of and an opportunity to discuss the violations.  On May 11, 2020, EPA issued a Notice of Noncompliance to the City under Section 1414(a)(1)(A) of the SDWA, 42 U.S.C. § 300g-3(a)(1)(A), for the violations, which included the City's failure to have a Class A certified operator onsite at the System's treatment plants at all times.

58. During the April 28, 2020, meeting between EPA and the City, the City requested clarification regarding the implementation of the Alternative Water Source Plan required under the Emergency Order.  Following the meeting, EPA issued an amendment to the Emergency Order on May 28, 2020, replacing a paragraph of the Order with the text contained in the amendment.  The amendment is attached to this Complaint as Attachment C.

59. Under the Emergency Order, as amended, EPA required the City to take actions to address the imminent and substantial endangerment and communicate regularly with EPA, including *inter alia*:

a.  provide alternative water supplies to residents following specified triggering events;

b.  develop a Comprehensive Equipment Repair Plan ("CERP") addressing the repair and/or replacement of monitoring equipment and the maintenance of appurtenant treatment equipment;

c.  address concerns about disinfection and pH treatment of the water;

d.  immediately repair line breaks or any cause of low pressure/loss of pressure;

e.  take additional coliform bacteria samples in certain circumstances, such as when a line breaks or when another low-pressure or loss-of-pressure event likely to cause contamination in the System's distribution system occurs;

f.  submit weekly updates to EPA on the City's progress complying with the Emergency Order and submit operating report entries on a weekly basis; and

g.  meet biweekly with EPA and MSDH.

60. In April 2020, EPA, MSDH, and the City began meeting biweekly to discuss the City's compliance with the Emergency Order, including the City's development of the CERP. Attendees typically included at least EPA Region 4's Drinking Water Enforcement Section Chief; MSDH's Director of the Bureau of Public Water Supply; the City's Public Works Director, Deputy Director of Water Operations, and Class A-certified operators; and legal and technical staff.  The City timely submitted an Alternative Water Source Plan for EPA's review and approval.

61. In May 2020, EPA and the City began negotiations to resolve the City's SDWA violations through an administrative settlement agreement.  The City timely submitted to EPA

15

the CERP required by the Emergency Order, and EPA approved an Alternative Water Source Plan that the City had revised in response to EPA's comments.

62. In December 2020, the City submitted to EPA an updated CERP, and EPA and the City continued meeting regularly to negotiate an administrative settlement agreement.

63. In early February 2021, the City submitted to EPA another updated CERP.

64. In mid-February 2021, back-to-back winter storms impacted the System, with freezing temperatures causing line breaks and equipment failure due to lack of pressure.  As a result, a surface water systemwide BWN was in effect from February 16 through March 17, 2021; a groundwater systemwide BWN was in effect from February 18 through March 10, 2021; and tens of thousands of the City's customers (primarily in West and South Jackson) were left without running potable water for several weeks.

65. Based on a March 31, 2021, public notice issued by the City informing the public of violations of drinking water standards and requirements, EPA found that the System was noncompliant with the SDWA, the National Regulations, and the State regulations.  Specifically, the System exceeded the maximum contaminant level for HAA5 (a group of five haloacetic acids that are a type of chlorine disinfection byproduct) in the 4th Quarter of 2020 and the 1st Quarter of 2021, and the City had failed to install optimal corrosion control treatment at J.H. Fewell by MSDH's deadline of May 31, 2019.  The City did complete installing optimal corrosion control treatment at O.B. Curtis.  On April 27, 2021, EPA issued a second Notice of Noncompliance to the City under Section 1414(a)(1)(A) of the SDWA, 42 U.S.C. § 300g-3(a)(1)(A), for the violations.

66. On April 30, 2021, an electrical fire damaged the electrical panel at O.B. Curtis running all five of the plant's high-service pump lines, rendering the pumps inoperable.  The loss of the

pumps caused multiple elevated tanks to be low or empty and caused certain areas of the distribution system to have sustained low pressure.  As a result, the City issued a surface water systemwide BWN on April 30, 2021 that lasted through May 3, 2021.

67. On May 4, 2021, the Federal Emergency Management Agency approved a Major Emergency Declaration for Mississippi, including portions of Jackson in Hinds County, for the impacts from the winter storms.

*The Consent Order*

68. Throughout 2021, EPA and the City continued negotiating an administrative settlement agreement, culminating in the EPA and the City entering into an Administrative Compliance Order on Consent ("Consent Order") under Section 1414(g) of the SDWA, 42 U.S.C. § 300g-3(g), effective July 1, 2021 (Docket No. SDWA-04-2020-2301).  The Consent Order is attached to this Complaint as Attachment D.

69. Under the Consent Order, the City agreed to *inter alia*:

    a.  provide EPA with a Comprehensive Staffing Plan within 30 days (i.e., by July 31, 2021) that identified "how [the City] will ensure that a Class A operator is onsite [at O.B. Curtis and J.H. Fewell] at all times, including any backup plans in case staff are unavailable," Consent Order ¶ 39; and

    b.  implement the tasks described in the City's Comprehensive Equipment Repair Plan as approved by EPA and attached as Appendix A to the Consent Order in accordance with the schedules of implementation therein, *id.* ¶ 40, including:

        i.  hiring two new operators for O.B. Curtis who would both be eligible for licensure and would complete the Class A operator test within

17

seven months (i.e., by February 1, 2022), *see* Comprehensive
Equipment Repair Plan, task nos. 2 and 3;

    ii.   within 60 days, developing a scope of work with timeframes for
returning the filters at J.H. Fewell to fully operational and functional
status, *see id.*, task no. 6; and

    iii.  repairing and rehabilitating the conventional and membrane filtration
systems at O.B. Curtis, including completing within seven months all
repairs to the conventional filtration system so that it would be fully
functional and operational, *see id.*, task no. 13.

