```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                        PLAINTIFF

 5   VERSUS                   CIVIL ACTION NO. 3:22-cv-00686-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI                DEFENDANTS

 7

 8
                         STATUS CONFERENCE
 9          BEFORE THE HONORABLE HENRY T. WINGATE,
             UNITED STATES DISTRICT COURT JUDGE,
10                     FEBRUARY 17, 2023,
                      JACKSON, MISSISSIPPI
11

12

13

14
                   (APPEARANCES NOTED HEREIN.)
15

16

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
1   APPEARANCES:

2

3   FOR THE PLAINTIFF:      ANGELA GIVENS WILLIAMS, ESQ.
                            KARL J. FINGERHOOD, ESQ.
4                           ANGELA MO, ESQ.

5   FOR THE DEFENDANTS:     CATORIA PARKER MARTIN, ESQ.
                            TERRELL WILLIAMSON, ESQ.
6

    ALSO PRESENT:           TED HENIFIN
7                           MALISSA WILSON
                            CHARLES MITCHELL MCGUFFEY
8                           GERALD KUCIA
                            MITZI PAIGE
9                           FRANK PAUL CALAMITA
                            SUZANNE RUBINI
10                          MICHELLE WETHERINGTON
                            SUZANNE ARMOR
11                          JOHNNIE PURIFY

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **TABLE OF CONTENTS**

2    Style and appearances...................................   1

3    Court Reporter's Certificate.............................  78

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN OPEN COURT, FEBRUARY 17, 2023.**

1

2

3      THE COURT:  Good morning.  Terri, call the case,

4   please.

5      COURTROOM DEPUTY:  Your Honor, this is the United

6   States of America versus the City of Jackson, Civil Action

7   Number 3:22-cv-686-HTW-LGI.  Appearing here in the courtroom

8   for plaintiff is AUSA Angela Givens Williams for -- also

9   appearing for the plaintiff, appearing by Zoom, is Attorney

10   Karl Fingerhood for the Department of Justice and Angela Mo

11   from the Department of Justice.

12      Appearing on behalf of the defendant in the courtroom

13   is Attorney Catoria Martin and Terrell Williamson.

14   Appearing for the State of Mississippi, Attorney Gerald

15   Kucia.  Appearing for interested party attorneys are Malissa

16   Williams -- Wilson.  I'm sorry.  And Charles Mitchell

17   McGuffey.  Also appearing in the courtroom is Ted Henifin,

18   the third-party manager.  Appearing by Zoom observing are

19   representatives from the Department of Justice, the EPA, and

20   the federal government.

21      At this time, we are going to ask that each of you

22   identify yourselves for the record.

23      MS. GIVENS:  Good morning, Your Honor.  Angela Givens

24   Williams from the U.S. Attorney's Office representing the

25   United States.

 1          THE COURT:  Okay.  Now, Terri, you were talking about

 2     the ones on Zoom, weren't you?

 3          MS. GIVENS:  Oh, sorry.

 4          THE COURT:  Yes, because she identified you earlier.

 5     So those on Zoom, would you please introduce yourselves.

 6          MS. PAIGE:  Good morning, Your Honor.  This is Mitzi

 7     Paige from the U.S. Attorney's Office as a spectator today.

 8          THE COURT:  Okay.  Thank you.

 9          MR. FINGERHOOD:  Good morning, Your Honor.  Karl

10     Fingerhood with the U.S. Department of Justice Environmental

11     Enforcement Section.

12          THE COURT:  All right.

13          MR. CALAMITA:  Good morning, Your Honor.  Paul --

14          MS. MO:  Good morning --

15          MR. CALAMITA:  Sorry.  Go ahead, Angela.

16          MS. MO:  Thank you.  This is Angela Mo with the U.S.

17     Department of Justice and Environmental Enforcement Section.

18          THE COURT:  Okay.

19          MR. CALAMITA:  Paul Calamita with AquaLaw on behalf of

20     Ted Henifin, third-party manager.

21          THE COURT:  All right.  Thank you.

22          MS. RUBINI:  Good morning, Your Honor.  My name is

23     Suzanne Rubini with the U.S. Environmental Protection Agency

24     Region 4.

25          THE COURT:  All right.  Thank you.

1          MS. ARMOR:  Good morning, Your Honor.  Suzanne Armor,

2     United States Environmental Protection Agency Region 4.

3          THE COURT:  Thank you.

4          MS. WETHERINGTON:  Good morning.  Michelle

5     Wetherington, U.S. EPA Region 4.

6          THE COURT:  Thank you.

7          MR. PURIFY:  Good morning, Your Honor.  Commander

8     Johnnie Purify, U.S. EPA Region 4 Water Division.

9          THE COURT:  All right.  Thank you.

10         Did I miss anyone?  All right.  I hear no answer on

11    that, so apparently, everyone has identified him and

12    herself.

13         Now, then, I want to start off with this proposed joint

14    motion for a stipulated order for confidentially of

15    settlement discussion.  And this matter was filed late last

16    night, and it purports to seek some confidentiality relative

17    to some negotiations that were provided in another case that

18    predates this case.  It is a joint motion, and so who is

19    going to be the spokesperson for this order?

20         MS. GIVENS:  Your Honor --

21         MR. FINGERHOOD:  Good morning, Your Honor.  Karl

22    Fingerhood from the Department of Justice.  I'd be glad to

23    answer questions.  It is -- it's actually for this

24    proceeding, this Safe Drinking Water Act case.  We do have a

25    similar order in the Clean Water Act matter, which is before

1    another judge.  But this proposed agreement would deal with

2    confidentiality of discussions in the Safe -- Safe Drinking

3    Water Act matter.

4        There is likely to be some overlap in the discussions

5    between the two, so at an -- out of an abundance of caution,

6    we also are going to seek to amend the order in that other

7    lawsuit to add in Mr. Henifin, the third-party manager to

8    that order.

9        THE COURT:  Now, I saw that -- that you expect to add

10    him to the body of -- of this order as well as the other

11    order.  So, then, who all will be bound?  Are there any

12    other parties that are not listed on this proposed joint

13    motion that need to be added besides the city manager,

14    anybody else?

15        MR. FINGERHOOD:  I don't believe so, Your Honor.  This

16    order covers both the United States, the Department of

17    Justice Environmental Protection Agency and the State, both

18    MSDH and MDEQ, as well as the city and the interim

19    third-party manager.

20        In addition, there's a provision in there that to the

21    extent we provide settlement information to an outside

22    consultant or expert, they will sign a document agreeing to

23    be bound by the confidentiality agreement.

24        THE COURT:  What time did you file this proposed order

25    last night?

1      MR. FINGERHOOD:  This was filed close to, I guess,

2    midnight, East Coast time.

3      THE COURT:  Okay.  So, then, it would have been a

4    little different time over here.  And so you filed it then.

5    Can you tell me why you filed it so late?  It's okay.  I

6    mean, I got a chance to look at it, but just tell me why it

7    was filed so late.

8      MR. FINGERHOOD:  Well, we were trying to coordinate

9    getting signatures from the different parties.  We -- we

10   were -- we would -- you know, the intention was to get it

11   filed before today's hearing, but I understand if Your Honor

12   wants to put it aside and have a separate hearing or, you

13   know, have some time to look it over, I completely

14   understand that, because we did file it very late.  So

15   that's -- it wasn't intended to require any action

16   immediately.  We just did want to get it on file as soon as

17   we could.  And once I got everyone's authority to sign or

18   actual signature page, I went ahead and e-filed it.

19      THE COURT:  No.  We don't need any more time.  We're

20   ready.  And so we are familiar with it.  Now, but you had

21   wanted this before this court as soon as possible so that

22   the prescriptions of the proposed order will take effect

23   immediately; is that correct?

24      MR. FINGERHOOD:  Yes, I think so.  But, you know, we've

25   been having some internal discussions, too, to, you know,

1    make sure that the matter's proceeding along.  So we do --

2    but we do think it would be helpful to have the order

3    entered.  We're planning a meeting with all the different

4    interested entities in the next couple weeks.  So I think

5    before that meeting it would be helpful to have that in

6    place.

7        THE COURT:  Is there some danger that's not

8    communicated by this order that precipitated filing of this

9    order?  Is there some fear that there was some leakage

10   regarding the confidential discussions or that something

11   relative to confidentiality had already been leaked?  Did

12   that have any bearing on this haste in getting this to the

13   Court at the time that you did?

14       MR. FINGERHOOD:  No, Your Honor.  This is something

15   that, you know, I had mentioned to the parties some time

16   ago, so it wasn't precipitated by any event.  We -- like I

17   said, we do have a similar order in the separate Clean Water

18   Act proceeding, and I think, in part, it's a function of the

19   number of governmental entities involved, and --

20       You know, for example, myself, Angela, Suzanne, we

21   don't have authority to bind our clients in any settlement

22   discussions.  We have to -- there are certain officials

23   within DOJ and EPA who have settlement authority so, you

24   know, we can kind of give our open and unvarnished opinions

25   in settlement discussions, but it's always subject to the

1    approval of the appropriate officials who do have settlement

2    authority.  And so that's likely the same for some of the

3    state and city officials, and so this allows us to have

4    those open and frank discussions without them, you know,

5    being out in the public before the decision makers have

6    actually weighed in on some of the things we may be

7    discussing.

8         THE COURT:  Other than a potential finding of contempt

9    for violating a court order, what penalty provision is

10    provided by this order if there is a violation?

11         MR. FINGERHOOD:  Well, I think Your Honor has hit the

12    nail on the head.  It would be a contempt proceeding.  This

13    is -- would be an order of the court issued by Your Honor,

14    and, therefore, to the extent it was violated, Your Honor

15    would determine the appropriate sanction.

16         THE COURT:  Under the banner of contempt; is that

17    correct?

18         MR. FINGERHOOD:  Yes, Your Honor.

19         THE COURT:  Okay.  Well, I've gone through the order,

20    and the order manifests that it has been agreed to by the

21    requisite principals here.  So unless there are some

22    questions by some of the parties, then I'm prepared to sign

23    it.

24         So I have looked through the people who are bound, and

25    I suspect that everybody who is a party here is bound, and

1    so I will sign the order or at least I approve the order.

2    Now, this order is a proposed order.  As I said before, it's

3    a joint motion.  Now -- and then there is the proposed

4    stipulated order of confidentiality, and that's the document

5    that I will be signing.

6        Now, is there anything else I need to know about this

7    matter other than what the contents are and what you now

8    told me?

9        MR. FINGERHOOD:  I don't believe so, Your Honor.

10        THE COURT:  Is there anyone else who is a signatory to

11    this agreement who has some questions on this matter or

12    would like to add some flavor to it, anybody else?

13        All right.  I don't see any hands leaping up for

14    attention, so I will go ahead then, and I will sign this.

15        So, Terri, it's the 17th, isn't it?

16        COURTROOM DEPUTY:  Yes, sir.

17        THE COURT:  Okay.  Settlement discussion.

18        Terri, I'm giving you both the motion and the order,

19    and I have signed the order the 17th day of February, 2023.

20    Okay.

21        Now let's move on to the next matter.  I see you are

22    here, and do you have your notepad?

23        MR. HENIFIN:  Excuse me, Your Honor?  Would you like me

24    to update you today?  Is that --

25        THE COURT:  Yeah.  Go to the podium.  You know your

1    place.

2         MR. HENIFIN:  Yes, sir.  Yes, Your Honor, I do.

3         THE COURT:  You were at the podium last time, what,

4    about two hours?

5         MR. HENIFIN:  Maybe a little longer than that, but it

6    was a nice conversation with you, Your Honor.

7         THE COURT:  Okay then.  Well, I suspect that we'll have

8    the same type of conversation.  You were so knowledgeable,

9    and you provided the answers to the questions that I asked,

10    and so you have your outline of how you wish to proceed?

11         MR. HENIFIN:  Yes, Your Honor.  I do.

12         THE COURT:  Okay.  Well, see, the last time, I just

13    started wading in on questions, and I don't know if you had

14    an outline prepared last time.

15         MR. HENIFIN:  I did not, Your Honor.

16         THE COURT:  Well, you did wonderfully.

17         MR. HENIFIN:  Thank you.

18         THE COURT:  You didn't need it.  So this time, since

19    you have an outline, then I am going to let you go through

20    your outline, because you will probably hit my questions in

21    your outline.  But if you don't, then I'll think of those

22    questions, and I'll come back to them.  Okay?

23         You ready to start?

24         MR. HENIFIN:  Feel free to chime in anytime.  This

25    is --

