UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                          Plaintiff

V.                              CASE NO. 3:22-cv-686-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI                  Defendant

**TRANSCRIPT OF STATUS CONFERENCE**

BEFORE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

January 12, 2023
Jackson, Mississippi

The proceedings were reported by a stenographic court reporter.
The transcript was produced using computer-aided transcription.

*Margaret Wasmund, RDR, CRR*
*Court Reporter*
*2851 Shiloh Road*
*Pelahatchie, Mississippi 39145*
*margaretwasmund@gmail.com/601-329-6113*

APPEARANCES:


REPRESENTING THE PLAINTIFF:

Karl J. Fingerhood, Esquire
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Washington, DC  20044

Angela Mo, Esquire
U.S. Department of Justice, ENRD
150 M Street, N.E., Room 2.900
Washington, DC  20002

Angela Givens Williams, Esquire
Mitzi Dease Paige, Esquire
U.S. Attorney's Office
501 East Court Street, Suite 4.430
Jackson, MS  39201


REPRESENTING THE DEFENDANT,
THE CITY OF JACKSON, MISSISSIPPI:

Catoria Parker Martin, Esquire
Terry Williamson, Esquire
City of Jackson
455 E. Capitol Street
Jackson, MS  39201


REPRESENTING THE INTERESTED PARTY,
JACKSON WATER:

Malissa Wilson, Esquire
Charles Mitchell McGuffey, Esquire
Forman Watkins & Krutz, LLP
210 E. Capitol St., Suite 2200
Jackson, MS  39201-2375

ALSO PRESENT:

Ted Henifin, Interim Third-Party Manager
Gerald Kucia, Esquire
Mr. Bryan Myers
Suzanne Armor, Esquire
Mr. Johnnie Purify
Suzanne Rubini, Esquire
Jim Vinch, Esquire
Mr. Jairo Castillo
Gabriel Allen, Esquire
Ms. Mary Jo Bragan

1          (January 12, 2023, 1:29 p.m.)

2               THE COURT:  Good afternoon.  This is United States of

3     America, plaintiff, v. City of Jackson, Mississippi, defendant,

4     Case Number 3:22-cv-686.  I scheduled this matter today to get

5     an expedited status report.  Now, before I get to anything else

6     in this matter, I want to be sure that I have the identities of

7     the parties represented.

8          So Terri, do you have their names?

9               THE COURTROOM DEPUTY:  No, sir, I do not.

10              THE COURT:  Okay.  Then I'll handle it.  Then let's

11    start over here.  I know you gave your names to the court

12    reporter, but I want you to also provide your name for the

13    record in this matter.  So now could we start right there.

14              MR. FINGERHOOD:  Yes, Your Honor.  Good afternoon.

15              THE COURT:  Good afternoon.

16              MR. FINGERHOOD:  Carl Fingerhood with the U.S.

17    Department of Justice, Environmental Enforcement Section.  My

18    cocounsel is appearing by Zoom.  I'll let her introduce

19    herself.

20              THE COURT:  Okay.  Cocounsel for DOJ.

21              MS. MO:  Good afternoon, Your Honor.  This is Angela

22    Mo with DOJ representing the United States EPA.

23              THE COURT:  Now, Counsel, who will be the

24    spokesperson for DOJ?

25              MR. FINGERHOOD:  I will be, Your Honor.

```
1              THE COURT:  Okay.  Thank you.
2        Next.
3              MS. WILLIAMS:  Your Honor, Angela Givens Williams on
4    behalf of the United States with the U.S. Attorney's Office.
5              THE COURT:  All right.  And will you be appearing
6    along with any cocounsel?
7              MS. WILLIAMS:  Mr. Fingerhood will be making the
8    entire presentation for the United States.
9              THE COURT:  Okay.  Thank you.
10       Next.
11             MR. KUCIA:  Gerald Kucia, Your Honor.  I'm here on
12   behalf of the State of Mississippi and the Attorney General's
13   Office.
14             THE COURT:  And will you be alone or with somebody
15   else?
16             MR. KUCIA:  I'm by myself, Your Honor.
17             THE COURT:  All right.  Thank you.
18       Now, let's go to the other side.
19             MR. HENIFIN:  Good afternoon, Your Honor.  I'm Ted
20   Henifin.  I'm the interim third-party manager that was named in
21   the order.
22             THE COURT:  Right.
23       Next.
24             MS. WILSON:  Yes, Your Honor.  Malissa Wilson,
25   counsel for the interim third-party manager, with Forman
```

1    Watkins & Krutz.

2              THE COURT:  Thank you.

3              MR. MCGUFFEY:  Judge Wingate, Mitch McGuffey,

4    cocounsel with Malissa, and also with Forman Watkins & Krutz.

5              THE COURT:  And between the two of you, who will be

6    the spokesperson?

7              MS. WILSON:  Your Honor, Mr. Henifin will be speaking

8    on behalf of the third-party manager since he's here.

9              THE COURT:  Okay.  Thank you so much.

10       Next.

11             MS. MARTIN:  Your Honor, Torri Martin.  I first want

12   to apologize for leaving our Zoom call early and running over

13   here and then apologize for getting over here a little late,

14   but Torri Martin.  I'm here on behalf of the City of Jackson,

15   and I'm joined by cocounsel --

16             MR. WILLIAMSON:  Terry Williamson.

17             MS. MARTIN:  And I will be speaking on behalf of the

18   City of Jackson.

19             THE COURT:  Okay.  Thank you.  I hadn't seen you in

20   awhile, Ms. Martin.

21             MS. MARTIN:  I know, Judge.

22             THE COURT:  In fact, it's been about five minutes,

23   right?

24             MS. MARTIN:  I know.

25             THE COURT:  Yes.  For the rest of you, she was on a

```
 1    conference call with me in another case, had nothing whatsoever
 2    to do with this.  So then she left, but your cocounsel on the
 3    conference call advised me why you were scurrying out of there.
 4    I would have told you that you didn't have to fly out of there
 5    so fast that you might have done damage to yourself.  So I've
 6    seen you just five minutes ago.
 7         Now, then, let's move on to this matter at hand.  There's
 8    some other people on this Zoom.
 9         Terri, do we know who they are?
10              THE COURTROOM DEPUTY:  No, sir.
11              THE COURT:  I see some other pictures here.  Can I
12    have the identities of these people if they're going to be
13    involved in this.
14              MR. FINGERHOOD:  Yes, Your Honor.  We've invited some
15    experts from EPA to be available if necessary to address some
16    of the court's questions.
17              THE COURT:  Okay.  And who are they?  Can you see
18    your screen?
19              MR. FINGERHOOD:  Yes.
20              THE COURT:  Okay.  Who are they?
21              MR. FINGERHOOD:  There's Bryan Myers, who has his
22    hand up.
23              THE COURT:  All right.  Mr. Myers.
24         And who is --
25              MR. MYERS:  Nice to meet you.  Your Honor, I'm the
```

1    drinking water enforcement section chief for EPA in Region 4.

2              THE COURT:  Okay.

3              MR. FINGERHOOD:  And in the middle -- well, it just

4    changed.  Next to Mr. Myers is Suzanne Armor.  She's the EPA

5    attorney assigned to this matter.

6              THE COURT:  Let me see.  How do you spell the last

7    name, Armor?

8              MS. ARMOR:  Good afternoon, Your Honor.

9              THE COURT:  Suzanne Armor.

10             MS. ARMOR:  Yes, sir.

11             THE COURT:  Okay.  Attorney Suzanne Armor.

12             MS. ARMOR:  Yes, sir.

13             THE COURT:  Okay.  Got you.

14             MR. FINGERHOOD:  And the gentleman in the military

15   uniform is Johnnie Purify.  He is also with EPA Region 4.

16             MR. PURIFY:  Good afternoon, Your Honor.  I'm Johnnie

17   Purify.  I'm the manager for the grants and infrastructure

18   section in Region 4.

19             THE COURT:  Manager for the grants, you said?

20             MR. PURIFY:  Grants and infrastructure section.  I do

21   the grants and the funding.

22             THE COURT:  Okay.  Thank you so much.

23             MR. PURIFY:  Yes, sir.

24             THE COURT:  Next.

25             MS. RUBINI:  Good afternoon, Your Honor.  My name is

```
 1    Suzanne Rubini.  I'm the deputy regional counsel in EPA
 2    Region 4.  I'm really just sitting in the gallery listening in
 3    if that's okay.
 4              THE COURT:  That's okay.  Thank you.
 5       Next?
 6              MS. PAIGE:  (Videoconference interference.)
 7              THE COURT:  Hold it.  We can't hear you.
 8              MS. WILLIAMS:  Your Honor, I'll introduce her.
 9    That's Mitzi Dease Paige.  She's an AUSA in our office, and
10    she's just listening in as well.
11              THE COURT:  Okay.  I don't see her picture up here.
12              MS. WILLIAMS:  She's down at the bottom in the --
13              THE COURT:  Oh, now I can see her.  Okay.
14              MS. PAIGE:  Here I am, Your Honor.
15              THE COURT:  This is Mitzi.  She says that she is
16    listening; is that correct, Mrs. Paige?
17              MS. PAIGE:  Yes, sir.  I'm a spectator in the
18    gallery.
19              THE COURT:  All right.  Thank you so much.
20       Next.  There was one more person, I believe.  Well,
21    there's two more.
22              MR. VINCH:  This is Jim Vinch.  I'm an attorney with
23    US EPA in Washington, D.C.  And I am just sitting to watch.
24              THE COURT:  Okay, then.  Thank you so much.
25       And then I believe the last person -- no, I think there
```

1    may be two more.

