UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                          Plaintiff

V.                              CASE NO. 3:22-cv-686-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI                  Defendant




**TRANSCRIPT OF HEARING**
**VIA VIDEOCONFERENCE**

BEFORE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

May 2, 2023
Jackson, Mississippi




The proceedings were reported by a stenographic court reporter.
The transcript was produced using computer-aided transcription.



*Margaret Wasmund, RDR, CRR, CRC*
*Court Reporter*
*2851 Shiloh Road*
*Pelahatchie, Mississippi 39145*
*margaretwasmund@gmail.com/601-329-6113*

APPEARANCES:


REPRESENTING THE PLAINTIFF:

Karl J. Fingerhood, Esquire
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Washington, DC  20044

Angela Mo, Esquire
U.S. Department of Justice
Environmental Enforcement Section
150 M Street, N.E., Room 2.900
Washington, DC  20002

Angela Givens Williams, Esquire
U.S. Attorney's Office
501 East Court Street, Suite 4.430
Jackson, MS  39201


REPRESENTING THE DEFENDANT,
THE CITY OF JACKSON, MISSISSIPPI:

Catoria Parker Martin, Esquire
Terrell S. Williamson, Esquire
City of Jackson
455 E. Capitol Street
Jackson, MS  39201


REPRESENTING THE INTERESTED PARTY,
JACKSON WATER:

Malissa Wilson, Esquire
Forman Watkins & Krutz, LLP
210 E. Capitol St., Suite 2200
Jackson, MS  39201-2375

Frank Paul Calamita, Esquire
Aqualaw, PLC
6 S. 5th Street
Richmond, VA  23219

ALSO PRESENT:

Ted Henifin, Interim Third-Party Manager
Gerald Kucia, Esquire
Suzanne Armor, Esquire
Michele Wetherington, Esquire
Jim Vinch, Esquire
Christin Williams, Esquire

1          (May 2, 2023, 3:34 p.m.)

2               THE COURT:  All right.  Terri, call the case, please.

3               THE COURTROOM DEPUTY:  Your Honor, this is United

4     States of America v. the City of Jackson, Civil Action

5     Number 3:22-cv-686-HGW-LGI.  Before the court this afternoon is

6     an agreed motion to amend professional budget.  And at this

7     time I'm going to ask the parties to introduce themselves,

8     starting with the plaintiff and then defendant.

9               THE COURT:  All right.  Let's proceed.

10          (Pause.)

11               THE COURT:  Well, I don't hear anybody yet, Terri, so

12     why don't you identify the --

13               MR. FINGERHOOD:  Good afternoon, Your Honor.  Karl

14     Fingerhood, U.S. Department of Justice, Environmental

15     Enforcement Section.

16               THE COURT:  All right.

17               MS. MO:  Angela Mo, U.S. Department of Justice,

18     Environmental Enforcement Section.

19               THE COURT:  Okay.

20               MS. WILLIAMS:  Angela Givens Williams, the U.S.

21     Attorney's Office.

22               THE COURT:  All right.

23               MS. ARMOR:  Suzanne Armor, EPA Region 4, Office of

24     Regional Counsel.

25               MS. WETHERINGTON:  Michele Wetherington, U.S. EPA

1    Region 4, Office of Regional Counsel.

2              MR. VINCH:  Jim Vinch, attorney at U.S. EPA

3    headquarters in Washington, D.C., Water Enforcement Division.

4              THE COURT:  Anybody else?

5         Okay.  I do not hear an affirmative.

6              MR. WILLIAMSON:  Terrell Williamson, legal counsel

7    for the City of Jackson, Mississippi.

8              MR. KUCIA:  Gerald Kucia, counsel for the Department

9    of Health.

10              MS. WILSON:  Malissa Wilson, Your Honor, counsel for

11    the interim third-party manager.

12              MR. CALAMITA:  Paul Calamita, Your Honor, also

13    counsel to the interim third-party manager.

14              MR. HENIFIN:  Ted Henifin, interim third-party

15    manager.  Good afternoon, Your Honor.

16              THE COURT:  Good afternoon.

17              MS. WILLIAMS:  And Christin Williams, general counsel

18    for Mississippi State Department of Health.

19              THE COURT:  Did we miss anybody?  All right.  We're

20    ready to get started.

21         What generated this request for a hearing, that is, my

22    request -- I actually requested Mr. Henifin to provide some

23    explanations, and so I thought I would just have him come over,

24    and we then had a sit-down on the matter.  It's nothing really

25    complicated.  It's just that I have some questions I felt

1    obligated to ask.  There's nothing wrong with the request.  In

2    fact, the request has been signed off on by all the parties.

3    But there were a few terms in here I didn't quite understand

4    and so, I just wanted to be sure that I gleaned some

5    understanding from these matters.

6          And to accommodate especially Mr. Henifin, we decided to

7    do it by Zoom and allow anybody else in the lawsuit who was

8    interested to observe.  And then after that some more people

9    asked to come in, and so I just said yes, they can come in too

10    because all of this is transparent.  There is nothing that is

11    supposed to be a closed-door confidential matter.  And so it's

12    all quite -- as I said, quite open and transparent.

13          So that's where we are.  And at present I think we are all

14    quite happy with the progress that has been made in this

15    endeavor concerning all these matters.  And I just wanted to

16    also talk about that.

17          Now, back on November 29, 2022, this court approved a

18    12-month budget that totaled $2,976,500.  And now JXN Water,

19    Inc., is asking for an additional $839,000.  This request has

20    generated some inquiries from some persons in the community,

21    and I just wanted to be sure that we are all transparent about

22    these matters, so then I just had some questions anyway, so

23    this is the best way to go about getting those questions

24    answered.  And I know the manager is more than able to provide

25    the answers to these matters.

1       So then on this matter of a budget, this money is coming

2    in and we are ensuring that it goes in the proper places.  We

3    have not had any problems whatsoever, no matter what some

4    people might have whispered, but I know of no real criticism

5    that has any basis to it for how this project is proceeding.

6       So let me start then with Mr. Henifin.  And all of you

7    know who he is because he is the most prominent, dominant

8    personality in this whole development here.  He has given so

9    generously of his time and efforts to make sure that we have

10   done what needs to be done, and we're in the process of doing

11   more.

12      Now, many of you might not -- well, not many of you.  Some

13   of you might not know of the tour that we took some time ago

14   where Mr. Henifin shepherded us around the city to see some of

15   the problems -- the more dramatic problems concerning the

16   water.  And those of you who were with us surely can't forget

17   the good waterfall experience we saw.  And there was a

18   consequence of a huge rupture in this large valve -- not

19   valve -- but pipe that now, Mr. Henifin, has been corrected; is

20   that correct?

21           MR. HENIFIN:  Yes, Your Honor.  That has now been

22   repaired and back in service and no longer a waterfall feature

23   of the abandoned golf course.

24           THE COURT:  Now, for anyone who does not know and

25   also for this record, which ought to address some of those

1   matters so that a reader can see what has been done most

2   prominently, how much water was the City of Jackson losing per

3   day at the waterfall site?

4           MR. HENIFIN:  We're estimating about 5 million

5   gallons a day that was being lost there, Your Honor.

6           THE COURT:  5 million gallons a day was being lost of

7   processed water, was it not?

8           MR. HENIFIN:  Yes, sir, fully treated.

9           THE COURT:  All right.  And that had been going on

10  since -- well, seven years.

11          MR. HENIFIN:  That's what we were told, Your Honor,

12  that that was first identified to the city in 2016.

13          THE COURT:  So from 2016 up until, what is it, about

14  two weeks ago?  Was it three --

15          MR. HENIFIN:  Yes, Your Honor, about two weeks ago.

16          THE COURT:  Okay.  About two weeks ago.  That

17  situation had been ongoing, 5 million gallons of treated water

18  a day -- a day -- was being lost --

19          MR. HENIFIN:  Yes, sir.

20          THE COURT:  -- which created a small lake as well as

21  some deep hole.  Did you ever find how deep that hole was?

22  When you-all measured it --

23          MR. HENIFIN:  No.  The one that --

24          THE COURT:  You know, you measured it --

25          MR. HENIFIN:  We could not see the bottom of it, Your

1    Honor.

2              THE COURT:  Yeah, it was 16 feet as far as you

3    got because --

4              MR. HENIFIN:  Yes, Your Honor.

5              THE COURT:  -- you didn't have any measurement that

6    would go deeper than 16 feet.

7              MR. HENIFIN:  Correct.

8              THE COURT:  So did you ever find how deep that hole

9    was filled with water?

10             MR. HENIFIN:  I don't believe so.  But the pipe

11   itself where the repair was made was 35-feet deep, so the hole

12   could have been all the way down to close to the pipe, so

13   definitely in excess of 20, maybe closer to 30.

14        But the repair itself, we had to excavate 35 feet down to

15   make the repair.  The pipe took a turn from where you saw it,

16   where they had put the -- a line -- prepared it for the line

17   stop, and it was about 10-12 feet deep at that location.  Then

18   it took a 45-degree turn to go down underneath Purple Creek,

19   went down 35 feet, and then went under the creek.  And the

20   break was right there at the 45-degree fitting where it turned

21   to go under the creek, so specialized equipment had to be

22   brought in from Texas to make that 35-foot deep excavation and

23   have enough strength to be lifting materials and shoring and

24   sheathing had to be put in around the hole to protect the

25   workers while they were in it, so a very complex repair.

