```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                          NORTHERN DIVISION

 3


 4   UNITED STATES OF AMERICA                            PLAINTIFF

 5   VERSUS                      CIVIL ACTION NO. 3:22-cv-686-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI                    DEFENDANTS

 7


 8
                            STATUS CONFERENCE
 9            BEFORE THE HONORABLE HENRY T. WINGATE,
               UNITED STATES DISTRICT COURT JUDGE,
10                          MAY 9, 2023,
                         JACKSON, MISSISSIPPI
11


12


13


14
                     (APPEARANCES NOTED HEREIN.)
15


16


17


18


19


20


21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1   APPEARANCES:

 2


 3   FOR THE PLAINTIFF:     ANGELA GIVENS WILLIAMS, ESQ.
                            KARL J. FINGERHOOD, ESQ.
 4                          ANGELA MO, ESQ.
                            CAROL L. KEMKER
 5


 6   FOR THE DEFENDANTS:    CATORIA PARKER MARTIN, ESQ.
                            TERRELL WILLIAMSON, ESQ.
 7


 8   ALSO PRESENT:          GERALD KUCIA
                            TED HENIFIN
 9                          MELISSA WILLIAMSON
                            CHARLES MCGUFFEY
10                          FRANK CALAMITA
                            JIM VINCH
11                          SUZANNE RUBINI
                            SUZANNE ARMOR
12                          LEIF PALMER
                            BRIAN SMITH
13                          MICHAEL CRESWELL
                            CHARLOTTE BUNCH
14                          WHITNEY BUHLER

15

16

17

18

19

20

21

22

23

24

25
```

1                    **TABLE OF CONTENTS**

2    Style and appearances.....................................  1

3    Court Reporter's Certificate.............................. 80

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **IN OPEN COURT, MAY, 9, 2023**

2

3          THE COURT:  Terri, call the case, please.

4          THE COURTROOM DEPUTY:  Your Honor, this is United

5    States of America vs. City of Jackson, Civil Action Number

6    3:22-cv-686-HTW-LGI.

7          Appearing in the courtroom on behalf of plaintiff is

8    Angela Williams, Karl Fingerhood.  Appearing by Zoom, Angela

9    Mo, also Carol Kemker from the EPA.  Appearing on behalf of

10   defendants is Attorney Catoria Martin and Terrell

11   Williamson.  For the State of Mississippi, Gerald Kucia.

12   For the interested party are Melissa Williamson, Charles

13   McGuffey, and Frank Calamita appearing by Zoom.  And

14   third-party manager, Ted Henifin, is in the courtroom.  Also

15   appearing by Zoom are EPA representatives and

16   representatives from the Department of Justice.

17         THE COURT:  All right.  Do you have their names?  Why

18   don't we just call the roll on those various agencies and

19   let them identify themselves?  Okay?

20         THE COURTROOM DEPUTY:  Yes, sir.

21         Can we start with EPA?  If you can identify yourself

22   for the record, those parties that are appearing by Zoom.

23         MR. VINCH:  Sure.  My name is Jim Vinch.  I'm an

24   attorney with the Water Enforcement Division in Washington,

25   D.C., for the EPA.

1    MS. ARMOR:  Good afternoon.  This is Suzanne Armor with

2    EPA Office of Regional Counsel in Atlanta, Georgia.

3    MS. RUBINI:  This is Suzanne Rubini, also with the

4    Office of Regional Counsel in Atlanta, Georgia.

5    MR. PALMER:  I'm Leif Palmer.  I'm the regional counsel

6    in EPA ORC in Atlanta.

7    MR. SMITH:  Brian Smith, Water Division, EPA Atlanta.

8    MR. CRESWEIL:  Michael Creswell, Office of Regional

9    Counsel in Atlanta.

10   MS. BUNCH:  Charlotte Bunch, Drinking Water Inspector

11   in ECAD in Atlanta.

12   MS. BUHLER:  Whitney Buhler (phonetically), Drinking

13   Water Inspector and Enforcement Officer in EPA Region IV.

14   MS. BARNES:  Okay.  Are there any representatives from

15   the DOJ?

16   MS. MO:  Yes.  This is Angela Mo.  I am from DOJ's

17   Environmental Enforcement Section, appearing on behalf of

18   EPA.

19   THE COURT:  Did we miss anybody?  All right.  The

20   answer appears to be no.

21   This is a status conference that was called by the

22   Court to address a development in this matter concerning

23   this Court's assumption of the litigation involving the

24   sewage problem in Jackson.

25   This sewage case originally belonged to Judge Tom S.

1    Lee, and recently he and I had a conference on the sewage

2    case that he had and the water case that I have.  And after

3    we discussed these two cases, we recognized, along with the

4    input of our third-party manager, Mr. Ted Henifin, that

5    these two cases had a lot in common.  And inasmuch as this

6    water case has been proceeding apace in recent days and

7    weeks, then Judge Lee and I agreed that the sewage case, as

8    well as the water case, should proceed in unison with each

9    other.

10    There are a number of factors with counsel that result,

11    and we will be talking about that shortly.  So that's what

12    brings us here is to get a status report on the sewage case,

13    as it might need to be paired with the water case.

14    Now, we have documents already in the water case, a

15    consent order between the parties, or among the parties, and

16    there is one in the sewage case also that has -- that was

17    crafted some many years ago.

18    Now the question is -- is whether we need to recraft

19    the consent order in the sewage case and to marry that case

20    to the water case so that they can proceed together since

21    the funding will have some interstices, that the two matters

22    have some common dilemmas and need to have some common

23    solutions.

24    So because of these and other such considerations,

25    Judge Lee and I thought that it's better that one judge, and

1    that being myself because the water case is more developed

2    at this point, handle both cases.  So that's what brings us

3    here so that we can address these particular matters, and

4    also get the input of the parties who are already in the

5    water case and the parties who are joining us in the sewage

6    case.

7        Now, the two matters up until the time that I put the

8    two cases together were separate and had different cause

9    numbers.  And -- Terri?

10       THE COURTROOM DEPUTY:  Yes, sir?

11       THE COURT:  Would you read off these different cause

12   numbers?  Start off with the water case, the style of the

13   water case, and then after that provide the style of the

14   sewage case.

15       THE COURTROOM DEPUTY:  Okay.  The style of the water

16   case is United States of America vs. City of Jackson.  The

17   Cause Number is 3:22-cv-686.

18       And the style of the sewage case, the Civil Action

19   Number is 3:12-cr-790 (sic).

20       THE COURT:  Okay.  So these two cases will now proceed

21   together.  An order has already been submitted by myself

22   combining these two cases.

23       First of all, inasmuch as this is an order that has

24   already been filed and should have been, at this juncture,

25   reviewed by all of the parties, nevertheless, I need to ask

1    whether anyone has any objection to the combination of these

2    two cases.  Does anybody?

3        MR. FINGERHOOD:  Your Honor, can I be heard,

4    respectfully?

5        THE COURT:  Yes.  And can you go to the podium, please?

6        MR. FINGERHOOD:  While I do not have an objection at

7    this time --

8        THE COURT:  Now, I need you to identify yourself.

9        MR. FINGERHOOD:  Oh, I'm sorry, Your Honor.

10        THE COURT:  And your agency.

11        MR. FINGERHOOD:  Karl Fingerhood with the U.S.

12    Department of Justice, and --

13        THE COURT:  Okay.  Is the green light on?

14        MR. FINGERGOOD:  It is now.

15        THE COURT:  Okay.  Go ahead.

16        MR. FINGERHOOD:  Karl Fingerhood with the U.S.

17    Department of Justice, Environmental Enforcement Section.

18        I would note that MDEQ is our coplaintiff in the sewage

19    case, and they are not here in court today.  We were advised

20    that this status conference related to the Safe Drinking

21    Water Act matter.  We did file a joint status report on the

22    sewer case last Friday, and we did request a status

23    conference in that matter.

24        And so I would respectfully request that perhaps we

25    delay discussions of the sewer matter until such time that

1    MDEQ is present, and we also can address the Court's

2    thoughts about combining the cases.

3        THE COURT:  Well, are you telling me that you have some

4    objections to that?

5        MR. FINGERHOOD:  I don't.  I think it makes sense, and

6    I think it certainly makes sense to have both cases before

7    Your Honor.  It's just that because our coplaintiff, MDEQ,

8    is not here, I think perhaps we should defer these

9    discussions until a time that they can be present.

10        THE COURT:  We will have another status conference.

11    And so by proceeding today, we actually have no intent to

12    dishonor your coplaintiff or to ignore your coplaintiff.  We

13    fully recognize that all parties should be present.  I don't

14    know why your coplaintiff was not -- is not present.  Are

15    you saying that your coplaintiff was not notified?

16        MR. FINGERHOOD:  Well, the interested party in the Safe

17    Drinking Water Act matter is the Mississippi State

18    Department of Health.  Under the Clean Water Act, MDEQ has

19    jurisdiction over the state component of the Clean Water

20    Act.  So it is the State, but it's two different parts of

21    the State.

22        THE COURT:  Okay.  But are you saying that you all did

23    not have notice of this matter?

24        MR. FINGERHOOD:  I don't believe that MDEQ was noticed,

25    because they are not either listed as a plaintiff or an

 1     interested party in this proceeding, only in the sewer

 2     proceeding.

 3          THE COURT:  Okay.  Well, we can remedy that in the next

 4     session, because the questions that are going to be posed

 5     today may not have all the solutions that we are seeking

 6     today, and there might be some matters that we put on the

 7     thinking table that might have to be addressed at another

 8     time, after the parties have had a chance to dialogue with

 9     each other and internally with each other.  And so there

10     will be other opportunities for us to go forward.  But you

11     are here, are you not?

12          MR. FINGERHOOD:  I am, Your Honor.

13          THE COURT:  And you are certainly capable of carrying

14     back the messages, are you not?

15          MR. FINGERHOOD:  I am.

16          THE COURT:  And --

17          MR. FINGERHOOD:  I just wanted to make sure that our

18     coplaintiff would not in any way be prejudiced, and it

19     appears the Court has been very clear that they will not be.

20          THE COURT:  They will not be.  And you, as I said, will

21     be here, and if something delves into some area that you

22     think some prejudice might erupt, then I will certainly

23     expect you to stand and so advise us of that.  And then we

24     will know what to do at that point.  Okay?

25          MR. FINGERHOOD:  Very good, Your Honor.

1      THE COURT:  All right.  Thank you for bringing that to

2   my attention.

3      All right.  Next party?  Yes?

4      MS. MARTIN:  Your Honor, Torri Martin here on behalf of

5   the City of Jackson.

6      And the City of Jackson has no objection to

7   consolidating the two matters.  We agree with Your Honor

8   that they should proceed in unison and that they are similar

9   issues in both matters.  And so I just wanted to make it

10   clear for the record that the City of Jackson has no

11   objection.

12      THE COURT:  Thank you so much for coming forward.

13      Next?  Anybody else who wants to come up and announce

14   either a show of support or wants to announce some

15   hesitation in going forward?  Anybody else?

16      All right.  I don't see a whole lot of other people

17   leaping to their feet, and so I then have to presume then

18   that we can go ahead and proceed.

19      Now, the first thing I want to do at this juncture, and

20   this is going to involve the sewage case, because this is

21   the case that's being consolidated with the water case, and

22   we pretty much know where we are at this juncture on the

23   water case.

24      So, counsel, can you tell us where the sewage in

25   Jackson is at this point?  I know I asked you a tall order

 1    case that I want you to be able to give me an overview of

 2    the sewage situation in Jackson.

