IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                          PLAINTIFF

VS.                      CIVIL ACTION NO. 3:22CV686-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI                  DEFENDANT


**TRANSCRIPT OF STATUS CONFERENCE**

**VOLUME 1 OF 2**


BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

JULY 12, 2023
JACKSON, MISSISSIPPI


(APPEARANCES NOTED HEREIN.)


REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 EAST COURT STREET, SUITE 2.500
JACKSON, MISSISSIPPI  39201
TERI_NORTON@MSSD.USCOURTS.GOV
(601)608-4186

1    FOR THE PLAINTIFF:

2        ANGELA GIVENS WILLIAMS, ESQUIRE
         U.S. ATTORNEY'S OFFICE
3        501 EAST COURT STREET, STE. 4.430
         JACKSON, MISSISSIPPI  39201
4
         KARL J. FINGERHOOD, ESQUIRE  (VIA ZOOM)
5        U.S. DEPARTMENT OF JUSTICE
         ENVIRONMENTAL ENFORCEMENT SECTION
6        POST OFFICE BOX 7611
         WASHINGTON, DC  20044
7
         ANGELO MO, ESQUIRE    (VIA ZOOM)
8        U.S. DEPARTMENT OF JUSTICE, ENRD
         150 M STREET, N.E., ROOM 2.900
9        WASHINGTON, DC  20002

10   FOR THE DEFENDANT:

11       CATORIA MARTIN, ESQUIRE
         TERRELL S. WILLIAMSON, ESQUIRE
12       OFFICE OF THE CITY ATTORNEY
         455 EAST CAPITOL STREET
13       JACKSON, MISSISSIPPI  39201

14   INTERESTED PARTY, JXN WATER:

15       MALISSA WILSON, ESQUIRE
         FORMAN, WATKINS & KRUTZ, LLP
16       POST OFFICE BOX 22608
         JACKSON, MISSISSIPPI  39225-2608
17
         FRANK PAUL CALAMITA,  ESQUIRE    (VIA ZOOM)
18       AQUALAW, PLC
         6 S.5TH STREET
19       RICHMOND, VIRGINIA  23219

20

21   ALSO PRESENT:  TED HENIFIN, INTERIM THIRD-PARTY MANAGER
                    GERALD KUCIA, ATTORNEY GENERAL'S OFFICE
22                  GRETCHEN ZMITROVICH, DEQ
                    DONNA HODGES, DEQ
23                  MAYOR CHOKWE ANTAR LUMUMBA

24

25

1                          TABLE OF CONTENTS

2

3                              VOLUME 1

4    WITNESSES FOR THE DEFENDANT:

5    RODERICK WILSON

6        Direct Examination By Ms. Martin  ......................13

7        Cross-Examination By Ms. Wilson  ......................55

8    ELLIOTT C. HOLMES

9        Direct Examination By Ms. Martin  ......................58

10       Cross-Examination By Ms. Wilson  ......................73

11       Redirect Examination By Ms. Martin  ...................74

12       Further Redirect Examination By Ms. Martin  ...........84

13   SPEAKERS FOR ORGANIZATIONS:

14    NSOMBI LAMBRIGHT-HAYNES  - oral statement presented  ....92

15    WAIKINYA CLANTON  - written statement presented  ......111

16    DOMINIC DELEO  - oral statement presented  ............114

17    BROOKE FLOYD  - oral statement presented  .............123

18    BISHOP RONNIE CRUDUP  - oral statement presented  .....137

19    EFREN NUNEZ ROMERO  - oral statement presented  .......144

20    MAKANI THEMBA  - oral statement presented  ............150

21

22

23

24

25

1          **THE COURT:**  Terri, call the case, please.

2          **THE CLERK:**  Your Honor, this is United States of

3     America versus City of Jackson, Civil Action Number

4     3:22cv686-HTW-LGI.  We are here this morning for a status

5     conference.  Appearing here in the court on behalf of the

6     plaintiff is Angela Givens Williams.  Appearing by Zoom for

7     plaintiff, Karl Fingerhood and Angela Mo.  For the defendants,

8     appearing here in the courtroom we have Catoria Martin, Terrell

9     Williamson.  Also, on behalf of the State of Mississippi,

10    Gerald Kucia.  The interested party that is here in the

11    courtroom is Malissa Wilson.  Appearing by Zoom is Frank

12    Calamita.  Also appearing in the courtroom is Mayor Lumumba.

13    Appearing in United States of America versus City of Jackson,

14    3:12cv790-HTW-LGI, here in the courtroom, we have Gretchen

15    Zmitrovich and Donna Hodges.

16         **THE COURT:**  Now, did you say that Angela Williams was

17    by Zoom?

18         **THE CLERK:**  No, she is here in the courtroom.

19         **THE COURT:**  I wanted to make sure I heard you

20    correctly.

21         Now, this is a status conference on the water situation

22    which is plaguing and has plagued Jackson, and the City

23    informed me on the last occasion that it was in contact with

24    some persons who had some reflections on this situation who

25    then wanted to advise the Court on their perspectives on how

1   the matter is being handled.  So let me turn to the city

2   attorney.  Good morning.

3         **MS. MARTIN:**  Good morning, Your Honor.  Torri Martin

4   on behalf of the City of Jackson.  We recently, in the last

5   probably five or ten minutes, filed a document.  I have a copy

6   here for the Court.  It is a response to your request for this

7   status hearing, and it is a list of the representatives that

8   are present here today, those who are requesting the

9   opportunity to speak, along with the fire department, and in

10   addition, the attorneys that are representing those

11   organizations.

12         **THE COURT:**  Can I see your list, please?

13         **MS. MARTIN:**  Yes, Your Honor.  May I approach?

14         **THE COURT:**  Do that.  Why don't you take me through

15   these papers that you have submitted to me.

16         **MS. MARTIN:**  Yes, Your Honor.  So the first

17   representatives we have listed are representatives from the

18   Jackson Fire Department.  So during the status conference last

19   Friday, July 7th, we brought up the issue of fire hydrants that

20   were dry, and so we have here today Elliott Holmes, who is a

21   deputy fire chief with the emergency services division, and

22   Roderick Wilson, who is the district chief with the water

23   supply office.

24      We also have offered exhibits from them.  We discussed the

25   fact that there was a lack of communication and coordination

1   with JXN Water regarding the checking of the maintenance and

2   control of the fire hydrants.  And so what we have offered

3   today as exhibits is April 6th through April 13th e-mails which

4   were exchanged between JXN Water and Mr. Roderick Wilson with

5   the fire department, along with an e-mail that was received on

6   April 20th from Ms. Jordan Rae Hillman, who is with JXN Water.

7        You asked us specifically for reports of house fires where

8   the fire hydrant was dry.  Exhibit C is a house fire at West

9   McDowell Road.  Exhibit D is an e-mail where Chief Owens

10  requested a meeting with Mr. Henifin.  Exhibit E is a second

11  house fire that was at Carver Street.  And Exhibit F is an

12  e-mail that was received from Ms. Hillman.  And Exhibit G is a

13  memo that the City received -- or the fire department received

14  from JXN Water.

15       **THE COURT:**  Now, question.  These two individuals,

16  Elliott C. Holmes, H-O-L-M-E-S, and Roderick D. Wilson, are you

17  intent on calling them as witnesses?

18       **MS. MARTIN:**  Your Honor, I can either call them as

19  witnesses or you can -- they can approach and you can speak to

20  them directly.

21       **THE COURT:**  Do both of them have the same testimony?

22       **MS. MARTIN:**  No, they have different testimony.

23  Roderick Wilson's testimony is specific to the --

24       **THE COURT:**  No, don't provide that to me right now.

25       **MS. MARTIN:**  Okay.  Okay.

1          **THE COURT:**  Are they present in the courtroom?

2          **MS. MARTIN:**  Yes, Your Honor.

3          **THE COURT:**  Okay.  Now, then, let's go to the next

4   group, representatives requesting the opportunity to speak.

5          **MS. MARTIN:**  So during our meeting of the status

6   conference last Friday, July 7th, we also mentioned that there

7   were several organizations with representatives who we have

8   been communicating with regarding the status of the system and

9   also regarding their concerns with the system.  I think last

10  Friday we gave a list of five that were the issues that we had

11  compiled as a result of some of our direct conversations with

12  those organizations.  And so this is a list of individuals that

13  are here that are offering concerns and also additional

14  commentary with regard to the issues that we discussed on

15  Friday.

16      And so we have Andy Kricun.  Andy -- I've listed

17  additional information about Mr. Kricun.  He is a consultant

18  who has been working with the City of Jackson since June of

19  2022.

20          **THE COURT:**  You can hold off on that until you call

21  him.

22          **MS. MARTIN:**  Okay.

23          **THE COURT:**  Because I would like to hear him talk

24  about whatever he wants to talk about, and I will have

25  questions for him.  So then you have who else, now?

1          **MS. MARTIN:**  Nsombi Lambright is a representative

2     from the NAACP.  We also have Waikinya Clanton.  She is a

3     representative from the Southern Poverty Law Center.

4          We have a list of North Jackson residents who will speak

5     on their issues with the water system.  And so those three

6     residents -- I will note that Dominic Deleo sent us a note that

7     he might not be here in the courtroom until 11:00 a.m.  So I do

8     want to note that for the record.

9          In addition, we have Chevon Chattman, which is a

10    representative from Working Together Jackson; Efren Nunez, who

11    is a representative from the Immigrant Alliance for Justice and

12    Equity; Makani Themba, which is a representative from the Rapid

13    Response Coalition.

14          **THE COURT:**  You can slow down --

15          **MS. MARTIN:**  Sorry, Your Honor.  I apologize.

16          **THE COURT:**  Go ahead.

17          **MS. MARTIN:**  Danyelle Holmes, who is a representative

18    from the Poor People's Campaign; Emily Johnson, who is

19    representing Grace House; Maise Brown, who is representing the

20    Student Water Relief, which is an organization; Arekia Bennett

21    Scott, who is representing Mississippi Votes; Okolo Rashid,

22    which is representing Beloved Community and also International

23    Museum of Muslim Culture; Rukia Lumumba, who is representing

24    the People's Advocacy Institute.  And then we have Dr. Erick

25    Ellis here, but we also were notified by him that due to an

1    illness, he will not be able to be here.  He was representing

2    the Willowood Neighborhood Association, but he did ask us to

3    ensure that it was noted for the Court that he wanted to be

4    here, but he's not able to attend due to an illness.

5              **THE COURT:**  Okay.

6              **MS. MARTIN:**  And then we have listed the attorneys

7    that are present on behalf of their clients.  So we have the

8    ACLU.  For the ACLU, we have Claudia Williams Hyman and McKenna

9    Raney-Gray.  For the Center for Constitutional Rights, we have

10   Emily Rutledge Early and also Jessica Vosburg.  For Forward

11   Justice, we have Lori Sherman and Kathleen Roblez.  And for the

12   Natural Resources Defense Council, we have Sarah Tallman.

13             At the bottom, we have noted organizations that told us

14   that they would be in the courtroom today but who are not

15   requesting the opportunity to speak today.

16             **THE COURT:**  Okay.  These attorneys you just

17   mentioned, you say they want to speak on behalf of their

18   clients?

19             **MS. MARTIN:**  They are not requesting the opportunity

20   to speak on behalf of their clients.  They are just here in the

21   role as representatives of those clients.  Based on the hearing

22   that we had on July 7th, we, you know, advised them that this

23   was the opportunity for those organizations to speak, and they

24   wanted that representation to come from the organization

25   itself, not from its attorneys.  And so I believe they are here

1  either virtually or in the courtroom today if you want to speak

2  to them directly.  But I believe it is their intent that the

3  organization speak and not the attorneys.

4       **THE COURT:**  So then what would their role be if they

5  are not going to say anything?

6       **MS. MARTIN:**  I think that they are here representing

7  their client.

8       **THE COURT:**  In what capacity?

9       **MS. MARTIN:**  I would defer to them to answer that

10  question, Your Honor.

11       **THE COURT:**  I mean, are you saying their clients feel

12  like they are in jeopardy for some reason, why they need an

13  attorney?

14       **MS. MARTIN:**  I cannot answer that question, Your

15  Honor.  We have only been in communication mainly with the

16  organizations themselves, and the organizations that are

17  represented by counsel advised us of that, and this is just the

18  list.  And I don't know if this order is --

19       **THE COURT:**  Slow down, please.

20       **MS. MARTIN:**  Okay.  I apologize, Your Honor.  I'm not

21  completely certain that this is all of the attorneys that are

22  here representing these organizations, but these are the ones

23  that we have been made aware of.

24       **THE COURT:**  Now, how did you secure this list of

25  persons who wanted to address the Court?  Did you send out a

1    communique or did your office seek to find people who had

2    complaints?

3            **MS. MARTIN:**  Based on our hearing on July 7th, I

4    advised the Court that we had a number of organizations that

5    had reached out to us directly with concerns about the lack of

6    transparency and lack of communication with the third-party

7    manager, so we did not send out a new call to anybody new.

8    What we did is go back to those same organizations and say if

9    you have a representative who would like to speak, now would be

10   the time.

11           **THE COURT:**  All right.  And over what period of time

12   did you do this?

13           **MS. MARTIN:**  Between Friday and today.  Friday, when

14   we left the courtroom and today, or last night.

15           **THE COURT:**  And have you spoken to these persons

16   yourself?

17           **MS. MARTIN:**  The persons who would like to speak

18   today, I believe I have spoken with most of them.  I have not

19   spoken directly with all of them, though.  I have not spoken

20   with them.  Their organizations have spoken with them.

21           **THE COURT:**  And did you make a record of your

22   conversations with them?

23           **MS. MARTIN:**  I did not.  I do not have a record of my

24   conversations with those organizations, aside from e-mail.

25           **THE COURT:**  So you have e-mail traffic between your

1    office and these persons.

2           **MS. MARTIN:**  I believe we do have e-mail traffic

3    between us and those persons.

4           **THE COURT:**  Okay.  Then let's start with the top of

5    the list.  Who do you want to call from the fire department?

6           **MS. MARTIN:**  I will call Roderick Wilson, the

7    district chief and water supply officer, first.

8           **THE COURT:**  Okay.  Is that person here in the

9    courtroom?

10          **MS. MARTIN:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  What about the second person?

12          **MS. MARTIN:**  Elliott Holmes is also here.  Would you

13   like me to call them both at the same time?

14          **THE COURT:**  No, I want to call Roderick Wilson and

15   have Mr. Elliott Holmes waiting outside the courtroom until it

16   is time for him to testify.

17          **MS. MARTIN:**  Mr. Holmes, if you could wait outside

18   the courtroom.

19          **THE COURT:**  Mr. Wilson, you can take the witness

20   chair over here, and you are going to be sworn by my courtroom

21   deputy.  Step up on the ledge there.  Turn and face us.

22          **THE CLERK:**  Raise your right hand.

23       **(OATH ADMINISTERED.)**

24          **THE COURT:**  You can have a seat right there.  Did you

25   have some papers when you came up here?

 1              **THE WITNESS:**  Yes, sir, I've got them right here.

 2              **THE COURT:**  Where are they?

 3              **THE WITNESS:**  My papers?

 4              **THE COURT:**  Okay.  Thank you.  Now, this is a

 5    microphone, so you can speak directly into it.  Okay?

 6              **THE WITNESS:**  Yes, sir.

 7              **THE COURT:**  Don't go too close to it, but you can

 8    speak into this and make sure everybody can hear you.

 9              **THE WITNESS:**  Yes, sir.

10              **THE COURT:**  Ms. Martin.

11                         **RODERICK WILSON,**

12    **having first been duly sworn, testified as follows:**

13                       **DIRECT EXAMINATION**

14    **BY MS. MARTIN:**

15     Q.  Chief Wilson, if you could, please, tell us about the

16    e-mail correspondence that was initiated between you and JXN

17    Water on April 6, 2023.

18              **THE COURT:**  Well, before that, Chief, tell us about

19    yourself.

20              **THE WITNESS:**  My name is Rod Wilson.  I've been on

21    the fire department for 25 years, rescue for 19 years, and went

22    into the Fire Marshal's office in 2015.  Then I became the

23    water supply officer last year.

24              **THE COURT:**  Okay.  And your educational background?

25              **THE WITNESS:**  I got a bachelor's degree from

1   Mississippi Valley State in industrial technology and an

2   electronic major.

3                THE COURT:  Any education beyond that?

4                THE WITNESS:  Yes, sir.  I'm a master personal

5   trainer as well, and I'm a sports nutrition specialist.

6                THE COURT:  What about fire training?  What have you

7   had?

8                THE WITNESS:  Extensive training.  Rope rescue.  It's

9   a list.  It's so much of it.

10               THE COURT:  You've gone to seminars, I take it?

11               THE WITNESS:  Sir?

12               THE COURT:  You've gone to a lot of seminars?

13               THE WITNESS:  Yes, sir.  I have a lot of CEUs as

14  well, investigation, inspections, fire safety education,

15  advanced sprinklers, and numerous certifications in water

16  supply as well.

17               THE COURT:  Have you ever been to an arson seminar?

18               THE WITNESS:  No, sir.

19               THE COURT:  Okay.  And what seminars have you been to

20  that dealt specifically with water treatment?

21               THE WITNESS:  The last one was at the national -- I

22  mean, the state fire academy.  It was advanced sprinklers.  And

23  that carried over to water supply as well.

24               THE COURT:  Now, how did it do that?  You said

25  sprinklers.

1            THE WITNESS:  Yes, sir.

2            THE COURT:  So how would sprinklers have something to

3    do with water treatment?

4            THE WITNESS:  You said water treatment?

5            THE COURT:  Yes.

6            THE WITNESS:  Well, no, I haven't had any CEUs with

7    water treatment.  I went out to O.B. Curtis, and they took me

8    through exactly what they did out there at the water treatment

9    plant.

10           THE COURT:  And when did you go out there?

11           THE WITNESS:  That was March, '23.

12           THE COURT:  For what purpose did you go?

13           THE WITNESS:  I went out there to go out there and

14   actually see what did they do and talk to the new company,

15   Jacobs.  I also took some paperwork out there that's going to

16   coincide with the ISO, so they can fill it out so we can be

17   ready for the new survey coming up in Jackson this year in

18   September.  And at that point --

19           THE COURT:  Go ahead.  At that point what?

20           THE WITNESS:  At that point in time, they ran me

21   through everything that is going on in the plant, what they do

22   out there and the whole process.

23           THE COURT:  Was that at anybody's invitation that you

24   come out there?

25           THE WITNESS:  Excuse me?

R. WILSON - DIRECT

1          **THE COURT:**  Were you there at anyone's invitation?

2          **THE WITNESS:**  Yeah.

3          **THE COURT:**  Whose?

4          **THE WITNESS:**  I can't remember her name.  I

5    think Larmon, whoever the supervisor is out there right now, we

6    made a call, and she told me that it was cool to come out

7    there.  And me and Chief Alexander had an interview with her at

8    that point in time.

9          **MS. MARTIN:**  Your Honor, if I may, I do want to make

10   sure it is clear to the Court.  You are saying you reached out

11   to her directly at first, correct?

12         **THE WITNESS:**  Correct.

13         **THE COURT:**  Okay.  So then you reached out to her to

14   ask her if it would be okay to come out?

15         **THE WITNESS:**  Correct.

16         **THE COURT:**  So how long ago was that?  You said

17   March 23rd?

18         **THE WITNESS:**  Yeah, in that ballpark.

19         **THE COURT:**  And how long did you stay there on the

20   premises?

21         **THE WITNESS:**  About two hours.

22         **THE COURT:**  Had you ever been out there before?

23         **THE WITNESS:**  I have not.

24         **THE COURT:**  What possessed you to want to go out

25   there?

1          **THE WITNESS:**  Initially, like I said, I wanted to

2     present them with things that was going to transpire with the

3     ISO.

4          **THE COURT:**  What is the ISO?

5          **THE WITNESS:**  The insurance bureau for the state, and

6     they do our ratings for the city.

7          **THE COURT:**  What kind of ratings?

8          **THE WITNESS:**  Insurance ratings.

9          **THE COURT:**  What is that rating?  What does that

10     gauge?

11          **THE WITNESS:**  I don't understand the question, Your

12     Honor.

13          **THE COURT:**  When the ratings come out, are they

14     numerical?

15          **THE WITNESS:**  Yes.

16          **THE COURT:**  And what's the maximum?

17          **THE WITNESS:**  You've got 1 to 3 -- actually, 1 to 4,

18     yeah.

19          **THE COURT:**  And which way do the numerical ratings go

20     in terms of efficiency?  Is 4 the highest or 1 the highest?

21          **THE WITNESS:**  One would be the highest.

22          **THE COURT:**  And heretofore, what was Jackson?

23          **THE WITNESS:**  In my opinion, Jackson is a 3.

24          **THE COURT:**  And 4 being the lowest?

25          **THE WITNESS:**  Yeah.

1          THE COURT:  Okay.  So Jackson was a 3 as opposed to a

2  1?  Is that what you are telling me?

3          THE WITNESS:  Yes, Jackson is a -- I know on our

4  trucks, it's just a 3.  To be honestly, I'm not exactly sure.

5          THE COURT:  But you said this is some sort of rating?

6          THE WITNESS:  Yeah.

7          THE COURT:  What does it measure?

8          THE WITNESS:  Sire?

9          THE COURT:  What does it measure?  What do those

10  ratings mean?  I'm not familiar with them.  That's why I'm

11  asking.  What do the ratings mean?  If a city is a 1 as opposed

12  to a 4, what does that mean?

13          THE WITNESS:  That means that -- the ratings actually

14  specify, you know, the water hydrants in the city, the water

15  supplies, whatever.  You know, with the fire department, I know

16  our testing go off the fire hydrants inside of the city.

17          THE COURT:  But I don't think that answers my

18  question.  Every city wants to be a 1, I take it, since that's

19  the highest.  Is that correct?

20          THE WITNESS:  That is correct.

21          THE COURT:  And no city wants to be a 4; is that

22  correct?

23          MS. MARTIN:  Just to clarify, Your Honor, I do want

24  to make sure --

25          THE COURT:  I'm asking him the questions.  I will

1    stay with him.  Is that correct?

2                 THE WITNESS:  That is correct.

3                 THE COURT:  So then a 4 will be an undesirable

4    rating?

5                 THE WITNESS:  Well -- let me retract my statement, if

6    I might.

7                 THE COURT:  I don't see how you are going to retract

8    it because I thought it was a simple question.

9                 THE WITNESS:  Yeah.

10                THE COURT:  You said that you provide ratings.

11                THE WITNESS:  I don't provide the ratings.

12                THE COURT:  But you collect data for the ratings.

13                THE WITNESS:  I work along with the State, and they

14   actually turn in the ratings.  The only thing I do, I turn in

15   pump numbers and I turn in flow tests, and they provide the

16   ratings.

17                THE COURT:  Okay.  And I was just asking you how one

18   interprets the ratings.

19                THE WITNESS:  Now, to my understanding, they do all

20   the interpretations.  I just turn in the numbers.

21                THE COURT:  Yeah, but you get the ratings, don't you?

22                THE WITNESS:  I don't do the ratings.

23                THE COURT:  I didn't say that.

24                THE WITNESS:  I turn in the numbers.

25                THE COURT:  Right.  But when you get the ratings,

1    what does the fire department do with the ratings?

2              **THE WITNESS:**  The ratings are not sent to me.

3              **THE COURT:**  Who are they sent to?

4              **THE WITNESS:**  They are sent to a staff -- my job is

5    to go out and do flow tests and turn in the numbers.

6              **THE COURT:**  I got that.  But then when the ratings

7    come back from the State, do they come to the fire department?

8              **THE WITNESS:**  I'm sure they do.

9              **THE COURT:**  You don't know?

10             **THE WITNESS:**  I don't know the direct line of where

11   they go, but I just -- I know that's what the process that they

12   do.

13             **THE COURT:**  Well, do you, at the fire department,

14   ever discuss these ratings?

15             **THE WITNESS:**  I don't -- I don't discuss the -- I

16   don't discuss the process that they bring the ratings into.

17   The only thing I do is go out, flow test, make sure that we

18   have adequate water, and I report whether we have adequate

19   water or not.  How the ratings come out, I personally don't

20   know.

21             **THE COURT:**  Well, you told me that.  So what good are

22   the ratings?  I mean, the ratings have to serve some purpose,

23   correct?  So what purpose do the ratings serve?  When the

24   ratings are given back to the fire department, and I presume

25   that they are given back to the fire department, what do you do

1   with the ratings?