70. In September 2021, EPA, MSDH, and the City began meeting biweekly to discuss the
City's compliance with the Consent Order and any situational changes.  Attendees typically
included at least EPA Region 4's Drinking Water Enforcement Section Chief; MSDH's Director
of the Bureau of Public Water Supply; the City's Public Works Director, Deputy Director of
Water Operations, and Class A-certified operators; and legal and technical staff.

71. On November 8, 2021, MSDH conducted its annual sanitary survey of the System and
noted as a significant deficiency that the O.B. Curtis high-service pumps remained out of service
following the April 2021 electrical panel fire, with no target date to return the pumps to service.
*See* 40 C.F.R. § 141.2 (defining "sanitary survey" as an onsite review to evaluate the adequacy of
the water sources, facilities, equipment, operation, and maintenance of a public water system for
producing and distributing safe drinking water).  MSDH required the City to provide MSDH
with a written response identifying corrective actions and timeframes by January 14, 2022, and
that the City complete the corrective actions within 120 days of receipt of the report, i.e., no later
than April 14, 2022.

18

72. On November 13, 2021, the City shut down O.B. Curtis due to chemical feed issues with the aluminum chlorohydrate process, which then caused low water pressure and issuance of a surface water systemwide BWN that lasted from November 15 through November 19, 2021.

73. On November 15, 2021, as part of a multi-state tour to spotlight environmental justice concerns in historically marginalized communities, the EPA Administrator visited Jackson, where he *inter alia* met with the Mayor, toured O.B. Curtis, and met with administrators and students of an elementary school that was closed at the time because of low water pressure.

74. On November 23, 2021, the City Council passed pay raises for drinking water treatment plant operators and increased water utility usage rates by 20%.

75. On January 19, 2022, the Mayor and the City's Chief Financial Officer met with the EPA Administrator in Washington, D.C., to discuss *inter alia* the City's water infrastructure needs and Bipartisan Infrastructure Law funding.

76. On January 24, 2022, the EPA Administrator sent letters to the Mayor and to the Governor of Mississippi outlining EPA's prerogatives for the City's drinking water system and the State's role in assisting the City to achieve compliance.

77. On January 25, 2022, EPA issued a third Notice of Noncompliance to the City under Section 1414(a)(1)(A) of the SDWA, 42 U.S.C. § 300g-3(a)(1)(A).  EPA found that the System was noncompliant with the SDWA, the National Regulations, and the State regulations because the City had yet to repair or replace the electrical panel at O.B. Curtis to restore the pumps to service, and because the City had not provided the required written response identifying corrective actions and timeframes to do so.

78. In February 2022, EPA coordinated with the Department of Homeland Security to obtain a commitment from the manufacturer of the electrical panel to expedite delivery of a replacement panel, and in mid-April 2022, the new electrical panel was installed at O.B. Curtis.

79. During the week of March 2, 2022, EPA Region 4, EPA's Technical Support Center, EPA's contractors, and MSDH visited the City to gather information and assess the City's water distribution system.

80. On March 18, 2022, the EPA Administrator sent letters to the Mayor and to the Governor of Mississippi, noting the availability of federal infrastructure funds under the Bipartisan Infrastructure Law.

81. On April 20, 2022, a water hammer—a sudden surge of water pressure when water flow quickly changes direction or is stopped, such as when a valve suddenly closes or a pump suddenly shuts down—caused a pipe to break in the O.B. Curtis potassium permanganate room, causing the plant to shut down and the System's water pressure to fall.

82. On April 21, 2022, during a regular biweekly meeting among the City, MSDH, and EPA, the City estimated vacancies for five operators and at least a half-dozen maintenance workers across both plants.  The City's timesheets indicated that two operator supervisors at both plants were working a combined average of 128 hours per week.

83. In late June 2022, the City began having difficulty producing water from O.B. Curtis because of equipment failures and inadequate maintenance related to the membrane filters, and the System became unable to fill elevated storage tanks throughout the System, thereby lowering water pressure.  The City issued a water conservation advisory on June 21, 2022, to customers that they should conserve the use of water.

84. On June 24, 2022, as a result of high turbidity levels and the continued water production issues at O.B. Curtis, the City issued a Systemwide BWN for all customers of both the surface water and groundwater systems.  This BWN stayed in effect for two weeks while City staff addressed production and turbidity issues.  That same day, the City began providing limited quantities of bottled water on a first-come, first-served basis.

85. On June 30, 2022, due to the ongoing high turbidity levels, MSDH issued a surface water systemwide BWN, supplementing the City's June 24, 2022 notice.