```
1          THE COURT:  No.  I'm going to let you --
2          MR. HENIFIN:  -- a very rough outline.
3          THE COURT:  No.  I'm going to let you do your outline
4     this time.
5          MR. HENIFIN:  Yes, Your Honor.
6          THE COURT:  All right.  Is the microphone on?
7          MR. HENIFIN:  It is now.  Thank you.
8          THE COURT:  Okay.  Now then, are you ready to start?
9     Do you need a water?
10         MR. HENIFIN:  I'm good, Your Honor.  I've got some
11    right there if I need to reach over and grab it.  I had a
12    little before, because I was prepared for this lengthy
13    discussion today.
14         THE COURT:  Okay.  Well, see, it might not be as
15    lengthy, because you have your outline today.
16         MR. HENIFIN:  Absolutely.
17         THE COURT:  And as I said, last time, I just started
18    asking questions.
19         MR. HENIFIN:  And there was a lot to ask, and I'm glad
20    you did.
21         THE COURT:  Well, thank you so much.  And so -- and I
22    know this time that you have your outline, and so I know
23    that you are going to be ready.
24         MR. HENIFIN:  I am ready.
25         THE COURT:  You were ready last time.
```

1        MR. HENIFIN:  I was.

2        THE COURT:  You did a great job.

3        MR. HENIFIN:  Well, thank you, Your Honor.

4        THE COURT:  Now, so then if, one, you need some water,

5    there it is; number two, if at some point you feel some

6    fatigue for standing there behind the podium, then you can

7    take a seat and rest yourself and get your energy back up.

8        MR. HENIFIN:  Appreciate that, Your Honor.

9        THE COURT:  Okay.  All right.  Now, then, how would you

10   like to start?

11       MR. HENIFIN:  I would like to give you a little update

12   on where we are for the systems and then I'll follow --

13       THE COURT:  Okay.  That'd be great.

14       MR. HENIFIN:  -- follow that with a few other things

15   about the order itself.  So if that's okay with you, I will

16   start there.

17       THE COURT:  Well, that's fine with me.

18       MR. HENIFIN:  Your Honor, as you're well aware, we've

19   got -- the system consists of plants and distribution

20   system.  I'm going to start with the plants, the two water

21   plants, the OB Curtis Plant and the J.H. Fewell Plant.  And

22   those have been the sources of a lot of our problems over

23   the last many, many years and the sources of our problems in

24   August and again in January -- or December actually.

25       So I'm happy to report today that I'll be signing a

 1    contract later today with Jacobs, a national firm that does

 2    operation and maintenance of water plants and waste water

 3    plants across the country.  They're the largest firm that

 4    does this kind of work in the nation, and they're -- they've

 5    been with us off and on pretty much since November, I

 6    believe.  If you recall my comments during our last status

 7    conference, I had let many of folks -- in fact, all of their

 8    team go home over the holidays, because they were all from

 9    other parts of the country, and that may have been a poor

10    decision and may have led to some of our challenges at

11    Christmastime.

12        Since that time, they've been here in force and

13    continuing to develop the plan to go under contract and be

14    responsible operators for our plants starting Monday,

15    February 20th, 2023.  That contract is a

16    six-month-open-book-cost-plus contract.  They aren't really

17    sure how much it's going to cost to do this work, and we're

18    not really sure -- but we want to make sure they're not

19    going to overcharge us.  So this gives us the opportunity

20    over six months to -- both them to learn and for us to see

21    exactly what it takes to operate the two plants.

22        The end of the six months is sometime in the August,

23    September time frame.  We expect to enter a

24    five-year-long-term-fixed-price contract for them to

25    continue the operation and maintenance of the plants, the

1   wells, and the elevated storage tanks.  So that will put us

2   in a great position for the long-term for the Jackson Water

3   System.

4        THE COURT:  Now, before you go any further...

5        MR. HENIFIN:  Sure.

6        THE COURT:  You used the term that the taxpayers

7   probably don't understand, and so I know what it means, but

8   I want to make sure that any taxpayer who later has privy to

9   this conversation understands what that means.

10        MR. HENIFIN:  That open book, Your Honor?

11        THE COURT:  Cost plus.

12        MR. HENIFIN:  Cost plus, yes, sir.

13        THE COURT:  Right.  Because ordinarily, a contract has

14   a -- has fixed terms and has fixed costs, and the cost-plus

15   contract is a different kind of contract.  It allows the

16   parties to pay -- one to pay in and one to receive monies

17   in -- in excess of what the start-up off figure was.

18        Because usually, in a contract like that, that means

19   that the party furnishing the resource -- the repairs, et

20   cetera -- at the time of entering into the contract doesn't

21   know for sure what all is going to be required, and

22   therefore, to make sure that such a party is not prejudiced,

23   then there's a cost-plus contract.  So you have sort of a

24   basic cost, but then this is going to be more than that,

25   then the repairing party has to justify that they need more

 1    money than what was initially proposed.

 2         So on this particular contract, it's a cost-plus; is

 3    that correct?

 4         MR. HENIFIN:  Yes, Your Honor, but it's a little -- a

 5    little different take on that.  In fact, we've negotiated

 6    labor rates up front, which are known, but we don't know how

 7    many hours they're going to need.

 8         THE COURT:  Okay.

 9         MR. HENIFIN:  We've got the labor rates negotiated, and

10    we have a markup on materials.  That's the "plus P," so

11    they'll actually open their books when they have to order

12    something, show us what the invoice was from the vendor, and

13    then we've negotiated a markup, a 10-percent markup, for the

14    materials that they buy.  In the form of chemicals, which is

15    a big part of the cost, 10 percent seemed too high, and

16    we've negotiated down to 2-and-half percent for that.  So

17    chemicals and power are one multiplier, and everything is at

18    another.

19         And so they'll monthly be opening their books, showing

20    us exactly what they spent to the local vendors and other

21    vendors that they are buying services and materials from.

22    Those have a markup.  We see their costs, we see their

23    markup, that's what we pay them.  On the labor side, they'll

24    track ours through the entire month, and we already know the

25    labor rate they'll be charged for each of their folks that

1    are working on the plants, and they will provide us the

2    hours times the negotiated hourly rate, and we will pay them

3    for that.

4         So it's a very -- the plus is the markups, and the

5    negotiated rate, which also has a markup in it.  But we're

6    actually looking at their books and seeing exactly what it

7    cost to operate on a monthly basis.  I mean, they only get

8    paid for what they actually did plus the markups.

9         THE COURT:  All right.  Thank you.  Now, I interrupted

10   you.

11        MR. HENIFIN:  No.  That's absolutely --

12        THE COURT:  So go back to where you were.

13        MR. HENIFIN:  That's absolutely fine.  So when we get

14   to the firm fixed-price contract -- so contractors build

15   risk into their prices in a firm fixed-price contract,

16   obviously.  And this is -- this whole six-month period is to

17   try to minimize the amount of risk they would have to build

18   into the long-term cost.  So this is -- we believe -- I

19   believe this is a -- like, a very positive step forward that

20   we can spend six months working closely with Jacobs to

21   understand what their actual costs are, so when they do bid

22   the firm fixed-price, we're all comfortable that there's not

23   excessive risk built into the price on the part of the

24   contractor.

25        But we -- we're also comfortable that he's not cut so

 1    short that they can't perform the job.  It's that balance.

 2    They need to be able to actually perform the job and make a

 3    profit, a reasonable profit, but we can't have them building

 4    in too much risk where we would be paying extra for that.

 5    And so that's the reason we've gone into this two-phased

 6    approach, to get the best price.  And something we're

 7    both -- both parties are comfortable that we've got the

 8    right amount of money in the contract.

 9        THE COURT:  Do you have a metric by which you can

10    compare in the past what Jacobs has performed in a contract

11    such as this nature?

12        MR. HENIFIN:  They've provided -- I don't have it on

13    the top of my head, but I have it for -- they've provided

14    some benchmarks of what this kind of work has cost in other

15    markets.  So I do have that, and I can provide that to the

16    Court if you would like.  But --

17        THE COURT:  Yes, I'd like to see it.

18        MR. HENIFIN:  Yes, sir.  I will provide that.  It lines

19    up very well with what they've done in localities and other

20    communities across the country.

21        THE COURT:  Have they ever had any litigation on those

22    kinds of matters?

23        MR. HENIFIN:  I don't know that they've had it on

24    costs.  Of course, they're a large company.  They've had

25    lots of litigation over their contracts over the years, but