2              MR. CASTILLO:  Hi.  This is Jairo Castillo.  I'm the

3    manager of the wastewater enforcement section in Region 4 EPA,

4    just in listening mode.

5              THE COURT:  Okay.  Mr. Castillo; is that correct?

6              MR. CASTILLO:  Castillo, yeah.

7              THE COURT:  All right.  Next.

8              MR. ALLEN:  Your Honor, my name is Gabriel Allen.

9    I'm an attorney at DOJ, but I am also just in the gallery today

10   only in listening mode.

11             THE COURT:  All right.  Thank you so much.

12       Next.

13             MR. BRAGAN:  I'm Mary Jo Bragan.  I'm chief of the

14   water enforcement branch in EPA Region 4.  And under that

15   branch are Brian, who does the drinking water enforcement, and

16   Hirah, who does the waste water enforcement.  And I am also

17   just in listening mode.

18             THE COURT:  All right.  Thank you so much.

19       Next.  Did I miss anybody?  All right.  Apparently not.

20   All right.  I have all the names.  Now, we're ready to get

21   started.

22       I asked for this interim and sort of expedited truncated

23   report session because of all the issues which have befallen

24   the City of Jackson since I signed this interim stipulated

25   order back on November 29, 2022.  Back on the date that I

1    signed this particular order, which resulted in the appointment

2    of our manager and the stipulated agreement among the parties,

3    I was under the impression that the situation on Jackson's

4    water was on the mend and improving.

5        But then, as I understand it now, thousands of citizens

6    were without water over Christmas and New Year's, which was a

7    surprise to me.  And so then I decided that it would be

8    appropriate to go ahead and find out where we are now, because

9    I was afraid that the dictates of this stipulated order may not

10   be in order, that the particulars would not be in compliance.

11   So I wanted to hear more about that at this phase so I can know

12   where we are and know what I have to start off doing, because

13   if the dictates of the interim stipulated order would not

14   accomplish our aims, then I need to move on for resolution of

15   this lawsuit through litigation.  So that's why I did this.

16       I'm fully aware that under the terms of the interim

17   stipulated order that reports are supposed to be made

18   quarterly.  And the first report to be made under the interim

19   stipulated order would be due at the end of this month.  But

20   that's a good ways away from where we are.  And if the

21   situation is dire at this point and if we are stuck in some

22   sort of litigation quicksand, then I need to go ahead and start

23   working on a judicial resolution of this matter.

24       So that's why I have had you-all contacted to be brought

25   here to catch me up with where we are at this time and also for

1   me to understand whether the parties are still in an optimistic
2   agreement or mood with regard to what has already been
3   established among and between you.
4        So then I need to hear something on this.  So how would
5   you like to proceed on this matter?
6            MR. HENIFIN:  Your Honor, I'd like to address some of
7   that as the interim third-party manager.
8            THE COURT:  All right, then.  Go to the podium,
9   please.  Now, you are the interim third-party manager?
10           MR. HENIFIN:  Yes, sir.
11           THE COURT:  And you were the agreed-upon choice to
12  handle this entire matter based on the conditions and
13  stipulations among the parties that -- well, I don't need to go
14  through everything that was in that order.  It's a long order.
15  I read every page of it and every word of it as to what is
16  supposed to transpire under your tutelage on this matter.
17       So then if you want to start off and provide a backdrop as
18  to where we were back on November 29 and where we are on
19  today's date so that I can understand what has transpired and
20  be able to answer my questions as to whether we are at a
21  standstill or whether we're still moving forward.
22           MR. HENIFIN:  Certainly, Your Honor.
23           THE COURT:  Are you ready to start?
24           MR. HENIFIN:  Absolutely.  Can I actually roll it
25  back maybe a week in front of that before you --

1    THE COURT:  All right.  Go ahead, then.  I'll be glad
2    to hear it.
3    MR. HENIFIN:  So as you're well aware, we had a state
4    of emergency declared in August --
5    THE COURT:  Correct.
6    MR. HENIFIN:  -- a federal declaration of emergency.
7    We also had a state declaration of emergency.  The state order
8    extended till November 22nd, the week before you signed this
9    order.  They were providing maintenance support.
10    August 30th, there was only one maintenance person at the
11    Curtis plant, a city employee.  There were no maintenance being
12    done of any real sorts.  They had very few operators.  So we
13    were in an extremely tenuous situation from a maintenance
14    standpoint.  And so when the order was declared, MEMA, the
15    state emergency management agency, brought in tremendous
16    resources to get us back operating there at the Curtis
17    treatment plant and did a fabulous job getting resources,
18    getting parts, materials, chemicals, everything that needed to
19    happen.
20    But at the end of that order, they were leaving.  And at
21    that point we had no other -- no maintenance people, no way to
22    order materials, no way to -- except through regular city
23    nonemergency methods.
24    THE COURT:  Well, then, excuse me, but what date did
25    they leave?

1          MR. HENIFIN:  November 22nd.

2          THE COURT:  They left on November 22nd?

3          MR. HENIFIN:  Yes, sir.

4          THE COURT:  Okay.  Go ahead.

5          MR. HENIFIN:  So recognizing we were on this path in

6    November, even though I wasn't appointed third-party manager at

7    that point -- I had been helping the city since the middle of

8    September -- I was working to get additional maintenance

9    resources on the ground.  And I worked out a deal with Jacobs,

10   which is a large operation and maintenance contractor.  They do

11   water and wastewater across the country.  They would allow us

12   to basically buy people, staff augmentation, through a task

13   order type contract.

14       So we lined up a few that we could get here, and they

15   started coming in the week before you signed the order, and

16   then they came in much larger numbers the week after.  So early

17   December, we were basically paying Jacobs to bring in

18   maintenance resources to bridge this gap for us.  The long-term

19   goal is to have a contract in place.  In fact, the first item

20   on our priority project list is to have an operation

21   maintenance contract in place.

22       That's not something you just click your fingers.  The

23   contractor has to come in, learn about the organization, learn

24   about what they're bidding on, see how it operates, what

25   condition it's in.  So by bringing them in as maintenance

1    resources, not under contract yet for the overall

2    responsibility of the plant, that was giving them the insight

3    they needed to start preparing to take over the operation and

4    maintenance as a full-time contract.

5        They were with us through December and they came from all

6    over the country because they had to pull resources where they

7    could find them.  And we really got into a pretty good routine

8    through December as we approached the holidays.  Things were

9    running very well.  Very tenuous -- this plant and distribution

10   system remain extremely tenuous from decades of neglect.  So

11   I'm never going to stand in front of you in the near term and

12   tell you that we won't run through this same issue again

13   tomorrow, next week, next month.  We've got a lot of time and

14   investment to make before we can say that confidently, and we

15   haven't had the chance to do that.

16       So Jacobs was on the ground helping us through

17   Christmastime.  We got close to the holiday, and this is where

18   I -- fully responsible for this decision -- we didn't require

19   these folks that had come from all over the country to stay

20   over the holidays.  They had families, places to go.  We

21   thought we were in a good position because we had run well for

22   all of December since they had been on the ground.  We still

23   had folks from the city here to operate the plant.  We had

24   folks that operate and maintain the fuel plant, so this has

25   been mainly focused on the Curtis plant.  There's two plants

1    here in Jackson.

2         And the fuel plant had some maintenance resources, and

3    they were willing to step up just for this period of time

4    between Christmas Eve and New Year's when we were letting the

5    Jacobs folks go back to their houses.  And I went back to my

6    home.  I'm from Virginia.  I planned to go home for the

7    holidays.  So I was home.

8         We had folks on the ground from the City of Jackson.  We

9    had Jordan Hillman who has been working for me who was the

10   former public works director who knows how to run the plant --

11   she's not a water person.  She's brilliant and a fast learner.

12   She knows a lot about it.  So she was helping direct things.

13   But we didn't require the Jacobs maintenance folks to stay

14   here.  So they weren't here during the freeze.  We lost a lot

15   of water out of the process as a result.  We weren't able to

16   react fast enough.

17        We drained the system, very similar to what happened in

18   August.  And getting it back online has taken -- we got the

19   majority of folks back with some water pressure later around

20   the 27th, 28th.  But there were people in south Jackson that

21   were without water for more than two weeks.  Unacceptable from

22   our perspective, but really nothing we could do with an

23   immediate fix to make that happen.