1   Estimate is now about $2 million for that work.

2           THE COURT:  Just for that.

3           MR. HENIFIN:  Just for that repair, yes, sir.

4           THE COURT:  So now that that has been repaired, does

5   that mean that the costs have gone down for water treatment?

6           MR. HENIFIN:  Not yet, Your Honor.  We're tracking --

7   water has a seasonality as far as water consumption goes.  A

8   lot of factors go into every day how much water is used and

9   lost in Jackson.  Over the last three months, we've seen a

10  decrease of about 2 million gallons a day on average.  So

11  January was at 52 million gallons a day.  February was roughly

12  50 million gallons a day on average.  And March was at 48.

13      So we're tracking a downward trend in total water that

14  we're treating and putting into the system.  So that's measured

15  at the treatment plant where it goes out into the distribution

16  system.

17      The interesting thing is that's counter to the normal

18  seasonality of water consumption.  A typical water consumption

19  graph would show lower use in January and higher use in March.

20  As the weather warms up people tend to use more of the water

21  you're producing.  So the indication to us is that some of our

22  leak repair work that was started even before the big leak and

23  the valving work we've done has made some difference in the

24  amount of water that needs to be produced and put into the

25  system.

1          Over time, we'll continue to track this.  We would expect

2     to see April even lower with this repair having been made

3     during April, but again, it takes time to trend that water

4     consumption and actually see the downward trend over time to

5     make sure we're actually picking up those -- as we fix those

6     losses we actually start seeing them reflected in the water

7     demand and water production we're putting into the system.

8               THE COURT:  Now, all that water that was lost out

9     there at the waterfall, it just simply went into the ground; is

10    that correct?

11              MR. HENIFIN:  Most of it was going into Purple Creek

12    which is a creek that feeds back into the Pearl River, I

13    believe, trace it back.  But I believe it cuts across and goes

14    eastward from that location where we were and drains over to

15    the Pearl River.

16              THE COURT:  Okay.  So now, is that area out there

17    dry, the surface area?

18              MR. HENIFIN:  The creek isn't, but the surface area

19    is, yes, sir.

20              THE COURT:  It's dry now?

21              MR. HENIFIN:  Well, we had a lot of rain the other

22    day, so potentially not from the rain.  But I haven't visited

23    it myself, but it should be dry from at least no treated water

24    is flowing and filling up any low spots.  It would be rainwater

25    if there is any moisture there.

1          THE COURT:  All right.  I was quite dismayed at that

2     site, as I told you while we were there at the site, that

3     amount of water treated already having enjoyed the person power

4     of the individuals who worked on treating the water as well as

5     the chemicals that had to be added to the water and, in

6     addition, the efforts to clean the water of debris and such

7     other matters that that was just simply being wasted per day --

8     per day -- for approximately seven years.

9          MR. HENIFIN:  Yes, Your Honor.

10          THE COURT:  Had you ever seen anything like that

11     before?

12          MR. HENIFIN:  I have not, Your Honor.

13          THE COURT:  Now then, that tour also involved a

14     glimpse at the sewage problem.  Now, I had asked to see the

15     water problem but then you added the sewage matter, which was

16     so helpful.  And we saw the one that was out there on Northside

17     Drive.

18          MR. HENIFIN:  Yes, sir.

19          THE COURT:  That's not far from where the nursing

20     home was -- the senior citizen home.

21          MR. HENIFIN:  Correct, Your Honor.

22          THE COURT:  Is that still a problem there?

23          MR. HENIFIN:  I believe so, Your Honor.  I haven't

24     seen it in the last few weeks with my own eyes, but I don't

25     know that that's been corrected.  Terry Williamson might have

1   some information on that.

2       Terry, do you know?

3           MR. WILLIAMSON:  I do not.  I could certainly check.

4   I know that we've had a crew that's been out there, and I know

5   that they determined that the cause of that was wipes and other

6   material that had been discharged from the nursing home there

7   on Manhattan.  I believe this is the location that caused this.

8           MR. HENIFIN:  Yes, sir, that's the one.

9           MR. WILLIAMSON:  And we went and cleaned that out.

10  And that's a recurring problem because of what's being

11  discharged from that nursing home.  They found adult diapers,

12  wipes, and those kinds of things that had been discharged.

13          THE COURT:  Well, now, I asked --

14          MR. WILLIAMSON:  I don't know if that was the only

15  issue or if there was something else in addition to that that

16  would have needed to be repaired, but I do know that we

17  investigated that and cleaned it to the extent that it was

18  possible to be cleaned.

19          THE COURT:  So then, when it was cleaned, was it

20  cleaned with a city truck that would have the capability of

21  submitting a coil into the pipe and cleaning it out?

22          MR. WILLIAMSON:  I believe it was, Your Honor.  We

23  recently purchased such a used truck that was in fairly good

24  condition for about $379,000 that we have begun using in

25  addition to our older trucks that we have maintenance issues

1    with, but this is a new truck and is much more reliable.

2              THE COURT:  The day that we had the tour, I was told

3    that the city had three capable trucks of addressing this type

4    of problem but that all three trucks were in the shop

5    undergoing repairs.  And further --

6              MR. WILLIAMSON:  Now, that was correct on that date,

7    Your Honor.

8              THE COURT:  And further that the trucks could not be

9    returned to the city's control because there were some issues

10   with paying the bill to get the trucks out of repair shops.  So

11   is that situation now remedied?

12             MR. WILLIAMSON:  I believe it is, Your Honor.  I

13   mean, I believe we've paid what's necessary to have those

14   trucks returned.  I know that one of those was returned and

15   shortly thereafter it was leaking.  The issues that we've had

16   with those three trucks are the reason that we invested in a --

17   it's a new truck to our fleet, although it was a used truck.

18   The problem with buying a brand new truck is the lead time on

19   that equipment is anywhere from a year to 18 months from the

20   time you order it.  So in order to get a more reliable newer

21   model combination vacuum truck, we purchased a used one.

22             THE COURT:  So the city now has one truck?

23             MR. WILLIAMSON:  I think the city has -- we should

24   have at least three that are working at this point.

25             THE COURT:  How many?

1          MR. WILLIAMSON:  That are running.  Three, I believe.

2     I haven't checked today, Your Honor.  I mean, that's not --

3     that doesn't come within my purview as the legal counsel to

4     keep up with that every day.  But I do know that the situation

5     that you referred to with the trucks being at the shop being

6     repaired and paying the bills that those bills were paid.

7          THE COURT:  So those trucks now have been returned to

8     duty?

9          MR. WILLIAMSON:  They should be.  Now, I would not

10    say that we have all four of those trucks operating at the same

11    time because that would require that we have four drivers with

12    commercial driver's licenses, and I think this is not uncommon

13    to the City of Jackson alone.  Right now, finding commercial

14    driver operators for those trucks is difficult.  And they also

15    have to be trained.

16        We've got one person that's trained.  We were in the

17    process of training another person.  So I know that we have --

18    we should have two people that are trained on using those jet

19    trucks, which means that we should be able to have two of those

20    in operation at a time.

21         THE COURT:  When I was out there on the tour, I was

22    also told that Jackson had about 250 more such spots with

23    sewage gushing up from the pipes onto the surface.  Has that

24    number decreased?  And I ask that because I'm about to do a

25    status conference on the sewage case because that sewage case

1    now has been transferred over to me.  So I will have both the

2    sewage case and the water case that I have already combined,

3    but I just haven't done yet the status conference on the sewage

4    matter because this is a recent development of my having

5    jurisdiction over the sewage case too.

6        So then at the time I saw the sewage small disaster, I was

7    told that there were about 250 more such little disasters

8    around the city.  Has that number dramatically decreased?

9        MR. WILLIAMSON:  Not dramatically, Your Honor.  I'm

10    not even sure at this point whether I could say that that

11    number has decreased.  I mean, that's not a static list.  As we

12    address some of those, they'll come off a list.  But there may

13    be other reports of SSOs that we investigate that we determine

14    are not something that we can address without doing some

15    further repair other than just simply cleaning the line.

16        And so you understand not necessarily all of those,

17    although I would say that a great -- more than a majority of

18    those locations are, like, ongoing SSOs.  Some of those are on

19    the list because there's a collapse that may not necessarily be

20    causing an SSO at that location.  It might be resulting in an

21    SSO further on down that collection line.  But it's on there

22    because there's obviously been a failure in a sewer collection

23    line that needs to be repaired that's beyond the capabilities

24    of the city doing those repairs.

25        THE COURT:  I will get more into this matter with the

```
1    sewage situation at a later time, but Mr. Henifin --
2              MR. HENIFIN:  Yes, Your Honor.
3              THE COURT:  -- I asked you if you could come in and
4    give us some more pointers on this professional budget for
5    which you have asked for some additional sums of money.  So let
6    me get to the main reason why I scheduled this matter with you.
7              MR. HENIFIN:  Yes, sir.
8              THE COURT:  I just took these other matters up just
9    as an aside at this point.  We will get more into those later.
10   But as you know, following your direction and thoughts on the
11   matter, that the two cases now, the water case and the sewage
12   case have now been combined.  And I'll be doing a session on
13   that, though, later on.  And so I've discussed this with you
14   and you have given me some -- well, it was your thoughts that
15   persuaded me that this is the direction we ought to go in to be
16   sure that we could address these tandem issues and solve them
17   together because they're so intertwined with each other.
18             MR. HENIFIN:  Yes, Your Honor.
19             THE COURT:  So, Mr. Henifin, let's go now to your
20   professional budget request because that was the main reason
21   why I wanted to have this session so that any questions that I
22   have I could ask.  But let me start with this.  First of all,
23   your request has been signed off by all of the parties; is that
24   correct?
25             MR. HENIFIN:  Yes, Your Honor.
```

1    THE COURT:  But I noticed that they signed consent as

2    to form only, right?  Did you see that?  Consent as to form.