 3         MR. FINGERHOOD:  Yes, Your Honor.  Karl Fingerhood from

 4    the Department of Justice.

 5         THE COURT:  Mr. Fingerhood, go right ahead.

 6         MR. FINGERHOOD:  We did file a status report update

 7    this past Friday, and it does indicate that there are a

 8    large number of ongoing sewer overflows.  I think it was in

 9    the number of 256.

10         There have been several bypasses of the sewage

11    treatment plant, so it is a severe problem, something that

12    we have been working on.  And as we indicated in the status

13    report, we have kind of redirected our attention following

14    the drinking water emergency to focus back on the sewer

15    issues that do need to be addressed.

16         THE COURT:  Now, I thank you for that status that you

17    provided to us on last Friday.  It was very helpful in

18    seeing exactly where we are now, because the order that was

19    governing the progress of litigation on the sewage matter

20    was entered back in, what, 2013 or 2014?

21         MR. FINGERHOOD:  Yes, Your Honor.

22         THE COURT:  Okay.  And so that was a long time ago.

23    And since that time -- well, let me ask you, could you go

24    back to the podium, please?

25         Mr. Fingerhood, since that time that there was this

1      consent order entered, and it had certain goals, as all

2      consent orders have, and certain metrics to measure how well

3      those particular matters are being addressed and whether

4      they are being achieved, would you say that today that the

5      sewage problem is better or worse than it was at the time

6      that consent order was entered?

7          MR. FINGERHOOD:  Your Honor, I would say it is worse.

8      And I'm --

9          THE COURT:  All right.  Now, I want you to explain why

10     you contend that it's worse.  I mean, I read your status,

11     and in addition, my third-party manager carried me around,

12     as you know, and we and a number of other people had a

13     chance to see some sewage problems on that tour.  And at

14     that time, Mr. Henifin was quite informative as to the

15     number of eruptions around the city that tracked the one

16     that we were shown out there off of Northside Drive, and

17     even told that there were more than 250 other such eruptions

18     around the city where raw sewage is bubbling up from the

19     ground.

20         And the one that we saw was close to a -- I think a

21     senior retirement home, which, of course, causes one some

22     angst when one recognizes that the vicinity of that mishap

23     is an area that could pose some health hazards to our

24     senior, senior citizens, and we then recognized what we were

25     looking at at that point as being a severe problem,

1    especially when one considers the number of such incidents

2    that dot the landscape of the city of Jackson.

3        So a few moments ago you said that you think that since

4    the consent decree was entered back in 2013 or 2014, that

5    the problem has escalated; is that correct?

6        MR. FINGERHOOD:  Yes, Your Honor.  I think that would

7    likely be undisputed by any of the parties.

8        THE COURT:  Do you have a theory as to why it has

9    escalated?  I mean, what has happened to the sewage

10   situation, whether with the pipes or any other facility, or

11   the plant or whatever, which has caused the increase in the

12   sewage problem in the city of Jackson?

13       Can you speak directly into that microphone, please?

14       MR. FINGERHOOD:  Yes, Your Honor.  I'm not an engineer,

15   but I would say my own view of what I've observed is that I

16   think, not unlike the drinking water situation, there was

17   underinvestment in the system, lack of routine maintenance

18   activities, and also financial constraints on the City as

19   far as being able to pay for the work that was necessary to

20   comply with the consent decree.

21       THE COURT:  Financial constraints.  So in your

22   estimation, what is the basis for this statement that there

23   were financial constraints?

24       MR. FINGERHOOD:  Just the ability to raise the rates

25   sufficiently to pay for the necessary work.  I think the

1    City probably has a better idea of the numbers, but, you

2    know, they were, you know, hundreds of millions of dollars

3    of work that needed to be done and still needs to be done.

4        THE COURT:  And with this Court's consolidation of the

5    water case and the sewage case, do you see that the sewage

6    matter can be addressed in the same type of approach that

7    the water case is being dealt with at this point?

8        MR. FINGERHOOD:  Yes.  We have had discussions with

9    both MDEQ and the City about somehow addressing the consent

10   decree, which is -- the City has acknowledged they are out

11   of compliance with, and an alternative mechanism to perhaps

12   stabilize the system.

13       THE COURT:  So how is the City not in compliance?

14       MR. FINGERHOOD:  Well, under the consent decree, there

15   were a number of items that the City was supposed to do, and

16   as we outlined in the status conference, they've really not

17   done many of them.  They have done some work at an area

18   called the West Bank Interceptor, but -- and some other

19   projects that they were required to do.

20       But some of the larger projects were never initiated,

21   you know, some of the city-wide investigations, et cetera,

22   that were going to go into the plan to fix the system, and

23   those were not done as they were anticipated, so now we're

24   thinking about how we make this situation better.

25       THE COURT:  The consent decree in the water case and

1    the consent decree in the sewage case then are worded

2    differently.  Do you see any problem in merging those two

3    documents?

4         MR. FINGERHOOD:  I think it would -- as a legal matter,

5    to merge them I think would be perhaps a little confusing,

6    but I think, you know, the -- we were -- I think we would

7    like to perhaps keep the Drinking Water and Clean Water Act

8    cases, even though they would be consolidated before Your

9    Honor, have separate, kind of, governing instruments just

10   because they're dealing with two different statutes.

11        THE COURT:  Do you see any problem with the moneys

12   allocated for each one being in some sort of common pool?

13   Do you see that?

14        MR. FINGERHOOD:  Well, I think there's legal

15   restrictions on the way certain of the funds that were

16   allocated by Congress, the way they can be used.  Certain

17   funds can only be used on the Drinking Water Act side.

18   Certain funds through the State can be used for the sewer

19   but for capital improvement projects.  So there are several

20   different legal restrictions on how the funds can be used,

21   and they do differ between the two statutes.

22        THE COURT:  But if we have consent decrees in both and

23   they are crystal clear as to their intended directions and

24   restrictions under the pertinent laws that separate the two,

25   do you see any problem then with the Court handling both at

1   the same time under the consolidation that I have ordered?

2       MR. FINGERHOOD:  No.  I believe the Court is very well

3   capable of overseeing both matters.

4       THE COURT:  Okay.  So that is how I would like to

5   proceed on this, because I think you agree with me that

6   there are some intertwined issues here between water and

7   sewage.  Do you agree with that?

8       MR. FINGERHOOD:  Yes.

9       THE COURT:  And therefore there is a great advantage in

10  proceeding to handle both of those under some common

11  directive as much as we can establish one.  Would you agree

12  with that, too?

13      MR. FINGERHOOD:  Yes.

14      THE COURT:  Okay.  Well, just a moment.  Don't move.  I

15  had a note here on various matters here that I intended to

16  mention, but since you had risen this talk about the sewage

17  matter, I just thought it is just better to go ahead and

18  mention these particular points and let you then expound on

19  them.

20      So I had here another note that arguably the system;

21  that is, relative to the sewage, is worse today after the

22  City has spent millions of dollars to meet reporting

23  requirements and conduct studies and write required plans.

24  Do you agree with that statement?

25      MR. FINGERHOOD:  Yes.  The City is worse today than --

1          THE COURT:  Now, on a scale of one to ten, how would

2     you quantify that rating of worse that you just provided?

3          MR. FINGERHOOD:  I really can't put a number on it.  I

4     would maybe ask the City.  They've been pretty honest, and I

5     think they would admit, as they did in the status report,

6     that they acknowledge that there is a number of things that

7     were required under the consent decree that have not been

8     done.

9          THE COURT:  Okay.  Then, finally, on an amendment to

10    the interim stipulated order, do you see any problems with

11    developing an amendment to that to bring us up to snuff

12    today and to carry us forward in the future?

13         MR. FINGERHOOD:  Well, I think what the parties had

14    been discussing would be some sort of amendment or document

15    that would be in the Clean Water Act case that would be, you

16    know, kind of -- not combined in the same document as the

17    Safe Drinking Water Act case but on a parallel track, both

18    before Your Honor.

19         THE COURT:  Seated off immediately to your right, as

20    you know, is Mr. Ted Henifin.  He is the third-party

21    manager.  And he has been our polestar in the water case.

22    Do you see any problems with him occupying a similar

23    guidance position in the sewage case since he has the handle

24    on all of the water concerns and the water concerns are so

25    intertwined with the sewage matters?

1    MR. FINGERHOOD:  Well, he does already have authority

2    over the WSBA, so I think there is some overlap already that

3    exists between the water and sewer.

4    THE COURT:  So would you have any objections to him

5    assuming a like position with regard to the sewage case in

6    that regard?

7    MR. FINGERHOOD:  I don't.  He may.  But, you know,

8    that's -- I know he -- you know, he has his hands full with

9    the Drinking Water Act case.  So I can't presume to speak

10   for him.  But from a qualifications standpoint, he certainly

11   has the qualifications.

12       In fact, you know, wastewater was really his main area

13   of expertise before he became the interim third-party

14   manager.

15   THE COURT:  Right.  And we're well aware of that.  And,

16   in fact -- in fact -- one second.  In fact -- you're not

17   finished.

18       In fact, I might add that -- oh, I'll let you talk in

19   just a second.  But, in fact, I might add that when he and I

20   were going over our progress, where we are, what is

21   necessary for the future and all, and after we had seen the

22   sewage problem and been advised that were 250 -- at least

23   250 more such eruptions around the city, then he was the

24   first one who suggested that perhaps the two cases ought to

25   be intertwined because they have so much in common.  So I

1    think that he will be on board on that, but I'm going to

2    confirm that in just a moment.

3        Now, but you would have no problems with him assuming

4    it if he is willing to take on this extra burden?

5        MR. FINGERHOOD:  Yeah.  I think we definitely would be

6    interested in discussing that with him.

7        THE COURT:  Okay.  Thank you very much.

8        Now, Mr. Henifin, before I go to the City of Jackson,

9    because I want to hear what the City of Jackson has to say,

10   but I think now this is the appropriate place to have you

11   inject.

12       Do you have any problems with taking on this extra

13   burden?

14       MR. HENIFIN:  No, Your Honor.  There's plenty of

15   problems with it, but I think I'm well suited for this

16   additional work, and I think we've got the systems in place

17   to make it functional.

18       THE COURT:  And I was correct in what I said was that

19   on our tour, I think it was the first time, that someone

20   suggested these two cases should be combined.  And you were

21   that person, were you not?

22       MR. HENIFIN:  Yes, Your Honor.

23       THE COURT:  And could you then explain in some detail

24   why you made that suggestion?

25       MR. HENIFIN:  Yes, Your Honor.  It's largely around the

1    financing and the fact that the financial plan that I had to

2    produce as part of the interim stipulated order on the

3    drinking water case included development of that financial

4    plan.

5        And because I have authority over the water and sewer

6    billing administration, revenues come in together.  We

7    separate those with -- well, it actually all flows to the

8    City at this point, because we couldn't direct the revenue

9    away from the City because of some bond covenants related to

10   the debt the City is carrying on both water and sewer, which

11   is combined.

12       In fact, they combined revenue into a single water and

13   sewer revenue for their bond issues many, many years ago.

14   So the money comes in actually is devoted to the system,

15   water and sewer.  The City, under our terms of our

16   agreement, pays a million dollars a month into our O & M

17   fund, the operation and maintenance fund to the water side,

18   and the balance is used for the City's purposes for the

19   sewer side, paying the bond debt, the other related costs of

20   the water and sewer system.