2             **THE WITNESS:**  Sir, sorry, Judge, I don't do anything

3   with the ratings.

4             **THE COURT:**  You don't?

5             **THE WITNESS:**  No, that goes to a higher level.

6             **THE COURT:**  Okay.

7             **THE WITNESS:**  Yeah.

8             **THE COURT:**  And you have no idea what the higher

9   level does with these ratings?

10            **THE WITNESS:**  I do not.  The only thing I do is, I go

11  out and test -- I do know when they are coming in to test, and

12  I get myself ready for the testing.  And once I do the test, I

13  turn my paperwork in to the State, and the State gets with my

14  chief.

15            **THE COURT:**  Okay.  And are these ratings published

16  anywhere at the fire station?

17            **THE WITNESS:**  I'm not aware.

18            **THE COURT:**  Do you all have any meetings on these

19  ratings?

20            **THE WITNESS:**  I'm not privy to those meetings.  I

21  don't go -- the only thing I do is test.

22            **THE COURT:**  So who is privy to what happens to these

23  ratings?

24            **THE WITNESS:**  Well, that would be people that is

25  above me.

 1              THE COURT:  All right.  Let's talk about some people

 2    above you, then.  Who is above you?

 3              THE WITNESS:  I have a deputy chief above me and I

 4    have a fire chief above me.

 5              THE COURT:  So the deputy fire chief, Elliott

 6    Holmes --

 7              THE WITNESS:  That's not my direct upline.

 8              THE COURT:  But is he above you?

 9              THE WITNESS:  Yes, he is above me.

10              THE COURT:  So then is he expected to know what

11    happens to these ratings?

12              THE WITNESS:  I can't conclude what he knows and the

13    extent of his knowledge.

14              THE COURT:  Okay.  So when you went out there for

15    this visit, you stayed for two hours.  Did you have a guide?

16    Did someone take you around as a guide?

17              THE WITNESS:  Yes, sir.

18              THE COURT:  Who was that?

19              THE WITNESS:  The supervisor of the plant took me

20    around.  She showed me everything from the start of the process

21    to the finishing of the process.

22              THE COURT:  And did you take any video equipment?

23              THE WITNESS:  I did not.

24              THE COURT:  Is this the first time you've ever gone

25    out there?

1              THE WITNESS:  This is the first time I went out;

2    there.

3              THE COURT:  Before that occasion when you went out

4    there, did you ever have occasion before that to need

5    information for the ratings?

6              THE WITNESS:  No, sir, I wasn't in the position.

7              THE COURT:  Who was in the position?

8              THE WITNESS:  That person is deceased.

9              THE COURT:  How long?

10             THE WITNESS:  A couple of years.

11             THE COURT:  So then last year?

12             THE WITNESS:  I wasn't in the position last year.

13             THE COURT:  Who did it last year?

14             THE WITNESS:  I don't know if it was done last year.

15   I moved into a chief position at a certain period of time, and

16   at that time, I wasn't at the point of questioning, you know,

17   how things would be done.

18             THE COURT:  Well, when you went out there, and before

19   you went out there, I take it that you looked at some of the

20   prior ratings?  Did you do that?

21             THE WITNESS:  I did not.

22             THE COURT:  I take it that you talked to somebody

23   about what your job duties should be out there when you went.

24   So who did you talk to?

25             THE WITNESS:  You say I talked to somebody about what

R. WILSON - DIRECT

1   my job duties would be when I got out there?

2          THE COURT:  No, I'm asking you did you.

3          THE WITNESS:  No, I went out there to see how it

4   functions, and like I say, I went out there to take the survey

5   notes to them so they would be aware of what's coming up in

6   September, as far as the State coming in and asking questions

7   so they could have -- so they wouldn't be blindsided on what

8   their functions will be.  So I had the notes, and this part of

9   the survey had nothing to do with the actual fire department

10  functions, so that's why I went out there.

11         MS. MARTIN:  Your Honor, if I may supplement, I do

12  want to state for the record that the job that Chief Wilson

13  performs is actually with regard to the distribution system and

14  not to the water treatment facility.

15         THE COURT:  All right.  Thank you.

16     Now, you said that Jackson is a 3?

17         THE WITNESS:  To my knowledge.  I don't know if that

18  has changed or not.

19         THE COURT:  How did you come by that information?

20         THE WITNESS:  I saw it on the truck.

21         THE COURT:  So what truck is it on?

22         THE WITNESS:  It is on one of the fire trucks.

23         THE COURT:  Is it on all of the fire trucks?

24         THE WITNESS:  I can't answer that question.

25         THE COURT:  Why would it be on the fire truck?

R. WILSON - DIRECT

1              **THE WITNESS:**  I don't know.

2              **THE COURT:**  That's not confidential information?

3              **THE WITNESS:**  I suppose it wouldn't be if it's on the

4    truck.

5              **THE COURT:**  Well, I'm just asking you why it would be

6    on the truck.

7              **THE WITNESS:**  I don't know.  I just -- Your Honor, I

8    just test -- I just test the system.

9              **THE COURT:**  I've got that.  But have you seen this

10   rating on all of the fire trucks?

11             **THE WITNESS:**  I wasn't paying attention.  I just

12   noticed it on the truck.

13             **THE COURT:**  So then when you went out there, you

14   didn't have any background information to know how to do your

15   job?

16             **THE WITNESS:**  I know how to do my job, Your Honor.

17             **THE COURT:**  Okay then.  What training did you have to

18   do your job?

19             **THE WITNESS:**  What do you mean what training?  As far

20   as flow testing?  I've been flow testing plugs.  I've been very

21   efficient in water lines since I've been on the fire

22   department.

23             **THE COURT:**  Okay.

24             **MS. MARTIN:**  Mr. Wilson, I would like you to define

25   what a plug is for Your Honor.

1          **THE WITNESS:** Also a fire hydrant.

2          **THE COURT:** Okay. Thank you. So then when you went

3   out there, you knew something about what you were supposed to

4   do on your report?

5          **THE WITNESS:** I was a -- I had a roundabout

6   understanding of what a water treatment plant does, if we are

7   still referring to the water treatment plant. Correct?

8          **THE COURT:** Yes, that's good enough. So where did

9   you get that understanding?

10         **THE WITNESS:** Sir?

11         **THE COURT:** Where did you learn that understanding?

12         **THE WITNESS:** Just asking other people.

13         **THE COURT:** Like who?

14         **THE WITNESS:** Just other chiefs and just questioning

15   around, firemen, what transpired --

16         **THE COURT:** You asked people at the fire department?

17         **THE WITNESS:** Sir?

18         **THE COURT:** You asked people at the fire department?

19         **THE WITNESS:** I asked people at the fire department.

20   I asked certain people that had worked -- I have asked retired

21   people that worked with waterways -- well, not waterways, the

22   company, just water supply and just different entities, what

23   goes on at the water treatment plant, and that also sparked my

24   curiosity as well. But like I said, my initial reason for

25   going out there was because I needed -- I wanted to go out

1    there and share with them what was going to transpire in

2    September.

3    **BY MS. MARTIN:**

4    Q.  Mr. Wilson, did you have a prior relationship with

5    operators within the water system that were City of Jackson

6    employees?

7    A.  Yes, that would be the ones that were at water

8    maintenance, but I never had a relationship with --

9    Q.  Can you name the individuals that you have a prior

10   relationship with in your role within water maintenance?

11   A.  That would be -- I don't know Bianca's last name that was

12   dispatch, and Victor Pickett.

13           **THE COURT:**  I'm a bit mystified here.  You are saying

14   you are going out to the water treatment plant to gather

15   information, information vital to a rating, correct?

16           **THE WITNESS:**  That's not correct.

17           **THE COURT:**  Okay.  What were you doing?

18           **THE WITNESS:**  I went out there to take a

19   questionnaire out there to let them see what was on the survey

20   that was coming up to ensure that they had the proper numbers

21   to fill in for the survey that's coming up in September.

22           **THE COURT:**  Did you get your so-called proper

23   numbers?

24           **THE WITNESS:**  No, sir, that function is not part of

25   the operations of the Jackson Fire Department.  That's why I

1    took it to them.

2            **THE COURT:**  Okay.  So then this information you

3    gathered, did you make a record of that?

4            **THE WITNESS:**  I did not receive any information.

5            **THE COURT:**  So did you ask any questions?

6            **THE WITNESS:**  I asked questions about how -- what did

7    they do out there.

8            **THE COURT:**  But you didn't make any notes on that?

9            **THE WITNESS:**  Well, they didn't have any notes

10   themselves.  They said they had to go through it and take care

11   of it.  They said they got it.

12           **THE COURT:**  You were out there for two hours, you

13   said.

14           **THE WITNESS:**  I was out there two hours on a tour.

15           **THE COURT:**  Okay.  But you didn't find anything

16   noteworthy on that two hours?

17           **THE WITNESS:**  It was an interesting tour.  I found

18   out how it works.

19           **THE COURT:**  Okay.

20           **THE WITNESS:**  And that broadened my horizons on what

21   they do out there.

22           **THE COURT:**  Very good.

23           **MS. MARTIN:**  Your Honor, I would like --

24           **THE COURT:**  Hold it.  One second.  I'm asking some

25   questions.  And Counsel, you stepped away from the podium.  If

1   you wish to continue asking questions, you will stay at the

2   podium.

3                    **MS. MARTIN:**  Yes, Your Honor.

4                    **THE COURT:**  You know that is not court etiquette,

5   what you just did.

6                    **MS. MARTIN:**  I apologize, Your Honor.  I was trying

7   to gather information --

8                    **THE COURT:**  But you turned your back on the Court at

9   the time while I was asking questions, and that is not court

10  etiquette.

11                   **MS. MARTIN:**  I apologize, Your Honor.

12                   **THE COURT:**  Thank you so much.  I know you'll do

13  better.

14      Now, back to what I was asking you on this whole matter.

15  So when you finished your survey, then you did what with your

16  survey?

17                   **THE WITNESS:**  My survey was not complete.  I took

18  their portion of what the survey was -- I took it to the water

19  treatment plant and showed them what was going to come up, what

20  was going to transpire in September.  That was nothing that I

21  had to do.

22                   **THE COURT:**  Okay.  So you left them some documents?

23                   **THE WITNESS:**  I left them some documents.

24                   **THE COURT:**  How many --

25                   **THE WITNESS:**  I left them -- I left them blank

1    documents.

2            **THE COURT:**  Blank?

3            **THE WITNESS:**  That they are going to have to

4    potentially fill out for the survey that is coming up.

5            **THE COURT:**  Okay.  So did you complete your task on

6    leaving these documents?

7            **THE WITNESS:**  Yes, sir.

8            **THE COURT:**  Okay.  Now, then, I'm going to turn you

9    back over to Ms. Martin here.  She has some questions for you.

10   I just wanted to get the background from you.  How many years

11   have you had?  Did you say 25 years?

12           **THE WITNESS:**  That's correct, sir.

13           **THE COURT:**  Thank you so much.  All right, Ms.

14   Martin.

15           **MS. MARTIN:**  Thank you, Your Honor.

16       Based on the line of questioning, I would like to state

17   for the record that Mr. Wilson, Chief Wilson is not here today

18   to testify based on the water treatment facility, and we do not

19   offer him as an expert in anything relevant to the treatment

20   facility.  What we are offering him for today is a fire chief

21   who has experience with testing hydrants for water supply.

22           **THE COURT:**  Testing --

23           **MS. MARTIN:**  Testing hydrants for the water supply,

24   which was the issue we raised with the Court on Friday.

25           **THE COURT:**  Okay.

1              **MS. MARTIN:**  In addition, I will state that

2    Mr. Wilson, to my knowledge, is not an expert.  He is not the

3    person with the relevant experience to testify with regard to

4    the rating.  It is my understanding that the lowest rating is

5    actually a 9.  The highest rating is actually a 1.  And the

6    highest rating in the state of Mississippi for any fire

7    department is a 2.  So I do want to put that in the record.

8              We can offer the chief, Willie Owens, as an expert or as a

9    witness in the future.  He was not able to be here today.  He

10   is out of the state.  But I do want to make it clear for the

11   Court that we are not offering Mr. Wilson as an expert in those

12   ratings.  And as he testified, he does not have knowledge with

13   regard to those ratings.  He performs one part of that test,

14   and that is all he is here to testify as to today.

15             **THE COURT:**  Counsel, I have a problem here.  You are

16   not testifying.

17             **MS. MARTIN:**  I am not.

18             **THE COURT:**  So then on this rating system, I've only

19   heard one piece of testimony, and that's from the witness on

20   the stand.  So, then, if you have some documents or a witness

21   who is going to testify in the manner you just stated, then you

22   have to call that person because you can't both be the attorney

23   and a witness.

24             So you are telling me now that the highest -- the lowest

25   rating is a 9, as opposed to what he said, it was a 4.  I don't

1    know, then, what it is.  He said it is a 4.  You say it is a 9.

2    But he is testifying under oath, and you are not.

3         So, then, do you have a document which says that a 9 is

4    the lowest?

5              **MS. MARTIN:**  I do not, Your Honor.  I chose not to

6    object to that testimony and not to object when you were

7    questioning the witness, but I would like to note an objection

8    for the record as to his testimony because he is not an expert

9    to offer that testimony.

10             **THE COURT:**  Okay.  And the record will reflect that

11   you made no objection.  But if the lowest is a 9, then I would

12   appreciate it if you would get me a document that says that or

13   a witness that will say that to counteract what he has already

14   said is a 4.

15             **MS. MARTIN:**  Yes, Your Honor.  I do believe that

16   Chief Elliott Holmes will be a more accurate witness with

17   regard to that information, but I will state for the record

18   that that is not the purpose in us being here today.  That is

19   not an issue that we raised on Friday.  The issue that we

20   raised on Friday was with regard to fire hydrants that were dry

21   and that they were dry based on the fact that water valves had

22   been shut off.  May I continue?

23             **THE COURT:**  Well, your objection is overruled.

24             **MS. MARTIN:**  Thank you, Your Honor.

25             **THE COURT:**  The witness has testified to the

1   questions I asked him about his background.  He told me what he

2   was out there for, and I asked him why he was out there.  He

3   said he was out there to provide information for a rating

4   system.  And so then I asked him about the rating system.  So

5   then he provided what information he had, and whether his

6   information is accurate is another matter, but you can't

7   testify as to what is accurate.  You can get documents to say

8   that or another witness, but you can't testify.  I mean, that

9   is black letter law.

10       Okay.  Now, go ahead and ask these other questions that

11   you wanted to ask.

12            **MS. MARTIN:**  Thank you, Your Honor.

13   **BY MS. MARTIN:**

14   Q.  Chief Wilson, if you could, please, tell us about the

15   exchange that you had with JXN Water.  Or as a matter of fact,

16   could you please tell us about what your experience was like in

17   performing the functions of your job prior to April of 2023?

18   A.  In performing my job, it actually -- performing my job ran

19   pretty smooth.  It was pretty much, you know, a relationship

20   between me and the water maintenance.  If they had a problem or

21   something like that, they would let me know or notify me of any

22   situation.  Then at that point, I would go and tell the

23   division chiefs and also the DCs -- I'm sorry, the district

24   chiefs that's over the fire units that's inside the city of

25   Jackson and make them aware of, you know, where we got a bare

 1    hydrant or where we have a water main that's I guess not

 2    flowing or whatever.

 3         Then at that point, then I would go out, and I would go

 4    and measure either upline or downline where the next plug is

 5    that's operating, and I would let the DCs know, well, we get

 6    anything in this area, this is the plug that you need to catch.

 7    On that other end, east or west end, there's another plug you

 8    can catch on that side.  But these right here are down right

 9    now.

10    Q.  You were receiving that information from who in the water

11    maintenance department?

12    A.  Victor Pickett.

13              **THE COURT:**  Say that again, please.

14              **THE WITNESS:**  Victor Pickett.

15              **THE COURT:**  And what is his position?

16              **THE WITNESS:**  I just know he worked over there at the

17    water maintenance at the time.

18              **THE COURT:**  Victor Pickett?

19              **THE WITNESS:**  Victor Pickett.

20              **THE COURT:**  Okay.  So he works with the water

21    company?

22              **THE WITNESS:**  Yeah.  Yes, sir.

23              **THE COURT:**  Okay.  Go ahead.

24    **BY MS. MARTIN:**

25    Q.  And Mr. Pickett worked for the water company, but he was

R. WILSON - DIRECT

1   also an employee of the City of Jackson; is that correct?

2   A.  Yes, ma'am.

3   Q.  So what initiated your correspondence with JXN Water on

4   April 6, 2023?

5   A.  Well, at the time, I was wondering -- I had got wind that

6   they were going to outsource it.  So that point, I wanted to

7   know where I was going to go and who was going to be contacting

8   me in case we had issues out there on the street with the

9   water.

10      Also, you know, where do I need to call to report I got a

11  bad plug -- I'm sorry, not plug -- fire hydrant in the city so

12  I can correlate my information to the fire department, like I

13  said, to the district chiefs so we can, you know, be in the

14  know of where we need to go to establish connection to a water

15  hydrant.

16  Q.  And when you say a bad plug, a bad fire hydrant, do you

17  mean the fire hydrant itself was malfunctioning, or do you mean

18  water was not flowing to that fire hydrant?

19  A.  Well, it can be numerous things.  The main thing is water

20  not flowing, but then you would get a plug -- I'm sorry, you

21  would get a fire hydrant that probably had a stripped stem on

22  it, or at the bottom is called a seat, and it might have a

23  leaky seat at the bottom and it's not letting enough pressure

24  go through or whatever, so we report that type of stuff to the

25  water maintenance, and they will come out and fix it.

R. WILSON - DIRECT

1   Q.  So who was performing the function of determining whether

2   or not the fire hydrant was malfunctioning?

3   A.  Well, if I was out there, I can determine that the fire

4   hydrant wasn't -- didn't have any water coming out of it.  Now,

5   the reason why it's not happening, that's when I would call the

6   water and the maintenance department, or, like I said, they

7   would contact me and we would adjust ourselves accordingly.

8   Q.  So you testified earlier that you believe they were being

9   outsourced.  Explain to me what you mean by that.

10  A.  I heard that the department, the actual city department

11  was going to close down, and it was going to bring in a company

12  to run those functions that the water maintenance were

13  performing.

14  Q.  And what do you mean when you say issues?  You explained

15  earlier about the fire hydrant itself.  But were there any

16  issues that you all would experience when either you or the

17  water maintenance department would go out and test the fire

18  hydrants?

19  A.  Well, yeah, any -- well, like connectors are too low to

20  the ground, a plug might need to be raised, you know, it might

21  be leaning.  Any type of problem that might impede

22  firefighting, you know, I would report that, or they would

23  report it to me, especially in the event that we didn't have

24  any water.

25  Q.  And why was the reason that you would have to coordinate

1    with the water maintenance department in testing the hydrants?

2    A.  Well, the reason why we've got to coordinate is because we

3    have to have some type of communication of getting problems

4    fixed because we are not there to fix them.  They correlate

5    information to us so we can make the adjustments so we can have

6    adequate water for fire suppression.

7    Q.  And you testified earlier that the way that you were

8    performing this function was by reaching out to Victor Pickett,

9    and you said Bianca, and you couldn't remember her last name.

10   I believe you are referencing Bianca Smith, who was previously

11   in dispatch?

12   A.  That is correct.

13   Q.  So explain to us what the coordination was between you and

14   Victor Pickett and Bianca Smith.  Whenever there was an issue,

15   would you communicate it to them, or would they communicate it

16   to you?

17   A.  Yeah, if I was out testing the flow in plugs, if I had a

18   problem, I would call -- if Victor was in the field working or

19   whatever, I would call Bianca, and Bianca would work a work

20   ticket out, and she would give it to Victor, and Victor would

21   complete it.

22   Q.  And do you know who is performing Bianca Smith's job at

23   this time?

24   A.  They gave me a work center, work center number to call and

25   just let them know the problem, that we've got a problem now.

1    Q.  Okay.  So you received a customer service phone number?

2    A.  Yes, ma'am.

3    Q.  And on April 6th, after you reached out to Mr. Henifin,

4    did you receive a response?

5    A.  No, ma'am.

6    Q.  Okay.  Did you send a follow-up e-mail to Mr. Henifin?

7    A.  Yes, ma'am, that would be the one I did on the 26th.  And

8    at that point in time, I cc'd Ms. Hillman.

9    Q.  And I just want to make sure, you had a copy of the

10   exhibits that were handed to the Court, and so I want to make

11   sure you said you sent that follow-up e-mail on April 26th.

12   But I do want to call your attention to Exhibit A.  And from

13   looking at Exhibit A, can you read -- it says, "From Roderick

14   Wilson."  Can you read the date of that e-mail?

15       I'm sorry.  I actually am referring you to the wrong one.

16   I actually want to take you to the next page.  And if you look

17   at the second, page 2 of 3, can you see "From Roderick Wilson?"

18   And I want you to tell me the date of the e-mail from

19   April 12th, 2023.  Do you see the e-mail I'm referencing?

20   A.  Yes, ma'am, I do see April 12th, 2023.

21   Q.  And can you read the text of that e-mail?

22   A.  It says, "Rod" --

23            **THE COURT:**  What date is this e-mail?

24            **THE WITNESS:**  Sir?

25            **THE COURT:**  What's the date of this e-mail?

1          **THE WITNESS:**  This e-mail is on April 12, 2023.

2          **THE COURT:**  There was a preceding one from April 6th,

3     you said, right?

4          **THE WITNESS:**  This was after -- yes, this was after

5     the 6th?

6          **THE COURT:**  Where is the April 6th e-mail?

7          **MS. MARTIN:**  It is actually below the April 12th one,

8     Your Honor.

9          **THE COURT:**  All right.  I want to hear the April 6th

10    e-mail first.

11    **BY MS. MARTIN:**

12    Q.   Okay.  So if you look at the bottom of page 2 of 3, you

13    will see -- can you read the date for that e-mail at the bottom

14    of page 2 of 3?  Can you read the date for us?

15    A.   It says April 6th, 2023.

16    Q.   Can you read the text of that e-mail?

17    A.   "Good morning, Mr. Henifin.  My name is Rod Wilson.  I'm

18    the District Chief/Water Supply Officer of the Fire Marshal's

19    office of the City of Jackson, Mississippi.  I'm contacting you

20    to verify if your company is going to take over the flowing and

21    the testing of the city fire hydrants.  Cc'd in this e-mail is

22    Division Chief of the Fire Marshal's office, Percy Evans."

23    Q.   You can read the second paragraph that's on page 3 of 3.

24    A.   "When time permits, Chief Evans and myself will like to

25    have a conference/meeting with you and/or your team about the

1    process you prefer us to implement when reporting damaged

2    plugs, low water pressure and other issues of the nature.  We

3    are looking forward to hearing from you, also working with you

4    and your staff.  Thanks.  DC Rod Wilson WSO."  And I left my

5    phone number.

6                **THE COURT:**  Okay.

7    **BY MS. MARTIN:**

8    Q.  Now, can you read the April 12th e-mail that's in the

9    middle of page 2 of 3.?  This was the next e-mail that you

10   sent?

11   A.  Okay.

12   Q.  It says April 12, 2023 at 9:08 a.m.

13   A.  Got it.  "Good morning.  This is Chief Wilson at the --

14   "Good morning, this is Chief Wilson at the Fire Marshal's

15   office.  I'm following up with you on this e-mail referencing

16   fire hydrants."

17   Q.  Okay.  And then after you sent that follow-up e-mail, did

18   you receive a response from JXN Water?

19   A.  That's when I received the one from Ms. Hillman.

20   Q.  And after you received that response, did you set up a

21   meeting with Ms. Hillman?

22   A.  Yes, ma'am.

23   Q.  And do you remember the date of that meeting?

24   A.  That was April the 14th.

25   Q.  Okay.  So on April 14th, you had a meeting with

1    Ms. Hillman.  Who all was in attendance at that meeting?

2    A.  In that meeting, it was me, District Chief Wilson, it was

3    Division Chief Percy Evans, and Ms. Jordan Hillman.

4    Q.  And can you tell us what you all discussed in that

5    meeting?

6    A.  In that meeting, we discussed the flowing, the testing,

7    all -- pretty much all the duties that needed to be performed,

8    as far as communications between the Jackson Fire Department,

9    also taking over the flowing of the plugs, testing of the

10   plugs, maintenance of the plugs, and again, I say communication

11   of relaying information back and forth with us.