86. On July 9, 2022, with the concurrence of MSDH, the City lifted the BWN.

87. In July 2022, EPA issued the report "City of Jackson Distribution System Assessment: Summary of Findings and Assessment Team Recommendations" ("July 2022 Assessment"), stemming from the March 2022 distribution system assessment and site visit conducted by EPA Region 4, EPA's Technical Support Center, EPA's contractor, and MSDH.  Of particular relevance to the claims in this Complaint, the many issues with the System identified in the Assessment included:

    a.  The System has an extensive history of line breaks;

    b.  The City does not collect and record continuous pressure data, which could be used to identify areas in need of pressure improvements to prevent contamination in the distribution system, *id.* at 6;

    c.  The City failed to consistently meet water quality parameters for pH and alkalinity, *id.* at 10;

    d.  The City does not perform routine flushing of the distribution system, which can be utilized to reduce water age (i.e., the amount of time for water to travel from its source to the user) and optimize chlorine residuals, *id.* at 6;

e.   There were infrequent cycling of storage tanks and poor mixing performance ratios, suggesting insufficient chlorine residuals in the system, *id.* at 7, and a disruption in the chloramine process control, *id.* at 10;

f.   The monochloramine residual in the O.B. Curtis effluent was at times less than the optimization goal, *id.* at 10-11;

g.   There were considerable staffing problems, including:

   i.   the Utilities Manager position was vacant at the time of the visit, which the City explained was due to budget limitations, *id.* at 11;

   ii.   there are insufficient operators to consistently staff three shifts, seven days per week; staff are unable to take time off without forcing remaining staff to work extra hours; supervisors are working shifts in addition to their managerial responsibilities; and distribution system crews are sparsely staffed and are unable to conduct preventive maintenance, *id.* at 12;

   iii.   operator turnover is high, and operators indicated instances of working up to 75 hours per week without receiving overtime pay, *id.*; and

   iv.   the utility does not have adequate plant and distribution system staff to perform preventative maintenance that could reduce overall operational costs of the system, *id.*; and

h.   Various water billing and metering issues persist and contribute to the City's loss of water-billing revenue (32 percent decrease since 2016) and loss of large customers (i.e., hospitals and local schools), *id.* at 12-13.

22

88. On July 29, 2022, MSDH issued a surface water systemwide BWN.  The next day, the City issued its own surface water systemwide BWN.  According to MSDH's notice,

> [w]ater samples collected 7/28/2022 showed turbidity levels of 1.0 to 2.5 turbidity units.  This is above the standard of 0.30 turbidity units.  Due to these high levels of turbidity, there is an increased chance that the water may contain disease-causing organisms. . . . Turbidity has no health effects.  However, turbidity can interfere with disinfection and provide a medium for microbial growth.  Turbidity may indicate the presence of disease-causing organisms.  These organisms include bacteria, viruses, and parasites, which can cause symptoms such as nausea, cramps, diarrhea, and associated headaches.

89. Since EPA's initial inspection of the City's public drinking water system in February 2020, EPA has communicated regularly with the City to enforce SDWA compliance and provided assistance, including providing ongoing assistance from EPA's Compliance Advisor program; providing financial technical assistance and analysis from EPA's contractor; requesting documents and further information; and holding meetings between EPA and the City, including between EPA Region 4's Enforcement and Compliance Assurance Division Director and the Mayor.

### Complete Loss of Water Use in August and September 2022

90. During the week of August 8, 2022, multiple raw water intake pumps failed at O.B. Curtis, impacting its ability to produce adequate quantities of water and causing a loss of pressure in the distribution system.  In mid- to late August 2022, the City experienced record rainfalls, resulting in what has been reported as the second wettest August on record for the City of Jackson.  Flooding exacerbated the pre-existing problems at O.B. Curtis by disturbing the water treatment process, clogging the filters, and preventing O.B. Curtis from producing potable water that could fill storage tanks and establish adequate water pressure in the distribution system.  As a result of the decreased water pressure, many System users had no running water

and thus lost the ability to use water for basic safety and hygiene purposes such as washing hands, showering, flushing toilets, fighting fires, and washing dishes.

91. During the period of low pressure, many System users were dependent on alternative water sources supplied by the City and State and federal agencies or procured from other sources.

92. On August 29, 2022, the Mayor signed a Mayoral Proclamation of Local Emergency under Section 33-15-17(d) of the Mississippi Code of 1972, as amended, which defines an emergency as "any occurrence, or threat thereof, whether natural, technological, or man-made, in war or in peace, which results or may result in substantial injury or harm to the population or substantial damage to or loss of property," Miss. Code Ann. § 33-15-5(h).

93. In proclaiming the existence of a local emergency, the Mayoral Proclamation referenced *inter alia* the March 27, 2020, SDWA Emergency Administrative Order and the July 1, 2021, SDWA Administrative Order on Consent.

94. On August 30, 2022, the Mississippi Governor issued Executive Order No. 1564 proclaiming under the State Constitution and Section 33-15-11(b)(17) of the Mississippi Code that "a State of Emergency exists in the City of Jackson, Mississippi and the surrounding areas of Hinds County that receive water from [O.B. Curtis] as a result of the total or near total loss of water pressure throughout that area" and ordering the deployment of the Mississippi National Guard to further response and recovery efforts.

95. On August 30, 2022, the President of the United States declared that an emergency exists in the State of Mississippi and ordered Federal assistance to supplement the State's response efforts due to the emergency conditions resulting from the water crisis.  The President's action authorized the Federal Emergency Management Agency (FEMA) to coordinate all disaster relief

efforts which have the purpose of alleviating the hardship and suffering caused by the emergency on the local population, and to provide appropriate assistance for required emergency measures to save lives and to protect property and public health and safety, and to lessen or avert the threat of a catastrophe in Hinds County.

96. FEMA, EPA, and the United States Army Corps of Engineers have deployed to Jackson emergency responders, drinking water infrastructure experts, and others to respond to the emergency situation on the ground.

97. The State of Mississippi has taken various actions to address the existing emergency circumstances, including issuing an emergency order from MSDH (the "MSDH Emergency Order") to the City on August 30, 2022.  By its terms, the MSDH Emergency Order is in effect for not more than 120 days (i.e., no later than December 28, 2022), subject to 30-day extensions by the State Health Officer.