```
 1    I'm not aware of any around costs and bids and operations
 2    from that end.
 3         THE COURT:  Or -- or on cost plus?
 4         MR. HENIFIN:  Not that I'm aware of, Your Honor.
 5         THE COURT:  Okay.  If you run into any such, then I'd
 6    like to see that too.
 7         MR. HENIFIN:  Yes, sir.
 8         THE COURT:  All right.  Thank you.  Now go back to
 9    where you were.  I know I keep chiming in.
10         MR. HENIFIN:  Sure.
11         THE COURT:  Go back to where you were.
12         MR. HENIFIN:  Well, that sort of summarizes where we
13    are on the plants, and to bring it home, we still have the
14    tenuous operation.  In fact, while they're assuming
15    operation control -- they've got a very sophisticated staff.
16    They've hired almost all of the existing city employees.
17    There were three that decided they didn't want to work for
18    Jacobs, and there were two that didn't pass the background
19    check that Jacobs had.
20         So I think somewhere around 22 employees that were
21    working for the city are now working for Jacobs as of
22    Monday, the 20th, and most -- all of the ones I have spoken
23    to personally are very pleased with their situation.  Much
24    to the dismay of the state, we've hired some Mississippi
25    State Department of Health employees as well.  I would like
```

1    to think they're the best that they had.  Now, they're part

2    of Jacobs, and they're going to be working at the plants as

3    well, so... and then they've hired a significant number of

4    other folks from the region.

5        There is a real benefit for the region that you've got

6    a national firm here.  Everyone believes that when you bring

7    a national firm into contract that they're going to bring

8    their own people.  They don't have a bunch of folks waiting

9    to go to Jackson.  I mean, probably a lot of them want to

10   come to Jackson, but they already have full-time jobs where

11   they are.  So it's incumbent on Jacobs to hire folks, and

12   it's most cost-effective to hire local folks.  So they've

13   been making it a strong effort to fill all their positions

14   with folks locally or within the region, and there will be

15   people moving here from other parts of the country, I'm

16   sure, as a result of that.

17       But Jacobs themselves has a strong team here for the

18   transition, and those folks will start going back to where

19   they -- they live, and work and over time, only the

20   permanent Jacobs folks -- and there won't be a lot of those

21   that had been moved here from other Jacobs locations.  There

22   will be some, but most of these folks will be new to Jacobs

23   but be trained in the Jacobs method of operating and have

24   the backstop of a large national organization and provide

25   technical assistance, training, all sorts of great things to

 1    help make our plants operate like the rest of their plants,

 2    which are very, very strongly operated across the country.

 3    Permit compliance consistent.  Just a great method of moving

 4    us that direction.

 5        THE COURT:  So these local employees who have now been

 6    transferred to Jacobs, should they have any concerns about

 7    permanent employment?

 8        MR. HENIFIN:  I don't believe so.  Jacobs is a large

 9    company, and if we get into this -- you know, we're fully

10    intending to go to this long-term contract with Jacobs so

11    that they should be guaranteed positions here through that

12    six -- first six months plus the next five years.  Jacobs is

13    committed to keeping them much longer than that, and it's

14    going to be incumbent on whoever's the contracting

15    authority, whether it continues to be like a third party

16    like we have today or whatever entity follows this.

17    Wherever administration of the water system resides going

18    forward, I would make a strong commitment that they're going

19    to rely on Jacobs to continue and operate unless they fail

20    for some reason, but I don't believe, based on their

21    history, we'll have that problem.

22        So I think they're here to stay.  The employees all

23    took these positions and feel very good about working for

24    Jacobs.  They've all seen pay increases as a result of it.

25    Obviously, the city employees gave up their Mississippi

1     State Retirement as a result of it.

2          THE COURT:  That was my next question on retirement.

3          MR. HENIFIN:  But there is a generous 401(k) in the

4     Jacobs package to help.  All the other benefits were very

5     comparable to what they were receiving as city employees,

6     and really to all -- everyone that I have spoken to,

7     they're -- they're looking very much forward to working for

8     Jacobs.

9          THE COURT:  But you also said that there might be a cap

10    at five years.

11         MR. HENIFIN:  Could be if -- if -- I can't imagine that

12    we would be looking for another contractor.  We -- whoever,

13    again, is -- whether it's a third party, whether it's the

14    city, whether -- whoever is moving the utility forward, I

15    can't imagine we would be looking for a different entity.

16         But the five-year restriction is typically how these

17    contracts are set up based on state law, and I haven't

18    researched if we could go longer here, but I believe five

19    years is about where we're at.  If we can go longer, we

20    might go longer.

21         MS. MARTIN:  Your Honor, Catoria Martin on behalf of

22    the City of Jackson.  We have done longer term contracts.

23    We have done longer than five years in the past based on

24    this type of work.

25         MR. HENIFIN:  But I would have to check with Jacobs --

1          THE COURT:  Okay.

2          MR. HENIFIN:  -- to see if they're interested in going

3     longer, but we have been planning on a five-year contract.

4          THE COURT:  So then, what can you say to the employees

5     who have been shifted over or in the process of being

6     shifted over about the permanence of their employment so

7     they don't have to worry about going over to Jacobs and

8     then, in five years, being let go without any retirement?

9          MR. HENIFIN:  So I believe that Jacobs would be firmly

10    entrenched in -- in placing them at another facility if for

11    some reason they didn't have this contract going forward.

12    There're always in need of skilled and talented operators

13    and other positions throughout the organization.  And with

14    250 facilities across the country, there're in a constant

15    recruitment concept.

16         So I think they are very secure.  I even believe

17    they're very secure here.  I don't believe we'll be seeing a

18    contract change.  It rarely happens in these kinds of

19    operation and maintenance contracts, but should it happen,

20    Jacobs is committed to keeping them employed.  It just might

21    not be in Jackson.

22         THE COURT:  What about the people that didn't want to

23    transfer to Jacobs?

24         MR. HENIFIN:  So there were some --

25         THE COURT:  Did someone debrief them as to why they did

1    not want to do so?

2        MR. HENIFIN:  Yes, sir.  And I think in all cases

3    they -- one had a -- already had another job offer within

4    another covered employer by the Mississippi Retirement

5    System, and so they went to work for a local school system,

6    not JPS but different school system.  One is very close to

7    retirement, and we're actually helping them get to

8    retirement in September without having to transfer Jacobs.

9    We're making provisions to that.  And the third one just

10   frankly never responded.  I can't explain that one.

11       THE COURT:  Okay.  And then you said that at least two

12   failed a drug test?

13       MR. HENIFIN:  It wasn't a drug test, Your Honor.  There

14   was a --

15       THE COURT:  What was it?

16       MR. HENIFIN:  They had a series of background check

17   requirements.

18       THE COURT:  Background check.

19       MR. HENIFIN:  Yes, sir.

20       THE COURT:  So it wasn't a drug test?

21       MR. HENIFIN:  I believe not.  Something popped on

22   someone's record that didn't fit with Jacobs.  In fact,

23   we're still debating whether or not that's going to keep

24   that person from being employed.  So I'm reaching back to

25   Jacobs.  I just learned this yesterday.

1          THE COURT:  Okay.

2          MR. HENIFIN:  And we're reaching back to Jacobs'

3     attorneys to see -- Jacobs onsite wants this person very

4     much.  They're a very skilled operator, but they've had a --

5     they've got a record in the distant past that doesn't meet

6     Jacobs' requirements, and so we are trying to figure out how

7     we can get past that.

8          THE COURT:  Does Jacob have an insurance policy which

9     precludes employment of certain people?

10         MR. HENIFIN:  I don't know that detail, Your Honor.

11         THE COURT:  And then with regard to disqualifying

12    features, people out here who want to apply to Jacobs, what

13    should they know about the features that might disqualify

14    them from employment at Jacobs?

15         MR. HENIFIN:  I don't have that list.  I'd say that

16    this was a very -- this one case I know was a very unique

17    case.  I'm not sure about the other person that didn't pass

18    the -- I don't know the details as to why they didn't meet

19    the requirements.  I do know the one that I'm going to

20    arguing with Jacobs and pleading my case to try to get that

21    waived and whatever policy they've got.  I don't know the

22    rationale on the other one yet.

23         THE COURT:  Okay.  So then on the disqualifying

24    features, I suppose that these matters would be set out in

25    the blurb seeking employees to tell them what would

1        disqualify them?

2            MR. HENIFIN:  I don't believe that that level of detail

3        is put into those applications -- or those advertisements,

4        other than you need to satisfactorily pass the background

5        check and the drug screen.  And so the details of what's in

6        a background check I don't know are routinely put into an

7        advertisement.

8            THE COURT:  Okay.  Go ahead.

9            MR. HENIFIN:  Sure.  That's where we are on the plants.

10       I'm feeling really good.  I'm sleeping a lot better knowing

11       we've got this professional group, and as of Monday, I'm no

12       longer the operator of records.  They are.  So they might be

13       joining me here next time we have a status conference and we

14       have to explain any problems, but we're not going to have

15       any more problems.

16           THE COURT:  Okay.  So are you saying that as a

17       guarantee or just a hope?

18           MR. HENIFIN:  That -- on the operation side, that's

19       just a hope.

20           THE COURT:  I know.

21           MR. HENIFIN:  The tenuous part that I was explaining

22       shortly ago is there's still a number of capital

23       improvements that need to be made at the plants.  The

24       chemical feed, I believe, is one that I talked about when I

25       was here at the last status conference.  None of the

1    chemical feed systems are flow-paced, meaning they aren't

2    computer-controlled, and so manually have to make

3    adjustments.  That work is under design now to replace all

4    of that so it is finally computer-controlled and done

5    correctly, and it'll have the appropriate pumps and

6    redundancies.

7        Once that's in place, we'll be a little closer to

8    saying it's not so tenuous, and we've still got a chlorine

9    system that's going to be replaced.  We've got sludge

10   channeling that needs to be replaced.  So we've got a number

11   of investments that still need to be made before I could

12   stand here in front of you and say it's not a tenuous

13   situation.  But it's less tenuous today than it was when I

14   was here in January.

15       THE COURT:  And how much improvement has been made on

16   the computer system?

17       MR. HENIFIN:  That one is just -- that works under

18   design.  So it had -- the actual improvements haven't been

19   made.  We've got an engineering firm that's working on that

20   design now.  We've brought in a national firm, HDR.  They're

21   doing the beginning design work.  Looking like that's

22   probably midyear before that's design finished and we can

23   start working on that -- those actual pumps and replacement,

24   things like that.  We're still months away.

25       THE COURT:  Can the computer spit out the e-codes now?

1    The e-codes, can a computer spit those out now?

2         MR. HENIFIN:  I'm sorry.  I'm missing --

3         THE COURT:  You know, the e-codes.  You know the code

4    that says --

5         MR. HENIFIN:  Oh, the codes.  Yes, sir.

6         THE COURT:  That's right.  The e-code.

7         MR. HENIFIN:  Yes, sir.  The --

8         THE COURT:  A, B, C, D, E.

9         MR. HENIFIN:  All right.  Yes, sir.

10        THE COURT:  Which says that as long as a residence or

11   commercial establishment has an e-code, then that entity

12   does not have to make any water payments.  And that has been

13   abused in the past when people have been put on the e-code,

14   and they didn't really have any problems with their delivery

15   of water because of the city.  But it might have been some

16   other factors that caused someone to put them on e-code.

17        MR. HENIFIN:  So this is -- in my prepared remarks,

18   that's a little further down.  That's the billing system.

19   So, like, totally different computer system than the one

20   that's at the plants controlling --