24        We've got lots of things in the order that will improve

25   that system, but it won't happen tomorrow and it won't be done

1    by February.  Sometime towards the end of the year we'll have a

2    much better, robust, resilient system based on what you've

3    approved in the order that's been written.  I'm confident of

4    that.  I'm optimistic.  The citizens of Jackson seem to be

5    hopeful and encouraging; and they were accepting that what

6    happened Christmas Day is the result of decades of neglect.

7        It wasn't that because I magically was named interim

8    third-party manager, it wasn't really my fault, but I do take

9    some blame for not having resources on the ground.  I'm not

10   sure I could have changed that, but I realize the buck stops

11   here now, and so I'm fully accepting of that.  But I've got

12   folks there now.  We've learned a hard lesson.  We're not

13   letting folks go away for any length of time until we've got

14   some real handle on the stability of the system.

15       That's what got us there.  And today, now we've got Jacobs

16   on the ground.  The plan moving forward to get to the operation

17   and maintenance contract is they're working with us to learn

18   more about the system, to learn what needs to be done.  Our

19   target date right now is February 13th for them to take control

20   of the system in a contract that's still not a full, long-term,

21   lump sum contract.  This would be an open book, basically,

22   reimbursement contract for another few months while they

23   continue to gather information that they need to provide a

24   realistic, not risk loaded, bid to us for a permanent -- or a

25   five-year contract for operation and maintenance.  So they need

1    time to make that happen, but I wanted them to be responsible

2    for the treatment sooner, so that's what's targeted our

3    February date.

4        In the interim, right now, they're hiring the city

5    employees that currently do that work, but they also have

6    advertisements out for other staff because there's just not

7    enough city employees even, but they'll bring on board, they'll

8    be part of Jacobs, and they'll be part of this contract

9    operation going forward.

10       Unfortunately, it all takes time, and we're in this very

11   tenuous situation.  So we're continuing to look for

12   alternatives that might help.  Jordan Hillman, who I mentioned

13   earlier, has been studying the distribution system with Terence

14   Byrd, who also was a city employee operating the plant -- still

15   is technically, but he's working directly for us -- to work on

16   the distribution system.

17       They've found valves that have been closed for a long

18   time.  They've been changing, opening valves that have been

19   closed, and we don't know why, dating way back.  And so

20   incrementally, I think we're making progress even without major

21   investments which take more time to happen.

22       I've hired a contractor that's coming in in February to

23   start doing valve assessments.  They're going to do valve

24   assessments on every valve in the system.  They're going to do

25   hydrant assessments on every fire hydrant in the system.

1    They'll start the valve work in February and have it completed

2    sometime in summertime, probably towards the end of July.  It's

3    going to make a big difference on what we know about the

4    system.

5         Prior to all this, we worked to get a hydraulic model

6    built of the system, which essentially is a computer

7    representation of the entire water distribution system.

8    Without that, you really have a hard time understanding how the

9    system operates, a system this size serving 150,000 people

10   covering the city of Jackson, which is a large city, 110 square

11   miles.  It's very complex.  And you can't really make good

12   decisions about your system if you don't have the data, meaning

13   you don't have a model and you can say, If I change this pipe

14   or change this valve or add a tank here, you understand the

15   impact on the entire system.

16        The city has not had a model of their system since the

17   '80s.  And even then, that was a very rudimentary version.  So

18   that model -- because we started that back in September with a

19   pro bono offer from one of the largest modeling firms in the

20   country building that model, it will be ready to use this month

21   only because we started back in September trying to get that

22   ready.

23        I've hired three engineering firms, national firms.  One

24   of them has been tasked with taking the model and doing some

25   analysis of the system to try to see if there's faster ways we

1  can ensure that we can keep pressure in south Jackson while we

2  work on the rest of these improvements.

3       We're evaluating whether we can switch some of the well

4  system over to the people at the very end of the surface water

5  system.  So we've got the well system down in the very

6  southern, western parts of the system.  It's not to cross into

7  the surface water system.  There shouldn't be a connection

8  between the two.  The two have very different quality water.

9  But the people at the very end of the surface water system

10 happen to be on the uphill side of Forest Hill -- of Forest

11 Hill Drive south of the high school.

12      And those houses, Mr. Cole, who I'm in communication with

13 regularly, is at the very end of the surface water system on a

14 hill.  He loses his water first, gets it back very, very late.

15 In fact, yesterday, the first day he's had significant pressure

16 all day long.

17      If we flip the well system around, we can actually put him

18 on the well system and ensure that he has better pressure.  So

19 we're looking at moving the boundaries of the well system to

20 help those that have been impacted the worst over and over

21 again.  And he's not -- this isn't his first time without water

22 pressure.  He's had a lot of problems with water pressure over

23 many years.

24      So I'm communicating with the community trying to

25 understand where the problems are -- Jordan Hillman, working

1    side by side with me -- to really get into the distribution

2    system and figure out how we can make that work better.  We've

3    got Jacobs working at the plant making sure things are

4    maintained and working.  But we're still -- example at the

5    plant.  I don't want to lecture you on water treatment, but

6    essentially one big part of it is you add chemicals --

7                THE COURT REPORTER:  Can you slow down just a little.

8                MR. HENIFIN:  I'm sorry.  I speak fast about water.

9                THE COURT REPORTER:  "You add chemicals."

10               MR. HENIFIN:  We add chemicals.  We mix it real fast

11   into the water as it comes into the plant, and that allows all

12   the small particles to clump together and essentially turn into

13   what we call floc.  And then you design a big settling basin,

14   so as the water flows through, gravity lets that drop to the

15   bottom.  And then your water is much clearer at the other end.

16   You run it through a filter and off you go.

17       If you're having turbulent problems and the floc doesn't

18   settle out fast enough, then you start putting some of those

19   solids over into the filters which reduces their ability to

20   filter the water.  They still filter it.  They filter it much

21   slower.  So now you don't get as much water out of the plant.

22       We have a failed system in the bottom of these settling

23   basins, sedimentation basins, that have that filtered

24   material -- or before it gets to the filter, the clumps of

25   small particles that gather together settle to the bottom.  We

1    use the term "sludge."  I really don't like that.  It's water

2    treatment residuals at the bottom of your sedimentation basin.

3    And those need to be removed every now and then or else it just

4    builds up inside the basin and then, again, you can't run

5    enough water through there to keep the capacity of the plant

6    up.

7         That system has been not functional at Curtis for decades,

8    so there's no automatic way to get the sludge out.  So we have

9    to take one basin down a third of the capacity of the plant

10   every ten days, clean out all that material that's built up in

11   the bottom, bring that basin back on.  And then we have to do

12   one of the other ones.

13        Every time we do that, we reduce capacity of that plant.

14   And the system here in Jackson is so fragile, if we don't put

15   out 45 million gallons a day every day at about 82 to 85 pounds

16   per square inch, we lose part of the system.  I'm not sure

17   there's any other system in the country that's in that

18   challenged situation.  On top of that, you've got 150,000

19   people we serve.  They should only need about 15 million

20   gallons of water a day.  We're putting 45 million gallons of

21   water into the system.  It's going somewhere, but it's not

22   going to our residents.

23        So we're trying to push water into a system that's got

24   leaks all over it, so we're losing pressure every day just by

25   pushing.  We should be able to stop pushing at the plants in a

```
 1   regular water system, one that was fully repaired, for hours
 2   without changing the pressure on the system.  We can't go
 3   minutes.  And that's all going to take investment, which we now
 4   have funding to do, but it can't be done overnight.  It's going
 5   to take a long-term, well-planned prioritized work in the water
 6   system to start shutting up the holes in it, finding the leaks,
 7   fixing the things like the sedimentation beds where the sludge
 8   removal system needs to be replaced, a list of things, the 13
 9   on your list, plus many, many more.  And that's why we're going
10   to be in this position, it could happen any day, until some of
11   those things really start falling into place.  And so --
12              THE COURT:  You said that more than one time that it
13   could happen any time.
14              MR. HENIFIN:  Yes, sir.
15              THE COURT:  You mean, the system can go back down.
16              MR. HENIFIN:  Yes, sir.
17              THE COURT:  At any time.
18              MR. HENIFIN:  Any time, yes, sir.
19              THE COURT:  And you're servicing 150,000 people.
20              MR. HENIFIN:  Yes, sir.
21              THE COURT:  How many of those people are currently
22   without water right now, today?
23              MR. HENIFIN:  None that I'm aware of, sir.
24              THE COURT:  So it's your impression that all are
25   being serviced right now.
```

1          MR. HENIFIN:  Yes, sir.

2          THE COURT:  What about the contaminant danger of the

3    water that is being furnished to these 150,000 folk?

4          MR. HENIFIN:  The water is tested regularly.  I keep

5    telling everyone it's the most tested water in America because

6    the EPA has been on-site doing many additional tests every day

7    since August 30th.  Very high quality water.  No concerns about

8    the water.