3    MR. HENIFIN:  I'm not familiar.  I'll ask my counsel

4    to address that, if we know.

5    THE COURT:  Okay.  Counsel, did you see where it was

6    signed "consent as to form"?

7    MR. CALAMITA:  Your Honor, Paul Calamita.  I believe

8    it's an accurate statement that substantively all parties have

9    signed off on the request, and maybe we didn't wordsmith the

10   motion as accurately as we should have.  But I am not aware of

11   any objection to either the substance or the form of the

12   motion, Your Honor.  I apologize if there was any inaccuracy on

13   our part in filing the motion.

14   THE COURT:  All right.  Then I just want to be sure

15   that no party on this call who is a party to the lawsuit has

16   any objections to this motion to amend the professional budget;

17   is that correct?  Anyone has an objection?  I see no hands.  I

18   see no waver of the body.  I see no finger headed up in the

19   air, so then I take it that way.

20   Now, Mr. Henifin, back to you.

21   MR. HENIFIN:  Yes, Your Honor.

22   THE COURT:  Just start off where you want.  I don't

23   intend this to be a prolonged session, but just enough to give

24   the information I need to have answers to some of the

25   questions.  I have with me my career law clerk, Navketan, who

1    has been with me since the inception of this matter.  And we

2    have gone over all of the documents.  We have gone over the

3    documents that you submitted to us prior to this session.

4         And, Mr. Henifin, would you read off into the record the

5    documents that you submitted to me prior to today?

6              MR. HENIFIN:  I can find them all, Your Honor, yes,

7    sir.  I submitted the financial report from my quarterly

8    report, so that was the financial report on the professional

9    budget from 12-1-22 through 3-31-23.  I submitted the write-up

10   on the -- from the grant application that showed the project

11   narratives around the ITPM professional budget request which

12   was included in that grant narrative for the 1442(b) grant.  I

13   submitted the detailed budget that went with that.  I believe

14   that was -- and then I submitted some bullet points that I had

15   written this morning to try to clarify and put some of those

16   all together.

17             THE COURT:  Okay.  Now, I'm going to give you leeway

18   to determine how you wish to discuss these matters.  And from

19   time to time I might interrupt with a question.  But otherwise,

20   you can start from the beginning of the initial budget and why

21   you were given leeway to submit an amendment at the appropriate

22   time and why this is a requested amendment.  So go ahead and

23   make your presentation.

24             MR. HENIFIN:  Thank you, Your Honor.  So as I've

25   stated in this document, this budget was drafted -- this ITPM

1    professional budget was drafted in early November at the

2    request of the Department of Justice, as we were still trying

3    to figure out what was going to be in the order, who was going

4    to be the interim third-party manager, and what kind of dollars

5    that might take to make that happen.  That was developed with

6    pretty little information at that point in time.

7        In fact, I've told the story that I was -- it was my

8    birthday.  I was at the Northampton Hotel in Cape Charles and

9    got up at 4:00 in the morning to sit down and draft this budget

10   so I could go celebrate the rest of the day.  So it was

11   definitely done without a lot of great knowledge and input of

12   exactly what we were going to be doing in the future.

13       To that point, the quarterly report that I submitted I

14   think we've been pretty accurate.  There weren't any changes

15   from that initial budget as we got into the first quarter, and

16   really it was a four-month report because we had December

17   included in there.  We are pretty much right on budget with

18   everything with the exception a little bit over on the

19   contractor and consultant line.

20       We're at 33 percent of the year with those four months,

21   and we're at 34.3 percent of that line item spent, and

22   everything else is at 33 or less and not significantly less if

23   you want to except potentially the staff compensation because

24   we're going to be billed by the city for some of the ITPM staff

25   for that portion of that, and I think that will bring that

1   right on up into that same 33 percent.

2       So just the quick aside that the budget seems to be fairly

3   accurate for what was in front of us.  What we didn't know at

4   the time and we didn't know until the very eleventh hour of the

5   stipulated order negotiations and we took it to the City

6   Council for their approval, they would not approve it without

7   adding the water and sewer billing administration function into

8   the order.  And that was agreed upon by all the parties via

9   some phone negotiation conducted by the city attorney, the

10  Department of Justice, the EPA, and the Department of Health.

11      And as we were trying to get the language right, we

12  realized there just wasn't an opportunity to amend the budget

13  at the same time.  So the city did calculate the operating

14  costs for the water and sewer billing administration and put

15  that into the money that they're obligated to commit to this

16  order and through this order, but we all agreed at that point

17  that we would come back to an amended professional budget if

18  there were additional costs associated with the WSBA to the

19  third-party administrator.

20      So what's been the reality of the water and sewer billing

21  administration is -- and I think everyone knew this at the

22  time -- there's significant challenges with the metering and

23  billing.  And we've actually had to bring in some consultants

24  to do a number of things.  So the big one from the first

25  quarter was PromisePay.  They're a minority-owned national firm

1    that specializes in making it easy for folks to access payment

2    plans, get information about their accounts.  And they're very

3    specialized in dealing with federal funding, like the LIHWAP.

4    They did CARES Act money distribution for many utilities across

5    the country.

6         And in this case, I asked them to look into what we could

7    do to get some attestations for disputed bills.  We had carried

8    a huge balance of arrearages when I took over at the end of

9    November, beginning of December.  Those were providing a lot of

10   our customers a great deal of stress.  They disputed the bill

11   but they still carried on their balance.  And folks are really

12   not -- if you've got a $7- or $8,000 cumulative arrearage on

13   your bill showing up every month, people that take paying their

14   bills seriously are very stressed by that.

15        And so one of the actions I took was bringing in

16   PromisePay to try to help gather attestations from these

17   customers that they did dispute the bill, that they didn't

18   believe it was accurate or reflective of their actual

19   consumption.  And we went through this process to determine if

20   they did do that.  I did not have -- I would not find enough

21   information to solve the dispute.  So if they attested that

22   they had disputed the bill, we essentially took those disputed

23   bills and cleared them off of their accounts.

24        That was over 7,000 accounts, so 7,000 families --

25   customers in Jackson felt some significant relief as these

1   large balances were removed.  But that cost money to get

2   PromisePay on board to do the work they had to do to get cell

3   phone numbers, design the mobile application to make that

4   happen, gather that data, report that data.

5       And so we're not done.  There's significant more that we

6   can still do along those lines.  That only addressed about

7   17 million of the estimated 56 million that was shown as

8   arrearages at that point in time.  I'd like to be able to

9   continue with PromisePay, but we can't continue at the rate at

10  which we were doing without additional funds for some of that

11  work.

12      They also were successful in bringing in about a half a

13  million dollars of low income water assistance program grant

14  funding from the federal government through the state, through

15  a program that's got a sunset at end of this year, so we're

16  rapidly trying to maximize Jackson's ability to pull some of

17  that money down.  So all of that has added up to the point

18  where I really believe I need more money in the consulting side

19  on the billing and collection, which is largely PromisePay.

20      The other piece that's very complicated is cleaning up the

21  data records in the billing system, wanting to make sure that

22  we've got the right folks, the right meters associated with the

23  right addresses, and then to clean up the fact that we know

24  we've got addresses that don't have water accounts and have

25  improved properties.

1        That work is going to take a lot of data scientist type

2    work where they're going to match different data sources to

3    make sure we've got correct street addresses, we've got the

4    right property owners or property residents, we've got all the

5    information we need that matches up with the meters.  That's

6    going to take, again, significant consulting.  I didn't have

7    the full dollar value on that until recently, so we may end up

8    having to come back with yet another amendment when I've got

9    that piece fully negotiated.

10        Finally, we also believe that we need -- well, I know I

11   need a few more staff to help manage the billing system and the

12   metering system.  We don't have anyone that's in the management

13   portion of that left within the City of Jackson that we can

14   utilize, so we've contracted, again, for some of that work to

15   on go and fill such time as we've got the metering and billing

16   system fully functional, which could be another year or more.

17        So those are all the things that really added up to the

18   need for additional both contract support as well as staff

19   support.  And I think it's going to be money well spent because

20   we need to get these things solved.  We're going to relieve the

21   minds of a number of folks as we clean up the billing issues

22   that have been plaguing us.  And we'll actually get a complete

23   data set on where the properties that need to be billed, who

24   owns them, how we're going to bill them, get them in the

25   system.

1    We're still installing meters.  We've got folks now paying

2    much more attention to that work that's ongoing.  So again,

3    this is the best guess at this point at what those needs would

4    be.  Again, I think I might be short based on the recent

5    proposal I received from Horne, a local consulting firm that

6    does very good analytics around data and can do a lot of this

7    data work for us.  But this is where we're at today.

8             THE COURT:  Okay.  So then the amount of money that

9    you're requesting, give that figure again, please.

10            MR. HENIFIN:  839,500 additional dollars.  Actually,

11   839.  Yes, that's exactly right.

12            THE COURT:  Okay.  Didn't you have a chart on this?

13            MR. HENIFIN:  Yes, Your Honor.  There should be one

14   that shows existing budget and then the two additional line

15   items that go into it.

16            THE COURT:  And, let's see now, it was on the ITPM

17   detailed budget, wasn't it?