21       So to go forward and really build a financially

22   sustainable system, we need to retire the debt, and all the

23   revenue needs to flow to the third party to make sure that

24   we can allocate revenue accordingly.  We mentioned earlier

25   that we've got a significant amount of Safe Drinking Water

1    Act money available through the benefits of the

2    Congressional appropriation that was done in December.

3        That 600 million can offset an awful lot of the water

4    needs, in accordance as Mr. Fingerhood had mentioned.  To

5    follow the statute, that water -- that money can only be

6    spent in drinking water needs.  That means our local

7    revenue, which is already combined, water and sewer, could

8    be largely redirected to sewer over some period of time

9    while we've got the benefit of the federal dollars for

10   water, which is what makes all this kind of work together.

11       The third point of making it work together on the

12   finance side is we've got some Corps of Engineer money

13   through the Water Resource Development Act.  That currently

14   needs a matching fund, and it can be used for water and

15   sewer, and if we use it for sewer and match it with some of

16   our water money, we can get more miles of a small-diameter

17   pipe replacement done at the same time.

18       This all requires some pretty close coordination.  I'm

19   not saying it couldn't be done with two separate people

20   managing that, but I believe that with the authorities

21   you've provided in the interim stipulated order, the freedom

22   to procure faster, to hire faster, to contract quicker will

23   make this move much faster than the ten years of non, I

24   guess, advancement in the sewer system that we've just

25   experienced.

1          I'm convinced that we'll make significant progress in

2     the very short order under that -- some sort of combined

3     between the sewer and water using the model that we have

4     with the interim stipulated order.

5          THE COURT:  Now, I want to hear from the City at this

6     point as to -- hold on, Mr. Henifin.  Mr. Henifin, hold on

7     just a minute.  I'm going to hear from -- I'm going to hear

8     from the City as how the City views all of this.  Then I'm

9     going to come back to you, because you have some more

10    points, I believe, that you would like to make on this

11    intertwining between these two systems --

12         MR. HENIFIN:  Yes, sir.

13         THE COURT:  -- that I'd like to hear enunciated on the

14    record, as well as in the presence of these other persons

15    here, because I think those matters are matters that ought

16    to be aired so that everybody understands what is to be

17    accomplished here and how this whole system could work in a

18    fairly short order for the betterment of the City of

19    Jackson.  So I'm going to come right back to you, but first

20    I want to hear from the City of Jackson.  So thank you.

21    I'll come right back to you.

22         MR. HENIFIN:  Yes, Your Honor.

23         MS. MARTIN:  Your Honor, Torri Martin again for the

24    City of Jackson.

25         I was going to try to address some of the issues.  I

1    was taking notes as you were asking questions of

2    Mr. Fingerhood.  I don't think that anybody in the City of

3    Jackson would disagree that our solid waste collection

4    system is in trouble -- sewage system.  I'm sorry.  I've

5    been talking about solid waste for so long.  I'm mixing it

6    with wastewater.  I apologize.

7         Arguably the system is in a worse position today than

8    it was in 2013.  The City of Jackson in 2013 entered into

9    this consent decree with the Department of Justice and the

10   EPA and MDEQ, and in the first few years of that consent

11   decree, I think that the City would argue that we were

12   substantially in compliance with that consent decree.

13        But I would also say that at the time that we entered

14   into that consent decree, the estimated amount of the cost

15   of funding that consent decree was $800 million.  The City

16   of Jackson, at no point throughout since 2013 have we ever

17   had $800 million to fund a consent decree for wastewater.

18   So what the City of Jackson has done over the last -- you

19   know, since 2013 is tried our best to comply with the

20   resources that we have had available.

21        And what we have found internally is that what that has

22   led to is us spending a substantial -- excuse me -- is to us

23   spending a substantial amount of money and time on studying

24   the collection system and submitting the reports that were

25   required under the consent decree, but it has not allowed us

1     to spend time and money on actually moving forward with

2     repairs to the collection system.

3         And so when you say that the system is in a worse place

4     today than it was then, it's because of that deferred

5     maintenance to the system.  It's because we have located --

6     we have consistently located dry-weather SSOs and we have

7     consistently located sewer failures, but we have not had the

8     funds to actually repair those SSOs and those sewer

9     failures.

10        So, as you know, our list has continued to grow.  It's

11    currently at approximately 256, and it continues to waver

12    around a 256 number because we simply do not have the

13    revenue to actually perform all of those repairs.

14        When we talk about the last couple of years, what the

15    City of Jackson did in November of 2021 is for about a year

16    and a half prior to '21, we hired outside counsel to come in

17    and help us negotiate or try to negotiate a modified consent

18    decree.

19        We proposed that modified consent decree in the

20    wastewater matter in November of 2021.  We have yet to

21    actually get a response -- or a formal response from the

22    Department of Justice and Environmental Protection Agency on

23    that proposal.  However, after November of 2021, we

24    experienced a water crisis in August of 2022.  When we

25    experienced that water crisis, we turned all of our

1    attention to water, to drinking water, Safe Drinking Water

2    Act.

3         Once we resolved that, once you executed the order on

4    the Safe Drinking Water Act, what the City of Jackson did is

5    we asked the Department of Justice and Environmental

6    Protection Agency and MDEQ to switch focus to sewer.  At

7    that time, what we told them is that we felt like we were

8    one step away from a crisis in terms of sewer.

9         And so in January of 2023, we asked the Department of

10   Justice and the Environmental Protection Agency and MDEQ if

11   we could move forward with some modification to the consent

12   decree requirements so that we could focus our time and our

13   money on repairing the problems in the system and not on

14   program management for the reporting requirements.  And

15   since that time, that's what we've been negotiating.

16        Your Honor, you asked earlier about an amendment to the

17   stipulated order.  I believe that the City of Jackson agrees

18   with the Department of Justice in that we think that it

19   should be a separate document.  However, we do not think

20   that that document should be a consent decree.  Our

21   experience with consent decrees is that they have not been

22   successful in terms of us actually meeting the goal of our

23   citizens, which is to improve the collection system itself.

24        I think what the City of Jackson would like to see is

25   for us to stay the current consent decree on the wastewater

1    system and for us to move forward with a short-term

2    agreement that would allow us -- and when I say "us," I

3    might be including Mr. Henifin, that would allow the City of

4    Jackson to move forward really focusing on those 256 SSOs

5    and trying to actually gain some type of resolution for

6    those before moving forward with the underlying requirements

7    of the consent decree.

8        THE COURT:  What kind of time frame are you suggesting

9    for the address of those 256 eruptions?

10       MS. MARTIN:  Your Honor, I would say based on the

11   amount of funding that we currently have available, I think

12   you need at least a year or two, maybe even three.  And the

13   funding is -- you know, Mr. Henifin, we've had -- the City

14   of Jackson has had several discussions with Mr. Henifin

15   about the funding, about his financial management plan, and

16   about what it would look like for us to essentially marry

17   the two.

18       And so some of the restrictions that we have on funding

19   come down to the bonds that we currently have, and it also

20   comes down to the loans that we currently have on both

21   systems, the drinking water and on the wastewater side.  We

22   have loans and we have bonds on those two.

23       I believe Mr. Henifin's plan is to pay down that debt

24   and to take -- and I don't know if he -- I can't remember

25   now if he has explained this in these meetings or not, but

1    to take the PAYGO, so the money that's being generated, and

2    to put it back into the system.

3        With the money that the City of Jackson currently has

4    available, we really think that we are going to have to

5    separate this into neighborhoods and focus on the

6    neighborhoods with the most SSOs that have been reported and

7    to try and tackle it neighborhood by neighborhood.

8        We previously submitted a priority project list to the

9    Environmental Protection Agency, Department of Justice,

10   MDEQ, and Mr. Henifin, and so we've been looking at that

11   priority project list with everybody that's in this room,

12   with the exception of MDEQ, but we have also submitted that

13   list to MDEQ.  And in that list, we proposed that we start

14   with the Queens neighborhood and the SSOs that are in that

15   neighborhood and then move down that list in trying to

16   tackle some of the problems that we have, because we know we

17   have some major issues in that area.  But I think that the

18   funding will really determine the timing.

19       THE COURT:  Now -- and could you slow down for my court

20   reporter?

21       MS. MARTIN:  Sorry, Your Honor.

22       THE COURT:  All right.  Now, Ms. Martin, thank you for

23   that update, but I still have a couple of questions here.

24       MS. MARTIN:  Okay.

25       THE COURT:  To someone who is not familiar with the

1    gravity of the sewage problem but only imagining what the

2    sewage problem actually looks like, and then to someone who

3    has seen raw sewage bubbling up from the ground, it is most

4    disconcerting to hear an estimate of one to three years for

5    that dilemma to be addressed and remedied.

6        When our tour group saw raw sewage coming out of the

7    ground out there on Northside Drive, it was very troubling

8    to see raw sewage coming out of the ground, forming a small

9    cesspool nearby concomitant with odor, and possibly even

10    disease possibility later, and close to a senior citizen

11    home.

12        So this estimate of one to three years is most

13    concerning, and the public I'm sure will be alarmed to think

14    that it would take that long to address a problem so

15    dangerous.  But you're saying that under the City's

16    projection, owing to the lack of funding, you're saying that

17    that's how long it will probably take?

18        MS. MARTIN:  Yes, Your Honor, that is my estimate.  And

19    I will say that we have experienced some horrific claims

20    when it comes to sewage.  That's one of the reasons why in

21    January of this year we went to the EPA and DOJ and said

22    this is an emergency.  We have got to address this problem.

23    But based on the funding that we have had available -- and I

24    will say part of the lack of funding comes down to, you

25    know, we had a significant period of time where we had

1    reduced water and wastewater billing collection.  We also

2    had a downgrade in 2018 of our bond rating.  Of course you

3    had the pandemic.  We had shortages with personnel,

4    inflation, supply chain issues, and a continuing decline in

5    our population.

6        But also, we have consistently had to be aware of the

7    fact that we have a large number, 25 percent, of our

8    population that lives in poverty.  And so earlier you heard

9    Mr. Fingerhood talk about rates and increasing rates.  We

10   have had to consistently be aware of the fact that we can

11   only raise rates so much before our citizens will be unable

12   to afford the rates that are necessary in order to fix this

13   problem.

14       We did have a rate increase in November -- excuse me --

15   or was it November or December -- in December of 2021, we

16   took a rate to the city council that did pass.  That was the

17   first rate increase we had had in several years.  But our

18   projections based on the consultant we have worked with on

19   this issue is that it will take some much higher rate

20   increases that most of our citizens cannot afford.  But in

21   addition, it will take other funding.  It will take funding

22   from the federal government; it will take funding from the

23   state government in order for us to fix this issue.  And we

24   have consistently requested funding from both.

25       THE COURT:  I have had some conversations with our

 1     third-party manager, Mr. Henifin.  He has some, I think,

 2     wonderful ideas as to how we can move forward on addressing

 3     these problems in a forthright and immediate reaction, and

 4     later I'm going to call back on him to provide that, and I

 5     would very much appreciate it if you would, at the time that

 6     he does this, listen carefully to what he has to say,

 7     because I don't know if you've had a chance to see his

 8     statistics and his figures on these particular problems, but

 9     I have.  And then I'd like you to react on that.

10          But now let me go to another matter.  You also

11     mentioned the bond structure for the City relative to these

12     issues.  The bond structure is not good, is it?

13          MS. MARTIN:  No, Your Honor.  When you say "not good,"

14     I think I understand what you mean, but I think the answer

15     is no.