12   Q.  And with regard to the testing of the fire hydrants, what

13   was represented to you by JXN Water, to your recollection?

14   A.  JXN Water -- are you asking me -- can you ask your

15   question again?

16   Q.  In that meeting, you just described to us what all you

17   discussed.  And what was represented to you from JXN Water in

18   that meeting?

19   A.  They said that they were going to handle all the

20   maintenance and repair of the plug and communicate with us if

21   anything should ever malfunction inside of the city.

22   Q.  Who stated that to you?

23   A.  Ms. Jordan Hillman.

24   Q.  All right.  We will move to an e-mail that you received I

25   believe on April 20th.  And that should be -- I think it's

1    Exhibit B.  And if you read at the bottom of page 1 of 2, I

2    believe there's a picture on page 2 of 2, but at the bottom of

3    page 2 of 2, you received an e-mail from Jordan Hillman.  Is

4    that correct?

5    A.  Yes, ma'am.

6    Q.  Can you read the text of that e-mail that you received on

7    April 20th?

8    A.  "Rod," stating me, we have a dry hydrant at 2685 Crane

9    Ridge on the frontage road.  It is valved off for a fire line

10   tap.  It will be put back in service by the weekend."

11   Q.  So for our benefit, what does that mean, that

12   communication?

13   A.  That means that, you know, they are going to correlate

14   information back and forth to us that whenever we have a bad

15   plug or we have a dry line or anything that's malfunctioning

16   with the water that will impede fire suppression, they will let

17   us know.

18   Q.  Aside from this April 20th e-mail, have you received any

19   other correspondence from JXN Water with regard to hydrants

20   that were being impeded?

21   A.  No, ma'am.

22   Q.  Prior to JXN Water coming in in November of 2022, how --

23   in your estimation, how often were you receiving correspondence

24   from water maintenance with regard to impediments to fire

25   hydrants?

1    A.   Me and Victor, whenever -- it wasn't breaking down that

2    much, but I would speak with him probably about every other

3    week or so.

4    Q.   Every other -- so does every other week mean every two

5    weeks?

6    A.   Yes, something like that, because I was in contact with

7    him as well letting him know that, hey, I got -- because I've

8    got to do testing and flowing for contractors and whatever, so

9    if I have a problem, I will call him out, hey, we got this,

10   this line is blowing, we got people calling the fire

11   department, we got this not working.  So I would correlate that

12   information to him, and he will get back with me.  He's like,

13   Rod, it is done.

14   Q.   And since the April 14th meeting, have you attempted to

15   communicate directly with Mr. Victor Pickett about

16   coordination?

17   A.   Yes, we had a few conversations where he instructed me to

18   start calling the call center.

19   Q.   And after April 20th -- if you could, please look at

20   Exhibit D.  And I know this is not your e-mail, but to my

21   knowledge, you are aware of this e-mail; is that correct?

22   A.   Are we on Exhibit D, 1 of 2?

23   Q.   Exhibit D.  It is a Friday, June 2nd e-mail.  Do you see

24   it?

25   A.   You say June 2nd?

1    Q.  It should say Exhibit D, June 2nd e-mail from Chief Owens

2    at the time.

3    A.  Are you saying Exhibit D?

4    Q.  Yes, D as in dog.  I apologize.

5    A.  Okay.  I'm sorry.

6    Q.  Tell me who this e-mail -- if you start at the bottom, the

7    first e-mail, who is this e-mail from?

8    A.  It is from Mr. Henifin.

9    Q.  No, that e-mail -- I don't know if you are looking at the

10   right e-mail.  In the "from" line, who does it say it is from?

11   I think you are reading "to," not "from.

12   A.  Okay.  From Willie Owens.

13   Q.  Who is Willie Owens to you?

14   A.  That is the head chief.  That is C1, which is the chief

15   over the entire fire department.

16   Q.  Okay.  And the date of this e-mail is June 2, 2023, and I

17   believe you already told us the "to."  Who is it to?

18   A.  It is to Ted Henifin.

19   Q.  What is the subject?

20   A.  "Maintenance of fire hydrants."

21   Q.  Could you read that e-mail for us?

22   A.  "Good afternoon, Mr. Henifin.  The Jackson Fire Department

23   has been checking/inspecting fire hydrants in the city for

24   years.  This included flowing, testing for the proper amount of

25   pressure and cleaning around them.  Cleaning around the

1   hydrants means cutting weeds and grass, making sure all caps

2   are attached and color-coding them according to the GPM of the

3   hydrant.  The fire department also checks private hydrants

4   located on apartments, hotels and hospital properties if

5   allowed to do so.  We need to have a meeting in order to

6   clarify as to what will be done with these fire hydrants now

7   that your company will be in charge.  Thank you."

8   Q.  Are you aware of why that e-mail was sent to Mr. Henifin?

9   A.  Not entirely.

10  Q.  If you're not aware, then we will put that one to the

11  side.  And I believe, Mr. Wilson, that concludes my questions

12  for you at this time.

13          **THE COURT:**  Hold up.  I do have a question.  You said

14  earlier that from time to time that breakdowns were reported.

15          **THE WITNESS:**  Yes, sir.

16          **THE COURT:**  What kind of frequency?

17          **THE WITNESS:**  Once a month or something like that.

18  Then maybe like once every two or three months or whatever.  It

19  wasn't every day that we were breaking down.  But they were --

20  they were in contact with me letting me know that things were

21  transpiring in the city.  Like major stuff, you know, like

22  major breakdowns, yeah, that was kind of far and in between.

23  But when we did have little incidents or little issues, I would

24  get a call.

25          **THE COURT:**  Do you have a record of that?

1           THE WITNESS:  I do not.

2           THE COURT:  There was no record made of these

3    breakdowns?

4           THE WITNESS:  No, sir.

5           THE COURT:  Can you explain why not?

6           THE WITNESS:  I can't explain why not.

7           MS. MARTIN:  Your Honor, I would like to follow up.

8    When you received --

9           THE COURT:  Well, I'm not finished yet.  So when you

10   said no record was made of these, there was no record at all?

11          THE WITNESS:  No, sir, I would get a call from them.

12          THE COURT:  But there was no record of the call?

13          THE WITNESS:  No, sir.

14          THE COURT:  So then inasmuch as there was no record

15   of the call, how did you determine when a problem is rectified?

16          THE WITNESS:  I would get a call back where I would

17   follow up with him.  I would follow up, "Hey, do we have

18   everything under control?"  But we communicated a lot.  I can

19   say that.

20          THE COURT:  So if the public wanted to know how the

21   system's integrity was on a regular basis, then the public

22   would have no way of knowing?

23          THE WITNESS:  Is that a question?

24          THE COURT:  Yes.

25          THE WITNESS:  That question would be above me.

1          **THE COURT:**  But from your perspective, if the public

2     wanted to know whether you all were handling something, the

3     public would not know?

4          **THE WITNESS:**  I'm not --

5          **THE COURT:**  From your perspective.

6          **THE WITNESS:**  From my perspective, I choose not -- in

7     my position, I choose not to take a position.  The only thing I

8     do, I follow orders.  That's not in my scope.

9          **THE COURT:**  So, then, it was not your determination

10    not to keep records?  That was above you?

11         **THE WITNESS:**  That's not true.  That's -- like I

12    said, what we did, we communicated often, and we made sure the

13    problem was fixed and rectified.

14         **THE COURT:**  There's not some national requirement

15    that a fire department keep records such as that?

16         **THE WITNESS:**  No, sir, not to my knowledge, not for

17    broke plugs.

18         **THE COURT:**  So if all the plugs in Jackson were

19    broken, there's no requirements to keep records on that?

20         **THE WITNESS:**  If all the plugs in Jackson were broke,

21    we wouldn't need to keep records, Your Honor.  We just can't do

22    nothing but go out and fix it.  I wouldn't know what we were

23    recording at that point.

24         **THE COURT:**  Okay.  Counsel, you can follow up with

25    your question now.

1   BY MS. MARTIN:

2   Q.  Yeah, just based on what was being recorded and what was

3   not, when you were communicating with Victor Pickett, were you

4   using a cell phone?

5   A.  Yes, ma'am.

6   Q.  Is it safe to say that there would be a call log that

7   would state who the call was coming from and who the call was

8   going to?

9   A.  No call log, but I do have some text messages showing

10  where I have sent pictures of plugs that need to be fixed and

11  stuff like that.  I do have that inside of my texts.

12       As far as the call log, as you use the phone, the call

13  scrolls off.

14  Q.  So we have obtained records in the past just like from the

15  phone company that would show a log of who was placing the

16  call, who this call was going into.  And so when I reference

17  call logs, that's really what I'm talking about.

18  A.  Gotcha.

19  Q.  In addition --

20          THE COURT:  But I don't know that you have done that.

21          MS. MARTIN:  I have not done that in this case.

22          THE COURT:  Again, you are testifying.  I don't know

23  if you've done that.

24          MS. MARTIN:  I'm just explaining to him -- my

25  question to him was whether or not that type of information

1    would be available.

2         **THE COURT:**  But you were testifying just then, and I

3    have already told you you can't ask questions and testify at

4    the same time.

5         **MS. MARTIN:**  Yes, Your Honor.  I apologize.

6    **BY MS. MARTIN:**

7    Q.  So Mr. Wilson, are you aware of whether or not a call log

8    would be available to provide evidence as to who the call was

9    going to and from?

10   A.  Yes, ma'am.

11   Q.  And did you ever utilize 311 dispatch when you were

12   communicating back and forth with Victor Pickett and Bianca

13   Smith?

14   A.  No, ma'am.

15   Q.  You did not use 311?

16   A.  No, ma'am.

17   Q.  Okay.  And then when you received information from

18   Mr. Victor Pickett, who was from water maintenance, and when

19   you received that information, were you distributing that

20   information to the district chiefs?

21   A.  Yes, ma'am, immediately.

22   Q.  How were you distributing that information to them?

23   A.  I would give the district chiefs a call and let them

24   know that, you know -- or I would actually go by the stations

25   and have them actually meet me at the site so I can show them

1    where, what plug we are going to use, the area that they can't

2    perform in.  And also, we will try to come up with a plan of

3    attack at that time.

4    Q.  Okay.  Thank you.

5    A.  Yes, ma'am.

6            **THE COURT:**  Hold it one second.  So then if a fire

7    erupted in an area where you had just received a call and the

8    plug was rendered useless, then how would the fire truck know

9    that it's useless before it went out there and tried to

10   connect?

11           **THE WITNESS:**  Well, the strategy, what the fire

12   department does, we have a sufficient amount of water on our

13   trucks already.  So the first unit would come in, and we would,

14   you know, go ahead with a plan of attack with the initial

15   attack of water.

16           Depending on the structure of the fire, the captain on the

17   first unit in would tell the second unit to catch the plug.

18   The second unit catching the plug would also alert the first

19   unit by radio that this plug is dry, it's not working.  If

20   there's a third unit coming in, that third unit would go ahead

21   and bypass that second unit and go ahead and supply water to

22   the first unit.  Then the second unit would come and relay its

23   tank water in the event that the third unit has already, you

24   know what I'm saying, dumped its water into the first unit, and

25   that would happen until the fire has been extinguished.

1          **THE COURT:**  So what you are telling me then is that

2     the first unit wouldn't know that the plug is dry?

3          **THE WITNESS:**  No, sir.

4          **THE COURT:**  Even though you would have received a

5     telephone call complaining that the plug was dry?

6          **THE WITNESS:**  I'm not understanding your question.

7          **THE COURT:**  If you would have gotten a telephone call

8     telling you that the plug is dry and needs to be repaired, and

9     then a fire erupts in that area, a fire truck goes out there

10    thinking it's going to fight a fire with available water, it

11    attaches to a plug, but nevertheless the plug is dry, that

12    first unit that goes out there didn't know from you or anybody

13    else that the plug was dry.  So valuable time is wasted because

14    they didn't know it was dry because there's no record made that

15    anyone would know that the plug is dry.

16         **THE WITNESS:**  Could I respond to that?

17         **THE COURT:**  That's why I'm asking the question.

18         **THE WITNESS:**  Maybe I misunderstood your question at

19    first.  In the event that that DC knew that that plug was dry,

20    he would tell the first unit that the first plug don't -- go

21    ahead and use the water efficiently.  Now, the second unit

22    would actually drop its line at the plug that we already

23    established that's working.

24         **THE COURT:**  But I was asking you how would the first

25    unit know the plug is dry when they get there.

1          **THE WITNESS:**  I think I misunderstood your question,

2    so that's why I, you know --

3          **THE COURT:**  Let me let you correct it if you need to

4    correct anything.  I just want to know what the procedure is.

5    But I thought you told me that you didn't make any record of a

6    problem with the plug.

7          So if a plug is dry and that call has been made in to you,

8    you made no record and nobody else, to your knowledge, made a

9    record.  So then the fire truck that would go out to that area

10   expecting the plug to be wet would find that it is dry.  They

11   would not have known not to even try that plug because you have

12   no records showing that it was dry.  That's what you said,

13   isn't it?

14         **THE WITNESS:**  The DC --

15         **THE COURT:**  Isn't that what you said?  Let me just --

16         **THE WITNESS:**  That's not what I'm saying.

17         **THE COURT:**  What are you saying?

18         **THE WITNESS:**  What I'm saying is, the DCs -- there's

19   three shifts.  All DCs are in great communications with each

20   other.  Now, they are going to know what's dry and what's not,

21   and what's --

22         **THE COURT:**  Explain that to me then.  How do they

23   know what is dry?

24         **THE WITNESS:**  They communicate amongst each other as

25   well.  They make notes amongst themselves of the plan of

1   attack.  Also, the DC is actually -- if the fire is that large,

2   the DC is on all fires.  He already knows what line to contact

3   with and what line not to contact with.  All three shifts are

4   in relations to each other to understand, you know, what

5   unit -- I mean, what plug to catch until that plug is fixed.

6            THE COURT:  How would they know that you had gotten a

7   call saying the plug was dry?

8            THE WITNESS:  How would who know?

9            THE COURT:  The trucks that would go out there.

10           THE WITNESS:  Because I would alert the DC

11  immediately, which I normally do.  When I get a call, they get

12  a call.

13           THE COURT:  That is the first time you've said that.

14           MS. MARTIN:  No, Your Honor, I believe he previously

15  testified to that through my line of questioning.

16           THE COURT:  Okay.  I don't remember it.  But you are

17  saying then that as soon as you get a call that a plug is dry,

18  you do what?

19           THE WITNESS:  I immediately call them.

20           THE COURT:  You call who?

21           THE WITNESS:  I call the DC.

22           MS. MARTIN:  You keep saying DC, but --

23           THE COURT:  I understand that is district chief.

24           THE WITNESS:  I'm sorry.  I call the -- not DC,

25  district chief.

1           **THE COURT:**  I know what DC means.  So then you would

2   call the district chief and tell him that the plug is dry?

3           **THE WITNESS:**  Correct.

4           **THE COURT:**  And then would they make a record of

5   that?

6           **THE WITNESS:**  Well, they make a record amongst

7   themselves.  I'm sure they have some type of memo system that

8   they use.

9           **THE COURT:**  But you don't know that?

10          **THE WITNESS:**  They communicate well within

11  themselves.  They -- whatever system they use to acknowledge --

12  I mean, not acknowledge, but whatever system that they use to

13  make each other aware of what's going on, they are very good at

14  it.

15          **THE COURT:**  Okay.  So then you get a call that says a

16  plug is dry.  You don't make a record, but you call the chiefs?

17          **THE WITNESS:**  I do.

18          **THE COURT:**  And you don't make a record of that

19  either?

20          **THE WITNESS:**  I don't.  Once I put it into their

21  hands, they've got it.

22          **THE COURT:**  Right, but you don't make a record

23  showing you informed them that the plug is dry?

24          **THE WITNESS:**  No.

25          **THE COURT:**  So nobody could possibly know the plug is

1    dry but you?

2            **THE WITNESS:**  That's not true.  They know -- the DCs

3    know that the plug is dry.

4            **THE COURT:**  Because you contact them?

5            **THE WITNESS:**  Because I contacted them.

6            **THE COURT:**  Right.  Okay.  Now, do you have any more

7    questions?

8            **MS. MARTIN:**  No, Your Honor.

9            **THE COURT:**  Okay.  Now, Mr. Henifin, since they are

10   asking questions concerning contact or communications with you,

11   do you have any questions through yourself or your lawyer?

12   Preferably your lawyer.

13           **MS. WILSON:**  Court's indulgence, Your Honor.

14           **THE COURT:**  Okay.

15           **MS. WILSON:**  Yes, Your Honor.  Malissa Wilson on

16   behalf of JXN Water, Ted Henifin, our third-party manager.  We

17   just have a few follow-up questions, more so for clarification.

18                         **CROSS-EXAMINATION**

19   **BY MS. WILSON:**

20   Q.  Can you tell us how many hydrants are in the system total?

21   A.  I can't give you that number.

22   Q.  Would it be roughly a thousand?

23   A.  I do not know.  I can't give you that number.  I don't

24   have a distinct number.

25   Q.  Okay.

1    A.  Okay.

2    Q.  And how many hydrants does the Jackson Fire Department

3  test or inspect over the years?  Let's go back past five years.

4  Is there any way that you can -- did you know that information

5  offhand?

6    A.  I don't know that information.

7    Q.  Is there any documentation of that information?

8    A.  I don't have the documentation.

9    Q.  Who has that documentation?

10   A.  I don't know.

11   Q.  Is there documentation?

12   A.  Yeah, there's documentation.  I don't have it.  I don't

13  have it on hand.  I don't have it here.

14   Q.  And you don't know who has it?

15   A.  I don't know who has it.

16   Q.  Do you know who maintains it?

17   A.  I don't.

18   Q.  And to clarify, with respect to Exhibit A, the e-mail

19  correspondence that you had with Ted Henifin's office in April,

20  I just want to clarify that your first e-mail, the one that you

21  sent on April 6th was sent on a Thursday.  Do you have any

22  reason to dispute that?  That April 6th, 2023 was a Thursday.

23       I'm at Exhibit A.  And what I'm trying to establish is

24  that the weekend following that Thursday was Easter weekend.

25  Would you have any reason to dispute that that following

1  weekend was Easter weekend?

2  A.  I'm not sure what Easter fell on.  I don't know.

3  Q.  If I represented to you that Easter was on April 9th,

4  would you have any reason to dispute that?

5  A.  I have no idea of what falls on the 9th.

6         **MS. WILSON:**  Court's indulgence, Your Honor.  No more

7  questions, Your Honor.

8         **THE COURT:**  These records, you say you don't know

9  where they are?

10        **THE WITNESS:**  I don't have those records in my

11 possession.

12        **THE COURT:**  But you said there are records.

13        **THE WITNESS:**  There are records -- if there are

14 records, they have got to be somewhere in either the deputy

15 chief's office or the assistant chief's office.  Now the direct

16 -- to pinpoint where those records are, I don't know.  On the

17 fire department, we stick to our area, and so I don't have

18 those records inside of my -- inside of my desk.

19        **THE COURT:**  Okay.  Thank you, then.  You can step

20 down.

21        **THE WITNESS:**  Thanks.

22        **THE COURT:**  We will take a 15-minute recess.

23     **(RECESS TAKEN AT 10:48 A.M. UNTIL 11:10 A.M.)**

24        **THE COURT:**  All right.  Call your next person.

25        **MS. MARTIN:**  I would like to call Deputy Fire Chief

1    Elliott C. Holmes.

2          **THE COURT:**  All right.

3          **(OATH ADMINISTERED.)**

4          **THE COURT:**  All right.  You can take a seat right up

5    there.  All right, Chief, this is a microphone here.  Is the

6    green light still on?

7          **THE WITNESS:**  It's still on.

8          **THE COURT:**  So speak directly into the microphone.

9    All right?

10          **THE WITNESS:**  All right.

11          **THE COURT:**  But not too close.

12          **THE WITNESS:**  Gotcha.

13          **THE COURT:**  You may begin.

14                    **ELLIOTT C. HOLMES,**

15    **having first been duly sworn, testified as follows:**

16                    **DIRECT EXAMINATION**

17    **BY MS. MARTIN:**

18    Q.  Deputy Chief Holmes, if you could, please state for the

19    record what your position is with the City of Jackson.

20    A.  Deputy fire chief over the emergency services division.

21    Q.  And can you tell us what your position -- what are the

22    duties of your position?

23    A.  The duties of my position is to oversee the emergency

24    services division of the Jackson Fire Department, also deal

25    with budget when it comes to the ESD division, along with

1    creating policies and different things to make sure that we

2    have a smooth operation.

3    Q.   Okay.  And what is your educational background?

4    A.   My educational background, I'm a high school graduate.  I

5    have some college, and I have a trade of barber stylist.

6    Q.   And how long have you been with the fire department?

7    A.   I have been with the fire department a little over 25

8    years.

9    Q.   And have you ever received any trainings as part of your

10   time with the fire department?

11   A.   Yes, throughout my ranks, I received training, from

12   becoming a certified firefighter to becoming a leaf drive

13   operator, moving on to the ranks of a lieutenant, then a

14   captain.  I also was eligible for the district chief position,

15   but I never made district chief.  But then I moved to the Fire

16   Marshal's office, where at the Fire Marshal's office I obtained

17   Inspector 1 and 2.  Also the other classes dealing with the

18   daily operations of the Fire Marshal's office on up until

19   making deputy fire chief July of last year.

20   Q.   Thank you.  And we've offered for today's hearing, status

21   conference, some exhibits.  So I'd like you to -- you have a

22   copy of those exhibits, and I would like for you to bring up

23   Exhibit C for us.  Can you tell us what that is?

24   A.   That's a -- that was a structural fire, house fire that

25   was located on 1178 West McDowell Road.

1   Q.   And what is this document that we are looking at?

2   A.   What I'm looking at?

3   Q.   Um-hm.

4   A.   It's basically a fire report of what happened at that

5   event on that particular day.

6   Q.   And what's the date of this fire report?

7   A.   May 29th, 2023.

8   Q.   Okay.  And can you tell us what page describes what

9   occurred at this fire?

10  A.   What page?  Do you want me to look at the actual fire

11  report itself?

12  Q.   Yes.

13  A.   Okay.  Give me one second.  That would be pages 3, along

14  with -- we have some more narratives on here -- along with

15  page -- the last page.

16  Q.   Okay.  So page 3 and the last page.

17  A.   Yes.

18  Q.   And let me pause this for a minute just to make sure.  And

19  can you provide us with -- so you told us page 3 and the last

20  page.  So there's a narrative on page 3 that starts with

21  remarks.  Can you read that for us and explain to us what this

22  means?

23  A.   Okay.  "District chief responded to 1178 McDowell Road for

24  a house fire.  When on scene, DC2 received a scene debriefing

25  from the on-scene command, which was Rescue 14.  After the

1    briefing, DC2 assumed command.  DC2 advised dispatch that PD

2    was needed to the scene for traffic control.  Engine 12 went in

3    for initial fire suppression.  Engine 22 supplied water by

4    catching the hydrant.  Rescue 14 went in for more manpower.

5    Engine 2 went into the structure and conducted a primary and

6    secondary search, reporting clear on both searches.  DC2 spoke

7    with the occupant of the structure, Mr. Jeremy Varando, and he

8    informed DC2 that he was at home alone and that he was outside

9    when he saw smoke, and when he went into the home, that's when

10   he saw flames.  DC also spoke" -- well, I guess "with the

11   homeowners, Ms. Teresa Varando, and she informed DC2 that she

12   was not at home at the time of the fire.  DC2 informed Red

13   Cross on behalf of Ms. Varando and also gave her a fire

14   verification form.  Truck 14 pulled the meter box from the

15   home, along with cutting the scene.  DC informed dispatch that

16   the fire was under control, and a fire investigator was needed

17   on the scene.  DC2 passed command to Engine 12, and district

18   chief returned back to service.  For any other additions,

19   please read more information."

20   Q.  From that description, can you tell us if there was a fire

21   hydrant that was dry when the fire department responded to the

22   scene?

23   A.  Okay.  From that narrative, that would be no, but from the

24   narrative of the actual truck that arrived second on the scene,

25   it actually tells you that there was a dry hydrant.

1    Q.  Can you point us to that narrative?  Is that on that last

2    page?

3    A.  That's on that last page, and that would be narrative

4    number 2 of 3.