98. Among other things, the MSDH Emergency Order provides:

> Notwithstanding the requirements of this Order, the City of Jackson shall continue to be responsible for compliance with the Safe Drinking Water Act [and] any U.S. EPA Emergency Administrative Orders . . . .  Compliance with this Order shall not in any way be construed to relieve the City of Jackson from its obligations to comply with all provisions of federal, state, or local law.

99. Pursuant to the emergency declarations, a Unified Command consisting of representatives from the Mississippi Emergency Management Agency, MSDH, the City, EPA, FEMA, and the U.S. Army Corps of Engineers have taken a number of actions to restore and sustain water service to the City's customers, including but not limited to:

> a.   reestablishing raw water flow at both plants;
>
> b.   restoring water tank levels and produced water volumes from both plants;

  c. integrating temporary operators from other states to assist within plant operations;

  d. granting provisional Class A licenses to two previously-licensed water operators at O.B. Curtis;

  e. repairing or procuring critical treatment equipment;

  f. increasing the facility maintenance capabilities at both plants in the short-term through use of mechanics, instrument technicians, electricians, and other workers from other states;

  g. engineering and developing a liquid soda-ash feed system for corrosion control treatment at O.B. Curtis;

  h. sourcing parts for both plants; and

  i. evaluating the winterization needs of the System.

100. On or about September 6, 2022, water pressure within the System and water service to System users was restored.

101. The July 29, 2022, BWN remained in effect until September 15, 2022.

102. Notwithstanding the actions that the State and the City have taken or will take to address the emergency situation, an imminent and substantial endangerment to the health of persons continues to exist.

103. From September 15, 2022, and through October 21, 2022, at least 16 more BWNs have been issued for various portions of the System.

104. The City has consistently experienced a shortage of certified Class A operators, maintenance personnel, and other key System personnel who can operate and maintain the System.

105. While System operations are currently being supplemented by contractors working under emergency, short-term contracts, this is not a long-term solution to the City's regulatory requirement to have a certified Class A operator onsite whenever O.B. Curtis and J.H. Fewell are in operation.  *See* Miss. Admin. Code § 15-20-72.2.2.1(5).

106. The emergency response does not address all of the repairs and rehabilitation needed for O.B. Curtis and J.H. Fewell to ensure long-term compliance with the SDWA, including but not limited to full repair of the O.B. Curtis conventional and membrane filters.

107. The emergency response does not address all of the repairs and rehabilitation needed for the distribution system, which requires *inter alia* repairing or replacing failing lines, developing a standard operating procedure for exercising valves and hydrants, conducting continuous pressure monitoring in the distribution system to characterize pressure loss issues, and developing and implementing a flushing program to improve water quality.

108. The emergency response is not designed to address the City's financial and technical capacity shortfalls that have long hindered the City's ability to operate the System in compliance with the law and in a manner that ensures a reliable source of drinking water for System users. Absent appropriate relief, the City will continue to experience these shortfalls and the System's users remain at risk of losing water access and dealing with boil-water notices during severe weather events and during System failures.

109. As the Mayor stated when appearing on "Amanpour & Co." on September 6, 2022:

> Until we have significant funding to deal with the challenges for the three decades' long of neglect and lack of investment in our water treatment facility, it's not a matter of if, but it's a matter of when these systems will fail again.

110. As the Mayor further stated when appearing on "Face the Nation" on September 11, 2022:

They [residents] have yet to have the boil water notice lifted, and so there are still concerns around the consumption of that water.

Right now, as many repairs and adjustments are taking place in the triage period of where we are at the water treatment facility.  There's also investigatory sampling taking place.  And so we believe that it's a matter of days, not weeks, before that boil water notice can be lifted.

But I would note this, that we have been here before, where we've been [able] to restore pressure.  We've been able to lift boil water notices.  But without the significant capital improvements to take place, it still is a matter of [when, not if] these things will happen again.

111. Therefore, while significant, the actions taken pursuant to the emergency response will not provide long-term, sustainable solutions to the City's drinking water system to a degree that will reliably protect the health of persons served by the System.

## GENERAL ALLEGATIONS

112. The City owns and operates the System.

113. The City is a "person" within the meaning of the SDWA, Mississippi SDWA, National Regulations, and State Regulations because it is a municipality.  *See* 42 U.S.C. § 300f(12); 40 C.F.R. § 141.2; Miss. Code Ann. § 41-26-3(p); Miss. Admin. Code § 15-20-72-2.1.2.11.

114. The System's surface water system and groundwater system are each a "public water system" and a "community water system" within the meaning of the SDWA, Mississippi SDWA, National Regulations, and State Regulations because they each regularly serve at least 25 year-round residents.  42 U.S.C. § 300f(15); 40 C.F.R. § 141.2; Miss. Code Ann. §§ 41-26-3(c) and (q); Miss. Admin. Code §§ 15-20-72-1.1.2.10 and 15-20-72.-2.1.2.4.

115. As public water systems that are community water systems, the System's surface water system and groundwater system are each subject to the requirements of the National Regulations and the State Regulations.  40 C.F.R. § 141.1; 40 C.F.R. Part 141 *passim* (imposing requirements

on community water systems); Miss. Code Ann. § 41-26-5(2)(a); Miss. Admin Code § 15-20-72-1.1.4.

116. The City is a "supplier of water" within the meaning of the SDWA, Mississippi SDWA, National Regulations, and State Regulations because it owns and operates a public water system. *See* 42 U.S.C. § 300f(5); 40 C.F.R. § 141.2; Miss. Code Ann. § 41-26-3(s) ("supplier of water" means any person who owns or controls a public water system).