21        THE COURT:  Okay.

22        MR. HENIFIN:  -- the operation.  So can we come back to

23   that, Your Honor?

24        THE COURT:  Sure.  That's great.

25        MR. HENIFIN:  Thank you.

1          THE COURT:  All right.  Go right ahead.

2          MR. HENIFIN:  Yes, sir.  So again, still tenuous.  Less

3     tenuous than it was before.  Much better shape at the

4     plants.

5          So then the second piece of this is our distribution

6     system.  You know, the plants pump the water into the pipes,

7     and the pipes deliver it to -- throughout our community.  At

8     the moment, we're in much better shape than we were as far

9     as pressure balancing goes, only because we've got Jordan

10    Hillman, former public works director.  He's working for me

11    now.  And Terrance Byrd, who is also a city employee, is now

12    working for Jackson Water, my organization.  They've been

13    actually working the distribution system by measuring water

14    quality in two different areas and trying to understand what

15    might be keeping it from flowing the direction it should.

16    This is a slow, hard process that they've actually

17    identified a number of major valves that were closed.

18    They've opened those valves, and we're seeing much better

19    pressure balance to the system as a result of just the work

20    they've done over the last month and a half.

21         So I can tell you today that all of our elevated

22    storage tanks have more water in them today than they've had

23    since I don't know when, since any of us have been looking

24    at this closely.  So more than probably six months, eight

25    months, maybe a year, maybe multiple years.  So we've got a

1    much better pressure balance, you know, anecdotally, the

2    very end of our surface water system -- you know, we've got

3    the well water system and a surface water system.  The very

4    end of the surface water system is on Forest Hills Road, and

5    there's three residents there that have been struggling with

6    water pressure off and on for much longer than even our

7    challenged years -- or challenged months since the fall.

8        I got a report -- a text message from one of those

9    residents on Wednesday that they finally were able to take a

10   shower.  And so we've gotten the pressure up at the very end

11   of the system to where it hasn't been since some time last

12   summer.  So I'm feeling pretty good about some of the work

13   we've done in the system.  But that's just the start.

14       So you -- I mentioned the fact we're working with a

15   hydraulic model, computerized model of the entire system,

16   and that is now complete but not calibrated.  So the next

17   step is calibrating it by understanding where all the valves

18   are, what position they're in, and assessing the condition

19   of all of the valves.  We ordered a contract to do that work

20   with a national firm that's here onsite with one crew right

21   now helping, again, my staff, open valve.  They'll be here

22   with multiple crews when we have enough mapping to keep them

23   busy because you -- we don't want to roll them into town and

24   then have them sitting around in pretty expensive trucks and

25   crews.  So we're trying to get ahead of them on the mapping.

 1          And then we have a national firm, Stantec Engineering

 2     Consulting, that is going to coordinate this work and take

 3     the -- the model's a tool, and you need someone to use the

 4     tool, and we need this calibration to help fix the tools.

 5     So we've got these three parties.  We have them all together

 6     here on Tuesday in a kick-off meeting, room full of very

 7     bright folks setting out the plan to how to move forward to

 8     get this done, to get the model fully functional and

 9     calibrated, realtime information coming from the valve crews

10     back to the modelers, and the engineering firm that's going

11     to analyze it can start some analysis and start seeing where

12     the holes are.  And that's all kicked off as of Tuesday.

13          We have a big group at the Trustmark Community Room

14     over in Fondren all day Tuesday.  Really made great

15     progress.  Feeling good about that.  The result of that will

16     ultimately be here are the changes we need to make to the

17     distribution system, whither it's add a valve, add to

18     pressure zones, do something different entirely to make sure

19     that we always have pressure in South Jackson and other

20     parts of the city that have suffered for many, many years

21     from lower pressure.  And I think the results of that are

22     going to be capital projects likely, and so we will get the

23     priority projects that can guarantee we can keep pressure in

24     the system some time before the end of the year as a result

25     of that effort.

1          I know it seems slow.  There's a lot of work to be done

2     to make that happen.  And trust me, I'm pushing very hard to

3     get that done quickly.  You know, with the fact that we're

4     only here 75 days into the order and we've got that team

5     onboard and kicked off I think says a lot about the speed at

6     which we're working right now.  So I'm feeling good that

7     we've got those folks here, and they're working hard.

8          So that's where we are on the distribution system.

9     We'll continue to do our little bits to try to find the

10    areas that work while they're modeling and while they're

11    doing the valve assessments.  But I would expect over the

12    next several months we're going to see some significant

13    improvements just in how the system operates today even

14    without further capital investments, which once we put those

15    in place, we'll provide much more of the guarantees we need

16    to make sure that we don't lose pressure every time we lose

17    a pipe or have a plant problem.

18         Normal systems don't have that.  You've got storage in

19    the system, so if you have a little hiccup at the plant, you

20    just shut it down.  The storage takes care of it.  That

21    should be happening here, but it doesn't, because we

22    don't -- and we don't even know how the system operates,

23    which is why we've got the modelers, the engineers, and the

24    valve folks working so hard right now to try to solve those

25    problems.

1        And then on top of that, you know, the -- the idea that
2    every time we have a line break, we start having parts of
3    the city go down, and a big line break, we can lose pressure
4    across the city, another thing that doesn't happen in every
5    system.  Often, pressure isolation allows the -- that part
6    of the system to not drain down the rest, but the other
7    piece of that is rapid response on the part of the water
8    system.
9        We've had two major line breaks that in the past would
10   have taken down significant parts of our system.  Our staff
11   responded quickly, isolated the valves that shut that water
12   off and made the repair later after isolating it.  That
13   wasn't our standard operating procedure prior to this.  But
14   in those two instances, we had larger -- large lines,
15   20-inch diameter pipes, full breaks, and we isolated it
16   within hours, and the system had no widespread problems.
17   Obviously, the people right there near lost water for a
18   period of time while we were making the repair, but we
19   didn't hear about it in the news.  We didn't lose water,
20   have a huge problem in the city, and that's because we've
21   now instituted some rapid response on these large breaks and
22   better procedures on how to deal with them.
23        So feeling pretty good about where we are on both the
24   plants and the distribution system, not good enough to tell
25   you I'm guaranteeing you no failures.  We still have some

1   tenuous pieces out there, but we're working hard to get

2   those taken care of.

3        Next piece might be leaks.  Another favorite part of

4   Jackson is you can drive around and see water flowing out of

5   the ground pretty much everywhere unfortunately.  We have

6   instituted a find-and-fix leak program.  We're still lining

7   up smaller contractors that can do the work for most of

8   these.  And most of these are on small diameter pipe, less

9   than six inches in diameter, less than 6 inches deep.

10       We've got a lot of small contractors that can do that

11  kind of work.  Lining up a group of contractors -- and they

12  could be managed by a local engineering, IMS, and they're

13  going to be a program manager for this find-and-fix leak

14  program that will start sometime.  And they will be

15  basically going over every city street to find where leaks

16  are, near meters, near -- in the street.  Identifying those

17  leaks and bringing in contractors that will have a whole

18  list of qualified contractors to work on that

19  simultaneously.  And I think within a couple of months,

20  we'll start seeing significant response and repairs of these

21  leaks that have plagued us for years.  And we get complaints

22  constantly about how long these have been going.  We just

23  don't have the response mechanism built yet, but we're

24  getting very, very close.

25       THE COURT:  What does that mean, that you don't have

1    the response mechanism yet?

2        MR. HENIFIN:  We don't have the contractors in place

3    that can respond for us.  We're working on that, getting the

4    contractors, getting the contracts to those contractors,

5    getting their bids.  Those will all be done on a

6    time-and-material basis, because you really don't know what

7    you're facing when you start digging up a leak.  Is it a

8    major crack?  Is it a whole break in the pipe?  Is it

9    something that can be done with a clamp?  There's such a

10   wide variety.

11       So we'll, again, prenegotiate labor rates and equipment

12   rates.  And the engineer firm that we've hired locally will

13   be onsite to make sure we're tracking their hours and their

14   costs, and they will invoice us, ultimately, based on those

15   prenegotiated rates for each of these repairs that they

16   make, and we'll --

17       THE COURT:  The last time you were here, you were not

18   sure as to where these leaks were located.

19       MR. HENIFIN:  Well, these are the small ones we know

20   where -- I mean, they're everywhere, right?  You can see

21   these.  We're still concerned that this isn't the full 30

22   million gallons a day that we're losing.  So we're still

23   going to be doing the -- the valve company that's coming in

24   to do the valve assessment is going to be doing some

25   acoustic leak detection work on the bigger pipes to find the

 1        leaks that we don't see.  We are convinced that there's

 2        leaks that are going into the ground -- maybe in the storm

 3        drainage system, maybe into the sewer system, maybe into the

 4        rivers or creeks -- that we haven't been able to see,

 5        because they're not bubbling up on the street.  And so

 6        people just don't notice that fact that the pipe's leaking

 7        if it's leaking into a body of water.  Those are the ones

 8        we're going to find through this acoustic testing of the

 9        pipes over a period of time.  So --

10            THE COURT:  And -- but the volume of water that is

11        affected by these leaks is tremendous.

12            MR. HENIFIN:  Yes, sir, it is.  30 million gallons a

13        day but --

14            THE COURT:  Day.  That's a day, right?

15            MR. HENIFIN:  Yes, sir.

16            THE COURT:  Okay.  Now, let's quantify that some kind

17        of way.  If we were taking that 30 million gallons of water

18        and distributing it to the homes, how much money would the

19        city be raking in for those 30 million gallons that now they

20        are losing, because they can't bill for it?

21            MR. HENIFIN:  So we essentially should be using -- our

22        citizenry should be using about 15 million gallons a day.

23        On the water side, that would generate somewhere in the

24        $30-million-a-year revenue.  So if they could use the extra

25        30 million gallons, which we'll come back to, because they

 1    can't.  But if we sell that water, then we would probably be

 2    at about a $90-million-revenue model just on the water side.

 3         But we can't use that much water.  I mean, 300 gallons

 4    a day per person is outrageous.  There's no city in the

 5    United States that's even close to that.  The average in the

 6    U.S. is 88 gallons a day per person.  We're -- if you

 7    estimate us at 100 and we're somewhere in the 15- to

 8    16-million-gallons-a-day range is what the citizens and

 9    Jackson should be consuming even with their sprinklers and

10    pools, it would average out to somewhere in that 100 gallons

11    a day per person.

12         And so the fact of putting out 300 gallons per day per

13    person means we're losing 200 gallons a day per person

14    somewhere in the city.

15         THE COURT:  And that translates into how much money

16    being lost?

17         MR. HENIFIN:  We wouldn't even be able to collect that

18    revenue, but where it is translated is to cost.  If we could

19    find those leaks, we wouldn't need half two plants.  We

20    would only need half of one of our two -- two treatment

21    plants.  At the Curtis Plant, there's a membrane plant and a

22    conventional plant.  They're both rated to do 25 million

23    gallons a day.  If we only need 15 to 20 million at the top,

24    we could shut half of it down and save half of our operating

25    cost.