9       Now, during the times we lose pressure we issue

10   precautionary boil water notices because theoretically you

11   could have some backflow.  So when you lose pressure in your

12   system, it could pull something else into the water system.  We

13   haven't seen any evidence of that.  Before we can lift those

14   precautionary boil water notices, we have to go out and test in

15   the system to see what we're finding.  We're not finding any

16   problems at all.  So the water is high quality if we can get it

17   to people.

18         THE COURT:  What is responsible, what device, for

19   getting the water to the user?  That would be your pumps,

20   right?

21         MR. HENIFIN:  The pumps at the plant, which again --

22   and then the tanks.  So we've got a series of elevated tanks.

23   And when the plant is producing more water than people can

24   drink, which it should be -- again, we should be producing a

25   lot more than they can use, but the leaks out of the system, we

1    can at periods of time put water in the tanks and then the

2    water in the tanks provides pressure as it starts being used

3    during the day.

4         Typically, you have a peak in the morning around breakfast

5    time, people up using showers, a peak in the afternoon when

6    they get home for dinner.  Late at night is when we try to put

7    more water into the system than people are using to fill those

8    tanks up, and so that way in the next day, as they're using it,

9    we're pushing it into the system, the tanks can provide extra

10   pressure and capacity throughout the system.

11              THE COURT:  Well, are there peak times for water use?

12              MR. HENIFIN:  Yes.  So the peak times are morning

13   hours, sometime between 6:00 and 9:00, and the evening,

14   sometime between 4:00 and 8:00.

15              THE COURT:  And 6:00 and 9:00, people are getting

16   ready to go to work.  Between 4:00 and 8:00, people are leaving

17   work --

18              MR. HENIFIN:  Coming home, cook dinner.

19              THE COURT:  -- and cooking.

20              MR. HENIFIN:  Yes, sir.

21              THE COURT:  So then during these peak hours when

22   there's more pressure on the system as the system currently is

23   operating, then those are the times when you worry most about

24   the system breaking.

25              MR. HENIFIN:  Well, I worry about it 24 hours a

1    day -- I'm sorry, Your Honor -- but it's more likely to have

2    low pressure during those times.  And so the people that were

3    suffering the most over the last -- the Christmas disaster

4    noticed pressure drops even as late as this week, again,

5    residents on Forest Hill.  Jackson State had some pressure

6    issues late yesterday afternoon again that was affecting

7    getting the water to the upper levels of their dorms.

8         So until we have the tanks filled again -- and this has

9    been a long process of adding water every night when we've got

10   water to add, and that's a bit of a complicated story.  But

11   most nights we can put more water into the system to help fill

12   those tanks up, and they continue to get better and better each

13   day.  But again, it's not something we can just turn on a

14   switch and fix.

15            THE COURT:  And when you have low pressure, those are

16   the occasions when you can actually experience contaminants.

17            MR. HENIFIN:  Potentially.  So the requirement is --

18   the health department requirement and EPA requirement is

19   around -- you're supposed to have 20 pounds of pressure at each

20   connection.  So at each meter if you maintain 20 pounds of

21   pressure you're protecting your system.  So when we go below

22   20 pounds of pressure at the meters, that's the time you

23   potentially could have some contamination get into the system.

24   Again, we issue precautionary boil water notice because we

25   don't know that's going to happen, but we want to make sure

```
1    that if it does, people are boiling their water before they use
2    it.
3             THE COURT:  So at present, the 150,000 people are
4    receiving water.
5             MR. HENIFIN:  Yes, sir.
6             THE COURT:  Uncontaminated water.
7             MR. HENIFIN:  Yes, sir.
8             THE COURT:  And water which should be sufficient for
9    all of the water needs, such as cooking, bathing, et cetera.
10            MR. HENIFIN:  Yes, Your Honor.
11            THE COURT:  Now, but you mentioned Jackson State and
12   you said that Jackson State in the dormitories were -- Jackson
13   State was not receiving water at the highest floors.
14            MR. HENIFIN:  For a while yesterday afternoon, yes,
15   sir.
16            THE COURT:  So that was as recently as yesterday.
17            MR. HENIFIN:  Yes, Your Honor.
18            THE COURT:  Are there any other places in the Jackson
19   area as recently as yesterday which were not receiving their --
20            MR. HENIFIN:  They were --
21            THE COURT:  -- quality water?
22            MR. HENIFIN:  They were receiving their water, just
23   not enough pressure to put it to the second floor.  So they
24   were above the requirements, obviously, of the 20 pounds.  So a
25   lot of taller buildings have booster pumps.  Even many of the
```

1    JPS schools have booster pumps.  So they -- to get water to

2    elevated floors, that's not atypical.  Most places that have

3    tall buildings have to have a pump to make sure that the water

4    pressure in their whole building stays the same.  I'm not clear

5    as to why Jackson State doesn't have it in all their dorms that

6    way, but I do know they have a number of booster pumps on

7    campus to deal with some of the taller buildings.  So I think

8    we were dealing with some of the less elevated three-,

9    four-story dormitories.

10              THE COURT:  You made a comment about preparing a

11    schematic of the water system in Jackson, a model as you called

12    it.  How long is it going to be before that model is prepared?

13              MR. HENIFIN:  It should be done this month, sir.

14              THE COURT:  Now, you're talking about January?

15              MR. HENIFIN:  Yes, sir.

16              THE COURT:  Now, will that indicate where the leaks

17    are located?

18              MR. HENIFIN:  No, it won't.  It will give us some

19    ideas maybe of places to look.  But we've also got the valving

20    contract that I talked about.  The third part of that contract

21    is using sophisticated leak detection methods where they

22    actually insert leak listening devices into the large diameter

23    pipes and they flow with the water and they are sending

24    information back to us if they find a leak.

25         The other thing we've been using with Mississippi

1    Department of Health is flying drones with thermal imaging.
2    That works well when the ground is very cold because the water
3    is much warmer and they can see that from the drones.  We were
4    very successful as we were losing water in the Christmas
5    holiday and we had the cold weather and cold ground, we found
6    several areas with some large leaks that we were able to
7    pinpoint using this thermal imaging from drones.
8         We're waiting for this weekend when the weather is
9    predicted to be cold again at night to fly some more drone
10   flights in areas that are hard to access, creek beds, creek
11   lines, ditch lines, areas that you don't -- we suspect that a
12   lot of this water is going places that people don't notice.  We
13   get plenty of reports of leaks, and granted we don't have the
14   people and contractors in place to respond to those leaks.  We
15   need to do a much better job, and we're working on that right
16   now to make that happen.  And you'll see a big difference in
17   our ability to respond and track leaks in the next month or two
18   as we put contracts in place to help augment city crews that,
19   frankly, have been starved of resources for years, don't have
20   the equipment, don't have the people, don't have the expertise
21   to make those repairs quickly.
22        And a key to keeping pressure on the system -- all systems
23   have pipe breaks.  You've got to get to them fast.  You've got
24   to isolate them so they don't drain out your system.  And we
25   haven't been successful in doing that in the past.  We had a

1    big break Monday night this week or Sunday night, the days all

2    flip together, on the well system, Highway 18 and TV Road.  Our

3    Terence Byrd, who was monitoring the system at the time, saw

4    one of the well tanks draining, responded, went out there,

5    found it.  We called in a contractor which we've got on call.

6    And they had it secured in about an hour and a half.

7         So we lost water in the tank.  We didn't drain it.  We

8    didn't lose pressure in any houses around it.  So that's the

9    kind of response we need to build into the system.  I just

10   haven't had time to make that happen.

11        THE COURT:  And you're saying that there will be

12   improvements shown by the end of this month?  In February?

13   When?

14        MR. HENIFIN:  No, I think -- I can't promise

15   improvements in the actual system, getting water and

16   guaranteeing that we're comfortable going to bed every night

17   that there's going to be water going up, until sometime later

18   this year.  I mean, these are all things we're going to be

19   putting in place -- put in place -- we're working on, but they

20   aren't going to have instant success.

21        There may be a few things we find through the modeling

22   work and the analysis that maybe help us a little bit faster,

23   that's what we're looking for, but we're only going to know if

24   those exist maybe by the end of February.  That's the earliest

25   we even know if there's easy fixes out there that we're

1    missing.

2         So there's no magic bullet here.  And if that's what

3    you're looking for, I guess we do need to do something

4    different.  But, frankly, I don't think you can do anything

5    different that would succeed.

6              THE COURT:  Is that because the system is so aged

7    and --

8              MR. HENIFIN:  I just believe it's --

9              THE COURT:  -- fragile?

10             MR. HENIFIN:  It's fragile.  It's just been -- I

11   don't think it's all age.  I think it's just lack of

12   understanding, lack of expertise, lack of investment, and

13   neglect.

14             THE COURT:  Well, do you anticipate the necessity of

15   replacing most of the pipes in the system that deliver the

16   water to the homes?

17             MR. HENIFIN:  I don't think they'll -- well, the

18   pipes that deliver the water to the homes from the street to

19   your house, I think those will all be replaced over the next

20   five years.