18            MR. HENIFIN:  Yes, sir.

19            THE COURT:  Right.  Now, why don't you take me

20   through this graph you have here.  Well, it's a summary graph.

21   But just take me through it on the highlights.

22            MR. HENIFIN:  This one's the one that went with the

23   grant application, and so I've listed personnel as the first

24   section --

25            THE COURT:  Right.

1          MR. HENIFIN:  -- and the budget for that part of it

2   was awarded -- you see the big block that says funded under EPA

3   award 84054501.  Those are the things that were in the base

4   budget that was in the interim stipulated order.

5          We've added the business officer, which I just talked

6   about, to run the WSBA, and we're doing that by contract.  And

7   then we've got a community benefits manager that we're

8   projecting -- we need somebody to help us a little bit more

9   with our community relations.  You've referenced there may have

10  been a few whispers out there.

11         I think that we aren't doing a good enough job to make

12  sure our message is getting and connected to the community

13  members, so I'm looking for a resource to do that, whether it's

14  contract or personnel.  I've shown it as a person in this

15  table.  I'm not sure we're going to find the right person.  We

16  may end up contracting for that.  But that's essentially what

17  we're trying to do there.

18         And then if you flip the page over, there should be

19  contract support on the back side or the next page.  And you

20  can see there's another group that was funded under the EPA

21  award.  And then the two we've added is the rate collection

22  support for $300,000 and the billing system data work for

23  $200,000, so that's the -- again, rate collection support would

24  be PromisePay predominantly or somebody similar to that to help

25  us get rid of some of the disputed bill -- resolve some of the

1    disputed bill issues, as well as make sure folks are attesting
2    to any other issues we might have around their disputed bills.
3        And then the billing system data work is what I was
4    referring to that I think we may end up being a little short on
5    the dollars.  They're estimated at $200,000.  I might be an
6    order of magnitude off.  But we will -- I mean, we haven't
7    gotten to that point yet, so I'd like to make sure we'd
8    negotiate that down.
9        So those are the changes.  The rest of this document is
10    showing how that would carry forward for the next two years
11    because the grant we applied for from EPA, the 1442(b) grant as
12    it's called, is going to fund the ITPM professional budget for
13    three years.  The anticipation is all of this will transition
14    into regular operation and maintenance over time.  It could be
15    even before the three years is up.
16        As the local revenues come in and can support this work,
17    and it makes sense for that to be part of the ongoing operation
18    of the utility, and those would transition from this separate
19    ITPM grant budget to be supported with local revenues as we
20    build the local revenue base back, solving the billing issue,
21    solving the collection issue.
22        So my projection would be that before the third year, we
23    would transition a number of these costs to operations and
24    maintenance as the local revenues allow.
25            THE COURT:  So if we go down the row on these things,

1  then there are so many people who are tied up on these

2  different categories, correct, as employees?

3         MR. HENIFIN:  Yes, sir -- well, right now, on the

4  personnel, we only have a chief operating officer, a former

5  city employee who is actually still a city employee,

6  permanently or long-termed detailed to the ITPM.  So they get

7  their city salary, which I reimburse the city for ultimately

8  when we get the bill, and they've got a supplemental salary

9  from the ITPM professional budget.

10        But the total professional budget will cover all of that,

11 so that's the chief operating officer, the drinking water

12 systems program manager, another city employee.  The two of

13 them are actually solving pretty much all of the pressure

14 issues that we've resolved so far by finding and identifying

15 valves and getting those open, and they're doing just amazing

16 work.

17        Then we have a distribution system manager who is managing

18 the contract that's doing some of the small pipe leaks.  And

19 we'll be adding an assistant because we're adding more contract

20 work for them to manage.

21        We've got an executive assistant who has really been the

22 person to answer and resolve a lot of phone call issues from

23 customers, whether it's a billing issue or a leak repair or a

24 new service.  They're doing a lot of that work for us.

25        And then the other two positions that are listed this year

1    would be the business officer.  And again, we're contracting

2    for that position right now, and that position is being done by

3    a contractor.  And the community benefits manager community

4    contact person will be a recruitment we'll be doing over the

5    next few months.

6         And then in future years, we list the business analyst as

7    a need that we would need in '24-25.  As we continue to get

8    more mature in our accounting and business processes, we need a

9    little more help on that end.  Right now, we're contracting for

10   all that work with an accounting firm.  But we do think -- we

11   know we need an in-house person to actually feed information to

12   the accounting firm and make sure we're managing our payments,

13   our receivables, and our bank accounts.

14             THE COURT:  These costs were projected out into 2025,

15   correct?

16             MR. HENIFIN:  Yes, Your Honor.

17             THE COURT:  Now then, let's talk about the particular

18   cost.  Most of these costs are comprised of salary?

19             MR. HENIFIN:  Yes, Your Honor.  And then there's a

20   line item for fringe benefits which would pay -- essentially

21   the majority of that is taxes, insurance, things like that.  We

22   aren't offering benefits at this point in time, just because

23   these are city employees.  But at some point we will have to

24   transition to an entity outside of the city for these

25   employees, so these are projected in the next year or two that

1   we'd start paying more benefits beyond just payroll taxes,

2   FICA, and Social Security that we're paying today.

3          MR. FINGERHOOD:  Your Honor -- and Ted, I'm sorry to

4   interrupt -- can I just ask?  I was looking at the Exhibit A to

5   the agreed motion, but I think you-all might be discussing a

6   different document.  I just want to make sure I'm looking at

7   the right document.

8          MR. HENIFIN:  Yeah.  We're discussing the one that I

9   provided the court yesterday, I believe, which is the detailed

10  budget portion of the 1442(b) application.  So I don't think

11  you've got that.

12         THE COURT:  Okay.

13         MS. MARTIN:  Is that in one -- I'm sorry, Your Honor.

14    Ted, is that in one of the filings or how can we find that

15  document?

16         MR. HENIFIN:  We'll have to send it to you because I

17  don't think y'all are copied on the grant application.  So we

18  will distribute that as soon as we get off of this, if that's

19  possible.

20         THE COURT:  Okay.  And this document is in two pages,

21  correct?

22         MR. HENIFIN:  Yes, Your Honor.

23         THE COURT:  And on the second page under contract

24  support are some other costs that are reported, and they are in

25  red; is that correct?

1          MR. HENIFIN:  Yes, Your Honor.  I'm not sure why I

2    ended up printing them in red.  I think that actually one of

3    the EPA versions came back to me with some red input, but I

4    apologize for the red ink.  So those are listed as regulatory

5    and legal support, which was part of the original budget, and

6    that's projected forward.

7          General counsel.  We've got accounting.  Our

8    communications firm, so we're contracting with a local firm to

9    do our communications work.  That's the Fahrenheit Group, a

10    Jackson firm, local firm.

11          I've got some IT support built in.  We haven't used that

12    to any great extent this year yet, but we will be.  The

13    financial adviser is on retainer.  They helped with the

14    financial management plan and continue to provide support as we

15    look for approaches for resolving some of the outstanding debt.

16          Then we've got some occupancy related contracts for part

17    of our office building and some utilities, other things we're

18    paying there.  Then the last two items are the ones we've

19    talked about which were the additional rate collection support

20    billing systems data, the total of $500,000 additional.

21          And then beyond that -- and we carry those costs forward

22    exactly at the 2023 rate, Karl.  And when y'all see this,

23    you'll see that there was no increase from what we originally

24    put into the budget beyond those two new items, and that's the

25    same for '24 and '25.  It's a flat budget for this all the way

1    out three years.  So those of you who are on the call that send

2    me bills, remember it's a flat budget for the next two years.

3        And then we've got supplies listed, which again matches

4    the budget from the original budget.  Travel which was in the

5    original budget for professional conferences, continuing

6    education, things like that for the staff.  Not for me.  My

7    travel is built into -- my personal travel is all built into my

8    compensation.  And then the professional liability insurance,

9    if we ever find someone to underwrite the policy, that's our

10   guess at what that's going to cost, but we have yet to find

11   anyone to underwrite this policy.

12       So the total ends up -- the increase brings the annual

13   total up to the $3,816,000, and that's the same number that's

14   put in for '24 and '25.  So that total of those over the

15   three years I think with the additional money because there

16   was -- what gets confusing, Your Honor, there was a grant that

17   provided that initial first year budget that's different than

18   the grant that we've applied for, same authorization or --

19   which is the 1442(b) of the Safe Drinking Water Act, but it's

20   coming through the 150 million of the 600 million that Congress

21   gave us.

22       So it doesn't look like it adds up, but essentially what's

23   in the 150 million is the two out years and the difference for

24   this amount, which ends up being $8.5 million out of the

25   150 million for the ITPM professional account.

```
 1              THE COURT:  All right.  Now, Ted, I could have my
 2   staff email this budget to the participants here.
 3              MR. HENIFIN:  That would be wonderful if you wanted
 4   to do that, Your Honor.  Thank you.
 5              THE COURT:  Okay.
 6        (Off-the-record discussion between the court and the law
 7   clerk.)
 8              THE COURT:  Navketan is about to email that to each
 9   one of you.
10              MR. HENIFIN:  Thank you, Your Honor.
11              THE COURT:  Just two minutes she says.  Now,
12   meanwhile, Ted, on the first page, on personnel staff.
13              MR. HENIFIN:  Yes, sir.
14              THE COURT:  Under each one of these categories, how
15   many people are we talking about?
16              MR. HENIFIN:  Just one.
17              THE COURT:  Okay.
18              MR. HENIFIN:  So we're at total staff --
19              THE COURT:  So third-party manager is just one.
20   Chief operating officer, just one.
21              MR. HENIFIN:  Yes, Your Honor.
22              THE COURT:  Drinking water systems program manager,
23   just one.
24              MR. HENIFIN:  Correct.
25              THE COURT:  Distribution system manager, just one.
```

1    Executive assistant is one.  Assistant distributions system

2    manager is one.