16          THE COURT:  Well, what it means is that the City of

17     Jackson is not in a position to borrow money, is it?

18          MS. MARTIN:  Correct.

19          THE COURT:  And is not in a position to borrow money

20     because of its bond rating, correct?

21          MS. MARTIN:  Correct.  I think we have exceeded our

22     capacity.

23          THE COURT:  And a city's bond rating has a huge effect

24     as to whether that city can borrow money in times of need,

25     to go to the bonding market, to get approved by the state to

1    issue a bond, and then investors will then be enticed to buy

2    bonds on the notion that buying bonds -- that over a certain

3    amount of time, a certain number of years, that those bonds

4    can be cashed in and the citizenry investors can then derive

5    investment income from those bonds.

6        But whether an investor will actually put forward any

7    interest in investing in a bond depends upon confidence that

8    at the end of that period, when the bond is supposed to be

9    cashed in, that the city will be able to pay those who have

10   invested in the bond.  And as a result, to encourage folk to

11   enter the bond market, a rating system has been developed,

12   and investors then who are interested in an investment of

13   bonds, municipal bonds; that is, city bonds, they can turn

14   to that rating system and see what that rating system had to

15   say about the city's capacity at some point when the bonds

16   are to mature that the city will be able to pay that money

17   off; that is, pay the investor back for having taken a

18   chance during this time period to invest in the bonds.

19       But, on the other hand, if the bond rating is poor,

20   investors aren't going to take a chance on buying bonds.

21   And, further, the lending institutions aren't going to take

22   a chance at lending any money towards a bond for a city in

23   that regard.  So what you're telling me then is at this

24   point, the City's bond rating is so low that the City cannot

25   find entities willing to extend money to the City for bonds,

1     and investors mostly will not invest in any bonds put

2     forward by the City because they don't have confidence that

3     at the time of maturity that the City will be able to pay

4     them off for those bonds.  Am I correct?

5          MS. MARTIN:  Yes, Your Honor, that's my understanding.

6          THE COURT:  So during this time period now, in your

7     estimation, what can the City do to improve its bond

8     appearance?  At this juncture, what could the City do?

9          MS. MARTIN:  We can increase revenues, which I think

10    Mr. Henifin has a plan for, and I do believe that

11    Mr. Henifin's financial management plan to pay down our debt

12    would also increase our ability to borrow money.

13         THE COURT:  Okay.  Now, at one point, I believe the

14    City was interested in borrowing some money.  Am I correct?

15         MS. MARTIN:  We have not been interested in borrowing

16    money.  If we have, it was SRF loans, which are loans that

17    are low-interest-rate loans that are offered to us through

18    the State of Mississippi.

19         THE COURT:  But that would increase the debt that the

20    City has.

21         MS. MARTIN:  Correct.

22         THE COURT:  And under Mr. Henifin's plan, the City

23    would be reducing its debt.

24         MS. MARTIN:  Correct.  Under Mr. Henifin's plan, we'd

25    be reducing our debts.

1      THE COURT:  So when I looked at the two, it seemed --

2  because I have seen that interest in incurring some new

3  debt, but it would just seem to me that between the two,

4  that Mr. Henifin's plan is a better plan for the City of

5  Jackson to reduce its indebtedness as opposed to taking on

6  new obligations that would merely increase its debt

7  obligations.  What do you think?

8      MS. MARTIN:  I will not offer an opinion, but what I

9  will say is --

10      THE COURT:  I'm not trying to put you on the spot.

11      MS. MARTIN:  What I will say --

12      THE COURT:  But I'm putting you on the spot.

13      MS. MARTIN:  You're putting me on the spot.  I cannot

14  speak for the administration -- I cannot speak for our

15  executive and legislative branches.  However, what I will

16  say is that at this time, I think that Mr. Henifin is the

17  most qualified -- he is likely the most qualified individual

18  to lead our wastewater division at this time.

19      THE COURT:  All right.

20      MS. MARTIN:  That's what I will say.

21      THE COURT:  That is a very politic answer.  I thank

22  you.  Thank you so much.

23      MS. MARTIN:  Thank you, Your Honor.

24      THE COURT:  All right.  Now, then, Mr. Henifin, I have

25  you now center stage.

1          MR. HENIFIN:  Yes, Your Honor.

2          THE COURT:  Let's start with that then, if you don't

3    mind.  Tell us about the plan that you have crafted that you

4    think would address our concerns in as short a time period

5    as possible.

6          MR. HENIFIN:  Yes, Your Honor.  And to Ms. Martin's

7    points, there's going to be some time to resolve these

8    overflows, even with all the money in the world.  Contractor

9    capacity and the actual need to basically clean the system

10   from top to bottom in the areas where there's been

11   overflows, where there's problems, I don't have a real good

12   estimate on that at this point, but I would say her one to

13   three years is not out of the range.

14         I would say we would be focused, because, again, of the

15   structure of a stipulated order.  If I had the same concept

16   of relief from state procurement laws and I had this funding

17   in hand that I should have in hand very soon from the

18   federal government, that we can make rapid progress.  But I

19   don't know that we'll get to the end within the first year.

20         THE COURT:  Now, one second.

21         MR. HENIFIN:  Yes, sir.

22         THE COURT:  While this sewage problem persists and we

23   are having in so many areas raw sewage still bubbling up,

24   what is the short-term release for people in those

25   neighborhood -- I said release.  I meant relief -- for those

```
 1    people in those neighborhoods where raw sewage is bubbling
 2    up even as we speak today?
 3        Now, the figure that you and I had talked about before
 4    was about what Ms. Martin had said, because she said 256,
 5    and we had talked about 250 or more, so you all are in the
 6    same camp as to your estimates, and that's what I was
 7    provided, you know, previously.  So what are the citizenry
 8    to do in the short term while raw sewage is bubbling up from
 9    the ground?
10        MR. HENIFIN:  Your Honor, I don't have a good answer
11    for that.  You know --
12        THE COURT:  Give me the best you got.
13        MR. HENIFIN:  Pardon?
14        THE COURT:  Give me the best you got.
15        MR. HENIFIN:  The best I've got is we would proceed
16    immediately with some contract support to go to those
17    communities that have those 250-some and do our best to
18    resolve the ones that can be resolved quickly through
19    cleaning, through vacuum trucks, through getting the pipes'
20    small repairs done.
21        But as we build a larger backlog of the repairs that
22    need to be done to eliminate those, the best we're going to
23    do is this current process, which is essentially putting a
24    sign up warning people not to go into the areas where
25    there's bubbling up sewage, because it does provide a health
```

1     hazard.

2          There are signs posted today in many of these locations

3     in the city to warn people to stay out of those areas until

4     we can get them resolved.

5          But, frankly, the only thing we're going to be able to

6     do is run as fast as we can to try to get those done.  Give

7     it everything we've got, get multiple contractors here,

8     national scale folks, to bring the resources we need to put

9     to that in a very fast manner.

10         What we haven't mentioned, unfortunately, Your Honor,

11    is there's also a problem with building backups.  It's one

12    thing for the sewage to be bubbling up on the street like we

13    saw or in a yard.  It's another thing when it bubbles up in

14    your bathtub or in your shower or out of your toilet and it

15    flows into your house.

16         We're having a number of those as well, and those are

17    all related to the same issues of needing to clean the

18    pipes, make sure that the flow is there.  We might need to

19    put some backflow preventers on the sewer lines so that

20    sewage doesn't back up into some low-lying houses.  And

21    that's, in my opinion, higher priority than the stuff that's

22    bubbling out onto the street in neighborhoods.  We need to

23    solve and prevent sewage from backing up into people's

24    homes, because I can't think of anything worse.

25         THE COURT:  And when a homeowner calls on the hotline

1    to report such, what do you think the response time is going

2    to be?

3    MR. HENIFIN:  Well, standard response time should be

4    less than two hours.  And that's what we will be going for

5    initially.

6    THE COURT:  And do you have the equipment to deal with

7    this?

8    MR. HENIFIN:  We will have to contract for that.  We

9    don't have the staff or equipment.  It's bringing a

10   contractor in with that capability, or multiple contractors

11   in with that capability, will be the only way we'll be able

12   to solve that.

13   THE COURT:  You know, we talked at length about this

14   matter -- well, we've been talking at length about all of

15   these matters, but when I first saw this bubbling up effect

16   out there on Northside Drive, you might remember that I

17   offered to pay for a cleanup out of my own pocket for that

18   particular one, because at the time, I was under the

19   impression that we just didn't have that many that severe.

20   And so I said that since I know some agencies who clean out

21   the pipes, then what if I just donated some money and got

22   that done and not charged anybody.  That's when you first

23   told me how many were involved.

24   MR. HENIFIN:  Yes, Your Honor.

25   THE COURT:  And then you told me that, well, it's not

1    just one.  It's about 250.  And then we had a long talk

2    about that and what it would take to clean out some of these

3    pipes.

4        Do we have the trucks and the equipment now to clean

5    out those pipes?

6        MR. HENIFIN:  I would have to refer to the City, but as

7    I understand it, they've got -- they had three trucks.  They

8    got them fixed, I believe, and they've got them back in

9    their possession.  They've recently bought a fourth used

10   one.  I believe their limitation is the crew, but I would

11   have to ask the City to comment on that, but --

12       THE COURT:  At the time we had our conversation, the

13   City did not have the trucks --

14       MR. HENIFIN:  Right.  The three --

15       THE COURT:  -- to actually go out to clean out the

16   pipes.

17       MR. HENIFIN:  Yes, sir, Your Honor.  The three trucks

18   were in the shop, and they weren't able to pay the bill, and

19   they were being held hostage by the vendor that was -- that

20   had done the repairs.

21       THE COURT:  And so the City at that time did not have

22   any one of these three trucks, and now, as I understand it,

23   the City has an operator problem; is that correct?  That is,

24   someone who can operate --

25       MR. HENIFIN:  That's my understanding, my most recent

1    understanding.  I haven't talked to the City of late on

2    that.  Ms. Martin or Mr. Williamson would have to talk to

3    that.

4         THE COURT:  As to whether they have an operator

5    problem, anyone trained to be able to do this, even if there

6    is a truck in existence that could go out, even if they only

7    have a truck, that means that they have one truck for trying

8    to address all such problems.

9         MR. HENIFIN:  Yes, Your Honor.

10         THE COURT:  Is that your understanding?

11         MR. HENIFIN:  Yes, Your Honor.

12         THE COURT:  So then if the sewage matter is placed

13    under your tutelage, as I expect for it to be, then how

14    would you address that circumstance?

15         MR. HENIFIN:  So I'd be looking to contract out that

16    entire operation, similar to what I've had to do on the

17    water side.  It's severely underresourced, understaffed, and

18    there's not time, as you pointed out.  These are urgent

19    matters.

20         There's not time to staff up, buy new equipment, train

21    people.  I need to turn to a contractor that's got all these

22    resources already developed.  And to the extent we can get

23    the contractor to agree to hire some of the city employees,

24    which we have done successfully in many cases on the water

25    side, we'd be looking at contractors and asking them to see

1    if they would hire any of our existing employees, the city

2    employees, to put them to work essentially doing the job

3    they're doing but with appropriate management tools,

4    equipment, scheduling, and probably even higher pay as a

5    result.

6         So it would be very similar and maybe not so popular a

7    move to eliminate the city function and convert it to a

8    contracted function going forward.  But, again, it's the

9    combination of this is an urgent problem.  It doesn't have

10   time for us to go out, hire more staff, train the staff, buy

11   the equipment, and put them to work.