5    Q.  Can you read that one for us?

6    A.  It says, "Rescue 14 responded to a residential house fire

7    at 1178 McDowell Road.  Upon arrival, Engine 12 was already

8    making an initial attack with an inch-and three-quarter attack

9    line.  Rescue 14 attempted to catch the plug, but it was not

10   working.  I took command until DC2 arrived on scene.  Once DC

11   took command, me and my private assisted Engine 12 with making

12   an interior attack.  There was flames showing from the A and B

13   side, as well as through the roof."

14   Q.  What portion of that narrative tells us that the hydrant

15   was not working?

16   A.  The second part of the sentence, when it says when they

17   attempted to catch a hydrant and it was not working, that let

18   you know that that hydrant was dry.

19   Q.  So how did they respond based on that hydrant being dry?

20   A.  Okay.  What they did at that time, they went ahead and

21   proceeded toward the actual initial truck that was on scene,

22   and what they did, they shuttled their water to that initial

23   truck so they could supply them with water so they wouldn't run

24   out.

25   Q.  Explain what you mean by shuttle.

1    A.   Shuttle water meaning that -- basically, I'm going to use

2    the trucks, for example.   We've got Engine 12 and we've got

3    Rescue 14.   Both trucks have approximately 500 gallons of water

4    on it.   And when you initially go to a fire, you are going to

5    make an initial attack with your tank water.   The hydrant is

6    basically something that we need for a constant water flow.   So

7    basically, when that hydrant was inoperable, Rescue 14 at that

8    time then dumped their water into Engine 12 so they could have

9    a continuous flow of water.

10   Q.   Okay.   So that's what occurred in this fire?

11   A.   Yes.

12   Q.   Okay.   And does the size of the fire matter with regard to

13   the amount of water that's necessary to fight it?

14   A.   Yes.   The size of it does matter.   Like, it all depends on

15   time.   Basically, if you were to respond to a home where you

16   say it is probably about five or ten percent involved, you may

17   not need a hydrant to extinguish that fire.   But I can say with

18   this fire, being that the person on scene stated that there

19   were flames coming through the roof, at that particular time

20   they knew they needed a continuous supply of water, because I

21   think when the DC arrived on the scene, it was pretty much

22   20 percent involved.   So at that time, to deescalate it as far

23   as the fire continuing to spread, they needed more of a big

24   water knockdown, and not just use an inch-and three-quarter

25   line.

E. HOLMES - DIRECT

1    Q.  When you say 5 to 10 percent involved, what do you mean?

2    A.  We are talking about the home itself.

3    Q.  So give me an explanation of what the word "involved"

4    means.

5    A.  It's basically -- if we've got a 1500-square-foot home and

6    we say 5 to 10 percent involved, we are talking about probably,

7    what, about 200 square feet of the home, maybe a room or

8    something like that.

9    Q.  Okay.  So when you say 5 to 10 percent involved, you mean

10   in a 1500-square-foot home, we are only talking about one or

11   two rooms?

12   A.  Correct.

13   Q.  So you are saying that if you need a larger supply of

14   water, it is based on how far the fire has advanced?

15   A.  Correct.  In normal cases, you can pretty much snuff a

16   fire out when you contain it to one room, but sometimes, you

17   know, it can spread.  Especially once -- when they stated that

18   when they arrived, the fire was already coming through the

19   roof, once it gets in the attic, it has a mind of its own.  And

20   at that time, you really know that you need to have a constant

21   flow of water.

22   Q.  Next, I want to direct your attention to Exhibit C -- no,

23   sorry, that is Exhibit C.  I want to direct your attention to

24   Exhibit E.

25   A.  Okay.

1    Q.   And what is this document?

2    A.   This document is a house fire located at 854 Carver

3    Street.

4    Q.   Okay.  And what was the date of that fire?

5    A.   The date of that fire was June 19th.

6    Q.   Okay.  And what part of this report is going to give us

7    the narrative of what occurred at that fire?

8    A.   That would be -- that would be on the second page.

9    Q.   Okay.  And are you talking about where it says remarks?

10   A.   Yes.

11   Q.   Can you read that for us?

12   A.   DC1 responded to 854 Carver Street for a house fire.  Upon

13   arrival, DC1 assumed Carver Street command.  First engine on

14   location was Engine 10, which made an offensive interior attack

15   after softening the structure by forcible entry through barred

16   doors.  Engine 10 used an inch and three-quarter line, attack

17   line, to knock down the fire.  Engine 1 was the next unit on

18   the scene and was ordered to protect the adjacent house that

19   was beginning to show signs of catching fire with the roof

20   beginning to smoke.  Engine 1 supplied Engine 10 with

21   additional tank water.  Rescue 1 came and gave a primary search

22   and pulled a backup line seated and charged and the front door.

23   Engine 6 supplied additional water along with Engine 3.  Truck

24   28 came in for manpower and cut utilities and ventilated the

25   structure.  Truck 28 completed overhaul and extinguishment of

1    all fire extensions.  Command contacted Alpha 1 for a fire

2    cause investigation.

3    Q.  Based on that narrative, is it evident that there was a

4    fire hydrant that was dry?

5    A.  It's evident.  It doesn't state it, but by the fact that

6    we were shuttling water, we used Engine 6, and we also used

7    Engine 3 to shuttle water to Engine 10.  And once again, like I

8    said, they did that because they want a continual flow of water

9    and the hydrant was inoperable.

10   Q.  Have you communicated with the individuals that drafted

11   this or the supervisors who were in charge of this report?

12   A.  Yes, I have spoke with them.

13   Q.  Did they report to you that there was a fire hydrant that

14   was dry?

15   A.  That is true.

16   Q.  The next thing I want to direct your attention to is

17   Exhibit D.  It is a June 2nd -- it says June 2nd e-mail from

18   Chief Owens.

19   A.  Exhibit B?

20   Q.  Exhibit D.  There's an e-mail there that says June 2nd,

21   2023.  Do you see that e-mail?

22   A.  Do you want me to look at the exhibit or the actual e-mail

23   itself?

24   Q.  The exhibit.

25   A.  Okay.  Got it.

1    Q.   Are you on Exhibit D?

2    A.   I'm looking at Exhibit D, yes.

3    Q.   Can you read the date for us?

4    A.   That would be June 2, 2023.

5    Q.   And who is it from?

6    A.   Chief Owens.

7    Q.   Who was it going to?

8    A.   Ted Henifin.

9    Q.   Can you read the text of that e-mail for us?

10   A.   "The fire department has been checking and inspecting fire

11   hydrants in the city for years." I think this is not what you

12   want me to read.

13   Q.   That's it.

14   A.   "This includes flowing, testing for proper" -- let me

15   start over.   "The Jackson Fire Department has been inspecting

16   fire hydrants in the city for years.   This includes flowing,

17   testing for proper amount of pressure and cleaning around them.

18   We need to have a meeting in order to clarify as to what will

19   be done with the fire hydrants now that your company will be in

20   charge."

21   Q.   And who is Willie Owens to you?

22   A.   Willie Owens is the fire chief of the Jackson Fire

23   Department.

24   Q.   Is he your supervisor?

25   A.   He's not my immediate supervisor, but he is overall my

1    supervisor.

2    Q.  Have you communicated with him about this issue around the

3    flow testing?

4    A.  We have talked.

5    Q.  Can you provide an explanation as to why Mr. Owens would

6    have sent this e-mail?

7    A.  He would have sent that e-mail, if I'm not mistaken, in

8    reference to the prior e-mails that we never was able to get in

9    contact with someone from JXN Water so we can establish what we

10   are going to -- what's going to be done as far as the

11   maintenance of the hydrant.

12   Q.  Okay.  I want to direct you next to a June 19th e-mail,

13   and I believe it is Exhibit E -- no, Exhibit F and G.  Do you

14   have Exhibits F and G in front of you?

15   A.  Yes, I have.

16   Q.  That first e-mail from June 19 at 1:43 p.m., can you tell

17   me who that e-mail was from?

18   A.  Jordan Hillman.

19   Q.  And who was that e-mail to?

20   A.  Patrick Armon.

21   Q.  Who is Patrick Armon?

22   A.  Patrick Armon is the assistant fire chief.

23   Q.  Can you read that e-mail for us?

24   A.  This e-mail?

25   Q.  The e-mail itself.  Not the attachment, but the e-mail

1    itself.  It should say Exhibit F at the top of it.

2    A.  Yes.  Please see attached memo regarding agreements

3    with --

4    Q.  I think you are reading the wrong thing.  You should have

5    a document in front of you that says Exhibit F at the top, and

6    it says June 13th e-mail from JXN Water to Fire Department.

7    A.  You are absolutely right.  Exhibit F.  Gotcha.

8    Q.  Do you see the text of that e-mail now?

9    A.  I do.

10   Q.  Can you read that e-mail for us?

11   A.  Okay.  It says, "Chief Armon, please see attached memo

12   that covers what is involved in our hydrant maintenance

13   contract.  It should give you a good idea of our timeline so

14   JFD can make any decisions needed about the hydrant maintenance

15   efforts in the interim period.  Let us know if we need to

16   further coordinate any efforts."

17   Q.  And to your knowledge -- who at -- to your knowledge, what

18   prompted that e-mail?

19   A.  To my knowledge, what prompted that e-mail was the Carver

20   fire because it was actually on the same day of this particular

21   e-mail.

22   Q.  Okay.  And do you have Exhibit G in front of you?  It says

23   June 19th memo from JXN Water.

24   A.  Exhibit G.

25   Q.  It should say Exhibit G at the top, June 19th memo from

1  JXN Water.

2  A.  I do.

3  Q.  And can you read the date of it for us?

4  A.  June 19, 2023.

5  Q.  Who is it to?

6  A.  The Jackson Fire Department.

7  Q.  And who is it from?

8  A.  JXN Water.

9  Q.  And can you read the first sentence of that memo for us?

10  A.  "This memo reflects the discussion JXN Water and Jackson

11  Fire Department had on April 14th and the follow-up discussion

12  on June 16, 2023."

13  Q.  And to your knowledge, did someone in the fire department

14  request this memo in writing?

15  A.  Yes.

16  Q.  Who requested this memo?

17  A.  Chief -- Chief Armon.

18  Q.  And when you say Chief Armon, you mean Chief Patrick

19  Armon?

20  A.  Chief Patrick Armon, yes.

21  Q.  Can you read the first bullet point of that memo for us?

22  A.  "JXN Water will continue to provide support to JFD on an

23  on-call basis for hydrant issues during the firefighting

24  events.  Orlando Chambers, Marcus Love, and Victor Pickett have

25  the same cell numbers as before.  For after hours or to reach

1    dispatch directly, call (601)500-5200, and the call center will

2    connect you with one of the on-call persons."

3    Q.  And then the next bullet point, can you read that one out

4    loud for us?

5    A.  "JXN Water will perform hydrant maintenance to the entire

6    hydrant system as a part of the Wachs Water Services Water

7    Valve and Hydrant Project."

8    Q.  And then turn to the second page for me, and I want you to

9    read the next to the last bullet point for me.

10   A.  Next to the last?

11   Q.  It should be a highlighted portion of it.

12   A.  "If the Wachs contract timeline aligns with JFD's needs,

13   there is no need for JFD to duplicate hydrant repair and

14   inspection work."

15   Q.  To your knowledge, is this the first time that the fire

16   department received in writing communication regarding the

17   continued maintenance and inspection of the fire hydrant?

18   A.  Yes.

19   Q.  Earlier when -- well, I want to ask you some questions

20   about the rating system for the fire department.  Are you aware

21   of a rating system for the fire department?

22   A.  Yes.

23   Q.  Are you aware of the range of that rating system?

24   A.  Yes.

25   Q.  Can you tell us what that range is?

1    A.  The rating range is from 1 to 9, and as of right now, the

2    Jackson Fire Department is a 3.

3    Q.  Do you know how long the Jackson Fire Department --

4            **THE COURT:**  You said Jackson Fire Department is a

5    what?

6            **THE WITNESS:**  3.

7    **BY MS. MARTIN:**

8    Q.  And can you tell us how long Jackson Fire Department has

9    been a 3?

10   A.  Jackson Fire Department has been a 3 for approximately, I

11   would say, at least ten years, if I'm not mistaken.

12   Q.  Okay.  And would you consider a 3 rating to be a good

13   rating or a bad rating based on the scale?

14   A.  It is a good rating, but we want better.

15   Q.  Okay.  And so are you aware of any municipalities or fire

16   departments in the state of Mississippi that have a 1 rating?

17   A.  I'm not aware of anyone that have a 1.

18   Q.  Are you aware of anybody that has a 2 rating?

19   A.  I think Gulfport or Biloxi has a 2.  Somewhere along the

20   coast I think has a 2.

21   Q.  Is it safe to say there is one fire department that has a

22   2 rating?

23   A.  To my knowledge, yes.

24   Q.  Are you aware of any other fire departments that have a 3

25   rating?

E. HOLMES - CROSS

1    A.   I am not.

2    Q.   And do you know of any fire departments who have -- I

3    would say less than a 3 rating, but it seems like the scale

4    goes up in numbers.  Anybody that has a 3 or more rating?

5    A.   A 3 or more?

6    Q.   Right.  So 4, 5, 6?

7    A.   Yeah.  I really don't want to go on the record for this,

8    but I think, I think Clinton has like a 5 or something.  Their

9    rating is higher than ours -- is lower than ours.

10   Q.   Lower than yours but higher on the scale?

11   A.   Yeah.

12          **MS. MARTIN:**  That's all the questions I have for you

13   at this time.

14          **THE COURT:**  All right.  The other side?

15                         **CROSS-EXAMINATION**

16   **BY MS. WILSON:**

17   Q.   Just one question.  Do you have Exhibit G in front of you?

18   And that is the memo, June 19th memo.

19   A.   Yes.

20   Q.   If you could turn with me to the second page.  Counsel

21   previously asked you to read that second to the last bullet

22   point, but she stopped you after the first sentence.  If you

23   could read the entirety of that bullet point.

24   A.   "If JFD requires the work to be performed in a quicker

25   timeframe, JFD may continue with their normal hydrant

1    maintenance and inspection."

2    Q.   Thank you.  I just wanted to include that in the record

3    for completeness sake.

4              MS. MARTIN:  One follow-up question.

5                      **REDIRECT EXAMINATION**

6    **BY MS. MARTIN:**

7    Q.   Chief Holmes, has the fire department been directed to

8    continue to perform maintenance as it was previously performing

9    maintenance prior to JXN Water being involved?

10   A.   Not to my knowledge, no.

11   Q.   Okay.  Would that direction come directly to you or would

12   that direction go to Chief Owens?

13   A.   It would either go to Chief Owens or Chief Armon.

14   Q.   Okay.  So you might not have knowledge of that?

15   A.   I might not have knowledge of that.

16             MS. MARTIN:  Thank you.  That's all I have.

17             THE COURT:  All right.  I have a few questions for

18   you.  You may have a seat.

19             MS. MARTIN:  Your Honor, I did want to just state for

20   the record, we prepared for today as a status conference and

21   not as an evidentiary hearing.

22             THE COURT:  Okay.

23             MS. MARTIN:  So I do want to just put that on the

24   record, that we were not prepared to offer witnesses for an

25   evidentiary hearing.  If Your Honor would like to notice an

1    evidentiary hearing, we will be happy to have all of the

2    witnesses present that would be necessary to testify in an

3    evidentiary hearing.

4             **THE COURT:**  Thank you so much.  All right, then.

5    Now, then, you said that there's this rating system of 1 to 9.

6             **THE WITNESS:**  Yes, sir.

7             **THE COURT:**  Where do you get that information?  Where

8    can I find it?

9             **THE WITNESS:**  Where can you find it?  With the

10   Mississippi Insurance Rating Bureau.

11            **THE COURT:**  And how did you find it?

12            **THE WITNESS:**  How did I find it?

13            **THE COURT:**  Yes.

14            **THE WITNESS:**  Our rating?  Through the fact that our

15   last rating that we had from them, we obtained that 3.

16            **THE COURT:**  And when was that?

17            **THE WITNESS:**  That was approximately probably

18   about -- what was 2015, '16 -- I would say a little over five

19   years ago, if I'm not mistaken.

20            **THE COURT:**  Do you understand that we've had

21   testimony today that the rating system goes to a 4?  Are you

22   saying that's in error?

23            **THE WITNESS:**  That's an error.

24            **THE COURT:**  And since you knew that one had testified

25   that it was a 4, then what proof did you bring here that it's a

1    4 -- I mean, that it's a 9 instead of a 4?

2            THE WITNESS:  I can't bring you any proof.  I don't

3    have any proof on me as of right now.

4            THE COURT:  But you do know that the prior witness

5    testified it was a 4?

6            THE WITNESS:  Yes, and he was incorrect.

7            THE COURT:  Okay.  Now, how did you find out that he

8    testified it was a 4?

9            THE WITNESS:  You just told me.

10           THE COURT:  No, I didn't just tell you.  Didn't you

11   also learn that from another source?

12           THE WITNESS:  Learn what, that it was a 4?

13           THE COURT:  No, that the prior witness testified that

14   it was a 4.  Didn't you learn that already?

15           THE WITNESS:  Yes, yes.

16           THE COURT:  And tell us how you learned it.  Because

17   remember, you were excused from the courtroom.  So how did you

18   know that the other witness testified that it was a 4?

19           THE WITNESS:  Because as they was walking, someone

20   was walking out, they was talking when I was sitting in the

21   back.

22           THE COURT:  And who was that person who was talking

23   and walking out?

24           THE WITNESS:  One of the division chiefs.

25           THE COURT:  Okay.  But you were directed to leave the

E. HOLMES - EXAMINATION BY THE COURT

1    courtroom so that you wouldn't hear the testimony of the other

2    witness, correct?

3                **THE WITNESS:**  Correct.

4                **THE COURT:**  But you know the testimony of the other

5    witness, don't you?

6                **THE WITNESS:**  Not because I was in the courtroom.

7    Because they was walking by the courtroom.

8                **THE COURT:**  But you know what the other witness

9    testified to because people were notifying you as to what the

10   testimony was, didn't they?

11               **THE WITNESS:**  Yes, the division chief did, yes.

12               **THE COURT:**  And they weren't supposed to do that,

13   were they?

14               **MS. MARTIN:**  Your Honor, I do want to state for the

15   record --

16               **THE COURT:**  Ms. Martin, would you have a seat,

17   please, and come back and make whatever you have to say after I

18   finish my examination.

19          Now, then, so on this particular point, you were directed

20   to leave the courtroom so that you wouldn't be able to hear

21   what the prior witness testified to.

22               **THE WITNESS:**  Correct.

23               **THE COURT:**  But you knew what the prior witness was

24   saying because people told you, didn't they?

25               **THE WITNESS:**  Yes.

1        **THE COURT:**  Tell us how you knew that and how they

2   told you.

3        **THE WITNESS:**  They basically said that --

4        **THE COURT:**  How did they communicate with you?

5        **THE WITNESS:**  Verbally.

6        **THE COURT:**  Pardon?

7        **THE WITNESS:**  They communicated with me verbally.

8        **THE COURT:**  Right.

9        **THE WITNESS:**  They said --

10       **THE COURT:**  They communicated with you to tell you

11  what that person was saying throughout the testimony, didn't

12  they?

13       **THE WITNESS:**  No, that's not true.  They basically --

14       **THE COURT:**  Well, what did they do then?

15       **THE WITNESS:**  The individual that told me that the

16  person that testified before me said, hey, they got it wrong --

17  he got it wrong about the rating.  He said that it went to a 4.

18       **THE COURT:**  Did anybody text information to you?

19       **THE WITNESS:**  I don't have a cell phone with me.

20       **THE COURT:**  Did anybody text information to you is

21  what I asked you.

22       **THE WITNESS:**  No, not to my knowledge.  I don't have

23  a phone.  My phone is not present with me.

24       **THE COURT:**  Did you borrow anybody's phone?

25       **THE WITNESS:**  No, I did not.

1          **THE COURT:**  So then the people who talked to you

2   about the testimony that was going on in the courtroom talked

3   to you personally?

4          **THE WITNESS:**  Yes.

5          **THE COURT:**  Did you not know that was wrong?

6          **THE WITNESS:**  I did, and that's when I say, I need

7   you to leave out of this room because I don't supposed to --

8   you know, I'm supposed to be in here by myself.

9          **THE COURT:**  And so you definitely reported that to

10  the Court that somebody had sought to educate you as to the

11  questions that had been asked of the previous witness?

12         **THE WITNESS:**  No, I didn't report --

13         **THE COURT:**  Why didn't you report that?

14         **THE WITNESS:**  At the time, I guess when I told them

15  to leave out, I wasn't aware that I should.

16         **THE COURT:**  But before you told them to leave out,

17  didn't they tell you information that the prior witness had

18  testified to?

19         **THE WITNESS:**  That's because they blurted it out.

20  It's not like, hey, come here and let me tell you something.

21  They just blurted it out.

22         **THE COURT:**  And you couldn't stop them?

23         **THE WITNESS:**  No, I couldn't stop them.

24         **THE COURT:**  And you couldn't report them?

25         **THE WITNESS:**  I didn't know to not -- I didn't know

1    of to report them.  Like I said, once they said it, I said,

2    hey, you need to leave out of here before both of us end up

3    being somewhere we don't need to be, and I closed the door.

4           **THE COURT:**  Okay.  And you knew, then, that that was

5    a violation of the Court's order?

6           **THE WITNESS:**  I'm not going to say I knew it because

7    what I'm going to say is by the fact of me telling him to

8    leave, I didn't want to violate the Court's order.

9           **THE COURT:**  I see.  So you were saying that nobody

10   was texting information to you?

11          **THE WITNESS:**  No, I don't have any way to receive a

12   text message.

13          **THE COURT:**  And that you didn't learn any information

14   of the prior witness' testimony through a text, whether it was

15   your phone or somebody else's?

16          **THE WITNESS:**  The information that I received --

17          **THE COURT:**  That answer is yes or no so I can make

18   sure I know what your answer is.

19          **THE WITNESS:**  Okay.  Repeat your question.

20          **THE COURT:**  So then you are saying you didn't learn

21   anything about the prior witness' testimony through a text?

22          **THE WITNESS:**  The person told me was a text, yes.

23          **THE COURT:**  I asked you before, but you said you

24   didn't have a phone, and so you --

25          **THE WITNESS:**  No, I did not have a phone, but the

1    information was texted to that individual.

2           **THE COURT:**  Right.  But I asked you earlier did you

3    learn anything by text, and you told me how you didn't have a

4    phone.

5           **THE WITNESS:**  Right.  You asked me did I receive a

6    text, and I said I didn't have a phone present with me.

7           **THE COURT:**  But you did learn some information

8    through text?

9           **THE WITNESS:**  Yes.

10          **THE COURT:**  And that information was the testimony of

11   the person before you?

12          **THE WITNESS:**  Yes.

13          **THE COURT:**  A violation of the Court's order?

14          **MS. MARTIN:**  Your Honor, I feel like I have to

15   interject at this point.

16          **THE COURT:**  Have a seat, please.  Is that correct?

17          **MS. MARTIN:**  I would like to note an objection for

18   the record.

19          **THE COURT:**  You've got an objection.

20          **THE WITNESS:**  Yes.

21          **THE COURT:**  From what you said already, you are

22   telling me that you knew that that behavior would affect your

23   credibility?

24          **THE WITNESS:**  Yes, I guess that's why I told him to

25   get out of the room.  Yes, I can agree with that.

1          **THE COURT:**  Now let's talk about the rating system.

2    Did you make any telephone calls or have anybody make a

3    telephone call to determine what the rating system is?

4          **THE WITNESS:**  No.

5          **THE COURT:**  Did you know the rating system before you

6    were told that the prior witness said that it was a 1 through

7    4?

8          **THE WITNESS:**  Yes.

9          **THE COURT:**  How did you learn it?

10          **THE WITNESS:**  I learned that because back in 2016,

11    when we had an insurance rating bureau, at that time I was in

12    the Fire Marshal's' office, and we went out with the insurance

13    rating.  So I knew what the rating was, and I knew what it

14    was prior to -- I knew prior to what our rating was before

15    then.

16          **THE COURT:**  How did you know it hadn't been changed?

17          **THE WITNESS:**  Which one?

18          **THE COURT:**  Any of it.  How did you know the rating

19    system hadn't been changed?

20          **THE WITNESS:**  I don't know if the rating system has

21    been changed since 2016.

22          **THE COURT:**  All right.  That's almost 8 years ago.

23          **THE WITNESS:**  Yes.