117. As a supplier of water, the City must comply with the National Regulations and the State Regulations.  40 C.F.R. Part 141 *passim* (imposing requirements on suppliers of water); Miss. Code Ann. § 41-26-15(b); Miss. Admin. Code § 15-20-72 *passim* (same).

118. The System's surface water system is a Class A system because it is a system with surface water treatment, groundwater under the direct influence of surface water, lime softening, or coagulation and filtration for the removal of constituents other than iron or manganese.  *See* Miss. Admin. Code § 15-20-72.2.2.1(5).

119. Sediment or other matter causing significant cloudiness in water, or high turbidity, is a "contaminant" within the meaning of the SDWA because it is a physical substance or matter in water.  *See* 42 U.S.C. § 300f(6).

120. HAA5 is a "contaminant" within the meaning of the SDWA because it is a chemical substance or matter in water.  *See* 42 U.S.C. § 300f(6).

121. Coliforms, *E. Coli*, *Cryptosporidium*, *Giardia*, *Legionella*, and viruses, pathogens, and bacteria are "contaminants" within the meaning of the SDWA because they are biological substances or matter in water.  *See* 42 U.S.C. § 300f(6).

122. EPA is authorized to bring this civil action because on February 28, 2020, MSDH requested that EPA take the lead in the SDWA enforcement process with the City.  *See* 42 U.S.C. § 300g-3(b)(2) (authorizing civil action if requested by state primacy agency).

## FIRST CLAIM FOR RELIEF

Injunctive Relief to Abate an Imminent and Substantial Endangerment to Health
(SDWA Section 1431, 42 U.S.C. § 300i)

123. Paragraphs 1 through 122 are realleged and incorporated by reference.

124. The EPA has received information that one or more contaminants, including at least sediment or other matter causing significant cloudiness in water, HAA5, coliforms, *E. Coli*, *Cryptosporidium*, *Giardia*, *Legionella*, or other viruses, pathogens, or bacteria, is present in or is likely to enter the System, which may present an imminent and substantial endangerment to the health of persons.  Such information includes:

    a.  the over 320 BWNs issued over the last two years, the vast majority which are caused by loss of pressure, as set forth in Attachment A;

    b.  the nearly seven-week surface water systemwide BWN running from July 29, 2022, through September 15, 2022;

    c.  the excessive number of line breaks in the System, which may create back siphonage capable of contaminating water in the System with contaminants outside the System;

    d.  the heightened susceptibility to breakage and corrosion of aging, pre-1910 cast iron distribution lines in the System;

    e.  the City's failure to adequately staff O.B. Curtis and J.H. Fewell with certified Class A operators;

f.  the City's failure to maintain equipment to ensure appropriate operation and maintenance of O.B. Curtis, J.H Fewell, and the distribution system;

g.  the City's failure to perform routine flushing of the distribution system;

h.  the infrequent cycling of storage tanks and poor mixing performance ratios;

i.  the frequent failures to maintain appropriate pH parameters as a corrosion control method;

j.  the failure of the System that began in August 2022 resulting in local, State, and federal emergency declarations and the loss of running water for many of the System's users for over a week;

k.  the City's recurring failures to implement an Alternative Water Source Plan following specified triggering events;

l.  the City's failure to comply with the Emergency Order; and

m.  the City's failure to comply with the Consent Order.

125. EPA has consulted with the State and local authorities to confirm the correctness of the information that contaminants are present in or are likely to enter the System, and to ascertain the actions that such authorities are or will be taking.

126. State and local actions have been insufficient to prevent the threat of additional failures in the System. *See* 42 U.S.C. § 300i(a) (allowing Section 1431 claims when, *inter alia*, state and local authorities have "not acted" in a manner that "protect[s] the health of persons"). Such failures are likely to continue to occur, whether under normal working conditions or in extreme weather events.

127. Under Section 1431(a) of the SDWA, 42 U.S.C. § 300i(a), the United States seeks an injunction to abate the imminent and substantial endangerment, including such relief as the Court

deems necessary to ensure the permanent and reliable provision of water, in compliance with the SDWA, to the System's customers.

## SECOND CLAIM FOR RELIEF

Failure to Staff O.B. Curtis and J.H. Fewell with Class A Operators at All Times
(SDWA Section 1414, 42 U.S.C. § 300g-3; Miss. Admin. Code § 15-20-72.2.2.1(5))

128. Paragraphs 1 through 122 are realleged and incorporated by reference.

129. At both O.B. Curtis and J.H. Fewell, the City lacks sufficient certified Class A operators, necessitating unsustainable working conditions, supplemental coverage by non-operators who hold Class A licenses (e.g., a Deputy Director of Water Operations and an operations supervisor), and high turnover of operators.

130. Timesheets for just four months of operation this year show that, in at least 15 instances, J.H. Fewell did not have a certified Class A operator onsite while in operation:

| Date | Time |
| --- | --- |
| June 5-6, 2022 | 8:18 p.m. – 6:52 a.m. |
| June 6-7, 2022 | 9:19 p.m. – 7:08 a.m. |
| June 11, 2022 | 7:00 a.m. – 10:00 a.m. |
| | 2:00 p.m. – 6:56 p.m. |
| June 12-13, 2022 | 7:13 p.m. – 6:55 a.m. |
| June 17, 2022 | 4:30 p.m. – 7:04 p.m. |
| June 18, 2022 | 7:00 a.m. – 7:04 p.m. |
| June 19-20, 2022 | 7:11 p.m. – 6:53 a.m. |
| June 21, 2022 | 4:00 a.m. – 6:57 a.m. |
| June 24, 2022 | 4:59 p.m. – 7:05 p.m. |
| June 25, 2022 | 7:01 a.m. – 7:05 p.m. |
| June 26-27, 2022 | 7:00 p.m. – 6:52 a.m. |
| June 28, 2022 | 4:03 a.m. – 6:55 a.m. |
| July 1, 2022 | 4:22 p.m. – 7:00 p.m. |
| July 2, 2022 | 7:00 a.m. – 3:09 p.m. |

131. As documented in the July 2022 Assessment, the City has insufficient operators to, among other things, consistently staff three shifts a day, seven days per week.