```
1            THE COURT:  Which would be how much?

2            MR. HENIFIN:  Which would be somewhere in the -- for

3     that one plant, that operating cost is going be -- that

4     would probably be about somewhere in the $12-million-a-year

5     range if we could cut half of that cost down.  I mean, the

6     savings here are tremendous, so we've got to find the water,

7     and we're going to find the water, and we're on -- on track

8     to find it.

9            The little leaks I talked about on the find-and-fix

10    will add up to millions of gallons, but not 30 million

11    gallons, I don't think.  And so we'll fix those leaks, and

12    those are the visible nuisance leaks that everyone has in

13    their -- you know, on their street creating puddles,

14    creating mudholes in their yards.  We need to get those

15    fixed, but at the same time, we need to find these bigger

16    leaks if we can, and that's what we're on.

17           THE COURT:  The bigger leaks --

18           MR. HENIFIN:  The ones that --

19           THE COURT:  -- where is water going?

20           MR. HENIFIN:  It's got to be going into a river, a

21    creek, pond, sewer system, stormwater system.  It's got to

22    go somewhere where people aren't paying attention to it or

23    we would find those, and that's why we need internal

24    acoustic devices that go in the pipes and listen for those

25    leaks and areas where we can't really access easily.
```

1   They're buried pipes likely leaking underground to some

2   other location; and so we just can't see it, we don't know

3   where it's happening.  Combination of the modeling leak

4   detection, all the things we're putting in place should help

5   give us clues as to where that water is and where it's going

6   and how to fix it.

7       THE COURT:  How much will this acoustic device cost?

8       MR. HENIFIN:  So that's part of the contract, of the

9   $5.6 million contract on the valve assessment, hydrant work,

10  and leak detection.  And then there's ongoing cost for

11  annual leak detection monitoring program.  The acoustic

12  devices will be sending a signal back to a software that

13  will be constantly listening for leaks, new leaks, and then

14  we'll be monitoring the system going forward from that end.

15      THE COURT:  Okay.  Go ahead.

16      MR. HENIFIN:  Sure.  So the other thing that's happened

17  recently is we have approached the Mississippi Department of

18  Health about reclassifying the Curtis Plant.  This gets a

19  little complex, and I'm not -- I am not the water regulator,

20  but I'll explain, basically, because we didn't do some

21  source water testing.

22      So you go out and check your reservoir to look for --

23  in this case it was cryptosporidium, which is a parasite

24  virus?  Yeah.  My expertise.  But the crypto essentially

25  require -- if you have it in your source water, you have to

1    do additional treatment.  And so what we found is we don't

2    have it in the source water.  We've got sampling from 2017

3    through 2019.  The health department has looked at and

4    agrees this doesn't exist in our water.

5        And so we are able to change our process to save some

6    money on how we're operating our water treatment plant based

7    on reclassifications the health department's working with us

8    on right now.  So hasn't happened fully yet, but again,

9    shows the cooperation between the state and us as we're

10   trying to figure out how to save some money and make sure

11   we're still protecting public health, providing safe

12   drinking water, but not adding unnecessary processes if they

13   truly are unnecessary.  And so that's the analysis we're

14   doing right now.  So that's going to potentially lead again

15   to further cost savings as we move forward.

16       And you know I've talked about the -- the

17   vulnerabilities already, so I guess now I'll transition.

18       That's kind of the status of where we are on the

19   plants, the pipes.  Any questions on that part?  Now it's

20   just going to go into some general observations around how

21   effective the order you've put in place has been, at least

22   from my perspective.

23       So, you know, I think it's being -- it's effective and

24   respected in the fact that I've been asked to visit with the

25   governor, lieutenant governor, the speaker of the house,