21             THE COURT:  You say they'll all be replaced?

22             MR. HENIFIN:  There's special funding that came with

23   the bipartisan infrastructure law that makes that almost

24   100 percent federally funded to replace service lines from

25   where they are in the street to the house.  So we're working on

1  that plan, and we obviously prioritize to get lead service
2  lines done first, which we don't know that we have any lead
3  service lines in Jackson.  There's no confirmation of that.
4  But we also have a lot of galvanized lines, and so getting
5  those galvanized lines out.  They typically are restricting
6  flow to the houses.
7       There's also galvanized small diameter pipes in 109 miles
8  of streets in Jackson.  So if you can imagine a 2-inch pipe,
9  over the years galvanized pipe builds up a lot of corrosion
10  inside, and the diameter continues to get smaller.  So you've
11  got 109 miles of streets that supply water to all the houses on
12  that street through a 2-inch pipe.
13       So even on a good day when we're putting a lot of pressure
14  on the system, those people aren't seeing full pressure.  And
15  so we've got a plan to start replacing those lines first.  And
16  we're using the Army Corps of Engineers, meeting with them
17  again this morning on that project, and they should start
18  sometime late summer, maybe early fall, tearing up streets and
19  replacing those pipes.
20       With the $20 million that we got through the continuing
21  resolution back in the fall, we should be able to get eight to
22  ten miles done.  They've also got potentially more money that
23  was authorized, hasn't been appropriated, in the Water Resource
24  Development Act that will extend that work significantly
25  through the system.  But that, again, not fast work, tear up a

1    neighborhood street from side to side and from block to block,

2    replace the water line, replace the sewer line, replace all the

3    connections going out and do that over and over again mile

4    after mile, but that's what needs to be done.

5         And then other lines through an assessment, both listening

6    for leaks, doing a more detailed depth of when they were

7    installed, what type of material, what their break history was,

8    we'll do a risk analysis of all the pipes and decide which ones

9    do need to be replaced.  And it tends not to be based on age.

10   I know everyone likes to gravitate towards old, because I'm an

11   old guy.  I'm not broken down totally yet.  I've still got some

12   life in me.  And all our pipes do too -- many of them do.

13        But you've got to determine what the real factor is.  And

14   age tends not to be the determining factor.  When you replace

15   based on age, you end up taking a lot of pipe out of the ground

16   that had a lot of years left in it.  Not saying that all the

17   old pipe is great, but we've got to be really strategic about

18   what we replace because the $600 million won't replace every

19   pipe in the system, fix all the problems in the plant.  And I

20   don't know that ten times that would do it.

21             THE COURT:  Let me ask you about this repair.  When

22   you're repairing all these pipes, how much of this will involve

23   tearing up the yards of homeowners?

24             MR. HENIFIN:  The part from the street to their house

25   will definitely be tearing up the yard of the homeowner.  It

1    goes from the meter box to your house, that stretch.  But that

2    will be done by contractors that we'll hold very close

3    accountability for to make sure that they don't leave the yards

4    in a mess, that they restore everything back the way it was

5    when they started.  And some of those will be challenging,

6    potentially driveways, other landscaping.

7         There's techniques where you can actually push the water

8    line under all of that using directional drilling and other

9    hydraulic tools so you don't have to open cut and dig it up.

10   The cheapest way is digging a trench.  These are not real deep

11   lines.  They're pretty small diameter.  But when you run into a

12   real problem, you can use hydraulic methods of pushing the line

13   under, and they can -- it's amazing the technology -- they can

14   come up within inches of where they're trying to come up, and

15   then you connect it to the house at that point, and you haven't

16   dug up much of the yard at all.

17        So we'll be balancing those costs against the impact of

18   the landscaping in the yard in deciding which method we use

19   every street and every house that we go to.

20             THE COURT:  So you anticipate laying this pipe or

21   determining that the old pipe is still suitable in 150,000

22   dwellings?

23             MR. HENIFIN:  That pipe -- the service lines -- and

24   I'm sorry.  I'm complicating things -- but the service lines,

25   the part from the street to the house, the goal is to replace

1   all of those.

2           THE COURT:  All of them.

3           MR. HENIFIN:  All of them across the city, but that

4   will be years.  I mean, you can't get those done overnight.

5   But those aren't causing our problem with the threats to the

6   system losing pressure.  Those are just potentially causing

7   individual house pressure challenges with maybe water quality

8   that comes from the line that they own.  That's the homeowner's

9   line from the meter to the house.  Galvanized lines can leach

10  chemicals as well.

11      So the idea is to improve -- if we're getting them great

12  water to their meter and then their own pipe system is adding

13  contaminants to it, then have we done anything?  No.  So we've

14  got to get it as far to their house as we can in the high

15  quality that we send it out of the plant.  And part of that is

16  the private system.

17      Then when it gets in the house, we could argue that we

18  should be in there because almost every house built before

19  1986, all the plumbing was soldered with lead solder.  And as

20  someone who has soldered pipe, it's a lot easier with the lead

21  mix solder than it is without.  So plumbers probably used it

22  into the '87, '88, '89, '90 range because they stockpiled it as

23  it was being taken out of production and wasn't allowed to use.

24      So every house in Jackson that has copper pipe that was

25  put in before 1990 is suspect of having lead solder.  And the

1    lead that they might see in their pipe or in their water is not

2    coming from the plant and not coming from the pipes that the

3    city owns.  It's coming from their own house.

4             THE COURT:  And so will the homeowner be responsible

5    for that cost?

6             MR. HENIFIN:  For the cost to get to their house, no,

7    sir.  That's again --

8             THE COURT:  The cost that once it comes to the

9    house --

10            MR. HENIFIN:  If they want to repipe their house

11   inside, that's on them, yes, sir.

12            THE COURT:  That's on them, even though it might be

13   lead and put in a lot earlier, that would still be on the

14   homeowner?

15            MR. HENIFIN:  Yes, sir.  It's all on the homeowner,

16   yes, sir.  And again, a lot of lead testing is available out

17   there to see if your drinking water -- if the water in your

18   house is adding lead to your water.  There's plenty of testing

19   kits that are available to do that to find out.  Most houses,

20   over time, whatever was going to leach out of it has leached

21   out of it.  So if your house was really built in 1990 and had

22   lead solder, there may be no leaching going on anyway.

23        And we're also making sure the condition of the water that

24   we're putting out into the system is as noncorrosive as

25   possible.  So you do that by putting a corrosion control plan

1    in place, which we're finishing up now, to ensure the pH is at

2    the right level all the time and that the right chemicals are

3    in the line so that we don't leach out any lead in our lines,

4    let alone in the individual homeowner's lines.  Lead has not

5    been an issue in Jackson; it really hasn't.

6                THE COURT:  So do you have any kind of projection as

7    to what a homeowner would be expected to be out of concerning

8    this whole procedure?

9                MR. HENIFIN:  I would think a lead test in the house,

10   if they were concerned about the age of their house and their

11   own piping, less than a hundred dollars, I think.  I don't

12   know.  Probably look at the experts here from EPA.  I'm not

13   sure what an individual homeowner lead test is, but they

14   probably know what it cost.  But that would be -- if they had

15   to replace all their pipes in their house, that's an expensive

16   effort.

17               THE COURT:  That's what I was asking about.

18               MR. HENIFIN:  But I really don't think we're in that

19   position where there's many people that would have to do that,

20   if any, in Jackson.

21               THE COURT:  Okay.  Let me back up now to the plant.

22   On this sludge you were talking about, this sludge that sinks

23   to the bottom you were telling me about.

24               MR. HENIFIN:  Yes, sir.

25               THE COURT:  Now, that is a contaminant, isn't it?

1          MR. HENIFIN:  No.  Essentially it's just small

2     particles that are in the reservoir today.  And so when the

3     water comes in to us, you need to get all those small particles

4     out.  Some of them could be a contaminant.  But essentially, we

5     take that sludge and we send it to the wastewater plant where

6     it's being treated.  So it's not going into anybody's water.

7     It settles out and then it goes into filters.  The rest of it's

8     filtered out.

9          So really when the water comes out of the plant, we've

10    taken everything that was in the reservoir that could

11    potentially be a contaminant, taken it out of the water.  We've

12    added chlorine to make sure there's no bacteria in it and make

13    sure the chlorine stays in the water long enough to be

14    effective.  And then we send it out of the plant with some

15    residual chlorine in it to make sure it stays that way through

16    the piping system all the way to your house.  And we check for

17    residual chlorine out in the system on a regular basis to make

18    sure we're putting the right amount of chlorine into the

19    system.

20          THE COURT:  What's the most dangerous chemical you've

21    encountered so far as part of sludge or anything else with the

22    treatment plant?

23          MR. HENIFIN:  I have not done the analysis.  I

24    haven't seen an analysis done of our residuals.  I don't know

25    what that would be.  But again, we're getting it all out before

1    it ever gets to the drinking water system so we're not overly

2    focused on what's in the sludge.

3            THE COURT:  But you've encountered dangerous

4    chemicals, though.