3                MR. HENIFIN:  Yes.

4                THE COURT:  Business officer is one.

5                MR. HENIFIN:  Yes.

6                THE COURT:  Community benefits manager is one.

7                MR. HENIFIN:  Yes.

8                THE COURT:  And business analyst is one, correct?

9                MR. HENIFIN:  Correct.  Yes, Your Honor.

10                THE COURT:  These are all individuals.  And what you

11    have placed there is a salary and fringes, and you've separated

12    those two for 2023 and then 2024 and pushed on out to 2025.

13                MR. HENIFIN:  Yes, Your Honor.

14                THE COURT:  Now, did any of these people come from

15    the city?

16                MR. HENIFIN:  They all did, Your Honor, with the

17    exception of we haven't made the -- the business officer is a

18    contract position, so was a former city employee but left in

19    2021 maybe.  It's been a year maybe since she's been with the

20    city.  And then the community benefits manager hasn't been

21    selected.  And the business analyst will be in next year's

22    budget.

23        So the chief operating officer, drinking water systems

24    program manager, distribution system manager, the executive

25    assistant, and the assistant distribution system manager are

1    all former city -- or actually, technically, current city

2    employees dedicated and loaned to the ITPM, so they're

3    receiving their fringe benefits at the moment from the city.  I

4    have to reimburse a full burdened cost for those individuals,

5    so I will see those costs come to me to pay the city back for

6    their -- both their salary -- the city salary and their

7    benefits under the city system.  And then I will also -- I've

8    got a supplemental income that they -- to make their salaries

9    competitive with the market that we're paying ourselves out of

10   our budget.

11        So what the numbers you're seeing are the combined, both

12   their city salary and their supplemental salary on top.  So

13   when you see a number like 100,000 to the executive assistant

14   in 2024, that's a combination of their city salary and a

15   supplement from the ITPM.

16             THE COURT:  And that was my next question concerns

17   the -- a comparison of the salary they're receiving from this

18   budget as compared to the salary they're receiving from the

19   city.  So what's the difference?

20             MR. HENIFIN:  So it varies depending on which

21   position we're looking at.  So in the case of the executive

22   assistant, it was about $35,000, I believe, $40,000 difference.

23   In the case of --

24             THE COURT:  Was that an increase or decrease?

25             MR. HENIFIN:  Increase, Your Honor.

1          THE COURT:  Are all these increases?

2          MR. HENIFIN:  Yes, Your Honor.

3          THE COURT:  Okay.  Keep going.

4          MR. HENIFIN:  So in the case of the assistant

5   distribution system manager, it was also about $40,000.  The

6   distribution system manager was around $40,000.  Both of those

7   are close, somewhere in that range.  The drinking water system

8   program manager and the salary listed, that's about a $75,000

9   difference.  And the chief operating officer is right around

10  $100,000 difference.

11         THE COURT:  And were these negotiated salaries?

12         MR. HENIFIN:  Yes, Your Honor.  Actually, I

13  determined the value of the position based on the duties

14  that -- we've written new job descriptions for each of these

15  positions.  The responsibilities are significantly different

16  because we're such a small organization, and they have a

17  variety of expectations based on that.  So these were all

18  market based, based on the new description of the work they'd

19  be performing.

20         THE COURT:  Are these salaries expected to carry over

21  to 2024 and 2025?

22         MR. HENIFIN:  Yes, sir, just as they're shown on the

23  budget projection right there.

24         THE COURT:  And was there -- is there a raise built

25  into 2024 and 2025?

1          MR. HENIFIN:  I believe the 2024 number show a raise

2     for one individual, and that's because they're currently -- I

3     think the drinking water systems program manager is at 150.

4     And I think we've decided that is so valuable based on the work

5     they've been doing for the valve work and pressure work that we

6     raised that to 175 for 2024, but we've absorbed that within the

7     overall budget.

8          THE COURT:  And what about 2025?

9          MR. HENIFIN:  No raises for anybody in 2025.  So

10    we're working them hard, and they're earning their money now.

11    And they recognize two things about this:  One, there's no

12    long-term future.  We haven't defined a governance structure,

13    so they're taking this on working for this interim third-party

14    manager who is court appointed under your authority, Your

15    Honor.  But we don't have a future.  We don't know where the

16    water system ends up.

17         And so this is really a point in time for these folks to

18    be giving it all to an organization to solve Jackson's water

19    problem, but it doesn't mean there is anything for them beyond

20    the end of this funding, which would be in 2025.  So whether

21    they end up in a new entity that's running the water system or

22    the city takes them back because the city is running the water

23    system, they're likely to be in a very different situation come

24    2026.

25         And that's part of the goal of finding the appropriate

1    governance structure is to create a durable organization that

2    has a future and then figure out with that new governance group

3    what salaries they can afford, what they could be put in for.

4    So I don't know that these will last beyond 2025 in any format.

5    And they're all aware that this is all subject to change at any

6    point in time in the future.

7         So the fact that they've been willing to come to work for

8    the interim third-party manager on a full-time basis and

9    they're working long and hard hours to make this happen, I've

10   got to remind myself from time to time that just because I'm

11   racing to the end and I have no control over my time and I'm

12   putting every waking hour and some sleeping hours into this, I

13   shouldn't expect that from my folks, but they're delivering.

14   They're the ones making the difference right now, and they care

15   deeply about success.

16        But again, I'd love to be able to tell them what their

17   future is going to look like, but as part of that unknown, I

18   think, I've definitely leaned into the high end of these

19   salaries knowing that they were going to be doing this work

20   without a known future.

21             THE COURT:  Without a parachute necessarily, correct?

22             MR. HENIFIN:  No parachute.  Barely have a plane to

23   fly in right now.  We're flapping wings.

24             THE COURT:  Well, so there is no agreement with the

25   city to take back any of these people?

1          MR. HENIFIN:  That is correct.  And I will let

2     Ms. Martin discuss that.  I don't believe we've got any plan

3     for what happens after we're done here.

4          THE COURT:  Ms. Martin, is there a plan?

5          MS. MARTIN:  Well, I guess if I could say that there

6     was a plan, it would be that they would resume their prior

7     position, but I think that would all depend on if they would be

8     willing to.  I mean, you just heard Mr. Henifin say that

9     they're making $100,000 more than they were previously making,

10    so the likelihood that they would be willing to return to their

11    City of Jackson positions is slim.

12         THE COURT:  So as you envision it right now, are you

13    saying that the City of Jackson might not be able to recruit

14    these people?

15         MS. MARTIN:  I would like to say that the City of

16    Jackson would not be able to recruit them at those salaries.  I

17    mean, you have people literally making $100,000 more than they

18    were making when they were working for the City of Jackson.  If

19    the City of Jackson could afford to increase their salaries at

20    that rate, I'm sure we would have, but you've got some of them

21    are making more than our public works director was making.  All

22    of them, I think, are making more than the public works

23    director was making.

24         THE COURT:  Ted, let me go back to you.

25         MR. HENIFIN:  Yes, Your Honor.

1          THE COURT:  There has been some news reports that
2    some people in the city will be losing their jobs.
3          MR. HENIFIN:  Correct.
4          THE COURT:  Can you speak to that?
5          MR. HENIFIN:  Yes, Your Honor.  So the challenge we
6    have is the operational side of the water maintenance group.
7    So those are the folks that fix the broken pipes, open and shut
8    valves, put new taps on, do all the kind of work that has to be
9    done on pipes out in the street.  Sometimes that's done --
10   well, often it's done during emergency hours.  When a pipe
11   breaks you've got to respond.
12         We aren't prepared -- I'm not prepared as an interim
13   entity to operate a full-borne utility maintenance type of
14   operation, which would require the right equipment, the right
15   safety program, the right management.  None of that exists
16   today within the city structure for whatever reason.  People
17   have left.  People have retired.  The city hasn't been
18   resourced to replace equipment, put in a safety program.  And
19   as such, the best solution -- the only solution I really see is
20   contracting for that work.
21         And so the plan has been to get local contractors to hire
22   these same employees that have knowledge of the city system,
23   have skills, but are under resourced.  Again, for whatever
24   reason, they don't have the right tools, equipment.
25         You go back to the sewer truck issue we were talking about

1    earlier.  It's pervasive throughout the city at Public Works

2    Department that they just don't have what they need to do their

3    jobs effectively and safely.  And I can't buy that equipment

4    and put management in place as this interim entity.  How would

5    I find someone who is going to come manage water crews when

6    they have no future.  I can't guarantee them -- right now, I

7    can't guarantee them beyond a year.  If we get this grant, I

8    could guarantee them a year and a half till the end of the 2025

9    grant period.

10        So I think it's unrealistic to think that the ITPM

11   organization can be running a full-blown water maintenance with

12   in-house folks, with our own staff.  So the solution is

13   contracting out.

14        I think we've done an amazing job of finding contractors

15   that want to hire the city employees who do this work, making

16   them available for conversations, explaining the benefits, the

17   jobs, and then providing applications and leaving it to the

18   city employees who want to pursue those careers with a

19   contractor as opposed to working for the city to take the

20   action to do that.