12        And so the fastest, most expeditious method of doing

13   this is to get contractors to come in and do that.  And to

14   the extent they would be willing to hire some of our folks,

15   some of the city folks, that's the best we're going to be

16   able to do to make this happen fast.

17        THE COURT:  So, meanwhile, until we reach a permanent

18   solution, we run the risk of disease, sickness, correct?

19        MR. HENIFIN:  Yes, Your Honor.

20        THE COURT:  But are there any statistics before us

21   which show that we have had and experienced a greater degree

22   of such hazards befall upon our citizenry in the most recent

23   past?  Do we have any statistics that show that we've had

24   greater hospitalizations or medical visits or things like

25   that?

1           MR. HENIFIN:  Not that I'm aware of, Your Honor.  Often

2      that's a very hard correlation to make.  There's a lot of

3      reasons for folks to develop gastrointestinal -- most

4      sewage-related illnesses are gastrointestinal.  There's just

5      not a great national tracking of the cause, was it exposure

6      to sewer, or was it exposure to sewer and recreational

7      waters?

8           I think EPA has done extensive studies, and they know

9      some correlation between a sewer overflow and the potential

10     for illness as a result of that based on the number of

11     gallons released and how the contact was, and I would turn

12     it over to the EPA scientists if they want to deal with

13     that.

14          But I know there is a correlation between being exposed

15     to sewage and gastrointestinal illnesses.  The problem is on

16     the health side, most doctors don't recognize, ask the right

17     questions, or report it on a national level that we would

18     really understand the impact, so I don't think you'd be able

19     to tease that out of medical information here in Jackson.

20     It's harder even on a larger scale.

21          I just don't think our health system is in tune to

22     that, because as a country, as a developed country, we've

23     largely eliminated waterborne illness related to raw sewage

24     because of the work of EPA over the last 50 years.  They've

25     been laser focused on eliminating sewer overflows from

1    communities across the country.  They've done a very good

2    job of doing that through a combination of enforcement,

3    encouragement, training, funding.  We had huge federal grant

4    funds available back in the late '70s and into the early

5    '80s.

6        We've basically eliminated the issue of raw sewage that

7    plagues all developing countries.  You know, the biggest

8    health hazard in most other countries is exposure to raw

9    sewage either through drinking water -- contaminated

10   drinking water or just the lack of sewage collection

11   ability.

12       Over three and a half million people die a year from

13   sewage waterborne illness, and 95 percent of them are

14   children.  The U.S. doesn't have these kind of statistics

15   because we've solved the sewage problem, and we need to

16   solve it here in Jackson.

17       THE COURT:  Okay.  Now, let's go to the matter of

18   revenue for the plan to deal with the sewage problem.  You

19   have a plan for that?

20       MR. HENIFIN:  Yes, Your Honor.  So the financial plan

21   that I laid out in January as part of this order actually

22   outlines how we can take -- again, key to this is retiring

23   the debt, and we've talked about that a little bit, and

24   we're still working through some challenges around the way

25   the money is flowed to us through the Safe Drinking Water

1    Act.  But we've got lots of people with great ideas that are

2    hoping to unwind that so we can figure out how to retire all

3    of the debt.

4        But if we can do that, we also need rates, local

5    revenue.  We've talked about our metering challenges over

6    many years, the fact that there's customers without meters;

7    there's customers without paying; there's customers that

8    don't accounts in our system.

9        We need to solve that, and the fastest way, again, may

10   not be the most popular, but it looks like if we could do an

11   interim rate based on something other than water

12   consumption, we wouldn't impact the 25 percent of our

13   population that lives in poverty.  In fact, they would see

14   reduced rates.

15       We would impact some of our more wealthy citizens.

16   They would see an increase in their water and sewer bill.

17   Combined it can generate enough revenue to put the system on

18   pace to be -- again, retire the debt, find an appropriate

19   way to recover the revenue of the $70 million, roughly, we

20   need a year to operate the sewer and water system.

21       And then over the next five years, if we stick to the

22   plan, again, using federal dollars for the drinking water

23   issues that we've got to solve, local dollars to pour

24   towards the sewer, match the Corps of Engineers' 219 money

25   with water money -- again, that was your reference to

1    potentially considering additional debt.  For those who

2    didn't quite follow that conversation, that was -- the 219

3    money from the Corps of Engineers requires a local match,

4    25 percent, and at one point when these issues were

5    separate, and they still are separate, so, you know, in our

6    current situation the only way the City can find the dollars

7    to make that match essentially would -- one of the options

8    would be borrowing more State Revolving Loan Fund money so

9    they would have the money to match the Corps of Engineers'

10    dollars to put that into the sewer.

11        By combining the two, we can use some of our Safe

12    Drinking Water Act money we're getting from the federal

13    government as the match to the 219 dollars coming from the

14    Corps of Engineers, so we can do sewer and water in the same

15    project and not have to borrow any additional money, so

16    that's sort of where that was.

17        So I think if we get this -- the revenue right, retire

18    the debt, and use the federal dollars to the maximum extent

19    possible in the way my plan is laid out, we would reach "A"

20    rated -- going back to your ratings, "A" rated credit

21    utility standards, the metrics by which you measure a rating

22    is typically number of days' cash on hand and the amount of

23    PAYGO you're able to generate and put back into your system.

24    Rate utilities can put about -- 2 percent's sort of the gold

25    standard.  If you can reinvest 2 percent of your plant value

1    every year back into your system with PAYGO money that

2    you're generating from your rates, that would be a gold

3    standard for utility.

4        And I'm not sure -- there's probably only the "AAA"

5    rated utilities in the United States that are at that 2

6    percent mark.  Everyone else falls a little bit short.  Most

7    people are in the 1 to 2 percent range.  That means you're

8    replacing your facilities every 100 -- or if it was 2

9    percent, it'd be every 50 years.

10        And that's a great reinvestment for this kind of

11    infrastructure.  It has a long lifespan anyway.  The plan I

12    put forward shows that we can generate 20 million a year,

13    which is 2.7 percent of the current plant value of the water

14    and sewer systems combined.

15        So it would put us in a really great position

16    financially after five years and then keep us on that

17    position for the next 20 according to the financial plan.

18    Obviously it's a plan.  Everyone has a plan until you get

19    hit in the face, but we will -- I think it's a sound plan.

20    And assuming we can get the debt worked out and the rates

21    put in place, I think we're on a good path, water and sewer.

22    And that generates local revenue put into the sewer system,

23    and we would dedicate pretty much most of the local revenue

24    at that point, a big chunk of the local revenue, into the

25    sewer system to make sure that we get a big jump on these

1    urgent problems that we've been talking about.

2        THE COURT:  And another beneficial effect of that plan,

3    should that plan succeed, would increase the attractiveness

4    of the bond structure.

5        MR. HENIFIN:  So the City's bond structure, they would

6    have no outstanding debt related to water and sewer.  I'm

7    not sure if they've got any general obligation debt.  It's

8    not large, I don't believe, but I don't know.  You'll have

9    to ask them.

10        But, yeah, from a bond rating standpoint, it should

11    improve to the point where they could borrow money if

12    needed.  And in my plan I show a potential for a new plant

13    or a major investment in the 2030 timeframe, and we can

14    support that debt through a State Revolving Loan Fund-type

15    loan, about $150 million in that time frame, and still not

16    impact our ability to generate PAYGO, not have to increase

17    rates any more than the plan already had in it.  So, yes, we

18    should be much more attractive to lenders as well as

19    investors at that point.

20        THE COURT:  So that plan then would have us experience

21    a self-sustaining water system, sewage system?

22        MR. HENIFIN:  Yes, Your Honor.

23        THE COURT:  And they'd be able to pay their own way?

24        MR. HENIFIN:  Yes, Your Honor.

25        THE COURT:  It's also going to mean there's going to

1    have to be a purge of the rolls.

2        MR. HENIFIN:  Yes, Your Honor.  So by switching on the

3    near term to a property attribute-based rate, we would grab

4    assessor's data and blend it into our data, so we would be

5    billing property owners, a hundred percent of property

6    owners, as opposed to, you know, trying to figure out who's

7    got a meter, where the meters are.

8        Meters become a tool for us to manage our system at

9    that point to keep track on pressure, look for big losses,

10   use listening devices.  There's active listening devices we

11   can turn on in the meters to listen for leaks.  Again,

12   remember we're looking hard for our 30 million gallons of

13   lost water, and you got to visit where we were losing 5

14   million gallons a day.  We've fixed that.  We've got a long

15   way to go.

16       If we get enough of these leaks fixed on the water

17   side, we could potentially close the fuel plant in very

18   short order and save 6 to $7 million a year in operation and

19   maintenance costs immediately.

20       So there's lots of potential out there.  We've just got

21   to keep, you know, running fast and trying to make the right

22   investments.

23       THE COURT:  And at the present time, we are making

24   headway, are we not?

25       MR. HENIFIN:  Yes, Your Honor.

1          THE COURT:  In fact, one big step was the closing of

2     the waterfall rupture.

3          MR. HENIFIN:  Yes, Your Honor.

4          THE COURT:  That's what I called it.

5          MR. HENIFIN:  That is what it was.

6          THE COURT:  Yeah.  I mean, it was a regular waterfall.

7     I mean, it was a miniature Niagara, you know, out there.

8          MR. HENIFIN:  We think we'll have -- you know, we're

9     trending water data just to see how much we're putting into

10    the system month by month.  We haven't got the April numbers

11    exactly right yet, but over the first quarter, we reduced

12    the amount of water we needed to put in the system by 2

13    million gallons each month in that quarter.

14          So we went from 52 million gallons in January to 48 in

15    March.  So we're on a good trend.  We need that number to

16    actually be down around 25, so we've got a long way to go,

17    but we're on the case.  We've got, again, two brilliant

18    young former city -- well, they are still city employees,

19    but they're working for me full-time, that are just out

20    there every day trying to figure out where the next leak is,

21    where the next valve's closed.  They're giving it everything

22    they've got.  They're well equipped.  They're very smart,

23    and they're making progress.

24          THE COURT:  Okay.  One second.  Don't move.  Let me see

25    if I have another question here.

1    Okay.  Thank you.

2    I turn back to the City now.  Ms. Martin, don't trip in

3    here now.  Our insurance is not too good.  Now, I notice you

4    almost tripped over your purse.

5    MS. MARTIN:  It was my purse.

6    THE COURT:  Yeah.  I want the record to reflect that if

7    you want to later contend that you were injured in this

8    courtroom --

9    MS. MARTIN:  No workers' comp.

10    THE COURT:  -- it was over your purse that you put out

11    there in the aisle.

12    MS. MARTIN:  I did.

13    THE COURT:  Okay.  Now, so I just want to be sure,

14    because our insurance agent will ask.

15    MS. MARTIN:  Speaking of insurance, Your Honor.

16    THE COURT:  Go ahead and speak.

17    MS. MARTIN:  So you mentioned earlier about short-term

18    relief for people in neighborhoods who are currently

19    suffering from some of the sewer overflow issues.  I do

20    agree with Mr. Henifin's comment that the focus should

21    really be on the sewer backups as opposed to the sewage in

22    the streets, at least in terms of priority.