24          **THE COURT:**  So again, you are testifying that's what

25    the rating system is -- is that today?

 1          THE WITNESS:  As far as my knowledge, that's the

 2     rating as of today.

 3          THE COURT:  I noticed you didn't say as far as your

 4     knowledge.  What I'm saying, though, is, that was 8 years ago,

 5     and you are telling me that to your knowledge, without seeing

 6     it, that has not changed?

 7          THE WITNESS:  That has not changed.

 8          THE COURT:  But you don't know that?

 9          THE WITNESS:  I don't know that.

10          THE COURT:  So when the other witness said it was 1

11     through 4, how do you know he is wrong?

12          THE WITNESS:  Because -- I don't know he is wrong.  I

13     just know he is wrong based off of 2016.

14          THE COURT:  But this isn't 2016, though, is it?

15          THE WITNESS:  Correct.

16          THE COURT:  Okay.  Do you have anything else you

17     learned from this inappropriate communication --

18          THE WITNESS:  No.

19          THE COURT:  -- about what the prior witness testified

20     to?

21          THE WITNESS:  No.

22          THE COURT:  You were reluctant to tell me how you

23     learned that information.

24          THE WITNESS:  I was wanting to get a better

25     understanding of how I needed to answer the question.  When you

1    were asking me the question, I didn't want to answer you

2    incorrectly.

3            **THE COURT:**  Okay.  All right.  Now let's start back

4    with the city attorney.  Counsel.

5            **MS. MARTIN:**  Your Honor, I would just like to note

6    for the record --

7            **THE COURT:**  Do you have any questions for the

8    witness?  And then you can make your other comments after the

9    witness has been excused.

10                    **FURTHER REDIRECT EXAMINATION**

11   **BY MS. MARTIN:**

12   Q.  Mr. -- Chief Holmes, do you have a cell phone on you?

13   A.  No.

14           **THE COURT:**  He already said that.

15           **MS. MARTIN:**  I just want to make it clear for the

16   record that he does not have a cell phone on him.

17   **BY MS. MARTIN:**

18   Q.  Have you had a cell phone with you since you have been in

19   the courtroom today?

20   A.  No.

21   Q.  Is it your understanding from the Court that you were

22   asked to leave the courtroom?

23   A.  Yes.

24   Q.  Did you understand when you were asked to leave the

25   courtroom that that meant that you could not communicate with

1    anyone that was in the courtroom?

2    A.  Yes.

3    Q.  So when the district chiefs were having a -- did Roderick

4    Wilson himself communicate with you?

5    A.  Not --

6    Q.  About his testimony.

7    A.  I wouldn't allow him to because --

8    Q.  Okay.  So when the district chiefs attempted to

9    communicate with you, what was your response?

10   A.  I said, I can't talk to you, man.

11   Q.  Okay.

12        **MS. MARTIN:**  That's all the questions I have here at

13   this time.

14        **THE COURT:**  Any additional cross?

15        **MS. WILSON:**  No, Your Honor.

16        **THE COURT:**  You can step down and be excused.

17        **MS. MARTIN:**  Your Honor, I would like to make my

18   objection --

19        **THE COURT:**  He can step down and be excused.

20        **MS. MARTIN:**  Okay.

21        **THE WITNESS:**  When you say excused, is that out of

22   the courtroom?

23        **MS. MARTIN:**  You can leave.

24        **THE COURT:**  Do you intend to recall him?

25        **MS. MARTIN:**  No, Your Honor.

1          **THE COURT:**  Does the other side intend to recall him?

2          **MS. WILSON:**  No, Your Honor.

3          **THE COURT:**  Then you can stay in the courtroom if you

4    wish or be excused.

5      Now then, do you have an objection?

6          **MS. MARTIN:**  I do, and my objection is based on the

7    fact that this is a status hearing and not an evidentiary

8    hearing, and the fact that if I had known that it was an

9    evidentiary hearing, I would have prepped the witness to ensure

10   that they all knew not to communicate with one another.  But

11   the Court's instruction to the witness was to leave the

12   courtroom.  It was not to not communicate with anyone that was

13   present in the courtroom.

14         **THE COURT:**  He just said that he wasn't supposed to

15   communicate.

16         **MS. MARTIN:**  I think that was his --

17         **THE COURT:**  Did you hear what he said?

18         **MS. MARTIN:**  I heard what he said, but I believe that

19   was his understanding, but it was not what was communicated to

20   him from the Court.

21         **MR. LUMUMBA:**  Court's indulgence.

22         **THE COURT:**  Counsel, you can sit down.  Excuse me.

23   You can sit down.

24      Now, then, go ahead and finish your objection.

25         **MS. MARTIN:**  I just wanted to note that my objection

1    is the fact that this is a status conference and not an

2    evidentiary hearing.  And so, therefore, I do not believe that

3    the communication between the district chiefs and Chief Holmes

4    was inappropriate.  What I would also like to note for the

5    record based on that objection is that what we were prepared to

6    discuss here today had nothing to do with the rating system,

7    and so, therefore, I don't know what other way we would have

8    gotten the information in about the rating system.

9         I planned to ask questions of District Chief Holmes about

10   the rating system.  I did not know what his knowledge would be.

11   But I would like to state that that was not the reason why we

12   were here today.  We were here today for him to testify as to

13   his knowledge of the house fires, what occurred during those

14   house fires, and also for him to testify about his knowledge

15   about the memo.

16        **THE COURT:**  Thank you so much.  But have you

17   forgotten that the witness said that he knew he wasn't supposed

18   to talk to anybody?

19        **MS. MARTIN:**  I have not forgotten it.

20        **THE COURT:**  So then that just undermines everything

21   you just said.

22        **MS. MARTIN:**  Your Honor, I just want to state for the

23   record that my objection is that that information was not

24   communicated to him, and I do not believe it was inappropriate,

25   based on the fact that this is a status conference --

1    **THE COURT:**  Hold it, Counsel.  You are saying that

2    when a witness testifies under oath and when the Court has

3    exercised the rule of sequestration, that the witness can

4    violate that, and you don't think it is a violation?

5    **MS. MARTIN:**  I believe sequestration applies to

6    evidentiary hearings and not to status conferences.

7    **THE COURT:**  What do you think this is --

8    **MS. MARTIN:**  This is a status conference.

9    **THE COURT:**  -- when you start providing information?

10    But you are saying you don't think that that was a violation,

11    even though your witness recognized that it was?  Is that it?

12    **MS. MARTIN:**  I am saying as the attorney for the City

13    of Jackson --

14    **THE COURT:**  Is that it what you are saying?

15    **MS. MARTIN:**  Yes, Your Honor.

16    **THE COURT:**  I just want to know.  Somebody over there

17    told you to say yes?

18    **MS. MARTIN:**  No, I already previously said yes, that

19    it is my belief -- I've stated this several times for the

20    record at this point that this is not an evidentiary hearing.

21    This was not noticed as an evidentiary hearing.  This was

22    noticed as a status conference.  And so the reason why we are

23    here today is not to put on evidence in an evidentiary hearing.

24    We are here today to respond to the Court's request for a

25    status conference.

1    When Your Honor asked us to bring the fire department here

2    today, it was not as evidentiary witnesses.  It was because we

3    noted for Your Honor that there was an issue with fire hydrants

4    that were running dry.  So that is the reason why we appeared

5    here today.

6    So yes, it continues to be my belief that we did not

7    violate the rule of sequestration because this is not an

8    evidentiary hearing.  I maintain that even though I cooperated

9    with the Court's request that we put these individuals on as

10   witnesses, this is a status conference.

11   **THE COURT:**  You also cooperated with the Court when I

12   said excuse the witness, didn't you?

13   **MS. MARTIN:**  I did, Your Honor.

14   **THE COURT:**  And you also know what the rule of

15   sequestration says, don't you?

16   **MS. MARTIN:**  I do.

17   **THE COURT:**  Okay.  Now, I believe that your mayor

18   wants to talk to you, so why don't you go over there and talk

19   to him.

20   **MS. MARTIN:**  Am I permitted to leave the podium?

21   **THE COURT:**  Absolutely.  I just said that.

22   (Ms. Martin confers with Mayor Lumumba.)

23   **MS. MARTIN:**  I will add to his testimony that the

24   reason why the witness knew what the rule of sequestration is

25   is because the mayor actually communicated with him directly

1    that he was not supposed to talk to anybody.

2        So the reason why he had -- I did not prep him for that,

3    so I did not know where that came from.  But the mayor just

4    instructed me that he actually communicated with him and told

5    him during the break that he was not to communicate with anyone

6    who had been in the courtroom.

7            **THE COURT:**  Do you have something else you want to

8    say?

9            **MS. MARTIN:**  I was just going to ask if Your Honor

10    was ready to proceed with -- we don't have any more witnesses.

11    We don't have anybody else to offer for testimony.  What we do

12    have is the list that we provided to Your Honor of

13    organizations, and that's all I have.

14            **THE COURT:**  Then we are going to take our lunch

15    recess.  It is 11:53, almost 12.  We will come back at 1:30.

16    So we will come back, and then I will hear the rest of what you

17    want to present.  And then I will, after that, turn to Mr.

18    Henifin and see if he and his attorney have anything they wish

19    to add.  So we are in recess until 1:30.

20        **(RECESS TAKEN AT 11:53 A.M. UNTIL 1:33 P.M.)**

21            **THE COURT:**  All right.  We are back on record.  What

22    says the city attorney?

23            **MS. MARTIN:**  Your Honor, Torri Martin here on behalf

24    of the City of Jackson.  We have concluded the representatives

25    that we had here for the City of Jackson.  I believe at this

1   time we have representatives from the community, based on the

2   invitation to hear firsthand from them of their concerns

3   regarding transparency and lack of communication.

4        The first representative that is listed is actually Andy

5   Kricun.  We received word from him during a break that he was

6   on the line earlier, but he is speaking at the request of the

7   EPA headquarters at the NACWA, National Association of Clean

8   Water Agency's conference between 2 and 3 p.m. Central today,

9   and so he had to drop off.  However, he said he will log back

10  on as soon as that speaking engagement concludes at 3 p.m.

11       So what I told him, I asked if he would be available

12  between 3:15 to 3:30, and he said he would be available at

13  those times.  But I believe everyone else is here.  There is

14  one correction to the representative for Working Together

15  Jackson.  I want to note that for the record as Bishop Ronnie

16  Crudup.

17       So at this time, we would offer these organizations, but

18  the City is not sponsoring these organizations or their

19  testimony.  They are not witnesses for the City of Jackson.  We

20  have asked them to appear based on the invitation today, and we

21  are consenting to them appearing with their own independent

22  concerns of the third-party manager.

23       So if you would like to hear from them at this time, I

24  believe they are all here.  Would you like for me to call the

25  organizations up?

1          **THE COURT:**  Yes.

2          **MS. MARTIN:**  We can start with Nsombi Lambright with

3     the National Association for the Advancement of Colored People.

4          **(ORAL STATEMENTS OF NSOMBI LAMBRIGHT-HAYNES PRESENTED)**

5          **THE COURT:**  Explain to me what you propose to do.

6          **SPEAKER:**  I am just here to share some of our

7     concerns about the water crisis overall, some of our work and

8     some of our concerns about the third-party administrator.

9          **THE COURT:**  Have you spoken to the third-party

10    administrator?

11         **SPEAKER:**  Not directly, but I have been in meetings

12    with him, and he has participated in a town hall meeting that

13    was sponsored by the NAACP maybe a month and a half ago.

14         **THE COURT:**  So other than voicing your concerns, are

15    you challenging any of his actions?

16         **SPEAKER:**  I would say I'm more coming as a concerned

17    citizen today than challenging actions.

18         **THE COURT:**  Well, I will swear you in anyway, since

19    everybody else so far has been.  Okay?

20         **SPEAKER:**  Okay.

21         **(OATH ADMINISTERED.)**

22         **THE COURT:**  All right.  You may be seated.  Well,

23    let's see, you are not being sponsored by the City or anybody

24    here.  I think you are coming on your own.  Is that correct?

25         **SPEAKER:**  That is correct.

1            **THE COURT:**  All right.  State your full name, please.

2            **SPEAKER:**  Nsombi Ayanna Lambright-Haynes.

3            **THE COURT:**  And Nsombi, I'm referring to you -- I'm

4    going to call you Ms. Lambright, but I was saying Nsombi, that

5    is what derivation, from what country?

6            **SPEAKER:**  I'm sorry.  I didn't understand you.

7            **THE COURT:**  From what country is Nsombi?

8            **SPEAKER:**  I believe it is from Cameroon.

9            **THE COURT:**  All right.  Have you been there?

10            **SPEAKER:**  I have not, unfortunately.

11            **THE COURT:**  I have not either, but I think I have a

12    statue from there.  I have an African mask collection which is

13    authentic.

14            **SPEAKER:**  Oh, wow.

15            **THE COURT:**  And I think I have one of my masks from

16    there.  Now, then, you stay where, your address?

17            **SPEAKER:**  4829 Maplewood Drive in Jackson.

18            **THE COURT:**  Maplewood?

19            **SPEAKER:**  Yes.

20            **THE COURT:**  And where is that located?

21            **SPEAKER:**  Jackson, Mississippi.

22            **THE COURT:**  And whereabout in Jackson?

23            **SPEAKER:**  It's in North Jackson at the intersection

24    of Northside Drive and State Street.

25            **THE COURT:**  And how long have you lived there?

1          **SPEAKER:**  Oh, gosh, almost 20 years.

2          **THE COURT:**  Okay.

3          **SPEAKER:**  I'm sorry.  Over 20 years.

4          **THE COURT:**  Over 20 years?

5          **SPEAKER:**  Yes.

6          **THE COURT:**  We are close enough.

7          **SPEAKER:**  And Judge, I also have to say, I do have

8     dual residences because I also have a home in South Jackson

9     that I share with my husband.  I got married four years ago,

10    and he has a home in South Jackson, and so I kept my North

11    Jackson residence as well.

12         **THE COURT:**  So he knows not to get frisky, right?

13    Because you will go home.  Is that it?

14         **SPEAKER:**  Absolutely.

15         **THE COURT:**  Okay, then.  So what is your occupation?

16         **SPEAKER:**  I'm the director of a nonprofit located

17    here in Jackson.

18         **THE COURT:**  And that nonprofit?

19         **SPEAKER:**  It's called One Voice.

20         **THE COURT:**  One Voice.  Tell me the purpose of One

21    Voice.

22         **SPEAKER:**  The purpose of One Voice is to make sure

23    that citizens in the state of Mississippi have a seat at the

24    table.

25         **THE COURT:**  Okay.  Which table?

1        **SPEAKER:**  At policy tables and tables that represent

2   them and that represent decisions that are being made, policy

3   decisions that are being made about their lives, that impact

4   their lives.

5        **THE COURT:**  How large is the organization?

6        **SPEAKER:**  We have a staff of 17 full-time.

7        **THE COURT:**  And do you have membership?

8        **SPEAKER:**  We do not.

9        **THE COURT:**  Okay.  And how are you funded?

10       **SPEAKER:**  We are funded through foundation grants.

11       **THE COURT:**  Is that a yearly matter?

12       **SPEAKER:**  Yes.  Yeah, most of them have annual

13  renewals.

14       **THE COURT:**  Where is your main office located?

15       **SPEAKER:**  It is located in the Masonic Lodge, which

16  is located at 1072 J.R. Lynch Street.

17       **THE COURT:**  Masonic Lodge.  How long have you been at

18  the Masonic Temple?  Do they still call it lodge or temple?

19       **SPEAKER:**  The technical -- the actual name is

20  M.W. Stringer Grand Lodge.

21       **THE COURT:**  Okay.  How long has your headquarters

22  been there?

23       **SPEAKER:**  Since its inception.

24       **THE COURT:**  And that's how long?

25       **SPEAKER:**  In 2016.

1          **THE COURT:**  2016?

2          **SPEAKER:**  Um-hm.

3          **THE COURT:**  Now, let me see if I remember.  It's only

4     one floor, right?

5          **SPEAKER:**  No, it's actually two floors, and we are

6     located on the second floor.

7          **THE COURT:**  Okay.  And what else is on the second

8     floor?

9          **SPEAKER:**  The state conference, NAACP.

10         **THE COURT:**  That's right.  It is two floors.  Now I

11    remember.  It's been awhile since I've been there.  Okay.  And,

12    of course, you receive your water from the City of Jackson?

13         **SPEAKER:**  Yes.

14         **THE COURT:**  Have you had any water problems?

15         **SPEAKER:**  Yes.

16         **THE COURT:**  Tell me about them.

17         **SPEAKER:**  Well, I guess I can start with growing up

18    in Jackson.  I don't want to take too much of the Court's time,

19    but I did grow up in the city Of Jackson, and so I can remember

20    as far back as being a high school student.  I did graduate

21    from Callaway High School, and I remember getting boil water

22    notices as a high school student, and every time that we would

23    have a winter storm, you know, we would be out of school for

24    maybe a few days or a week at a time, and our water would be

25    off for a few days.  And we didn't get storms that frequently

SPEAKER:  NSOMBI LAMBRIGHT-HAYNES

1    then, and so it may be once or twice a year at that time.  So I

2    can remember, you know, boil water notices and water shut-offs

3    at that time going back to 1990, is when I graduated from high

4    school.  So that's when Jackson water problems began for me.

5         And of course, fast forward to the recent water crisis.

6    You know, we, of course, like every other citizen in Jackson,

7    experienced the water shutdown at both of my homes and did not

8    have access to drinking water or flushable water or water to do

9    anything else with for several weeks.

10        **THE COURT:**  So one home did you say was in North

11   Jackson?

12        **SPEAKER:**  Yes.

13        **THE COURT:**  And you are claiming the address on that,

14   right?

15        **SPEAKER:**  Yes.

16        **THE COURT:**  That's on Maplewood?

17        **SPEAKER:**  Yes.

18        **THE COURT:**  And the second home is where?

19        **SPEAKER:**  927 Woodville Drive.

20        **THE COURT:**  Woodville?

21        **SPEAKER:**  Yes.

22        **THE COURT:**  And then there's the Masonic Lodge.

23        **SPEAKER:**  Absolutely.

24        **THE COURT:**  And you said that you went to high school

25   here?

SPEAKER:   NSOMBI LAMBRIGHT-HAYNES

1          **SPEAKER:**  Yes.

2          **THE COURT:**  So then you would have been out there

3     from time to time at the Masonic Lodge?

4          **SPEAKER:**  Yes.

5          **THE COURT:**  Didn't you call it one time the Masonic

6     Temple too?

7          **SPEAKER:**  Yeah, I probably did.

8          **THE COURT:**  I know I did.  I have some fond memories

9     of the place.  Has it been renovated on the first floor?

10         **SPEAKER:**  Yes, there have been significant

11    renovations on the flooring, and there was some painting done

12    several years ago.

13         **THE COURT:**  What about the stage?  Is the stage still

14    on the first floor?

15         **SPEAKER:**  Yes, in the auditorium.  Yes.

16         **THE COURT:**  Okay.  I think the last time I was over

17    there, it has been quite awhile ago, it was when there was an

18    honor ceremony for Henry Kirksey.  His daughter was here, and

19    Karen met with me, and we went out -- well, we didn't go

20    together, but we spent some time out there together.  We had

21    gone to law school together.  But anyway, that was out there at

22    the Masonic Lodge.  So have they done anything with the stage?

23         **SPEAKER:**  The only thing that I can remember changing

24    with the stage is some new curtains maybe about ten years ago.

25    Oh, and some new lights.

SPEAKER:   NSOMBI LAMBRIGHT-HAYNES

1          **THE COURT:**  Okay.  You know the history of that

2    place?

3          **SPEAKER:**  Oh, yeah.

4          **THE COURT:**  Do you know the role it played in civil

5    rights?

6          **SPEAKER:**  Medgar Evers' funeral was held in that

7    auditorium.  And it has -- was also the place of a number of

8    significant civil rights occurrences.

9          **THE COURT:**  I just talked about Henry Kirksey, and,

10   of course, Medgar, it's a very bitter, bitter memory.  So when

11   Medgar passed away, do you recall what happened after he died,

12   all the rioting that went on downtown?

13         **SPEAKER:**  Yes.

14         **THE COURT:**  Did you participate in that?

15         **SPEAKER:**  No.  I'm afraid I wasn't born during that

16   time.

17         **THE COURT:**  Oh, wow.  I'm just really aging myself,

18   am I not?

19         Well, as I said, I have a lot of memories from there,

20   especially with Medgar, and because that's where he launched

21   his last demonstration that I was a part of.  And so, as I said

22   before, before that, so I have a lot of history on what was

23   happening down there.  And also, on that first floor, right

24   before the stage, where it used to be, there were some law

25   offices.

1          **SPEAKER:**  Absolutely.

2          **THE COURT:**  And I spent a lot of time at those law

3     offices too.

4          Now, let's talk about this matter here.  Now, you were

5     telling me that you have had some problems for a very long

6     time.  Is that it?

7          **SPEAKER:**  Yes.

8          **THE COURT:**  Have the problems gotten better or worse

9     in the last 3 or 4 months?

10         **SPEAKER:**  I would say they have been about the same

11    in terms of the quality of water.  I have water.

12         **THE COURT:**  Okay.  What about water pressure?

13         **SPEAKER:**  I have water pressure.  You know, it

14    varies --

15         **THE COURT:**  Okay.

16         **SPEAKER:**  -- from day-to-day.  You know, when I think

17    about shower pressure and that sort of thing, it varies.  And

18    when I look at the color and consistency of the water, I have

19    not drank Jackson water in years, because when I look at the

20    water and I look at the consistency -- and I do a lot of

21    traveling for my job, and when I go other places and I look at

22    the water in other places, it looks a lot different than

23    Jackson water.  It's clearer.  I can see through it.

24         Even when I look at my mom's water in Brandon,

25    Mississippi, it looks a lot different than Jackson's water and

SPEAKER:   NSOMBI LAMBRIGHT-HAYNES

1   so --

2          **THE COURT:**  When is the last time you made this

3   comparison?

4          **SPEAKER:**  Let me see.  I went to my mom's house last

5   Sunday.

6          **THE COURT:**  Okay.

7          **SPEAKER:**  And washed her dishes for her.

8          **THE COURT:**  Okay.

9          **SPEAKER:**  So, yeah, I see it quite often.  And so,

10  like I said, I have not drank Jackson water in -- I can't

11  remember the last time.

12         **THE COURT:**  So you don't have much confidence in it

13  is what you are telling me?

14         **SPEAKER:**  No.

15         **THE COURT:**  Okay.

16         **SPEAKER:**  In addition to that, Judge, I am a

17  three-year breast cancer survivor.  I am also -- I've also

18  always had problems with eczema, which is a skin condition.  I

19  also have a 27-year-old son who was born here in Jackson.  He

20  graduated from Lanier High School, which I think is your alma

21  mater.

22         **THE COURT:**  They beat us in basketball.

23         **SPEAKER:**  Uh-oh, my apologies.  My apologies.

24         **THE COURT:**  That's right.  Please make it.  They are

25  the ones that kept us from being state and national champs.

SPEAKER:   NSOMBI LAMBRIGHT-HAYNES

1          **SPEAKER:**  I'm sorry.  My son did also play

2   basketball.

3          **THE COURT:**  But let me just say this, though, in case

4   there are any Bulldogs around here.  I said that if my team

5   could not win, I wanted them to, because I grew up with all of

6   them when we were on the north end, and later when I was on the

7   south end and all of that.  So if my team couldn't win, I

8   wanted the Bulldogs to win.

9          **SPEAKER:**  Agreed.  I feel the same way.

10         **THE COURT:**  And they definitely did that.  I beat

11  them for three years, and they beat me for the one that

12  counted.

13         **SPEAKER:**  Oh, there we go.

14         **THE COURT:**  All right.  Now, what I'm saying about

15  three years, I'm saying when I was a peewee, when I was a

16  junior, in junior high and all of that, I led my team in every

17  category and we beat them.  But when we got to high school,

18  they dusted me off.  And I didn't get too mad.  I just cried.

19         **SPEAKER:**  Okay.

20         **THE COURT:**  Now, then, so your son is what?

21         **SPEAKER:**  Oh, I would just say that my son also

22  suffers from eczema, so we both have this skin condition.  And

23  I noticed -- and I have not had this confirmed by a physician,

24  but I noticed that when we traveled to other places, that we

25  don't have these problems with our skin.