132. On May 18, 2022, the City's then-Deputy Director of Water Operations emailed the then-Director of Public Works (cc-ing the Chief Administrative Officer and Chief Financial Officer), stating: "I worked 24 to 36 hours at OBC [O.B. Curtis] every Saturday and Sunday 7a-7p and Wednesday or Thursday night 7p-7a over six (6) months last year because of the Class A operator shortage.  At this point, I am just worn down."

133. On November 16, 2021, the City Engineer emailed the Director of Human Resources, Chief Administrative Officer, Chief Financial Officer, and the then-Director of Public Works about the "low number of current licensed water operators."  He wrote: "If we lose any additional operators at either plant a shutdown is unavoidable.  We are in an emergency crisis. We are overworking our staff due to our low numbers that [sic] putting a lot of stress and strain on them.  The lack of competitive pay is hindering our efforts to recruit new water operators."

134. In an October 27, 2021, memorandum from the City Engineer to the then-Director of Public Works, Chief Administrative Officer, Director of Human Resources, and a human resource officer titled "Recruitment and Retention Policy for Water Treatment Plants," the City Engineer stated:

> The Department of Health requires a Class A Operator on duty during all hours of operations.  We are facing a severe situation that needs to be addressed proactively. Currently, we have six class "A" licensed operators between the two plants that are in operations twenty-four (24) hours a day, 365 days a year.  Our current operators are working more than one shift and covering empty shifts due [to] the shortage of Class A operators at each plant and working more than one job just to keep up with the cost of living in Jackson that in turn puts the city's water at risk by having tired semi alert operators watching the water process.  This poses a safety hazard not only to the water process but our operators as well.

135. Thus, the City has not sufficiently staffed its System with certified Class A operators onsite at all times of operation, in violation of Miss. Admin. Code § 15-20-72.2.2.1(5).

136. Paragraph 39 of the Consent Order required the City to submit a Comprehensive Staffing Plan within 30 days of the Consent Order's effective date, i.e., no later than July 31, 2021.  The Plan was required to *inter alia* identify how the City will ensure that a Class A operator is onsite at all times, including any backup plans in case staff are unavailable.

137. The City has not provided EPA with a Comprehensive Staffing Plan, in violation of Paragraph 39 of the Consent Order.

138. Under Section 1414(b) of the SDWA, 42 U.S.C. § 300g-3(b), the United States is entitled to injunctive relief to remedy the violations and, as appropriate, civil penalties.  Unless enjoined by an order of the Court, violations of the State Regulations and the Consent Order are likely to continue and/or recur.

### THIRD CLAIM FOR RELIEF

Failures to Implement the Alternative Water Source Plan
(SDWA Section 1431, 42 U.S.C. § 300i)

139. Paragraphs 1 through 122 are realleged and incorporated by reference.

140. EPA issued the 2020 Emergency Order to the City under Section 1431(a)(1) of the SDWA, 42 U.S.C. § 300i(a)(1).

141. As required by Paragraph 39.a of the Emergency Order, the City developed and submitted an Alternative Water Source Plan ("AWSP") to EPA for review and approval.  EPA approved the City's May 21, 2020, AWSP.  Among other things required by the AWSP, alternative water "must be made available at no cost to every person served by the System, as needed for drinking, cooking, maintaining oral hygiene, and dishwashing," and the City must provide "at least one gallon per day, per person to every person served in the affected area."

34

142. Under Paragraph 39.c.ii of the Emergency Order, the City must implement the AWSP for as long as any of the daily special purpose samples required under Paragraph 37 (CFE Turbidity Exceedance Events) or Paragraph 38 (Low Pressure/Loss of Pressure Events) of the Emergency Order receives a total coliform-positive sample result.

143. During the below seven boil-water-notice events, the System had a daily special purpose sample that was total-coliform positive, yet the City did not implement its AWSP:

| Boil Water Notice ID | Reason for Boil Water Notice | Dates of Boil Water Notice |
|---|---|---|
| 10-BWN-2020 | Pressure loss due to valve replacement | August 6-11, 2020 |
| 37-BWN-2020 | Pressure loss when contractor hit main line | August 13-19, 2020 |
| 41-BWN-2020 | Pressure loss due to break on main line | August 23-25, 2020 |
| 84-BWN-2020 | Pressure loss due to line break | December 23-30, 2020 |
| 19-BWN-2021 | Pressure loss due to break on line | January 27-February 1, 2021 |
| 48-BWN-2021 | Pressure loss due to blow out on main line | June 12-17, 2021 |
| 67-BWN-2021 | Pressure loss due to malfunctioning valve | August 20-26, 2021 |

144. Thus, the City has failed to implement the AWSP when required, in violation of Paragraph 39 of the Emergency Order.

145. Under Section 1431(a) and (b) of the SDWA, 42 U.S.C. § 300i(a) and (b), the United States is entitled to injunctive relief to remedy the violations and, as appropriate, civil penalties. Unless enjoined by an order of the Court, violations of the Emergency Order are likely to recur.