```
 1      other senators.  It's getting a lot of attention.  The
 2      city's been incredibly cooperative, and I spent a lot of
 3      time with the senior city staff as well keeping them
 4      informed.  But everybody is supportive of getting the water
 5      system fixed, and I think everyone has been supportive of
 6      the method at which we're going after this through this
 7      order, the way it's been set up.  I think it's just been --
 8      it's been great to be in the community and -- and get the
 9      support from folks that really want to see their water
10      system fixed, and they all are very supportive of the method
11      at which we're going after this.
12          You know, so one of the pieces that -- when I submitted
13      the financial plan, I had to do it in a fairly short order.
14      It was 60 days after the order was signed that it had to be
15      submitted, not enough time to get community input.  Over the
16      next month, we've got a series of community meetings set up,
17      nonpolitical.  We have not invited elected officials.  It's
18      to get input from the residents here in Jackson about
19      potential new rate structures as well as, you know, what
20      kind of organization would they want to see governing the
21      water system going forward.  And so we'll get that feedback,
22      and I think we'll be able to refine a recommendation to the
23      Court, at that point, about what that long-term path should
24      be going forward, and I'm looking forward to those meetings.
25          That's -- going to be a series of them.  We're
```

1    spreading them out throughout the community.  We're going to

2    do them on weekends whenever people are going to be

3    available.  My communication from Farenheit and the US Water

4    Alliance are helping me set those up and facilitate those

5    meetings.  So a lot of information gathering because we had

6    to jump out in front of some proposals that you may have

7    read in the financial plan around future governance options,

8    which I laid out several, as well as rate options, which

9    I've laid out several.  And so to fine tune that, getting

10   this community input is a critical piece of that.

11        THE COURT:  Well, what do you expect to hear from the

12   population?  I would expect for them to say that they want

13   constant water, cleaner water, and cheaper water.

14        What else do expect for them to say?

15        MR. HENIFIN:  I also expect -- what I'm trying to get

16   out of them is do they want -- who do they want to be

17   running their water system.  Do they want it to be an

18   authority that's created by the state?  Do they want it to

19   be an authority created by the city?  Do they want it to be

20   back in the city as a city department?  They want something

21   different?  There's a variety of ways to move forward, but

22   what -- which one will they trust, and which one do they

23   feel comfortable with I think is the big -- the big

24   question.

25        THE COURT:  But you said a few moments ago that you

1    didn't want to invite politicians because you didn't want

2    this to be a political meeting.

3        MR. HENIFIN:  So the -- so they could be free to speak

4    their minds about the -- where they feel comfortable about

5    the future of the water system.

6        THE COURT:  But that last question would be a political

7    question.

8        MR. HENIFIN:  So they would be able speak it without

9    politicians in the room or answer that question without

10   politicians in the room.  That's the intent of that being a

11   nonelected official question.

12       THE COURT:  And so how does the city feel about that

13   proposed town meeting without their involvement?

14       MR. HENIFIN:  All the council members want to be

15   involved.

16       THE COURT:  They want to be involved?

17       MR. HENIFIN:  They're all -- they're all trying to get

18   to all these meetings, and I think -- at that point, though,

19   I've talked to the senior -- the mayor in particular, and I

20   think he is okay, not maybe comfortable, but okay with the

21   idea that we need to solicit this information without

22   further political influence.  Doesn't mean we're acting on

23   it.  We're just trying to get feedback.

24       THE COURT:  And you want this feedback person to

25   person?  That is, you want it to be a meeting with the

1    members of your team talking directly to the public?

2        MR. HENIFIN:  Yes.  Yes, Your Honor.

3        THE COURT:  So therefore, you have ruled out the

4    prospect of sending out a questionnaire?

5        MR. HENIFIN:  Not ruled it out yet, sir, but we're --

6    let's get our first phase of feedback and see where that

7    goes.  But the questionnaire could easily follow.

8        THE COURT:  And how committed are you and your team on

9    this notion of not allowing politicians to attend?

10        MR. HENIFIN:  We're not going to throw them out, Your

11    Honor.  We're asking them not to attend.

12        THE COURT:  And so if they do attend, is that when you

13    throw them out?

14        MR. HENIFIN:  No, we're not going to throw them out,

15    Your Honor.

16        THE COURT:  Okay.

17        MR. HENIFIN:  We'll try to manage it the best we can,

18    unless you want to order them to stay away.

19        THE COURT:  Well, the reason that you are pursuing this

20    in this manner is, as you said, you do not want them to

21    be -- that is the citizenry -- to be intimidated.

22        MR. HENIFIN:  Exactly.

23        THE COURT:  And feel like they are reporting their

24    political figures, and you just want to have their

25    unadulterated opinion as to this whole matter, but you still

1    have to acknowledge this question can spill over into a

2    political answer.

3         MR. HENIFIN:  Oh, it's extremely political, Your Honor.

4    Obviously, based on what's going on in the state capital,

5    there's a lot of interest in politics going on around our

6    water system.

7         THE COURT:  But as of right now, have you -- have you

8    taken any steps towards this community meeting?

9         MR. HENIFIN:  Yes.  So as my communications group,

10   Farenheit, as they've been setting up, you know, we've

11   talked about who they're inviting and who, you know, as far

12   as opening it to the public, and they've told the -- some of

13   the council members that have asked to be in attendance that

14   we're asking them not to.  It hasn't been a challenge to

15   receive that yet.  We'll see what happens when we actually

16   hold the meetings, but you know, we're expressing to the

17   council members and the mayor the fact that we're trying to

18   do this without a lot of political influence at least for

19   the feedback.  We understand that ultimately when a decision

20   or a recommendation is made to the Court, there's going to

21   be a lot of interest from the politicians on how that

22   happens.

23        THE COURT:  Will the public be provided any vital

24   information before the meeting?  For instance, what is the

25   cost of water in the City of Jackson?  Will they be provided

1    that and how that's determined, how that's calculated for

2    instance?

3    MR. HENIFIN:  Yeah.  So in the financial model, we've

4    developed several rate plans.  You know, you've identified,

5    I think, already some just in your comments.  So we don't

6    have everyone billed, and we don't even know where all the

7    accounts are.  There're a number of challenges with our

8    current metering system that we need to fix.  We're going to

9    stick on a meter basis.

10    So one of the questions to the public is would you

11    trust a nonmetered basis for billing water.  So the idea

12    would be you use a property attribute, say square footage

13    property value, and you would apply a factor to that to

14    calculate what their fair share of the water system cost

15    would be.  And that's pretty controversial in many ways, a

16    lot from the leadership and the state government that

17    believes that's potentially in violation of state law,

18    that's yet to be determined on our end from what argument we

19    might have that way.

20    But, you know, that's the -- the problem we have here

21    in Jackson is we've got eight -- actually more than, like,

22    ten years of failed metering issues.  We had the Siemens

23    Contract.  We weren't doing well just before that.  As

24    people lost faith in their meters and the city lost control

25    of the ability to meter and bill for a variety of factors,

 1    there's very low confidence when people get a bill, if they

 2    get a bill, that it's correct; and so we are battling this

 3    constantly.

 4        We've got over 6,500 properties we've identified that

 5    are improved and according to the assessor's database but

 6    have no corresponding water accounts.  So we've got to go

 7    put eyes on every one of those to see is it truly an

 8    improved property with an active water user?  Is it an

 9    abandoned house?  Is it just a garage?  But that's 6,500

10    properties we've got to go put eyes on to find out why

11    they're showing in the assessor's database as an improved

12    property, and we don't have a water account for them.  And I

13    can tell you anecdotally there's a number of folks in this

14    community that have told me, but they've tried to get a

15    water account.  And for whatever reason, they haven't gotten

16    one, and they've been using water for years.

17        So we've got so many problems associated with this

18    metering, and -- and we're -- I am committed to figure this

19    out one way or another.  But, again, one solution --

20    proposed solution that we really want people to give us some

21    feedback on is this idea of does it really matter if you

22    have a meter, and we come up with a different way to bill

23    you for your water that's equitable across the population,

24    affordable for everybody, and generates the revenue we need.

25    And it's easy.  You don't have to call us and complain about

1    your meter read because there won't be a meter read.  Your

2    bill will be the same month after month after month.  It's

3    very easy to bill, very easy to understand.

4         I think it's got a lot of positives from that -- you

5    know, our metering infrastructure is going to cost us

6    $10 million a year going forward.  That's the cost of our

7    billing staff; the IT folks that are -- we are contracted

8    with between the meter and where it goes into our billing

9    system; and then the metering contract which we've entered,

10   which is a no-cash-up-front-metering contract.  We didn't

11   spend anything.  They get it all on the backside as we start

12   using the meters.

13        And so once all the meters are in place, the ones that

14   are being installed today, the bill will be $5.2 million in

15   the first year and then escalate about 3 percent every year

16   for the next 20 years.  So we're on the hook for that

17   metering cost.  Haven't found a way out of the contract yet.

18   Haven't given up, but the buyout as they provide it to us,

19   $60 million, in today's dollars, to buy us out of that

20   metering contract.

21        THE COURT:  Have you determined who has the authority

22   to place commercial and residential customers on the e-plan?

23        MR. HENIFIN:  I am not sure what the e-plan is, Your

24   Honor.  I'm going -- I'm going to research it and find out.

25        THE COURT:  Well, I can tell you what it is.  I think I

1   said something about it last time.  The e-plan was not known

2   to the general public.  I bumped into it on another case.

3   And I do mean bumped into it because I didn't know anything

4   about it.

5         But the e-plan is -- it comes into focus when -- and it

6   had -- it had a good intentioned source for the e-plan.

7   That is, if the city is responsible for the nondelivery of

8   water because there's something wrong with the city pipes.

9         MR. HENIFIN:  All right.

10        THE COURT:  Or the city's delivery system.  Then the

11  homeowner or business should not be required to make

12  payments until the city corrects that problem.  So that was

13  called an e-plan.  And so, again, the e-plan had a great

14  beginning because why should the customer have to pay when

15  it's not the customer's fault that the distribution of water

16  was not being accomplished?

17        But then, later on, some entities and homeowners were

18  placed on the e-plan not for that particular reason.  And

19  I'm not talking about recently.  I'm talking about over the

20  years.  And so these entities were placed on the e-plan,

21  which means then that regular bills were not being submitted

22  to these entities, whether homeowners or businesses.  And in

23  fact, over the years, these e-planners were not required to

24  make any water payments for years.  Not just months, but for

25  years.  And some persons, in fact, even considered this

1    forbearance on having to pay water bills was a right that

2    they had because they had been off of the requirement so

3    long they didn't think they were required to pay any water

4    bills.  So this e-plan extended to the homeowner -- to

5    certain homeowners, and it extended to certain businesses.

6    And a great amount of revenue was lost to the city because

7    of this whole e-plan situation.

8         And then, when I asked some persons connected with the

9    water company, how could I find out who all were on the

10   e-plan so that one could investigate to see whether they

11   were legitimately on that e-plan, the answer was no, because

12   the answer was -- was that there was not a computer model

13   that would identify the e-planners.  And so then, people

14   just stayed on it.

15        So I asked from time to time, you know, about that, but

16   I didn't have a lawsuit to work with at the time, but

17   nevertheless -- and I was given various reasons as to why

18   certain individuals or businesses were placed on the e-plan.

19   When they didn't have this circumstance, I just described to

20   you where it was the city's fault that they were not being

21   distributed water.  There were other considerations

22   involved.

23        And this apparently lasted for quite a while.  Years.

24   And so, as I said, I wanted to know why the city just simply

25   couldn't hit a button on the computer and create all of the

1    folk on e-plan and then go out and investigate as to whether

2    they legitimately were on the e-plan.

3        MR. HENIFIN:  That might explain the 6500 properties

4    that I just described, why they don't have accounts.  But

5    this is the first I've heard of the e-plan, but it may help

6    me in my further investigation as to why we don't bill a

7    hundred percent of our customers, haven't for years.  Lacked

8    about 60 to 70 percent of the revenue we should.

9        But there's just huge gaps in the information, and, you

10   know, it's part of my job, because I was given that lovely

11   prize of the water and sewer billing administration, will be

12   to get to the bottom of that and make sure that everyone is

13   using water, is charged the appropriate rate, and we are in

14   the business of collecting that.  But it needs to be

15   affordable.

16       There's no doubt that in current rate models there is a

17   disjoint to making -- rate has to be the same for all

18   customer classes.  And in our traditional model, we set the

19   rate where we think it's affordable for the lowest quintile

20   of our population, and that's a subjective determination

21   made by people like me and my staff.  And that could be 6,

22   8, 10 percent of their household income devoted to their

23   water bill.  Frankly, I find that terrible, something that I

24   am looking for a better way.

25       And, again, some of the billing mechanisms we've

1    suggested and I've have suggested through the financial plan

2    does address that in a more equitable way.  And I think as a

3    country we need to be concerned about the rising cost of

4    water.  Water's expensive, and -- and let me give you a

5    quick summary of what I've been telling everybody about

6    water here, and it's true across the country.

7        Actual water is pretty cheap.  We get it for free from

8    the reservoir or the river.  We add a little bit of chemical

9    and a little power and we push it out into the system.  The

10   expense is in the big infrastructure we've already got in

11   the ground and the treatment plants; the labor to run the

12   treatment plants; the labor to maintain the pipes, fix the

13   pipes.  Nothing to do with actual -- the water you consume.

14   Because if you didn't drink water tomorrow and everyone in

15   your neighborhood drink water tomorrow, all of those costs

16   would be the same whether you're using your water or not

17   with the exception a little bit of chemical and a little bit

18   of power.

19       And so all our cost is fixed essentially.  And that's

20   why a consumptive rate is just -- doesn't make much sense

21   for water whether you're in Jackson or whether you're in

22   Sacramento or wherever you are in the country.  It's a habit

23   we've gotten into.  It's the accepted practice.  It's the

24   method at which we bill.  It needs to change, and I'm hoping

25   it changes here in Jackson as a result of this order.

1      THE COURT:  Do you have a model across the country that

2   you hope to follow?

3      MR. HENIFIN:  Nobody else has gotten to that point.

4   We've got some studies that have been done by the US Water

5   Alliance.  We would be, as far as I know, the first utility

6   to try to do a property-attribute-based rate across the

7   board.

8      THE COURT:  And you're hoping that that will come to

9   pass in the near future?

10      MR. HENIFIN:  I am, but it's going to be a battle.  We

11   may need your help, Your Honor.

12      THE COURT:  All right.  Well, I'm here.

13      MR. HENIFIN:  Thank you.

14      THE COURT:  Go ahead on.

15      MR. HENIFIN:  So I don't know that I've got a whole lot

16   left.

17      THE COURT:  Well, that's okay.

18      MR. HENIFIN:  Those are -- those are the big-ticket

19   items.  I would like to mention one that has come up is

20   the -- as it's sort of related to the order you started with

21   this morning on the confidentiality on the other issue

22   before another judge here.

23      Your Honor, I am in charge as a part of your order as

24   billing for water and sewer.  It's a single enterprise, and

25   I bill -- have to bill for both, and yet, I've got no

1    control or authority on how the sewer dollars are spent.

2    And with a large federal influx that came, fortunately, at

3    the time of this order, shortly after that, we've got a lot

4    of money to work with water, but we don't have a lot of

5    money to work with sewer, because all of that federal money

6    has been designated and restricted largely for sewer -- or

7    for water use only.  But by using those in combination in

8    the same financial plan, we can take more of our local

9    revenue and devote it to sewer while we use the federal

10    revenue for the water side.

11       So I think there's some opportunities by bringing these

12    together.  I think the parties are going to talk more about

13    that, but I'm hoping that we figure out how to make that

14    work.  And that's, I think, all I have got, Your Honor.

15       THE COURT:  Well, I have one more question.  We've had

16    a lot of conversations here and about the water plants, all

17    of the water plants, and then you-all are sending me a ton

18    of paperwork.  You've killed a lot of trees.  And I've been

19    reading all this stuff trying to develop some expertise on

20    this, but I'm limited on my development when I'm just

21    reading.

22       What's the possibility of a tour of the water plant?

23       MR. HENIFIN:  Anytime you want, Your Honor.  I'm ready

24    to take you.

25       THE COURT:  Okay.

 1          MR. HENIFIN:  We'll put people that really know what's

 2     going on out there with us because I'm not the expert.  You

 3     know, I can make a lot of things happen, but I'll have

 4     someone there who can tell you everything you want to know

 5     about that water plant.

 6          THE COURT:  Okay.  I want a tour of the water plant.

 7     And then, would it be any problem if I take pictures while

 8     I'm out there for my own files?

 9          MR. HENIFIN:  No, sir.  We'd appreciate you do it.

10          THE COURT:  Okay.

11          MR. HENIFIN:  We're not hiding anything out there.

12          THE COURT:  Okay.  Good.  That's what I wanted, to make

13     my file and have my tour, and I have some questions with the

14     hands on so I can have some idea about what's going on

15     hands-on.  And I want to see all of that.

16          MR. HENIFIN:  I would love to take you, Your Honor, and

17     we'll have a great time at the drinking water plant.

18          THE COURT:  Okay, then.

19          MR. HENIFIN:  Both plants.  Yes, sir.

20          THE COURT:  All right, then.  Anything else you want to

21     tell me?

22          MR. HENIFIN:  That's about it.  Have a good weekend.

23     Drink lots of water.

24          THE COURT:  Well, I'll be right here over the weekend.

25          All right.  Anybody else have something that you would

```
1     like to add up here, anybody else?

2         MS. MARTIN:  Your Honor, Catoria Martin on behalf of

3     the City of Jackson.  If I may clarify some points, if that

4     is acceptable?

5         THE COURT:  Okay.  Sure.

6         MS. MARTIN:  And, Your Honor, I tried to make some

7     notes based on the comments from Mr. Henifin, and we -- we

8     do have a very good working relationship.  We -- we meet

9     with Mr. Henifin probably at least weekly either virtually

10    or in person; and so I did just want to clarify some of the

11    points that came up.  Some of them make sure that Your Honor

12    is cleared on kind of where we are in terms of status, but

13    also some of them just to make sure that the Court is

14    informed.