5            MR. HENIFIN:  Not personally.  I don't know what any

6    of the tests have shown for the sludge.  I haven't looked at

7    that data, if it even exists here.  There's a good chance you'd

8    have the lovely PFAS, PFOA, some of the other sort of lifetime

9    chemicals might be settling out in some of that, but I have

10   no -- I don't even want to guess what might be in there.  I

11   don't think there's any -- you know, the reservoir water is a

12   recreation water.  People are swimming, enjoying it on a

13   regular basis.  That's the same water we're starting with.  So

14   if they were being contaminated swimming in the water, then we

15   might be even more concerned.  But our source water is a good

16   source water, as is the water that goes in the river.  I don't

17   think we've got any great concerns about additional

18   contaminants getting into our drinking water.

19           THE COURT:  So you don't know of any instances where

20   people have been hospitalized because of contaminants in the

21   drinking water?

22           MR. HENIFIN:  I do not know of that.

23           THE COURT:  Okay.  Let me ask you another question

24   now.  I'm shifting gears.  You were talking about this

25   schematic that's supposed to reveal a lot about the model for

1  the city, including where potential leaks might be.

2       MR. HENIFIN:  Yes, sir.

3       THE COURT:  Are you aware that some neighborhoods

4  around Jackson are complaining of leaks --

5       MR. HENIFIN:  Yes, I am.

6       THE COURT:  -- in that neighborhood?

7       MR. HENIFIN:  Yes, Your Honor.  There's

8  neighborhoods -- I'd say every neighborhood is complaining

9  about leaks.

10      THE COURT:  And that the water is puddling up in

11 several neighborhoods to a deep level.

12      MR. HENIFIN:  I haven't seen deep level.  I've seen

13 lots of puddles, running water going in the storm water, and

14 we're continuing to report those.  And to the extent we can fix

15 them, we're getting to them.  But we triage those.  Bigger

16 leaks we spend more time and priority on than the smaller

17 leaks.  I'd like it to be different, and it's going to be

18 different.  And we're going to have some contractors in place

19 to help us fix that.  But with the current setup that we've got

20 at this point in time, we don't have the capacity to get to all

21 those leaks.  We don't even have a good system to track who

22 reported it, if they even got through to us.

23      THE COURT:  Well, is there a number that people are

24 supposed to call for that?

25      MR. HENIFIN:  So, exactly, that's part of the

1  problem.  They can call 311, and there's also a water

2  maintenance number and a -- water maintenance and 311 are

3  really the numbers.  Those are published.  There's an after

4  hours number as well.  I personally don't believe any of that

5  is handled well.  We're too slow, if we even respond if they

6  even get through.  Currently working diligently on changing

7  that, creating a call center that's going to be a one call for

8  water -- all things water.  And we're going to have a system

9  behind it to know who called, what they complained about, what

10  the outcome was, where the leak was.  We'll be able to dispatch

11  from there.

12      This is basic 1990s concept here, but we're going to try

13  to step up into that to make sure we've got a robust system to

14  actually be able to tell people, Yes, you called in on this

15  date and you reported this leak.  And we're going to tell you

16  it might be two weeks before we get there because we might not

17  have the capacity yet to mobilize.  But at least they know that

18  we've heard them and we got it on the schedule.  And if we

19  don't get there in two weeks, we'll call them back and say,

20  Hey, we had these problems.  We weren't able to get to your

21  leak.  We're going to get it whatever date that is.

22          THE COURT:  Are you presently keeping a ledger on

23  that?

24          MR. HENIFIN:  It's done by paper, on scraps, on

25  wherever.  It's awful.

1        THE COURT:  So you don't really have a ledger at this

2   point.

3        MR. HENIFIN:  No, sir.

4        THE COURT:  So at this point, you can't say how many

5   people are experiencing these leaks in their front yards?

6        MR. HENIFIN:  Correct.  Been on the job six weeks.

7        THE COURT:  I understand.

8        MR. HENIFIN:  I want to put that in.  Yes, sir.

9        THE COURT:  I know.  I know you just got here.

10        MR. HENIFIN:  But it's a top priority.  And I've

11   got -- the one hire I've made from the outside is focused on

12   that every day all the time.  He comes from a private sector,

13   Verizon customer service background.  He is -- Microsoft is

14   working with us.  Again, it looks likes we're going to get some

15   pro bono work from them to get the system set up we need to

16   make that happen.

17        THE COURT:  Next question.  You talk about the need

18   for maintenance people.

19        MR. HENIFIN:  Yes, sir.

20        THE COURT:  What's your optimal number of persons you

21   need?

22        MR. HENIFIN:  I don't know that, sir.  We haven't

23   done a staffing analysis.  On the plants, the staffing analysis

24   is all about Jacobs figuring that out.  So we're going to hand

25   that operation maintenance responsibility over to this

1   contractor.  They're currently working on what their staffing

2   plan needs to be.  But I don't have a staffing plan.  I'm not

3   spending time there because it's going to be their

4   responsibility sometime in mid-February.

5           THE COURT:  So at present you-all don't even know yet

6   how many people you need on hand daily to keep the system

7   going?

8           MR. HENIFIN:  Correct.  I mean, I know that I have to

9   have a licensed -- what we're currently doing, we have to have

10  a licensed operator buy a permit.  We have to have a helper to

11  a licensed operator all the time there in the plant.  And then

12  I can tell you we need probably five to ten maintenance people.

13  We're operating with about five Jacobs folks, contracted folks,

14  on a daily basis.  So we're probably already short.  But again,

15  when they take the contract, they will determine their staffing

16  plan and their requirements and that will be built into the

17  contract.  So I'm not spending any time really worried about

18  that staffing plan.  I'm just making sure we've got enough

19  coverage to keep the plant running at the moment.

20          THE COURT:  Do you think that you can find the people

21  you need in Mississippi or will you have to go nationwide?

22          MR. HENIFIN:  I think Jacobs will be looking for

23  folks everywhere.  They've posted jobs.  They're putting it out

24  in social media.  They know there's not enough licensed

25  operators close by.  They're going to hire pretty much

1   everybody in the city that works for water that wants a job,

2   and then they're starting to advertise already for others.

3       They'll be doing training to try to get people up to fully

4   licensed operator.  But they need to have a licensed operator

5   at each plant every day all the time.  So they need a lot of

6   licensed operators, and we know we don't have that here.

7       Jackson is unique in being one of the only surface water

8   systems in the state.  And we're definitely the most -- we're

9   not close to anybody else that has a surface water system.

10  Different licensing requirements for surface versus well, and

11  so people that operate some of the well systems around us can't

12  qualify to run our system without getting additional training

13  and operation licensing done.

14          THE COURT:  And where is that done, this training?

15          MR. HENIFIN:  I think Mississippi State runs a short

16  course on drinking water licensing.  I think there's probably

17  some others, but I haven't really researched that here.

18          THE COURT:  Okay.  What about well water, who does

19  the licensing for that?

20          MR. HENIFIN:  Mississippi Health Department still

21  does that.  I think the licensing training is probably done,

22  again, through community college or through Mississippi State

23  University.  I'm not sure where that's coming from either.

24          THE COURT:  And what period of time is that study?

25          MR. HENIFIN:  I couldn't tell you.

```
1              THE COURT:  In order to get -- is that a --
2              MR. HENIFIN:  It's typically -- I think to get a full
3     license, it's typically a couple years because you have to have
4     some practice as well as classroom training.  So it's state
5     dependent somewhat on the requirements.  But most places
6     it's -- you start out at a operator one or at the trainee
7     level.  You work.  You learn.  You take a test.  You move up.
8     And I don't know exactly what the intervals are here for the
9     various tests you have to take to pass to get to be a fully
10    licensed operator, but it's likely a couple years.
11             THE COURT:  Is there on-the-job training?
12             MR. HENIFIN:  Yeah.  That's how they're moving along
13    by being the assistant to the licensed operator and learning
14    the trade there as well as classroom training to learn the
15    theory and the chemistry, the math, everything that has to go
16    into it so they can operate the plant.
17             THE COURT:  Now let's talk about funding.  I think
18    it's going to be my last topic.
19             MR. HENIFIN:  The fun one.
20             THE COURT:  Do you need some water?
21             MR. HENIFIN:  I'm good, I think.
22             THE COURT:  Okay.
23             MR. HENIFIN:  Thank you, sir.
24             THE COURT:  Let's talk about the funding.  How much
25    funding do you need to put Jackson in a decent position?
```

1           MR. HENIFIN:  I think we've got that through the

2    600 million that came through the omnibus bill.  So that gives

3    us 450 million for infrastructure, another 150 million for

4    technical assistance, which is a little bit nebulous at this

5    point what that exactly can use.  But we know we can use some

6    of that for operation and maintenance as well.

7           We need to get onto a sustainable financial plan where

8    we're raising enough revenue and collecting the revenue to

9    continue to operate the system, because the federal government

10   money is really one-time money, right?  And we need a

11   sustainable path going forward where Jackson is generating

12   enough revenue to operate their system and reinvest in it on a

13   regular basis.