21        Unfortunately, maybe it's the messaging, maybe it's

22   communication, maybe it's the culture that doesn't like change,

23   nobody does, we have been less than rapidly successful in

24   making this happen in most cases.  Now, we've got the entire

25   metering group, which was the first one we worked with, there

1    were nine folks.  They've all either accepted positions with
2    the contractor or two of them are retiring from the city and so
3    they won't be working for them.

4        So all of those folks have been placed or are going to
5    retire.  So that's the first win for us from the metering side.
6    And they're going to work to do work for the metering
7    contractor who has been working with us to do the ongoing
8    maintenance and continuing connections and fixes and those
9    things.  So I count that as a success.  They're going to make a
10   little bit more money.  They're going to be staffed and
11   equipped by this professional metering contractor.  And I think
12   it took awhile for those folks to come to terms with that.  But
13   I think they're reasonably satisfied if they have to make a
14   change, if change is being forced on them, they've made a
15   decision that I think they can feel good about long term.

16       The larger pipe folks, about 20 of those people, we've
17   presented the same kinds of options to them with different
18   contractors, folks who are doing bigger pipe work and more
19   emergency work and other site development work.  The first
20   contractor, we talked to them, talked to our folks.  There's
21   only one person interested in going to work for that
22   contractor.  I think part of it was the contractor does work
23   all over the state.  They were worried they'd get reassigned.

24       Anyway, we've found a different contractor who is
25   committed to keeping these folks working in Jackson for us, and

1    we're entering an agreement with the contractor basically
2    saying we're going to use you if you hire these people.  So
3    they are working hard to bring five folks on board on Wednesday
4    and actually start working in Jackson.  We're working with a
5    third contracter to try to bring a few more on.  But at the end
6    of the day I think we're going to be in the ten range of folks
7    that will not have accepted or taken advantage of the
8    opportunities we've tried to provide, and they will be returned
9    to the city.

10         We have got a scheduled meeting next Thursday with the
11   mayor and city administration and myself with these employees.
12   They'll have another shot at that point to say no -- they'll
13   find out where they go back in the city.  If they don't want to
14   do that, we'll let them get back with the contractors and give
15   them another shot at going to work for one of the contractors.

16         So I don't think anyone will be out of a job, Your Honor,
17   but it won't be the job they were in today.  It will either be
18   a different job within the city or it will be working for a
19   contractor or they will have made a choice not to do either of
20   those things.

21         So what I can tell you is all of them will change, and I
22   can't do anything about that.  We're making it the best we can
23   to try get everyone a great opportunity; and if not, then the
24   city is going to do their best to put them in a position that's
25   the closest to their abilities; is that correct, Torri?

1          MS. MARTIN:  Yeah.  I would just say this caveat,

2    Your Honor.  I don't know that the City of Jackson is as

3    optimistic as Mr. Henifin is that nobody will result with no

4    job.  I think that we will have some employees who might end up

5    in a situation where they are unwilling to work for the

6    third-party contractor and they are unwilling to accept the

7    positions that the city has available, and so they would

8    therefore end up in a position where they would no longer be

9    employed.

10         MR. HENIFIN:  I agree with that, Torri.  I meant to

11   say essentially that they'll all have an opportunity, I

12   believe, but some may choose not to do it.

13         THE COURT:  Ted, let me go back to you on these

14   salaries.

15         MR. HENIFIN:  Yes, sir.

16         THE COURT:  What source did you consult about

17   determining what the salary should be above the city level?

18         MR. HENIFIN:  Some connected with national

19   associations, the American Water Works Association as well as

20   the National Association of Clean Water Agencies and the Water

21   Environment Federation.  They all advertise for positions.  I'm

22   familiar with what the pay scales are for many of those

23   positions.  And I used that as the basis and then, again,

24   factored in the fact that these are not going to be permanent

25   positions.  These people are taking a chance.  There's got to

1   be some risk built into it for them.  So that's how I arrived

2   at the salaries that are on here.

3            THE COURT:  So did this model concern any state -- I

4   mean, or city that was the size comparably to Jackson?

5            MR. HENIFIN:  I know personally that if you take

6   Virginia, my hometown, the City of Hampton, Virginia, their

7   public works director is paid roughly what the chief operating

8   officer is paid, just about $200,000 a year.  The other

9   management positions on here and the field positions are very

10  comparable to what they pay.  So I don't believe it's out of

11  line, but I didn't compare it to an exact match of the

12  economics of Jackson and the Mississippi economics in general.

13  This was much more looked at from a national focus as opposed

14  to a regional focus.

15           THE COURT:  But the majority of these people came

16  from Jackson; is that correct?

17           MR. HENIFIN:  They all did, Your Honor.

18           THE COURT:  Okay.  And, of course, when they accepted

19  this position, then they were told that this position was

20  possibly a dead-end position.

21           MR. HENIFIN:  When they accepted these positions,

22  they were told they end on November 29th, 2023, because I had

23  no idea there would be any additional money beyond that at that

24  point in time.  So they all accepted these basically one-year

25  positions at that point.

1          THE COURT:  And now it's being projected out to 2025.

2          MR. HENIFIN:  It appears that that's in the grant

3    that has -- at least we've heard has been approved at the EPA

4    level.  We're still waiting for the final approvals from the

5    Office of Grants and Debarment, which should come any day

6    because my invoices are backing up pretty high at this point,

7    and we're going to be in trouble within a few weeks if we don't

8    start seeing that grant dollars.  Not just a challenge to make

9    payroll, but we'll be challenged to pay invoices like to the

10   contractor that made the big repair on the broken water line at

11   the waterfall.

12       So getting really near crunch time where I'm begging folks

13   to just hold tight and we will get their payments to them when

14   we can.  The grant money is coming.  I'm confident.  It's just

15   a matter of the wheels of federal bureaucracy that don't always

16   move too quickly.

17          THE COURT:  All right.  And as soon as that money

18   comes in then, I'll be notified, correct?

19          MR. HENIFIN:  Yes, Your Honor.

20          THE COURT:  Okay.  Now, so back to the --

21          MR. HENIFIN:  You might hear me scream.

22          THE COURT:  Because you're looking for it.

23          MR. HENIFIN:  If you just hear me screaming, you'll

24   know.

25          THE COURT:  I know we had already talked about that.

```
 1    So this is how you determined the salaries, and these salaries

 2    are paid monthly, weekly, or what?

 3              MR. HENIFIN:  Biweekly, Your Honor.

 4              THE COURT:  Biweekly?

 5              MR. HENIFIN:  Yes, Your Honor.

 6              THE COURT:  Okay.

 7              MS. MARTIN:  I don't know -- Your Honor, this is

 8    Torri Martin.  I do want to say they're still receiving their

 9    regular city salary, and it's also being paid biweekly.

10              THE COURT:  Okay.

11              MR. HENIFIN:  We tried to line those up, I believe.

12              THE COURT:  Okay.  Hang on just one minute.

13         (Pause.)

14              THE COURT:  Ted, can we talk about community outreach

15    now?

16              MR. HENIFIN:  Yes, Your Honor.

17              THE COURT:  The remainder of additional funds ought

18    to be allocated to community outreach which, according to the

19    motion, entails local engagement with the community and

20    development of what's called a robust community plan.  What do

21    you have in mind?

22              MR. HENIFIN:  So the San Francisco Public Utilities

23    Commission really started this 15 years ago where they start

24    working with local contractors.  As we bring folks into the

25    community to do work and spend some of this $600 million, we
```

1    get them to commit to providing support to the community in

2    some form or fashion.  So many times that's tutoring or

3    sponsoring a school or doing cleanups or workforce development

4    or mentoring a small business.

5        So we have a need to have a coordinator for that because

6    essentially you work with each contractor individually.  You

7    don't pay for this.  The idea is you try to work with

8    contractors who are already doing similar things in the

9    communities they work in.  And we leverage that, basically end

10   up putting it in the contract as a requirement that they live

11   up to their expectations and their obligations based on that.

12   So that's the first community benefit piece that we're thinking

13   about.

14       For the community connections, we really need someone that

15   can work more closely with the various community organizations.

16   At one point we had an employee we thought that filled that

17   role.  We had a little challenge, and we've gone our separate

18   ways.  As a result, that's a void in our organization at the

19   moment.  So the idea would be this community benefits and

20   outreach manager person would spend a lot of time working and

21   visiting and being with the various community organizations

22   here in Jackson.  And there's a lot of them.

23       The Rapid Response Coalition represents 12 to 15

24   organizations.  We've got the Peoples Assembly.  There's just

25   any number of organizations, and we really need to be engaging

1   with them on a regular basis.  And without someone to do that,

2   it's falling through the cracks.  And so that's an area that

3   really needs to be bolstered if we want to make -- if we want

4   to move successfully into some trust, both in leadership and in

5   the water system itself.  And we need to have better

6   connections to the community organizations here in Jackson and

7   the faith community as well, so a lot of work to do in that

8   area.  It's a combination of developing the community benefits

9   plan that our contractors will give back to the community as a

10  result of, and the second piece is regular, like, weekly

11  outreach and connection to our active community organizations

12  here in Jackson.

13          THE COURT:  Now, is this expected to be a -- is this

14  expected to be a supplement to what the city already has, or do

15  you envision this as some new venture?

16          MR. HENIFIN:  I think this is a new venture trying to

17  make those connections around Jackson Water, what we're doing

18  specifically in the water system, try to help educate folks

19  about water, offer tours with Jacobs so they can see the plant,

20  like you did, get a better understanding where the water comes

21  from, the science behind treating water.