23    What we currently have in place at the City of Jackson

24    is the risk management department.  One of the reasons why

25    we went to the EPA, Department of Justice, and MDEQ in

1    January of this year was based on the number of claims we
2    were getting in on sewer.  We get sewer claims in to our
3    Risk Management Division where they go in and they
4    evaluate -- they do two things:  They investigate with our
5    Public Works Department to determine whether or not the City
6    can fix the issue, and then the second thing that they do in
7    the Risk Management Division is they actually try to mediate
8    and compensate individuals for loss based on the sewage
9    claims.
10       And so they are kind of our first arm.  It's a separate
11   division from the main legal department.  It does fall under
12   my office, and so that's one of the reasons why I see all of
13   those claims.  But what we currently do is if the City of
14   Jackson -- if we have an issue with an SSO or we have a vac
15   truck that we can send out and it clears the system, we do
16   that.
17       But I will say this with this caveat:  Typically if
18   it's a larger issue and we're going out and we're clearing
19   the system, clearing the system is a temporary fix.  So we
20   will send a truck out; they will clear the system.  If there
21   was a backup in the home, we compensate those individuals
22   for whatever damage there was in their home, and even if
23   they were displaced from their home.  If they can prove to
24   us that they were displaced from their homes, then we also
25   compensate them for days in hotels.

1          We have a claim right now that we're looking at where

2     we have a broken sewer line that's underneath a home that's

3     been there for quite a while, and on that particular claim,

4     we're actually looking at the value of the home versus our

5     ability to fix that much larger sewage issue.  And so our

6     Risk Management Division consistently goes through those

7     claims as they come in and evaluates whether or not we can

8     pay the claim and whether or not the Public Works Department

9     has sufficient equipment to fix whatever the issue is.

10         THE COURT:  Now, one second.  Hold it.

11         MS. MARTIN:  Uh-huh.

12         THE COURT:  You were telling me about this sewage

13    problem under this house.

14         MS. MARTIN:  Uh-huh.

15         THE COURT:  And you were trying to determine which is

16    more expedient or expeditious with regard to remedying that

17    particular problem.

18         MS. MARTIN:  Yes, Your Honor.

19         THE COURT:  Now, so then the first thing you looked at

20    was whether you all could go under the house and deal with

21    the piping, the tubing, and everything else under the house.

22         MS. MARTIN:  Yes.

23         THE COURT:  But I don't quite understand that approach

24    right now.  And I'm sure it's correct, you know, because you

25    all are more expert than I am, but I understand that the

1   sewage pipes are only about two feet under the ground.  Is

2   that so?

3        MS. MARTIN:  That, Your Honor, I'm not certain of.  I

4   might defer to Ted Henifin on that.  He's the expert.

5        THE COURT:  Mr. Henifin, is that correct?

6        MR. HENIFIN:  For a service line to the house, it's

7   probably in that two-to-three-foot range.  I think in this

8   particular case -- in this particular case, it's a main line

9   that was actually built, and then a house was built on top

10  of it.

11       Now, that should have never happened, but things

12  happen.  And so now you've got a line that's probably six to

13  eight feet deep and a larger diameter.  You need a large

14  excavator to get to the break.  That's why you don't build

15  sewer lines under houses and structures.

16       So that somehow this one probably was put in without an

17  easement.  No one knew it was on the lot when the builder

18  came following that at some point and built their house.  It

19  happens in communities across the country where it just

20  doesn't get recorded quite right, the contractor putting the

21  line in at the time cut it through a developable lot but

22  didn't actually get an easement recorded, so the lot still

23  looks like it's open and available to build on.

24       Someone buys it, builds on it, never knew that there

25  was a sewer line under it until it fails, and now you've got

1    to figure out how to get the house off of the sewer line so

2    you can dig down to it, which means you acquire the house,

3    you tear it down, relocate the people.  But it's not unique

4    to Jackson.  It's happened in every community I've been

5    around.  It's not common, but it's not unique.

6        THE COURT:  Well, thank you for the explanation,

7    because, as I said, I was under the impression that sewage

8    line would only lie two to three feet, you know, under the

9    ground, and thus I couldn't understand why this posed such a

10   problem if the sewage line was that shallow under a house,

11   why they just simply couldn't go under the house and deal

12   with two or three feet.  And so now I understand why that

13   happened.

14       MS. MARTIN:  It's a very unique situation.  But our

15   Risk Management Division is kind of the first line of

16   defense, and they do go in and do their best to try and

17   mediate the claims that come in.  If there is a collapse,

18   then we do have -- we can put in a bypass pump, but, again,

19   that's temporary.

20       A lot of fixes that we currently are able to afford to

21   do are temporary fixes, because we don't have the resources

22   for those more long-term fixes.

23       You asked earlier about our equipment.  We do have four

24   trucks, but three of them are more than ten years old.  The

25   fourth one is new.  However, we only have currently two

1    drivers, because the drivers of those trucks, they're

2    required to have CDL licenses, and we currently only have

3    two drivers that are capable of driving those four trucks.

4        THE COURT:  Now, you need to put some more meat on the

5    skeleton, because people who are informed that you just need

6    a CDL driver are going to say, well, that's all it takes for

7    me to do down and get one of those jobs and drive one of

8    those trucks.  They're gonna be rushing down.  But you need

9    more than just a CDL, right, to drive one of those trucks?

10        MS. MARTIN:  I would defer to our Public Works

11    Department.  They would have to be trained.

12        THE COURT:  Yes.  But they don't have to be trained to

13    drive.  They need to be trained how to use the equipment,

14    right?

15        MS. MARTIN:  Yes, how to use the equipment.  Exactly,

16    Your Honor.

17        THE COURT:  In order to use the equipment to try and

18    clean the pipe out along with that particular truck.

19        MS. MARTIN:  Correct.

20        THE COURT:  You know, what that truck --

21        MS. MARTIN:  The vac truck.

22        THE COURT:  Yeah.  What that truck provides is some

23    special equipment, so you need more than just a CDL driver.

24    You need somebody who is skilled at how to clean that pipe

25    out using the facilities on that truck.  So it's more than

1    just a CDL, because then if some people heard that they

2    don't have a CDL down there, well, I got a CDL; I'm going to

3    hurry up and get on down there and apply for that job

4    because that's all you need --

5        MS. MARTIN:  Yeah.

6        THE COURT:  -- but it's more than that, and I don't

7    need any training because I have a CDL.

8        MS. MARTIN:  It's specialized training, Your Honor.

9        THE COURT:  That's right.  But they need the CDL.  They

10   need the specialized training, because they have to know how

11   to operate that truck and know how to utilize the equipment

12   on that truck to clean out the piping and all of that.

13   Right?

14       MS. MARTIN:  Correct, Your Honor.  You're right.

15       THE COURT:  Now, since you mentioned something about

16   being temporary, a few moments ago I said that when I saw

17   the problem out there on Northside Drive and I was thinking

18   all I had to do was call one of the local providers and have

19   them come out there and scope that out and that will be it,

20   but you also said that that could only be a temporary fix.

21   Did you not say that, temporary?

22       MS. MARTIN:  In some cases, us flushing the system with

23   that vac truck is just a temporary fix because it's

24   something else in the line that's causing it to be clogged.

25   So we can go in and flush it out, but if there is something

1    else that's coming in that line -- so the example, I guess,

2    that I have from public works is I know we had one house --

3    or one sewer line that was -- it was backed up because of --

4    it was close to a nursing home and there were -- not diapers

5    but flushable wipes -- flushable wipes in the line, and

6    so -- and diapers and stuff like that in the line.

7         So we came in and we flushed that line.  But if they

8    don't stop putting stuff down in the line that's causing it

9    to clog, then it's temporary.  So we come out and we flush

10   it and it clears it for a temporary period of time, but then

11   if they keep continuing to do whatever it was that was

12   clogging the line, then we'd have to come back out and flush

13   that line again.

14        THE COURT:  Okay.  Another thing, by the way, you

15   didn't mention is grease.

16        MS. MARTIN:  Grease, correct.  That's another one that

17   comes up a lot.

18        THE COURT:  A lot of people have a habit of after they

19   have fixed a huge meal, cooked a huge meal and utilized a

20   lot of grease in doing so, they pour it down the toilet.

21        MS. MARTIN:  Yep.

22        THE COURT:  Or either they pour it down the sink, and

23   they promptly clog it up.  And then someone has to call one

24   of these flushers out there to try and clean the line.  And

25   that's another thing.  Not to mention another one, those

1    people who have a lot of young children and the young

2    children threw their toys off into the toilet and that clogs

3    it up.

4        So there are a whole lot of things that can cause the

5    clog.

6        But when you said "temporary," those I don't see as --

7    so much as being temporary, because these are acts of humans

8    who just continue to do what they're doing.  But I was

9    wondering whether you meant temporary in the sense that even

10   though you snake a line up in there, that it needs something

11   more than just a snaked line up in there because of some

12   other problem.  Not continuous violations, but something

13   else inherent in that matter.  Is there something else?

14       MS. MARTIN:  So you can have a collapsed line.

15       THE COURT:  A collapsed --

16       MS. MARTIN:  A collapsed line.  So if you have a

17   collapsed line, then our fix, we can do the bypass pump.

18       THE COURT:  Right.

19       MS. MARTIN:  But if we can't put a bypass pump in

20   there -- the bypass pump will fix it, because it'll make it

21   avoid the line.  It'll go around the line.

22       THE COURT:  Okay.

23       MS. MARTIN:  It's bypassing it.  But if we can't put a

24   bypass pump in there and it's a collapsed line, we can go in

25   and flush it, but it's going to be a short period of time

1    before it clogs again if the line is collapsed.

2        THE COURT:  I see.  Now, so you have one major truck on

3    the scene now.

4        MS. MARTIN:  Yes, Your Honor.

5        THE COURT:  The other three are still in the shop?

6        MS. MARTIN:  No.  They are out of the shop.  They are

7    out of the shop, but they're just older.  So they are out of

8    the shop, but we don't have enough drivers for all four of

9    them.  We only have two drivers.  So the brand-new shiny

10   truck is being driven, and one of the older trucks is being

11   driven, but we have to hire additional personnel for those

12   other two trucks.

13       THE COURT:  How many calls do you think are being made

14   by this major truck that you have?  How many calls are they

15   answering, would you say, per day?

16       MS. MARTIN:  So that's our public works director,

17   Robert Lee.  He said about ten to twelve trucks -- I mean

18   ten to twelve calls are being answered per day by the new

19   truck.

20       THE COURT:  And how much time would you say is

21   allocated to each occurrence when the truck shows up at some

22   house?

23       MS. MARTIN:  Depending on -- he said it depends on the

24   issue.  The amount of time depends on what the problem is.

25   And if they show up and it's an easy issue, then they fix it

1    right away.  And if it's not, then it goes on our list and

2    they would have to come back.

3        THE COURT:  And so you're saying ten to twelve per day?

4        MR. LEE:  Yes, sir.

5        THE COURT:  Okay.  And we're talking about five days a

6    week or six days a week?

7        MR. LEE:  Before they ran -- seven this past week, sir.

8        THE COURT:  Okay.  Including Sunday?

9        MR. LEE:  Yes, sir.

10        THE COURT:  7 times 12, that's 84.  Okay.  That's about

11    right?

12        MR. LEE:  Roughly, yes, sir.

13        THE COURT:  Roughly.

14        MS. MARTIN:  And for the record, I do want to state

15    that's Robert Lee, our public works director, that's

16    speaking from the audience.

17        THE COURT:  Okay.  Well, that's a lot -- that's a lot

18    of calls.

19        MS. MARTIN:  It is.  But some of those calls -- so when

20    we go out there, if we have the equipment to fix it at that

21    time, we fix it at that time.  But there are many calls that

22    we go out, we recognize it's an issue that we cannot fix,

23    and then it goes on that 256 list.