SPEAKER:  NSOMBI LAMBRIGHT-HAYNES

1              THE COURT:  I see.  Okay.  Only in Jackson?

2              SPEAKER:  Only in Jackson.

3              THE COURT:  Okay.

4              SPEAKER:  So those are just some of the concerns that

5    I have -- that I continue to have about Jackson's water.

6              THE COURT:  Now, you don't like the color, right?

7              SPEAKER:  Well, yeah, the cloudiness.

8              THE COURT:  That's what it is, cloudiness?

9              SPEAKER:  Yes.

10             THE COURT:  Okay.  What else?  Cloudiness, the eczema

11   that erupts.  What else?  What about the taste?

12             SPEAKER:  Water tests?  Yeah.

13             THE COURT:  Taste.

14             SPEAKER:  Oh, taste.  Like I said, I have not tasted

15   Jackson's water in --

16             THE COURT:  Because you say you don't drink it?

17             SPEAKER:  Correct.

18             THE COURT:  What about showers?  Do you take showers

19   in it?

20             SPEAKER:  Yes, and that's what I was referring to in

21   terms of the eczema.  So when I bathe with Jackson's water, I

22   have issues with my skin, with breakouts, both myself and my

23   son.

24             THE COURT:  Is the water really amenable to lathering

25   up soap?  Is it soft water or hard water?

SPEAKER:  NSOMBI LAMBRIGHT-HAYNES

1          **SPEAKER:**  It feels grainy sometimes.

2          **THE COURT:**  Okay.  Anything else you want to tell me

3    about the water?

4          **SPEAKER:**  That's about it.

5          **THE COURT:**  Now, have you called and reported this to

6    anybody?

7          **SPEAKER:**  Not recently.

8          **THE COURT:**  When is the last time you called and

9    reported?

10         **SPEAKER:**  During the last EPA hearing.

11         **THE COURT:**  Okay.  And how long ago was that?

12         **SPEAKER:**  This was maybe back in April.

13         **THE COURT:**  Okay.  And what did you say when you

14   called in?

15         **SPEAKER:**  There was actually an in-person meeting at

16   the JSU e-Center that we were allowed to talk about some of our

17   concerns about, you know, moving forward and some of the things

18   that we wanted to see done.

19         **THE COURT:**  And did you testify, make a statement?

20         **SPEAKER:**  I think I put my concerns in writing.  I

21   didn't speak, but I put my concerns in writing.

22         **THE COURT:**  And what did you say?

23         **SPEAKER:**  A lot of what I've said today in terms of

24   some of the concerns.  I also asked for water filters to be

25   provided.  We also asked for the water system to be managed in

1   Jackson.

2              THE COURT:   Okay.

3              SPEAKER:   We wanted to make sure that the Jackson

4   water system is run by Jacksonians.   And that's one of the

5   reasons why I wanted to come today.   And so when I received the

6   notice about this hearing as the Jackson NAACP president, one

7   of our concerns during the town hall meeting at New Hope Church

8   that was held in May was about making sure that Jackson's water

9   was not privatized and that Jackson's water management remain

10  in the City of Jackson.   So those were some of the concerns

11  that we raised during that town hall, and those are some of the

12  concerns that we have today about JXN Water.

13             THE COURT:   Now, why would you concentrate on having

14  someone from outside of Jackson when you said that Jackson has

15  had problems all along?

16             SPEAKER:   Well, you know, for me, it goes back to

17  what we just talked about in terms of walking in that building

18  at 1072 Lynch Street.   When I walk in that building every day,

19  you know, I can't help but to think about some of those

20  sacrifices that Mr. Kirksey and Mr. Evers made for us, and I

21  just believe that they would want Jackson water to be run and

22  managed in Jackson.

23             THE COURT:   Now, how would you say that?   Did you

24  know them personally?

25             SPEAKER:   I knew Mr. Kirksey.   I can't say I knew Mr.

1    Evers.  I feel like I know Mr. Evers.  When I walk in that

2    building every day, I feel like his spirit is still there.  And

3    I know Mrs. Evers and I know Reena Evers very well.  But I'm

4    blessed to say I got the opportunity to meet Mr. Kirksey on the

5    campus of Tougaloo College, and I got a chance to meet him when

6    he was advocating for the parkway not to be built through

7    Jackson State's campus.  I was a student at Tougaloo College

8    during that time, and I went to many of his community meetings

9    during that time.

10          **THE COURT:**  Well, I knew both then, and I

11   demonstrated under Medgar Evers, his last demonstration, in

12   fact.  And as far as Kirksey, I was his campaign manager for

13   him to become senator, state senator, so I wrote a whole lot of

14   his stuff, like his speeches and everything else.  So I knew

15   him extremely well.  But anybody that's asked you did you know

16   either one, and you said that you just knew Kirksey from afar.

17   And you met him, I guess, when Tougaloo built a house out there

18   for him.  Is that correct?  You know Tougaloo built a house out

19   there one time for Senator Kirksey?

20          **SPEAKER:**  Yes.

21          **THE COURT:**  And he was glad to be provided that

22   donation when they did that.  But anyway, what else -- but I

23   asked you a question a few moments ago.  I asked you if

24   Jackson's water has had problems all of these years, ever since

25   you were back in high school, and at one time during that whole

SPEAKER:  NSOMBI LAMBRIGHT-HAYNES

1    time period, the folk from Jackson was in charge, why, then,

2    would you think that somebody from outside the state couldn't

3    do as well?

4            **SPEAKER:**  I think that it should be fixed within the

5    City.

6            **THE COURT:**  What do you mean by "in the City"?

7            **SPEAKER:**  I think that the problems have never been

8    addressed adequately.  I think that there have been requests

9    for assistance from the State that have not been honored, that

10   have not been met, and that Jackson has never had a fair shot

11   to fix its water system.  And I think that now we have that

12   opportunity, but I believe as a citizen, and I'm just speaking

13   as a citizen, I'm not a water expert, I'm not a scientist, just

14   as a plain ole citizen, I want Jackson's water management to

15   stay in Jackson.

16           **THE COURT:**  Okay.  But you know nothing about

17   qualifications?

18           **SPEAKER:**  No.

19           **THE COURT:**  Okay.  All right, then.  Is there

20   anything else you want to add?

21           **SPEAKER:**  The only other thing that I would like to

22   add, as president of the branch, and I'm just trying to

23   remember some of the concerns that our members have brought to

24   us, so I'm trying to remember everything while I'm here, is

25   that they would like more transparency.

SPEAKER:   NSOMBI LAMBRIGHT-HAYNES

1        We have started receiving the letters that have come from

2   JXN Water, and the letters that residents have received

3   indicate a quality of water report.  However, the feedback that

4   we have received from our members is that they don't understand

5   what that report means.

6        And so they would like more transparency from JXN Water in

7   terms of understanding what that report means in terms of the

8   quality of water.  And there were also ongoing concerns about

9   the billing system.  And those are the only concerns that I

10  recall at this time.

11          **THE COURT:**  Okay.  Now, on this matter about the

12  reports, did you see any of these reports prior to now?

13          **SPEAKER:**  Yes.

14          **THE COURT:**  Did you have questions about what they

15  meant?

16          **SPEAKER:**  The reports -- yeah, they were -- yes, they

17  were pretty long and confusing in the past as well.

18          **THE COURT:**  So has there ever been a time period when

19  those reports were not confusing?

20          **SPEAKER:**  No.  I have never understood the reports.

21          **THE COURT:**  Okay.  So it's just the same as it has

22  always been, in other words?

23          **SPEAKER:**  I guess you can say that.

24          **THE COURT:**  What about the billing system?  Have you

25  ever understood the billing system?  Do you understand how

SPEAKER:  NSOMBI LAMBRIGHT-HAYNES

1  Jackson bills its residents?

2       **SPEAKER:**  Personally, I haven't had a problem with

3  the water bill, but I know that that has been a long concern

4  for other residents.

5       **THE COURT:**  When you say long concern, that means

6  this is something that has gone on for a while, a long while?

7       **SPEAKER:**  Um-hm.

8       **THE COURT:**  Pardon?

9       **SPEAKER:**  Yes, correct.  You know, however, we have

10  another management system, so things are supposed to be better

11  now, and so this is the place where we have money in from the

12  EPA, so people are saying, hey -- Judge, the thing that we hear

13  most at our NAACP meetings is that, hey, we have all of this

14  federal money now, things are supposed to be better.  And when

15  things don't start getting better, people start complaining

16  more.  And so I'm just bringing concerns that we receive --

17       **THE COURT:**  I gotcha.  Now, over what period of time

18  do you expect things to drastically change?

19       **SPEAKER:**  I know change takes awhile, and that's why

20  I ask for more transparency, because sometimes when you --

21       **THE COURT:**  What's your gauge on it, as to when you

22  would expect it?

23       **SPEAKER:**  I have no idea, and that's why you have to

24  continue to engage in transparency so that people can know,

25  hey, these are the steps that we are taking, and it's going to

1    take this long, and you know, it's not going to be five years.

2    It may be another ten years.  So people need to know that.

3                 **THE COURT:**  Okay.  I can agree with that on

4    transparency.  Well, let's see if any of these people here have

5    a question for you.

6                 **SPEAKER:**  That's it.

7                 **THE COURT:**  Okay.  Anything over here?

8                 **MS. WILLIAMS:**  No, Your Honor.

9                 **THE COURT:**  What about back here?

10                **MR. KUCIA:**  No, Your Honor.

11                **THE COURT:**  Then let's go over here.

12                **MS. WILSON:**  No, Your Honor.

13                **THE COURT:**  Then let's go back there.

14                **MS. MARTIN:**  No, Your Honor.

15                **THE COURT:**  Thank you for coming forward.

16                **SPEAKER:**  Thank you, Your Honor.

17                **THE COURT:**  And I have to get back out to the Masonic

18   Temple.

19                **SPEAKER:**  You are welcome anytime.

20                **THE COURT:**  It has a lot of memories for me.  Be

21   careful.

22       The next person on that list or the next organization on

23   that list, Waikinya Clanton.

24                **MS. MARTIN:**  I believe we just had word that Waikinya

25   Clanton had to leave.

1          **THE COURT:**  From Southern Poverty Law Center.

2          **MS. MARTIN:**  But I'm hearing now that there's a

3     witness statement that has been offered for Your Honor.

4          **THE COURT:**  Let me see it, please.  Now, who took the

5     statement or picked up the statement?

6          **MS. MARTIN:**  I'm not sure.  What I'm getting is that

7     she left that statement because she had to leave.  It's from

8     Waikinya Clanton from the Southern Poverty Law Center.

9          **THE COURT:**  Do you know her?

10         **MS. MARTIN:**  I know who she is.  I've met with her

11    before.

12         **THE COURT:**  And this statement, are you satisfied

13    that it is her statement?

14         **MS. MARTIN:**  I didn't even look at it.

15         **THE COURT:**  I state that because it's not signed.

16         **MS. MARTIN:**  That's what I would be looking for is a

17    signature.  I can request that she submit a statement that's

18    executed.  But she did not hand it to me.  I know she was in

19    the courtroom when we came back from lunch.  I'm assuming she

20    had to leave before we got to her.

21         **THE COURT:**  Upon that representation, I will read

22    this statement.

23         **MS. MARTIN:**  Okay.  She was here in the courtroom,

24    definitely.

25         **(WRITTEN STATEMENT OF WAIKINYA CLANTON PRESENTED)**

1          **THE COURT:**  I will make this a part of the record,

2     and I will just summarize it in this fashion.  This is from

3     Waikinya J.S. Clanton of the Southern Poverty Law Center in

4     Mississippi, and she thanks the Court for the opportunity to

5     voice questions and concerns regarding the City of Jackson's

6     water system.  She opines that the residents of Jackson have

7     been reduced to no more than pawns in a grueling game of chess

8     between the City and the State.  And because of that, she says

9     it has been unfair to the citizens of Jackson.

10         She says there's a first round of federal funding which

11    has made its way to Jackson, but it's not without issues.  The

12    people should be able to trust their government just as they

13    should be able to trust their water supply, but sadly, here in

14    the capital city, that is simply not the case.  She says that

15    the process surrounding the water crisis has been anything but

16    transparent.  The people have a right to a fair and

17    unobstructed process regarding a problem that continues to

18    plague every aspect of their lives.

19         Then she says that the people here in Jackson are most

20    impacted when crises impact the city, and they deserve the

21    dignity of fair and adequate representation of their needs on

22    every issue, especially when it comes to the quality of life

23    for themselves and their families.  The welfare of their

24    children's schools, their places of employment, houses of

25    worship and other places they gather all hang in the balance as

1    we consider the best way to move forward.

2        And she says that every aspect of life in this community

3    has been disgraced by what we are experiencing here in Jackson.

4    This courtroom has the power to make necessary and lasting

5    changes that address the needs and adheres to the will of the

6    people of this community, that is, to clean the water and keep

7    it public.  The voice of the people should not be ignored in

8    this matter.  The people deserve a seat at the table at every

9    phase of this process, and we ask this Court to support the

10   will of the people of this city.

11       She says, it is unfathomable to me that the city of

12   Jackson, since 2020, has experienced more than 300 boil water

13   notices all because the people have been used as political

14   pawns.  The residents and businesses of Jackson deserve to live

15   and thrive in healthy and environmentally safe communities.  No

16   one should have to question the quality and safety of their

17   water supply.  Clean and sanitary water is a basic human right.

18   Local, state and federal leaders must work together in the best

19   interest of all Mississippians to ensure that there is a viable

20   long-term solution to Jackson's water problems.

21       This is her statement.  I'll make this a part of the

22   record.

23       Now, let's call upon the next witness.  I think it is

24   Northeast Jackson Residents, an organization representing

25   Northeast Jackson residents.

SPEAKER:   DOMINIC DELEO

1        **MS. MARTIN:**  Your Honor, I believe it is three

2   residents that are listed:  Dominic Deleo, Brooke Floyd, and

3   Candice Abdul Tawwab.

4        **THE COURT:**  Okay.  Are they here?

5        **MS. MARTIN:**  I believe so, Your Honor.

6        **THE COURT:**  You know, I'm going to dispense with the

7   oath since we're just hearing what your opinion should be and

8   what your concerns are.  I thought that might be something that

9   was more controversial.  It is not at this juncture.  So let me

10  hear what you have to say.  If I need to put you under oath, I

11  will put you under oath later.  So go ahead on.  State your

12  name, please.

13       **(ORAL STATEMENTS OF DOMINIC DELEO PRESENTED)**

14       **THE COURT:**  State your name, please.

15       **SPEAKER:**  Dominic Deleo.

16       **THE COURT:**  All right.  That is spelled D-E-L-E-O?

17       **SPEAKER:**  That is correct.

18       **THE COURT:**  You stay on Berkley Drive?

19       **SPEAKER:**  Yes.

20       **THE COURT:**  Where is Berkley Drive?

21       **SPEAKER:**  It is in an area that used to be called

22  Leftover, and it is now called Loho.

23       **THE COURT:**  Okay.  Do you pronounce it Berkley or do

24  you pronounce it Barkley?

25       **SPEAKER:**  Berkley.

SPEAKER:   DOMINIC DELEO

1          **THE COURT:**  And your occupation?

2          **SPEAKER:**  I work both for organizations and as a

3      consultant, but I work in communications.

4          **THE COURT:**  What type of communications?

5          **SPEAKER:**  Doing websites, sometimes policy research,

6      social media.  I'm presently employed by the CDC Foundation.

7          **THE COURT:**  What does that stand for, CDC?

8          **SPEAKER:**  The Center for Disease Control, like the

9      COVID people.

10         **THE COURT:**  Yes, I thought that's what it was, but I

11     didn't know you were with that CDC.  How long have you been

12     with them?

13         **SPEAKER:**  Just a little over a year now.

14         **THE COURT:**  And your primary function there?

15         **SPEAKER:**  Communications coordinator, same kind of

16     work.

17         **THE COURT:**  Okay.  Now, you wanted to come forward

18     and say something about your concerns relative to the water?

19         **SPEAKER:**  Yes, if I could, and I will try and keep it

20     short.

21         **THE COURT:**  Let's start off with, have you registered

22     your comments to anybody so far?

23         **SPEAKER:**  I have not, although I thought there might

24     be an opportunity to submit a written version of what I'm going

25     to say.  I'm not sure if that is true or not.

1          **THE COURT:**  Well, have you talked to any persons

2    involved in this litigation here?  There are quite a few

3    involved in the litigation.

4          **SPEAKER:**  In the litigation, no, Your Honor.

5          **THE COURT:**  Have you talked to anybody, period, in

6    administration or power?

7          **SPEAKER:**  Yes, I have been on some of the calls that

8    the Rapid Response Coalition has had, so I've been -- although

9    I'm not a member of their organization or any of the

10   organizations that are a part of that coalition, and also some

11   of the calls that the Jackson Undivided Coalition had.

12         **THE COURT:**  All right.  And do you know any of the

13   other persons who are listed as potential speakers today?

14         **SPEAKER:**  I do know the previous witness a little

15   bit, and I'm not sure who else is going to speak.

16         **THE COURT:**  How do you know her?

17         **SPEAKER:**  I've worked for nonprofits in the area and

18   often interacted with her on a variety of different issues.

19         **THE COURT:**  Did you all discuss any parts of your

20   expected statements or words?

21         **SPEAKER:**  No, I haven't.

22         **THE COURT:**  Okay.  Now, tell me, what are your

23   concerns that you wish to enumerate for the Court?

24         **SPEAKER:**  If I could start with -- I mean, I feel

25   like this problem, the infrastructure problem, the water

SPEAKER:  DOMINIC DELEO

1    crisis, it has been going on for a long time.  I've lived here

2    15 years.  I remember talking to someone in the public works

3    department 10 or 11 years ago, and he told me that half the

4    water that was being treated because of bad pipes was getting

5    lost, and that that was just something that eventually had to

6    be dealt with, but, you know, that was a long-term problem, and

7    there wasn't any money to fix it.

8             **THE COURT:**  He said no one could fix it?

9             **SPEAKER:**  I'm sorry?

10            **THE COURT:**  You said he said that no one could fix

11   it, or did you say that it simply had not been fixed?  I didn't

12   understand you.  Did you say that no one could fix it?

13            **SPEAKER:**  No, no, that there was no funding.

14            **THE COURT:**  Okay.  Start me back over.  You talked

15   with somebody with what organization?  Public works, you said?

16            **SPEAKER:**  Yes.

17            **THE COURT:**  And that person told you what?

18            **SPEAKER:**  That there was a problem even back then

19   that the pipes, the distribution pipes were leaking, and that a

20   lot of water that was treated on the way to residents would get

21   lost because of leaky pipes.

22            **THE COURT:**  How long ago was this conversation?

23            **SPEAKER:**  I don't know the exact date, Your Honor,

24   but probably ten years ago.

25            **THE COURT:**  And this conversation that you had with

SPEAKER:   DOMINIC DELEO

1   somebody with this division of the City, how do you know that

2   person had the authority and the knowledge to know what that

3   person was talking about?

4           **SPEAKER:**  I understand I'm in a courtroom, and that's

5   probably just hearsay.  I'm just saying that that was something

6   I think was understood ten years ago, you know, by anybody who

7   asked a lot of questions.  I wasn't a journalist at the time,

8   but I was writing some opinion pieces in the *Jackson Free*

9   *Press*, and that was the occasion to kind of talk with this guy

10  to understand.  It's also about the time that the Siemens

11  contract was being done, so I was sort of curious about that as

12  well.

13          **THE COURT:**  Did you write some pieces for the *Jackson*

14  *Free Press*?

15          **SPEAKER:**  I think I did.  Yes, I would have to go

16  back.

17          **THE COURT:**  And did they concern the water matter?

18          **SPEAKER:**  Yes.

19          **THE COURT:**  All right.  And did you write more than

20  one piece?

21          **SPEAKER:**  If -- and it's awhile ago.  I think it was

22  just one.

23          **THE COURT:**  And how was your piece received by the

24  public, if you know?

25          **SPEAKER:**  I don't think I got any feedback on it, to

1    be honest.

2              **THE COURT:**  Okay.  Was that a specific target for

3    *Jackson Free Press*, the water matter in Jackson, or was this

4    piece you wrote just simply a side piece to some other things

5    that you were doing?

6              **SPEAKER:**  I'm not sure I understand your question,

7    Your Honor.

8              **THE COURT:**  Well, at the time, did *Jackson Free Press*

9    have a mission to address the water issue in Jackson?

10             **SPEAKER:**  As a -- as an alternative newspaper or --

11             **THE COURT:**  Yes, as a journalistic concern.

12             **SPEAKER:**  Yes, at the time especially around the time

13   of the Siemens contract, I think they were writing a lot about

14   it.

15             **THE COURT:**  Okay.  And you wrote on the Siemens

16   matter too?

17             **SPEAKER:**  I'm sorry.  Say that again, sir.

18             **THE COURT:**  Did you write on the Siemens matter too?

19             **SPEAKER:**  Yes.

20             **THE COURT:**  Okay.

21             **SPEAKER:**  I'm saying yes, but I think it was all in

22   the same piece.

23             **THE COURT:**  Okay.  So now let me move you on to your

24   present concerns about the water matter.

25             **SPEAKER:**  Right.  And if I may, Your Honor, the whole

SPEAKER:   DOMINIC DELEO

1   reason I was kind of interested in that issue is it seemed at

2   the time, ten years ago, insane to me that we were so worried

3   about how much we measured water usage, when a lot of the water

4   that we treated was just going back into the ground, and that

5   we were about to spend, at the time, $90 million on that

6   contract.  And I think over the term of the Siemens contract,

7   the City will have spent, what I've read, so I haven't figured

8   this out myself, but what I've read is $400 million over the

9   course of I guess the loan for the Siemens contract.  So that

10  was my interest.

11       Do you want me to proceed with my other concerns?

12           **THE COURT:**  Go right ahead.

13           **SPEAKER:**  I agree with the groups that are saying

14  that there needs to be more transparency.  I would also say

15  that I don't think the communications part of JXN Water has

16  been as strong as it could be.

17       Having said that, I have the utmost respect for Mr.

18  Henifin.  I feel like he was dropped into a plane that was

19  about to crash and has safely landed it, or he was a medic on

20  the battlefield and he was doing triage.  I understand there

21  wasn't always time to involve everyone.

22       I would like to also say I probably went to 75 percent of

23  the public meetings he had.  I went to a lot, especially in the

24  beginning, a lot of the meetings that he held in the different

25  wards.  And he was very active, and he was very active with

SPEAKER:   DOMINIC DELEO

1    many of the groups that would like to speak today.  I think he

2    was communicating with them.  I know that because they told me

3    that.

4         I have heard or I have seen that that communication has

5    lessened a lot in probably the last 3 to 4 months.  And I know,

6    just as a resident, I mean, I'm someone who is interested in

7    all of this and wants to see it resolved, but I know often I

8    feel like I would know meetings way before the average resident

9    would because I'm interested in all of this stuff, and often, I

10   don't know, someone will text me and say, Do you know about

11   this meeting?  And I'll say, no, I have Mr. Henifin's e-mail

12   address.  And I will shoot him an e-mail and get a response,

13   Oh, that been rescheduled.  I find that out sometimes, what I

14   didn't even know to begin with.  I'm not saying I'm any kind of

15   special person that I should know, but I've been in many of the

16   meetings.  I'm probably on a couple of e-mail lists.  I think

17   that could be better.

18        I work in communications.  Communications can always be

19   better.  You can always do more.  You know, people have busy

20   lives.  They are not always able to go to meetings and are not

21   always aware of what is happening.  So that's one of my

22   concerns.

23        I have some other ones.  I think the one I would

24   concentrate on for the Court is, when he wrote his first -- I

25   forget the actual name, I think it's the financial plan for you

SPEAKER:   DOMINIC DELEO

1    that was submitted at the end of January, he, I'm going to say

2    suggested, but I felt like he had already made the choice that

3    the best way for the long-term stability of the system was to

4    change the billing system or the billing method and to use

5    either property assessment or some other framework other than

6    actual water usage.  That's something I've thought for a long

7    time was the best thing for Jackson and the most equitable way

8    for these problems to be solved.

9        I also told him at the time, I suggested to him that I

10   thought it ought to be, instead of being a monthly bill that we

11   had to collect, that the City had to collect every month, that

12   it ought to be put on the tax rolls.  And I realize, I

13   understand that would require some law changes.

14       I do find it troubling that right after he made all of

15   those public statements and he said he thought that was the

16   best way to do it, that our legislature, for some reason,

17   decided they would tell him he couldn't do that, that he could

18   only charge by water usage.  That's very concerning to me.