## FOURTH CLAIM FOR RELIEF

Exceedances of Turbidity Limits
(SDWA Section 1414, 42 U.S.C. § 300g-3; 40 C.F.R. §§ 141.173(a)(2) and (a)(1);
Miss. Admin. Code § 15-20-72.1.7.4)

146. Paragraphs 1 through 122 are realleged and incorporated by reference.

147. Under Subpart P (Enhanced Filtration and Disinfection – Systems Serving 10,000 or More People) of the National Regulations and the implementing State Regulations, the turbidity

level of representative samples of the System's filtered water must at no time exceed 1 nephelometric unit ("NTU").  40 C.F.R. § 141.173(a)(2) (setting forth turbidity requirements for systems using conventional filtration); Miss. Admin. Code § 15-20-72.1.7.4 (requiring compliance with 40 C.F.R. § 141.173).

148. The turbidity levels of filtered water samples from the System taken between February 18-23, 2021, exceeded 1 NTU, in violation of 40 C.F.R. § 141.173(a)(2) and Miss. Admin. Code § 15-20-72.1.7.4.

149. The turbidity levels of filtered water samples from the System taken on June 27 and 28, 2022, exceeded 1 NTU—ranging as high as 7.5 NTU—in violation of 40 C.F.R. § 141.173(a)(2) and Miss. Admin. Code § 15-20-72.1.7.4.

150. The turbidity levels of filtered water samples from the System taken on July 18, 2022, exceeded 1 NTU—ranging as high as 2.5 NTU—in violation of 40 C.F.R. § 141.173(a)(2) and Miss. Admin. Code § 15-20-72.1.7.4.

151. Under Subpart P (Enhanced Filtration and Disinfection – Systems Serving 10,000 or More People) of the National Regulations and the implementing State Regulations, the turbidity level of representative samples of the System's filtered water must be less than or equal to 0.3 NTU in at least 95% of the measurements taken each month.  40 C.F.R. § 141.173(a)(1); Miss. Admin. Code § 15-20-72-1.7.4.

152. In February 2021, the System failed to meet that standard, in violation of 40 C.F.R. § 141.173(a)(1) and Miss. Admin. Code § 15-20-72-1.7.4.  Specifically:

      a.  At O.B. Curtis, only 75% of the turbidity measurements were less than or equal to 0.3 NTU; and

    b.  At J.H. Fewell, only 93% of the turbidity measurements were less than or

        equal to 0.3 NTU.

153. Under Section 1414(b) of the SDWA, 42 U.S.C. § 300g-3(b), the United States is entitled

to injunctive relief to remedy the violations and, as appropriate, civil penalties.  Unless enjoined

by an order of the Court, violations of the National Regulations and the State Regulations are

likely to recur.

**FIFTH CLAIM FOR RELIEF**

Failure to Timely Proceed with General Filter Rehabilitation at J.H. Fewell
(SDWA Section 1414, 42 U.S.C. § 300g-3)

154. Paragraphs 1 through 122 are realleged and incorporated by reference.

155. To address turbidity exceedances at J.H. Fewell and as required by task no. 6 of the

Consent Order's CERP, the City developed an initial scope of work to rehabilitate the filters at

J.H. Fewell in order to return them to fully operational and functional status.  *See* Consent Order

at Appendix A (CERP), task no. 6.  Upon EPA approval of the scope of work, the CERP would

be updated to include the individual tasks and timeframe.  *Id.*

156. EPA approved the City's initial scope of work for the general filters on December 13,

2021, and a revised scope of work on February 4, 2022.  Under task no. 6.B of the scope of

work, the City agreed to issue a notice to proceed to begin the engineering design process within

eight months of the City's execution of Drinking Water State Revolving Fund ("DWSRF") Loan

No. 3.

157. The City and the State executed DWSRF Loan No. 3 on September 30, 2021, so the

notice to proceed to begin the engineering design process was due to be issued by May 30, 2022.

158. On April 4, 2022, the City requested an extension and proposed to start the design

process on July 1, 2023.  EPA denied this extension.

37

159. Thus, the City has not timely issued the notice to proceed to begin the engineering design process and has not timely begun the design process to rehabilitate the general filters at J.H. Fewell, in violation of Paragraph 40 and task no. 6 of the CERP (Appendix A) of the Consent Order.

160. Under Section 1414(b) of the SDWA, 42 U.S.C. § 300g-3(b), the United States is entitled to injunctive relief to remedy the violation and, as appropriate, civil penalties.  Unless enjoined by an order of the Court, violations of the Consent Order are likely to continue.

## SIXTH CLAIM FOR RELIEF

Failure to Install Corrosion Control Treatment
(SDWA Section 1414, 42 U.S.C. § 300g-3; 40 C.F.R. §§ 141.80(e) and 141.83;
Miss. Admin. Code § 15-20-72.1.3.2)

161. Paragraphs 1 through 122 are realleged and incorporated by reference.

162. Under Subpart I (Control of Lead and Copper) of the National Regulations and the implementing State Regulations, the System's lead action level is exceeded if the concentration of lead in more than 10% of tap water samples collected during any monitoring period is greater than 0.015 mg/L (i.e., if the 90th percentile lead level is greater than 0.015 mg/L).  40 C.F.R. § 141.80(c); Miss. Admin Code § 15-20-72.1.3.2 (incorporating National Regulations on lead and copper).