15        And so the first one is on the displaced employees.  So

16    you heard Mr. Henifin talk today about, you know, three

17    employees who did not want to continue working with the

18    third-party operator, which is Jacobs Engineering, and two

19    employees who didn't pass the background check.  So we are

20    happy to hear that it sounds like only one of those three

21    employees will be returning back to the city, and I did want

22    to inform Your Honor that we do have a plan for those

23    employees who Mr. Henifin has not found performance issues

24    with.  We will try to place those employees in other places

25    within the city.
```

1    And so on the sewer side, we have some open positions,

2    and so we will try and place those employees in other places

3    in the city.  And so we've worked with Mr. Henifin to ensure

4    that whatever employees he's not able to keep employed, they

5    will come back to the city, and if there are no performance

6    issues, we will do our best to find a place for them in the

7    city.

8        THE COURT:  Okay.  Thank you.

9        MS. MARTIN:  On the long-term contract for maintenance,

10   the city has in the past done longer term contracts.  I

11   think the best example of that is our contract on the sewer

12   side.  We have a contract with Veolia, and that was

13   initially a ten-year contract with a five-year extension.  I

14   did want to include that the stipulated order that was

15   entered into by all of the parties actually requires that if

16   the third-party manager enters into a long-term contract,

17   that contract then has to be reviewed by the office of the

18   city attorney.

19       So the City of Jackson will have the opportunity to

20   comment and offer suggestions on any long-term contract that

21   is entered into, and the city is very interested in reducing

22   cost on those long-term contracts.  And so we will at that

23   point have a discussion with the third-party manager about

24   longer terms but also how -- depending on the amount of --

25   the amount time and the term and the ability to make some

1    repairs on the distribution side, how that might benefit the

2    city in terms of reducing that cost of that maintenance

3    contract.

4        And the city does have a past relationship with Jacobs

5    Engineering.  I don't know if that was clear to Your Honor,

6    but we have worked with them in the past.  We have not

7    worked with them in this capacity where they have provided

8    maintenance, direct maintenance, to that water treatment

9    plant, but the city has had a relationship with their

10    company in the past.

11        THE COURT:  Over what period of time?  Over what period

12    of time?

13        MS. MARTIN:  We -- we had at least one existing

14    contract with them in the last two years.  That was a

15    contract where we were trying to do some work personnel and

16    the public workings department.

17        THE COURT:  Okay.  Were you satisfied with the

18    performance under that contract?

19        MS. MARTIN:  I believe so.  I do -- I believe we were

20    very satisfied with their work at that point.

21        THE COURT:  And you're saying you believe?

22        MS. MARTIN:  I believe so because I did not -- I was

23    not the person who administered that contract, but we did

24    not terminate that contract, and the work that I saw that

25    they performed under that contract I thought was successful.

1          THE COURT:  Okay.  Continue.

2          MS. MARTIN:  Okay.  The third point that I want to talk

3     a little bit about is the public meetings that Mr. Henifin

4     is entering into where he has asked that politicians do not

5     attend.  He did have a conversation with the mayor about

6     those meetings.  I do think the mayor is in agreement.  I

7     have not been a part of any conversations with the city

8     council about those meetings.  But the city really sees

9     those meetings as hitting two points, one of which I

10    strongly believe will probably take up much of the time in

11    those meetings, which is his concept of modifying the rate

12    structure.

13         Mr. Henifin talked a little bit about his plan, and

14    we've had a lot of meetings with him about -- from day one,

15    I think we started having conversation with Mr. Henifin

16    about revising our rate structure, what's been detrimental

17    about our current rate structure, and how in the future, if

18    we modify that rate structure, it might benefit the city and

19    also citizens.  We really believe that having conversations

20    with the public about the proposed rate structure is

21    essential mainly because there has been a lot of confusion.

22    I think a lot of that confusion has been brought on from the

23    legislature.  We've had a lot of legislation that's been

24    proposed in this session, and a lot of that legislation was

25    proposed prior to Mr. Henifin actually producing this plan.

1          So prior to him making the financial management plan

2     public, there was some legislation that was introduced, and

3     the public is incredibly confused about what has been

4     proposed in the financial management plan and how that will,

5     in the end, affect the City of Jackson.  And so although

6     his, I think, reasoning for not involving politicians is to

7     try and keep politics out of it.  I do a hundred percent

8     agree with Your Honor that this is a political -- it's going

9     to be a political issue, but I also think that on behalf of

10    the city, we think it's important that the public have the

11    opportunity to have these conversations with Mr. Henifin

12    prior to his recommendation to this city on how we modify

13    the rate.

14         And that's mainly because in the current stipulated

15    order, it requires him to make a recommendation to the city

16    and consultation with the city to make a recommendation to

17    the mayor of any modifications of the rate structure.  The

18    mayor is then required to bring whatever the proposal is

19    from Mr. Henifin to the city council for the city council to

20    either approve or disapprove.  And the way that the

21    stipulated order is written, regardless of whether the city

22    council approves or disapproves of that rate structure, if

23    we have not had a rate increase in the last 12 months, it is

24    automatically implemented by Mr. Henifin.

25         And so we do think that it is incredibly important that

1    the public is able to chime in but also that they are

2    informed on the rate structure, the options that are

3    available prior to Mr. Henifin moving forward.

4        THE COURT:  Do you anticipate the rate structure

5    increasing the cost to the taxpayers or decreasing the cost?

6        MS. MARTIN:  Based on my knowledge of the plan, I think

7    that some citizens will experience a decrease, and a smaller

8    percentage of citizens will experience an increase.

9        THE COURT:  And what would be the metric to determine

10   whether one experiences one or the other, increase or

11   decrease?

12       MS. MARTIN:  So based on my knowledge of Mr. Henifin's

13   plan, if he moves forward with the property attributes, it

14   will depend on the size of their house or the value of the

15   house.

16       So I think the current plan has some property

17   attributes.  One of them is based on square footage of your

18   house, and one of them is based off of actual property

19   value.  And I think that's what led to some of the confusion

20   with the public because the legislation that's been

21   introduced -- at least one of the bills specific -- is

22   specific to the rate being based off of consumption, and

23   although -- you asked a question earlier of Mr. Henifin of

24   whether or not there was a model in the United States for

25   this property attribute rate structure.  There is not a

1    model for the property attribute rate structure.  However,

2    even here in the state of Mississippi, there is a model for

3    fixed rates.

4        So there are some municipalities that do not charge

5    based on consumption.  They charge a fixed rate.  And that

6    rate is based off of, I think, their actual cost, but it's

7    not based on the individual household's consumption of

8    water.

9        THE COURT:  Do you recall the identities of those

10   municipalities?

11       MS. MARTIN:  Let me confer with my colleague.

12       THE COURT:  Okay.  Go right ahead.

13       MS. MARTIN:  I apologize, Your Honor.  Long Beach,

14   Mississippi, has a fixed rate, and we believe it's smaller

15   municipalities.  But Long Beach, Mississippi, we're certain

16   has a fixed rate.

17       THE COURT:  Okay.

18       MS. MARTIN:  So that was my comment on the public

19   meetings, and I don't know that in those public meetings --

20   and we've been in a lot of town hall meetings with the

21   public.  We believe that the time will probably be taken on

22   rate structure.  We fully expect that the conversations

23   about a governance structure will probably be something that

24   will come along later, and we believe that there is time for

25   that discussion.

1          The last point I wanted to make is -- and Mr. Henifin

2    mentioned this on the end of his comments about the sewer

3    side.  We are just as -- you know, we -- we talked briefly

4    about the confidentiality order at the beginning of this

5    hearing today.  We are fully engaged with the Department of

6    Justice and the Environmental Protection Agency on the sewer

7    side on the Clean Water Act consent decree that we currently

8    have in place.  We have read through Mr. Henifin's plan.

9          His plan includes some financial restructuring on the

10   sewer side as well.  And it's like he said, the bills that

11   we send out -- when we send out a water bill, it actually

12   has three components.  It has water, sewer, and sanitation

13   all included in that one bill.  And so we do not -- we'd

14   have no opposition to making some changes on the sewer side;

15   however, we do -- we are currently engaged in conversations

16   with Mr. Henifin to make sure that he understands the sewer

17   projects that we believe need priority.

18         We don't know that we have much time on the sewer side

19   to wait for revenue to be generated.  And so literally in

20   the last week, we've been having conversations with

21   Mr. Henifin about how to move forward in terms of our

22   financial situation on the sewer side now that we are

23   focusing more on the sewer side as part of this agreement.

24         THE COURT:  Are you telling me that the sewer side is

25   more problematical than the water side?

1          MS. MARTIN:  Your Honor, I would not say that it has

2    more problems; however, I would say that it is just as

3    urgent as the needs on our water side.

4          THE COURT:  So tell me some of the dire consequences on

5    the sewer side.

6          MS. MARTIN:  So we're already under a consent decree on

7    the sewer side, and I would say that we are partially in

8    compliance on that.  But the areas where we are not in

9    compliance is -- we have many issues with what they call

10    SSOs, Sanitary Sewer Overflows, and we're experiencing those

11    throughout the city.  They're leading to sewer backups.  And

12    so just generally, that is kind of where we are on the sewer

13    side.

14          But we have, I think -- currently our list of SSOs is

15    like 256.  And from the legal department's point of view,

16    we -- we believe that it is urgent, and it is something that

17    we need to focus on, and that there are some serious

18    priorities within the city when it comes to the sewer

19    department.

20          THE COURT:  So these issues on the sanitation side and

21    the sewer, do they have consequences with regard to disease

22    possibilities?

23          MS. MARTIN:  Yes, Your Honor.  I would actually say

24    Mr. Henifin is qualified to -- to tell you kind of what

25    those issues could be.  He is not as knowledgeable with the

1    projects and with the issues that we have.  We just recently

2    started disclosing to him some of the problems that we have

3    and some of the projects that we have planned for the next

4    12 months, but Mr. Henifin's background is actually in

5    sewer.  He has a lot of experience on the sewer side, on the

6    Clean Water Act side.

7        THE COURT:  So then these problems that you just

8    mentioned on the unsanitations and the problems generated

9    through the bad sewage, is that a -- a germ matter, or is

10   that some kind of other problem there besides just germs?

11   What about parasites?

12       MS. MARTIN:  I'm going to defer to Mr. Henifin, the

13   technical expert.

14       THE COURT:  Okay.

15       MR. HENIFIN:  All of the above.  You know, raw sewage

16   is -- is the source of many intestinal and gastrointestinal

17   illnesses.

18       THE COURT:  Right.

19       MR. HENIFIN:  And being in contact with that threat

20   that -- look worldwide.  About three and a half million

21   people die a year from waterborne illness.  Most of those

22   are children.  So yeah.  There's a serious danger if you're

23   exposed to raw sewage of getting the gastrointestinal

24   disease.  The United States and most developed countries

25   have medicine and doctors to take care of that, but left

1    untreated, they're definitely threats to the human life.

2         THE COURT:  And again, will the illness stem from

3    germs, parasites?

4         MR. HENIFIN:  It's the bacteria predominantly.

5         THE COURT:  I was about to get to that one next,

6    bacteria.  I mean, what is it?

7         MR. HENIFIN:  It's E. coli bacteria.

8         THE COURT:  E. coli.  Okay.  Well, this the first time

9    I've heard that term here during this session.  And so

10   that's what it is, E. coli?

11        MR. HENIFIN:  Predominantly.  There's a number of other

12   potentials in the waste water that can also cause gas -- and

13   I don't know the biology of all of those but -- or the

14   whatever -- the virology of all of those.  But there's

15   viruses; there's E. coli bacteria; there's other bacteria;

16   there could be Norovirus, which is, you know, the disease

17   that many cruise ships suffered over the years where it's an

18   intestinal disease; Legionnaires' disease.

19        You can get a variety of things in your waste water

20   that -- when it's raw and untreated pose a serious public

21   health risk, which is why it's highly regulated.  It's very

22   serious when you have sanitary sewer overflows because you

23   expose the public to untreated waste water which is a

24   dangerous public health issue.

25        THE COURT:  Do you have an estimate on how many Jackson

 1     citizens have been exposed to this?

 2          MR. HENIFIN:  I do not as --

 3          THE COURT:  And have had to receive medical treatment,

 4     for instance?

 5          MR. HENIFIN:  I have no idea.  As Ms. Martin explained,

 6     I've just, within the last week, started talking to them a

 7     little bit about their sanitary sewer issues.

 8          THE COURT:  In order --

 9          MR. HENIFIN:  You wouldn't even -- I don't know that

10     doctors would even pick up on it.  They might think it's

11     just a regular gastrointestinal virus or something going

12     around.

13          So typically, I refer -- I guess I defer to the public

14     health officials.  But in the United States, I don't know

15     that we've seen large public health outbreaks as a result of

16     exposure to raw sewage.  I think this potential's always

17     there, but it's probably less quantified because folks go to

18     their own doctor or they just think, oh, I've got food

19     poisoning or the stomach flu and it goes away in a week or

20     two in normal cases.  And if you don't get dehydrated, you

21     don't get hospitalized.

22          But I think we even have more people on the call that

23     could probably explain it in greater depth if we needed to.

24     But I do know that it is a serious public health issue.

25     It's why it's highly regulated.  EPA puts more work, in my

1   opinion, on enforcement on the waste water side than they do

2   on the drinking water side because it is such a challenging

3   issue.

4        THE COURT:  Ms. Martin, do you have any idea of reports

5   of Jackson citizens who may be exposed to this?

6        MS. MARTIN:  Your Honor, I can certainly say we do not

7   have any claims based on citizens being exposed to raw

8   sewage.  What our fear is -- most of the claims that we have

9   with regard to waste water are individuals who have homes

10  that have been damaged based on the sewer backup.  And so

11  the majority -- vast majority of our claims, that is what

12  our claims are is that it's some type of damage that's been

13  caused to a home based on the sewer backup from the issues

14  that are at the street.

15       However, what I will say is our greatest fear is that

16  because of the sanitary sewer overflows that the raw sewage

17  might be seeping into a lake or some other body of water

18  that has the potential for citizens to be exposed to it.

19       THE COURT:  Do you have a raw sewage hotline?

20       MS. MARTIN:  3-1-1.  Our 3-1-1 hotline is our hotline.

21  That's how we have identified the 256 sanitary sewer

22  overflows.  It's been based on individuals calling them in

23  and us going out and checking and confirming that it's a

24  sewer overflow.

25       THE COURT:  And that's a 3-1-1 number?

1          MS. MARTIN:  Yes, Your Honor.

2          THE COURT:  And that number goes to who?

3          MS. MARTIN:  The department of public works.

4          THE COURT:  And what's the response time?

5          MS. MARTIN:  The response time to fixing the issue?

6          THE COURT:  That's right.

7          MS. MARTIN:  The response time to fixing the issue, it

8     depends on the issue that is presented.  If it is an issue

9     that the city has the equipment and the resources to fix at

10    the time, I would say your response time is seven days or

11    less.  If it is -- we kind of have a list where we've said,

12    you know, yes, this one we can respond to right away.  We

13    can -- I don't know all of the terminology.  I'm definitely

14    not a technical expert.  But it's essentially a way that

15    they can blow the system.  What is it?

16          They have a vacuum truck.  And so they can sometimes

17    fix some of those issues by using that vacuum truck, but

18    there are some issues that require much more complicated

19    work.  The best example I would give you is we've got a

20    project that's in The Queens that is estimated at

21    $23,000,000.  And so we've experienced many calls in that

22    vicinity based on those sanitary sewer overflows, but again,

23    it is individuals who are having issues in-home from the

24    backup based on the fact that we need to replace pipes.

25    Like, we need to do more serious work in that area.

1          THE COURT:  Are most of the problems remedied by the

2     snake device?

3          MS. MARTIN:  No.  No, Your Honor.

4          THE COURT:  You know what I mean by the snake device?

5          MS. MARTIN:  Yes, Your Honor, I know exactly.  I do

6     know what that is.

7          THE COURT:  Okay.

8          MS. MARTIN:  I know exactly that is, and I would say

9     no.  They are -- the most of them are not remedied by that,

10    and I would say the majority of the calls that we get go on

11    a much larger list.  That is, when we have the resources,

12    when we have the equipment, that's when we start working

13    down that list, and that's one of the reasons why we are

14    having this conversation with Mr. Henifin about his

15    financial management plan versus the projects that we

16    believe are urgent projects.

17         THE COURT:  Okay.  Thank you very much.

18         MS. MARTIN:  Yep.  And the last thing I had on my list

19    was this e-code, I think, that you were asking Mr. Henifin

20    about.

21         THE COURT:  I did.

22         MS. MARTIN:  The City of Jackson -- I -- to our

23    knowledge, the only e-codes are utilized for buildings and

24    institutions that have medical -- where it is medically

25    necessary that water continue to be provided to those

1    entities.  And so it's our understanding that those e-codes

2    are put on those billings to make sure -- not that they

3    don't receive a bill, but that their water is not cut off.

4    The only other knowledge that we have of individuals

5    who might not be receiving a bill kind of goes back to the

6    Siemens debacle.  And it goes back to where the city, you

7    know, experienced many issues with that metering contract,

8    and based on those issues with that metering contract had

9    what we call "lost bills."  And I do think that's something

10   that we have communicated with Mr. Henifin about, and he has

11   a plan for how he wants to address that issue, and we're

12   working directly with him on that.

13   THE COURT:  Ms. Martin, the e-code matter goes well

14   beyond that.  And I don't need to get into this right now,

15   but this e-code debacle goes well beyond just making sure

16   that water wasn't cut off at these various places.  This

17   e-code matter goes back through different administrations,

18   and I don't want to say anything else about that.  But this

19   determination as to who is going to receive an e-code had

20   some other aspects to it.  We can discuss all those some

21   time later, another occasion, but it has more aspects to it

22   than simply what you just said.  That just merely means that

23   you're just not fully familiar with it.  But unfortunately,

24   people were placed on the e-code for favors.

25   MS. MARTIN:  Your Honor, we appreciate you bringing

1    that to our attention.

2        THE COURT:  Okay.  Thank you now.

3        MS. MARTIN:  That's all I have.  Thank you.

4        THE COURT:  Oh, let me say something else, Ms. Martin.

5        MS.  MARTIN:  Yes, Your Honor?

6        THE COURT:  I don't want anyone getting the impression

7    that I said that your boss is the one who did all this.  So

8    let me just quickly add that this whole matter with the

9    e-code has a long history.  And so it has gone through

10   different administrations who have taken their perspective

11   as to why they wanted to put certain people and businesses

12   on the e-code which did not have proper purposes.  But I was

13   not saying that these e-codes are the result of this

14   administration.  These e-codes preceded this administration

15   and -- and more than one administration.  So at some point,

16   then we can talk at length about it, but right now, I

17   don't -- I don't see why I need to go ahead and -- and as

18   they say rustle in the feathers on this.

19       MS. MARTIN:  We appreciate that as well, Your Honor.

20       THE COURT:  All right.  But I can tell you that I am

21   very familiar with this because when I found out about it, I

22   was incensed, and I tried my best to determine what could be

23   done on this matter.  As I said, I was naive at first.  I

24   thought that all I had to do was talk to various people who

25   would go to the specific computer and punch a button and all

 1    of the e-codes would come out.  And I would see the names

 2    and addresses of businesses and residences and then send

 3    somebody out there who would confirm that these e-codes were

 4    not appropriate, that they were for another reason.  And I

 5    thought that that's all that had to be done, but every time

 6    I made that inquiry, I was told that there was no computer

 7    with the water company that could spit out e-codes.

 8         So instead, I, on some circumstances, just gave all --

 9    got -- accumulated my anecdotal explanations as to who's on

10    it and what they said about being on it.  So...  but we can

11    talk about all those matters later.

12         MS. MARTIN:  Yeah.  Thank you, Your Honor.  We look

13    forward to addressing those issues with Mr. Henifin.

14         THE COURT:  Okay.  Thank you so much.  All right.  I

15    want to thank you again for giving me a great update on what

16    is transpiring over there.  It seems to me that you've

17    managed to make some real headway here, and I recognize that

18    with the seriousness of the problem, that it's not a fix

19    that can be provided over night.  It's going to take some

20    time.  And so I know that from time to time there might be a

21    hiccup or two that takes you back to the starting block when

22    you find something that you did not know existed and then

23    you have to try and deal with it.  But we will work along

24    those lines, and we'll see.

25         Now, finally, you talked about having to pay off some

1 contracts after you've gotten into them.  Now, before you

2 actually submit the checks, could you submit a copy of what

3 you proposed and submit them to me?  Because then I would

4 like to have the amount of money that's being submitted and

5 a short explanation of what is being submitted.  That's for

6 your protection, the city's protection, and for my oversight

7 responsibilities.

8   MR. HENIFIN:  I understand, Your Honor.

9   THE COURT:  I won't hear later that some monies were

10 expended that shouldn't have been expended or some monies

11 were expended in a greater amount than should have been

12 expended.  So in order to protect all the parties, we got to

13 provide a check and balance.  And when you were here last

14 time, I asked you whether there was a check and balance, and

15 you said that you would be the one responsible for paying

16 the bills.

17   Well, you need some protection, and so I need then to

18 know what amounts of money you intend to expend before you

19 expend it so I can at least look it over.  And as soon as I

20 get it, I will read it.  And then, if I need -- if I have

21 some questions, I will call you up.

22   MR. HENIFIN:  And for clarification, Your Honor, that's

23 for a reference to potential buyout of the metering

24 contract, which doesn't seem within reach.  The rest of

25 expenditures are currently just paying folks for work