14          The 600 million is going to get us a long way towards

15   getting the major systems back where they need to be to reset

16   everything.  But at that point, we need to be raising enough

17   revenue here to maintain that going forward, staff -- in this

18   case, pay the contractor on a regular basis and continue to

19   operate the system and reinvest in it.  And so that's why I'm

20   pretty confident that the 600 million is going to get us to

21   that point.  The concern is the operation and maintenance going

22   forward, we need a different way to generate revenue to make

23   sure we've got that.  So that's part of what's required in the

24   order.

25          The next deliverable I have, other than the quarterly

1    report, is a financial plan that includes how we're going to

2    generate the revenue in the long haul.  That's due at the end

3    of this month.  So we're still working hard with some

4    professional financial management firms and a rate setting

5    group and some other consultants that I'm working with to

6    figure out what that all looks like and be able to deliver that

7    to the city -- to the parties, DOJ, EPA, and the city, on the

8    26th of this month.

9          THE COURT:  Will my next report or the report after

10   detail these moneys and who will have oversight over these

11   moneys?

12         MR. HENIFIN:  Yes, sir.  I believe at this point I

13   have the oversight based on the order of how those moneys are

14   planned out and how they will be spent.

15         THE COURT:  And when will you have a complete report

16   on that?

17         MR. HENIFIN:  It's probably maybe not the next

18   quarter but the quarter after.  We'll have a great financial

19   plan at the end of this month, but it's not going to

20   specifically say which project is done in which year.  We'll

21   have target dollars that we will be spending in each year going

22   forward, which will pull down that $600 million.  It will also

23   pull down the other loans that we get through the state for the

24   state revolving loan fund, which we have an open loan now

25   that's valued at about 29 million.  And we have our ARPA money,

1   which is another 50 million worth of water work.

2       You add all that together, the Corps is putting their

3   20 million in.  They had authorization for another 100.  That's

4   where this big number of, like, 795 has been thrown around.

5   It's the combination of all those sources.  The Corps will be

6   responsible for their money, but I will be helping point them

7   in the right direction of how we want it spent to improve the

8   system to the most optimal way of using their dollars.  Their

9   dollars can be used for some sewer work, so that's why we're

10  doing sewer line and water line using Corps money.  The rest of

11  the money that's coming to us is really restricted to just

12  drinking water.

13          THE COURT:  Will all this money be deposited in a

14  central source or will the donors have control of the money

15  until it's necessary?

16          MR. HENIFIN:  They do.  It's a reimbursable program.

17  The state revolving loan fund is a reimbursable program.  So

18  when we enter a contract with a consultant or a contractor,

19  they submit an invoice under an approved work plan that we've

20  already submitted to the SRF folks.  Then when we get the

21  invoice, we show them we've paid the invoice, they pay us back,

22  or we show them we need money to pay the invoice, they pay us,

23  and we pay the contractor.  So the money is almost never here.

24  It's always in the federal coffers or the state is holding it

25  and waiting for us to ask for the money to come down.

1          THE COURT:  So these moneys are coming from different

2    sources?

3          MR. HENIFIN:  I don't think it's clear yet.  Maybe

4    that's a question for EPA.  I believe the 450 million state

5    revolving loan fund is coming through the traditional state

6    revolving loan fund process in which EPA gives it to the states

7    as a capitalization grant; the state holds that and then

8    disburses it.  And that's a question for the EPA if that's

9    going to be the same method.  That's the statutory method the

10   state revolving loan fund was set up with.  It's a

11   reimbursement method.  States administer the dollars, but the

12   dollars flow from the federal government to the state and then

13   from the state to the actual utilities that are spending the

14   money.

15         THE COURT:  Will the state auditor's office be

16   involved in this accounting process, this --

17         MR. HENIFIN:  I'm assuming -- again, this is beyond

18   my knowledge of the state's processes, but I know they have to

19   have audits to meet the requirements of the state revolving

20   loan fund that go back to EPA and to the federal government.

21   So there's constant audit requirements on all that money, no

22   matter who has got it.  And when we're spending it, we're

23   subject to all those rules as well.  So even though it's just a

24   reimbursement, there's special procedures that we have to

25   follow to make sure that we're following every -- crossing

1    every T and dotting every I to make sure that we're doing it in

2    accordance with the regulations and the statutes that govern

3    the state revolving loan fund federal dollars.

4        There's wages that have to be paid.  The Davis-Bacon Wage

5    Act, which requires doing regular audits of our contractors to

6    make sure they're actually paying their people the required

7    wages.  There's American Iron and Steel requirements to make

8    sure we're buying things that we have to buy through American

9    made products.

10       There's a lot of little strings attached to these dollars

11   that are federal dollars.  But again, that's not unusual.  Most

12   people in the utility world that's been around the state

13   revolving loan fund are pretty used to all that.

14           THE COURT:  But when these moneys come in, these

15   moneys would have to be reported to the court?

16           MR. HENIFIN:  Yes, sir.

17           THE COURT:  For the court then to say whatever it has

18   to say about the receipt and oversight of the moneys?

19           MR. HENIFIN:  That would come as part of the

20   quarterly report.  You'll see what moneys come in and what

21   money has flown out.

22           THE COURT:  So are you saying that moneys will come

23   in and go out before the court has a chance to look at it?

24           MR. HENIFIN:  Essentially.  The 600 million or the

25   450 that comes SRF will come in.  It will be programmed in that

1    financial plan that's due at the end of the month, again not by

2    specific project but by year we anticipate to spend it.  Over

3    the course of the development of this plan over the next

4    several months, each quarterly report you'll see more detail

5    around here are the projects we're planning to do -- specific

6    projects we're planning to do to spend this money down.

7         There's specific projects we'll do to use the ARPA money,

8    which is already actually in process.  ARPA is the money that

9    the state matches, and that process was in place already, and

10   the city gave us that money to work.  So we've got an ARPA pot,

11   a state revolving loan fund pot, and then just our regular

12   operation and maintenance money which the city is providing.

13        THE COURT:  So I'm a little confused here.  Who would

14   actually draw down the money?

15        MR. HENIFIN:  I will.

16        THE COURT:  So then on your signature, you'll be able

17   to draw down as much as you want?

18        MR. HENIFIN:  Big approval processes to be able to

19   get to that point.  They're all built into the system.  So I

20   have to describe and write out a work plan for a particular

21   project.  That project goes through an approval process before

22   they say, Yes, it meets all the requirements of state revolving

23   loan fund.

24        And that approval process currently in the state revolving

25   loan fund is EPA and, in Mississippi's case, the Mississippi

1    Department of Health.  Even a very close eye that it's

2    eligible, it's in our work plan, it's what we want to do.  They

3    approve it.  I let the contract.  The contract starts

4    invoicing.  I take the invoice, ask for reimbursement.  So

5    that's how that works.  And so there's never really money

6    coming to me.  It's all approval of a project on a budget.  And

7    then as I start executing that, I'm asking for the

8    reimbursement as the work's being done.

9            THE COURT:  Now, that budget should have been

10   approved by the court in the quarterly report, correct?

11           MR. HENIFIN:  The financial plan, which is going to

12   cover kind of the whole deal, is going to be approved.  I don't

13   know that it's subject to your approval -- everything is

14   subject to your approval, Your Honor.  I don't know the

15   mechanics of that other than I submit that report.  You'll get

16   that, the financial plan.  And actually EPA and the city and

17   everyone else that's a party is going to have some approval of

18   that, including it's going to be coming to you as well.

19           THE COURT:  Don't move.

20       Yes.

21           MR. FINGERHOOD:  Your Honor, if I could be heard?

22           THE COURT:  Go right ahead.

23           MR. FINGERHOOD:  I think to some extent the court

24   has -- all of us -- the state, the EPA, the proposed

25   third-party manager -- came together with the list of priority

1   projects, so that is where the work is going to be focused on.

2   So in essence, those are the tasks, that's where the money is

3   going to be spent, and that was part of our order that it go to

4   these projects, and there's a process too as far as

5   prioritizing things within that and budgeting within that.  And

6   we're working on that progress -- with that process right now

7   with the manager and the state and EPA.

8           THE COURT:  All right.  Thank you so much.

9       Now, when pipes burst, as I'm sure some did once the

10  temperature went below 32.

11          MR. HENIFIN:  Yes, sir.

12          THE COURT:  Did y'all have a whole lot of that --

13          MR. HENIFIN:  Yes, we did.

14          THE COURT:  -- this last climactic situation.

15          MR. HENIFIN:  We did.  We did.  Not dramatic.  A lot

16  of little pipes, some a little bit larger, but not dramatically

17  breaking giant pipes and having to secure parts of the city,

18  not that different than kind of every day in Jackson.  I think

19  what we had a lot of, Your Honor, was people were preparing --

20  citizens of Jackson, at our urging, were preparing for this

21  freeze and protecting their own homes, their own businesses, by

22  running their faucets so they didn't freeze.  And then they

23  might have run them a little more than what really needed to be

24  done.  And so we had a big demand, we had some breaks, and we

25  had plant problems.  And those all added together to us not

1   having the ability to keep the system pressurized.