22      We're going to have the technical parts of the water

23  system well under control much sooner than we're ever going to

24  rebuild trust in this community on the drinking water.  And so

25  a big portion of this is all about how do we get to folks to

1  get them enough information and education that they'll actually
2  start drinking their tap water and stop spending the time and
3  energy and effort to bring cases and cases of bottled water
4  home every week.

5      Every time I go to the store in Jackson, everyone's cart
6  has five cases of bottled water on it.  The water is safe to
7  drink.  You can drink it.  But I understand the lack of trust
8  is deep, and we're fighting an uphill battle, but we need to
9  make that effort to try to prove that and help people see
10  what's behind the science of the drinking water.  And some of
11  them might start drinking it as a result and others we're just
12  not going to change that opinion.

13      I think at the current -- the last survey I saw only
14  32 percent of Americans drink their water out of their tap.  So
15  you put it in a city like Jackson, I'm guessing we're down in
16  the 5 or 10 percent range.  I don't know.  It's a shame because
17  we know the water is safe.  But the history here is not such
18  that that confidence is there, and it's going to take a lot of
19  work to make that happen.

20          THE COURT:  So in this particular department of
21  community outreach, how many people do you anticipate working
22  in that department?

23          MR. HENIFIN:  One, Your Honor, because we just don't
24  have the capacity and budget to add a significant group of
25  people in there.  So it's a matter of leveraging our resources

1   with some of the contractor resources.  Jacobs is bringing a

2   communications person to the table, and that communications

3   person will help do both communications and outreach.  I think

4   we'll see that -- in fact, we have seen the same thing from

5   HDR, another one of our contractors.

6        So we know we can get the contractors interested.

7   Everybody wants to find a way to plug in and do more than just

8   fix pipes and fix the system or run the plant.  It's a matter

9   of finding the right way to get them connected and helping us

10  expand our reach into these community organizations and within

11  the community in general.  So I think it's possible with a very

12  small coordinated staff, but I wouldn't want, again,

13  challenging with an entity that doesn't exist at more than a

14  two-year period or three-year period.

15       Once we have the governance figured out, if we get to that

16  point, and we can transition to that durable entity, I can

17  envision this being several people focused on community

18  benefits and community outreach over time.  But that will --

19  that's going to take some time to make that work.  And until we

20  have a long-term future, I think the best we can do is leverage

21  contractors with potentially one person.  That might need to be

22  a contracted person as well.  I haven't figured that piece out

23  yet.

24            THE COURT:  Okay.  Now, let's move on to another

25  subject.  Let's move on to the software.

1              MR. HENIFIN:  Yes, Your Honor.

2              THE COURT:  Tell me what you need, what you

3     anticipate.

4              MR. HENIFIN:  We don't have a work order -- yes, sir.

5              THE COURT:  What you anticipate.

6              MR. HENIFIN:  Your Honor, we don't have a work

7     order -- we don't have a work order system which is fundamental

8     for a utility to make sure that we can record where we need to

9     be working, the hours that are put in, the asset condition

10    that's gathered.  So we need a work order system, an asset

11    management system, a fully functional geographic information

12    system.  And those all are basically the foundation blocks for

13    any utility.

14         On top of that, we've already talked about billing.  But

15    the software we're really talking about here is the -- it's

16    Cartograph is the manufacturer for the work order system.

17    We're working hard right now to get that in place, get the

18    licenses.

19         On the billing side, we're moving away from -- we're going

20    to a cloud-based solution which requires different licensing

21    than the current licensing we have for the Oracle billing base,

22    but that's going to have some cost to it initially, but long

23    term some lower costs.

24         But the majority of this is on the geographic information

25    system which is the maps with all of the asset information

1   built into it.  So essentially, if you can imagine, you get a

2   map of the city, you can zoom in, you can see the particular

3   street.  You click on the pipe, it tells you it's an 8-inch

4   pipe.  It was installed in 1968.  It was made out of ductile

5   iron material.  It was last inspected by whatever firm, and

6   they determined the condition to be fair.  And they also will

7   include a risk assessment as to consequence of failure.  If

8   it -- say it runs underneath the Capitol, the consequence of

9   failure might be very high, maybe low.  No, it's going to be

10  very high.

11       And then you'd have likelihood of failure, because that's

12  the factor you use to determine when you need to replace an

13  asset is the consequence of failure and the likelihood of

14  failure.  And the likelihood of failure is based on the

15  condition and the material it was originally made with and then

16  any kind of repair history.  We don't have great repair history

17  because we don't have a work order system and an asset

18  management system that are together, and that's all tied,

19  again, to the geographic information system.

20       So you can imagine with 110 square miles of Jackson,

21  thousands of miles of pipe, every asset has to be put in there

22  and loaded up, detail information.  That takes a lot of time,

23  both cost of the software, the licensing, and then the

24  consultant work that needs to happen to populate that with

25  accurate data is where all this is going at this point.

1          THE COURT:  So give me a time frame on this.

2          MR. HENIFIN:  So the work order system we expect to

3   be functional in its initial state within a month or so.  We've

4   been trying to delay moving our call center until we have the

5   functional work order system.  We've decided to move the call

6   center earlier because we just need to get that working better.

7   And the call center has its own work order management system.

8   We've been figuring out how that transitions into our work

9   order system once ours is up and running.

10         So the work order system should be up and running, I would

11   say, four to eight weeks.  The GIS work is ongoing.  Our

12   consultant is working on that today.  What they're doing is

13   actually taking some digitized maps and now adding real

14   geographic positioning system, GPS, to get the pipes and assets

15   where they really are in the field.  And then at that point,

16   they'll start the condition assessment work on top of that.

17         That's going to be -- GIS will be a year to be fully

18   functional, but it will still be missing data for a long time.

19   I mean, it's an ongoing living piece of software essentially

20   that you continue to add information to over time.  So we will

21   have -- a functional GIS is anticipated by the end of this year

22   because it's critical for the model work that's ongoing to

23   determine exactly what improvements we need to make to the

24   distribution system.  So those are critical pieces.  And we

25   should see a lot of that develop and be usable this fall.

1    And then the last piece -- what was the last one -- so

2  GIS -- asset management will really be -- while we're doing a

3  lot of the work on the GIS system and the work order system,

4  asset management condition assessment work will continue on

5  probably for another year or so as we get through the whole

6  system and get that really accurate and up-to-date.  Again,

7  that information does get loaded back into the GIS so that you

8  can geo -- essentially map out and see where everything is.

9    The valve work that's already been awarded and started is

10  a valve assessment of every valve in the system.  Again, that

11  will tie back directly into the GIS and asset management and

12  work order systems.  So we'll essentially be able to issue a

13  tablet to a technician.  When they're on-site, they would see

14  every valve.  They'd see a map.  They'd be able to click --

15  understand what they're dealing with from the mapping and the

16  pipe layout and the physical layout of valves, what shuts off,

17  what doesn't.

18    And all that valve information is going to be done by the

19  end of the calendar year is the schedule for that contract.

20  And that's the contract we awarded in January of this year to a

21  firm called Wachs Water.  And they will exercise and assess

22  every valve in the system.

23    And they've been on hand already to assist the chief

24  operating officer Jordan Hillman and our water systems manager

25  Terence Byrd.  As they've identified valves that are suspect,

1   we've brought the Wachs crew over to those locations.  They've
2   got specialized equipment to get those valves open to assess
3   their condition and make sure that we've got them in the right
4   position, we know what they are, what they're doing.
5        So we're taking advantage of that contract already, and
6   that's really gotten us to the point where as of March 31st we
7   had found 41 large valves shut.  We've opened those.  And the
8   pressures are largely stabilized through the system with very
9   few exceptions.
10            THE COURT:  Well, you say it's 41.  Would you
11   identify -- what percentage was that of the system?
12            MR. HENIFIN:  That's only probably 1 percent of the
13   valves, but those are all big valves.  They were all on lines
14   that were 16 inches and greater, so those are -- there are many
15   fewer valves on those lines.  And there's also many fewer miles
16   of large pipes because most of your mileage of pipe is in your
17   neighborhood streets as opposed to your big distribution lines
18   that circle the city and cut through the city.
19        So 1 percent -- we estimate right now we've got 4,000
20   total valves in the system.  As of March 31st, we had opened
21   41 suspect valves.  We actually have looked at a lot more
22   valves.  I don't have the exact numbers.  I do have a map that
23   shows the valves that have been assessed and the ones that were
24   found closed and the ones that were found open.  And that's
25   much more -- I want to say that's in the 200 valve range at

1   this point.  So somewhere in the -- 100 out of 4,000,

2   2 percent, I guess, something like that, a little more than

3   that.  5 percent.  Mental math at 6:00 is not helping.  I'm in

4   Eastern time right now.  Sorry.

5          THE COURT:  So what software here would have

6   prevented -- not prevented, but alerted us on the waterfall

7   situation?

8          MR. HENIFIN:  The part of the asset management.  And

9   that's one I didn't include in the list, and thank you for

10  reminding me.  We're also adding active leak detection to our

11  software suite.  So as part of the work that the Wachs Water

12  firm is doing on the valves, they're adding acoustical leak

13  detection to about 2,000 locations.  That will be turned on all

14  the time.  We're matching that up with meter -- the meters are

15  acoustical as well, the new meters that are going in.  And they

16  also have an acoustic leak detection feature.