24        So the reason why that list fluctuates is as we're

25    going out, we're curing the ones that we can cure.  If we

1    can't cure it, then it stays on the list.  There are some on

2    the list that we have hired an outside contractor to come in

3    and help us diagnose and fix.

4        And so the example I would give you on the outside

5    contractor -- the reason why I said if we can afford to fix

6    it, we fix it.  If we can't afford to fix it, it stays on

7    the list.

8        So an example with the outside contractor is that

9    outside contractors can CCTV a line, and they can also clean

10   a line.  And we have a contractor that's $250,000.  Well,

11   that $250,000 contract only gets us 40 days.  So it's about

12   40 days of work that we can get from that outside contractor

13   where they're going out, they're CCTV'ing, cleaning, and

14   hopefully fixing many of them.  But if they can't fix it,

15   then they turn it back to us for us to know it's got to stay

16   on the list.

17       THE COURT:  Okay.

18       MS. MARTIN:  So that's the process we've been going

19   through, Your Honor.  That's the process we've been going

20   through.

21       You talked about a little bit with Mr. Henifin about

22   the ability to generate revenue, and I believe earlier when

23   I spoke with you, you wanted me to kind of hear his plan and

24   respond to it.

25       So, Your Honor, what I would say is we have looked at

1 Mr. Henifin's plan in detail.  We have looked at the

2 spreadsheet.  We've talked to him many, several times --

3   (An off-the-record discussion was held.)

4  MS. MARTIN:  So in looking at Mr. Henifin's plan, the

5 City of Jackson has some concerns about his ability to

6 generate the PAYGO funds.

7  The main concern that we have is knowing what we know

8 about collections in the City of Jackson, and the fact that

9 Mr. Henifin has not yet been able to implement the rate

10 increase, we have concerns on how long it will take for us

11 to generate sufficient income to make changes -- or

12 implement the changes that he would like to implement in our

13 sewer system.  And so we know that on the Safe Drinking

14 Water Act there are sufficient funds there to fund the

15 priority project list.

16  We do, though, still have some concerns about the

17 ability to generate the PAYGO on the wastewater side,

18 because it all depends on -- and I will -- you know, of

19 course Mr. Henifin can respond to this, but we really

20 believe that it all depends on his ability to implement the

21 rate change and for citizens to actually start making those

22 payments and start paying their bills.  And because of the

23 lack of collections that we've experienced over the last few

24 years, we just have some concerns on his ability to actually

25 generate that money.

1        THE COURT:  All right.  Thank you very much.  While

2    you're there, let me ask you a different question.  I said

3    that I am combining water and sewage.  And we need a

4    document which would reflect that combination.  Do you have

5    any problems in trying to come up with a document which

6    combines these two thrusts?

7        MS. MARTIN:  Yes, Your Honor.  I think that we would

8    propose a supplemental stipulated order that would combine

9    the two, the water and wastewater.

10        THE COURT:  You submitted that, didn't you?

11        MS. MARTIN:  I submitted that very recently to EPA and

12    DOJ and also to Mr. Henifin.

13        THE COURT:  All right.  Now --

14        MS. MARTIN:  Very recently, EPA and DOJ and MDEQ.

15        THE COURT:  Well, then I want to -- before I hear from

16    the other side again, I want to have you react to this

17    observation that I've made.  In your submission you asked

18    that Mr. Henifin be made a party along with the, what is

19    that, MDEQ or somebody?

20        MS. MARTIN:  Okay.  Yes.  The confidentiality

21    agreement, we have asked that he be bound by that

22    confidentiality agreement, and it's a confidentiality

23    agreement that existed before Mr. Henifin joined in this

24    case.  So it already existed in that case before he joined

25    it.

1          THE COURT:  Now, I don't have a problem in making him a

2     part of the confidentiality requirement.  However, I do have

3     some concerns about making him a party, because as someone

4     who works directly for the Court on this issue, I confer

5     with him on a regular basis.  And if he is a party, I don't

6     want that construed as a conversation outside of the

7     attention of everybody else.  And so, therefore, I don't

8     want him as a party in that respect, but he can be bound by

9     the confidentiality matter.  Do you have a problem with

10    that?

11         MS. MARTIN:  No, Your Honor.  No, we don't have an

12    issue with him not being a party.

13         THE COURT:  Does anybody have an issue with that?

14    Because that language in that stipulation would have to be

15    changed in that respect, because he then would not be a

16    party who would be bound by rules that govern ex parte

17    conversations with the Court as a party.

18         So since he deals with me all the time, and under the

19    documents I've been laboring under thus far, he is able to

20    do that, and we have done that on a regular basis where I've

21    been kept up to snuff on everything that's been going on and

22    also have an idea as to where we are going.  So I don't want

23    him restricted in that respect.  Anybody have a problem with

24    that?

25         MR. FINGERHOOD:  Your Honor, Karl Fingerhood on behalf

1    of the Department of Justice.

2        I think we would be fine.  Mr. Henifin is an officer of

3    the court under the third-party order, and so if Your Honor

4    wishes to change the language to reflect that, I think that

5    may address the concern.

6        THE COURT:  Okay.  Thank you so much.

7        Ms. Martin, thank you for -- are you finished?

8        MS. MARTIN:  That's all I had, Your Honor.

9        THE COURT:  All right.  Thank you so much.

10        Now, then, you had stood earlier because you have

11    something you want to add.  Go right ahead.  Add.

12        MR. FINGERHOOD:  Well, I do, Your Honor.  As you were

13    indicating, you have been having some conversations with

14    Mr. Henifin.  We haven't had the same level of conversations

15    with him.  As you know, I am an attorney for the Department

16    of Justice.  I don't have, you know, final say on things.

17    And my client, EPA, has to weigh in, and also MDEQ.  So we

18    do look forward to meeting with Mr. Henifin in the near

19    future and discussing a lot of the items that he raised

20    today, and we do have a confidentiality order, because we

21    like to have open and frank discussions, and a lot of the

22    people involved, the engineers, myself, we're not the

23    ultimate decision-makers.  So we would like to have the

24    final decisions made by those decision-makers.

25        We -- some of the things that were discussed -- I did

1    just want to briefly mention on the grant side, in the

2    status report there's, I think, acknowledgment that there

3    are certain Congressional laws that dictate how the money

4    can be used, and I think the third-party manager is looking

5    into having a legislative fix.  But without, you know,

6    Congress changing the law, you know, we have to follow the

7    law as it is written.  So we will have to have some further

8    discussions on that.

9        I know he also mentioned debt retirement.  While I'm

10   not weighing in one way or the other, another consideration

11   is rather than spending the money on debt retirement, can

12   that money be used right away for quick fixes?  So that's a

13   financial, you know, type of decision that, you know, we'll

14   want to discuss with him and get more on his thinking on

15   that and, you know, have our financial experts weigh in.

16   But it is just another consideration that is out there.

17       And that is all I had to add at this time, Your Honor.

18       THE COURT:  All right.  Thank you so much.

19       Two things.  One, I would like all of the parties to

20   try and get together to see if you can come up with a

21   stipulation as to how we can combine sewage and water.  And

22   try to have that for me in the next two weeks so that I can

23   look it over and see if it passes muster over this

24   direction, because we would like to have these documents

25   handy so that we'll know what we can do in this regard with

 1    both those matters, and also with regard to Mr. Henifin's

 2    involvement and direction on these matters, because earlier

 3    when I asked whether anyone disagreed with his being the

 4    lead person on the sewage as he has been on the water, I saw

 5    no objection to that.

 6         So I need to have whatever, then, you can submit on

 7    that matter, and I would hope that there are some agreements

 8    on it, because there is supposed to be a stipulation.  And

 9    so we can get all of that and move from there.

10         Ms. Martin?

11         MS. MARTIN:  Your Honor, just a point of clarification.

12    You've mentioned that you wanted us to bring something to

13    you in two weeks.  My question is whether or not you want us

14    to submit a proposal that we have all negotiated or if you

15    want us to take a proposal -- we would have to take -- we,

16    the City of Jackson, if we're going to enter into a

17    stipulated agreement like we did previously, we would have

18    to take that to the city council.  Do you want us to try and

19    iron something out in the next two weeks that we take to the

20    city council?  Or do you want us just to iron out an

21    agreement and bring it directly to you?

22         THE COURT:  Why don't you go ahead and iron out as best

23    you can what you intend to submit to the city council so at

24    least we can look at that preliminarily and have some idea

25    whether that's even agreeable to us.  Otherwise you might

1    not even go to city council, because we might not agree with

2    it.

3         MS. MARTIN:  Thank you, Your Honor.

4         THE COURT:  Or will that be okay?  Okay?

5         Yes?

6         MR. FINGERHOOD:  Your Honor, Karl Fingerhood,

7    Department of Justice.

8         Just to clarify, as you know, the Safe Drinking Water

9    Act case was an emergency.  That took us three months to

10   negotiate that document, which I think is a world record.

11   And I just want to clarify, I think we could probably have a

12   stipulation as far as how we're going to proceed with the

13   discussions.

14        But a finalized document, as I mentioned, there is all

15   kinds of decision-makers that would have to be involved in

16   any type of final document.  And so I just want to clarify

17   that that's not what the Court is asking for.  You want a

18   document that will kind of set forth the procedure for

19   moving forward?

20        THE COURT:  As you know, what concerns me primarily is

21   that every day that we do nothing, we have sewage bubbling

22   up.  We have the potential for other water problems if we

23   don't address them, and every day that goes by, we run the

24   risk of escalating our problems.

25        And we talked about this whole possibility that there

1    could be health concerns, and we don't want to see any of

2    that.  So to say that we're going to allow this matter to

3    just fester for months means that we're not being as

4    forthright as we could be.  That is number one.

5        And number two, you all are experienced at this point.

6    You all did the water thing, and even though you broke a

7    record in doing it, but you did it.  And since you have that

8    as a guidepost, then I don't see why it would be so

9    difficult to craft some measure so that we can start getting

10   work- -- so we can start getting moving on these matters and

11   try to get some relief, especially in the sewage area,

12   because what is the citizenry to do when they recognize that

13   we have all these sewage issues cropping up and they are

14   running this unimaginable risk of harm from infection they

15   can't even see in the air?

16       So I am quite concerned of moving this thing forward as

17   fast as we can go.  And if we need to all come together and

18   sit around the courtroom and try to hash out any problems

19   that might crop up as opposed to allowing the matter to

20   fester and we'll come back at it later when the parties have

21   a chance to call each other and get together to discuss it,

22   I don't mind calling a session for us to come to this

23   courtroom and go paragraph by paragraph and see then if we

24   can reach consensus.

25       So I am quite concerned about the impact all of this

1    has on our citizenry, and I think that we just owe it to

2    them to do this as fast as possible.  So if reach some major

3    logjams, then I will call a session for us to get together

4    and then use some template for an agreement and then go down

5    paragraph by paragraph and to see what the objections are

6    and go from there.  And then with everyone having telephone

7    capabilities to call their respective offices and to put

8    them on notice of the time requirements for this thing, then

9    those folks should be amenable to immediate contact.

10        Again, we need -- we cannot overlook the gravity of

11   this matter.  This is -- this is a matter of utmost gravity

12   to talk about the possibility of the dangers and the hazards

13   that are lurking out there ready to grip our citizenry at

14   any moment, and right now we're talking about, as Ms. Martin

15   said, 256 eruptions.