19       I will end there.  I don't want to take the Court's time

20   up too much.  I don't know if Your Honor has any other

21   questions for me.

22            **THE COURT:**  No.  Just like I asked the other person,

23   do you have anything else you want to add?

24            **SPEAKER:**  No.

25            **THE COURT:**  Is there anything you want to say about

SPEAKER:  BROOKE FLOYD

1    the quality of the water, for instance?

2         **SPEAKER:**  We were lucky.  Even when we -- even when

3    we didn't have water, I think when it came back on, we were

4    often one of the areas that got water sort of the quickest,

5    but ...

6         **THE COURT:**  Okay.  So then you are not making a

7    complaint on the texture of the water relative to taste or

8    feel?

9         **SPEAKER:**  No.

10        **THE COURT:**  Or color or anything else?

11        **SPEAKER:**  No.  I mean, other than when we were in

12   crisis, we followed what Mr. Henifin and JXN Water suggested to

13   do or the Department of Health suggested to do.

14        **THE COURT:**  Okay.  Thank you so much.

15        **SPEAKER:**  Thank you, Judge.

16   **(ORAL STATEMENTS OF BROOKE FLOYD PRESENTED)**

17        **THE COURT:**  Brooke Floyd Kelton.  I'm sorry, not

18   Brooke Floyd Kelton -- that's a street.  Oh, I see what it is.

19   Brooke Floyd, then there's a comma here, and then it's Kelton

20   Drive. Come on up.  I'm sorry, Ms. Floyd.  I didn't see the

21   comma.  Now, then, I've already answered the question about

22   your address.  Kelton Drive.

23        **SPEAKER:**  Yes, Kelton Drive.

24        **THE COURT:**  So then let me ask you then, what is your

25   occupation?

1      **SPEAKER:**  Right now I am the director of Jackson

2    People's Assembly here in Jackson.

3      **THE COURT:**  Jackson People's Assembly.

4      **SPEAKER:**  Yes, sir.

5      **THE COURT:**  What do you do?

6      **SPEAKER:**  I help organize community meetings, I get

7    people involved in their local government, give them access to

8    the correct information, and help people get out and vote.

9      **THE COURT:**  Okay.  And have you been successful?

10      **SPEAKER:**  I think so.

11      **THE COURT:**  And your efficiency rating, if you have

12    one that you've placed upon yourself?

13      **SPEAKER:**  Efficiency rating as far as attendees to

14    meetings and giving people access or determining folks voting?

15      **THE COURT:**  That's right.  And your ultimate goal?

16      **SPEAKER:**  To get people involved in their government?

17      **THE COURT:**  Yes.

18      **SPEAKER:**  Oh, we have been very successful.

19      **THE COURT:**  You have?

20      **SPEAKER:**  Yes.

21      **THE COURT:**  How do you reach the people?

22      **SPEAKER:**  Knocking on doors, calling, texting, going

23    into their neighborhoods when we have a crisis as we had, as

24    started August 29th.  We helped pass out water, asked people

25    what their needs were, went to their homes.  When we had the

SPEAKER:  BROOKE FLOYD

1    tornadoes two or three weeks ago, a month ago, we gave people

2    hot meals when they needed it, ice when they needed it.  So if

3    you meet people where they are, they are going to show up.

4           **THE COURT:**  Are you a nonprofit?

5           **SPEAKER:**  Yes, sir.

6           **THE COURT:**  So then you get most of your money, if

7    not all of it, from philanthropic sources?

8           **SPEAKER:**  Yes, and grants.

9           **THE COURT:**  Are these bi-annual, annual or

10   multi-annual or what?

11          **SPEAKER:**  They are all different.  You have one-time

12   grants that will only fund you for a little bit, and then you

13   will have some that will continue on if you continue to do the

14   work.

15          **THE COURT:**  Okay.  So then during the water crisis,

16   you say you passed out water?

17          **SPEAKER:**  Yes, sir.

18          **THE COURT:**  Where did you buy the water from?

19          **SPEAKER:**  People donated money for us to purchase

20   water.  It's not just my organization.  With that, that was a

21   large-scale effort where we worked with lots of different

22   organizations in the coalition, with the Mississippi Rapid

23   Response Coalition.

24        But we received donations from all over the United States

25   and purchased water.  We were also given water.  People

SPEAKER:   BROOKE FLOYD

1    actually brought truckloads of water.  And so we were able to

2    pass out water to residents here in Jackson.

3              **THE COURT:**  Did you ever pass out any information

4    about the quality of water in Jackson?

5              **SPEAKER:**  Yes, we did.

6              **THE COURT:**  And what did that information say?

7              **SPEAKER:**  Well, we got our information directly from

8    the CDC and the EPA on how to maintain safe standards when your

9    water quality has gone down, how to be safe during that time,

10   how to wash your hands, how to maintain safe, how to boil your

11   water correctly, and keep your -- well, keep your health safe,

12   but how to be able to consume your water, and what the water

13   quality would look like if it is okay.  And we also passed out

14   water testing kits to the residents so they could test their

15   own water at home once they got water access again.

16             **THE COURT:**  Okay.  So is it fair to say you followed

17   closely this entire crisis?

18             **SPEAKER:**  Oh, yes.

19             **THE COURT:**  Okay.  And did you speak to anybody

20   concerning this lawsuit about that water crisis?

21             **SPEAKER:**  Concerning this today?

22             **THE COURT:**  Yes.

23             **SPEAKER:**  No.  I'm here today as myself for my

24   household.

25             **THE COURT:**  Okay.  And tell me about your household.

SPEAKER:  BROOKE FLOYD

1   How many?

2            **SPEAKER:**  There's four people.  My husband and my

3   children, my two children.

4            **THE COURT:**  And how old are they?

5            **SPEAKER:**  They are six-year-old twins.

6            **THE COURT:**  Okay.  Boy or girl?

7            **SPEAKER:**  Boy and a girl.

8            **THE COURT:**  Okay.  Now, then, on this water matter

9   affecting your household, are you saying that you have some

10  effect at your house?

11           **SPEAKER:**  Yes.

12           **THE COURT:**  Or is the effect outside of your house,

13  somewhere else like maybe your job.

14           **SPEAKER:**  No, no, no.  This is my house.

15           **THE COURT:**  So at your house?

16           **SPEAKER:**  Yes.

17           **THE COURT:**  So tell me what your problems are, and

18  also, then, tell me what your concerns are.

19           **SPEAKER:**  Okay.  Well, like many Jackson residents

20  and homeowners, I have had problems anytime that there is a

21  major issue or line break or the city loses -- the main system

22  goes down.  When the water is turned back on, my home, which

23  was built in 1954, it is old, when the water gets cut back on,

24  for whatever reason it rushes back into my home, so we have had

25  the raw sewage rushes back in, we've had the pipes bust in my

SPEAKER:   BROOKE FLOYD

1   home.  Right now, two years, I think that was around

2   Thanksgiving when that happened, and as soon as the water came

3   back on, the water pushed up through the middle of my kitchen.

4   So right now we have a huge board where they had to come in and

5   lay all the front piping down again.  We have had to reroute

6   our pipes from the street through the kitchen through the

7   main -- all the way through the back of the house.  We've spent

8   upwards of $30,000 since we purchased our home in 2000 -- let's

9   see -- I'm sorry.  I get my dates confused, but I think we

10  purchased our home in 2014 when we purchased our home.  So we

11  have been there quite awhile.  I could be -- no, I got married

12  in 2014, so we purchased our home in 2010.  So we purchased it

13  before that. so we have had that home for quite awhile.  But

14  we've spent quite a lot of money.

15      Every time there is an issue with the city of Jackson's

16  water, it affects our home, if there is a main line or

17  something like that that breaks.  We understood that when we

18  bought the home.

19      We know that Jackson has water issues.  I moved here in

20  the late '80s with my parents.  My dad's family is from here.

21  We know about Jackson water issues, so it was expected.  I

22  don't think it was known that it was going to be that

23  astronomical.  I was young when I purchased our home.  We were

24  young, and so we were, like, we didn't understand that expense

25  at that time.

SPEAKER:  BROOKE FLOYD

1           My concern now is, through all of those things that we
2   have accepted as living here, now my concern is, is the water
3   safe and do I know if it's safe or not.  And I say this because
4   in the past when those things have happened, we have received a
5   boil water notice.  And even if the City didn't upload it
6   immediately, within 24 hours the Mississippi Department of
7   Health had it on their site, and I was able to look up my
8   address and know I had a boil water notice.  Okay.  We know,
9   you know, we are not going to wash dishes with this, we are
10  going to boil all the water, we are good to go.  We have our
11  system down.  We know the system.  We are from Jackson.  I know
12  what the system is to wash dishes in the city when you don't
13  have access to water.
14          Over the past month in my neighborhood, I have lost water
15  pressure or lost water service at least three times with no
16  notice, and I have called JXN Water.  The first time I called
17  when the water cut off, and they were like, oh, we are so
18  sorry, ma'am -- great customer service -- we are sorry, ma'am,
19  yes, they are doing some work, we don't know when it is going
20  to be back on.  I said, okay, I understand.  Because the main
21  water line break had been broken for a while, since, like,
22  January.  So I knew it was coming.  I was glad they were
23  finally fixing it.  However, it went off, I called, it came on
24  that night, and it was horrible, discoloration, smell, and
25  things were floating in it.

SPEAKER:  BROOKE FLOYD

1      I called the next day, because, I mean, I'm from Jackson,

2  so I knew it was probably a boil water notice.  I called the

3  next day, like, hey, we've got a boil water notice, right?  I

4  just kept being put on hold.  Nobody ever came back.  The phone

5  disconnected.

6      The next day, still discolored water.  It's like this oily

7  thing in it.  This has been over 3 weeks now.  I have called

8  every week.  I've not gotten a response.  There's no boil water

9  notice for my neighborhood on Mississippi Department of Health.

10 Our water is another color.  Last night, in fact, my daughter,

11 when I was giving her her bath, was like Mommy, why does our

12 water look blackish?  I was like, okay, we are in and out,

13 don't do your face.  We are going back to our routine.  We use

14 bottled water for your face to wash you off.  And we are in and

15 out quickly, because I like to do them, when the water looks

16 like that and stuff like that, I like to do a shower thing

17 instead of them sitting in the bath, because they do have

18 severe allergies.

19     My issue is, I just want to know.  I just want to know.

20 And you know there is something in the water because their

21 bubble bath doesn't even work.  Like, our soap is not even

22 working at our house.  We are not getting any bubbles.

23     I just want to know if there's an issue.

24         **THE COURT:**  Have you experienced a difference between

25 soft water and hard water, for instance?

SPEAKER:  BROOKE FLOYD

1          **SPEAKER:**  Yes.  I actually grew up on well water in

2    Van Buren, Missouri.  My grandparents had a well that was on

3    our farm.  When I moved here, it's a different type of water,

4    so yes, hard and soft water is completely different.

5          **THE COURT:**  So how would you characterize Jackson's

6    water some time ago, and how would you characterize it now, if

7    it is different?

8          **SPEAKER:**  So I would say our water from -- and we did

9    see a shift.  So last summer, before August 29th, I would say

10   that our water was hard.  Then after all the water crisis and

11   everything, when we finally got significant water pressure,

12   there was definitely a feeling of the water is not washing off.

13      By December, when the cold weather happened and everyone

14   kind of lost a little bit of water pressure again and it was

15   the cold temperatures and things were happening, it was off for

16   a couple weeks there around Christmas, but by January, we were

17   back to normal in my home with the way the water felt and what

18   was happening.  These issues that I'm describing now really

19   have started in the past month and a half, like, when those bad

20   storms came with the tornadoes.  And then when they started,

21   there was a big line break actually on, what is that, Old

22   Canton Road, right there down the hill from Nandy's Candy, and

23   they had to block off the whole road.  I remember traffic had

24   to be diverted, and my neighborhood is right above that hill.

25   And when that happened, they were fixing the one in my

SPEAKER:    BROOKE FLOYD

1   neighborhood at the exact same time that -- because we are in a

2   circle.  So that was happening, and that huge block-off

3   happened that same day, and nothing really has been right

4   since.

5        THE COURT:  Okay.  And how would you characterize the

6   water now, hard or soft?

7        SPEAKER:  I wouldn't -- right now we barely -- our

8   water pressure is really low right now at our house.  In fact,

9   yesterday, while I was in the shower, it just completely cut

10  off.  And 45 minutes later, then it just cut back on.

11       So I don't know quite what is going on right now.  There

12  was no one out there working.  All they were doing was filling

13  in the street.  They completed the project, and so they weren't

14  messing with the water lines, so I'm not sure exactly what

15  happened now.  So, yeah.

16       THE COURT:  So the water shut off yesterday?

17       SPEAKER:  Yes, when I was in the shower, like 10:00

18  in the morning.  It may have been a little before that because

19  I had to be somewhere.

20       THE COURT:  So then when it cut off, what did you do?

21  Since the water was cut off, what did you do at that point?

22       SPEAKER:  So I panicked because I was washing my

23  hair, and I had soap everywhere.  I got out of the shower.  It

24  was just like, you are kidding me.  And I checked the faucets

25  to see if something was wrong with just my showerhead, and

SPEAKER:   BROOKE FLOYD

1    flushed the toilets and dried my hands off so I could go and

2    call the water company to see if they were repairing the line.

3    I called the water company and it said, Please hold.  And then

4    I sat there in soap and a towel and waited for someone to come

5    back on the line to just tell me anything.  Then the phone got

6    disconnected like it has done the past couple of times when I

7    called before.  And then I was upset because it was a bad

8    morning yesterday, and so I just kind of sat there.

9        I'm sure we have all had those mornings when things were

10   not going your way.  It felt like a Monday, but it was a

11   Tuesday.  My husband told me to calm down, it was going to be

12   okay.  And then I went and got some bottled water to try to

13   rinse the soap off of me and the water came back on.  So I was

14   able to rinse the soap off, rinse everything off.  It was low

15   pressure, but it was on.  I rinsed everything off.  I was able

16   to get dressed and go about my day.

17          **THE COURT:**  So how long was the water off?

18          **SPEAKER:**  About 30 -- it was about 45 minutes total.

19          **THE COURT:**  So you had to sit there the whole time?

20          **SPEAKER:**  Yes.

21          **THE COURT:**  And when it came back on, you said it was

22   low pressure?

23          **SPEAKER:**  Yes.  It is full pressure now.  It is just

24   like it will be full pressure, and you will turn it on, and

25   then it will do this, PSST, PSST, PSST, and then shoot out

SPEAKER:  BROOKE FLOYD

1    really crazy, and then it will go back low.  So I just haven't

2    really washed dishes with it.  We are doing the boiled water

3    method where we wash dishes with the boiled water.

4            **THE COURT:**  Are your neighbors experiencing the same

5    problem, to your knowledge?

6            **SPEAKER:**  Oh, yes, I talk to my neighbors.

7            **THE COURT:**  Are they experiencing the same problems

8    you just described?

9            **SPEAKER:**  The people that live to the left of me

10   have.  They have bought another house, though, out on the

11   reservoir, so when this type of stuff happens, they just go and

12   stay out there.

13           **THE COURT:**  Okay.  But they are having the same

14   problem with their water pressure?

15           **SPEAKER:**  Yes.

16           **THE COURT:**  What about the neighbors on the other

17   side?  You said to the left.  What about to the right?

18           **SPEAKER:**  There's no house there anymore.

19           **THE COURT:**  Okay.  So your next nearest neighbor to

20   your left or right, is that person having problems?

21           **SPEAKER:**  Okay.  So diagonal, the house is for sale.

22   In front of me, their schedule is off from mine, so I'm in bed

23   when they get home.  I'm knocked out.  So I'm not sure.  But I

24   can check with my diagonal neighbor, because my sister is

25   friends with them.

1          **THE COURT:**  Now, the person across from you who is

2     selling his or her house, did they provide any reason why they

3     are selling?

4          **SPEAKER:**  They -- the people that have owned that

5     house since I very first moved into that neighborhood, they

6     have never lived there.  It was like a -- the people that owned

7     it, I don't know if they passed away or went into a nursing

8     home.  They were elderly, and their child didn't live here.  So

9     they just rent it out because they don't want to live in

10    Jackson.  Like, they live in another state, not to down

11    Jackson.  They just don't live here.  I wouldn't say it like

12    that.

13         **THE COURT:**  So they live in another state?

14         **SPEAKER:**  Right.  And they are just, like, we'll just

15    rent it out.

16         **THE COURT:**  And they are happy with that state?

17         **SPEAKER:**  Right.  Right.

18         **THE COURT:**  So their decision not to come here is

19    nothing personal?

20         **SPEAKER:**  Right.  They've never -- yeah.  And we have

21    had great renters there for years that stayed for a long time,

22    but a lot of the people that rented there worked for, like,

23    Entergy, so they would come and stay for sections of time and

24    then just move on to the next job.

25         **THE COURT:**  Okay.  Anything else you want to tell me?

SPEAKER:  BROOKE FLOYD

1          **SPEAKER:**  No.  I understand that this is going to be
2     a long process.  I've always understood that.  I'm happy that
3     the money has come in for change to begin.  All I want is to
4     know, and I think that the residents that I have talked to and
5     that have expressed concern to me, like my mother and my family
6     and people like that, it's just they just want to know.  It's
7     not anything, you know -- like, we know Rome wasn't built in a
8     day.  Jackson's water infrastructure isn't going to be fixed in
9     a day, but we want to know what is happening.  And if it's a
10    boil water notice, we need to know it.  If the water is going
11    to get cut off tomorrow, a heads up would be great instead of
12    being left in the dark, and especially if you have small
13    children, elderly parents.  I have an elderly mother.  I have a
14    sister with auto immune disease that cannot, cannot ingest
15    unsafe water.  It would be detrimental to her health.  So those
16    type of things are things that we have to know.

17          **THE COURT:**  And give me the ages of your twins again.

18          **SPEAKER:**  Six.

19          **THE COURT:**  Okay.  Anything else?

20          **SPEAKER:**  That would be it.

21          **THE COURT:**  Thank you for coming.

22          **SPEAKER:**  Thank you.

23          **MS. WILSON:**  Your Honor, we did have one follow-up
24    question for this witness.  We did want to get her complete
25    address.

SPEAKER:   BISHOP RONNIE CRUDUP

1              THE COURT:  Could you give your complete address,

2     please.

3              SPEAKER:  4623 Kelton, K-E-L-T-O-N, Drive.  Thank

4     you.

5              THE COURT:  Okay.

6              MS. MARTIN:  Your Honor, I just wanted to let you

7     know that Candace is no longer here and did not leave a written

8     statement.

9              THE COURT:  Okay.  Next?

10             MS. MARTIN:  Did you get my correction on that one,

11    that it is Bishop Ronnie Crudup, Sr. instead of Chevon

12    Chattman?  I can't remember now if I notified the Court or not

13    of that correction.

14             THE COURT:  You did say that.

15             MS. MARTIN:  Okay.  We got that when we got here

16    today.

17        (ORAL STATEMENTS OF BISHOP RONNIE CRUDUP PRESENTED)

18             THE COURT:  Okay.  So then Bishop Crudup, come

19    forward.  Good afternoon.

20             SPEAKER:  Good afternoon, Judge.

21             THE COURT:  So you are representing, is it --

22             SPEAKER:  Working Together Jackson.  I'm representing

23    Working Together Jackson.

24             THE COURT:  Yeah, Working Together Jackson.  Okay.

25    Go ahead.  I'm sorry.  Is that a part of your church, your

SPEAKER:  BISHOP RONNIE CRUDUP

1   ministry?

2          **SPEAKER:**  No, the church is actually a member of

3   Working Together Jackson.  Working Together Jackson is a

4   broad-based nonpartisan community organizing organization that

5   is now celebrating ten years of its life and actually works to

6   teach the democratic process and help people to develop their

7   power to make change that they want to see.

8          **THE COURT:**  And it's been in existence for how long?

9          **SPEAKER:**  Well, the network itself, the national

10  network, goes all the way back to the early '60s, but community

11  organizing has been here in Jackson since 1992.  That was a

12  previous organization called the Amos Network that was the

13  first iteration of the organization.  And ten years ago, we

14  rebuilt the organization and rebranded it, and we now call it

15  Working Together Jackson.

16         **THE COURT:**  Okay.  All right.  Go right ahead, then.

17  Talk to me.

18         **SPEAKER:**  All right.  As a part of Working Together

19  Jackson, we are here to state that we also have concerns and

20  want to see a more vigorous transparency on the part of the

21  third-party administrator.  But before I say that, let me say

22  that we also want to express that we are pleased with, once

23  again, the third-party administrator being put in place by the

24  Court, by EPA, by the Department of Justice and others who have

25  done this because we think that this is a part of the solution

SPEAKER:  BISHOP RONNIE CRUDUP

1    for the problem that Jackson has not only for its present water

2    condition but also wastewater that we understand is even

3    larger, a larger problem.

4        So we have been involved vigorously with the City of

5    Jackson around this dealing with water issues.  And even when,

6    of course, this crisis popped up, then we also were people that

7    stated our position to the State and some of the plans that the

8    State had related to taking over the water department here in

9    Jackson.  So we were pleased when the mayor and others along

10   with, as I said, the EPA and the Court and others, decided to

11   put in a third-party administrator, just because we think, as I

12   said, that that's a part of the solution as a part of this.

13       But we are also concerned because we think that if this is

14   going to work out the way that we think it really can work,

15   then there's got to be a little bit, in our opinion, a little

16   more vigorous approach than there is.

17       Let me say this too, that we are not interested in any

18   kind of adversarial relationship with Mr. Henifin.  We think he

19   is doing a good job.  But we want to suggest that one of the

20   things that may be helpful in the midst of this is to do

21   something that has been done before out of another crisis that

22   we suffered here in the city of Jackson.  When Jackson Public

23   Schools was threatened to be taken over, then there was a

24   remedy brought about, and as a part of that, then the Better

25   Together Commission was developed, and there was an advisory

SPEAKER:  BISHOP RONNIE CRUDUP

 1  board that was put in place, made up of various stakeholders,

 2  both individuals and organizations that worked with the school

 3  board and others at that time to help them through this whole

 4  process.

 5        We would suggest that something similar be done with the

 6  third-party administrator because we understand that it's a

 7  tremendous task in terms of what he is seeking to do, and it's

 8  going to take a long time also to do that.  We think that that

 9  is a process that will work.  It happened before.  It's

10  interesting we are back -- we are kind of here because at that

11  point, the State was threatening to take over JPS.  We are here

12  because the State was seeking to take over the water

13  department, the water here in Jackson, and so I think we can

14  learn something from that history that we have already gone

15  through.

16        I want to say too, we certainly, as we talk about

17  transparency, we are concerned with things such as we want --

18  we never heard anything related to why the only African

19  American administrator in the water department was let go.  We

20  think that that is something that speaks to the issue of the

21  lack of transparency.  And then we are very, very concerned

22  about contract justice.  This city is 82 percent African

23  American, and African American businesses do not get -- using

24  the word "fair" isn't even equitable in the midst of this

25  because it is almost criminal, Judge, the amount of business

SPEAKER:  BISHOP RONNIE CRUDUP

1    that African American businesses get in this city.  But we

2    think there's a tremendous opportunity here.  And for us, the

3    opportunity is that with the $600 million that the Biden

4    administration has already put in, which we are very excited

5    about and pleased about, and we think probably somewhere in the

6    area of 2 billion dollars that eventually will be spent between

7    water and wastewater or more, we think that that presents a

8    wonderful opportunity to revitalize Jackson if a lot of those

9    contracts, once again, are done in such a way that we see both

10   African American firms and also majority firms that live in

11   Jackson or exist in Jackson or in Mississippi get some of that

12   business.  We are concerned now that most of the firms that are

13   doing the work are firms from outside of Mississippi.

14       And because we have -- we don't get that kind of

15   information, is that a short-term circumstance or process in

16   terms of those firms being in place where we are going to see a

17   little bit more of effort of business in Mississippi come in

18   and eventually take over some of that?  Because there are a lot

19   of businesses in Mississippi that have a lot of experience in

20   terms of water and working with wastewater plants as well as on

21   the wastewater side, but we don't get that information.