163. When the lead action level is exceeded, the System shall implement all applicable source water treatment requirements specified by the State under 40 C.F.R. § 141.83.  40 C.F.R. § 141.80(e).  Under 40 C.F.R. § 141.83, the System must complete source water monitoring and make treatment recommendations to the State within 180 days after the end of the monitoring period during which the lead action level was exceeded.  40 C.F.R. § 141.83(a)(1).  The State

then makes a determination regarding source water treatment and, if necessary, may require the public water system to install and operate such treatment.  40 C.F.R. § 141.83(a)(2)-(3).

164. The System exceeded the lead action level of 0.015 mg/L for the monitoring periods of January-June 2015, January-June 2016, and July-December 2016.

165. MSDH issued a compliance plan to the City on February 12, 2016, to address the lead action level exceedances.

166. The City conducted an optimal corrosion control treatment ("OCCT") study between October 2016 and April 2017 and provided the recommended treatment technique to MSDH on June 13, 2017.

167. MSDH concurred with the recommended treatment technique and set a deadline of May 31, 2019, for the City to complete installing the treatment at J.H. Fewell.  At the City's request, MSDH later extended the deadline to December 29, 2019.

168. The City has not completed installing OCCT at J.H. Fewell, in violation of the National Regulations and the State Regulations.  *See* 40 C.F.R. §§ 141.80(e) and 141.83; Miss. Admin. Code § 15-20-72.1.3.2.

169. Under Section 1414(b) of the SDWA, 42 U.S.C. § § 300g-3(b), the United States is entitled to injunctive relief to remedy the violation and, as appropriate, civil penalties.  Unless enjoined by an order of the Court, violations of the National Regulations and the State Regulations are likely to continue.

## SEVENTH CLAIM FOR RELIEF

Exceedances of Maximum Contaminant Level for HAA5
(SDWA Section 1414, 42 U.S.C. § 300g-3; 40 C.F.R. § 141.64(b)(2);
Miss. Admin. Code § 15-20-72.1.2.6)

170. Paragraphs 1 through 122 are realleged and incorporated by reference.

39

171. Under Subpart G (Maximum Contaminant Levels and Maximum Residual Disinfectant Levels) of the National Regulations and the implementing State Regulations, the maximum contaminant level for HAA5 is 0.060 mg/L, or 60 µg/L, determined as a locational running annual average at each monitoring location.  40 C.F.R. § 141.64(b); Miss. Admin. Code § 15-20-72.1.2.6 (applying 40 C.F.R. § 141.64 to public water systems).  The "locational running annual average" is the average of sample analytical results for samples taken at a particular monitoring location during the previous four calendar quarters.  40 C.F.R. § 141.2.  The maximum contaminant level for HAA5 is a health-based standard, as HAA5 may cause an increased risk of cancer when ingested long term.

172. The HAA5 locational running annual average at one monitoring site in the System's distribution system for the 4th Quarter of 2020 was 0.066 mg/L, or 66 µg/L.

173. The HAA5 locational running annual average at one monitoring site in the System's distribution system for the 1st Quarter of 2021 was 0.065 mg/L, or 65 µg/L.

174. Thus, the City exceeded the maximum contaminant level for HAA5, in violation of 40 C.F.R. § 141.64(b) and Miss. Admin. Code § 15-20-72.1.2.6.

175. Under Section 1414(b) of the SDWA, 42 U.S.C. § 300g-3(b), the United States is entitled to injunctive relief to remedy the violations and, as appropriate, civil penalties.  Unless enjoined by an order of the Court, violations of the National Regulations and the State Regulations are likely to recur.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States prays that this Court:

1. Enter an injunction requiring the City to abate any conditions of its public drinking water system that may present an imminent and substantial endangerment to human health;

2. Enter an injunction requiring the City to comply with the SDWA, including the National Regulations and the State Regulations;

3. Enter an injunction requiring the City to comply with the EPA Orders;

4. Enter a money judgment, as appropriate, for civil penalties; and

5. Grant such other relief as this Court deems just and proper.


Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


Dated: November 29, 2022          /s/ Karl Fingerhood
                                  KARL FINGERHOOD (PA Bar No. 63260)
                                  ANGELA MO (CA Bar No. 262113)
                                  STEFAN J. BACHMAN (SC Bar No. 102182)
                                  DEVON LEA FLANAGAN (VA Bar No. 87444)
                                  Attorneys
                                  Environmental Enforcement Section
                                  Environment and Natural Resources Division
                                  U.S. Department of Justice
                                  P.O. Box 7611
                                  Washington, D.C. 20044-7611
                                  Tel: (202) 514-7519
                                  Fax: (202) 616-2427
                                  Email: Karl.Fingerhood@usdoj.gov
                                       Angela.Mo@usdoj.gov
                                       Stefan.Bachman@usdoj.gov
                                       Devon.Flanagan@usdoj.gov

41

DARREN J. LAMARCA
United States Attorney for the
Southern District of Mississippi

ANGELA GIVENS WILLIAMS
Chief, Civil Division
Assistant United States Attorney

Dated: November 29, 2022      /s/ Jennifer Case
                                                     JENNIFER CASE (MS Bar No. 104238)
Assistant United States Attorney
United States Attorney's Office
501 East Court Street, Suite 4.430
Jackson, Mississippi 39201
Tel: (601) 965-4480

OF COUNSEL:

SUZANNE RUBINI
SUZANNE ARMOR
MICHELE WETHERINGTON
United States Environmental Protection Agency
Region 4
61 Forsyth Street S.W.
Atlanta, Georgia 30303

JAMES VINCH
United States Environmental Protection Agency
Office of Enforcement and Compliance Assurance
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460