```
 1      they're doing.
 2           Do you want to see all of those before they --
 3           THE COURT:  I don't need --
 4           MR. HENIFIN:  Just the contract buyout, right?
 5           THE COURT:  The contract buyout is just what I want to
 6      see.
 7           MR. HENIFIN:  And there may not be any of those because
 8      it's out of reach at the moment, but we're still exploring
 9      that opportunity.  If we get there, I will bring that to
10      you, yes, sir.
11           THE COURT:  Okay.  Because see, that would be a major
12      cost.
13           MR. HENIFIN:  Yes, sir.
14           THE COURT:  But paying people for work performed on an
15      hourly rate and stuff like that, I don't need to really see.
16           MR. HENIFIN:  Appreciate that.  Yes, Your Honor.
17           THE COURT:  Okay.  Because that'd just be too onerous
18      of you to have to produce all these people.
19           All right.  Is there anything else from anybody?  Has
20      anybody been excited about this conversation that you wanted
21      to jump up and say something else?
22           All right.  I don't see anybody else jumping up.  So
23      all right.  Thank you all so much then.
24           COUNSEL:  Thank you, Your Honor.
25
```

1             (Court adjourned at 10:49 a.m.)

2      **************************************************************

**COURT REPORTER'S CERTIFICATE**

I, Caroline Morgan, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically reported by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 23rd day of March, 2023.


*/s/ Caroline Morgan, CCR*

Caroline Morgan, CCR #1957
Official Court Reporter
United States District Court
Caroline_Morgan@mssd.uscourts.gov