2        What was interesting was that Christmas holiday was

3   Sunday.  The actual celebrated holiday was Monday.  Tuesday, we

4   saw significant response back -- positive response to our

5   system.  Anecdotally, we believe a number of people went back

6   to work, found that they had left their faucets on to keep

7   their businesses from freezing.

8        We also have a lot of stories of sprinkler systems in

9   buildings that weren't occupied over the holidays freezing and

10  breaking and running free.  A lot of buildings have backflow

11  preventers which are typically exposed outside or in

12  unconditioned spaces.  Those broke and froze.  And I'm thinking

13  that when they got back to their buildings after the holiday,

14  they secured all that, because we saw amazing response to the

15  system Tuesday, and we didn't fix anything that would have

16  accounted for that, but we don't know that because no one is

17  reporting that to us.  That's inside their building or on their

18  property.  And so I think a significant amount of our

19  challenges were really frozen pipes in private buildings.

20            THE COURT:  Do you have any advice to homeowners

21  about when the temperature dips below 32 degrees what they

22  ought to do?

23            MR. HENIFIN:  Just need a little drip in their

24  faucets.  They don't need to turn them on wide, but definitely

25  should be dripping those faucets and the outdoor hose bib the

```
1    same way.  It doesn't need to have a lot of flow.
2         I actually heard this from one of the Jacobs folks that's
3    been working with us.  Corpus Christi had a big freeze when he
4    was working there and they made that advice and they found that
5    the water consumption jumped because people that live in the
6    South and aren't used to what folks in the northern climates
7    know where they freeze a little more often, you just put a
8    little drip.  And if you've got water moving, it's not going to
9    freeze up.  And I think we might need to clarify that a little
10   better for homeowners going forward, that it doesn't take
11   opening the faucet wide, just a little drip will take care of
12   it.
13             THE COURT:  When you say a little drip, do you mean
14   drip.
15             MR. HENIFIN:  Yeah, I mean --
16             THE COURT:  Drip.  Drip.
17             MR. HENIFIN:  -- just drip, drip, drip, yeah.  Maybe
18   a little faster than drip.  Drip.  But not much more.  We can
19   probably put a YouTube video out there to show people how to
20   protect their faucets.
21             THE COURT:  So maybe then they can sort of measure
22   how much drip they can --
23             MR. HENIFIN:  Yes, sir.  I think that's a great idea.
24             THE COURT:  Instead of just opening the faucet up
25   completely.
```

1           MR. HENIFIN:  Yeah, exactly.  And I think there was a

2    lot of that too.

3           THE COURT:  Okay.  Well, thank you.  You've been very

4    accommodative --

5           MR. HENIFIN:  Thank you.

6           THE COURT:  -- with my questions.  Do you have

7    something that I didn't ask about that you think it's important

8    to state?

9           MR. HENIFIN:  We're doing our best to -- I'm running.

10   I'm trying to get this done, and it's killing me when we have a

11   disaster like this.  And I'm telling you right now it could be

12   tomorrow.  I'm doing everything I can to keep it from

13   happening.  And I've stood in front of 140 people with

14   Councilman Banks on January 2nd after driving 11 hours down

15   here and spent three hours in front of 140 people who hadn't

16   had water since Christmas day.  That's a tough audience, but I

17   felt for them because they need to have water.

18         That's the only reason I'm here.  I don't need a job.  I

19   don't need this work.  I think Jackson deserves better, and I'm

20   trying.

21           THE COURT:  Thank you so much.

22         Do I need to hear from anybody else to add something to

23   what our manager said?

24           MR. FINGERHOOD:  Just briefly, Your Honor.  First of

25   all, I wanted to thank Your Honor for acting on the proposed

1    order so quickly.  I know it's pure speculation, but I think if

2    what happened, unfortunately over the holidays, had occurred

3    without having an interim manager in place, things could --

4    even though it seems inconceivable -- have been even worse.  So

5    I appreciate the court acting on that quickly.

6         And I think going forward, I've mentioned to other

7    parties, we were thinking it may make sense to have regular

8    status conferences maybe two or three weeks after the court

9    receives the quarterly reports from the third-party manager to

10   keep the court apprised of the progress and address any

11   questions the court may have.

12              THE COURT:  That will be fine with me.  I would like

13   to know exactly what's going on.  And when you sent over the

14   interim stipulated order, I forget what time it came to the

15   office, but I had it read within the hour because this is a

16   critical matter for the city of Jackson, and I read it as soon

17   as it hit my desk that same day, within an hour after it was

18   delivered over here.

19        I thought that the order was detailed.  It set out the

20   aims and aspirations, what was anticipated and expected, and it

21   is that reason that I asked for this status conference today

22   because, after I read everything, I got the impression that we

23   were on the improvement side and that these matters were going

24   to be addressed forthwith that we had dealt with, the city had

25   dealt with with its team here, a great team of professionals in

1  all these necessary areas had dealt with all of the problems
2  that had plagued Jackson to that point.
3      Only now, I thought the city was moving towards rectifying
4  it for the future.  And so I was highly surprised when I saw
5  the number of people who were left without water on Christmas
6  and over New Year's.  After Christmas, I thought maybe there
7  was just a hiccup in the system.  But then when New Year's
8  rolls around and after that then I recognized I need to have a
9  status conference so I can see if we were all on the same page
10  still and if this matter was moving as expeditiously as we had
11  hoped.
12      So I think this report is encouraging.  And so I know our
13  manager has not been on the scene for any length of time.  And
14  I'm just hoping that our citizenry will understand all the
15  problems that the city has, but I certainly understand the
16  frustrations that the citizenry is encountering when there's no
17  water.
18      Now, that is a precious commodity, and we take it for
19  granted.  We take it for granted when we want to take a shower.
20  We take it for granted when we want to go and cook something.
21  I'm talking about you-all, not myself, because I don't cook.
22  I'm trying to learn.  I even sent off for a book on how to
23  cook, but anyway -- and take it for granted when we have all
24  these water usages, and then to be without, not to mention some
25  of the ones that's almost embarrassing to talk about, such as

1   toilet use and people having to go and buy water to hold it in
2   the bathroom.
3       And I have seen people at the various stores stocking up
4   on that for that very reason.  When they have been talking to
5   each other, I've heard them discussing why they had to buy so
6   much water.  But there are just so many usages that we expect
7   from our water, we don't recognize how vital it is to us until
8   we're without it.
9       Unfortunately, in Jackson, we have gone through many
10  phases of being without.  And the citizenry now recognizes that
11  this is a constant sore with them.  And so they are highly,
12  highly frustrated over this development.
13      And now it's more like a badge of honor for someone to
14  say, I had water through Christmas and New Year's.  And then
15  somebody else speaks up and says, Well, I didn't.  And it's
16  just -- it's awful.
17      And I heard some people in Walmart, who didn't know who I
18  was and what my involvement might have been in any of this,
19  talk about how they had to tell some relatives who had come
20  from another state to visit over the holidays to pack back up
21  and head back to their homes in another state and how they
22  missed out on all of that because they couldn't even prepare
23  the sumptuous meal they had prepared that they had thought they
24  were going to have and then couldn't enjoy the company of their
25  relatives who had already crossed two or three state lines to

1   get here.  And now, they were getting in a car, going back, and

2   taking the Jackson folk with them so that they could enjoy the

3   holidays somewhere together with water.

4       And so this is, as everybody here knows, a very serious

5   outcome, and I'm just hoping that our manager here will be able

6   to put everybody on page and move us on down the road as

7   quickly as possible.  I understand the difficulties here that

8   you just got here.  I just signed this order on this interim

9   stipulated order just back in November.  So I'm just hoping

10  that my full order that comes in our report at the end of the

11  month will provide all the details that we need to provide,

12  which would include a lot of what I've already inquired about.

13  But nevertheless, for my records and for my upkeep, I still

14  want my January order when it comes in.  It's supposed to be

15  here, I think, January 30th; is that correct?

16              MR. HENIFIN:  Yes, sir.

17              THE COURT:  And so then for January 30th then, I want

18  to have my order so I can go through it.  And trust me, I will

19  go through it line by line.  And based on some things you've

20  said already and some things I anticipate being in the order, I

21  will pull some books and start doing some more research on it.

22  So I look forward to that.

23      Now, is there anything else from any of you?  Well, I see

24  no hands.  I thank all of you for coming over on such short

25  notice, and I look forward to seeing you at the next briefing.

1    Thank you so much.

2              MR. HENIFIN:  Thank you, Your Honor.

3              MS. WILLIAMS:  Thank you, Your Honor.

4         (Proceedings concluded at 2:47 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


        I, Margaret Wasmund, RDR, CRR, CRC, certify that the

foregoing is a correct transcript from the record of proceedings

in the above-entitled matter

        Dated this 5th day of March 2023.



                                    *Margaret Wasmund*
                                    MARGARET WASMUND, RDR, CRR, CRC
                                    COURT REPORTER