17      So we will have leak detection on every water meter at

18  every residence and business and we'll have it on the main

19  lines at these 2,000 other locations, and that will be actively

20  monitored by software that's designed just to do that.  And it

21  highlights when you have an anomaly in the sound that

22  essentially says you might have a leak in this area, and then

23  you go out and look for the leak at that point.  So

24  theoretically, the leak detection software that we would be

25  putting in place would have helped find that leak when it

1   happened.

2        I would also say there's some nonsoftware pieces that are

3   not in place that will also be put in place which better

4   managed utilities typically have once a year inspection of

5   their right-of-way where their pipes go, especially in remote

6   locations.  You physically go through those locations, you cut

7   down trees, you bushhog whatever growth so that you have access

8   to your pipes if they do break.  That hasn't been done in

9   Jackson in many, many years.

10       We're putting together a contract to start the

11  right-of-way maintenance work for all of our pipes.  That work

12  in and of itself in most utilities does identify leaks in

13  remote locations because you've got a bushhogging, landscaping

14  type contractor going through.  He finds the wet spot if you

15  haven't found it from other sources.  And you go out and

16  investigate from that.

17       So best practice is to do that really twice a year.  I

18  think we're going to start with an annual.  We've first got to

19  get them cleaned up, and they're a mess right now.  So these

20  are the easements where our pipes run largely in more remote

21  locations or along highways or other places that typically

22  don't have pedestrian traffic or people close by that would

23  report a leak if they saw it, and so we'll have that program in

24  place as well, so not exactly software.  It's more of the old

25  school, get boots on and go out and look, but a critical part

1    of running a well-managed water system.

2              THE COURT:  Okay.  These are -- you have answered my

3    major questions here.  And finally, with regard to their

4    overall assessment of where we are on a percentage of 100, what

5    would you say?

6              MR. HENIFIN:  Your Honor, I think we're -- from an

7    operational system perspective, we've got a high quality

8    contractor running our plants and doing a good job there.

9    Water plant operations are running well.  Again, many systems

10   still need work, but they're doing a good job of making sure

11   we're getting water into the system every day.  The

12   distribution system is reacting much better since these valves

13   have been opened, and we continue to work on that.

14        So adding all that up, I'd say we've moved from an F to

15   maybe a D plus in our utility system at the moment in time.

16   The American Society of Civil Engineers does an annual

17   infrastructure report card.  And across the country water

18   systems are in the C minus range, C range.  It's going to take

19   us awhile to get there.  We're probably a D, D plus, if that.

20   But we're getting there.

21        So I'd say what's that equate to in a gradient scale?

22   Maybe around 60-65 percent, somewhere in that range.  But to

23   get from this to 100 percent, it's going to require every bit

24   of that $600 million.  It's going to require significant good

25   contractors giving us good bids, making sure we get the right

1    work done for the right price.

2         So there's a lot of hurdles to get from this D range to

3    the B to A range, but I think we'll make that over the next

4    three years if we can execute the program we've got in front of

5    us.

6              THE COURT:  Now, I want to be sure there's no

7    confusion about your resort to the alphabet grade because I

8    wouldn't want folk running around saying that it's just a

9    D plus.  But you are using the D plus terminology relative to

10   what would normally be a C, which would be what is the letter

11   grade across the country, are you, right?

12             MR. HENIFIN:  Letter grading across the country is

13   maybe a C minus.  I don't have the water system on the top of

14   my head right now.  It happens when you get old and retire and

15   you don't follow that stuff quite as closely, but we've

16   averaged -- I think water infrastructure -- sewer and water has

17   been in the -- anywhere from D to C minus pretty much every

18   year since the American Society of Civil Engineers started

19   doing these infrastructure report cards.  And it's been

20   25 years or more that they've been doing this.

21        So I will provide that to you, Your Honor.  I'll dig it up

22   and I'll send it over to Nav so you can see what the national

23   grading scale is.  And they even have some ideas of what you

24   need to be to get the next grade up.  So they give us a little

25   hint.

1            THE COURT:  Yeah, I want to --

2            MR. HENIFIN:  I'll pull that and send it to you, yes,

3    Your Honor.

4            THE COURT:  Yes.  I want to see that because, again,

5    when you start talking about letter grades, then someone who

6    doesn't know what the average is across the country will be

7    quite dismayed and disappointed about where we are and what's

8    happening here when you just get a letter grade.  But we're

9    doing much better than what it would seem just from the resort

10   to the letter grade that you mentioned.  And, of course, it is

11   the letter grade by which we're going to compare ourselves

12   nationally; but if we really look at the national comparison,

13   we're looking better than what people would construe to be a

14   D plus in arithmetic.  So it is a little better than that.

15           MR. HENIFIN:  It's tough still.  I think we're only

16   at three, four months past our latest failure, and that

17   happened on my watch.  And I'm committed not to have another

18   one of those.  But I don't think we're to the point where we

19   can claim any kind of victory beyond we've made some

20   improvements in the pressure.  We've got some contractors on

21   board and consultants that are really smart, and they're

22   planning on spending the $600 million to make sure that we do

23   have a more reliable, more sustainable system, but I'm not

24   convinced we're much beyond that D at this point, Your Honor.

25           THE COURT:  Well, I mean, I said that we can go with

1    the letter grade, but we just have to understand the context in
2    which we have the letter grade.  That's all I'm saying.
3              MR. HENIFIN:  Absolutely.  Yes, Your Honor.
4              THE COURT:  But the context is not the same context
5    as a fourth grader coming home with a D.
6              MR. HENIFIN:  Correct, Your Honor.
7              THE COURT:  That's all.
8              MR. HENIFIN:  At least not in my house.
9              THE COURT:  Okay.  Now, Ted, you've been most
10   helpful.  And it's after 5:00.  We started this at 3:30.
11             MR. HENIFIN:  That's right.
12             THE COURT:  And so you have been talking straight
13   across the time period, except for the questions I've asked
14   from time to time.
15             MR. HENIFIN:  Yes, Your Honor.
16             THE COURT:  And those are questions I had determined
17   needed to be asked just to have more specificity on some of the
18   matters.  Now, I really just wanted to make a record on some of
19   these things because you have been most generous with your time
20   with me.  And you and I have discussed many of these matters.
21   But I just wanted to be transparent in what's happening here
22   and also just to make a record of it because we have a court
23   reporter here.  And I wanted to make a record of where we are
24   on an interim basis to show how we're utilizing these funds.
25        And so when the budget request came in, then I wanted to

1    be sure we can discuss where we are and why we need these

2    particular dollars over and beyond what I might have already

3    gleaned from you when I've had conversations.  And so --

4    because you have been most transparent in your conversation and

5    most helpful.  And you have spoken with me on more than one

6    occasion about these matters.  And so I have a much better

7    understanding and grasp than most people because of your

8    teachings on this matter, but I just wanted to ask you some

9    specific questions to specify some matters on the budget itself

10   and why that request is being made, for instance, on the matter

11   of salary.  It's there --

12            MR. HENIFIN:  Yes, sir.

13            THE COURT:  -- but other persons who have not made an

14   inquiry would not understand why the salary is what it is or

15   for that matter, as you explained, that this salaried employee

16   is taking on a job for which there might not be a future in the

17   next two, three years.  And therefore --

18            MR. HENIFIN:  Yes, Your Honor.

19            THE COURT:  -- that would explain why there is a

20   premium on getting very qualified people over a short period of

21   time where there might not be another position available.  And

22   so that has to be taken into account with regard to that.  And

23   again, just looking at a budget request, one would not

24   understand that.

25            MR. HENIFIN:  Yes, Your Honor.

1          THE COURT:  And so I had those questions just for the

2    record, although, as I said, you and I have talked about these

3    matters.  For instance, when we had the tour you had told me

4    some of these matters about what to expect.  And there's a

5    whole lot of other issues that need to be aired later on so

6    that the public will understand what's happening here.

7       Well, now we've made a record of it.  And now that we have

8    and I've asked you my questions on this record, I am prepared

9    to go ahead and sign off on the budget.

10         MR. HENIFIN:  Thank you, Your Honor.

11         THE COURT:  But before I just signed off on it, I

12   just wanted to be sure that I had my questions answered.

13   Now --

14         MR. HENIFIN:  I appreciate it.

15         THE COURT:  -- anything else you want to say in

16   closing?

17         MR. HENIFIN:  No, Your Honor.  I appreciate your

18   thoroughness, and I'm available whenever.  I agree that we need

19   to be transparent and people need to understand what we're

20   trying to do.  Unfortunately, it's really hard to reach the

21   masses with this information, but we are continuing to try.

22   And I know next week we'll have an opportunity to do some more

23   of that in public.

24         THE COURT:  Yeah, I know.  We're going to talk about

25   how we're going to try and reach the public later.  And so I

1    will be with you in an in-depth conversation on those matters.

2    But again, I want to thank you again for the great job you're

3    doing and also how you made yourself available on short notice

4    to have this conference here today.  So I want to thank you.

5    And I am --

6                MR. HENIFIN:  You're welcome, Your Honor.

7                THE COURT:  -- signing off, but I'm going to sign off

8    on the budget.  All right?

9                MR. HENIFIN:  Thank you, Your Honor.

10               THE COURT:  All right, then.  I'm signing off.  Have

11   a great day.

12        (Proceedings concluded at 5:16 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


    I, Margaret Wasmund, RDR, CRR, CRC, certify that the
foregoing is a correct transcript from the record of proceedings
in the above-entitled matter.

    Dated this 6th day of May 2023.


                              *Margaret Wasmund*
                              MARGARET WASMUND, RDR, CRR, CRC
                              COURT REPORTER