16        Well, we don't know how many we're going to have in the

17   next two weeks.  And then they would just simply increase,

18   and meanwhile, the citizenry only have an outlet device of

19   calling this one truck that would have to try and make its

20   way over to its neighborhood to try and deal with it, and

21   meanwhile, there are other neighborhoods with even worse

22   problems.

23        So let's just see how far we can get.  And if we cannot

24   get it done then, like I said, I will call a conference, and

25   we will use a template, and I'll just go -- I'll either

1    prepare it, Mr. Henifin will prepare it, or any one of you

2    can prepare it, and then we'll simply go paragraph by

3    paragraph to see where we are and what our disagreements are

4    and what the items of friction might be.  So I understand

5    what you're telling me, but I don't want to be bogged down

6    with the normal administrative logjam.

7         MR. FINGERHOOD:  I understand, Your Honor.

8         THE COURT:  Okay.  Thank you much.

9         MR. FINGERHOOD:  The only thing I have to say is, you

10   know, Mr. Henifin is still running the drinking water

11   system, which keeps him pretty busy.  But as long as he can,

12   you know, put in the time, we are looking forward to talking

13   with him.

14        THE COURT:  I have talked with him at length.  As I

15   said before, Mr. Henifin is the first one who suggested that

16   these two cases should be put together.  And that is why he

17   added to that tour that we took the matter of sewage.  That

18   was his idea to add that.  Because, you see, what I had

19   asked is that we all solve the water problem.  Well, once he

20   gained a captive audience, and since he was the one talking

21   to the bus driver, then instead of coming back this

22   direction, he told her to go by Northside Drive, because he

23   said there was something else he wanted me to see.

24        Well, I did not know the sewage problem was so dire,

25   and then I did not know the entanglement of the sewage

1    problem with the water problem.  I recognized when I was

2    doing my reading on the water matters, I saw word "sewage"

3    crop up here and there, but I still didn't understand until

4    he took us out there to that -- that eruption how dire the

5    problem was and, furthermore, how intertwined these problems

6    were.

7        So he and I had long conversations about that, and then

8    thereafter, then I asked Judge Lee if he was amendable to a

9    discussion on the matter, and then I went by his office to

10   talk to him about this, and immediately after I described

11   all these things, armed with the information that

12   Mr. Henifin had provided to me, Judge Lee readily recognized

13   why these two matters should be intertwined.

14       And since the water case was more developed than the

15   sewage matter, then he immediately said, then they should be

16   under your tutelage and you do -- you go ahead and deal with

17   both of them.

18       And therefore that's why I am, because I'm so farther

19   progressed on the water matter than if I had combined the

20   cases under his guidance when he has done nothing on the

21   water side, but I have done something on the sewage side in

22   connection with the water case, so I did have a thumbnail

23   sketch on that.

24       And, in addition, I have a close working relationship

25   with Mr. Henifin, who is such an expert on all this and

1    speaks so eloquently and decisively on these matters.  And

2    so I have already been dealing with him on a regular basis.

3          So I have burned up his cell phone from time to time to

4    call to find out what's going on, where we are, and I want

5    to throw some flowers at him.  And not just flowers, but I

6    want to throw a bed of roses at him for what he did on the

7    waterfall problem.  This was a problem that had been

8    festering for some seven years.

9          Now, he then came in and attacked that matter and came

10   in with the wonderful and great approach to dealing with

11   that waterfall problem where we were losing 5, what, million

12   gallons of water, treated water, per day for seven years,

13   and he came in and came up with a solution that dealt with

14   that timely so that now it's dry out there.  The waterfall

15   is gone, and he has dealt with that.  That's a tremendous

16   saving to our water system, and he came in, took his crew,

17   and he went through that.

18         Now, when I saw that waterfall out there, I could not

19   believe it, because next to the waterfall, as you all know,

20   there was a small lake.  And then there was a hole out there

21   that was so deep that the workers couldn't find the bottom.

22   They only had a 16-foot pole to shove down the hole to see

23   how deep it was, and they ran out of pole because the hole

24   was deeper than 16 feet of treated water next to what looked

25   like a small lake, and then the waterfall cascading down,

1    you know.

2        So, anyway, he has done a herculean job on that and all

3    the other matters.  He reports to me all the time on what

4    he's doing, and he has done a great job.  And now we are

5    waiting for when the first additions of the moneys are going

6    to be provided, and I think you all were here at the last

7    session I had when I went over with him as to what exactly

8    all the dollars were going to be expended for, and --

9    because it's not a matter of just simply saying we are going

10    to take X number of dollars and spend it without any

11    explanation.

12        My job is to oversee everything, and so -- and he is

13    prepared, and so I had the hearing last time, and I asked

14    all my line item questions about any and everything and gave

15    all of you an opportunity to ask your questions also.  And

16    he is -- he has abundant answers to everything that's going

17    on, because he's on top of it.

18        So anyway, Mr. Henifin, publicly I acknowledge my

19    respect.  Thank you so much.

20        MR. HENIFIN:  Thank you so much.

21        THE COURT:  All right.  Now, Ms. Martin?

22        MS. MARTIN:  Your Honor, I will just add, you mentioned

23    the urgency of preparing a document.

24        THE COURT:  That's right.

25        MS. MARTIN:  The City of Jackson agrees.  We have

1    actually already prepared a draft.  I don't know if that --

2    I think earlier when you were talking about the

3    confidentiality order, I thought you were talking about the

4    draft.  We actually prepared a draft that follows along with

5    the stipulated order that we did on drinking water.  We have

6    presented that to all parties, and we believe that we can

7    get this done within the next two weeks.

8         THE COURT:  Okay.  Thank you.  And I have seen that.

9    But I was saying more about the confidentiality agreement

10   because of my concern about making Mr. Henifin a party.

11        MS. MARTIN:  Yes, Your Honor.

12        THE COURT:  Yes, sir?

13        MR. FINGERHOOD:  Your Honor, we just got that document

14   I think either late last night or very early this morning.

15   We have shared it with EPA.  We've actually been working on

16   our own document.  I'm not sure if the document that the

17   City worked on was shared with our coplaintiff, MDEQ, and

18   they would need to weigh in, too.

19        But we do have our own document.  I think, you know, we

20   can get that to the City and MDEQ in short order, and, you

21   know, it may be something to work off.  So I would ask that

22   everyone keep an open mind until they kind of see what we've

23   been working on.  And, you know, we can keep the discussions

24   going from there.

25        THE COURT:  Very helpful.

1          Finally, because of the gravity of this problem and

2     because of the need to move swiftly on this matter, I am not

3     antagonistic to holding a conference, as I said earlier, in

4     the courtroom for us to go over a template.  Perhaps it

5     would be the City's that you submitted or somebody else's,

6     but we can go over every line item there until we have an

7     agreement to get that out before the public and so that we

8     can start solving these dire problems.

9          I am not against staying here all day working on

10    something.  I am not against working on Saturday.  I am not

11    against working as long as we need to.  In fact, this last

12    week I was supposed to be in court on another matter, and in

13    my order, I had said that we will move -- we will be in

14    session on Friday and Saturday.

15         One of the attorneys said in this other case that at

16    least you didn't say we had to come in on Sunday, and I

17    responded that, you don't have to worry.  I was not going to

18    have you come in on Sunday at 8:30, 9:30.  We have church

19    time.  But look out for 2:00 on Sunday.  So then I figured

20    you're out of church and then you're ready to spread your

21    good cheer around and your agreements, and then we can move

22    on it.

23         So on this one, the same way.  I am not against staying

24    as long as possible for us to do this as fast as possible,

25    because I was just alarmed at seeing all of that raw sewage

1    sprouting out of the ground just so many yards away from a

2    senior citizen home.  I would be alarmed if it's near

3    anybody's home, but to see that next to a senior citizen

4    home just tickled a new chord.  So we need to just make sure

5    that we try and do the best we can as fast as we can.

6         Now, with that, is there anything else that any of you

7    want to order -- want to add?  Yes, ma'am?

8         MS. MARTIN:  Your Honor, one last thing.  We do need to

9    extend the stay in the Safe Drinking Water Act case, the

10   underlying case, because the stay expires I believe at the

11   end of this month.

12        THE COURT:  Okay.

13        MS. MARTIN:  And so if it pleases you, we can just

14   submit an order extending the stay.

15        THE COURT:  Why don't you submit an order, copy

16   everybody else, and if anybody has an objection, then let me

17   know in due course in the normal order.

18        MS. MARTIN:  Thank you, Your Honor.

19        THE COURT:  Thank you so much.  Anything else from

20   anybody else?

21        MR. CALAMITA:  Your Honor, if I may?  Your Honor?

22        THE COURT:  Yes.  Who is this?

23        MR. CALAMITA:  Paul Calamita on behalf of --

24        THE COURT:  Okay.  Ka-luh-my-ta or ka-luh-me-ta?

25        MR. CALAMITA:  Ka-luh-me-ta.

 1          THE COURT:  Okay.  How are you?

 2          MR. CALAMITA:  I'm doing well.  Thank you, Your Honor.

 3     On behalf of Mr. Henifin, I would like to --

 4          THE COURT:  Now, you're breaking up on me.

 5          MR. CALAMITA:  I apologize.  Can you hear me now?

 6          THE COURT:  Well, go ahead on.  Let's see what we can

 7     do.

 8          MR. CALAMITA:  I would like to observe that we agreed

 9     that we need to move quickly, and the City's approach is an

10     amendment to your supplement to your drinking water order.

11     And we think that makes a lot of sense.

12          Number one, the parties have all approved that

13     structure and many of the specific provisions.

14          Number two, it keeps Mr. Henifin from becoming a party

15     to any document.  An alternative would be a consent decree,

16     and that might be difficult and cause Mr. Henifin to become

17     a party.

18          Three, your order has some very important liability

19     protections that we need to hold on to.  So while we are

20     open to other approaches, we think what the City has come up

21     with is the most efficient and appropriate way to proceed,

22     Your Honor.

23          THE COURT:  Okay.  Thank you very much.

24          Ms. Martin, that's a vote of confidence for your

25     submission.  Is that your partner?

1          MS. MARTIN:  No, Your Honor.

2          THE COURT:  All right.  Well, finally, in the very near

3     future, this Court is going to address the concerns of the

4     public with regard to this, and the Court will have a

5     procedure by which that is being done, and you will have

6     further announcements on this as those details are worked

7     out.  But I won't say more about that at this time, but

8     later on there will be another mechanism to try and get more

9     information to the public on these particular matters.

10         Now, with that, I want to thank all of you for your

11    patience, and I will check to see where we are in this after

12    two weeks, to see then if you have been able to come up with

13    some approach written-wise or whether the Court is going to

14    have to call everybody together and try and iron it out in

15    person.

16         So thank you very much.  I'll be in contact.

17              (Court adjourned at 3:34 p.m.)

18    ****************************************************************

1                    **COURT REPORTER'S CERTIFICATE**

2

3         I, Caroline Morgan, Official Court Reporter for the

4    United States District Court for the Southern District of

5    Mississippi, do hereby certify that the above and foregoing

6    pages contain a full, true, and correct transcript of the

7    proceedings had in the forenamed case at the time and place

8    indicated, which proceedings were stenographically reported by

9    me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13        THIS, the 18th day of May, 2023.

14

15                        /s/ Caroline Morgan, CCR

16                        Caroline Morgan CCR #1957
                          Official Court Reporter
17                        United States District Court
                          Caroline_Morgan@mssd.uscourts.gov
18

19

20

21

22

23

24

25