22       So we think that if communications is better there, then

23   it helps all along the way in the job that Mr. Henifin has to

24   do, as well as the citizens of Jackson, Mississippi.  Because I

25   live in Jackson, Mississippi.  My church is in Jackson,

SPEAKER:  BISHOP RONNIE CRUDUP

1    Mississippi.  I live in South Jackson.  And through this whole

2    process, I've been out of water at my house, Judge, where

3    nothing comes through the tap on five different occasions.

4    Once in '21 for two weeks, once for a whole month in '22, and

5    then another, what, twice this year and another time as well.

6        And even now, our pressure down in my part of town, which

7    I live in Brookwood Subdivision right on the bottom end of this

8    city, a lot of times is quite low.  And that's something that

9    all of the folk in my neighborhood, because we talk about it,

10   experience it.

11       And so we understand that this is going to take a long

12   time, and I think some folks have talked about five years.  I

13   think it is probably more 10, 15.  Well, there's got to be

14   better communications along the way in this.  As I said, we are

15   not here to complain in that sense and be adversarial towards

16   Mr. Henifin at all.  We appreciate what he is doing.  But we

17   live by the mantra "People don't do what you expect.  They do

18   what you inspect."

19       So we think with a little bit more vigorous transparency,

20   our process will work better for everybody.

21           **THE COURT:**  All right.  Now, what is your address?

22           **SPEAKER:**  My personal address is 242 Heathway Cove,

23   Jackson, Mississippi.  My church address is 1750 Ellis Avenue.

24           **THE COURT:**  Okay.  Now, on this matter of involvement

25   of more, I guess you would say minority firms --

SPEAKER:  BISHOP RONNIE CRUDUP

1          **SPEAKER:**  Yes.

2          **THE COURT:**  -- what firms do you know who are in the

3     water business?

4          **SPEAKER:**  There are a number of firms who actually --

5     minority firms or --

6          **THE COURT:**  Minority firms.

7          **SPEAKER:**  Well, I don't think that there are any, as

8     I know of, African American firms that are necessarily in the

9     water business.  There have been some that's been in the

10    wastewater business.

11         **THE COURT:**  Let's start with the water business

12    first.  We are not really discussing the wastewater.  But in

13    the water business, how many African American firms do you know

14    that are actually in that line of work?

15         **SPEAKER:**  I don't know anybody who actually operates

16    plants, if you want to talk about that side of it, but Mr.

17    Henifin's job, as I understand, is a little bit more far

18    reaching than that in terms of construction, digging stuff up,

19    you know, repairing lines, hauling dirt.  I mean, you've got a

20    whole lot of sides of this that there are plenty of African

21    American contractors that could do some of that side of this

22    work.

23         **THE COURT:**  Okay.  All right, then.  Thank you very

24    much.

25         **SPEAKER:**  Thank you.

1          **THE COURT:**  Okay.  Efren Nunez, come forward, please.

2     Good afternoon.

3          **(ORAL STATEMENTS OF EFREN NUNEZ ROMERO PRESENTED)**

4          **SPEAKER:**  Good afternoon.

5          **THE COURT:**  And your name, please?

6          **SPEAKER:**  Efren Nunez Romero.

7          **THE COURT:**  All right.  And you are with the

8     Immigrant Alliance for Justice and Equity?

9          **SPEAKER:**  That's right.  Correct.

10          **THE COURT:**  And where is your headquarters?

11          **SPEAKER:**  Our headquarters are on West Fortification

12     Street.

13          **THE COURT:**  Okay.  And what does that organization

14     do?

15          **SPEAKER:**  We are doing different problems, like

16     immigration is one of them, you know, for the Latino community,

17     and special other races, and labor rights, health issues, like

18     working with different stuff for COVID, example, when there was

19     COVID among us.  And those are three or four of the things that

20     we do.

21          **THE COURT:**  How long have you been with them?

22          **SPEAKER:**  About three years, '21, from '21.  That's

23     the time this organization was born too, officially.

24          **THE COURT:**  Okay.  Now, do you have a problem at your

25     work or home or both?

1    **SPEAKER:**  I will say at work.  And representing the

2    Latino community is all -- 90 percent live in West and South

3    Jackson, and this has a lot of issue with this water problem

4    for a little while, for a long time, because I'm living here

5    about 25 years already, and this problem has come for a long,

6    long time.  You know, the governor or mayors has been going

7    through, has been kind of working with some of the mayors

8    before, like Frank Melton, for example, used to be work --

9    **THE COURT:**  You said Melton, Mayor Melton?

10   **SPEAKER:**  Correct.  And other mayors too.  But about

11   this situation, and the governor -- as to the governor, and we

12   hear this for a long time, and that's why I'm saying about the

13   water crisis, but this one in '21, when we started this, and

14   every time was getting worse until the plants broke, these

15   water plants.  And after that, it's very bad situation,

16   especially for us, Latino, or for everybody, but I'm talking

17   about a Latino community because we are in this area, and we

18   don't know much about it, what is going on, until we appeared,

19   and we are going to start working together, Mississippi Rapid

20   Response is one of them, and we start getting information

21   finally and let the people to know what is going on with the

22   water.  But still, in these places, some of them still don't

23   have water.  Like a lot of us don't have that right now, you

24   know, pressure or water, or it's no good to drink, and we have

25   to spend money to buy, to keep buying and have that for us to

SPEAKER:   EFREN NUNEZ ROMERO

1   take a shower and get water from somewhere.

2        Through conversation, we are getting some donation and

3   buying and giving away to the people, and that's long lines

4   every time.  But one thing I was hearing for a long time is

5   about in this case and this time it's the Governor trying not

6   to -- the money we was getting from the Biden administration

7   not going to the City, because I hear news, newspaper, T.V.,

8   about they try to ruin Jackson pretty much, because they want

9   to take over some of the stuff that is here, and they want us

10  to leave Jackson or to work somewhere and get the stuff in

11  Jackson.

12       But back to the water, right now, we have areas they don't

13  have water.  If they have, it is brown, don't taste good, don't

14  drink it no more.  And they have a smell, and the people, if

15  they take a shower -- I'm talking about '21, '22, '23, they was

16  talking water still wasn't -- when the water plant broke,

17  that's when we start getting information to them, but before

18  that, they have a rash, stomachache, go into the hospitals for

19  no reason, and they don't get the news about boil water until

20  the last, I'm going to say the last year pretty much we started

21  getting those.

22       I just come back.  I had a surgery in my back, like, six

23  months ago when I was in my country, and I just come back and

24  incorporate into this organization about a month ago and

25  started getting all the details right now, the last few weeks,

SPEAKER:   EFREN NUNEZ ROMERO

1  about this situation again about the water.  But this keeps

2  going, you know.  I don't see it going -- I heard the money --

3  they started receiving the money, and they started repairing or

4  fixing some of the stuff, but I was seeing it was getting

5  worse.  And right now, I hope it is getting better, but this --

6  I heard about it's going to take a long time to fix this.  I

7  hope it doesn't take too long, because the money is there.  The

8  only thing, it has to be released to the City for them to work.

9       I hear Mr. Ronnie about the minorities.  We are minorities

10  too, and we have company that we can work with the City too to

11  improve this or to make better or to work or fix or do these

12  type of jobs too.  You know, I don't -- I can recommend some

13  people, but we have to get the opportunity to have this

14  information.  That way we can apply for that too.  That's one

15  of the things I would like to see for us.

16       **THE COURT:**  Okay.  And approximately how many people

17  are you speaking for?

18       **SPEAKER:**  I'm going to say probably around -- all

19  this time, it was going to our building for getting water, and

20  we would sign them down or put their names.  Probably around

21  600 families.  But here in the city really it's like ten

22  thousand Hispanic people in the city, in that area.

23       But one more thing about Hispanic, they are kind of scared

24  when you ask for names, you know, to put the names, to have a

25  list, because even though I'm Latino and they know me, they

SPEAKER:   EFREN NUNEZ ROMERO

1    still thinking that you are going to turn them in to government

2    authorities.  We know pretty much what is going on with

3    documents, but not everybody is like that.  Now, us, we have

4    the documents.  But they are scared of the authorities because

5    of what is going on, you know, the police, state troopers and

6    rangers, and even different type law enforcement stop us,

7    sometimes only because you are Latino pretty much, and they

8    scare you.  And that's the reason sometimes they don't want to

9    tell you.  They prefer to stay out of the loop, and that way

10   they can keep going, only call us privately, but they don't

11   want to give any information about even names sometimes.

12        **THE COURT:**  But do they give you their addresses, the

13   ones having problems?

14        **SPEAKER:**  Yes.  Some of them, yes.  If they want me

15   to help them or to get involved, yes, they give me -- I go to

16   visit and check, take notes and see about the water or whatever

17   other problem they have.

18        **THE COURT:**  So then you can report to the authorities

19   addresses that might need some treatment or some repairs?

20        **SPEAKER:**  Yes.  Yes, I can.

21        **THE COURT:**  Okay.  So do you keep a list of those?

22   Do you keep a list of those?

23        **SPEAKER:**  Yes, we have a list.

24        **THE COURT:**  Well, then, later on, then, you can

25   submit your list to Mr. Henifin over here.

SPEAKER:  EFREN NUNEZ ROMERO

1          **SPEAKER:**  Okay.

2          **THE COURT:**  So then he can get your list, and then he

3     can get to working on that list and see what you have.  Okay?

4     Anything else you want to complain about?

5          **SPEAKER:**  No, I think that's enough.  That's all I

6     have to say.

7          **THE COURT:**  What you say, that is enough?

8          **SPEAKER:**  Well, no, not enough.  There's more to say,

9     but --

10         **THE COURT:**  No, if you want to say something else, go

11    right ahead, now.

12         **SPEAKER:**  Today we are okay.

13         **THE COURT:**  I'm not stopping you.

14         **SPEAKER:**  No, no.

15         **THE COURT:**  If there is something else you want to

16    get off your chest, go ahead and get it off.

17         **SPEAKER:**  Like I say, we need the governor to start

18    working with us.

19         **THE COURT:**  Okay.  Thank you for coming forward.

20         **SPEAKER:**  Thank you.

21         **THE COURT:**  I still have a long list of persons, and

22    as I call the organization that you might be representing, can

23    you raise your hands, please, so I know if you are going to be

24    available later?  Mississippi Rapid Response Coalition?  I

25    don't see a hand.

1          **MS. MARTIN:**  Your Honor, I don't know if they

2     understand.  Are you saying are they available, do they need to

3     go first, or are you saying --

4          **THE COURT:**  What I intend to do is recess and start

5     back tomorrow, so -- to give my court reporter a break and all

6     of that.  Plus, we have to hear from Mr. Henifin after all of

7     this is over, so we are not going to finish today.  If that's

8     the case, which is the case, then we just as well take the

9     break now and start back tomorrow morning.  And then after the

10    lunch break, we should be finished with this list, and then I

11    can hear from Mr. Henifin.

12         So going back to the list that's left, Mississippi Rapid

13    Response Coalition, is there somebody here who will be here

14    tomorrow morning at around 10 or 10:30?

15         **SPEAKER:**  I will be in Los Angeles tomorrow morning.

16         **THE COURT:**  Can you take us?  Is that okay?  All

17    right.  Will there be someone in your sted who will preach to

18    us about what your concerns are?

19         **SPEAKER:**  (Inaudible).

20         **THE COURT:**  She said she'll have to figure that out.

21       **(ORAL STATEMENTS OF MAKANI THEMBA PRESENTED)**

22         **THE COURT:**  Your name, please?

23         **SPEAKER:**  Makani Themba.

24         **THE COURT:**  Your name comes from where?

25         **SPEAKER:**  My name comes from South Africa.  It is a

SPEAKER:  MAKANI THEMBA

1    Zulu name.

2            **THE COURT:**  Are you Zulu?

3            **SPEAKER:**  Not that I know of.  It's a name I changed

4    it in the '70s.

5            **THE COURT:**  Okay.  Have you read the histories of the

6    Zulus?

7            **SPEAKER:**  You know what?  I haven't checked in with

8    them, but all I'm doing is representing myself and the

9    Mississippi Rapid Response Coalition.

10           **THE COURT:**  Okay, then.  Now, I'm going to talk to

11    you about that in just a moment.

12           **SPEAKER:**  Yes, sir, but I --

13           **THE COURT:**  Say something about your name.

14           **SPEAKER:**  Yes.  Surely.

15           **THE COURT:**  The Zulus have a fascinating history.

16           **SPEAKER:**  They do, a very powerful one, yes.

17           **THE COURT:**  Yes.  You ought to read it.  It is a

18    fascinating history.

19           **SPEAKER:**  Indeed.  I heard you earlier that you are a

20    collector of masks.

21           **THE COURT:**  I do.  I have quite a few.  I have some

22    from South Africa too.

23           **SPEAKER:**  That's beautiful.

24           **THE COURT:**  Yes.  I collect all of that.  My masks,

25    incidentally, are authentic.  They are not copies.  They are

1    authentic.  I have a guy who purchases for me around the world,

2    and so they are authentic.

3        Now, back to the Zulus real quick.  There was a special on

4    Shaka Zulu.

5            **SPEAKER:**  Yes.  Yes, indeed.

6            **THE COURT:**  I did a number of papers on Shaka Zulu

7    way back before you were born.  And I did them back when I was

8    in college.  So I knew a whole lot more about Shaka Zulu before

9    he ever became popular, because when I wrote on him, there was

10   very little known about him.  But I did an in-depth paper on

11   him, his tribe, the expansion, the problems with the bush

12   people, the Boer war, and all those kinds of things, but the

13   Zulus were fascinating people and I really admire them.

14           **SPEAKER:**  Yes, sir.  Me too.

15           **THE COURT:**  Now, then, back to you.  So will you have

16   someone from the Mississippi Rapid Response Coalition?

17           **SPEAKER:**  You mean right now?

18           **THE COURT:**  No, tomorrow.

19           **SPEAKER:**  Tomorrow?  I think we will have to find out

20   because, unfortunately, I have a 6:00 a.m. flight to Los

21   Angeles, so I will not be here.  But we will have to find

22   someone if we can, sir.

23           **THE COURT:**  You mean you would rather go to Los

24   Angeles than to be here tomorrow?

25           **SPEAKER:**  Well, no.  My mama needs my care, so I

1    relieve my sister once a month for a week to care for my

2    mother.

3                **THE COURT:**  Okay.  I hope she does well.

4                **SPEAKER:**  I appreciate that.

5                **THE COURT:**  Tell her she has my well thoughts of her.

6                **SPEAKER:**  Thank you, sir.  Appreciate that.

7                **THE COURT:**  Now, then, so you will look and see if

8    you can have somebody come tomorrow?

9                **SPEAKER:**  We have to confer to make sure.  I don't

10   want to sit here and make a lie out of it, but we are going to

11   do our level best.

12               **THE COURT:**  Okay, then.  Thank you.

13               **SPEAKER:**  Thank you, sir.

14               **THE COURT:**  And if I don't talk to you again before

15   you depart, have a good trip.

16               **SPEAKER:**  I appreciate that.  Thank you, sir.

17               **THE COURT:**  All right.  The next is Mississippi Poor

18   People's Campaign.  Are you Danyelle Holmes?

19               **SPEAKER:**  Yes, sir, Your Honor.

20               **THE COURT:**  Can you come back tomorrow morning?

21               **SPEAKER:**  Yes, sir.

22               **THE COURT:**  Good.  I will see you tomorrow morning.

23        Next, from Grace House.  Anybody from Grace House?  It was

24   Emily Johnson.  If she can come back, then I would love to hear

25   from her.

1        **MS. RUKIA LUMUMBA:**  She had to leave.

2        **THE COURT:**  Thank you so much.  The next is Maise

3   Brown or Maise Brown (pronouncing).  Which one is it?

4        **MS. RUKIA LUMUMBA:**  Maise Brown.  And she also had to

5   leave, but she did submit a statement.  Mississippi Votes.  I

6   think they gave it to Attorney Martin.

7        **MS. MARTIN:**  She did.  I apologize.

8        **THE COURT:**  So Maise Brown of the Student Water

9   Relief?

10       **SPEAKER:**  Yes.  And her paid organization that she

11  works for, her employer, is Mississippi Votes.  And so they --

12  she submitted a statement from them.  My name is Rukia Lumumba.

13       **THE COURT:**  Thank you.  Next is Arekia Bennett Scott

14  of Mississippi Votes.

15       **MS. MARTIN:**  Your Honor, I believe that's the written

16  statement that we have.  It's from Mississippi Votes, but I

17  believe there's a connection between Ms. Maise Brown and

18  Mississippi Votes as well.

19       **THE COURT:**  Thank you so much.  Next is Beloved

20  Community/International Museum of Muslim Culture.

21       **SPEAKER:**  Good afternoon, Judge.

22       **THE COURT:**  Hello, Ms. Rashid.  How are you?

23       **SPEAKER:**  I'm great.  My name is Okolo Rashid.

24       **THE COURT:**  All right.  How have you been?

25       **SPEAKER:**  I've been good.  Thank you.  How have you

1    been?

2    **THE COURT:**  I've been kicking, just not as high as I

3    would like, but I've been kicking.  And I always enjoy coming

4    down to hear some of the lectures on the various topics that

5    you all are sponsoring.  I was down there not all that long

6    ago.

7    **SPEAKER:**  That's right.  We are going to get you back

8    down there too.

9    **THE COURT:**  I know it.  I will be back.  You are

10   still there, aren't you?

11   **SPEAKER:**  Yes, sir.

12   **THE COURT:**  I went by there yesterday morning, and I

13   looked over there and I saw you had some little signs on the

14   outside.  I started to get out and go see if you and your

15   husband were there, but then, of course, I had to run on down

16   here, so I did.  It is so good to see you.  Will you be able to

17   come back tomorrow?

18   **SPEAKER:**  I actually have a really important call at

19   10:00 tomorrow, but I really want to be a part of this, and I

20   want to -- so I'm trying to see how I'm going to do that now.

21   **THE COURT:**  Well, I'm sure that we will not conclude

22   at 10:30ish, so if you can finish your call, I think you can

23   get on down here, can't you?

24   **SPEAKER:**  Okay.  Great.  That would be wonderful.  I

25   will come back.

1    **THE COURT:** Tell your husband I asked about him.

2 Next is Rukia Lumumba, who just stood a few moments ago.

3    **SPEAKER:** I'm not speaking.

4    **THE COURT:** Well, it says on here People's Advocacy

5 Institute.

6    **SPEAKER:** Institute. I'm not speaking, though.

7    **THE COURT:** You're not?

8    **SPEAKER:** No.

9    **THE COURT:** Okay. Your name is down here.

10    **SPEAKER:** Yeah.

11    **MS. MARTIN:** My apologies. I wasn't aware. We can

12 remove her from the list.

13    **THE COURT:** She is welcome to say something if she

14 wishes to do so now. Okay?

15    **SPEAKER:** Can I reserve and answer tomorrow?

16    **THE COURT:** You can.

17    **SPEAKER:** Okay. Thank you.

18    **THE COURT:** Then there's a board member and

19 vice-president for the Willowood Neighborhood Association,

20 Dr. Erick Ellis.

21    **MS. MARTIN:** Yes, Your Honor. He notified us that he

22 was sick with cold symptoms, so he did not want to come today.

23 I can make the request again tomorrow and just let him know we

24 are recessing today and we will restart tomorrow.

25   And I did want to let you know, Andy Kricun has rejoined

1   the call, who was at the top of the list, so he did want me to

2   let you know that he has rejoined the Zoom call.

3           **THE COURT:**  Okay.  Now, you are saying that Dr. Ellis

4   has some COVID symptoms?

5           **MS. MARTIN:**  That is not the statement I'm making

6   because of HIPAA.  What I'm saying is that he had some

7   cold-like symptoms.

8           **THE COURT:**  Oh, some cold.

9           **MS. MARTIN:**  Cold-like symptoms.

10          **THE COURT:**  C-O-L-D.

11          **MS. MARTIN:**  Yes, Your Honor.  So he chose not to

12  come today based on those symptoms.

13          **THE COURT:**  Okay.  Well, I respect HIPAA, but if he

14  has any symptoms involving COVID, then he has our sympathy but

15  also our assertion that he shouldn't come.

16          **MS. MARTIN:**  I will relay that information, Your

17  Honor.

18          **THE COURT:**  Thank you.  Now, he can always send

19  somebody else now.

20          **MS. MARTIN:**  Okay.

21          **THE COURT:**  Okay.  All right.  Then I have this list

22  of organization attorneys present on behalf of their clients.

23  Now, Counsel, you said that they were not going to make any

24  address at all; is that correct?

25          **MS. MARTIN:**  I don't believe so.  I believe that they

1    are just here just in the courtroom representing their clients.

2    I don't think that they plan to speak today.  I think the only

3    other speaker would have been Andy Kricun.

4              **THE COURT:**  Andy --

5              **MS. MARTIN:**  Kricun, who was at the top of the list

6    of the representatives requesting an opportunity to speak.

7              **THE COURT:**  Oh, okay.

8              **MS. MARTIN:**  That's the one that had to speak from 2

9    to 3:00 p.m.  He said he would be back at 3:15, 3:30.

10             **THE COURT:**  Okay.  All right.  And that would

11   complete the list, wouldn't it?

12             **MS. MARTIN:**  Yes, Your Honor.

13             **THE COURT:**  Okay.  Then I see down a little further,

14   Institute for Democratic Education in America, IDEA,

15   represented by Rosaline McCoy.  Is Rosaline out here, or did

16   she leave?  Was she ever here?

17             **MS. MARTIN:**  I believe she left.  She wasn't ever

18   requesting an opportunity to speak, but she left.

19             **THE COURT:**  You said she did or did not?

20             **MS. MARTIN:**  She did not request the opportunity to

21   speak.

22             **THE COURT:**  Okay.  She directed me to a water article

23   that she wrote some time ago.  Are you aware of that article?

24             **MS. MARTIN:**  No, Your Honor, I'm not.

25             **THE COURT:**  She wrote some article way back.  I

1    forgot exactly how long ago it is, but she wrote some article.

2    But at any rate, I have it.  She reminded me of it, so I pulled

3    it up.  I will tell you where it is located when I look back at

4    it again.  You know, she is in the McCoy family.

5              **MS. MARTIN:**  Yes, Your Honor.

6              **THE COURT:**  Who owned a lot of property down on

7    Farish Street and that whole area down there.

8              **MS. MARTIN:**  I actually did not know.  My

9    relationship with her is through the Boys and Girls Club.

10   That's the only way I've ever know her.

11             **THE COURT:**  I've been knowing her most of her life,

12   just like her mama, Rosie, although I would never call her

13   that, because she was more like my godmother.  So that's Rose

14   McCoy, who was Dr. Rose McCoy, who was married to the dentist,

15   Dr. McCoy.  And so they were down on Farish, that whole area,

16   and they owned a lot of property down there.

17        And at one point Rosaline McCoy told me there was a

18   problem on Farish Street, and I was going to bring that up, but

19   I think that's a sewage problem.  I will come back to that

20   later, but I think that is a sewage problem.

21        And then Alternative roots, R-O-O-T-S.  Anybody here from

22   there?  Alternative Roots.  R-O-O-T-S.  And I see Wendy

23   Shenefelt.

24             **MS. MARTIN:**  She's not here.

25             **THE COURT:**  Okay.  Well, that's the group.  We will

1    start tomorrow at 10:00.

2         Now, also be advised that after we have gone through this

3    list, then we will give Mr. Henifin an opportunity to respond

4    to these matters, and if there are other matters that come up

5    that are not mentioned so far, then please mention them,

6    because I like to have a full address of all concerns.

7         So then that's the way we will go tomorrow.  And we

8    will -- well, we will go until we finish.  So we will not be

9    bonded to the clock.  We will just go until we finish.

10         Now, is there anything else I need to take up at this time

11    before I recess for the balance of the day?  Anything from any

12    of the parties over here?  Why don't we start with Ms.

13    Williams.  Anything?

14              **MS. WILLIAMS:**  No, Your Honor.  Thank you.

15              **MS. HODGES:**  No, Your Honor.

16              **MR. KUCIA:**  No, Your Honor.

17              **THE COURT:**  Now, over here?

18              **MS. WILSON:**  No, Your Honor.

19              **MS. MARTIN:**  No, Your Honor, City of Jackson.

20              **THE COURT:**  All right, then.  We will start at

21    10:00 a.m. and -- I should be ready to go at 10:00.  I have a

22    telephone conference in a criminal case, but it should not take

23    more than 20 or 30 minutes.  But I should be on the bench at

24    10:00.

25    (HEARING RECESSED UNTIL THE FOLLOWING MORNING AT 10:00 A.M.)