IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                                        PLAINTIFF

VS.                              CIVIL ACTION NO. 3:22CV686-HTW-LGI

THE CITY OF JACKSON, MISSISSIPPI                               DEFENDANT


**TRANSCRIPT OF STATUS CONFERENCE**

**VOLUME 2 OF 2**



BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

JULY 13, 2023
JACKSON, MISSISSIPPI



(APPEARANCES NOTED HEREIN.)










REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 EAST COURT STREET, SUITE 2.500
JACKSON, MISSISSIPPI  39201
TERI_NORTON@MSSD.USCOURTS.GOV
(601)608-4186

```
 1    FOR THE PLAINTIFF:

 2          ANGELA GIVENS WILLIAMS, ESQUIRE
            U.S. ATTORNEY'S OFFICE
 3          501 EAST COURT STREET, STE. 4.430
            JACKSON, MISSISSIPPI  39201
 4
            KARL J. FINGERHOOD, ESQUIRE   (VIA ZOOM)
 5          U.S. DEPARTMENT OF JUSTICE
            ENVIRONMENTAL ENFORCEMENT SECTION
 6          POST OFFICE BOX 7611
            WASHINGTON, DC  20044
 7
            ANGELO MO, ESQUIRE     (VIA ZOOM)
 8          U.S. DEPARTMENT OF JUSTICE, ENRD
            150 M STREET, N.E., ROOM 2.900
 9          WASHINGTON, DC  20002

10    FOR THE DEFENDANT:

11          CATORIA MARTIN, ESQUIRE
            TERRELL S. WILLIAMSON, ESQUIRE
12          OFFICE OF THE CITY ATTORNEY
            455 EAST CAPITOL STREET
13          JACKSON, MISSISSIPPI  39201

14    INTERESTED PARTY, JXN WATER:

15          MALISSA WILSON, ESQUIRE
            FORMAN, WATKINS & KRUTZ, LLP
16          POST OFFICE BOX 22608
            JACKSON, MISSISSIPPI  39225-2608
17
            FRANK PAUL CALAMITA,  ESQUIRE    (VIA ZOOM)
18          AQUALAW, PLC
            6 S.5TH STREET
19          RICHMOND, VIRGINIA  23219

20

21    ALSO PRESENT:  TED HENIFIN, THIRD-PARTY MANAGER
                      GERALD KUCIA, ATTORNEY GENERAL'S OFFICE
22                    GRETCHEN ZMITROVICH, DEQ
                      DONNA HODGES, DEQ
23                    MAYOR CHOKWE ANTAR LUMUMBA

24

25
```

```
1                          TABLE OF CONTENTS

2


3


4                              VOLUME 2

5    SPEAKERS FOR ORGANIZATIONS:
```

```
6    ANDY KRICUN  - oral statement presented  ...............164

7    DANYELLE HOLMES  - oral statement presented  ..........198

8    RUKIA LUMUMBA  - oral statement presented  ............249

9    OKOLO RASHID  - oral statement presented  .............269

10   TED HENIFIN  - response presented  ....................289
```

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **THE COURT:**  Good morning.  This is a continuation of

2     the hearing from yesterday, and the Court inquired on yesterday

3     afternoon which persons were going to be available to return

4     today.  So I want to start with the ones who were at the top of

5     the list originally who were unable to appear on yesterday and

6     see if they are here today.  So Andy Kricun, or Kricun.

7          **MS. MARTIN:**  Your Honor, he is here virtually.

8          **ORAL STATEMENTS OF ANDY KRICUN PRESENTED VIA ZOOM**

9          **THE COURT:**  Okay.  Good morning.

10         **SPEAKER:**  Good morning, Your Honor.

11         **THE COURT:**  Now, I have you here on my list as

12    someone who wants to offer comments on this particular matter

13    concerning the water controversy.  Is that correct, that you

14    wish to offer comments?

15         **SPEAKER:**  Regarding the --

16         **THE COURT:**  Did you hear me?

17         **SPEAKER:**  Yes, I did hear you, Your Honor.  I would

18    like to offer some comments regarding the Mississippi State

19    Department of Health Advisory, because I had the opportunity to

20    speak with the Mississippi State Department of Health last --

21    about two weeks ago, and I wanted to present those comments and

22    a couple of other suggestions as well, Your Honor.

23         **THE COURT:**  All right.  Go right ahead.

24         **SPEAKER:**  Thank you, Your Honor.  Just by way of

25    background, I've been working with the City of Jackson since

1    June of last year.  I was working with an organization that

2    hired me as a senior fellow to assist Jackson with technical

3    issues in water and wastewater issues because my background is,

4    I'm a long-time wastewater and water utility manager, and so

5    that was even before the Jackson water crisis in August.  And

6    since then, I've been working to provide technical assistance

7    and written advice to the city.

8        What prompted this particular request, I happened to also

9    volunteer and serve for -- serve on the U.S. EPA's National

10   Environmental Justice Advisory Council, and I'm the co-chair of

11   a committee that is working on new drinking water standards for

12   the country, and it so happens that on the committee with me

13   was a member or is a member of the Mississippi State Department

14   of Health.  And so we were sequestered for four days two weeks

15   ago in Washington, DC, and I happened to ask him about the

16   issue that I had read about with regard to the advisory with

17   respect to pregnant women and young children of the ages of 5

18   years or less and asked if the State was going to remove the

19   advisory or whether the advisory was still valid.  And what he

20   told me, Your Honor, was that the advisory was absolutely valid

21   and they intend to keep it in place.

22       That doesn't mean that it contradicts JXN Water saying

23   that it meets the water standards -- that the water treatment

24   meets the standards.  The reason the advisory is in place is

25   for two things:  One, in 2016, the State of Mississippi

1    approved a protocol for corrosion control for Jackson's two

2    drinking water plants, and they put this advisory in place

3    until and unless those facilities, the plant, the improved

4    plant is implemented through upgrade of these corrosion control

5    systems.

6         He told me that the main water treatment plant, Curtis,

7    has an interim system that is in place, but not permanent, and

8    that the Fewell plant, the older and smaller plant, does not

9    have any system.  And so this fellow from the Mississippi State

10   Department of Health indicated to me that the advisory will

11   remain in place until the systems are completed, permanent and

12   that the plan, State-approved plan has been satisfactorily

13   implemented.

14        So it's not -- again, these things are not contradictory.

15   The drinking water -- based on JXN Water's water quality report

16   and what the third-party manager, Mr. Henifin, has said, that

17   the water is safe to drink for most people, I'm sure it's

18   absolutely true, but the advisory is still in effect, and it is

19   important to make sure that pregnant women and young

20   children -- households of young children of the ages 5 years or

21   less do get this advisory, and also it is recommended that it

22   stay in place.

23        In addition, the second part, and that, again, has nothing

24   to do with the water leaving the water treatment plant, but

25   just the fact that in Jackson or anywhere in the country, if

1   you have an older home, that could mean that even if the water

2   leaving the plant is safe, by the time you drink it at your

3   faucet or tap, it might have an undue amount of lead,

4   especially after long periods of disuse, you know, the first

5   thing in the morning or in the evening when a child gets home

6   from school.  So the advisory also recommends that especially

7   for pregnant women and young children, there be care if there

8   is the potential for internal harm.

9        So I just wanted to make sure that was clear because there

10  was the point of view that the filters (Zoom lag) -- that the

11  advisories weren't necessary, at least from what I read in the

12  paper.  I just wanted to make it clear that I believe, as a

13  professional (Zoom lag) -- and as a member of the Environmental

14  Justice Council, that it is really important that pregnant

15  women and households of young children be advised and be

16  protected.

17       And again, that isn't discounting the quality of the water

18  leaving the treatment plant or the work that is being done by

19  JXN Water.  It is a matter of compliance with this 2016

20  State-approved plan for corrosion control and also the fact

21  that there could be internal lead plumbing.

22       The other concern I have, and it's just a matter of time,

23  because I know Mr. Henifin agrees with me on this, it is just a

24  matter of timing, I am concerned about the presence of chlorine

25  gas at the Curtis treatment plant because the Curtis treatment

SPEAKER:   ANDY KRICUN

1   plant is so close to a residential neighborhood, and it's just

2   a good practice to eliminate that -- if the gas were to escape,

3   it is poisonous, and the plant is very close to a residential

4   neighborhood.  It's a low risk of it happening, but a high

5   impact if it were to happen.  So, for example, at the water

6   plant that I used to work in in Camden, New Jersey, we

7   eliminated chlorine back in the 1980s.

8        So it is just a good practice, and Mr. Henifin has already

9   indicated that is on his list to do, you know, to encourage

10  acceleration of that to the maximum extent possible, even if

11  maybe putting in, like, temporary tanks of a safe chemical

12  while the permanent repair is made, just to be protective of

13  the neighboring community.  Those are my main concerns, Your

14  Honor.

15          **THE COURT:**  I have a question for you.  Well, I have

16  several questions for you.  I see that you previously served as

17  a consultant to the City of Jackson as a senior fellow at the

18  United States Water Alliance.  Is that so?

19          **SPEAKER:**  That is so, Your Honor, up until the end of

20  August, and my fellowship expired naturally.  It was a two-year

21  fellowship.  And actually, I was succeeded by Mr. Henifin.

22          **THE COURT:**  So then tell me about the United States

23  Water Alliance.  What is that?

24          **SPEAKER:**  The U.S. Water Alliance is a nonprofit that

25  works to engage water utilities, like the ones that Mr. Henifin

SPEAKER:  ANDY KRICUN

1    and I used to work at, but also consultants, regulatory

2    agencies, et cetera.  They are basically a nonprofit trying to

3    promote water equity and best practices in the water sector.

4    Mr. Henifin and I, you know, belonged to it when we were public

5    sector managers, and he and I served as senior fellows for the

6    alliance.

7              **THE COURT:**  And then I see here that you consult with

8    the City of Jackson now?

9              **SPEAKER:**  Yes, I do, Your Honor.  After my fellowship

10   expired at the end of August, there was a desire to continue my

11   services because the Jackson water crisis had just occurred two

12   days previous.  So I have been consulting for the City of

13   Jackson through the Thomas Consulting Group and also through

14   the Kellogg Foundation, and I'm representing neither of them

15   today.

16             **THE COURT:**  Is that a paid position?

17             **SPEAKER:**  Yes, it is.  I am paid by the hour, by the

18   hour worked.

19             **THE COURT:**  And who pays you?  Who pays you?

20             **SPEAKER:**  The Kellogg Foundation and also --

21             **THE COURT:**  Hold on a second.  There's somebody who

22   is not muted talking in the background.

23         (Off-Record)

24             **THE COURT:**  What's the name of the foundation?

25             **SPEAKER:**  The Kellogg Foundation.

SPEAKER:   ANDY KRICUN

1              THE COURT:  So who pays you?

2              SPEAKER:   The Kellogg Foundation has retained me to

3    do work with -- mainly due to the Water Workforce Initiative

4    and communications with the City, and then Thomas Consulting

5    Group pays me for technical advice to the City.

6              THE COURT:  Are you paid through the City?

7              SPEAKER:   No.

8              THE COURT:  Who hires you?

9              SPEAKER:   Kellogg Foundation and the Thomas

10   Consulting Group hired me.

11             THE COURT:  That consulting group, are they

12   affiliated with the City?

13             SPEAKER:   They are contracted to assist the City,

14   yes.  I don't know -- they are not directly employed with the

15   City, though.  I believe they are -- they are paid by another

16   foundation to assist the City.

17             THE COURT:  So then on your relationship with the

18   City, do you have any?

19             SPEAKER:   I do not have a direct contractual

20   relationship with the City, Your Honor.

21             THE COURT:  So what is your indirect relationship?

22             SPEAKER:   I have been providing technical advice to

23   them since June of 2022 through (Zoom lag) --

24             THE COURT:  I'm sorry.  You say you have been

25   providing technical advice -- you say you have been providing

SPEAKER:  ANDY KRICUN

1    technical advice to the City?

2              **SPEAKER:**  To the City since June of 2022 through

3    contract.

4              **THE COURT:**  Through the contract?  And your

5    contract --

6              **SPEAKER:**  (Unintelligible.)

7              **THE COURT:**  Your contract is with --

8              **SPEAKER:**  I had a contract, Your Honor, with the U.S.

9    Water Alliance up until the end of August of 2022, and then

10   since then I've had two contracts, one with the Kellogg

11   Foundation, and one with the Thomas Consulting Group since

12   then.

13             **THE COURT:**  When you signed your contract, with whom

14   did you sign it?

15             **SPEAKER:**  With all three of those entities, Your

16   Honor, at different times.

17             **THE COURT:**  So name the three entities.

18             **SPEAKER:**  The U.S. Water Alliance.  It was a senior

19   fellowship that includes many duties and services, but it did

20   include, in the last two months of it, work with the City of

21   Jackson.  And then second was with the Kellogg Foundation, and

22   that started right after my contract with the U.S. Water

23   Alliance expired.  And third was with the Thomas Consulting

24   Group.

25             **THE COURT:**  Are you presently employed?

SPEAKER:  ANDY KRICUN

1        **SPEAKER:**  I'm self-employed, Your Honor.

2        **THE COURT:**  So when you say you are self-employed,

3   tell me what that means.

4        **SPEAKER:**  I mean, I'm employed as a consultant to

5   work for various entities, including the Thomas Consulting

6   Group and the Kellogg Foundation.

7        **THE COURT:**  At present, do you have a contract with

8   some entity as a consultant?

9        **SPEAKER:**  Yes.

10        **THE COURT:**  With whom?

11        **SPEAKER:**  Kellogg Foundation and the Thomas

12   Consulting Group.

13        **THE COURT:**  You said that your contracts expired,

14   didn't you?

15        **SPEAKER:**  No, Your Honor, the contract with the U.S.

16   Water Alliance expired at the end of August, 2022, but my

17   contract with the Kellogg Foundation then began the very next

18   day for continuity.  Kellogg wanted me to continue providing

19   assistance to the City.

20        **THE COURT:**  Kellogg wants you to provide assistance

21   to the City?

22        **SPEAKER:**  They asked me to continue what I was doing

23   with the City, that I had been doing as a senior fellow to the

24   U.S. Water Alliance.

25        **THE COURT:**  And do you know whether Kellogg has a

SPEAKER:   ANDY KRICUN

1  contract with the City?

2          **SPEAKER:**  I do not know.

3          **THE COURT:**  So, then, the moneys that you are being

4  paid, are they paid strictly from Kellogg, or does Kellogg

5  derive its moneys from other sources that pad your paycheck?

6          **SPEAKER:**  Kellogg pays me directly.  They were

7  self (Zoom lag) -- mainly in the City.

8          **THE COURT:**  These comments that you made to me

9  earlier about the water situation at present, is this the first

10 time that you have enunciated these comments?

11         **SPEAKER:**  As I mentioned -- well, there were two

12 different comments.  The first comment with regard to the

13 Mississippi State Department of Health, I just found that out

14 during the conversation I had with the Mississippi State

15 Department of Health official during that Environmental Justice

16 Council meeting in Washington two weeks ago, and so I found

17 that out two weeks ago, and I wrote a note to the mayor of

18 Jackson last week advising him of what I heard and letting him

19 know that the state advisory was in effect, that it would

20 remain in effect until the State-approved plan for corrosion

21 control at the two drinking water plants was satisfactorily

22 addressed and completed, and that the State believed that the

23 advisory for pregnant women and young children was in fact --

24 not only would stay in effect -- not only was in effect, would

25 stay in effect and was valid for those vulnerable populations.

SPEAKER:   ANDY KRICUN

1                 **THE COURT:**  And who did you speak to?

2                 **SPEAKER:**  I didn't speak to anyone.  I sent an e-mail

3      to the mayor.

4                 **THE COURT:**  No, no, no, no.  You said you spoke to

5      someone in DC.

6                 **SPEAKER:**  Oh, I spoke with Mr. William Moody from the

7      Mississippi State Department of Health.  I knew him from the

8      unified command work that started right after the crisis

9      occurred, and I was represented in those meetings, so I knew

10     him from then, and it turned out that he and I are on the same

11     committee that are looking at safe drinking water standards for

12     the nation.

13                **THE COURT:**  And so then you have a continual

14     conversation with him?

15                **SPEAKER:**  He and I serve on the same committee, but

16     all the meetings thus far have been virtual.  This was the

17     first in-person meeting, so this was the first opportunity I

18     had to have a discussion with him.

19                **THE COURT:**  But you had continuing conversations with

20     him?

21                **SPEAKER:**  I had one conversation with him, Your

22     Honor.

23                **THE COURT:**  I thought you said you served on the

24     committee together.

25                **SPEAKER:**  Let me be exact.  We serve on a committee

1   together, and there are many things discussed where he and I

2   are present during the same period of time, but he and I did

3   not have a direct conversation until, on any topic, again,

4   other than being a part of the committee and being a part of

5   the general conversation, until the face-to-face conversation

6   that I had with him while I was in Washington, DC two weeks

7   ago.

8        **THE COURT:**  And you said that you advised the mayor

9   of this last conversation?

10        **SPEAKER:**  I wrote an e-mail to him summarizing what I

11   had heard from the Mississippi State Department of Health and

12   letting him know, because I thought as a professional engineer,

13   and also just from an ethical perspective, I thought it was

14   imperative for him to know that the risk to pregnant women

15   and -- at least in the State's opinion, the State Department of

16   Health's opinion, at least to pregnant women and young children

17   is still an issue, and that the advisory is still in place and

18   that they still do recommend the advisory and protective

19   things, like filters.

20        **THE COURT:**  Did you advise Mr. Henifin of that too?

21        **SPEAKER:**  I did not.

22        **THE COURT:**  Why not?

23        **SPEAKER:**  Because my understanding is that the City

24   of Jackson liaises with the interim third-party manager through

25   this interim order, and it would have been stepping out of my

SPEAKER:  ANDY KRICUN

1   lane to do that, Your Honor.  The pathway was for me to advise

2   the City, and then the City would in turn advise the interim

3   third-party manager, Mr. Henifin.

4        And also, I was aware, after having read the newspaper

5   articles, that what I had heard from the Mississippi Department

6   of Health was somewhat in variance.  So in an appearance (Zoom

7   lag) -- I thought it was appropriate for me to go through the

8   chain of command to the City of Jackson, who would then figure

9   out a way to work it out with the third-party manager and

10  yourself.

11            **THE COURT:**  Do you regularly communicate with the

12  mayor of the city?

13            **SPEAKER:**  Not regularly.  Infrequently, depending on

14  the issue, but from time to time.

15            **THE COURT:**  And on different subjects or the same

16  subject?

17            **SPEAKER:**  Different subjects.  Like, for example, the

18  availability of grant funding for the City of Jackson,

19  availability of water workforce initiatives, things like that,

20  invest on contracts, et cetera.

21            **THE COURT:**  Does the mayor have any input on your

22  contract with Kellogg?

23            **SPEAKER:**  Not that I know of.

24            **THE COURT:**  So, then, Kellogg asked you to stay on so

25  that you could help the City, correct?

SPEAKER:  ANDY KRICUN

1              **SPEAKER:**  I mean, they -- I think -- I'm not a

2    mind-reader, but that is what they represented to me, yes.

3    Since my fellowship was expiring and I had been working for

4    three months in the city, and it was such a critical time,

5    because it was just coincidental that my fellowship ended at

6    the end of August, and then the crisis started on -- the crisis

7    occurred on August 29, and they asked me to stay on.  They

8    invited me to stay on and offered me a contract to do so.

9              **THE COURT:**  So then who is your contact person with

10    the City?

11             **SPEAKER:**  I don't really have a contact person with

12    the City directly.  It depends on the issue.  I mean, if it's a

13    financial issue -- again, I have worked with them for over a

14    year now.  If it's a financial issue, I might write to the CFO.

15    If it was an urgent issue, like the issue of the advisory, I

16    might write to the mayor.  It depends on the issue.  Water

17    workforce, I might write to the chief of staff.

18             **THE COURT:**  So you are saying that the City of

19    Jackson, then, has nothing to do with your contract?

20             **SPEAKER:**  As far as I know, they have nothing to do

21    with it.

22             **THE COURT:**  Did you know Mr. Henifin before he

23    started here?

24             **SPEAKER:**  Yes, very well, and I think very highly of

25    him.

1          **THE COURT:**  And on this matter of -- concerning the

2    youngsters and pregnant women, is that reduced to writing

3    somewhere?

4          **SPEAKER:**  Well, it's in the Mississippi State

5    Department of Health Advisory.

6          **THE COURT:**  I know that, but is there somewhere I can

7    read for a backdrop on all of that?

8          **SPEAKER:**  Well, yes.  The fellow from the Mississippi

9    State Department of Health showed it to me because we were

10   together in the meeting in Washington, as I mentioned, and he

11   pulled it up on his laptop and I read it with him, looking over

12   his shoulder on his laptop.  So I don't know precisely where to

13   find it, but it is easily found.  I'm sure I could find it on

14   the Web or get it from him and provide it.

15        And the point, Your Honor, is that it should be widely

16   known.  And again, I'm not contradicting that the water leaving

17   the treatment plant is safe or meets the regulatory

18   requirements.  These things can be true at the same time.  The

19   advisory is about the corrosion control systems, and it is

20   specifically for pregnant women and young children under five.

21   And I just wanted to make sure that the people, the vulnerable

22   population, didn't ignore -- or weren't aware of the advisory

23   and didn't take the protective opportunities that they should

24   to protect -- you are talking about vulnerable people, pregnant

25   women and young children.  I felt it was my ethical duty to

SPEAKER:  ANDY KRICUN

1   make sure there was no ambiguity about the advisory once I

2   learned this directly from the state official.

3           **THE COURT:**  And can you send me the backdrop on this

4   matter, that is, what forms the advisory and all?

5           **SPEAKER:**  Yes, I would be happy to.  As soon as I'm

6   back to my home office, I will obtain a copy of it.  Should I

7   send it directly to you or should I send it through someone?

8           **THE COURT:**  Send it directly to me.

9           **SPEAKER:**  Would it be okay for me to find out your --

10  (Zoom lag)  Do that via the city attorney to get your

11  confidential information, Your Honor?

12          **THE COURT:**  No, just the address at the courthouse,

13  501 East Court Street.  Repeat, 501 E. Court Street, Jackson,

14  Mississippi, Suite 6.750.  The zip is 39201.

15          **SPEAKER:**  Yes, Your Honor.  So you want me to mail

16  you a copy of that?

17          **THE COURT:**  Yes.

18          **SPEAKER:**  Will do, Your Honor.  I will do that as

19  soon as I get back home.

20          **THE COURT:**  And also, I would like to see a copy of

21  your contract, if you don't mind.

22          **SPEAKER:**  Yes, Your Honor.

23          **THE COURT:**  You say it's just with Kellogg, right?

24          **SPEAKER:**  I have two contracts that are currently

25  going, ongoing.  One is with Kellogg and one is with the Thomas

1   Consulting Group for different kinds of work.

2           **THE COURT:**  Okay.  Relative to the water matter, you

3   have a contract with whom?

4           **SPEAKER:**  So the way it is parsed out or the way it

5   is paid out is that I work on things like water workforce

6   opportunities or community engagement is more through the

7   Kellogg Foundation, and technical assistance is more through

8   the Thomas Group.

9           **THE COURT:**  Okay.

10          **SPEAKER:**  In this particular matter, it really arose

11  from my volunteering as a member of the Environmental Justice

12  Council and learning about the nature of this advisory and how

13  it impacted Jackson's vulnerable residents, and I felt it was

14  my duty to bring this forth.

15          **THE COURT:**  Where is your home?

16          **SPEAKER:**  I live in New Jersey, Your Honor.

17          **THE COURT:**  Is that where you are now?

18          **SPEAKER:**  No, I am traveling for a conference.  This

19  is why I had to step out yesterday, because the reason I am

20  here is to speak for the EPA on a completely different issue to

21  an association, where Mr. Henifin and I first met.  We are both

22  are on the board of this particular association, and we are

23  active utility managers, and I'm traveling for a conference of

24  that association that I was speaking at yesterday, and I'm

25  flying home today, Your Honor.

1          **THE COURT:**  Anything else you want to say?

2          **SPEAKER:**  The only thing I would say, Your Honor, is

3    just to note that in my opinion, having been somewhat of a

4    neutral observer, but I really believe that the City of Jackson

5    and JXN Water really want the same things, the good and the

6    benefit of the residents of Jackson.  And I think that me,

7    having promoted the hearing, it probably would be best that

8    there was more consistent communication between JXN Water, the

9    City and the residents, but I recognize -- because as I said, I

10   know Mr. Henifin and I know he's a good person who believes in

11   public service, as evidenced by what he is doing here in

12   Jackson, so it's just a matter I think of capacity and timing,

13   but I hope -- it's like a learning curve for them to work

14   together, but my hope is that there is better coordination and

15   communication among JXN Water, the City and the residents so

16   that they all work together toward the common goal -- I mean, I

17   believe they are working together toward the common goal, but

18   it is more communicative.

19         The other thing I would add lastly, Your Honor, I would

20   urge JXN Water to consider competitive procurements when an

21   emergency isn't involved.  And certainly when there is an

22   emergency, it is necessary to have non-competitive procurements

23   in order to meet the emergency.  But when there's long-term

24   high cost work to be done, and when there is the opportunity

25   and time period to allow for competitive procurement, I would

SPEAKER:    ANDY KRICUN

1    recommend that because it would enable the city to get -- since

2    we are dealing with public funds and public assets, it would

3    increase the probability of the City getting lower costs and

4    also the opportunity for community benefits to be worked into

5    the contract and those kinds of things just because of

6    competition.  So that would be something I would urge for the

7    future.  But again, I recognize we are transitioning from the

8    emergency into a longer term period.  So those are my comments,

9    Your Honor.

10         **THE COURT:**  Now, you said that you are a neutral

11    observer.  Is that what you are saying?

12         **SPEAKER:**  I mean, as far as a person who is outside

13    the city -- being neutral, I don't live in the city of Jackson.

14    So as an observer of the situation since June, I would say that

15    is how I would describe myself, a person who is on the outside

16    looking in, you know, not involved in the day-to-day work the

17    way the City is currently and Mr. Henifin is since he is

18    relocated.  An outside observer.  That's what I meant.

19         **THE COURT:**  Hold it.  But you said you are a neutral

20    observer, and you have been here, that is, you have studied the

21    Jackson water situation, am I correct?

22         **SPEAKER:**  Since June of last year.  Yes, Your Honor.

23         **THE COURT:**  So before Mr. Henifin started his work,

24    what was the status of the water in Jackson?

25         **SPEAKER:**  Well, I can tell you what my advice was,

SPEAKER:   ANDY KRICUN

1    which would include into that.  I thought that the -- well,

2    there's three elements, if I may.  The drinking water system,

3    both the distribution system and collection system, had serious

4    issues.  And even before the Jackson water crisis at the end of

5    August, there were serious issues, noncompliance issues, a lot

6    of leakage on the drinking water side.  On the sewer collection

7    side --

8            THE COURT:  No, don't talk about the sewage water.

9    We're just talking about drinking water.  You said that --

10           SPEAKER:  The drinking water --

11           THE COURT:  One second.  Hold it.  You said that

12   there were serious issues on the drinking water side before Mr.

13   Henifin got here.

14           SPEAKER:  Yes, Your Honor.

15           THE COURT:  What caused those serious issues, in your

16   estimation?

17           SPEAKER:  Well, different issues have different

18   causes, of course, but I would say that the issues -- let me

19   enumerate the main issues.  First, there was a serious shortage

20   of staffing, very understaffed.  Second, on the distribution

21   side, there was a significant amount of leakage, which adds

22   more cost to the system, because if you have to make more water

23   and a lot of it is leaking out, it costs more.  Right?

24           THE COURT:  How did you find out about the leakage?

25           SPEAKER:  By reviewing reports.  There's a way of --

1    there's a reportage form that one looks at to see what kind of

2    -- how much water is generated versus how much water is

3    actually billed for.  And they had very high, you know,

4    numbers, and they still do have numbers because that's

5    something JXN Water is working toward to fix.

6         **THE COURT:**  And how would you characterize the

7    quantity of leakage?

8         **SPEAKER:**  Well, the way I would quantify it is that

9    there's a term called nonrevenue water, which is basically the

10   amount of water -- the percentage of how much water that this

11   plant makes versus how much water actually gets to the house

12   and is billed for.  So it's a combination of leakage plus

13   underbilling, and Jackson had, like, (Zoom lag) 50-percent

14   rate, and a well run system is about 10 to 15 percent.  And the

15   system currently still has a high amount of nonrevenue water

16   because it is going to take a lot of time for JXN Water and the

17   City of Jackson to work together to get that down through

18   improvements to the billing system and reductions of leakage.

19        **THE COURT:**  So you are saying that a level that's

20   expected is like 10 to 15 percent?

21        **SPEAKER:**  A well run system, because, you know, for

22   example, even the best run systems have some leakage or

23   unbilled water.  For example, you wouldn't charge the fire

24   department to use water to put out the fire.  That would be

25   nonrevenue water.  So it is never zero, but a good rule of

1    thumb is maybe 10 to 15 percent.  So the City of Jackson has

2    and still has a very high level of nonrevenue water.  It is

3    definitely something that I know JXN Water is working to

4    address.

5              **THE COURT:**  But before Mr. Henifin got here, you said

6    that it was about 50-percent leakage?

7              **SPEAKER:**  It was very high.  There is no doubt.  Mr.

8    Henifin inherited that problem.

9              **THE COURT:**  Do you have a theory as to why the

10   leakage was that high?

11             **SPEAKER:**  Well, remember, the 50 percent includes

12   leakage plus unbilled revenue.  It is two things combined

13   together.  I think the issue with the leakage is largely due to

14   the aging infrastructure, and in some cases, like, maintenance,

15   like, for example, valves that might be open that need to be

16   shut.  And I saw that JXN Water has recently found some of

17   those and shut them.  So that should reduce the leakage.  So I

18   would say it would be a combination of aging infrastructure and

19   understaffing, which has been historically the case for Jackson

20   for some time.

21        I will, if I may offer an opinion, I do feel that it would

22   have been better if the federal and state government had

23   offered more funding opportunities for a city like the city of

24   Jackson, because I worked in a very poor years for many years,

25   the city of Camden, and it is really essential that they get

SPEAKER:  ANDY KRICUN

1   extra help for the infrastructure.  So it is very difficult for

2   a lower income community, not just Jackson, Flint, Gary,

3   Camden, et cetera, to meet these aging infrastructure problems.

4   And before, the infrastructure was funded with more federal

5   funding, and the federal funding has really dropped, even

6   though there has been a bit of an upkick.

7        So all low income cities are having problems, or many, I

8   should say, low income cities are having problems with aging

9   infrastructure, so this has been an ongoing problem for the

10  city of Jackson, and it is something that Mr. Henifin inherited

11  when he began his work here.

12       **THE COURT:**  And when you were consulting with the

13  City, did you point out these same points you are pointing out

14  now?

15       **SPEAKER:**  Yes, I recommended that they seek funding

16  from the state and federal government to try to close that

17  infrastructure gap.  I also suggested contracted operations,

18  which is ultimately what Mr. Henifin did on the water side by

19  bringing in Jacobs.  I thought that would be a way to make

20  up -- I'm sorry.  I mentioned two problems, the aging

21  infrastructure and understaffing.  So the aging infrastructure,

22  my recommendation was to seek more funding, and they have.  But

23  as you know, I'm sure you know, Your Honor, they were able --

24  good teamwork with the City, JXN Water, et cetera, and with

25  Representative Thompson and also the senators from the state of

SPEAKER:  ANDY KRICUN

1   Mississippi, the legislative branch, Jackson has got quite a

2   lot of infrastructure funding which will help close that gap.

3   That's on the infrastructure side.  And then on the staffing

4   side, I did think they probably needed the private contractor

5   operations, like they were already doing on the wastewater

6   treatment plant side, and that is what JXN Water has done.

7           **THE COURT:**  How does a company determine leakage, the

8   equipment, the instruments.  Are you familiar with that?

9           **SPEAKER:**  There are leak detection services -- it is

10  difficult because it is underground, obviously, but there are

11  leak detection services.  The best way to deal with it is to

12  first see if you have a problem.  If you are making a hundred

13  gallons, right, and only 60 are getting to the houses, let's

14  say, you know that globally, systemwide, there is a certain

15  amount of leakage, and then you try to track it down.  If it's

16  a valve, it is easier to fix than a broken pipe.  But my sense

17  with the Jackson system, and this is not through studies, it's

18  just my sense of it based on the age of the system, and from

19  what I've read from Mr. Henifin's reports too, that it is

20  probably death by a thousand cuts.  It is not, like, one giant

21  leak.  It's in many places, and so it takes time to track these

22  leaks down, Your Honor.

23          **THE COURT:**  Well, you know, I went on a tour, and I

24  was shown a huge leakage of something like millions of gallons

25  of water per day, and I was told that this leakage had occurred

188

SPEAKER:   ANDY KRICUN

1    over a long period of time.

2            **SPEAKER:**  Um-hm.

3            **THE COURT:**  Are there instruments that would have

4    told someone about that?

5            **SPEAKER:**  The way I would answer that is that, first

6    of all, if it was on public property, it is easier -- versus

7    private property -- in other words, no city can scour the city

8    looking for leakage.  You generally, you know, find it when a

9    citizen reports something bubbling up, or we might see a very

10   large loss of pressure, and then you respond to it.  If it was

11   easy to find, then JXN Water could eliminate the leakage faster

12   too.  It is difficult to locate, but a lot depends on whether

13   or not the service tells you that I'm not getting water

14   anymore.  So then you know.  For example Mr. Smith and

15   Mrs. Jones would say, my water is not -- it is blocked and

16   start complaining, and then you'd go and see what was wrong.

17   So a lot of it is reactive, I would say, Your Honor.

18           **THE COURT:**  Well, Mr. Henifin took me and others in

19   this litigation out to a site where these millions of gallons

20   of water were being lost per day.

21           **SPEAKER:**  Um-hm.

22           **THE COURT:**  So what I'm asking you is, since you

23   talked to me about leakage and, as you say, that Jackson had

24   a -- well, a 50-percent loss, well, then, wouldn't that loss be

25   of such a large magnitude that Jackson would have known that

 1    this loss is occurring on a large scale somewhere?

 2         **SPEAKER:**  Yes.  They did know -- they did know and

 3    still do.  I still think JXN Water's current -- last report was

 4    like 56 percent, so it is still pretty high, I mean, still.  I

 5    think the thing is that what Jackson faced then and Mr. Henifin

 6    and JXN Water face now is that it isn't one giant leak.  Like I

 7    was saying, months later -- because if it were, you would see

 8    it puddling up, and if you addressed it, you would see the

 9    leakage go down.  Instead, I think it's, like I said

10    inelegantly, it is death by a thousand cuts.  There are a lot

11    of these in the system.  It's an aging system, and so they are

12    going to have to track them down valve by valve, pipe segment

13    by pipe segment.

14         Now, one thing I will say, now that Jackson received

15    federal funding, and I saw the first traunch just came in, so

16    it's not as though JXN Water has had the funds, the funds are

17    just coming in, but these federal funds will allow JXN Water to

18    replace older sections of the city system.  And obviously with

19    the new pipe, you will knock out those leaks, you know --

20    instead of repairing each leak at a time, you will knock out a

21    whole pipe section, if you know what I mean.  So I think the

22    capital improvement will go a long way toward reducing the

23    leaks.  They are not easy to find unless it is one big leak.

24         **THE COURT:**  Well, we did have one big leak.  That's

25    the millions of gallons that were being lost.  And I went out

SPEAKER:  ANDY KRICUN

1   on a tour and saw that.  It was like a waterfall.  And an

2   artificial lake had been created as a result, which was about

3   35 feet deep of nothing but treated water.  Did you know

4   anything about that?

5           **SPEAKER:**  I did not.  Is this the leak on the -- I

6   did not when I was working in Jackson before.  Is this -- I may

7   have read about a leak that was on a golf course, a private

8   golf course.  Is that the same one?

9           **THE COURT:**  No.

10          **SPEAKER:**  Then I don't know, Your Honor.

11          **THE COURT:**  This one is on Atkins Boulevard.

12          **SPEAKER:**  Okay.

13          **THE COURT:**  Do you know anything about that?

14          **SPEAKER:**  No, Your Honor, I do not.  I'm unaware of

15  that.

16          **MS. MARTIN:**  Your Honor --

17          **THE COURT:**  Do you know anything about it?

18          **SPEAKER:**  No, Your Honor, I do not.

19          **MS. MARTIN:**  Your Honor, if I may, the leakage that

20  you are talking about, it was on a private golf course.  I

21  don't know if you realize that, but it was a private golf

22  course that had been abandoned.  I will defer to Ted Henifin to

23  offer his comments on that, but it is the same leak that

24  Mr. Kricun is talking about.

25          **THE COURT:**  All right.  Thank you so much.  Do you

SPEAKER:   ANDY KRICUN

1   know anything about that leak, whether it's on a private golf

2   course or a public golf course?

3          **SPEAKER:**  I only read a report that it was found.  It

4   was on a private golf course, and that's a big win for the city

5   and kuddos to JXN Water for finding it so they can eliminate it

6   and get a chunk of that.  I mean, bear in mind that's, pardon

7   the pun, it is a bit of a drop in the bucket because there is

8   so much leakage, but that's a big win to find that one big

9   leak.

10      But I guess I would say that it would have been easier for

11  the City or even for JXN Water to find it sooner if the owners

12  of the property would have reported it.  I mean, even JXN Water

13  didn't find it for several months because they are not -- it's

14  typical that water companies are reacting to reports of the

15  owners, and then they come and fix it.

16         **THE COURT:**  Okay.  Now, you are still working with

17  Jackson; is that correct?

18         **SPEAKER:**  I'm working with the foundation and the

19  consulting group, as I mentioned, who are working with Jackson.

20  I'm not contracted with the City of Jackson.  I'm trying to

21  help them where I can.

22         **THE COURT:**  And then, finally, with regard to the

23  work that's being done now, do you see improvement or is it

24  static, or do you see that the efforts have all been in vain?

25  What is your view of this matter?

SPEAKER:  ANDY KRICUN

1          **SPEAKER:**  Well, Your Honor, to be honest, I'd say

2     that there has been improvement for sure.  My recommendations

3     would be that, as I said earlier, I think this advisory is very

4     important just to protect vulnerable populations, and I think

5     this might have been maybe a misunderstanding on just an

6     ambiguity that I thought should be corrected.

7          I am concerned about that chlorine gas, but I know that's

8     on JXN Water's list.  I do hope that there's better -- I think

9     communication will go a long way, and again, it is a new

10    situation, but I think that will help.  But I also think that

11    it's the idea of competitive procurement wherever possible, but

12    there's no doubt, this is a good direction for the City of

13    Jackson, and I think there has been progress.  I think there

14    has been improvement in the Jackson water system since Mr.

15    Henifin took it over.  And I think more progress will occur

16    over time, especially if the two parties are working together

17    as closely as possible.

18         **THE COURT:**  Did you forget anything that you wanted

19    to tell me about?

20         **SPEAKER:**  No, Your Honor.  I think I covered

21    everything.  Thank you very much for the opportunity to speak,

22    and best wishes to Mr. Henifin and to the City of Jackson and

23    to its residents.

24         I have been friends with Mr. Henifin for many years and

25    worked with the City over a year, and I'm really committed to

SPEAKER:  ANDY KRICUN

1      seeing a good outcome for them, so that's my wish.

2              **THE COURT:**  All right.  One second.  Any questions

3      over here of this individual?

4              **MS. WILLIAMS:**  No, Your Honor.

5              **MR. KUCIA:**  Yes, Your Honor.

6              **THE COURT:**  Okay.  Your question?

7              **MR. KUCIA:**  Mr. Kricun, my name is Gerald Kucia, and

8      I represent the State, and specifically the health department.

9      You testified that you had spoken to Mr. William Moody about

10     the water situation here in Jackson.

11             **SPEAKER:**  Yes, I did, but not -- I didn't reach out

12     to him for that purpose.  We happened to be serving together on

13     the committee, so I asked him about it.

14             **MR. KUCIA:**  Other than Mr. Moody, have you spoken to

15     anybody else with the Mississippi State Health Department about

16     the water situation in Jackson?

17             **SPEAKER:**  Not directly as I did with Mr. Moody, but I

18     was participating in those unified command calls over -- from

19     September -- August 29ish, 2022, until the last call in the

20     first quarter of 2023, and so there were other State Department

21     of Health members on those unified command calls, but I didn't

22     speak directly with anyone.  The only direct conversation I had

23     was with Mr. Moody, you know, when he and I were in Washington,

24     DC together at the end of June.

25             **MR. KUCIA:**  Can you identify any of the other state

SPEAKER:   ANDY KRICUN

1    health employees who were on those calls that you've described?

2        **SPEAKER:**  I'm sorry, sir, not off the top of my head.

3    I would have to go back and look at the invitation list, but I

4    will say that I thought State Department of Health and the

5    state FEMA and also their counterparts were incredibly helpful

6    to the City of Jackson, and the JXN Water and the City of

7    Jackson were all participating together, Corps of Engineers

8    too, and they were all working together to reduce the crisis,

9    but I don't know who else was on the calls for the Department

10   of Health.  I just thought there was more than one.

11       **MR. KUCIA:**  Yes, sir.  You also testified, if I

12   understood you correctly, that the advisories that are

13   currently sent out are related to issues of corrosion control.

14   Is that correct?

15       **SPEAKER:**  It's not a yes or no.  My understanding is

16   that the reason for the advisory was started in 2016 was

17   because the two drinking water treatment plants in the city of

18   Jackson, the Curtis plant and the Fewell plant, did not have

19   adequate permanent corrosion control systems, and the City

20   submitted a plan which was approved in 2016, and the advisory

21   is in effect until that plan is actually implemented with the

22   actual installation of those approved systems, permanent

23   systems for Curtis and for Fewell.

24       And I'm sorry, that's the main thrust of the advisory.

25   There is also a corollary, if you will, that mentions the issue

SPEAKER:  ANDY KRICUN

1  of being careful if you are in an older home that is likely to

2  have internal lead plumbing, which has nothing to do with the

3  water that's being generated by the Jackson water plant.  It's

4  a feature or function of the type of home the person has, but

5  again, the goal of the Department of Health is to protect the

6  public's health at the tap, so that is like a corollary to the

7  advisory (Zoom lag).

8          **MR. KUCIA:**  No further questions, Your Honor.

9          **THE COURT:**  Okay.  Any other questions on the other

10  side?

11          **MS. WILSON:**  Yes, Your Honor.

12          **THE COURT:**  Go to the podium, please.

13          **MS. WILSON:**  You want me to go to the podium, Your

14  Honor?

15          **THE COURT:**  Well, try it right there then.  Go ahead.

16          **MS. WILSON:**  Malissa Wilson, counsel for JXN Water.

17  We just have one question.  Are you speaking in your individual

18  capacity or in an official capacity, and if you are speaking in

19  an official capacity, what organization are you speaking on

20  behalf of?

21          **SPEAKER:**  I'm definitely speaking as an individual,

22  as a person who found out information through my voluntary

23  service on the EPA's Environmental Justice Council, and I

24  thought since there was variance from what I was reading in the

25  paper and what I was learning directly during those meetings, I

1    thought it was important to bring it forth and make sure the

2    vulnerable population was protected and there was no ambiguity

3    about it.  So definitely my individual capacity, ma'am.

4            **MS. WILSON:**  No more questions, Your Honor.

5            **THE COURT:**  Back row?

6            **MS. MARTIN:**  Your Honor, I do have one follow-up

7    question.

8            **THE COURT:**  Okay.

9            **MS. MARTIN:**  Andy, this is Torri Martin with the City

10   of Jackson.  Have you ever had a contract with the City of

11   Jackson?

12           **SPEAKER:**  Directly with the City of Jackson, no, Ms.

13   Martin.

14           **MS. MARTIN:**  That's the only question we have.

15           **THE COURT:**  I have to ask, what do you mean by

16   directly?  You say you have not had one directly.

17           **SPEAKER:**  A contract --

18           **THE COURT:**  Have you had one indirectly?

19           **SPEAKER:**  Well, no, other than the ones I mentioned

20   where I'm contracted to work in Jackson but not -- I'm not

21   contracted with -- there is no contract with me and the City of

22   Jackson.  But I'm providing advice to the City as I previously

23   described, contracts that I previously mentioned, Your Honor.

24           **THE COURT:**  And do you have a notebook of your advice

25   to the City?

SPEAKER:   ANDY KRICUN

1          **SPEAKER:**  No.  No, I don't.  It would just be -- I do

2   it on an ad hoc basis, you know.  It was verbal, if it was in

3   person or on a call or via e-mail.

4          **THE COURT:**  So this advice that you are providing,

5   you provided it to your contractor and not to the City?

6          **SPEAKER:**  Oh, no, sometimes I would write directly to

7   the City, you know, but they would -- my contractor would be

8   aware of that if I did.

9          **THE COURT:**  Okay.  Thank you very much.  Any other

10  questions by anybody?  Thank you very much.  I appreciate

11  you.

12         **SPEAKER:**  Thank you, Your Honor.  I appreciate the

13  opportunity to speak.

14         **THE COURT:**  Good luck on your speech.  Are you

15  through with your speech?

16         **SPEAKER:**  Yes, sir, it was yesterday.  Thank you for

17  being flexible, Your Honor.

18         **THE COURT:**  All right.  Let's go to the next person.

19  This is going to be Efren Nunez.  Did we do that person

20  yesterday?

21         **MS. MARTIN:**  Yes, Your Honor.

22         **THE COURT:**  And then Makani Themba, did we do that

23  person yesterday?

24         **MS. MARTIN:**  Your Honor, I believe yesterday she

25  represented to the Court that she would be in Los Angeles

today.

**ORAL STATEMENTS OF DANYELLE HOLMES PRESENTED**

**THE COURT:** All right. Danyelle Holmes, Mississippi Poor People's Campaign.

All right. Ms. Holmes, how are you doing today?

**SPEAKER:** I'm doing good, Your Honor.

**THE COURT:** Okay. Now, what is your relationship with Mississippi Poor People's Campaign?

**SPEAKER:** I am a national social justice organizer with repairs of the breach doing work with the Poor People's Campaign.

**THE COURT:** Are you a citizen of Jackson?

**SPEAKER:** Yes, sir, I've been a citizen of Jackson since 1991.

**THE COURT:** Okay. Go ahead. Tell us what you have to say.

**SPEAKER:** Your Honor, I'm here today to express concerns of transparency as it relates to Jackson's water, the safety and cleanliness of Jackson's water. We have -- the Mississippi Poor People's Campaign is a member of the Mississippi Rapid Response Coalition, but we have also been on the ground doing work here since 2018 here in the city of Jackson and across the state of Mississippi, but we are the Poor People's Campaign, which is the overall umbrella of -- the state campaigns in Mississippi happens to be one of them, and

SPEAKER:  DANYELLE HOLMES

1    we are in 42 states across this country.  And I am the national

2    social justice organizer for Mississippi.  And Mississippi is

3    my home, born and raised here in Greenwood, Mississippi -- in

4    Greenville, Mississippi, and later came to Jackson upon

5    attending college here.  However, in doing this work and in

6    meeting Mr. Henifin -- we first learned of Mr. Henifin through

7    the U.S. Water Alliance, the Mississippi Rapid Response

8    Coalition, which is the -- make up over 30-plus organizations.

9        We entered into a partnership with the City of Jackson on

10   August 29, 2022, to ensure that Jacksonians had access to clean

11   drinking water, and we knew that this fix of the water

12   infrastructure would be a long overhaul.

13       So after establishing that partnership, which I must say

14   that we had been doing this work prior to the partnership with

15   the City of Jackson, our work started in COVID during 2020, on

16   the ground ensuring that students had hot meals that couldn't

17   get to the buses or couldn't walk to school.  Then we were hit

18   with COVID, and then the winter crisis, and then came the water

19   crisis.  So for the last three years we have been on the ground

20   running strong day-to-day operations of making sure the needs

21   are met here in the city of Jackson, as well as across the

22   state, and those that come in from out of state for hurricanes

23   or whatever that would lead them here.

24       Again, I learned of Mr. Henifin through U.S. Water

25   Alliance and learned that he was in the running for the

1    third-party manager, that he would be the ideal individual to

2    come in, and I think he would be, or I thought he would be, and

3    maybe still so.  I don't know, because the lack of

4    communication is why I'm here today.  And so when we later met

5    Mr. Henifin during a community meeting, several community

6    meetings, we were introduced to Mr. Henifin.  And at those

7    community meetings, Mr. Henifin had made some commitments to

8    the community.

9         Some of those commitments, one was transparency with the

10   citizens of Jackson.  Another commitment was Jackson

11   maintaining its own public water system.  These were stated on

12   recorded zoom calls, so this can be repeated.  You can go back

13   and actually listen to these community meetings.  And also

14   including minority contractors in the city of Jackson and

15   making sure -- he also talked about how the State's attempt to

16   take over Jackson's water was nothing more than a money grab.

17   And he also stated publicly during one of those meetings I

18   recall, and I think I also may recall it was during a press

19   conference as well, his partnership with the Mississippi Rapid

20   Response Coalition.  Although nothing had been put on paper, he

21   publicly stated that he was in partnership with the Mississippi

22   Rapid Response Coalition.

23        So that led us to expect transparency if you state it

24   publicly that you are going to be in partnership with us,

25   because we have community members calling on us daily regarding

SPEAKER:   DANYELLE HOLMES

1    their water bills, their water quality, groundwater, water

2    smelling like eggs, sulfur, grainy.  Whatever their issues are,

3    they are going to call those that they know that are in the

4    community, that have been in the community assisting them.

5        So after failed attempts of not being able to communicate

6    properly, get some transparency with Mr. Henifin, we met with

7    the EPA in April, we expressed those concerns to the EPA, DOJ

8    as well, and that meeting was held at the e-Center in Jackson.

9        Later on, we were able to -- I was able to address Mr.

10   Henifin at the NAACP meeting that was held at New Hope and

11   expressed that we needed transparency, that we had been

12   attempting to reach out to him in regards to, one, the water

13   quality; two, the lack of community meetings that he had also

14   made a commitment to doing on a monthly basis to the community,

15   that he would hold these meetings to keep the community

16   updated.  However, after this water debt relief program was

17   launched and there was confusion about the funds and where that

18   money was coming from, whether it was LIHWAP or whether it was

19   money from the EPA or wherever the money was coming from,

20   wherever the breakdown of that communication with the water

21   debt relief program, that shortly after, I think a day after,

22   Mr. Henifin said that he had misspoke on something relating to

23   the grant money and how all of that technicality of what was

24   rolling on that.

25       And then there was the firing of Mr. Abdul-Tawwab,

1    director of the help center, which was one of the community

2    members as well, but was well experienced to be the director of

3    the help center.   And so there were community meetings

4    scheduled I believe prior to the firing of Mr. Abdul-Tawwab.

5    However, those meetings were cancelled when the community began

6    to reach out to Mr. Henifin to ask for transparency and to see

7    what was going on.   We had not heard from Mr. Henifin.   We have

8    been waiting for community meetings, and to this notion of

9    Jackson not needing any boil water notices, when we had been

10    getting reports from residents that the water was still brown,

11    oily, and smelly and wasn't drinkable or residents were even

12    scared to bathe in it.

13        So we continue to this day to still distribute water to

14    residents who call and say they don't have water, their water

15    isn't running properly, that they have brown water or they are

16    just afraid to drink Jackson's water.

17        So this is why we are here today.   I did meet with Mr.

18    Henifin, along with Ms. Makani Themba in May, after speaking

19    with him at the NAACP meeting.   We were able to get a meeting

20    scheduled.   We had an hour-and-a-half-long meeting there.   We

21    did talk to Mr. Henifin, and pretty much we listened a lot.   We

22    did express concerns.   But during that meeting, it was when we

23    later learned that Mr. Henifin said that he had misspoke at the

24    community meetings prior if he had said the commitments that he

25    had made.   And some of those things he misspoke on was Jackson

1    maintaining its own water supply.  He, at that time, notified

2    me and Ms. Makani that he did not think Jackson would ever be

3    able to maintain its own water, and we reiterated back to him

4    that this was a commitment that you had already made to the

5    committee.

6         Another one of the commitments he had made was workers

7    maintaining their employment with the City of Jackson, that he

8    was there to ensure that that would happen.  He said that he

9    did not recall saying that, but, however, if he said it, he

10   misspoke.

11        Then after hearing a meeting in April where Mr. Henifin

12   was at Millsaps meeting with a group of individuals, and I

13   don't know who those were, I wasn't in attendance, but the

14   meeting was public on its JXN Water Facebook page, and during

15   that meeting, Mr. Henifin said he had been given more power

16   than he would have given himself.  And that really raised red

17   flags because now we are wondering what kind of power does Mr.

18   Henifin have.  And when we began to ask questions, well, who

19   does Mr. Henifin report to, the only question -- the only

20   answer we could get was his only oversight is the judge.

21        Well, then I questioned again, well, how do we get in

22   touch with the judge if we have immediate concerns or if the

23   community has immediate concerns.  So, Your Honor, that is why

24   I'm here today.  We also learned that Mr. -- well, entered into

25   a ten-year contract with Jacobs.  He did express that as well.

1              Mr. Henifin also expressed that he was not pleased with

2     how the contractors for years had been taking advantage of the

3     City of Jackson and overbilling them for parts and work that

4     wasn't necessary for them to be billed for.  And he also

5     communicated with Ms. Makani and I that he would not be

6     engaging with those same contractors during this process of

7     fixing Jackson's water infrastructure.  So that's why I'm here

8     today.

9              **THE COURT:**  So, then, have you been consistently

10     involved in Jackson's water situation?

11              **SPEAKER:**  Yes, sir, I have.

12              **THE COURT:**  Over what period of time?

13              **SPEAKER:**  Since 2020.

14              **THE COURT:**  You don't go back before 2020?

15              **SPEAKER:**  Well, we have always assisted individuals

16     doing humanitarian aid, but Jackson's water crisis that really

17     hit when I became involved, prior to then, no, I wasn't deeply

18     involved in Jackson's water crisis.

19              **THE COURT:**  So since you have been involved, and

20     let's say it was 2020, what efforts did you make at that time

21     to understand the source of Jackson's water problem?  What did

22     you do in 2020, for instance?

23              **SPEAKER:**  For instance, in 2020, I was just learning,

24     because I'm not a water expert.  That's not my expertise.  But

25     I made it my business.  Actually, in 2016, I began studying

SPEAKER:   DANYELLE HOLMES

1    environmental climate justice work.

2         So I attended a fellowship with former Vice President Al

3    Gore called the Climate Reality Project, which I am now one of

4    the leading mentees for that program.

5              **THE COURT:**  So you didn't do anything relative to

6    water in 2016?

7              **SPEAKER:**  No, sir, because at that time, in 2016,

8    there were no real issues with bubbling water -- boil water

9    notices since I've been in Jackson.  I've never trusted

10   Jackson's water.  When I came here in 1991, I was told don't

11   drink Jackson's water.  And that was when I was attending

12   Tougaloo College.

13             **THE COURT:**  Why -- well, not why, but what were you

14   told about Jackson's water that alarmed you?

15             **SPEAKER:**  Well, one, when you first drinking -- the

16   chlorine smell coming out of Jackson's water when I got here in

17   1991 was extremely strong, and I don't see how anyone can

18   ingest that kind of water.  So that was totally different water

19   coming from the Mississippi Delta.  So yeah, I didn't trust it.

20   That was my own common sense and intellect that told me as well

21   not to drink that water.  But I've always been told Jackson's

22   water was unsafe.  No one ever went into details, and I also

23   wasn't talking to water experts as well to say why isn't

24   Jackson's water unsafe.  I don't think I was really that deeply

25   engaged.  I was young then, so I didn't really know what to

1    expect, and that was something, again, that was not a part of

2    my upbringing.

3              THE COURT:  Were you then at Tougaloo?

4              SPEAKER:  Yes, I was at Tougaloo in 1991.

5              THE COURT:  Okay.  How long were you at Tougaloo?

6              SPEAKER:  For three years.

7              THE COURT:  Okay.  So while you were on The Yard, you

8    were not really involved with the Jackson water situation?

9              MS. MARTIN:  No.  While I was on The Yard, I was in

10   tune to my education.

11             THE COURT:  Absolutely.

12             SPEAKER:  And trying to live my best life as well.

13             THE COURT:  There you go.  You should have.

14        I was on the Tougaloo Board of Trustees for a while, so

15   I'm glad that you were up there paying attention to what was

16   going on on The Yard.

17             SPEAKER:  On The Yard.

18             THE COURT:  So then in 2020, did you get involved

19   then?

20             SPEAKER:  We were giving out water in 2020.  There

21   were some -- but then also, understanding that you have to --

22   in order to be able to assist, there has to be some kind of

23   organizing effort.  And so around 2020, that's when the

24   organizing effort really got serious here in the city of

25   Jackson as it relates to community and community organizations

1   coming together, because we knew that we were in a crisis in

2   2020.

3            **THE COURT:**  And did you seek to meet with any leaders

4   at that time?

5            **SPEAKER:**  I've met with leaders.  I meet with the

6   leaders all the time.  I don't hold back.  If there is an issue

7   with the City, I address the City.  So yes, I did address the

8   City in 2020 regarding the water.

9            **THE COURT:**  When you said you addressed the City, how

10  did you do it?

11           **SPEAKER:**  I don't remember if it was a phone call,

12  probably at the city council meeting, but also I'm in

13  communication with the administration.

14           **THE COURT:**  Does that mean you are in communications

15  with the mayor?

16           **SPEAKER:**  Yes, in communications the mayor, the chief

17  of staff or the mayor's secretary, security, whoever I can get

18  a message to.

19           **THE COURT:**  And answers that were provided to you, if

20  any, did they satisfy you?

21           **SPEAKER:**  No.

22           **THE COURT:**  What kinds of answers did you receive?

23           **SPEAKER:**  That Jackson needed money to fix its water

24  infrastructure.

25           **THE COURT:**  And did you look at the color of the

SPEAKER:   DANYELLE HOLMES

1   water?

2             **SPEAKER:**  At the what?

3             **THE COURT:**  Color.

4             **SPEAKER:**  Color of the water?

5             **THE COURT:**  Yes.

6             **SPEAKER:**  Yes.

7             **THE COURT:**  What was that color at that time?

8             **SPEAKER:**  Well, my water at home was clear, and I

9   live in northeast Jackson.  Other folks at that time, water was

10  brown.  But now that has reversed.  My water is brown.  And

11  folks in South Jackson, some may have --

12            **THE COURT:**  So where do you live?

13            **SPEAKER:**  I live in Northeast Jackson off of

14  Wayneland Drive.

15            **THE COURT:**  Okay.  Now, then, in '20, when you were

16  conversing with leaders in Jackson, did you make a note of all

17  the people you talked to, or can you tell me?

18            **SPEAKER:**  Did I make a note of all the community

19  people or all the people of the city administration?

20            **THE COURT:**  Of the administration.

21            **SPEAKER:**  I didn't make a note.  What I will note is

22  that I have to go through the administration because I have a

23  city council member that doesn't represent the entire Ward One,

24  so there is no pathway to getting through to my city council

25  member, so I have to go around and go directly to the

1    administration.

2          **THE COURT:**  All right.  So you went to the

3    administration, and you talked to them about the water problem

4    in 2020?

5          **SPEAKER:**  In 2020.  It wasn't in depth, but people

6    were without water.  Now, we went on in '21, 2022, and that's

7    when we really began to have serious conversations about where

8    Jackson was with its water.

9          **THE COURT:**  With whom did you talk at that time?

10         **SPEAKER:**  These meetings happened through the

11   Jackson's People Assembly community meetings, and I think at

12   some point discussions -- and that was when either the mayor or

13   the mayor's representative would come out to community meetings

14   and speak to the community directly as it related to Jackson's

15   water and where we were.

16         **THE COURT:**  And what did you learn?

17         **SPEAKER:**  I learned a lot.  I learned about

18   hydraulics, the hydraulic system and what it would take, the

19   complex and conventional system that is complicated to operate.

20   I later learned of also contaminants in water that can be very

21   harmful.  And even as recently as the report, I'm learning

22   daily about the water, that *People Magazine* published an

23   article saying that cancer-causing for every chemicals found in

24   U.S. tap water.

25         **THE COURT:**  Were you satisfied at those conferences

SPEAKER:  DANYELLE HOLMES

1   what you learned?

2           **SPEAKER:**  Absolutely not.  I will never be satisfied

3   until Jackson's overall water infrastructure is completely

4   fixed, and I'm not getting tagged and my colleagues are not

5   getting tagged, called out on social media and getting calls

6   about them having to -- and I don't know if you can see this

7   far, but as recent as July 4th and on Monday of this week,

8   myself, along with Rukia Lumumba, were tagged in Facebook

9   posts.  One reads, "This BS right here.  My water is the exact

10  same color.  Rukia Lumumba, tell your brother I need answers

11  and clean water ASAP.  I bet y'all ain't looking at no brown

12  water.  Fix it now.  The City of Jackson, Mississippi, explain

13  this filth."

14      And then the resident said, "Dear City of Jackson:  Why do

15  we have to bathe our residents in dirty brown water?  Got to

16  love being in the capital."

17      Then there is another one where a young lady actually

18  posted running water with her faucet being filled with brown

19  water.  And this was done on Monday, and I was tagged in this

20  post.

21          **THE COURT:**  I see.  Okay.

22          **SPEAKER:**  Then there is an article where a

23  resident -- that was done by media on July 8th that was

24  published by WLBT regarding the safe drinking water here in the

25  Jackson -- regarding Mr. Henifin stating that Jackson's water

SPEAKER:  DANYELLE HOLMES

1    was safe.  And Jackson resident Johnny Dickerson was

2    interviewed, obviously, and stated that he was upset, and I

3    will read it for you.

4        It says, "Jackson resident Johnny Dickerson is upset after

5    Henifin made that statement and said that's not completely

6    true.  He says the water that is coming out of his faucet is

7    brown and smelly.  He feels it is detrimental.  Ted Henifin, or

8    whatever his name is, keeps talking about it is safe to drink.

9    I want him to come drink some of this and let me know,

10   Dickerson says.  As Dickerson sits feet away from his faucet,

11   he doesn't hold back his frustration when describing the water

12   that is coming out of it.  It's been oily and soapy coming out

13   of the faucet, Dickerson said.  He claims he's tried to get

14   answers about the water.  I called the EPA and I called

15   downtown, you know, Dickerson said.  He said, Nothing has been

16   done to fix the problem.  I'm not sure, but I'm getting a lot

17   of dots around my ankles and things around my feet.  It's a big

18   concern of mine, he said.  Like many others around the capital

19   city, Dickerson and his family have been dealing with this

20   water issue in the capital city for months.  That's why you see

21   bottled water stacked up in his home to cook and now to bathe

22   with.  He admits buying water case after case is hitting his

23   wallet."

24       "Henifin maintains the city water is clean and safe to

25   drink, despite it being discolored and having an odor.

1    However, Dickerson is still concerned and poses these

2    solutions.  I just want to see it fixed, he said.  I don't want

3    them to keep saying the water is safe to drink when it's not

4    safe to drink, you know.  Fix it.  You've got enough money.  We

5    called JXN Water about Dickerson's water issues and concerns

6    but were told to call back on Monday during regular business

7    hours."

8             **THE COURT:**  Okay.  Do you have something else you

9    want to read?

10            **SPEAKER:**  No, sir, Your Honor.  That's all I have.

11            **THE COURT:**  Okay.  Now, let me continue.  So then you

12   started your campaign for clean water in earnest in, what, '21,

13   '22?

14            **SPEAKER:**  Not a campaign for clean water but a

15   campaign to ensure that all Jacksonians had access to clean

16   drinking water.  We did do a campaign Moral Mondays for clean

17   water and keeping our public water system.

18            **THE COURT:**  Okay.  So then in '21 and -- is it 2021

19   or 2022?

20            **SPEAKER:**  '21/2022.  Moral Mondays were -- we did a

21   series of Moral Mondays led by our co-chair, Reverend Dr.

22   William Barber and Reverend Lisdale Harris, along with myself

23   as the National Social Justice organizer and the Mississippi

24   Rapid Response Coalition.

25            **THE COURT:**  Okay.  Now, during that time, did you

SPEAKER:  DANYELLE HOLMES

1    have transparency?

2            **SPEAKER:**  I did not, no, sir.

3            **THE COURT:**  But did you at that time seek

4    transparency?

5            **SPEAKER:**  I've been seeking transparency from Mr.

6    Henifin since we met.

7            **THE COURT:**  No, no.  Mr. Henifin wasn't here then,

8    was he?

9            **SPEAKER:**  He was here --

10           **THE COURT:**  I'm talking about before he came.

11           **SPEAKER:**  Oh, yes.

12           **THE COURT:**  Did you see transparency from the City?

13           **SPEAKER:**  Mr. Henifin had been talked about.

14           **THE COURT:**  But did you seek transparency from the

15    City is what I'm asking you, before Mr. Henifin came here?

16           **SPEAKER:**  Yes, let me just -- to be clear with you,

17    Your Honor, when it comes to clean water, the frustration has

18    been on the City -- wit the City as well.

19           **THE COURT:**  So I'm asking you then, with the City as

20    well, did you seek transparency before Mr. Henifin came here?

21           **SPEAKER:**  Absolutely, we were receiving transparency,

22    yes, sir.

23           **THE COURT:**  So you say you did receive it?

24           **SPEAKER:**  Yes, we received transparency that the City

25    was broke and that it was doing its best to try to get

SPEAKER:  DANYELLE HOLMES

1    resources to fix its water infrastructure -- or not that the

2    City was broke but that the City needed the 1 point however

3    many billions of dollars to fix the water infrastructure.

4         **THE COURT:**  Is that the only explanation you were

5    given, that the City was broke?

6         **SPEAKER:**  Other than what I knew from prior -- the

7    divestment from the State, the State's intentional -- being

8    intentional on not funding the City of Jackson, giving the City

9    of Jackson resources.

10        **THE COURT:**  So you are telling me that your

11   explanation for Jackson's water problems was that the City was

12   broke?

13        **SPEAKER:**  Repeat yourself.

14        **THE COURT:**  You are saying that the brokenness of the

15   City led to the water problem?

16        **SPEAKER:**  The lack of resources to fix the water

17   infrastructure led to the water problem, and this is not with

18   just this administration, but Your Honor, as I read back on

19   private orders and notices, and I don't have those with me

20   because I wasn't prepared, but all the way back to Harvey

21   Johnson's administration when they were seeking resources to

22   fix Jackson's water infrastructure and were not awarded those

23   resources.

24        **THE COURT:**  So that is what you contend to be the

25   sole explanation of why Jackson has the water problems that it

1      has, because they just didn't have any money?

2              **SPEAKER:**  Well, my sole explanation is that this goes

3      back decades.

4              **THE COURT:**  I understand that, but is that your

5      explanation for it?  Do you have any others, explanations as to

6      why Jackson's water problem is where it is?

7              **SPEAKER:**  No, I don't, Your Honor.

8              **THE COURT:**  Okay.  So your view is that had Jackson

9      the finances, Jackson would have fixed its water problem?

10             **SPEAKER:**  Yes, I believe that -- my explanation is

11     that if the EPA, the State, the federal government all

12     together, along with the State of Mississippi, assisted

13     Jackson, that Jackson's water problem wouldn't be this out of

14     control or probably fixed.

15             **THE COURT:**  Is it also similarly your contention that

16     Jackson's call response would have been so much better if it

17     had had the responses?

18             **SPEAKER:**  Call response for what?

19             **THE COURT:**  When people call in complaining.  A lot

20     of folks said they didn't get call-backs or got hung up on.

21             **SPEAKER:**  I'm not aware of that.  Call-backs to --

22     311 call-backs, 911 call-backs to what?

23             **THE COURT:**  When people were calling about their

24     water and calling to the City, they said they had complaints

25     and could not reach city officials.  Do you put any stock in

SPEAKER:  DANYELLE HOLMES

1    that?

2              **SPEAKER:**  Now, I do know of residents calling 911 and

3    not getting calls answered.  The 311, yeah, I do -- I am aware

4    that folks were not getting answers from 311, and there was a

5    communication problem with JXN Water -- so let me just be

6    clear, because I did have this conversation to come up with

7    U.S. Water Alliance, who at the time was a consultant, I think,

8    with Mr. Henifin, and they were on the calls with the

9    coalition.  Every morning at 8:00, we had morning calls to

10   organize around this water crisis issue, and so they were in

11   the standing, and Mr. Henifin was a fellow of theirs, and so

12   they are the ones who introduced Mr. Henifin's coming to

13   Jackson to the coalition.  And we had those questions about the

14   311 calls.

15        So it was through U.S. Water Alliance that they had

16   reached out to Mr. Henifin regarding 311 and folks having

17   access to be able to call in regarding their water.  And we

18   were told that that would be done February 28th, the end of

19   February, that the line would be up and running, and that it

20   would be switched over from the City of Jackson.  But I think

21   more recently, it has been done in the last 30 days.

22             **THE COURT:**  When you say transparency, what do you

23   want to know?

24             **SPEAKER:**  I want, one, open communication.

25             **THE COURT:**  Give me some specifics --

SPEAKER:   DANYELLE HOLMES

1          **SPEAKER:**  As it relates to the safety of Jackson's

2   water.

3          **THE COURT:**  Give me some specifics as to what you

4   want in transparency so I can hear exactly what you are saying.

5   And also, when you say you want transparency, do you want

6   technical explanation?

7          **SPEAKER:**  Yes, I would like a technical explanation.

8   I want transparency with the hiring.  Well, one, I want

9   transparency as it relates to Jackson's cleanliness and safety.

10         One of the problems, Your Honor, is when the water is

11  being tested from the water source, right, but then the water

12  has to travel to the homes.  And I'm not for certain if you

13  know what Jackson pipes actually look like, but pipes traveling

14  -- water traveling through pipes with this type of gunk in it,

15  I can't in my own conscience tell residents that their water is

16  safe to drink.  And so definitely water should be tested at the

17  delivering site, when it gets to the home.  You are testing the

18  water from the source and testing the water when it is

19  delivered to the homes.  That is two totally different tests.

20  And so we are getting -- you can see the water is clear, may be

21  clear coming from the plant, but when it gets to the home, the

22  water isn't clear, as you can see, through these pictures of

23  running water.  So there is no way you can tell a resident that

24  their water is safe to drink.

25         Then go on down --

218
SPEAKER:  DANYELLE HOLMES

1          **THE COURT:**  One second.  Hold it.  One second.

2     Excuse me.  Hold it.  When the water is delivered, delivered to

3     the homes, is the City responsible for the pipes that come all

4     the way to the home?

5          **SPEAKER:**  Well, it's responsible for the pipes that's

6     running on the City's property, public property.

7          **THE COURT:**  That's not my question.

8          **SPEAKER:**  No, it's not responsible for the -- it's

9     not responsible for the water pipes that are on the

10    private-owned property.

11         **THE COURT:**  So have you taken that into account at

12    all?

13         **SPEAKER:**  I have, and we have been in conversation

14    with the EPA on assisting residents with old homes whose pipes

15    are outdated and need to be replaced, because replacing

16    Jackson's water infrastructure is one thing, but residents

17    needing to replace their old-age infrastructure into their

18    homes to ensure that their water is clean, that is another.

19    And we know that Mississippi is the poorest state in this

20    country, and 30 percent of Jackson's residents are living in

21    poverty.

22         So we just need ways -- and again, I'm not an expert at

23    this, but I do know -- I've done enough to know what needs to

24    happen in order to ensure that even myself have clean access --

25    I mean, access to clean drinking water --

219
SPEAKER:   DANYELLE HOLMES

1        **THE COURT:**  So going back to my question that you

2   haven't answered yet.

3        **SPEAKER:**  I'm not sure I can answer it, Your Honor.

4        **THE COURT:**  Well, then I'm going to ask it again and

5   see if you can hear the question.  Okay?

6        **SPEAKER:**  Okay.

7        **THE COURT:**  When the water is delivered from the

8   plant to the house in Jackson, the City is responsible for what

9   part of that delivery?  Are you saying that the City is

10  responsible from the time that it leaves the plant until it

11  actually comes out of the faucet at the house, or is there some

12  intervening responsibility from somebody, such as a homeowner?

13  What is your answer?

14       **SPEAKER:**  My answer would be that it is partly to

15  blame -- the City would be partly to blame for both.  It holds

16  some ownership because, one, it's not the residents' fault that

17  Jackson's water infrastructure is decades old, and not --

18       **THE COURT:**  I don't think you are answering my

19  question.  Did you just answer my question?

20       **SPEAKER:**  The answer is --

21       **THE COURT:**  I'm going to ask you the question again,

22  and place answer my question.  So listen to my question.

23       **SPEAKER:**  Do you want a yes or no answer?

24       **THE COURT:**  No, you can do anything you want to.

25  Just answer my question.

SPEAKER:  DANYELLE HOLMES

1              **SPEAKER:**  Okay.  Go ahead.

2              **THE COURT:**  So then when the water leaves the plant

3      and it gets to the homeowner, are you saying that the City is

4      responsible for the condition of the water all the way to the

5      home?

6              **SPEAKER:**  It is responsible for the water up until it

7      gets to the point on the property, technically.  So it's not

8      responsible for the water once it enters -- well, that's a very

9      complicated question, Your Honor, that I don't have an answer

10     to.

11             **THE COURT:**  What's complicated about it?

12             **SPEAKER:**  One, is because we don't know the condition

13     of the water by the time it makes it onto the private-owned

14     property.

15             **THE COURT:**  I didn't ask you the condition.  I just

16     asked you for responsibility.

17             **SPEAKER:**  Okay.  Well, the responsibility on the

18     private property lies with the owner of the property.

19             **THE COURT:**  So then if the owner has responsibility,

20     once the water hits the private property, then are you saying

21     then that the City still has responsibility too?

22             **SPEAKER:**  If the water is traveling through pipes

23     that look such as this right here with all of this corrosion

24     and gunk in it --

25             **THE COURT:**  I got all of that.  But my question,

1   though, what about it?  What is the answer?

2           **SPEAKER:**  Your Honor, I can't give you a

3   straightforward answer that you are looking for because if you

4   are asking me at this point where we are with the city of

5   Jackson's water infrastructure now, I would say that yes, the

6   City is responsible.  If the city's water infrastructure was

7   overhauled, then I would say that property -- and the

8   overhauling completely fixed, that the individual resident

9   property, that is their issue on their property.  That is the

10  best that I can give you an answer from my perspective.

11          **THE COURT:**  Now, I must say that that is a confusing

12  answer because I can't seem to get a straight answer from you.

13  I asked you if the water leaves the plant and then it comes to

14  the property line of the private citizen, is the City

15  responsible for the quality of the water that then goes into

16  the pipes on the private property?

17          **SPEAKER:**  Yes, it's responsible for the quality of

18  water that goes into the pipes on the private property.

19          **THE COURT:**  And is the City then responsible for the

20  quality of the water that comes out of pipes that belong to the

21  private citizen?

22          **SPEAKER:**  Yes, sir, Your Honor.

23          **THE COURT:**  And so then what should be done if there

24  are pipes on private property which are corroded or which have

25  debris and other matters therein, whose responsibility is that

1    in Jackson to fix those pipes?

2            **SPEAKER:**  Those pipes on the private-owned property,

3    that responsibility lies with the property owner.

4            **THE COURT:**  And so then I would assume you would

5    think that the City of Jackson could be able to help out in

6    determining whether the pipes are actually corroded or clogged

7    or filled with contaminants.

8            **SPEAKER:**  I don't think --

9            **THE COURT:**  Wouldn't you think that the City could be

10   helpful in that regard?

11           **SPEAKER:**  I'm not sure, Your Honor.  I don't know

12   what capacity the City has to do that.  I don't know if the

13   City even has the expertise or those in place to even be able

14   to assess what's on someone else's property.  I'm not certain.

15           **THE COURT:**  Let's go to something else, then.  Back

16   to this whole matter of transparency, are you familiar with the

17   type of contaminants are removed at the water plant?

18           **SPEAKER:**  Some.

19           **THE COURT:**  Name me the ones you are familiar with.

20           **SPEAKER:**  One, E.coli, I think it's S-H-I-G-E-L-L-A,

21   a bacteria, lead, and again, off the top of my head, I can't

22   name, but I do know that contaminants and bacteria, but those

23   are not terminologies that I use on a daily, so no, I can't.

24   But if you go to some notes or if I had been more properly

25   prepared for these questions, I would have those answers.

1          **THE COURT:**  Well, you are the one talking about

2   transparency, and all I'm doing is trying to determine what you

3   mean by your transparency.

4          **SPEAKER:**  My transparency, what I mean is making

5   sure, one, this notion that Jackson's water is safe and

6   residents are getting this discolored water.

7          **THE COURT:**  So then if you are given notices, and you

8   can always view water yourself, then can you make a

9   determination whether it's safe?

10          **SPEAKER:**  If I'm looking at brown water, I would make

11   a determination that it isn't safe to drink.

12          **THE COURT:**  Okay.  I wouldn't want to see brown water

13   either, but when you view water, can you determine, then,

14   whether it is safe relative to contaminants?  Can you do that

15   yourself?

16          **SPEAKER:**  No, you can't, not just by looking at

17   water.

18          **THE COURT:**  So then on that transparency, you just

19   simply want an answer, is it safe?  Is that it?

20          **SPEAKER:**  Well, one --

21          **THE COURT:**  You said you can't perform the tests

22   yourself if you don't understand it.

23          **SPEAKER:**  Well, we have actually given out home tests

24   as a part of the coalition.

25          **THE COURT:**  Okay.

SPEAKER:   DANYELLE HOLMES

1        **SPEAKER:**  We have given out residents home tests.  We

2   have been on-site testing water at residents and at even

3   some of --

4        **THE COURT:**  And do you understand these tests?

5        **SPEAKER:**  I understand when the water test that we

6   have, at-home water test, it tells you the level, gives you a

7   level, and if your water falls under a certain level, and I

8   can't think of that level right now, but if it falls under a

9   certain level, your water is safe to drink, within a certain

10  level.  And if it goes above that, your water is unsafe to

11  drink.  And so during those water tests in South Jackson and at

12  my home, my water reached a level that was not safe to drink,

13  Your Honor.

14       **THE COURT:**  And who promulgated those test kits?

15       **SPEAKER:**  They were donated to us.  I can't remember

16  who actually sent them here, but one of our donors sent those

17  water test kits here, and I think they were connected -- I

18  can't remember.

19       **THE COURT:**  And what's the accuracy of those test

20  kits?  Who certified them?

21       **SPEAKER:**  I can't remember if they were -- I can't

22  remember, Your Honor.

23       **THE COURT:**  Do you know whether they were certified

24  by any reputable organization?

25       **SPEAKER:**  They were sent to us by a reputable

1    organization.

2            **THE COURT:**  But that wasn't my question, though.

3            **SPEAKER:**  I don't know anything about the

4    certification.

5            **THE COURT:**  So, then, how do you know that your kits

6    functioned as intended?

7            **SPEAKER:**  I believe on the water testing kits, Your

8    Honor, and I know that we will resume after lunch, but I can

9    easily go acquire one of those tests and bring it back to you

10   so you can see it for yourself --

11           **THE COURT:**  I don't need to see it.  I was listening

12   to you talk when you said that you had already done this, you

13   had already made these tests.  So I'm asking you, then, how did

14   you assure yourself before you made these tests that those kits

15   were reputable?

16       I know what I can do, and I know what my status of

17   knowledge is, but I'm asking about yours, and I'm asking about

18   how did you make a determination that those kits were reputable

19   at the time that you did it or that they were accurate?  How

20   did you do that?

21           **SPEAKER:**  On the box, if you will look on the box of

22   the test --

23           **THE COURT:**  Did you look on the box?

24           **SPEAKER:**  I did.

25           **THE COURT:**  And what did it say?

1              **SPEAKER:**  If I'm not mistaken, it says 99.9 percent

2    accurate.

3              **THE COURT:**  And how did -- oh, that -- well, no,

4    that's what the box said.

5              **SPEAKER:**  And then there's a certification on the

6    box.

7              **THE COURT:**  But that's what the box said.  You are

8    saying, then, you take the word of the box.

9              **SPEAKER:**  Well, actually no.  We have partners here

10   with Brown University who is testing water as well.

11             **THE COURT:**  Did you talk to them?

12             **SPEAKER:**  Yes, sir, Your Honor.

13             **THE COURT:**  Did you talk to them about those kits?

14             **SPEAKER:**  I talked to them about their water tests.

15             **THE COURT:**  But you did talk to them about the kits

16   that you are telling me --

17             **SPEAKER:**  There is no need for me to talk to them

18   about the kits because they are using actually labs, credible,

19   reputable labs.  I did talk to them about we had been doing our

20   own dependent home testing.

21             **THE COURT:**  Okay.  Let me move on to something else,

22   then.  I see that we are just -- have some difficulty in this

23   conversation.

24       I was asking you simply what you construe as transparency

25   is all I'm asking you.  You keep saying that you want

1    transparency, and all I'm simply asking you is, what is your

2    definition of transparency other than to know what is going on?

3    That is just simply a generic response.  But for someone who

4    readily acknowledges that you are not an expert, that you don't

5    know much about these contaminants or anything else on that,

6    then I want to know, then, what aspect of transparency are you

7    looking for?  That's all.

8             **SPEAKER:**  Your Honor, if I may add, while I'm not an

9    expert, I will say that I am an educated black woman, and so it

10   doesn't take much for me to do my own research, so I'm getting

11   an understanding of what -- the basic understanding.  I may not

12   know the expert knowledge and all the language that goes along

13   with it, but I do know, I have common sense to know and

14   educated enough to know --

15            **THE COURT:**  Okay.  You have defended your

16   intelligence and your background and your education.  I'm not

17   interested in that.

18            **SPEAKER:**  I'm not either.

19            **THE COURT:**  I'm just interested in your definition of

20   transparency.

21            **SPEAKER:**  Okay.  Well, let me read off to you --

22            **THE COURT:**  Excuse me.  Let me finish.  So now can

23   you get to my question?

24            **SPEAKER:**  Yes.

25            **THE COURT:**  You have a habit of talking about

SPEAKER:  DANYELLE HOLMES

1    something else when I ask you one question.  So let me start

2    again.

3        Since you say that you want transparency, I'm simply

4    asking you how do you define the transparency that you are

5    seeking?

6            **SPEAKER:**  Okay.  Asking the Court to require public

7    knowledge and understanding reports, a breakdown of what these

8    water reports are reading.  Giving -- asking that the

9    third-party manager or representative of JXN Water give

10   residents an explanation as to why their water is brown, oily,

11   green, greasy or coming out with dirt in it.  That's what

12   transparency looks like, because I can't explain that to a

13   resident.  But when you are making calls and you can't get any

14   answers, there's no transparency.

15           **THE COURT:**  I also asked you how faithful have you

16   been to this notion of transparency over the years?  And it

17   seems like you've only been interested in transparency when Mr.

18   Henifin came to the fore.  Is that correct?

19           **SPEAKER:**  No, sir, Your Honor.

20           **THE COURT:**  You asked before about all of this; is

21   that right?

22           **SPEAKER:**  Yes, Your Honor.

23           **THE COURT:**  So then did you get answers before as to

24   why the water looked or smelled like it did?  And if so, tell

25   me the answers you got because you have not told me so far.

1          **SPEAKER:**  Okay.  Yes, sir, Your Honor.  But how -- I

2     have inquired about why the water was brown previously before

3     Mr. Henifin came on, as I've said.  We have not -- I'm not new

4     to just getting on the ground doing this work because Mr.

5     Henifin is here.

6          **THE COURT:**  And the answer you received is what?

7          **SPEAKER:**  Well, one, we would always receive boil

8     water notices.  And if we called and the water --

9          **THE COURT:**  I asked you did you receive an answer as

10    to why it was the color that it was.

11         **SPEAKER:**  Yes, sir, Your Honor.

12         **THE COURT:**  And what's the answer?

13         **SPEAKER:**  Either it was a water main break, something

14    going on with the sewer and the water, something with the line.

15    It was various answers.  It was always a different answer, Your

16    Honor.

17         **THE COURT:**  And who was giving you these different

18    answers?

19         **SPEAKER:**  If you call, I have talked to technicians

20    at public works and the water and sewer administration, calling

21    the public works department as well, making those reports.

22         **THE COURT:**  Did you call the city leaders?

23         **SPEAKER:**  At times I've called the city leaders.

24         **THE COURT:**  And did you get the transparent answers

25    you were seeking?

1          **SPEAKER:**  Yes, sir.

2          **THE COURT:**  And what were those transparent answers?

3          **SPEAKER:**  There is a water main issue.  They are

4    working to fix it.  There is a sewer issue.  They are working

5    on it.  Or the trucks are in the shop.  Whatever the issue was,

6    I got an answer.

7          **THE COURT:**  And that was transparent?

8          **SPEAKER:**  If they were being truthful, I mean, it was

9    transparent enough.  Was I pleased?  Maybe not, with the

10   answer.

11         **THE COURT:**  See, that doesn't tell me anything.

12   Maybe it told you something, but it didn't tell me anything

13   just to say the valve is broken.  It still doesn't tell me why

14   the water is brown.

15         **SPEAKER:**  Well, if they are telling me it is a water

16   main break, the water system has been compromised due to a

17   water main break or something in the system, that would explain

18   why the water is brown.

19         **THE COURT:**  But you are telling me, though, that that

20   explanation would have been enough for you.  If Mr. Henifin had

21   given you that same statement, that a water valve was broken,

22   you would have felt like he was being truthful to and accurate

23   on transparency.  Is that it?

24         **SPEAKER:**  Yes, if he had given me that same answer,

25   that there's a water main break, absolutely, I would have had

1    to accept that answer because that's been the answer that we've

2    been getting all along, that the water main break -- the water

3    is brown because there's a water main break.

4         **THE COURT:**  You see, I would have wanted to know, if

5    I were in your place asking these questions about transparency,

6    how did it break.  I would want to know how much water is being

7    lost.  I would want to know how contaminants are being sucked

8    into the system.  So then if I asked those questions and could

9    not get an answer, then I would wonder about transparency.  I

10   would want to know how much money are the citizens losing

11   because of that, does it affect the bills.  There's a whole lot

12   of questions one can answer that would deal with quote-unquote

13   transparency.  But during most of this hearing, when people

14   have come in here saying they wanted transparency, they have

15   just simply used the word, and I don't understand what they

16   mean by transparency.

17        So since you have done your research and you have asked

18   various questions that are supposed to have been specific, then

19   that's why I asked you your definition of transparency.  But

20   that definition that you have given me is just simply

21   generalized "we have a problem" definition, and thus it tells

22   me nothing about anything beyond that on transparency.  So I

23   have given you an opportunity to tell me these things, but you

24   have not told me these things, nor have you even shown an

25   interest in them, because you said as long as you were told

1    that the main is broken, that would be complying with

2    transparency.  I don't understand that.

3                    **SPEAKER:**  Your Honor --

4            **THE COURT:**  So then if you have something else you

5    want to say, if I've overstated or understated or misstated

6    your position, please correct.  I'll hear you.

7                    **SPEAKER:**  Your Honor, I have read reports, again,

8    dating back to Harvey Johnson's administration that talks about

9    Jackson's water, and the need for an overhaul, and the plan

10   that they had in place to fix Jackson's water.  However, the

11   resources were not acquired in order to begin that work.  So

12   going down, constantly going down that same rabbit hole of

13   finding out -- and no, when I wake up in my home every morning,

14   all I want to know is that my water is clean, and that it's

15   safe to bathe in and safe to drink, it's a safe place for my

16   grandchildren and my daughter to come and without being

17   compromised with their asthma and eczema and all of the other

18   health issues that they have.

19           And so for me, and you would have to know -- have somewhat

20   of an expertise knowledge to know about the amount of water

21   that Jackson is losing.  If it's not in the paper or Jackson is

22   not saying -- I don't know as a resident how much water Jackson

23   is losing.  I didn't know about the bubbling of the waterfall

24   that was going on that's right up the street from my home that

25   sits on the private golf course.  I didn't know about that.

SPEAKER:  DANYELLE HOLMES

1    Right?  And that golf course has been shut down for a number of
2    years now.
3              THE COURT:  Well, now, but you don't lay that at Mr.
4    Henifin's feet, do you?
5              SPEAKER:  I don't leave what at Mr. Henifin's feet?
6              THE COURT:  The golf course.
7              SPEAKER:  Absolutely.  That's a private-owned
8    property.  I will leave the problem with the owners of the
9    property.
10             THE COURT:  Doesn't the City own the piping that goes
11   through that property carrying processed water that doesn't get
12   to Jackson's homes?  And the amount of water, millions of
13   gallons that are being lost?
14             SPEAKER:  So as a resident of Jackson, I've always
15   been told any issues that's on my property lies with the
16   property owner.
17             THE COURT:  But then if processed water is being lost
18   that was produced at a City-owned facility, then that is money
19   being lost that belongs to the taxpayers, which means the
20   taxpayers have an interest in making sure that results of its
21   labors get to the homes of Jackson and that processed water
22   makes it where it is destined to go.
23        So then whether the pipes go under a private property or a
24   public property, nevertheless, it is a facility of the city at
25   that point, because it is water that belongs to the city that's

1    been processed and paid for by the city.

2         Now, shouldn't that interest you as this matter of

3    transparency?

4              **SPEAKER:**  I now have interest that -- yes.  Today, I

5    now have interest.  You have broken it down and pretty much

6    made me a mini expert.  So I now have interest.

7              **THE COURT:**  I like that.

8              **SPEAKER:**  And I will continue to look at that.

9              **THE COURT:**  Well, see, I like that, because, you see,

10   that's what I expect from a Tougaloo student on whose board I

11   sat for many years.  I would expect that.  But then if you see

12   something new that you can add to your storehouse of knowledge,

13   that you would do that readily and accept that.  Incidentally,

14   what's your major there at the school?

15             **SPEAKER:**  Accounting, economics.

16             **THE COURT:**  Well, see, that is why you are so

17   meticulous.  When I was serving as a lawyer, before I became a

18   judge and trying cases and picking juries, I knew then that if

19   I picked accountants and economic people, I knew that you all

20   looked at things a lot more specifically than a whole lot of

21   other folks.  So then that had to be something you take into

22   account when you are picking a jury as to the educational base,

23   as well as where they got it from, because there are some

24   people who are just going to be a little more picky on the

25   evidence than the other people.

SPEAKER:  DANYELLE HOLMES

1        So then when you get some accountants, they are going to

2   be pretty close, just like some folks who majored in my

3   background, which is in philosophy.  So you know then they are

4   going to be a lot more specific about the information they are

5   asking and expect to find.

6        Now, I want to say, though, I congratulate you on being so

7   involved, and frankly, I want you to stay involved.  Now that I

8   have an idea of those things that concern you, then we will see

9   what Mr. Henifin later has to say, and I'm sure he has some

10   responses he would like to make to all of your comments on

11   these particular matters.

12        But regardless, it is important for the city of Jackson to

13   have safe, clean drinking water.  It is important, critical, to

14   have water which doesn't spread any kind of disease or

15   aggravate any kind of illness.  It is important to have all of

16   those.  Water is an element, is a natural resource that has

17   been provided to all of us, and nobody should be placed in a

18   position of questioning the quality of their water.  So I agree

19   with you on all of that.  And I commend you for reaching out on

20   these matters.

21        But you see, what also is going to be needed here is to

22   reach out in a unified voice to work on these matters, and

23   that's what I was asking you, is what do you define as

24   transparency, because that word has been thrown around here a

25   lot, but I have not heard many definitions as to transparency,

1   because if someone is saying I want these technical reports,

2   they can't read them unless they have a background in that

3   particular area or unless they do some serious researching into

4   that area.

5       Now, you go beyond that, and you have said that now that

6   you understand some of these other matters, you will do some

7   more research.  Well, I commend you to do just that.  In fact,

8   I would hope that all the citizens of Jackson would apply

9   themselves towards understanding how the water company

10  operates, how it generates its product, how it cleans itself.

11  I would want to know -- I would hope that all the citizens of

12  Jackson would get into that.  Then they will better understand

13  the task that lies before Jackson and the cost that they have

14  to bear, causing some misery, inconvenience, health risks, all

15  of those things.

16      So I want all of Jackson citizenry to understand that, not

17  just flip the switch on the faucet and say, here comes some

18  water, but also look at, study it, and try to get an idea of

19  why the water is what it is and what efforts are being made to

20  clean it.  Those are things we have to do.  So I commend you on

21  trying to deal with these issues, and I commend you on studying

22  these matters, because then when people call you up, that will

23  put you in a better position to answer their questions as to

24  where we are.

25      You made a comment that the water has been bad for a long

SPEAKER:  DANYELLE HOLMES

 1   time, for a long time, but here's what I'm asking you relative

 2   to that comment.  Although somebody might say that we need a

 3   zillion dollars to fix the problem, the question is, without

 4   the needed expertise, even with all of those zillions of

 5   dollars, would the problem be fixed if the professional

 6   involved does not understand what the serious problems really

 7   are?  Just to throw money in one direction doesn't say that

 8   you're going to fix the problem.  So what you are telling me

 9   then is that ever since Harvey Johnson was mayor, because you

10   said it goes back to Harvey Johnson, are you saying, then, that

11   Jackson has suffered from lack of finance this entire time and

12   that this entire time has led to where we are today?  If that's

13   the case, then if that's your position, then fine.  But then

14   from Harvey Johnson's time all the way up to now, has there

15   been, quote-unquote, transparency?  Has those different

16   administrations advised the public of all of the problems we've

17   had with the water company?

18        Now, perhaps you can tell me if you recall, each

19   administration all over these years has proclaimed that we had

20   a serious water problem, and that the sole reason for such was

21   lack of money.

22        **SPEAKER:**  Your Honor, I would have to say absolutely.

23   I don't know about the administration with Frank Melton, but if

24   you go back to the administration -- and I will say that

25   Jackson's water problem predates prior to --

SPEAKER:  DANYELLE HOLMES

1               **THE COURT:**  Well, you said Harvey, so --

2               **SPEAKER:**  Harvey Johnson.  But --

3               **THE COURT:**  I hate to bring up Harvey Johnson's name,

4       but nevertheless, you said it.

5               **SPEAKER:**  There was a plan in place.  There was a

6       plan drafted by Johnson's administration.  There was a plan for

7       the late Mayor Chokwe Lumumba, who had raised these same

8       issues.  Mayor Tony Yarber had gone to the State for resources

9       as well regarding Jackson's water infrastructure as well.  And

10      then it carried on into this administration, Your Honor.

11              **THE COURT:**  Okay.  So then you are saying that the

12      problem has existed for what?  Almost 30 years?

13              **SPEAKER:**  I would say even longer than that.  From my

14      reading and understanding of what I have read in reports, the

15      problem dates back probably 50 years.

16              **THE COURT:**  50 years?

17              **SPEAKER:**  Yes.

18              **THE COURT:**  Okay.  Then I would assume, then, you are

19      also saying that the problem has escalated over that time

20      period.

21              **SPEAKER:**  Absolutely, and it has come to its peak.

22              **THE COURT:**  Okay.  Well, then, what we have to do,

23      then, is look at all of these matters, which I would be doing,

24      and I hope you join me in that search.

25              **SPEAKER:**  Yes, sir.

1          **THE COURT:**  So I want you to be looking at those

2     matters too.  So I want you to study the water situation here,

3     the problems.  I want you to study reports and things like

4     that.  And when I hold some public sessions, such as now,

5     inviting people to come to court, I hope then that you will

6     return.

7          **SPEAKER:**  I will be here.

8          **THE COURT:**  And to bring all of that Tougaloo

9     learning you have back here and share it with me so that you

10    can tell me what you have also read and learned.

11         **SPEAKER:**  Yes, sir.

12         **THE COURT:**  Now, you have something else you want to

13    add, anything else?

14         **SPEAKER:**  One last ask, Your Honor, and this is an

15    ask, you don't have to address it now, but we ask that the

16    Court -- Mississippi Poor People's Campaign asks for the Court

17    to require public release of all contracts and hiring salaries

18    and resumés for JXN Water, and that would be my last ask, Your

19    Honor.

20         **THE COURT:**  So you want to know who all would have

21    contracts?

22         **SPEAKER:**  Yes, sir.

23         **THE COURT:**  And how much they are getting paid?

24         **SPEAKER:**  Yes, sir.

25         **THE COURT:**  And for what projects?

SPEAKER:   DANYELLE HOLMES

1            **SPEAKER:**  Yes, sir.

2            **THE COURT:**  And you make that request because I

3    assume you are saying that that should be a matter of public

4    knowledge?

5            **SPEAKER:**  Yes, sir, Your Honor, public knowledge.

6            **THE COURT:**  And since you asked for this information

7    on past contracts, is there some specific reason that generated

8    that request?

9            **SPEAKER:**  Absolutely, Your Honor.  I will be very

10   transparent with you.  One of the City of Jackson's employees

11   who are on loan from the City, and I don't know whose decision,

12   but if you would look at the report on Mr. Henifin's page, that

13   individual, and her name is Jordan Hillman, I think her salary

14   is now 300 percent times what she was making at the City of

15   Jackson.  So we think that is a bit excessive, and it does not

16   match the resumé.

17           **THE COURT:**  But now this request for salaries and

18   employees and all, does that go beyond Mr. Henifin's staff?

19   Does it also concern any projects that might be lent out to

20   contractors?

21           **SPEAKER:**  Yes.

22           **THE COURT:**  So you are interested in anyone who

23   receives a contract to work on any phase of the water problem

24   dilemma?

25           **SPEAKER:**  Yes, sir.

1              **THE COURT:**  Okay.  Anything else along those lines?

2              **SPEAKER:**  No, sir, Your Honor.

3              **THE COURT:**  Now, you said the name, the project and

4      the salary?

5              **SPEAKER:**  Um-hm.  We are asking for a public release

6      of all contracts and hiring salaries and resumés for

7      individuals engaging with JXN Water.

8              **THE COURT:**  Okay.  Now, what would you do with the

9      resumé?

10             **SPEAKER:**  Match the qualifications to their contracts

11     or their salaries.

12             **THE COURT:**  And do you have people on staff who could

13     actually do that?

14             **SPEAKER:**  Yes, sir, Your Honor.

15             **THE COURT:**  And who would they be?

16             **SPEAKER:**  They are not on staff, but they are part of

17     the coalition.

18             **THE COURT:**  I mean, but who would they be, these folk

19     who have that expertise?

20             **SPEAKER:**  We would actually have to select the

21     individuals, but we have several qualified individuals.  I

22     can't just call out names without making a consensus with the

23     coalition, but those names would have to be drafted.  We would

24     have to make a decision on who would be the best one.  But we

25     do have qualified individuals in the coalition amongst the 30

1   plus organizations to vet out these and look at these resumés

2   and qualifications.

3            **THE COURT:**  And what you would do, then, is make your

4   response to whether that hire is a fit hire?

5            **SPEAKER:**  If there's questionable hires, we would

6   raise questions with the Court -- well, with Mr. Henifin first

7   and then with you if we don't get anywhere with him.

8            **THE COURT:**  Have you ever done this before?

9            **SPEAKER:**  Done what?

10           **THE COURT:**  Raised questions about the qualifications

11  of contractees?

12           **SPEAKER:**  Yes, I have raised questions with the City

13  of Jackson during the Siemens ordeal when individuals were

14  putting in meters, and I was engaged in questioning the City of

15  Jackson then, under the Yarber administration, and these

16  erroneous bills, when the new billing system was in place and

17  residents were receiving extremely high water bills.  There

18  were questions and frustrations that came into play that I had

19  with the City as well.  And I asked -- I did not ask -- I asked

20  who did they hire, where did they get these folks from.

21           But after being taken advantage of for so long that we've

22  been able to see with contractors, we are asking now that we

23  have this on hand as public knowledge.

24           **THE COURT:**  Have you made such a request to the

25  current administration?

SPEAKER:  DANYELLE HOLMES

1              **SPEAKER:**  No, sir, Your Honor, I have not.

2              **THE COURT:**  Why not?

3              **SPEAKER:**  The current administration does not have

4    authority over its water.

5              **THE COURT:**  When it did have.  It's had it years

6    before, so did you make a request then?

7              **SPEAKER:**  They weren't engaging in any water

8    infrastructure work, Your Honor.  You are saying have I asked

9    for every contract and salary?

10             **THE COURT:**  No.  I'm just asking, since you are

11   talking about water matters, I just asked did you ask this same

12   question about the City's engagement of people working on water

13   matters.

14             **SPEAKER:**  Well, Your Honor, there has not been any

15   real work done on water matters in the city.  If you recall,

16   the City has not been able to move forward in fixing its water

17   infrastructure because it lacked the resources to move forward

18   in fixing it.  So they would patch up a pipe here and there,

19   water main break, fix it here and there, but --

20             **THE COURT:**  Well, it's still the same question.  If

21   they were patching up stuff, somebody had to get a contract.

22             **SPEAKER:**  Not if the work was done by the City of

23   Jackson.

24             **THE COURT:**  Exactly.  But then did you ask whether

25   any work was done not by the City of Jackson but on contracts?

1        **SPEAKER:**  No, sir, Your Honor, I haven't asked those

2    questions.

3        **THE COURT:**  Is there a reason why you didn't ask?

4        **SPEAKER:**  No, sir, Your Honor.

5        **THE COURT:**  Is that a question you should ask?

6        **SPEAKER:**  I will put that question in now.  I would

7    ask the City for -- to make it public knowledge as well.

8        **THE COURT:**  Okay, then.  All right, then.

9        **SPEAKER:**  I would ask that you require the City to

10   make it public knowledge.

11       **THE COURT:**  I see.  I've already done that.

12       **SPEAKER:**  Thank you.

13       **THE COURT:**  But I didn't say public knowledge.  I

14   have already made an inquiry as to who past contractors were.

15   I'm ahead of you on that.

16       **SPEAKER:**  Thank you, Your Honor.

17       **THE COURT:**  But I haven't done anything with it at

18   the present time.  I will tell you, however, that I have made

19   that request because I too am concerned about persons who may

20   have had contracts and who have not fulfilled the terms of

21   such.  And I too am concerned that persons who fall into that

22   category not be let contracts if they have failed on prior

23   ones.  So, then, I am concerned about that.  But I have looked

24   into that some -- well, months ago, so I'm way ahead of you on

25   that particular matter.

SPEAKER:  DANYELLE HOLMES

1             SPEAKER:  Thank you, Your Honor.

2             THE COURT:  I just thought it was interesting to hear

3    what you had to say on that particular point, but I also

4    thought it was interesting that you didn't ask the present

5    administration anything.  That wouldn't have anything to do

6    with you working along with the mayor's sister, would it?

7             SPEAKER:  Absolutely not, Your Honor.

8             THE COURT:  Well, I was kind of curious as to why you

9    would not have asked about the present administration when you

10   asked about others and complained about others, why you haven't

11   asked anything about the current administration.

12            SPEAKER:  Just to be clear, Your Honor, just because

13   you've mentioned the mayor's sister, I just want for the court

14   record to know that I am self-governed, and I'm not scripted by

15   anyone.  So my own conscious and convictions have me to ask

16   such questions, when there are questionable issues at hand,

17   such as individuals being paid 300 percent, a salary that's on

18   loan from the City of Jackson.  If there have been questionable

19   concerns, from time to time I do sit in on city council

20   meetings where they are calling out what has to be paid on the

21   docket that sometimes doesn't get paid.  So there are

22   questions -- if there was something alarming as to asking the

23   city council to approve an individual's hire with a salary

24   that's 300 percent times what they formerly would have made in

25   that field, or it doesn't match their resumé, I would have very

SPEAKER:  DANYELLE HOLMES

1    well raised questions at that time.

2          **THE COURT:**  I know you repeated the 300-percent

3    increase more than one time.  You want to repeat it one more

4    time?

5          **SPEAKER:**  300 percent, because it's sure a lot.  It

6    almost makes you want to curse.

7          **THE COURT:**  Because you repeated it more than one

8    time.  Now that we have got that thoroughly plowed over several

9    times, I ask one more time, why didn't you even inquire as to

10   the current administration's contracts that might have dealt

11   with the water issue?

12         **SPEAKER:**  Well, Your Honor, and I'm just going to

13   be -- frankly, honestly, when you hear that the City is already

14   struggling to pay its bare minimum bills and contractors, I

15   didn't foresee that nothing alarming came out of me needing to

16   see who these contracts are going to and what amount of money

17   that is getting.

18      There have been some conversations about previous

19   contractors who I felt personally did not do their jobs with

20   the City.  And my ask is that, you know, they not be engaged

21   and be able to get contracts again, not continue to rake the

22   City of Jackson, and that was from black contractors and white.

23         **THE COURT:**  And were there any such contractors

24   engaged by the current administration?

25         **SPEAKER:**  These contractors that I spoke of, they

1   rolled over into this prior administration, but they came out

2   of a previous administration.

3              **THE COURT:**  Okay.  Anyway, thank you so much.

4              **SPEAKER:**  Thank you.

5              **THE COURT:**  I'm told now it's 12:18.  We still have a

6   short ways to go, so let's come back at 1:30 then.  So 1:30,

7   I'll see you back here.

8        **(RECESS TAKEN AT 12:19 P.M. UNTIL 1:36 P.M.)**

9              **MS. MARTIN:**  If I may, Your Honor.

10             **THE COURT:**  Hold one second.  You all know my

11  magistrate judge, Magistrate Judge Isaac.  She's assigned to

12  the case too, so she's decided to come in and listen to parts

13  of it in person, but she's assigned to the case too, and she

14  works along with me.

15       Now, then, she is a very fine magistrate judge, and as you

16  know, the magistrate judge, they do the bulk of the work.  And

17  so they get all the cases ready to go to trial and let me know

18  everything I need to know so we can act like we know something.

19  But it's all done by the magistrate judges here.

20       Now, back to this matter here, since the crowd has

21  diminished, am I to assume that some of the people who are

22  supposed to talk have left too?

23             **MS. MARTIN:**  Your Honor, we did receive a note after

24  the break that Rukia Lumumba is here to speak, and she has

25  another engagement after this, but she is requesting to speak

1  first.  And then Okolo Rashid, she is here and present to

2  speak.  But Emily Johnson and Maise Brown are not here, and I

3  do still have a written statement from Mississippi Votes.

4         **THE COURT:**  Okay.  Emily Johnson is not here, and no

5  statement, no written statement?

6         **MS. MARTIN:**  Not that I have.  But they have all

7  requested that we -- in our response, we asked that -- they

8  want to preserve the right to supplement the record with a

9  written statement, but we haven't received a written statement

10  at this time.

11         **THE COURT:**  Hold it.  The next one is --

12         **MS. MARTIN:**  Maise Brown, I think, with Student Water

13  Relief.

14         **THE COURT:**  Will that person be here?

15         **MS. MARTIN:**  She is not.

16         **THE COURT:**  And the next one is Arekia Bennett?

17         **MS. MARTIN:**  I have a written statement from Arekia

18  Bennett that was prepared.

19         **THE COURT:**  Show that to Mr. Henifin.

20         **MS. MARTIN:**  Do you want me to hand this to the

21  clerk, Your Honor?

22         **THE COURT:**  Please.  For those of you on this side

23  over here who have not seen the statement, you are welcome to

24  look at it later.  I know I'm going to receive it, so I have

25  done that, I'm receiving it.  But nevertheless, I still want

1   you later to look at it so you are familiar with it in case if

2   anything should come up calling for you to make a counter to

3   the statement or support of it, that you can do so.

4           **MS. WILLIAMS:**  Yes, Your Honor.  Thank you.

5           **THE COURT:**  Next.  So then what about Dr. Erick

6   Ellis?

7           **MS. MARTIN:**  Dr. Erick Ellis communicated with me

8   this morning that he still is under the weather and will not be

9   able to be here.

10          **THE COURT:**  Okay.  So you are only looking to present

11  Rukia Lumumba?

12          **MS. MARTIN:**  And Ms. Okolo Rashid.  I do believe she

13  is here too.  Those are the only two left.

14          **THE COURT:**  And who wanted to go first?

15          **MS. MARTIN:**  Ms. Lumumba requested to go first.

16          **THE COURT:**  Okay, then.  She can come forward.  Go

17  right ahead.

18          **ORAL STATEMENTS OF RUKIA LUMUMBA PRESENTED**

19          **SPEAKER:**  Good afternoon, Your Honor.  Thank you for

20  allowing me to present to you and to the court.

21      I am Rukia Lumumba.  I am the daughter of the late Nubia

22  and Chokwe Lumumba.  I am also the sister of the current mayor,

23  Chokwe Antar Lumumba.  More importantly than my family legacy,

24  I am a 20-year-old expert in community design and participatory

25  research and development.  I've been doing that for about 20

1   years.  I'm also a legal professional.  I'm also the executive

2   director of the People's Advocacy Institute, co-founder of the

3   Mississippi Rapid Response Coalition, as well as the Jackson

4   Undivided Coalition, the Mississippi Bail Fund Collective.  I'm

5   also a co-founder of the Mississippi Prison Reform Coalition.

6       My work extends to public safety initiatives, including

7   the Strong Arms of Mississippi Credible Messenger

8   Transformative Mentoring Program, as well as the Operation Good

9   Cure Violence Program.  These programs are first in the state,

10  specifically the Mississippi Bail Fund collective, which is the

11  only bail fund in the state of Mississippi, our Strong Arms of

12  Mississippi Credible Messenger Program, as well as Our

13  Operation Good Cure Violence Program.

14      I'm also currently working with the University of

15  Mississippi Medical Center to develop a hospital-based violence

16  intervention program, working as the lead community partner

17  bringing in community groups.  And I sit on the board of

18  numerous nonprofits, both in Mississippi and nationally.  I am

19  also the co-director of the Electoral Justice Project of the

20  Movement for Black Lives, which is my national work.  And I

21  have studied alternatives in public safety development and

22  throughout the nation but have worked for ten years in New

23  York, where I served as the Director of Youth Services for two

24  of New York's largest alternative to detention programs and

25  incarceration programs.  One is CACES, the Center for

SPEAKER:  RUKIA LUMUMBA

1   Alternative Census and Employment Services.  And the other one,

2   the Center for Community Alternatives.

3       I have worked with numerous city departments, court

4   systems, and the like, specifically a lot of community members,

5   around developing policies, programs and processes that allow

6   community members to be fully engaged in the responsibility of

7   developing the systems that impact our lives and the policies.

8       So I just wanted to give that little bit of information

9   about me, because I'm so much more than the mayor's sister.

10  I've been doing this work for a very long time.

11              **MAYOR LUMUMBA:**  That is correct.

12              **SPEAKER:**  I'm his older sister.  And, you know, way

13  before he decided to ever run for office, I was organizing in

14  community.  I am definitely my father's child, and I am very

15  proud of that.  I have dedicated my life to this work, and I

16  will continue this work.

17      And so I am very grateful for the opportunity to work with

18  the various community groups that I work with.  I take their

19  ability and their trust to work with me very seriously.  I am

20  humbled by their desire to continue to deal with me, but I

21  think it is my spirit and my ability to be humble in the

22  process of leadership, in the process of bringing people

23  together, and to recognize that my opinion is not the only

24  opinion that matters, nor is it the most important.

25      So you hear that I have a lot of coalitions, because I

SPEAKER:  RUKIA LUMUMBA

1    believe that collectively, we are a lot stronger than we are

2    individually.  So my organization is based -- our premise is

3    based on this concept that together we help to create the

4    change that we need.  So most of our work is done in coalition,

5    and all of our work is done after we have gone through a

6    process with community members to determine that it is

7    necessary.  So I wanted to just indicate that.

8        I do not take money from the state or from the city.

9    Because Mississippi has nepotism laws, and because I don't want

10   to even be perceived as receiving funds from the city and

11   improprieties and things like that, I don't take money from the

12   city.  I value my integrity way too much.  And I don't take

13   money from the state because I believe there are a lot of

14   nonprofits in this state.  And right now, when I started my

15   organization here, when I came back home, I wanted to be sure

16   that I didn't take from a pot of money that was already too

17   little for the people here.  So most of my work, if not all of

18   my work, actually is funded by individual donors, as well as

19   foundations, mostly foundations from across the nation.  I

20   don't think I receive any foundational money from a

21   Mississippi-based entity, outside of maybe I think the United

22   Way gave some money to the Rapid Response Coalition.

23            **THE COURT:**  All right.  Thank you for that

24   introduction.

25            **SPEAKER:**  You're welcome so much.  Thanks for

1    listening.

2        **THE COURT:**  Now, you are with the People's Advocacy

3    Institute?

4        **SPEAKER:**  I am, and with the Mississippi Rapid

5    Response Coalition.

6        **THE COURT:**  Okay.  And on the water issue, you have

7    some views on that matter?

8        **SPEAKER:**  I do, and I also have a community statement

9    I would like to present to the Court, and I can give it to Mr.

10   Henifin first and then present it to you.

11       **THE COURT:**  Would you do that?

12       **SPEAKER:**  Yes.  It is ten pages.

13       **THE COURT:**  In that case, why don't you summarize

14   what it says.

15       **SPEAKER:**  Yes.  That's what I'm going to focus on

16   today.  Thank you.

17       **THE COURT:**  So then on this statement that you are

18   providing, he has a ten-page statement, and you said that you

19   will give one to the Court?

20       **SPEAKER:**  Well, that's the one I'm giving to the

21   Court, and then I can e-mail it.  We also already submitted it

22   to the EPA via the portal -- through e-mail.  I'm sorry.

23   Through e-mail.  This is our amazing legal team over here.

24       **THE COURT:**  So then I will accept what your comments

25   are.  So could you summarize them?

1          **SPEAKER:**  Um-hm.

2          **MS. MARTIN:**  Your Honor, just quickly for the City,

3    have we received a copy of it?

4          **SPEAKER:**  I think they e-mailed it to you as well.

5    They e-mailed it to the EPA, as well as the City.

6          **THE COURT:**  I don't want you to read it, but just

7    summarize it.

8          **SPEAKER:**  I'm going to summarize it.  I have some key

9    points I'm going to just touch on, because they really talk

10    about the solutions that you've been talking about today, so I

11    want to make sure that I -- in the statement it lists them,but

12    I want to make sure that I also state them so that if you have

13    any questions, we can address those.

14        Should I proceed?

15          **THE COURT:**  Go right ahead.

16          **SPEAKER:**  Thank you.  So first I want to say that our

17    ultimate goal is to unquestionably obtain safe, clean drinking

18    water that can be sustained by the City of Jackson long after

19    the Environmental Protection Agency and the interim third-party

20    manager complete the last water project as set forth in the

21    priority project list outlined in the interim stipulated order.

22        Now, to reach this level of success, the following

23    elements must be present in any remedial work to end this

24    crisis:  One, full transparency, as you've heard numerous times

25    today; processes for collaborative input and accountability;

1    maintaining public control of the water system; educational

2    resources; and an immediate access to clean water.

3         So as we talk about full transparency, there are some

4    clear solutions that we have, and I will go to the solutions

5    first.

6         There are several actions that we believe would be helpful

7    to immediately begin to address the current lack of

8    transparency.  First, the parties should move to ask the Court

9    to either vacate the current confidentiality order or allow

10   trusted community leaders to attend specific meetings during

11   the ongoing legal process.  I think this step of having

12   community members come present today and yesterday was a start

13   to that process, but we can't just assume that this is the only

14   time that we are going to be able to engage community members

15   in the process of the redesign of this water system.

16        Second, the current ISO, and that's the stipulated order,

17   and any subsequent stipulated orders should remove provisions

18   that exempt the third-party manager from public record laws.

19   The people have a right to know about their water system, where

20   its running, and to request data directly from the entity

21   running the water system.

22        We also should require that, one, that the stipulated

23   order and the interim third-party manager comply with

24   Mississippi Code Annotated 31-7-13 regarding procurement,

25   establish a community review board to meet regularly with the

SPEAKER:  RUKIA LUMUMBA

1    interim third-party manager, hold regular public forums where

2    he is in attendance or his team, provide the public with

3    written notice about proposed rate adjustments and local

4    community consultation before an adjustment occurs, and

5    increase the frequency with which the interim third-party

6    manager must file status reports, as well as require the

7    interim third-party manager to post water quality monitoring

8    data on the interim third-party manager website and send water

9    quality data directly to consumers.

10           Finally, and perhaps most importantly, there needs to be a

11   clear understanding and commitment to a timeline detailing how

12   and when Jackson's water system will transition back into the

13   hands of the people.

14          I want to be clear that these recommendations are not

15   something that is new.  It took us a very long time to get to

16   these recommendations.  And I have more.  I just want to pause

17   here.

18          The third-party manager is the current authorizer, the

19   current runner of our water system.  That is why we are here

20   talking about them.  Had it been the City of Jackson, we would

21   be talking about them.  If you ask anybody about our actions as

22   an organization and as a coalition, whether it was the City of

23   Jackson, the State of Mississippi, or the EPA, we have been

24   very vocal about our concerns and our demand for community to

25   be fully engaged in the process of this redesign and in the

1    process of determining what qualifies as clean water.

2        We don't necessarily believe that the EPA standards are as

3    high as they should be after researching and doing work with

4    other people.  And I don't have that data here, but I'm going

5    to mention it just now because I know that has been the topic

6    of conversation over and over again over the past couple of

7    days.

8        So I do want to be clear, we are addressing this to the

9    third-party manager and their organization, JXN Water, but this

10   applies to both the City, the third-party interim manager, as

11   well as the EPA.  We believe that it is necessary that

12   community be engaged.

13       Let's go on now to community involvement and input, our

14   second bullet point.  So we know Jackson's history demonstrates

15   that far too often, those most disconnected from the city's

16   problem, like state actors, are brought into the city as

17   experts.  Meanwhile, local black and brown communities are

18   ignored, and their leadership is considered an afterthought, if

19   at all.

20       To truly solve the water crisis, the community needs a

21   structurally secured seat at the table to take part in creating

22   short-term and long-term solutions that will be sustainable for

23   generations of Jacksonians to come.  So having a structurally

24   secured seat at the table means immediately hiring a trusted

25   salaried community ombudsperson who is required to put forth

1    the community's interests and demands.  The community

2    ombudsperson should be included in all closed-door meetings

3    about the water and sewage system, and they should have access

4    to all necessary information to advance the voice of the

5    people.  Furthermore, this ombudsperson must submit

6    easy-to-read reports to the community and hold community

7    meetings to keep the people informed.

8         In addition to hiring this community ombudsperson, there

9    are at least three immediate ways that community involvement

10    could be facilitated.  First, the people of Jackson should be

11    considered hired and properly trained for jobs to fix the

12    system.  The median household income in Jackson is $39,000,

13    with nearly 30 percent of the population living in poverty.

14    Hiring from the Jackson community and paying fair wages is not

15    only a necessary step for sustainably maintaining the water

16    system, but it also brings needed economic development to the

17    city.

18         Second, the residents of Jackson need to take part in the

19    consent decree process prior to its completion and

20    implementation because they are the individuals who are most

21    affected by the outcome.

22         Finally, community input is also needed in the creation of

23    an emergency assistance program.  Thus far, the current process

24    failed to engage Jackson residents in the development of a new

25    building and water system.  Furthermore, there has been no

1  consideration in providing immediate financial assistance to

2  community members who are struggling to pay their water bills.

3      I want to be clear that in every instance where there has

4  been a water shortage or a boil water notice where residents

5  are unable to use their water, it has been community groups,

6  not just the Mississippi Rapid Response Coalition, but

7  faith-based institutions and a number of other individuals who,

8  out of their hard-earned money, have come forth to provide

9  relief to Jackson residents.  It is time that we see this

10 relief actually come from actors that have the funds that we

11 have all fought for.  The money that Jackson got for its water

12 infrastructure is not just money that came because a grant was

13 submitted.  It was also money that came because community was

14 outraged and spoke up.  And I'm not going to limit the voice

15 and the impact of community in participating in that process.

16 And I think that that is important.  Just as important as it

17 getting the money -- I'm sorry.  Slow down?

18          **THE COURT:**  Slow down.

19          **SPEAKER:**  I'm so sorry.  It is also important that we

20 also be a part of the process to determine how and what our

21 water system looks like.

22     We too often are only considered after decisions have been

23 made, and that, in my opinion, will continue to lead to

24 consistent traditional approaches and results that we have seen

25 over and over and over again, not only with our water system

1    but with systems throughout our government entities.  And so

2    that's one that is really important.

3         I think it's also important to note that our principle as

4    it relates to the Rapid Response Coalition, and specifically

5    People's Advocacy Institute for sure, is that we don't believe

6    in just getting a handout.  Right?  We don't wait for someone

7    else to solve the problem for us.  We try to do what we can

8    with the resources that we have.

9         And so when we are talking about making sure that

10   Jacksonians are trained, making sure that contracts and things

11   like that are actually kept local or at least provided the

12   opportunity to become local, that means that we are not asking

13   for a handout.  We are actually looking at what did Jesus

14   Christ say.  Right?  You know, what does the Bible say about we

15   don't just want to give people a fish?  No.  We want to teach

16   people how to fish.  Right?  When we talk about this whole

17   parable of all of the ways that we engage, we are tired of

18   constantly being on the receiving end.  We want to be on not

19   only the receiving end but on the end of developing, on the end

20   to be able to be sustainable and self-determined.  And that is

21   important.  That's really important.  So I just want to

22   highlight that again.

23        So let's talk about, going to the next bullet point,

24   keeping the system public.  So the order, the stipulated order

25   gives the interim third-party manager unilateral

1   decision-making power on awarding new contracts.  Recently, the

2   interim third-party manager outsourced the call center, water

3   maintenance, water meter reading, and meter maintenance, and

4   billing and collections.  These moves indicate to the community

5   that the third-party manager is setting up Jackson's water

6   system to be privatized by well-resourced contractors.

7        The community's position on this is clear and always has

8   been.  Privatization will not fix the water crisis, nor will it

9   create equitable long-term solutions for those most impacted by

10  it.  It will exploit community members living in poverty and

11  cause more damage.

12       The water system used by residents of the city of Jackson

13  should be maintained and controlled by the City of Jackson, and

14  the interim third-party manager's actions should be monitored

15  with concrete milestones to meet this goal.

16       And so, first, to obtain this goal, there must be an

17  intentional effort to give Jackson residents the opportunity to

18  take part in fixing the water system.  Such efforts to hire

19  Jackson residents must go beyond scholarships.  In fact, we

20  believe that at least 80 percent of the hiring should consist

21  of Jackson residents.  To promote local hiring, there must be

22  continued community outreach when soliciting bids.

23       According to the recent report filed by the interim

24  third-party manager, they only held one business open house, in

25  January of 2023.  Although 100 small minority businesses were

1   in attendance at that event, the interim third-party manager

2   only selected three for bids.  Moving forward, we must -- the

3   interim third-party manager must notify and allow for comments

4   from the Jackson residents prior to outsourcing jobs.

5        Additionally, all water offices must remain and/or

6   returned to the City of Jackson.

7        Second, the requirement to hire and train Jackson

8   residents should be extended to outside contractors, such as

9   Jacobs.  In addition, when contractors are considered for bids

10  to fix the water system, they must be required to engage with

11  the community, and to the extent possible, be willing to sensor

12  or enter into a community benefits agreement.  These standards

13  are for protection for community and guard against

14  privatization.

15       Finally, Jackson residents need a clear transition plan.

16  To obtain this, all participants in the pending case must agree

17  that the federal government will return the water system back

18  to the people of Jackson and set a clear timeline for that

19  return.

20       And you have to excuse me.  With the screen here and the

21  lighting, my eyes are getting a little bad, so I'm having a

22  little hard time seeing a little bit.  I apologize.  So I will

23  talk a little slower probably because I'm reading also.

24       Our next bullet point, educational resources and

25  informational notices.  I want to go straight to the point.  So

SPEAKER:   RUKIA LUMUMBA

1   in order to address ongoing well-founded suspicions and

2   concerns about water quality, the people of Jackson need

3   educational resources on the status of water quality, and they

4   need proof that the water in their homes is safe for drinking

5   and bathing.

6        Educational resources must go beyond mere statements from

7   the interim third-party manager telling the public that the

8   water is safe.  Jackson residents need to receive data from

9   testing performed at the water treatment plants and the testing

10  that has been performed at randomized homes.  This data should

11  be released to the public, and following the data release, JXN

12  Water should hold informational sessions with the community

13  regarding the testing results.

14       Finally, the people of Jackson should have access to home

15  testing kits where they can see for themselves that the water

16  is safe to drink.

17       On that note, I will jump back to the presentation by

18  Ms. Holmes where she mentioned that the Rapid Response

19  Coalition was distributing water testing kits and water

20  filters.  And so while Ms. Holmes is over directing our ground

21  team, meaning she is on the ground making sure we have a team

22  of volunteers and staff that are on the ground distributing the

23  water, I'm responsible for ensuring that we have an

24  infrastructure to receive donations, to ensure we have a

25  dispatch system, to ensure that we have a structure that allows

1    for volunteers and all of that to happen.  And so I have more

2    information about what we received.

3        So the Movement for Black Lives, their Black Hive Climate

4    Justice Table is the entity that provided us with over 6,000

5    water filters and testing kits.  Because they are a climate

6    justice entity, they also ensured, and it took them weeks to

7    send us that because they were ensuring that they were EPA

8    improved and that the filters were also approved.  And so I

9    don't have my notes here of the exact name of the filters nor

10    the exact name of the water testing kits, but we can definitely

11    provide that information after court.  We can e-mail it or

12    submit it in writing via e-mail or something of that nature.  I

13    wanted to highlight that.

14        But we feel like that is not just our responsibility.  We

15    do not receive money from the City or the State as a Rapid

16    Response Coalition either.  Most of our donations from the

17    Rapid Response Coalition have come from individual donors, and

18    so we are working hard with what we have, and we like to remain

19    autonomous.  It's an importance around autonomy, and it allows

20    us to have more self-determination as a community.

21        You know, I'm kind of going off topic a little bit, but

22    there is an importance to not simply constantly relying on

23    government to do everything.  We understand that we are

24    co-governors, that we are a part of -- that we deserve to be a

25    part of the process, that as residents, we don't just receive

1   policy, we don't just receive resources, but we have a right to

2   also dictate what those are and to be a part of the process of

3   securing them and actually implementing them.

4       So that's about our water.  Our education system -- I

5   could name every system.  We should be a part of the process.

6   I think I've said that like several times.

7       Our next bullet point:  Immediate access to water.

8   Despite priority number four in the order -- project priority

9   list, begin to develop a plan for emergency supply and

10  distribution of potable and non-potable water if needed to meet

11  water demand beyond the capacity of the Jackson drinking water

12  facilities.  There is no information on the website or

13  elsewhere on how to access potable water.

14      Although the interim third-party manager asserts the water

15  in Jackson is safe to drink, the fact remains that water coming

16  into residents' homes is not always so.  We have heard many

17  people testify to that today and yesterday.  Residents have had

18  to bear the brunt of purchasing bottled water for years, in

19  addition to paying water bills for water that is not drinkable.

20  Residents also have had to purchase filters for their home.  In

21  order to address ongoing community need for immediate access to

22  clean water, a potable water distribution Alternative Water

23  Source Plan must be adopted with community input as detailed

24  further, and I'm going to list this out for you in a very

25  abbreviated way.

266
SPEAKER:   RUKIA LUMUMBA

1      So, one, it must have community input.  And I talked a

2  little bit more earlier about what that community input looks

3  like.  It also must include notification of potential hazards,

4  and the need to boil water is the first step in addressing the

5  problem surrounding boil water notices.  When there is a loss

6  in water pressure, there needs to be boil water notices issued

7  to communities affected.

8      Furthermore, these boil water notifications should be

9  adequate.  Adequate notification consists of a press release, a

10  telephone alert system that immediately calls and texts

11  residents in the affected areas, posting of boil water notices

12  on all social media platforms, circulation of e-mail

13  correspondence, and collaboration with the Mississippi Rapid

14  Response Coalition and other grassroots community organizations

15  on the ground to ensure effective grassroots communication from

16  trusted messengers.

17      Not only should residents received notification of water

18  issues, but there should also be mechanisms in place for

19  Jacksonians to be able to call in and notify the city of water

20  leaks and other problems that arise.  Residents should be able

21  to call in and report a main leak posted on the JXN Water

22  website and social media using a dial-in number.  And this

23  information should also be found on the City of Jackson

24  website.  And honestly, it probably should be found on the EPA

25  website since we are under their authority at this time.

1        Finally, JXN Water should hire a community liaison who

2   will inform community leaders of the communities that need to

3   boil water or take other actions.

4        So sending bottled water and other resources to the

5   affected area is needed during the boil water periods.

6   Ensuring immediate finalization and implementation of an

7   Alternative Water Source Plan following triggering events,

8   including sending at least one gallon of potable water per day

9   per person and other resources to the affected area is also

10  needed during boil water periods.

11       Currently, the Alternative Water Source Plan is triggered

12  by -- what is this? -- coliform events, as prescribed in

13  paragraph 39 of the emergency administrative order.  We request

14  that the Alternative Water Source Plan is triggered upon the

15  issuance of any boil water notices, even if related to a

16  non-coliform hazard.

17       The interim third-party manager's April 28, 2023 status

18  report states only that he expects that a draft plan will be

19  submitted to parties for review and comment as of June 30th.

20  It remains unclear when or if the interim third-party manager

21  will have a full compliance plan that is ready to be

22  implemented.  During these times of emergency, immediate

23  implementation of an Alternative Water Source Plan is

24  essential.

25       And I just want to say that we are happy, we would be so

SPEAKER:  RUKIA LUMUMBA

1   welcoming to work with the third-party administrator -- sorry,

2   manager, with the City of Jackson and the EPA and the

3   Mississippi Department of Health to develop this plan.

4       You know, during the water crisis, we saw an unprecedented

5   collaborative.  We saw all of these parties working together,

6   including community in the conversation, for the first time

7   that I've known the recent history.  So we want to see that

8   continued.

9       This isn't about, oh, it has to be Mississippi Rapid

10  Response Coalition.  Though we have groups that have been doing

11  this work for a long time, and we believe we should be at the

12  table, it shouldn't just be us.  There are so many

13  organizations, so many faith-based institutions that have

14  dedicated their time and their work to this effort, and we want

15  to see them all engaged.

16      We have a right, we have a responsibility, and we have the

17  opportunity now to do something different where we are fully

18  engaging community in the process.  We want all of these

19  things.  I thank you for your time and welcome questions.

20          **THE COURT:**  Thank you very much.

21          **SPEAKER:**  You don't have any questions?

22          **THE COURT:**  I do not.

23          **SPEAKER:**  Oh, beautiful.  Thank you.  I appreciate

24  it.

25          **THE COURT:**  Okay.  Thank you so much.

1          **SPEAKER:**  Does anybody else have any questions?

2    Anybody?  Thank you.

3          **THE COURT:**  We have one more person.  Hello,

4    Ms. Rashid.  How are you?

5          **SPEAKER:**  I'm great.  I'm doing fine.  I have this as

6    my statement too.

7          **THE COURT:**  Do you have a copy of it?

8          **SPEAKER:**  This is my copy to give to.  I'm just going

9    to do -- just present some of what is on there.

10         **THE COURT:**  I was looking to see, do you have a copy

11   for us too?

12         **SPEAKER:**  I just brought one, but I could get another

13   one to you by e-mail.

14         **THE COURT:**  We will make a copy of his.

15         **SPEAKER:**  Okay.

16         **THE COURT:**  Go ahead.

17              **ORAL STATEMENTS OF OKOLO RASHID PRESENTED**

18         **SPEAKER:**  Okay.  Well, let me begin with the name

19   God, the Merciful Benefactor, the Merciful Redeemer.  I would

20   like to greet you all in my greetings and a universal greeting

21   of "Alsalam ealaykum," which means "May the peace of God be

22   upon you."

23        I'm Okolo Rashid, executive director and CEO and

24   co-founder of the International Museum of Muslim Cultures,

25   America's first Muslim museum dedicated to educating the public

1    about Islamic history and culture and the contributions of the

2    diverse Muslim communities to America and the world.

3         IMMC was ranked fourth by *USA Today* among the ten best

4    religious museums in the country, and we are, of course,

5    located right here in Jackson.

6              **THE COURT:**  Tell them your address on Capital Street

7    and where it is.

8              **SPEAKER:**  Okay.  My address is 201 East Pascagoula

9    Street.  Well, that's the home base of the museum.  But we have

10   a satellite site, 101 East Capital Street, Jackson,

11   Mississippi, where we have our amazing "Muslims with Christians

12   and Jews, an Exhibition of Covenants and Coexistence."  It is

13   an amazing exhibition.  I welcome you.  We also have "The

14   Legacy of Timbuktu" exhibition at our main museum.

15        So I'm going to begin by making my comments around --

16   primarily focused on our Beloved Community major project work.

17   So I want to start by saying that although in the last few

18   years our beloved mayor and the city council have not agreed on

19   very much, however, on March 1st, 2022, the City Council of

20   Jackson, with Mayor Chokwe Antar Lumumba's lead, unanimously

21   approved the International Museum of Muslim Cultures resolution

22   for City of Jackson Beloved Community, an integrated

23   transformation pilot project.  So thus you see that they all

24   saw the need and value of what we shared with them over

25   multiple meetings around the value of what a Beloved Community

1    could mean for the city of Jackson but also for Mississippi.

2        So thus over the last year and a half, Jackson Residents

3    for a Beloved Community has sought to build a broad-based and

4    dynamic inter-faith, inter-organization and inter-generational

5    social justice partnership model to heal and transform we say

6    the soul of America, beginning in Mississippi and within the

7    city of Jackson to create this Beloved Community that Dr. King

8    and others envisioned, including Muslim Americans.

9        Just to highlight a few things we have done in this last

10   year and a half is that we have begun building significant

11   partnerships.  We've been very involved in the water crisis.

12   We were a distribution center.  We partnered with Islamic

13   Relief USA and the Rapid Response Coalition, PAI, and other

14   partners here to, you know, distribute thousands of bottles of

15   water and hand sanitizers to the community.

16       We have engaged with the community around -- we did a

17   major cleanup with the City of Jackson.  We've had a number of

18   community engagement meetings and getting input from the

19   community.  We just finished a major survey and data collection

20   in Ward 2.

21       This project, what we expect as an end product is that we

22   will identify a significant number of partners that will

23   share -- that's in this two-year period, we have a two-year

24   pilot -- we will gain a significant number of core partners

25   that will engage to increase our understanding of shared

1  beliefs regarding social justice, self-determination, racial

2  equity and healing, what we are calling a religious freedom and

3  human dignity framework within the city of Jackson.  That

4  simply means a strong sense of individual freedom and

5  self-determination, and we like to use that quote in our

6  declaration of independence, "Assuming among the powers of the

7  earth, a separate but equal station to which the laws of nature

8  and nature's god entitles us."  How are we going to get our

9  young people, how are we going to get our community people

10 engaged in the wonderful work that Rukia has spoken of if they

11 can't connect to that?

12      So in this next two years, we expect to continue to expand

13 the project, and our end goal for the -- we will expand this

14 for the next two years, but after that, we hope to have a model

15 that we can expand throughout the city of Jackson for the next

16 two years, and we hope as a final product we will have of this

17 two-year period is to have a strong community economic

18 development partnership model, as well as a strategic plan to

19 utilize for this expansive work in the city of Jackson.

20      The Beloved Community project works provide multiple

21 collaborations, educational approaches, and robust programming

22 to engage the community through the formation of 12 new teams

23 which we are seeking to organize with the partners that are

24 doing this work across sectors.  We are doing this with

25 marginalized communities and through the lens of futurism and

SPEAKER:   OKOLO RASHID

1    innovation.  So we are working with inter-faith and cultural

2    groups and leaders, racial equity, practitioners, education,

3    criminal justice, health care, housing, business, economic

4    development, entrepreneurship, infrastructure, and

5    policymakers, local, state and the federal government.  We have

6    a design shop that kind of outlines all of that with our

7    statement that we submitted.

8         We envision -- just a couple more points, and then I'll

9    kind of come to what we would like to see.  We envision a

10   beloved community as a genuine revolution of values, as

11   Dr. King spoke of, where all people share in the resources and

12   wealth of this city.  That vision is for a city wherein

13   poverty, hunger, homeliness, racism, hatred, conflict and

14   violence are not tolerated.  Unconditional love and loyalty to

15   brotherhood and sisterhood with neighborly concerns reaching

16   beyond race, class, gender, age, and geographical borders are

17   the foundational principles.  Peace, human dignity, trust and

18   love for all of humanity are core tenets.

19        This Beloved Community is based on the cultivation of

20   human dignity and a dignity economy, of which the mayor has --

21   and we feel that the work that we are doing, even though the

22   mayor has proposed that and that's a part of his agenda, we

23   feel it needs this kind of work to buffer the work that his

24   sister talked about and the work that we are talking about to

25   buffer and bolster what he is proposing and seeking to do.

SPEAKER:   OKOLO RASHID

1          So wherein we have identified -- a part of that work is

2    that we have got to identify as well as develop the components

3    of a thriving, sustainable and continuously improving community

4    model with the goal of impacting the greater Jackson community

5    in areas such as transformative justice, which Rukia talked

6    about, public safety, safe neighborhoods, affordable housing,

7    clean water and air, exceeding living wage jobs, quality

8    education, physical and mental health care, innovative

9    technology, and cultural infusion.

10         So thus with this background, the backdrop in mind,

11   Honorable Judge Wingate, we have some critical questions that

12   we, as stakeholders, need answered by JXN Water.

13         I want to begin this by saying that I have not met Mr. Ted

14   Henifin, but I'm sure he is a great man and is doing great

15   work, but I would just like to outline some of the things that

16   we would like to get answers to.  And this is not me talking,

17   but this is the collaborations of partners within this Beloved

18   Community, this newly formed Beloved Community initiative.

19         We would like to ask Mr. Henifin why is he hiring mostly

20   outside of Jackson and the state firms to do the work?  How

21   would spending funds outside the city help improve the economy

22   of Jackson and build capacity of local minority firms?

23         We were led to believe that the infrastructure funding

24   will not only improve the water system but also be a lever for

25   economic upliftment of the community.  Most of the money is

1   spent outside of the city and state.

2       Number two:  Why is Mr. Henifin's leadership team all

3   white in a super majority African American city, about

4   82 percent?  Why did he fire the only African American

5   administrative leader, whom he touted in the press as the chief

6   experienced officer and most qualified in customer and employee

7   experience, which he stated was a serious problem for Jackson,

8   and he wanted to change that.  Yet this high profile African

9   American, whom many in the community felt was doing an

10  exceptional job, was fired by Mr. Henifin without a clear

11  explanation to the community stakeholders.

12      Number three:  How much has Mr. Henifin spent to date on

13  outsourcing services?  What is the percentage of work going to

14  local firms?  What is the percentage of work going to African

15  American firms?  Our understanding is that it is negligible.

16      Number four:  IMMC's Beloved Community business

17  partnership sources have reported to us the following:  Number

18  one, that Mr. Henifin is not following federal procurement law

19  in selecting firms.  How does he know -- this is a question

20  that our business sources ask.  How does he know he is

21  selecting the most qualified firms?  Isn't this a violation of

22  federal procurement law when federal funds are involved in his

23  sole source firm, who he knows and has previous relationships

24  with don't have full understanding of institutional knowledge

25  of our system?  How much more does it cost taxpayers to learn

1     the system on our expense.

2         Number two:  Mr. Henifin is not following the standard --

3     these are our business sources.  Mr. Henifin is not following

4     the standard act in providing preference to local firms,

5     although this is specifically outlined in the

6     600-million-dollar funding bill.

7         Number three:  Mr. Henifin is not following the Biden

8     administration's goal of providing up to 40 percent of the work

9     to minority and disadvantaged firms.  Thus, we believe, for all

10    of the reasons above, that the third-party administrator is not

11    working in the best interest of the citizens of Jackson.  He

12    should immediately make public all executed contracts or

13    pending contracts, as well as provide a public statement and

14    clear explanation for the firing of his most experienced and

15    only African American administrator.

16        Further, he should procure all contracts following federal

17    procurement laws and provide preferences to local and minority

18    firms to help create the dignity economy we all seek for the

19    citizens of the city of Jackson.

20        Your Honor, IMMC's position is, if Mr. Henifin fails to

21    comply with what we have asked for, then we request from the

22    Court to remove Mr. Henifin as third-party administrator and

23    replace him with a qualified African American administrator who

24    has the sensitivities and best interests of the citizens of

25    Jackson.  I'm saying that's what's in my statement, but I love

 1    much of the material that Rukia has presented, and we are very

 2    willing to work to help to craft that plan and be a part of

 3    that plan.  Thank you.

 4         **THE COURT:**  So then since Mr. Henifin has been here,

 5    has he done anything constructively in your view?

 6         **SPEAKER:**  I would say yes.

 7         **THE COURT:**  What would you say he has done?

 8         **SPEAKER:**  I think the fact that he has established

 9    the JXN Water Company here.  He initially started off, in our

10    opinion, being receptive and accessible to the community, with

11    a goal and a vision, we felt, for the betterment of the

12    community.

13        I think what has happened at this point where we are now

14    is many of those things that have already been said, the whole

15    transparency issue and the whole community involvement, the

16    community being at the table and having a voice, those things

17    have just not continued to materialize.

18         **THE COURT:**  Do you know how many water leaks Jackson

19    had?

20         **SPEAKER:**  I have no idea.

21         **THE COURT:**  And do you know how many leaks have been

22    repaired under his watch?

23         **SPEAKER:**  I do not.

24         **THE COURT:**  Do you know how many sewage eruptions the

25    city of Jackson has had over the time before he came?

1              **SPEAKER:**  No, I do not.

2              **THE COURT:**  Do you know the number that he has dealt

3       with since he has been here?

4              **SPEAKER:**  No, I do not.

5              **THE COURT:**  Do you know how many calls went

6       unattended and unreturned before Mr. Henifin set up a call

7       center?

8              **SPEAKER:**  I do not.

9              **THE COURT:**  Do you know how many calls now, on a

10      regular basis, that his team has taken on that were not taken

11      on previously?

12             **SPEAKER:**  No, I do not.

13             **THE COURT:**  So do you know, then, what the major

14      problems were before he came to the city of Jackson?

15             **SPEAKER:**  I have some sense of that through my

16      business sources, yes.

17             **THE COURT:**  Tell me what they are.

18             **SPEAKER:**  What our business sources are?

19             **THE COURT:**  No.  Tell me what major problems were

20      here when Mr. Henifin came.

21             **SPEAKER:**  I'm saying the major problem was that we

22      had a failed water system.  It totally collapsed.  And prior to

23      that, we were having major intervals of interruptions and

24      crisis around the water system.  So I'm very familiar with

25      that.

1              **THE COURT:**  And did you have crises down at your

2    business?

3              **SPEAKER:**  Sure.

4              **THE COURT:**  Like everybody else, I take it?

5              **SPEAKER:**  Of course, yes.

6              **THE COURT:**  Right.  And since he has been here, have

7    you had any crises?

8              **SPEAKER:**  Well, we've had water to stop.  We've had

9    colorations of water and the other issues that people have been

10   talking about.  We have had that, yes, but we have not had a

11   major crisis, no.

12             **THE COURT:**  You have not had a major crisis?

13             **SPEAKER:**  No, we have not.

14             **THE COURT:**  Now, let's go back to before he came.

15   Before he came, how would you describe Jackson's water problem?

16             **SPEAKER:**  We were on the verge of a crisis all the

17   time.

18             **THE COURT:**  More than one time?

19             **SPEAKER:**  Yes, of course.  Yes, sir.

20             **THE COURT:**  And do you attribute any blame to anyone

21   for that, before he came?

22             **SPEAKER:**  Well, you know, I'm one that follows what

23   our experts say, and so our experts say that it's because of

24   the disinvestment of the state government and really channeling

25   moneys away from the city and not providing the adequate

1    support for the city.  So I'm of that opinion.

2         **THE COURT:**  Okay.  So what you are saying is that the

3    problem was generated for lack of funding from the State.  Is

4    that what you are saying?

5         **SPEAKER:**  That's what experts say.

6         **THE COURT:**  Okay.  Now, I don't want you to go

7    through all of these experts --

8         **SPEAKER:**  Repeat that.  I'm sorry.

9         **THE COURT:**  You don't have to give me all of your

10   experts, but you are saying that some persons who are deeply

11   informed on these matters contend that it was a lack of moneys

12   from the State.  Is that correct?

13        **SPEAKER:**  That's a big part of the problem historical

14   -- historically.

15        **THE COURT:**  So what's the other part of the problem?

16        **SPEAKER:**  Well, I think that -- I've heard leadership

17   is a problem.

18        **THE COURT:**  When you say leadership, you are

19   describing whom?

20        **SPEAKER:**  I'm saying that's what they have said.  Not

21   today, not today's leadership necessarily -- well, what has

22   been said is African American leadership.  I disagree with

23   that.

24        **THE COURT:**  Okay.

25        **SPEAKER:**  But I think leadership prior to the African

SPEAKER:   OKOLO RASHID

1    American leadership, which has been, I guess, the last 20 or so

2    years, but I'm saying the historical leadership, that they left

3    our water system in this condition.  And then after African

4    Americans began to gain leadership, we were -- I mean, that

5    white flight, the support base for the city continues, you

6    know, to erode as we speak.

7                **THE COURT:**  Isn't there black flight too?

8                **SPEAKER:**  Pardon?  Oh, yeah.  I would say black

9    middle class.  So it's not just the black and white.  Let me be

10   clear.  I want to be clear about that.  This is not just a

11   black and white issue, no.  But there are some underlying

12   structural racism and white supremacy issues that has to be

13   addressed when we are addressing these things.  But that's a

14   part of what we hope to do is have an integration of the

15   various institutions and organizations that are working on this

16   problem to come to some kind of common understanding and shared

17   understanding around these terms.  And it should be

18   interracial, it should be multi-diverse, multi-sectional across

19   the community.

20       So that's our plan.  That's what we hope to know.  We are

21   new.  We are the new kid on the block.  And we are hearing "Who

22   are you?  You haven't been doing this work."  But we have

23   examples of a community that really underpins the support of

24   this country that actually helped.  I know we hear a lot about

25   the fact that this is the only country that has ever done what

SPEAKER:   OKOLO RASHID

1   it has done, but there is another model example in the times of

2   the Prophet Mohammed, who was also a respected states leader

3   that established -- you might know some of this, you're a smart

4   man -- that established the first Constitution in history and a

5   model community.

6           **THE COURT:**  Ms. Rashid, you know I know some of that.

7           **SPEAKER:**  Of course you do, but most people don't.

8   So I'm saying --

9           **THE COURT:**  And you and I have --

10          **SPEAKER:**  -- we are looking at those kinds of models

11   for us to learn from.

12          **THE COURT:**  You and I have discussed these

13   ideological and philosophical matters over the years, and so

14   you know I'm familiar with this.  So I need not go into all of

15   these particulars because I don't have to go into those to

16   apply my questions here.  What I want to know, then, is, when

17   you start talking about white flight, let's talk about black

18   flight.  We have that too, don't we?

19          **SPEAKER:**  Probably.

20          **THE COURT:**  Middle class in great numbers have left

21   Jackson, haven't they?

22          **SPEAKER:**  They have.

23          **THE COURT:**  We have a huge number of houses around

24   Jackson which are abandoned.  Aren't they?

25          **SPEAKER:**  Yes.

SPEAKER:   OKOLO RASHID

1          THE COURT:  And we have a number of people who don't

2    want to move here because of crime.

3          SPEAKER:  Yeah.

4          THE COURT:  Are you saying that crime is tied to the

5    water problem?

6          SPEAKER:  I'm saying that crime is tied to structural

7    racism and white supremacy.  That's what I'm saying.  And I'm

8    saying we have to study it.  We can't erase it.  We can't be

9    blind to it.  We have to approach it as intelligent people with

10   historical precedence.  That's what I'm saying.

11         THE COURT:  Now, you've heard me speak on a lot of

12   these matters, haven't you?

13         SPEAKER:  Of course.  I know your history.

14         THE COURT:  I know you do, because you've been around

15   me for a long time.

16         SPEAKER:  That's right.  We went to school together.

17         THE COURT:  Exactly.  And your husband, same thing.

18         SPEAKER:  Yes, both of you were student activists.

19   He marched with Medgar Evers.  You probably marched with Medgar

20   Evers as well.

21         THE COURT:  Well, you know I marched.

22         SPEAKER:  You did march.  Of course you did.

23         THE COURT:  And you know I went to jail.  And you

24   know I got out of jail burned.

25         SPEAKER:  Yes.

1          **THE COURT:**  And you know that I went through all of

2     that hell.

3          **SPEAKER:**  Yes.

4          **THE COURT:**  And you also know that the day Medgar

5     Evers was killed, he was on his way to come see me.

6          **SPEAKER:**  Yes.  You were in jail.

7          **THE COURT:**  I was in jail because I had marched, and

8     I was burned at the time.  And Medgar was trying to raise some

9     bond to get me out of jail because the guards said they were

10    going to kill me.

11         **SPEAKER:**  I didn't know that.

12         **THE COURT:**  Well, that's why he was trying to get me

13    out so desperately, because everybody else had gotten out

14    because they were over the age of 18, except me and one or two

15    others.  I was just 15.  So Medgar was trying hard to get me

16    out of jail because -- and if he didn't, then he knew what

17    would happen.  My mother didn't even know where I was because

18    they wouldn't tell her while I was in jail.  They would not let

19    her know, so she didn't know whether her son was alive or dead

20    or where he was located after they arrested me for leading the

21    march.  Because, remember, I was the one that was supposed to

22    give the speech as to why we were marching.  And I was the one

23    who was leader of that last march that was started by Medgar.

24    And then I found out that Medgar was dead on the day that he

25    was supposed to come down and let me know if he was going to be

1    able to get me out of jail in the next three to four months.

2    Otherwise, he couldn't get me out then.  I had to stay in jail

3    for another three or four months.

4         So you know about all of that.

5              **SPEAKER:**  Sure.

6              **THE COURT:**  And you know my history on those things

7    and all the other stuff I did in civil rights marches and stuff

8    I led and stuff like that.  So you know better than anybody

9    here in this courtroom besides myself what my background is on

10   all of these things that I don't talk about all the time.  But

11   nevertheless, what I'm asking here is, on these problems that

12   have addressed us here, they are a lot more complicated than a

13   simple statement that we just need some money.  That's what I'm

14   saying.

15             **SPEAKER:**  I can't agree with you more.  I can't agree

16   with you more.  It's going to take work.  It is going to take

17   us deciding to work together.  That's why we call it an

18   integrated transformation.  We are not going to transform

19   Jackson individual, in our own silos.  That's why we are the

20   young kid on the block.

21        We say that we need to have an integrated transformation.

22   We've got to have a situation where we that are doing all of

23   this great work, we've got to be willing to also set our egos

24   aside and let's sit down and begin to strategize.

25        And I'm just going to say the foundation of this project

1   is that we are never going to get a Beloved Community until we

2   rethink the civil rights movement and the African American

3   Muslim movement as parallel movements to one freedom struggle

4   in this country.

5       Most people think that the Muslims were just about

6   religion, and they are over there.  They put Malcolm, they put

7   Mohammed Ali, they put Elijah -- all of these are civil rights

8   leaders.  They were never civil rights leaders.  They were

9   human dignity and human rights leaders.  It's time for us to

10  really -- we say that Dr. King, in his last year -- all of this

11  is the foundation of this project.  Dr. King, in his last

12  years, discovered that our problem was bigger than civil

13  rights, that it was a human rights problem and a human dignity

14  problem.  And he talked about what a radical revolution of

15  values, what it was going to look like.  And, of course, he

16  talked about the need to go beyond our borders, beyond class,

17  beyond race, and the love for humanity as one.

18      And our position and the work we are doing, we are saying

19  that at that moment in his transformation, that his and

20  Malcolm's and the Muslim movement, they converged.  They

21  converged at that moment.  And they began to shape a more

22  religious-based or prophetic-based movement.

23          **THE COURT:**  And what I was saying is that we just

24  have a number of problems we need to address.

25          **SPEAKER:**  We do.

1          **THE COURT:**  In fact, the very last time I was at your

2     cultural center, I spoke on black-on-black crime.

3          **SPEAKER:**  You did.

4          **THE COURT:**  And engendered a pretty interesting

5     conversation on that.

6          **SPEAKER:**  President Ron Mason and you were going at

7     it.

8          **THE COURT:**  That's right, ex-president of Jackson

9     State.  Right.

10         **SPEAKER:**  University of D.C. now.  He just retired.

11         **THE COURT:**  That's right.  We were talking about

12    black-on-black crime, and I was trying to make sure he

13    understood what the genesis of black-on-black crime is.

14         **SPEAKER:**  Maybe I missed that.

15         **THE COURT:**  You can't pass it off.

16         **SPEAKER:**  I need that because we have a genesis.  Our

17    genesis is that if you don't restore a sense of inner dignity,

18    which we call it inherent nobility, honor, worth, a born sense

19    of leadership and self-governance, that's at the core of what

20    we are saying, this whole dignity piece, if we don't restore

21    that, we say that's what our Constitution is talking about, the

22    declaration -- the Constitution, when it says, "Assuming among

23    the powers of the earth."  What are these powers of the earth?

24    This separate and equal station.  So every individual has got

25    to gain a sense of that.

SPEAKER:  OKOLO RASHID

1           So we seek to do multiple collaborations.  We seek to do

2    what Dr. King said.  In order to build a Beloved Community, he

3    said that we, as a group -- he said it doesn't have to be the

4    whole, the majority, but it had to be a critical mass -- a

5    critical mass of us must commit to undergo the training and the

6    education and the philosophy and methodology for doing that.

7    That's what we hope to do in trying to build these

8    partnerships.  We at least want to begin conversations, and we

9    have begun that.  We are a year and a half in.

10          **THE COURT:**  Well, I want you to keep the

11   conversations going on, no matter what.

12          **SPEAKER:**  We are going to invite you to be a part of

13   that.

14          **THE COURT:**  You always do.

15          **SPEAKER:**  I will.  We are going to do it again.

16          **THE COURT:**  All right.  Thank you, now.

17          **SPEAKER:**  Thank you so much.

18          **MS. WILSON:**  Your Honor, may we have a short recess

19   before Mr. Henifin's closing remarks?

20          **THE COURT:**  Okay, then.  Let's take about 20 minutes,

21   a 20-minute recess.

22          **(RECESS TAKEN AT 2:43 P.M. UNTIL 3:20 P.M.)**

23          **THE COURT:**  Mr. Henifin, go to the podium, please.

24   Thank you.  Mr. Henifin, we've heard a lot here today on

25   comments about your organization, and what the public -- what

1   these people allegedly say that they would like to see.  And I

2   notice that the theme throughout these comments primarily has

3   been transparency.  And I know that you have made notes on the

4   different comments.  I saw you discussing with your lawyer and

5   taking copious notes all during the time period.  So I will not

6   ask questions that might occur here to me, but I would like you

7   to take your time and express yourself to the various

8   questions, and if you have any additional matters that are

9   mentioned -- that are unmentioned, then I might ask questions

10  about those.  Is that okay?

11            **MR. HENIFIN:**  Yes, Your Honor.

12            **THE COURT:**  In that case, then, would you begin.

13            **RESPONSE OF TED HENIFIN PRESENTED**

14            **MR. HENIFIN:**  Yes, Your Honor.  So again, I've

15  prepared written statements.  As you noticed, I was making

16  notes throughout the last couple of days.  I'm not going to

17  address every individual issue.  We will follow up on the

18  discolored water, things like that that have been reported, to

19  the extent we can, but I wanted to summarize what I've heard

20  and the actions we are taking from here.

21            **THE COURT:**  Go right ahead.

22            **MR. HENIFIN:**  So I really appreciate you holding this

23  status conference as it really gave me the opportunity to hear

24  a lot from the people, and I think that was the point.

25            **THE COURT:**  Now, Mr. Henifin, sometime prior, in

1   fact, I guess over two months, when I inquired about holding a

2   town hall meeting, and I had proposed a town hall meeting to be

3   held at any one of two places, Jackson State or Tougaloo, I

4   believe it was.

5              **MR. HENIFIN:**  Yes, Your Honor.

6              **THE COURT:**  And I had asked for your input on it and

7   had actually -- we had gotten down the road on planning that.

8   But then the hitch in that matter came when I decided that I

9   needed to call D.C. to ask the Administrative Office for U.S.

10  Courts what they thought about my participating in a town hall

11  meeting of the sort that I originally proposed and had

12  discussed and told you about.  Correct?

13             **MR. HENIFIN:**  Yes, Your Honor.

14             **THE COURT:**  And because that particular schematic

15  would have included primarily you, members of your team, the

16  matter was supposed to be open to the public, and there was

17  going to be a deep effort at asking for the press to attend.

18  In fact, you had even suggested a potential moderator or two --

19             **MR. HENIFIN:**  Yes, Your Honor.

20             **THE COURT:**  -- who then would assist in that.  And

21  further, that you had suggested maybe doing a session at

22  different places on this town hall meeting, and I was supposed

23  to be there in the matter to be sure that all the issues were

24  covered.

25             I called up to the administrative courts in D.C., and they

1    did not like the idea.  They did not like my involvement as I

2    proposed it to be because they were concerned that my

3    participation in a town hall meeting of the sort where this

4    lawsuit was still ongoing might involve some comment on the

5    lawsuit itself, and judicial officers involved in lawsuits are

6    not supposed to comment on the particular aspects of a lawsuit

7    that is still ongoing.

8          And so they said that they preferred that I not do it that

9    way.  And so then even though the planning had been pretty

10   developed at that point, we cancelled it.  Is that correct?

11              **MR. HENIFIN:**  Yes, Your Honor.

12              **THE COURT:**  So we cancelled it and decided that we

13   would go another route and handle matters in the courtroom.

14   And so at that time, I intended to schedule a series of status

15   conferences in the courtroom to catch up everybody as to where

16   we were.  And then in the interim, these concerns came up.

17         And so before we go forward on the alternative plan, then

18   we just shifted to this because, in addition, there were some

19   hearings that were being held on the water case possibly being

20   combined with the sewage case.  And because all of those

21   matters came up, then it eventually devolved into going ahead

22   with this status conference because the Court is supposed to

23   receive a status conference anyway on a regular basis as to the

24   expenditure of funds, et cetera.  So this is how we essentially

25   get to where we are.

RESPONSE OF TED HENIFIN                                    292

1          So as I said, we had planned to do these town hall

2     meetings, but the administrator of the U.S. Courts told me

3     that's not something I should do because this is still an

4     ongoing litigation, because if anything happens to this

5     concerted attempt to resolve these matters, we still have to

6     deal with the litigation that underlies all of this, and then I

7     have to make some legal rulings on it and a pronouncement,

8     which would not be in this kind of a climate, and it would

9     simply be a judicial response to the complaint that was filed

10    by the plaintiffs in the case and the responses made by the

11    defendants, and then it would simply be a trial on the matter,

12    and then I would craft the solution based upon whatever the

13    evidence provided.  And this concerted effort here at resolving

14    this matter would then be abolished.  Correct?

15          **MR. HENIFIN:**  I believe so, Your Honor.

16          **THE COURT:**  But in order to maintain this effort at

17    conciliation of the parties, then an agreement was reached, and

18    that agreement was reached between the parties and among the

19    parties, and that's how you come into the picture, because

20    among the terms of the agreement was that there would be a

21    third-party interim manager appointed by the Court.  So that's

22    how you then become involved, and I end up appointing you as

23    that person, based on your qualifications, credentials, and the

24    approval of the parties.  Correct?

25          **MR. HENIFIN:**  Yes, Your Honor.

1          **THE COURT:**  There was a hundred percent approval of

2    the parties.  So that's how it got to this point.  But as I

3    said, if for any reason this thing, this attempt, this effort

4    falls apart, I still have the lawsuit.  And I would still have

5    to make ruling whether the plaintiff over here should get the

6    remedy that the plaintiff suggested and asked for.

7       Now, Ms. Williams, are you not a part of the plaintiff

8    group?

9          **MS. WILLIAMS:**  Yes, Your Honor, I am.

10          **THE COURT:**  And as the plaintiff group, you represent

11   who?

12          **MS. WILLIAMS:**  The United States of America

13   representing the EPA.

14          **THE COURT:**  And when the complaint was filed, in the

15   section that deals with the remedy sought by the United States,

16   please tell us what remedy you were asking that the United

17   States receive as a result of the lawsuit which is in front of

18   me right now.

19          **MS. WILLIAMS:**  Your Honor, I don't have the complaint

20   in front of me.  Let me see if I can pull it up.  But there are

21   various remedies available to the EPA under its statutes with

22   respect to ensuring that the quality of the water satisfies the

23   Safe Drinking Water Act, and they could include the situation

24   such as we have here with the receiver, also various other

25   sanctions or things of that nature, monetary sanctions, a

1    consent decree and things of that nature.

2              **THE COURT:**  What you are seeking is some remedy for

3    what you construe to be violations of the defendant, correct?

4              **MS. WILLIAMS:**  Yes, Your Honor.  There were

5    demonstrated violations of the Safe Drinking Water Act, as well

6    as a prior administrative order that the EPA had reached with

7    the City.

8              **THE COURT:**  And the City of Jackson, Mississippi is

9    the defendant?

10             **MS. WILLIAMS:**  Yes, Your Honor.

11             **THE COURT:**  So under your complaint, were this Court

12   to reach -- I will just stop just for a moment.

13        Mr. Henifin, why don't you have a seat while I have this

14   conversation with her.  Ms. Williams, go ahead and look through

15   your cell phone and find what you are looking for.

16             **MS. WILLIAMS:**  Yes, Your Honor.  Thank you for the

17   Court's indulgence.

18             **THE COURT:**  Well, I caught you unprepared to just

19   stand up and just talk about this matter.

20             **MS. WILLIAMS:**  Thank you, Your Honor.  As you are

21   aware, technology is not always our friend, but we are moving.

22             **MR. FINGERHOOD:**  Your Honor, Karl Fingerhood on

23   behalf of the United States.  I'm here virtually.  If I can

24   help out my co-counsel, the complaint asks for certain

25   injunctive relief basically requiring that the City come into

1   compliance with the Safe Drinking Water Act and also other

2   injunctive measures that may be needed to abate an imminent

3   threat to human health and the environment.  We also suggested

4   penalties that the Court could impose under statute.  So that's

5   basically the relief we've sought in a nutshell.  However, as

6   Your Honor is aware, we reached a compromise agreement which

7   you are now responsible for overseeing.  And Mr. Henifin was

8   appointed as the third-party manager who is an agent of Your

9   Honor to oversee the implementation of the settlement

10  agreement.

11          **THE COURT:**  Okay.  And what I was saying is that if

12  this agreement falls through, then we go back to the lawsuit.

13  And at that point, this Court has to make a determination

14  whether the City is in violation, and if so, whether the United

15  States is entitled to the relief it seeks.

16          **MR. FINGERHOOD:**  That's correct, Your Honor.

17          **THE COURT:**  Now, then, your complaint, the complaint

18  that you have filed in this case.

19          **MS. WILLIAMS:**  Yes, Your Honor.

20          **THE COURT:**  Ms. Williams, do you have it now?

21          **MS. WILLIAMS:**  Yes, I do, Your Honor.

22          **THE COURT:**  Then go to the podium.  Ms. Williams, you

23  can hit that little lever on the right-hand side of you.  Look

24  under that platform there.  You see it?

25          **MS. WILLIAMS:**  Yes, Your Honor, I do.  Thank you.

1          **THE COURT:**  Oh, there you are.

2          **MS. WILLIAMS:**  Yes, here I am.

3          **THE COURT:**  Now, then, Ms. Williams, give a synopsis

4     of the complaints against the City of Jackson.

5          **MS. WILLIAMS:**  Your Honor, the EPA had identified

6     certain violations of the Safe Drinking Water Act, and the

7     parties have gone through this -- EPA had issued an

8     administrative order requiring the City to come into compliance

9     with the Safe Drinking Water Act, and the parties had gone

10    through efforts to try to get the City into compliance, but

11    they were unable to come into compliance.

12         So over the course of a couple of years, the order was

13    issued in 2020, I believe, the administrative order, that is,

14    was issued in 2020, and over the course of that time, there

15    were numerous boil water notices that were issued, and they

16    were concerned that there could be contaminants in the water

17    because of the boil water notices.  And once we had the

18    catastrophic failure of the water system in August of 2022, the

19    parties came to the conclusion that we could no longer wait on

20    the City to come into compliance, and negotiations began

21    shortly thereafter to come to resolution on this interim

22    stipulated order.

23         **THE COURT:**  Okay.  So you're asking for injunctive

24    relief?

25         **MS. WILLIAMS:**  Yes, Your Honor.

1           **THE COURT:**  And injunctive relief means you are

2   asking me, if necessary, to require the City to do certain

3   things --

4           **MS. WILLIAMS:**  Yes, Your Honor.

5           **THE COURT:**  -- under threat of contempt --

6           **MS. WILLIAMS:**  Contempt of court.

7           **THE COURT:**  -- if the City doesn't do it?

8           **MS. WILLIAMS:**  Yes, Your Honor.

9           **THE COURT:**  And then you are also, in your complaint,

10   asking for the Court to impose financial penalties.

11          **MS. WILLIAMS:**  Yes, Your Honor, to enter a money

12   judgment to include civil penalties as appropriate.

13          **THE COURT:**  So there are a lot of remedies that you,

14   as plaintiff on behalf of the Environmental Protection Agency,

15   are requesting.  Correct?

16          **MS. WILLIAMS:**  Yes, Your Honor.

17          **THE COURT:**  So then, as of right now, you are an

18   informed observer as to what's going on, but you are also a

19   signatory to this agreement because you are a party about this

20   whole approach that we are taking right now.

21          **MS. WILLIAMS:**  Yes, Your Honor, we represent the EPA,

22   yes.

23          **THE COURT:**  So the EPA is monitoring this whole thing

24   because it is a party.

25          **MS. WILLIAMS:**  Yes, Your Honor.

1          **THE COURT:**  And the EPA had to give its signature to

2     this appointment of Mr. Henifin and to this course that we are

3     now pursuing; is that correct?

4          **MS. WILLIAMS:**  Yes, Your Honor.

5          **THE COURT:**  The other parties involved also had to do

6     the same thing.

7          **MS. WILLIAMS:**  The Mississippi Department of Health

8     is an interested party, not an actual party to the lawsuit, but

9     they were involved, as I appreciate it, in the negotiations.

10         **THE COURT:**  And they have signed off?

11         **MS. WILLIAMS:**  Yes, Your Honor.

12         **THE COURT:**  All right.  And all of the necessary

13    parties have signed off allowing this particular approach of a

14    potential settlement to go forward?

15         **MS. WILLIAMS:**  Yes, Your Honor.

16         **THE COURT:**  But as I said before, if this settlement

17    effort fails, then the matter falls back on this Court to hold

18    its trial, to make its ruling, and should it rule, then,

19    against the City to impose whatever remedy this Court would

20    think is appropriate.

21         **MS. WILLIAMS:**  Yes, Your Honor, absolutely.

22         **THE COURT:**  Including the injunctions, financial

23    matters and all of that.

24         **MS. WILLIAMS:**  Yes, Your Honor.

25         **THE COURT:**  Now, thank you so much.

1          **MS. WILLIAMS:**  Thank you.

2          **THE COURT:**  And Mr. Fingerhood, do you have anything

3     to add on that?

4          **MR. FINGERHOOD:**  No, Your Honor.

5          **THE COURT:**  Thank you so much.

6          Now, then, so now where we are is that we have Mr.

7     Henifin, who, under this consent of the parties, has been

8     appointed by the Court as a third-party manager.  And so his

9     involvement in this is critical, because if, again, this

10    approach collapses, we go back to a lawsuit where the United

11    States says that the City of Jackson is acting unlawfully under

12    the statutes involving water involved here.

13         Now, then, Mr. Henifin, would you go back to the podium?

14         **MR. HENIFIN:**  Yes, Your Honor.

15         **THE COURT:**  What I was saying before is that we have

16    heard from organizations and spokespersons and individuals who

17    have maintained that they have some criticisms.  I believe that

18    you have written out a response to those, have you not?

19         **MR. HENIFIN:**  Yes, Your Honor.

20         **THE COURT:**  And just a few minutes ago, I saw one of

21    the responses, but I was not able in that short amount of time

22    to read your responses, and even so, I didn't intend just to

23    read it and let it go at that.  I wanted to make sure that

24    everybody else could hear your responses and so then we can

25    move a pace on what you have to say in regard to these matters.

RESPONSE OF TED HENIFIN

1    I have a memory of what all has been transpiring these

2    last two days and what has been said and the comments that have

3    been made and the requests that have been submitted to the

4    Court, and if your responses don't go far enough in addressing

5    them, or if you leave out something, then I will remind you of

6    those matters and give you an opportunity to respond.

7          **MR. HENIFIN:**  Yes, Your Honor.

8          **THE COURT:**  Is that fair enough?

9          **MR. HENIFIN:**  Yes, Your Honor.

10         **THE COURT:**  Okay.  Now, is there any objection

11   whatsoever to this procedure?  Do you have any objections at

12   all to this procedure?

13         **MR. HENIFIN:**  No, Your Honor.

14         **THE COURT:**  Now, are you ready to start?

15         **MR. HENIFIN:**  Yes, Your Honor.

16         **THE COURT:**  Go ahead and start.

17         **MR. HENIFIN:**  For being responsible for the drinking

18   water system in Jackson, especially given the history of

19   failures that the residents have endured for long, is an

20   immense and humbling one for me and my team.  I have a small

21   team of caring people who only want the best for the citizens

22   of Jackson.  They bravely stepped into the management and

23   operational void at great risk to their reputations and

24   careers.  The job descriptions, qualifications and the method

25   by which fair compensation were determined were discussed in

1    detail during a previous status conference here in this court.

2         In the case of Jordan Hillman, her salary, market-based

3    for the new responsibilities she assumed as the Chief Operating

4    Officer of JXN Water, is approximately 185 percent above her

5    previous salary with the City, not 300.  She earns every penny

6    of that as she is responsible for practically every improvement

7    in the water system that we have accomplished to date.  She

8    works around the clock every day of the week.  Sorry.  We would

9    be struggling without her knowledge, expertise, passion.  I owe

10   her a huge debt of gratitude.  The same is true of our major

11   contractors we've hired, both within and without Jackson.

12        **THE COURT:**  Now, Mr. Henifin, on a prior occasion

13   when you appeared before the Court, the Court asked you about

14   the salary structure, correct?

15        **MR. HENIFIN:**  Yes, Your Honor.

16        **THE COURT:**  And I asked you to give me an explanation

17   as to why there had been an increase in the salary structure of

18   persons you had hired from the City onto your team.

19        **MR. HENIFIN:**  Yes, Your Honor.

20        **THE COURT:**  And at that time, what do you recall

21   telling me?

22        **MR. HENIFIN:**  Well, they really were signing up for a

23   temporary deal and without no future set.  They were highly

24   qualified.  For the new responsibilities, I did market

25   research.  That all should be in the transcript of that, Your

1    Honor.  But I did a lot of work to set those salaries based on

2    the responsibilities that we were providing her, asking them to

3    serve in this temporary environment that we live in today.

4           **THE COURT:**  Now, I remember what you said, but again,

5    in this spirit of transparency for those who weren't here when

6    we had this last session in open court, you explained the

7    salary structure and why you had increased their pay from what

8    it was with the City.  So even though some persons rendered

9    statements in front of the Court that they wanted to understand

10   the salary, there had been an explanation given in open court,

11   am I correct?

12          **MR. HENIFIN:**  Yes, Your Honor.

13          **THE COURT:**  I asked about that at the time that you

14   were here when it was said that there was going to be a status

15   conference, and maybe people didn't get the word, but

16   nevertheless, there were a number of people who were here who

17   did get the word, and they understood that matters were going

18   to be discussed, matters concerning budget and revenue and all

19   of those other issues, and if they wanted to, they could get

20   involved in asking questions.

21          So then, at that time, I asked you to explain and justify

22   the salary structure.

23          **MR. HENIFIN:**  Yes, Your Honor.

24          **THE COURT:**  Now, let's go through those matters again

25   as to why you increased the pay of those folks from the City

1  who were hired onto your team.

2          **MR. HENIFIN:**  Yes, Your Honor.  I believe, and I'm

3  remembering the details from awhile back, but they had

4  different responsibilities.  We are a very small organization,

5  and the responsibilities are essentially taking -- in the case

6  of the Chief Operating Officer, acting on my behalf to manage

7  all the operations that are going on on a daily basis, and I

8  pointed out Ms. Hillman works around the clock, as does

9  everyone else that we've got on staff.  We are on call 24/7.

10  Water lines break whatever.  System issues happen whenever.

11  And so with the small staff we have got and the contracts we

12  are managing, it takes a lot out of them.

13          So based on their responsibilities, I did some market

14  research to understand what the market pay would bear for that.

15  And on top of that, they don't have a future doing this work

16  because we are an interim organization.  By the interim order

17  you've put us under that created the JXN Water need, we don't

18  have a long-term future.  When we set this up, we had a

19  one-year budget.  As of today, we have got a three-year budget,

20  and we don't know what the future is.

21          So they are jumping into this full-time without any idea

22  what their long-term future is related to the water system.  So

23  there's a premium to pay for that.  They are still City

24  employees as far as benefits go, and so the City -- we are

25  reimbursing the City for their salary, their portion of the

1    salary and benefits they are getting from the City, and then

2    the difference between that and the market-based salary that I

3    established is what JXN Water is paying them on top of that.

4           **THE COURT:**  Now, I'm going to take these up.  You say

5    they have different responsibilities now.

6           **MR. HENIFIN:**  Yes, Your Honor.

7           **THE COURT:**  So when they were with the City, what

8    were their responsibilities?

9           **MR. HENIFIN:**  In the case -- each of them were

10   different, but in the case of Jordan, she had been director of

11   planning five years prior to the disaster and was appointed as

12   interim public works director, which is a position that has a

13   broad set of responsibilities but also has a significant amount

14   of oversight and support from the City in general.

15        In their current role, there's only me above her in the

16   chain of command, and she is largely autonomous in how she

17   operates and makes a lot of decisions on my behalf because I'm

18   not in the field with her every day.  So the responsibilities

19   are really to ensure that the water is provided.  She is the

20   person that is responsible to make sure the water pressure

21   remains where it is and that the water is available and

22   pressurized.  She is hunting down closed valves in the system.

23   She is doing so many different things hands on, as well as

24   managing multiple contracts, setting up our IT system, doing a

25   variety of things that were well out of her scope when she was

1   with the City.

2          **THE COURT:**  So she is doing far more for you than she

3   did with the City.

4          **MR. HENIFIN:**  I believe so, yes, Your Honor.

5          **THE COURT:**  Next point.  You say she is working

6   around the clock 24/7.

7          **MR. HENIFIN:**  Yes, Your Honor.

8          **THE COURT:**  So then does she have to answer these

9   calls and address concerns on a 24/7 basis?

10          **MR. HENIFIN:**  Yes, we finally have spread some of

11   that out so that she's not always the first person that gets

12   called, but she monitors the pressures in the system pretty

13   much at all hours from all locations.  We took a recent

14   vacation to Paris.  Every morning was texting me with screen

15   shots of our tanks here in Jackson.  She just has taken this on

16   as a personal challenge and ensuring that everything is getting

17   done correctly.  So she pretty much never is off my radar.  I

18   can call her any time.  The City calls her all the time.  She

19   coordinates our people.  She coordinates the contractors.

20          We are fortunate now to have the call center in operation

21   which has taken some of that load off.  We are able to dispatch

22   directly from that.  We continue to try to put systems in place

23   to resolve these issues so it isn't totally reliant on one or a

24   handful of people.  We have systems in place that weren't

25   there.  Jordan has largely designed those systems and gotten

1    them in place for us.  She was very much responsible for the

2    call center system that we have got in place now.  She is

3    working on our work order tracking system.  So the breadth of

4    what she is doing is just amazing.

5              **THE COURT:**  Now, next point.  Small staff.  How large

6    is your staff?

7              **MR. HENIFIN:**  Our staff is five people and a

8    contractor at the moment, and then we've got 15 folks from

9    the -- that were formerly in the water and sewer billing

10   administration building that are really the people who take the

11   escalation from the call center to resolve billing issues.  So

12   a total of 20, but five are responsible for the water

13   distribution and water operations, and that's the small staff

14   that I have referred to.

15        In that case, it is Jordan Hillman as chief operating

16   officer and myself, and of that five, we are the only two white

17   people.  I know it was pointed out that we were only white

18   administrators.  The other three folks are black.  We've got

19   Tiana Whitsett, who's running -- actually, there's four.  Tiana

20   Whitsett runs our administrative services, so she takes care of

21   all the administrative parts of what we are doing, former

22   city -- well, still is a city employee.  All of these people

23   were city employees that are now under my direction, and they

24   are sharing this same setup where they get their city salary

25   and then the market-based compensation on top of that from me.

1   But we have Tiana Whitsett, who's the administrative services

2   manage, a black woman.  We've got Terrance Byrd, who formerly

3   ran the -- was the senior operator at the JH Fewell Water

4   Treatment Plant.  And he manages the field work around our

5   distribution system.  He is also a black male.  Working for him

6   managing our contracts on-site and opening and closing valves

7   are Orlando Chambers and Marcus Love, both black males.

8       So the percentage that was quoted in one of the documents

9   that was turned in is pretty far off.  By my calculation, 2 out

10  of 6 are white, and 4 out of 6 are black, so I think we're not

11  too far off of the demographics of the community.  If we bring

12  in the WSBA, the billing people that are in the building,

13  100 percent of that 15 people are black.  So if you look at the

14  overall staff that are actually JXN Water staff, there are

15  2 white and 18 black.

16          **THE COURT:**  Next, when we are talking about the need

17  to look at the market rate for employment in those particular

18  areas, I asked you and you responded whether you had to take

19  into account the temporal nature of the job that you are hiring

20  these people for, that you were asking them to leave a job with

21  the City that would have retirement benefits and other creature

22  comforts to take a job with you, which is temporal, because

23  under your organization, they might not be employed after the

24  time for you to complete your contract.  Is that so?

25          **MR. HENIFIN:**  Well, Your Honor, we kept them as city

 1   employees under this arrangement so they could maintain their

 2   retirement and other benefits.  Now, they are not guaranteed to

 3   go back to the same position they left from, but if JXN Water

 4   disappears tomorrow, you have to do whatever you have to do for

 5   the dissolution of this arrangement, they would still be city

 6   employees, and they still have their pension.  So that's why we

 7   set it up like we did.

 8       The temporal nature is, they are getting more

 9   responsibility, more pay over this short period of time, and

10   they potentially go back to an unknown job with the city if we

11   dissolved.

12           **THE COURT:**  And what about salary?

13           **MR. HENIFIN:**  And the salary would return to their

14   city salary, I would assume, if they had a position with that

15   salary when they went back to those positions.

16           **THE COURT:**  Do you know if that is guaranteed, the

17   city salary.

18           **MR. HENIFIN:**  I don't know what the guarantee would

19   be to place them back in the City.  I would assume it would be

20   similar to what we've tried to do with everyone else.  If

21   there's a position the City has got available to put them in,

22   the City would do what they could to place them, but I don't

23   believe there's any guarantees.

24           **MS. MARTIN:**  Your Honor, they never vacated those

25   positions.  They are still effectively in the city positions.

309

1    They still have all the city benefits, insurance, we still pay

2    PERS for them.  So they are still effectively in the positions

3    they were in with the City of Jackson.  The only difference is

4    they are getting paid the stipend, or whatever you want to call

5    it, from JXN Water.

6         **THE COURT:**  Okay.  Thank you.  So, then -- oh, let me

7    go back to you.  Are they guaranteed to be able to return to

8    the City?

9         **MS. MARTIN:**  Well, they are still city employees, so

10   they would have --

11        **THE COURT:**  But I'm asking are they guaranteed that

12   they could return to their prior jobs?

13        **MS. MARTIN:**  As long as that position continues to

14   exist.  But what I would say is, with some of the other

15   positions that Mr. Henifin has had, we have had to eliminate

16   positions.  So the budget for those positions are all -- that

17   money is being transferred to Mr. Henifin.  So we have had to

18   eliminate positions because we no longer have a budget for

19   water and sewer -- well, water for now.

20        So the money that we were utilizing to pay that payroll,

21   we are transferring that money to Mr. Henifin.  So we have had

22   to eliminate some of those positions.  The people he is talking

23   about, we have not eliminated those positions at this time.

24        Oh, some of them are in what we call an at-will position.

25   So some of them are in what we would call a civil service

1    protected position, and some of them are in an at-will

2    position.

3              THE COURT:  So then the answer to my question that I

4    asked earlier, whether they were guaranteed to be able to

5    return to their position, is answer is no?

6              MS. MARTIN:  All except I think one of them would be.

7              THE COURT:  All of them would be what?

8              MS. MARTIN:  All of them would be civil service

9    protected, I think, except one of them.

10             THE COURT:  How many would be at-will?

11             MS. MARTIN:  Only one.  That's what I'm saying.  From

12   the people he just listed, only one of them is currently

13   serving in an at-will position.

14             THE COURT:  So they are still civilly protected right

15   now?

16             MS. MARTIN:  For what it's worth, Your Honor, the

17   Civil Service Commission has asked us to potentially brief that

18   issue with this Court because we -- there's a question on

19   whether or not once we transfer the system, the control of the

20   system to Mr. Henifin, whether or not the civil service

21   protection transferred with them.

22        What I would give you an example of, when the state of

23   Mississippi has had -- where they've decided they are going to

24   put something up, like the conservatorship that they do for the

25   schools, and they'll say that that conservator, when they come

1  in, they can hire and fire who they want, they take away

2  that -- I think what the State calls the employee appeals

3  board, they take away that state service protection from them.

4  And so we are not sure if the civil service protection still

5  applies or not.  That's a question that our Civil Service

6  Commission is currently being faced with.

7       **THE COURT:**  So back to my answer, at this point,

8  those persons are not guaranteed a job with the City at this

9  point, because you said the civil service issue has not been

10 resolved.

11      **MS. MARTIN:**  That issue has not been resolved.  If

12 that issue is resolved in their favor, then all except one of

13 them would have civil service -- I say in their favor.  If that

14 issue is resolved and the determination is that they will

15 continue to have civil service protection, then all except one

16 of them would continue to have that position.  But I would say

17 this:  That is if the position continues to exist, because we

18 have had to eliminate positions based on the fact that we no

19 longer have a budget for water.  The money that we had for

20 water has all been -- is being transferred to Mr. Henifin.

21      **THE COURT:**  But all of that tells me that if I am one

22 of those persons that when I elect to go with Mr. Henifin, I

23 recognize that one of the perils of making that decision is

24 that I might not have a job with the City later.  Is that

25 correct or not?

1          **MS. MARTIN:**  I would say -- I'm an at-will employee,

2     for what it is worth.  So yeah, I think it's the same way.

3          **THE COURT:**  So the answer is yes to my question?

4          **MS. MARTIN:**  Yes.

5          **THE COURT:**  But when these persons decided to go with

6     Mr. Henifin, then they recognized that after Mr. Henifin leaves

7     here, then they might not have a job with the City?

8          **MS. MARTIN:**  They might become at-will employees.

9     Yes, Your Honor.

10          **THE COURT:**  Okay.  Therefore, they might not have a

11    job with the City.  You keep saying at-will.  I know what

12    at-will means.  That means you could fire them at any time for

13    no reason and don't have to even give an explanation for it,

14    and they don't have to do anything which says they are

15    deserving of being fired.  But at-will means that the employer

16    can fire them for whatever reason, any reason whatsoever, as

17    long as it does not offend the workplace laws of firing people

18    because of racism or age and things like that, but otherwise,

19    the employer is left completely able to fire for any reason.

20          **MS. MARTIN:**  Correct.  And what I'm saying is that at

21    least one of them was already in an at-will position.

22          **THE COURT:**  Okay.  And then the others could become

23    at-will?

24          **MS. MARTIN:**  Correct.  I think it's two different

25    things.  They could either become at-will or their positions

1    could be eliminated based on funding.  But if it came back to

2    the City, those positions would continue to exist.

3              **THE COURT:**  Now, I asked that question because when

4    Mr. Henifin had to approach these people to work on his team,

5    they, then, wanted to know is my job protected after you leave

6    here.  So if I take this job and I take this increased salary

7    for the time being, am I guaranteed to keep it?  And the answer

8    is no, you aren't guaranteed to keep it.

9              **MS. MARTIN:**  Your Honor, I feel compelled to make

10   sure that you are aware that -- this is -- I think he said five

11   people, so we are talking about four city employees.  There

12   were numerous other employees whose salaries were greatly

13   reduced, because he did not offer them employment, and so they

14   came to work for the City, and we had to find other positions

15   for them.

16             **THE COURT:**  Well, that might be.

17             **MS. MARTIN:**  I just want to make sure the Court is

18   aware of that.  We are talking about four people who, yes, are

19   in this position, but there are several other employees, a

20   great number of employees whose salaries were reduced based on

21   the fact that they were not offered a position with him or they

22   were not offered positions with some of the other contractors.

23   There were other employees who chose to move forward in

24   retirement.  So there are a whole class of employees who are in

25   very different positions.

1       **THE COURT:**  Now, we could discuss all of that later

2   in a different setting, but the reason why we are discussing

3   what we are discussing now is because those who have come

4   before the Court to render complaints have made complaints only

5   about his staff and complaints only about the salary, one in

6   particular that went to 300,000, and they have not complained

7   about the other actions the City has taken, but they are only

8   complaining about his staff.

9       So I'm pointing out through his testimony that the ones

10  who went with him had increased duties, and besides the

11  increased duties, that they recognized that this increased

12  salary and even their employment with the City was at jeopardy,

13  because when he leaves, they might not have a job, and when he

14  leaves, they definitely will not have the increased salary.

15      Now, I was just trying to point that out.  So the answer

16  is that he had to convince these people to come to work for

17  him, knowing that if he left, they possibly would not even have

18  a job with the City.  That's the only point.  Mr. Henifin, is

19  that correct?

20      **MR. HENIFIN:**  Yes, Your Honor.  And one small

21  correction.  It's not 300,000.  They were talking about

22  300 percent.  Her salary is 200,000.

23      **THE COURT:**  Yeah, 200.  But they kept saying --

24      **MR. HENIFIN:**  300 percent increase.

25      **THE COURT:**  -- 300 percent.  And so I just wanted to

1      point out the problem you had in securing your staff, because

2      then you had to go out and convince some people who already

3      were doing well with the City, who had a more than average

4      salary with the City, to come with you into an unknown

5      territory.  That's what I'm talking about.

6              **MR. HENIFIN:**  Yes, Your Honor.  To some degree, they

7      realized there wasn't really a position for them that would

8      continue in water with the City.  So there were a number of

9      factors at play in that convincing, but that essentially is

10     what it was.

11             **THE COURT:**  I just wanted the public to understand

12     that that was a factor that posed some difficulty in putting

13     together a qualified staff from existing city workers, because

14     a lot of folk then wouldn't want to come with you when they

15     recognized that they were not guaranteed a job when you left

16     after a short amount of time.

17             **MR. HENIFIN:**  Yes, Your Honor.

18             **THE COURT:**  That's all.  The next point you want to

19     raise?

20             **MR. HENIFIN:**  I've learned a lot over the past two

21     days listening to the various folks that have come before you.

22     I appreciate everyone's time that they came here.  The common

23     themes, and I kind of grouped this into some different themes,

24     because there were a lot of different themes, but pretty much

25     every speaker talked about the water system has been struggling

316

1  for a long time.

2      Most speakers feared it would take upwards of a decade to

3  fix, and we are obviously trying to speed that along.

4      There is little trust in the water quality.  These aren't

5  brilliant conclusions, but it's pretty much common themes that

6  were talked about.  And people are so accustomed to receiving

7  precautionary boil water notices that they are suspect when

8  they are no longer seeing them.  Again, I have pointed this out

9  many times in public that it is not a normal course of action

10 for a city to receive widespread and multiple boil water

11 notices on a regular basis, and I believe the citizens here

12 have been conditioned to think that is normal.  It is not

13 normal, and we are trying to get away from that.

14     We have been aware of all of these concerns, and we have

15 been working on that to prioritize our efforts.  Our priorities

16 from the beginning have been focused on the top two.  And yeah,

17 we have been at this for a little over 7 months.  We got the

18 first federal funding that's been a lot of the discussion in

19 April.  So we haven't even -- we didn't even have federal

20 funding beyond the -- my own professional staff funding.  We

21 had no federal funding to do any of the projects until April.

22 So we are still just months away from when we finally got some

23 funding.

24     But our top priorities have been to ensure the water is

25 treated appropriately at the treatment plants consistently  and

1    meeting Safe Drinking Water Act.  That's been top priority.

2    And the second has been to establish and reestablish pressure

3    in the system so everyone has pressurized water all the time.

4    We are not there yet.  We are close.  You heard most people

5    here have talked about some improvements in the pressure, not

6    everybody, but we are getting there across the board.

7        There are thousands of miles of pipes.  We are out there

8    fixing breaks, we're opening valves.  You have talked about the

9    over 150.  I think we are close to 200 leaks that have been

10   repaired since March when we started that effort.  We have

11   opened more than 90 valves.  We are continually maintaining the

12   treatment plants with our contractor operator at Jacobs and our

13   distribution system to meet industry standards.  We are trying

14   to get there.  And in the months ahead, we are going to

15   continue more and more of those improvements.

16       We have the 13 priority projects that are directing what

17   we are doing, that is part of the order, and we are focused on

18   getting those up and going and running and moving forward.

19       I'm going over the highlights of this at this point.  I

20   realize --

21           **THE COURT:**  Now, Mr. Henifin, tell us how you detect

22   leaks.

23           **MR. HENIFIN:**  We have done a number of things,

24   including putting people on the ground, but mostly it is

25   through the work of Jordan Hillman and Terrance Byrd.  They

RESPONSE OF TED HENIFIN

1   study the distribution system, try to figure out why.  We have

2   put pressure monitors in the system that weren't there up to

3   this point, so we have now got a network of pressure monitors

4   in the system, and when they see a change in the pressure, they

5   try to figure out what happened, and then they will go out and

6   physically look for the leaks and use their knowledge of the

7   system to try to pinpoint where those are.  Then from that

8   point, we can get a contractor on it to fix it.  That's one

9   method.

10      We have got some acoustical leak detection with our new

11  meters that are being installed, and so they can listen for a

12  change in the sound of the water going through the meters,

13  which may indicate that there is a leak nearby.  If you get a

14  number of those meters indicating a change in sound of water

15  flowing through the pipes, that's another good indication of an

16  area, it doesn't pinpoint it to an exact location, but it tells

17  you where to look for the leak.  So again, our staff goes out

18  and looks for those leaks and finds them at that point and then

19  schedules the repairs.

20      Then we just signed an agreement with a firm that is going

21  to do some satellite imaging where they fly over the city a

22  number of times during the course of a month as the satellite

23  passes above us to get images to look for water leaks below the

24  ground, believe it or not.  So that's going to get going.

25      And then finally, as part of our valve assessment and

1   hydrant maintenance contract, they are going to put some active

2   listening devices on other parts of the system where the meters

3   wouldn't be nearby, so on the big transmission lines and

4   distribution lines.  So we will have a multi-pronged approach

5   to try to determine where leaks are.

6        And we've got active leaks now that we are still working

7   on scheduling repairs for that are complicated by where those

8   leaks are and the accessibility and how to solve those.  Those

9   are underway as we speak.

10        **THE COURT:**  Now, when you began your task here and

11   you had determined that you wanted to find leaks, what was

12   already in place in the city that would help you locate leaks?

13   You have given me one, two, three, four, about five different

14   approaches here, and what did the city have in operation as an

15   approach to discovering leaks when you came?  Did they have all

16   of these in place?

17        **MR. HENIFIN:**  No, Your Honor, but the metering that

18   was going in had the capability.  They hadn't activated that

19   yet.  They were exploring that.  So that was already in place

20   with the new metering contract.

21        The only tools they really had were the ten elevated water

22   tanks across the city.  So when the elevated water tank

23   pressures changed, and you measure the pressure by how much

24   water is in those tanks, as that changed, that would give them

25   an indication of where they might look for a big leak, but it's

1    a much more macro scale.  You are not as fine-pointed where you

2    could start your search when you are just dealing with one of

3    the ten tanks areas, and it could actually not be directly in

4    that area because of the closed valve system they had.  There

5    basically were no tools to find leaks active at that point.

6            **THE COURT:**  Let's go through each one of them.

7    Pressure monitors, are they costly?

8            **MR. HENIFIN:**  No, Your Honor.  They were I want to

9    say ten thousand dollars each.

10           **THE COURT:**  How many do you have?

11           **MR. HENIFIN:**  We put 25 out initially.

12           **THE COURT:**  250,000?

13           **MR. HENIFIN:**  No, the -- yes, 10,000 times 25,

14   250,000.

15           **THE COURT:**  So there were no pressure monitors?

16           **MR. HENIFIN:**  No, Your Honor.

17           **THE COURT:**  What about acoustical leaks?  Did you

18   have any acoustical leak devices here at the city when you took

19   over?

20           **MR. HENIFIN:**  Only, again, the metering contract had

21   already installed 20,000 meters that had that capability, but

22   we had not -- the City had not turned it on at that point.  So

23   that was a potential, but they just hadn't gotten to the point

24   of using it.

25           **THE COURT:**  So the City didn't have that either?

 1          **MR. HENIFIN:**  It was there, but they hadn't exercised

 2     it to actually start using that technology.

 3          **THE COURT:**  Why hadn't the City started using it,

 4     then?

 5          **MR. HENIFIN:**  I think it was pretty much new

 6     technology at the time, and I don't know how much they knew

 7     that the meters had that capability.

 8          **THE COURT:**  Wait a minute.  You are saying that they

 9     had the devices, but they had not cut them on?

10          **MR. HENIFIN:**  I don't think they knew enough about

11     the expertise to help them understand what the meters could do

12     and how that technology would work.  It was still developing at

13     that point, so I don't think they were ready to do it at that

14     point in time.

15          **MS. MARTIN:**  Your Honor, it was our understanding

16     that there was an additional cost associated with that.

17          **THE COURT:**  What was the cost?

18          **MR. HENIFIN:**  And there is an additional cost, and I

19     want to say it's a hundred thousand a year.

20          **THE COURT:**  A hundred thousand a year.  So you are

21     saying that the City didn't have that hundred thousand?

22          **MS. MARTIN:**  No, to -- well --

23          **THE COURT:**  I'm sorry, but I'm talking to the

24     attorney over here.

25          **MS. MARTIN:**  Give me just a second and let me confirm

1    with my client, Your Honor.

2            **THE COURT:**  Go ahead.

3        (Ms. Martin confers with Mayor Lumumba.)

4            **MS. MARTIN:**  Your Honor, the contractors that were

5    installing that technology were not at the point at which they

6    were ready to turn that technology on.  What they told us is

7    that they were including that technology, but it was not yet

8    time for us to activate it.

9            **THE COURT:**  Could you put some more meat on that

10   skeleton?  Why not?

11           **MS. MARTIN:**  So there was a contractor, I believe the

12   same contractor that I believe Mr. Henifin is utilizing.

13           **THE COURT:**  So then why was it not ready to be cut

14   on?

15           **MS. MARTIN:**  Because they were still installing the

16   meters.  So that's what he's saying.  We had it, it was being

17   installed with the meters -- it still is being installed with

18   the meters, but we had not yet -- from what they were advising

19   us, they were telling us it was not yet time to activate that

20   technology.

21           **THE COURT:**  Mr. Henifin, what about you; what is your

22   response to that?

23           **MR. HENIFIN:**  I do agree they weren't ready to

24   activate it when you signed the order as of the effective date.

25   There was an additional cost, which I don't know that the City

1    committed to even doing anything with that.  But it is true

2    they were not ready to activate it.  We pushed them along to

3    get it activated much quicker, but they --

4         **THE COURT:**  Now, when you say you pushed them along,

5    what did you do?

6         **MR. HENIFIN:**  We met with them and said, We have got

7    to get this turned on.  Let's see what we can do.

8         **THE COURT:**  And so how long had they been working

9    with those unturned-on devices?

10        **MR. HENIFIN:**  I'm not sure when the first meter

11   started to be installed.  But you need a significant number of

12   meters in place to make this work, because you need to listen

13   to more than just one meter in one location.  So you need --

14   several meters in an area need to be installed, and not every

15   house was getting their meters installed in any kind of order.

16   So you need to have a critical mass of meters in each area you

17   are trying to listen to, and that was taking awhile based on

18   the installation pattern that was going.

19        So, again, I agree with the city attorney that they just

20   were not ready to turn it on as of the effective date, but we

21   continued to encourage moving along faster.

22        **THE COURT:**  All right.  And when did you start your

23   encouragement?  About what month was that?

24        **MR. HENIFIN:**  That was actually before the effective

25   date, Your Honor.  So it would have been when I was assisting

1    in my role as a U.S. Water Alliance senior fellow in the

2    October time frame.

3         We were desperate to find leaks during that recovery from

4    September through the end of October, and many days we would

5    spend with three or four people driving the city trying to find

6    leaks when we were losing pressure and concerned we were going

7    to drop the whole system again.  Those were tough, long days,

8    and we were using whatever we could find.  So we brought the

9    consultant or the vendor that provided leak detection and we

10   asked them to see what they could do even on a test basis.  So

11   we started work with them.  Again, that would have been the

12   City, Jordan Hillman as public works director, and me just as

13   an executive adviser, whatever my role was at the time, and we

14   started basically imploring them to help us find these leaks

15   before we dropped the system out.

16        And there were many days from the end of September to the

17   end of October where we were hours away from losing the system

18   like we did at other times, our previous -- so we were working

19   as hard and trying to use every tool that might be available

20   just to keep the system running once we got the boil water

21   notice lifted on September 16th, I believe.

22        **MS. MARTIN:**  Your Honor, I do want to note for the

23   record that if that's the right timeline, at that point in

24   time, Mr. Henifin would have actually been working -- he was a

25   consultant to the City.  U.S. Water Alliance was a consultant

1    to the City, much like Andy Kricun, who testified earlier, he

2    was a consultant working with the City.

3              **MR. HENIFIN:**  I thought I said that.

4              **THE COURT:**  He said that.

5              **MS. MARTIN:**  Oh, I just wanted to make sure it was

6    clear because --

7              **THE COURT:**  It's very clear.  He said that.

8              **MS. MARTIN:**  Okay.  I just wanted to make it clear

9    for the record that at that time, he was working for the City.

10             **THE COURT:**  The record is clear.  He said that.

11             **MS. MARTIN:**  Okay.

12             **THE COURT:**  Now, when you said that the city was

13   hours at that point from the city breaking down, what do you

14   mean?

15             **MR. HENIFIN:**  There were many days in that

16   September/October time frame when we would develop a leak and

17   we couldn't figure out where it was or why it was doing what it

18   was doing in the system, and so we were concerned we would drop

19   pressures below the boil water notice requirement of 20 pounds

20   per square inch at the meters, yet we knew we didn't have a

21   great method of determining whether or not we would lose

22   pressure at those meters.  All we had was pressure gauges at

23   the treatment plants.  So the surrogate that the City operated

24   under for many, many years was if the pressure dropped below

25   65 pounds at the treatment plant, they would issue the boil

1    water notice.  They would not verify whether or not that was

2    necessary at every meter because they didn't have the tools or

3    the people to do that.

4         That was an extremely conservative approach, probably very

5    good at the time, but you were essentially issuing a boil water

6    notice to a large section of your population that probably

7    didn't need it at the time because their meters were not

8    suffering.

9         Anecdotally, I hear a lot from folks that live in the

10   northeast part of Jackson, and they never lost pressure through

11   any of these events.  So pretty confident, based on hydraulics,

12   that a good portion of the system probably was issued boil

13   water notices unnecessarily over the years.

14        **THE COURT:**  Now, you have said that satellite imaging

15   is something possibly planned.  Is that so?

16        **MR. HENIFIN:**  That's brand new.  So during those same

17   challenged times in September and October when we were trying

18   to keep the system running, we worked with the Mississippi

19   Department of Emergency Management and the Mississippi Health

20   Department to get drones to fly and look for water, which

21   actually was relatively successful, but it doesn't cover enough

22   area in the city and so you have to isolate that to a smaller

23   area and use drones with thermal imaging to try to find water

24   leaks below grade.

25        We had limited success because you need pretty good

1    differential between the temperature of the water and the

2    temperature of the air, and unfortunately, we didn't have --

3    the water was pretty warm at that point, and the air was pretty

4    warm, and so without that differential, which you get much

5    better in the wintertime -- when our water is still probably in

6    the 60-plus-degree range, and the outdoor air temperature and

7    ground temperature go down into the 40s, you get a much better

8    image of where you might find pockets of warm water which

9    indicates a leak.

10        So we had some limited success using drones, and we had

11    looked into that as a long-term option, but the satellite

12    imaging concept is relatively new technology.  We learned about

13    it at a conference, at an American Waterworks Association

14    annual conference just last month.  We have already reached out

15    and entered an agreement to get them flying the satellite over

16    us and getting the images we need, which we should see in the

17    next few months.  And that is emerging technology that wouldn't

18    have been available for the city a year ago.

19        **THE COURT:**  Right.  I understand that.  Then on the

20    matter of physical view, such as boots on the ground who run to

21    see if they can detect a water leak, how many people do you

22    utilize for that?

23        **MR. HENIFIN:**  We use predominantly two people.  If we

24    are having a big leak and we can't find it, we will do all four

25    of those staff members.  An occasion, late night type searches

1    and things, we will employ a contractor to help us, but it's

2    pretty much the knowledge of the system that resides in the

3    four folks that worked in the system for a long time that are

4    on the staff.

5                    THE COURT:  And they are on your staff?

6                    MR. HENIFIN:  Yes, Your Honor.

7                    THE COURT:  Go through the rest of your response.

8                    MR. HENIFIN:  Sure.  So I guess the other part I

9    wanted to talk about is the fire department.  I think what was

10   interesting, we have made great progress over the last 7 months

11   opening valves, fixing leaks, all the things we've talked

12   about, and also building the systems to support that, the

13   geographical information system mapping, hydraulic modeling,

14   asset management, assessing the valves.  And soon we will be

15   able to evaluate all the hydrants, that was talked a lot about

16   yesterday morning, something that hasn't been done in a long

17   time and which will provide the fire department with critical

18   data and the tools to manage that, a system that you can

19   actually mark on a computer to say this hydrant is out, this

20   one is on.  They'll have much better access to information.

21        You know, what was interesting for me personally during

22   the status conference was I didn't understand how the fire

23   department had been so successful in preventing and putting out

24   fires here in Jackson with all the water issues, because when

25   you think through the history we have talked about, and many

RESPONSE OF TED HENIFIN

1    people came up here and talked about the extended periods of

2    time without water pressure over the last many, many years, so

3    the question I had when I got here was how in the world are

4    they not having whole blocks burn down because they didn't have

5    water.  That was answered for me yesterday.  JFD has assumed

6    that when they show up, they need to have their own water, and

7    they expressed that yesterday.  They bring a tanker truck full

8    of water and they fight the fire from their truck before they

9    ever worry about a hydrant.  And then they shuttle water to the

10   truck.  And then it finally dawned on me, these people are

11   professionals.  They are prepared.  They have a plan.  Because

12   the water system hasn't been reliable in decades, and so they

13   have developed a great way to make this work.

14       I'm in great admiration of the fire department that they

15   have figured this workaround, and they aren't dependent on

16   which hydrant has water and which one doesn't.  They fight the

17   fire from the truck, and they get there immediately and they

18   are out fighting the fire.  And then they bring water to the

19   truck to keep it going.  In an ideal situation, they would be

20   able to get a hydrant connected and solve a lot of the labor

21   issues they probably have moving water.  They even have

22   agreements with the surrounding communities to bring them water

23   if they need it.

24       So they have involved the problem, and I was very

25   impressed with that, and that's something new that I learned

1   here yesterday.

2        And then the other issue, we heard over and over again

3   about the safety of the water.  The water is safe.

4        **THE COURT:**  Before we leave the fire department, the

5   witness didn't know how many hydrants we had.  Approximately

6   how many hydrants are there in Jackson?

7        **MR. HENIFIN:**  Obviously, I didn't know either,

8   because in a previous status conference, I've said 4,000.  We

9   believe now it is 8,000.  That's the best information we have

10  now.  Somewhere just under 8,000 have been mapped as part of

11  our mapping.  We might be missing a few here or there, but we

12  think that number is much closer to reality based on actual

13  physical location of the hydrants.  We have put 7,900 something

14  into our mapping system, which means someone has actually gone

15  out, found the hydrant, put on the global positioning system

16  device to locate that and get it into our system.  So it is

17  somewhere around 8,000, Your Honor.

18       **THE COURT:**  8,000.  And on a prior occasion, you

19  thought there were 4,000?

20       **MR. HENIFIN:**  Yes, Your Honor.  In fact, in the

21  contract we let, we estimated 4,500 for the contractor's

22  purposes.  But it is a unit price contract.  It will cost us a

23  little more, but they will get to all 8,000.

24       **THE COURT:**  And then as far as the Jackson Fire

25  Department, what was the max number they gave you?

1            **MR. HENIFIN:**  I think they didn't give us a number,

2   but they did -- they had some records of how many they've flow

3   tested and inspected in a given year, and the best year they

4   ever did was around 2,000 hydrants in one calendar year.  It

5   looks like, based on the information we could come up with, and

6   again, we didn't find the data to really support this,

7   somewhere between 100 and 200 hydrants are normally flow tested

8   in inspection in a given year.

9            **THE COURT:**  I was disappointed that the city or fire

10  department doesn't keep records, and I asked if they had

11  records of different events and reports.  And while they say

12  they are sure they have them, nobody could point to where they

13  are or that they have actually even laid eyes on them.  Did

14  that hamper you in trying to determine what to do with these

15  fire hydrants?

16           **MR. HENIFIN:**  We weren't going to depend on existing

17  records.  We really needed physical mapping.  So I don't think

18  it hampered us, Your Honor.

19           **THE COURT:**  So what you did was your own physical

20  mapping?

21           **MR. HENIFIN:**  Yes, Your Honor.

22           **THE COURT:**  Then how did you determine which hydrants

23  were dry?

24           **MR. HENIFIN:**  We haven't yet.  So that's going to be

25  part of the assessment that gets done over the next 12 months,

1    and then that will be determined -- the nice part about that is

2    it will get recorded into this geographic information system, a

3    computerized map.  Every fire hydrant will be on there, and you

4    would be able to take that into the field on a fire truck, and

5    you touch the hydrant that you are looking at on the map, and

6    you would understand what pressure it's going to operate at,

7    when the last time it was inspected, what they could expect

8    when they went to that hydrant.

9         And on top of that, we are going to be painting the tops

10   of the fire hydrants with a pressure indicating paint.  There

11   is a standard by the American Waterworks Association that sets

12   standards for pressure ranges at fire hydrants.  So you paint

13   the top cap so that a fire truck pulls up and knows immediately

14   they can expect a certain pressure and flow from that

15   particular hydrant.  So that will be done as part of the

16   assessment we are doing over the next 12 months.

17             **THE COURT:**  Is there any such system in place now in

18   the city?

19             **MR. HENIFIN:**  Here in Jackson?

20             **THE COURT:**  Yes.

21             **MR. HENIFIN:**  I don't believe so, Your Honor.

22             **THE COURT:**  So if a fire truck pulls up to a plug

23   now, just taking a look at it, can they determine from a glance

24   whether it is dry or not?

25             **MR. HENIFIN:**  Not unless it's been marked off.  There

1    are some I've seen in the city.  You essentially put a ring on

2    the hydrant where one of the connections is so that a truck

3    would pull up and see that that ring has marked that as a dry

4    hydrant.

5            **THE COURT:**  And did you find records in the city

6    where the City had notated how many dry hydrants it has.

7            **MR. HENIFIN:**  We didn't ask for those records.  I

8    don't know that they are there.

9            **THE COURT:**  So you don't know if there is such a

10   system?

11           **MR. HENIFIN:**  Correct.

12           **THE COURT:**  And on this matter they talked about

13   before where there was a dry hydrant, can you tell us about

14   that and how that happened?

15           **MR. HENIFIN:**  I don't know why that particular

16   hydrant was dry.  I understand it was valved closed, for

17   whatever reason.  Most of our hydrants have a valve between the

18   line that provides the water, so the city's distribution

19   system, and the hydrant itself.  So you can shut the valve off

20   to do maintenance on the hydrant, and then it should get

21   reopened.

22       So my guess is, like the other closed valves we've found

23   around town, that one had to have maintenance done to it at

24   some time, or repair.  The valve was closed, the work was done

25   on the hydrant, and the valve wasn't reopened.  That's what I

1    understand for that particular hydrant.

2         **THE COURT:**  Are there any documents concerning that

3    particular hydrant?

4         **MR. HENIFIN:**  Not that I'm aware of, Your Honor.

5         **THE COURT:**  Have you asked the City for specific

6    documents on that specific hydrant?

7         **MR. HENIFIN:**  No, I haven't, Your Honor.

8         **THE COURT:**  So let me turn to the city attorney.  Do

9    you have documents on that specific hydrant?

10        **MS. MARTIN:**  I assume there are documents that exist,

11   but I haven't requested those documents from the fire

12   department.  When I asked them about the fire, I relied on what

13   you requested from us last Friday, which was the fire report

14   itself.  But if you would like documents on that hydrant, I can

15   provide those documents to you.  But I believe the information

16   that Mr. Henifin is talking about is information on the valves

17   that were closed or opened.  That is actually the water

18   department opens and closes valves, not the fire department.

19        **THE COURT:**  I think he wants to talk to you.

20        **MS. MARTIN:**  Give me a minute, Your Honor.

21     (Ms. Martin confers with Mayor Lumumba.)

22        **THE COURT:**  Okay.

23        **MS. MARTIN:**  So, Your Honor, the mayor just informed

24   me that the fire chief actually -- so the fire chief -- I

25   mentioned to you previously that the fire chief was not

1    available yesterday to be here because he is out of the state,

2    but what the mayor has stated to me is that the fire chief

3    represented, when we first discussed this, that the actual

4    hydrant, from their documentation, was supposed to be open.

5    That was the reason why they relied on it to be available to

6    supply additional water to the truck.  But when they went

7    there, the documentation was not correct with what was actually

8    present with the hydrant.  And that's the reason why, when Mr.

9    Henifin is saying the valve was closed, that was also our

10   assumption, was that the valve had been closed because they

11   thought that it was open.  They thought it was a working

12   hydrant, based on their documentation.

13            **THE COURT:**  All right.  And you have documentation

14   that says what you just said?

15            **MS. MARTIN:**  I can request the documentation from the

16   fire chief.  That's what the fire chief represented to the

17   mayor.

18            **THE COURT:**  Well, then can you submit that to me,

19   please?

20            **MS. MARTIN:**  Yes, Your Honor.

21            **THE COURT:**  Now, Mr. Henifin, on that hydrant, do you

22   have any more information on that particular hydrant?

23            **MR. HENIFIN:**  I do not, Your Honor.

24            **THE COURT:**  Now, on the number of fires -- well, hold

25   it.  I will try to ask this question in the right way.  You

1    said that you don't have or didn't have documentation as to

2    what hydrants were dry across the city.  Is that correct?

3              **MR. HENIFIN:**  That is correct, Your Honor.

4              **THE COURT:**  Okay.  Now, who would have that

5    information?

6              **MR. HENIFIN:**  I'm not sure, Your Honor.

7              **THE COURT:**  You also said that those hydrants were

8    not marked.

9              **MR. HENIFIN:**  As far as their pressure?

10             **THE COURT:**  Right.

11             **MR. HENIFIN:**  Correct, Your Honor.

12             **THE COURT:**  You also made a statement that now you

13   have a basic understanding of why Jackson has not suffered any

14   more fires than it has suffered because of dry hydrants.

15             **MR. HENIFIN:**  Yes, Your Honor.

16             **THE COURT:**  And that was because you said that the

17   fire department has found a way around dry hydrants.

18             **MR. HENIFIN:**  Yes, Your Honor.

19             **THE COURT:**  Should that approach be documented

20   somewhere?

21             **MR. HENIFIN:**  I would think so, Your Honor.

22             **THE COURT:**  Let me turn to the city attorney then.

23             **MS. MARTIN:**  Your Honor, that is standard practice

24   for them to carry the water on the truck.  That's not because

25   they intend on the hydrant being dry.  It's a standard practice

337

RESPONSE OF TED HENIFIN

1   for them to carry 500 gallons on every truck regardless of

2   whether the hydrant is going to be dry or not.

3        What they have informed us of, and we didn't get into this

4   yesterday with them, but what they informed us of is that it

5   really depends on the size of the fire.  If it's a larger fire,

6   they cannot fight that fire with just the water that's on the

7   truck.  They have to tap into the hydrant.  And so they always

8   assume -- that's the reason why they keep documentation on the

9   hydrants.  They always assume they are going to be able to use

10  the water from the hydrant.

11       If you heard them talking about shuffling water yesterday,

12  them shuffling that water, they need a continuous flow of water

13  if it's a larger fire, because they know that they are going to

14  need a lot of water to fight that fire.  But the water that's

15  on the truck itself, that is standard practice for them to

16  always have -- what they explained to me is that they always

17  have at least four trucks that on the way to a fire, that's

18  going to carry 500 gallons apiece.  But depending on the size

19  of the fire, that might not be enough water to actually fight

20  the fire.  That is based on the size of the house and also the

21  amount of the house that is -- what's the word he used

22  yesterday? -- involved.  So besides the amount of the fire --

23  well the amount that is involved and the size of the house.

24       **THE COURT:**  Now, then, before Mr. Henifin arrived

25  here, how would a fire truck know that a hydrant is dry or wet?

1          **MS. MARTIN:**  They maintain documentation, and they

2     were also in constant communication with the water maintenance

3     department.  So if you remember Mr. Wilson's testimony, it was

4     that he consistently was communicating with Victor Pickett in

5     water maintenance.  It was not until Mr. Henifin started -- and

6     not even when Mr. Henifin started, I think Jordan Hillman

7     actually directed them that they -- or Victor told them

8     directly that they should not be communicating through him

9     directly, that they needed to call the customer service line.

10    And if you look at the memo that Jordan Hillman had sent, it

11    says, "Contact the customer service line.  Don't contact Victor

12    Pickett directly."

13         So an example you gave yesterday of if there was a hydrant

14    that was dry and you needed to communicate that information

15    immediately, how would you communicate that information

16    immediately?  In the past, what would happen is that Pickett

17    would contact Wilson, Wilson would contact those district

18    chiefs.  What they are saying now is there is no direct

19    communication with them.  What they are having to do is contact

20    the customer service line and then communicate through the

21    customer service line.  But that's just like we got the e-mail

22    from Jordan Hillman on April 20th.  Since that time, the fire

23    department is representing that they have not gotten additional

24    correspondence notifying them of a dry hydrant.

25          **THE COURT:**  And my question on yesterday also asked

1    what documents do you have to show, before Mr. Henifin came,

2    what hydrants were dry.

3         **MS. MARTIN:**  I believe they do have that

4    documentation.  That's what the mayor is saying.  The fire

5    chief is saying that they do keep up with that documentation.

6    That is the documentation that you just requested.  And I will

7    request that documentation from the fire department.

8         **THE COURT:**  I would like to see the documentation

9    because the witness on the stand yesterday said he didn't know.

10        **MS. MARTIN:**  I would also note for the record, he is

11   the --

12        **THE COURT:**  Hold it.  Let me finish what I was

13   saying.  But he also said that he didn't know, and you are

14   saying that that's not part of his job to know that?

15        **MS. MARTIN:**  That's what it sounds like.  It was not

16   part of his job.  The fire chief -- I would assume the fire

17   chief would know more so than the water supply officer.

18        **THE COURT:**  Wait a minute.  So what is a water supply

19   officer's job?

20        **MS. MARTIN:**  I think the water supply officer, he

21   doesn't keep up with the documentation.  All he is doing --

22   it's just like I asked him the question about 311, and he said

23   he wasn't familiar with 311.  It's because he doesn't realize,

24   and when he makes those calls -- when he was making those calls

25   back and forth with Victor Pickett, that information was being

1    reported to 311, and it was being documented in 311.

2        His job is just -- like you said, fires happen

3    immediately.  So his job is just to communicate that

4    information.  The minute he gets it, he communicates it.  He

5    doesn't keep up with the documentation on which hydrant, where.

6    He told you himself he doesn't keep records.  He just transfers

7    the information.

8        **THE COURT:**  Okay.  I'm still lost, because I just

9    want to know where the records are.  You told me he

10   communicates something, but you haven't told me who makes the

11   record.

12       **MS. MARTIN:**  I'm assuming the district chiefs make

13   the record and that the district chief's record goes to the

14   fire chief.

15       **THE COURT:**  You are assuming?  That's what I'm

16   asking.  And by the way, I don't want to hear any more noise

17   over here.  If anyone talks out again over here, I'm going to

18   levy a couple of sanctions.  That is not how you behave in my

19   courtroom.  I'm talking to her, and I do not expect anybody to

20   chime in audibly to disturb my conversation.  It is real clear.

21   If I hear something else, then somebody is going to suffer some

22   sanctions, and I do mean sanctions.

23       Now, then, back to our conversation.  What record can I

24   find to show that after, there is a report that has been

25   communicated to these other chiefs that we are talking about?

1          **MS. MARTIN:**  So what I'm saying is, what Chief Wilson

2    reported yesterday is that when he gets the information, he

3    immediately reports that information to the district chiefs.

4    The district chiefs report directly to the fire chief.  The

5    fire chief is saying that he has records that show what the

6    status is of the fire hydrants.

7          **THE COURT:**  Okay.  And you are going to send that to

8    me?

9          **MS. MARTIN:**  I'm going to request that information

10   from the fire chief, and whatever I receive, I will send it to

11   you, Your Honor.

12         **THE COURT:**  I appreciate it.  Thank you.

13      Now, Mr. Henifin, go ahead on with your --

14         **MR. HENIFIN:**  Can I chime in on the fire hydrant

15   issue one more time, even though we are beating this dog to

16   death?  The exhibits that were provided yesterday around that

17   particular fire and another fire, the reports didn't indicate

18   there was any lost time as a result of hitting a dry hydrant.

19   It seems to have been a red herring to somehow indicate that

20   I'm not doing a good job, that I'm responsible for making sure

21   that these fire hydrants are reported and we didn't even know

22   that it was there.  I'm not sure why we were even talking about

23   the fire, because if you read that fire report, the engine that

24   showed up was fighting the fire, the second engine came and was

25   shuttling water, and they don't mention anything about a delay

1    in their response as a result of this.  I'm not really sure why

2    we are talking fire hydrants, and I feel a bit put out that

3    this was sort of put at my feet as a result of this.

4        Now we can continue.

5            **THE COURT:**  Hold it.

6            **MS. MARTIN:**  I would like to respond, Your Honor.

7    The reason why we were talking about the fire hydrants is

8    because last Friday, when we were -- we requested the status

9    conference last Friday to talk about transparency and lack of

10   communication.  The reason why we were talking about the fire

11   hydrants is because it was evidence of an issue of the lack of

12   communication between the fire department and JXN Water.

13       The fire chief had sent an e-mail to JXN Water trying to

14   get a meeting with them because there was great confusion over

15   who was going to be in control of checking the fire hydrants.

16   No one ever said that JXN Water was responsible for the fire.

17   No one ever said that JXN Water was responsible for the house

18   burning down, because no house burned down, and the fires were

19   under control.  The only reason why we offered those reports is

20   because Your Honor requested fire reports.  Those reports were

21   not offered to show that the fire hydrant being dry resulted in

22   an additional loss to the homeowners.  We do not believe there

23   was an additional loss to the homeowners.

24       What we believe is what the fire chief represented to us,

25   that it's an issue if their documentation shows that a hydrant

1    is supposed to be open and when they get there -- their

2    terminology I think is wet -- so if their documentation shows

3    that a fire hydrant is supposed to be wet and they get there

4    and it's not wet, in those instances, it did not have an

5    effect.  But what Chief Owens is trying to do is prevent that

6    from being a problem in the future.  So he was trying to talk

7    about prevention, that there is a need for that communication

8    so that in the future, if they are fighting a larger fire, they

9    can rely on the information and that there is a constant flow

10   of information between the fire department and JXN Water.

11       It was never to say that JXN Water was responsible for the

12   fire.  It was never to say JXN Water was responsible for an

13   additional loss to those homeowners.  It was simply to

14   emphasize that there is a lack of communication and a need for

15   increased communication.

16           **THE COURT:**  Okay.  Thank you.

17           **MR. HENIFIN:**  To the communication issues, the

18   exhibits they showed, we did get a request in April, which they

19   provided as Exhibit A, I believe.  Right.  It was Exhibit A.

20   I'm just checking back.  That's the introduction from Rod

21   Wilson e-mailed to me on April 6th, which was the Thursday

22   before Easter.  We responded on Wednesday, April 12th.  So you

23   had basically a four-day weekend, Good Friday, Easter Monday.

24   And even without that, I don't think responding to an e-mail

25   that doesn't say, this is urgent, it's an introduction, "I want

1   to verify your company is going to take over the hydrants,"

2   within a week, and I can tell you there are a lot of people I

3   haven't responded to within a week, unfortunately, this was a

4   pretty quick response.  And then we set up a meeting after that

5   to talk about flow testing, and that meeting was held on

6   April 13th.

7        And so the first e-mail I get on this issue is April 6th,

8   and they are talking about communication issues, when it is

9   responded to and met on April 13th?  And then they said, again,

10  there was a problem responding to a June 8th e-mail.  Actually,

11  it was a June 2nd e-mail to me, and by -- we responded to that

12  one -- this is all from their documentation -- we responded to

13  that for a meeting on June 16th.  So yes, it was the better

14  part of two weeks for that, to set that meeting up.  Nothing

15  indicated this was an urgent matter.  And we had that meeting

16  and sent a memo documenting that on June 19th.

17       So I'm not understanding the communication issue related

18  to hydrants, the fire department.  I think we have got a pretty

19  good relationship to them at a working level.  And I was,

20  again, bringing them up because they were on the stand

21  yesterday I thought needlessly, and I do believe they are doing

22  a great job of being prepared to fight fires.

23       Now we can move on to water safety --

24            **THE COURT:**  The water is safe.  Go ahead.

25            **MR. HENIFIN:**  The water is safe.  You and I have had

1    many discussions about that here in this courtroom.  We had a

2    lengthy status conference.  This morning I was a bit surprised

3    to hear testimony from Andrew Kricun.  I know Andy.  I've known

4    him for a long time.  The fact that he made these comments

5    about the recommendation that is listed on the state website

6    about the water recommending, a precaution recommendation, that

7    there should be -- well, filtered water for children under five

8    and pregnant women.  We have talked at length about that.  It

9    should be in the transcript.  But at the end of the day, that's

10    just a recommendation from the health department, not an

11    advisory.

12         We don't know the science basis for that, and it appears

13    it's only been applied to Jackson.  So I'm not sure why the

14    health department has singled out Jackson, who has met their

15    lead testing requirements according to the Safe Drinking Water

16    Act for the last six years without a problem, and yet this

17    recommendation from the health department exists on their

18    website.  They can't tell me with how many exceptions.  If we

19    are below the action level, which again, we have discussed at

20    length -- on the lead testing, we sampled a hundred homes,

21    approximately, 102, every six months.  We are below the action

22    level.  Ninety percent of those homes there is no action

23    necessary at that point.  But that does mean that a few homes

24    exceed that action level numbers.  So it is somewhere less than

25    10 or right around 10, depending on how many we sample, and in

1    the past, there have been 4, 6, 7.  So those folks do have lead

2    in their water.  But what number of action level exceedance is

3    out of the sample makes the health department put this

4    recommendation on their website, and they haven't been able to

5    tell me that.

6          So this seems to be an arbitrary and capricious rule that

7    has been applied just to Jackson.  They may have their reasons.

8    I haven't heard what those reasons are.  But for that reason,

9    we don't believe you need -- we know we are meeting Safe

10   Drinking Water Act.  We have talked at length about that.  We

11   just released the water quality report from last year.  The

12   water is safe to drink without reservation.

13         If you've got a vulnerable population, it's a personal

14   choice, and they should consult with their doctor if they

15   should be drinking tap water or any water.  That's not an issue

16   for us, and we don't need to be providing that printed

17   recommendation.  The water is safe.

18              **THE COURT:**  Go to your next matter.

19              **MR. HENIFIN:**  So finally, there's many ways to get in

20   touch and get good information from JXN Water, even though a

21   lot of people seem not to reach out to that.  The best way to

22   get information is on our website.  And as someone pointed out

23   early on, it's been challenged, and we have had a number of

24   reasons for that, but it's getting better every day.  We are

25   also putting social media posts out now, so it's a JXN Water

347

RESPONSE OF TED HENIFIN

1  based social media post, a good place to get information.  The

2  best place right now is the call center, still 601-500-5200.

3  People are there to answer that phone and make sure that it

4  gets pushed off to staff.

5      On the fire hydrant issue we were just talking about, the

6  reason we don't rely strictly on Victor Pickett, one person,

7  one phone, there have been times Victor hasn't answered my

8  calls as his boss.  I don't think that is a good system to have

9  one person and one phone is the only place you report a dry

10 hydrant.  So we changed that system to report it to where we

11 knew the phone call would be answered and we could dispatch the

12 appropriate information from there.

13     And then, third, a great place to get information is

14 directly from the JXN Water staff.  We do some direct mailings.

15 Everyone got their water quality report this year with a

16 letter, a cover letter, explained a little bit about it, and

17 the link to actual report.  We are at community meetings,

18 events, town halls where our staff is present.  You can ask and

19 talk to our staff directly.  Other printed materials that are

20 produced by JXN Water, a great place to get information.  And

21 then we follow up.  We are taking all of this seriously to get

22 to everybody's information.  So if someone has discolored

23 water, you need to report it so we can go out and find out what

24 the problem is.  We would love to take care of it as soon as we

25 hear about it.

348

1    But at the end of the day, I do think that you hit this

2  earlier, this difference between communication and

3  transparency.  I think we've been very transparent.  We may not

4  have communicated all of this information well, and we are

5  working on that.  We have created a -- we have been busy trying

6  to solve the water system.  We had to triage what we are doing.

7  The setting up our communication strategy has just really

8  happened.  We had a communications team meeting the end of

9  June.  We are putting together a strategy.  We will get better.

10    But you know, the top priority has been to get safe water

11  to everyone in Jackson, and we will get to the rest of this as

12  we move along.  I appreciate your time.  We've got a long way

13  to go.  We know the trust is low.  We are going to work to get

14  the trust back.  We take all of these concerns seriously, and

15  we appreciate hearing them, and we'd love to hear them

16  directly.

17    **THE COURT:**  Now, some persons have mentioned how they

18  just didn't know what was going on, and that's their

19  definition, I guess, of transparency.  I asked at least one

20  person, maybe more than one, what is the definition of

21  transparency because I didn't quite understand what they meant

22  by transparency, because it's just a word which says to be able

23  to communicate something clearly to those who need to know what

24  is going on.  But I don't know what that means to know what is

25  going on when we are talking about technical stuff most of the

1   time, about how the water is being purified and collected, and

2   the difference between surface water and well water and all of

3   these other kinds of things that the public generally knows

4   nothing about and doesn't care to know about.  But

5   nevertheless, there is this matter of transparency where the

6   public is throwing around and somebody planted a seed and I

7   guess a couple of trees have grown from it.

8        But now, on this matter of communicating with the public,

9   I had asked you on an occasion to tell me what your ongoing

10  activities are in the community, and you have provided to me

11  the various activities in the community that you have

12  undertaken where you have spoken before groups, heard what they

13  had to say, responded.  Can you just summarize that for me?

14           **MR. HENIFIN:**  I went back through the calendar, and

15  33 either lunches, town halls, community meetings, neighborhood

16  association meetings I've personally attended and my staff has

17  attended a dozen more in my absence.

18           **THE COURT:**  Thirty-three that you attended?

19           **MR. HENIFIN:**  Personally, yes, Your Honor.

20           **THE COURT:**  And you said your staff has attended even

21  a dozen more.

22           **MR. HENIFIN:**  Yes, Your Honor.

23           **THE COURT:**  At those occasions, did you answer

24  questions?

25           **MR. HENIFIN:**  As long as people asked them.  I was

1    answering questions until the time ended.

2         **THE COURT:**  So then since you have made these many

3    addresses and visitations, how much of this has taken out of

4    your time to run the water system?

5         **MR. HENIFIN:**  A significant amount, Your Honor,

6    probably two hours at least for each of those, some of them

7    were much longer.  That would include transit time.

8         **THE COURT:**  And during the time that you are there

9    providing this service to the community, who then makes the

10   decisions?

11        **MR. HENIFIN:**  For the water system?

12        **THE COURT:**  Yes.

13        **MR. HENIFIN:**  Ms. Hillman.

14        **THE COURT:**  And then after you finish your address,

15   what do you do?

16        **MR. HENIFIN:**  Back to work, ask her what happened or

17   help her out or start working back on the duties I'm not

18   getting done when I'm -- but that is part of my duty is to talk

19   to the public.

20        **THE COURT:**  We agreed with that, didn't we?

21        **MR. HENIFIN:**  Yes, we did.

22        **THE COURT:**  We agreed that you would provide

23   information to the public about these various matters, and that

24   that would be part of your job, to be sure that they were

25   notified.

1            **MR. HENIFIN:**  Yes, Your Honor.

2            **THE COURT:**  Now, do you think that needs to be

3    increased?

4            **MR. HENIFIN:**  I'm not sure I've got the capacity to

5    do much more, but we would continue to do our best to attend

6    every invite we've got.  I don't know that we have turned down

7    one yet.

8            **THE COURT:**  So you have accepted all the invites?

9            **MR. HENIFIN:**  Yes, Your Honor.  Often I've had to ask

10   for a delay because I wasn't going to be available, but I think

11   everyone has accommodated that to this point.

12           **THE COURT:**  The questions you have gotten, are they

13   pretty much like some of the questions we have heard here?

14           **MR. HENIFIN:**  Some of them, yes, Your Honor.  And

15   just general curiosity, how we got people, the fact that I work

16   for the federal judge, what's in the order, what are my

17   requirements?  Those are the kinds of questions we get a lot

18   of.  And most people are surprised.

19           **THE COURT:**  And what are they surprised about?

20           **MR. HENIFIN:**  There's just a general lack of full

21   understanding of what we are doing.

22           **THE COURT:**  Do they ask about bacteria in the water?

23           **MR. HENIFIN:**  No, not typically, Your Honor.  I don't

24   recall anyone asking about that.  There was at the -- I don't

25   believe I counted the public forum I attended at the NAACP

1    where I was there to answer water questions, and I think one of

2    the folks that talked to you today did ask about why there

3    aren't any boil water notices, and it did imply there had been

4    a bacteria issue, but that was the only question about that

5    that I've heard directly.

6            **THE COURT:**  Did you get questions on what is the

7    procedure for purifying water?

8            **MR. HENIFIN:**  Not to any great detail.  I explained

9    if people ask about the process.  Most people aren't overly

10   interested in the process to make the water -- they want it

11   clean, safe.  They are interested in the requirements we have

12   to meet, how it gets tested.  There is a general interest

13   around that and definitely an interest in how it gets to their

14   home, and in what quantity and pressure.

15           **THE COURT:**  How it gets to their homes?

16           **MR. HENIFIN:**  Yes, Your Honor.

17           **THE COURT:**  And then one of the other questions that

18   I mentioned, that folk have asked about -- one second.  Hold

19   it.

20       All right, Mr. Henifin.  Do you have other matters that

21   you would like to add?

22           **MR. HENIFIN:**  No, Your Honor.  I just was in summary

23   saying we know we have a long way to go to win back that trust

24   of our customers.  They want water that is safe, pressure that

25   is reliable, and a bill that is accurate, and we are committed

1    to make that happen.

2          **THE COURT:**  Now, one other matter, maybe two.  You

3    are not an attorney here.  Yes, you are not acting as an

4    attorney, are you?  That's a yes or no question.

5          **MR. LUMUMBA:**  I have not entered an entry of

6    appearance, Your Honor.

7          **THE COURT:**  So your answer is no?

8          **MR. LUMUMBA:**  Right.

9          **THE COURT:**  Perhaps you did not know the rule, so I

10   won't hold it against you, but the rule is that, yes, an

11   attorney is allowed to come into the building with a cell

12   phone, but only if that person is acting as an attorney.  You

13   are not here acting as an attorney.  So, therefore, you are not

14   supposed to be using your cell phone.

15         Now, because you didn't know the rule and only reacted

16   because you thought that the rule excluded you, then I won't

17   take any action on that.  But in any future engagement when you

18   are in federal court, if you are not acting in the capacity as

19   an attorney, you cannot have your cell phone.  I'm just giving

20   this as a matter of information, because if not, then you are

21   subject to contempt.

22         **MR. LUMUMBA:**  I thank you for that information,

23   Judge.

24         **THE COURT:**  Okay, then.  As I said, you were not

25   informed, and so I'm just informing you because I knew that you

1     are an attorney.  And I then asked is there a rule that deals

2     with that.  I thought that there was, but I just wanted to be

3     sure that I was correct in the rule.

4          So the rule is simple, is that an attorney who is in a

5     representative capacity may come into the courthouse with a

6     cell phone.  But an attorney who is not in a representative

7     capacity cannot come into the courthouse with a cell phone.

8               **MR. LUMUMBA:**  Thank you again for the information,

9     Judge.

10              **THE COURT:**  All right.  Thank you.  But like I said,

11    you didn't know the rules, so I just wanted to make sure you

12    were stated it so on some future occasions that that would not

13    be any problem.  Thank you so much.

14         Now, Mr. Henifin, there are some letters that have been

15    submitted to me reflecting the comments of various members of

16    the public that I have accepted, and some persons who were

17    expected to provide some testimony here who couldn't show up

18    but who had, on the other hand, submitted to me some letters I

19    have accepted, and I'm going to read those and give those

20    whatever gravity they need.

21         You have letters commending you for your work since you've

22    been here in Jackson.  Am I correct?

23              **MR. HENIFIN:**  Yes, Your Honor.

24              **THE COURT:**  And also some letters from organizations?

25              **MR. HENIFIN:**  Yes, Your Honor.

RESPONSE OF TED HENIFIN                                                      355

1          **THE COURT:**  Have you shown these letters to the city

2     attorney?

3          **MR. HENIFIN:**  I have not, Your Honor.

4          **THE COURT:**  And have you shown them to parties over

5     here?

6          **MR. HENIFIN:**  I have not, Your Honor.

7          **THE COURT:**  So, then, I have seen the letters, and

8     let me state this as delicately as possible.  Your concern with

9     these matters, as you communicated to me, was one out of

10    consideration, and at present, I agree with you and your

11    approach to this.  The backdrop that I'm getting to is this.

12    The aim here is to improve the water.

13         **MR. HENIFIN:**  Yes, Your Honor.

14         **THE COURT:**  To make it safe, to keep it safe, and

15    then to distribute it and then to make sure the public

16    understands.

17         **MR. HENIFIN:**  Yes, Your Honor.

18         **THE COURT:**  There is no political agenda here.

19         **MR. HENIFIN:**  I don't believe so, Your Honor.

20         **THE COURT:**  You don't have a political agenda.  I

21    don't have a political agenda.  So this is not a political

22    matter.  Would you agree with me on that?

23         **MR. HENIFIN:**  Yes, sir, Your Honor.

24         **THE COURT:**  So then as a result of that, when you

25    receive some letters, and I suppose you gave me all the ones

1   that you received, some of the persons had political statements

2   that they made in these letters one way or the other.

3           **MR. HENIFIN:**  Yes, Your Honor.

4           **THE COURT:**  You were concerned about political

5   statements, and you didn't want political statements polluting

6   this conversation?

7           **MR. HENIFIN:**  Yes, Your Honor.

8           **THE COURT:**  And I agree with you.  So, then, I want

9   you to know that I agree with the position you've taken, and as

10  a result of that, I have these letters you submitted, and I am

11  going to delete those letters that make a political statement.

12  So they will not be part of the record.  They will not be

13  aired.  And when various political theories have been

14  submitted, they will not be included.  So I'm telling you that

15  I agree with the stance that this is not something that we are

16  getting into.

17          **MR. HENIFIN:**  Yes, Your Honor.

18          **THE COURT:**  So I am simply going to delete those,

19  keep them for my personal file or file them later under seal if

20  it comes to that, and only to be opened by me, but they are --

21  if they criticize some political officeholder, they are not

22  helping out this situation.

23          **MR. HENIFIN:**  Agreed.

24          **THE COURT:**  And there are a number of persons who may

25  have been criticized.

1             **MR. HENIFIN:**  Yes, Your Honor.

2             **THE COURT:**  And we are not going to get into that.

3             **MR. HENIFIN:**  Yes, Your Honor.

4             **THE COURT:**  So I just want all parties here to know

5     that this inquiry is not meant to cast a shade or a shadow on

6     anyone or any organization or any governmental unit.  What we

7     are here to do is simply to devise an approach that's going to

8     help us reach our desired aim, which is this matter of water.

9     So I will take all of those out and not make any of that a part

10    of the record, because it shouldn't be.

11            **MR. HENIFIN:**  Agreed, Your Honor.

12            **THE COURT:**  So I won't do that.  And I thank you for

13    your position on the matter, because when you submitted those,

14    you said up front that the reason why you didn't want to submit

15    them in open court is because they would cast shade on

16    different organizations, different officials, elected and

17    appointed, and you decided that that shouldn't be done, and I

18    agreed.

19            **MR. HENIFIN:**  Yes, Your Honor.

20            **THE COURT:**  Now, is there anyone here who disagrees?

21    Because if there is substantial disagreement, then I will just

22    put them in.  But I don't think it has a place, nor do I think

23    there is any reason why you need to look at them because they

24    don't help us out at all on this dispute.

25            Oh, and let me just say this.  I'm not protecting anything

1    concerning myself because not one of them mentions me.  So I'm

2    going to take that as satisfaction with myself completely,

3    because not one of them in any derogatory matter mentions me

4    other than to say that they are glad that the federal court is

5    involved.  And other than that, that's the only mention of the

6    federal court.

7        But nevertheless, I do not feel that any political issue

8    is properly before us, theories, et cetera, and whatever.

9        Okay.  Now, then, having said that, then I'm going to

10   follow the course I just stated.  And, Mr. Henifin, is there

11   anything else you would like to say?

12            **MR. HENIFIN:**  No, Your Honor.

13            **THE COURT:**  Okay.  Let me just think for a moment.

14   Why don't you talk to your attorney and see if she has

15   something you think you need to say, and me, while I consult

16   with my brain trust over here and see if there is something

17   else I need to go over.

18        **(OFF-RECORD)**

19            **THE COURT:**  All right.  We are back on record.  First

20   of all, I understand that a question was asked why could Mr.

21   Henifin keep his cell phone when I just spoke to the mayor

22   about his.  The answer is simple with regard to Mr. Henifin.

23   He asked permission yesterday before we started, and the

24   permission was granted because he has to stay in contact with

25   his people.  If the mayor had requested, then I would have

1    reconsidered.

2        Now, the second question that wasn't asked, the press back

3    in the back has a computer upon which they are typing, and the

4    Court allowed that, and the Court has prepared a document --

5    well, a notice that is going out to members of the press

6    informing them under what circumstances they could have in the

7    courtroom an electronic device, but there are certain

8    limitations, and those limitations, they cannot, what, take

9    pictures, cannot record, cannot talk on the phone to anybody,

10   and anyway, there are restrictions.  And those who are here in

11   court with those electronic devices have been adhering to that

12   particular rule yesterday, today, and I believe some other

13   cases.  That's right.  In fact, that's where I crafted the rule

14   on another occasion in other cases.  And so they have adhered

15   to the rule.  I have not seen any reason why they have

16   violated.  But the rules are explicit, clear, and meant to be

17   obeyed, and I have not had any problems with anybody.

18       **MR. LUMUMBA:**  Yes, Judge.  For clarity, I was not the

19   person who asked that question that you were just

20   investigating.

21       **THE COURT:**  That's okay.

22       **MR. LUMUMBA:**  But nonetheless, thank you for the

23   clarity.  I would say by the same premise that you believe that

24   Ted would need to get in contact with his people, it would

25   certainly stand to reason that as the mayor of the City of

1    Jackson, with my many duties, responsibilities, emergencies,

2    need to call declarations of emergency, that that need may be

3    present.  As you noted, I was unaware because as an officer of

4    the Court, as I stand as that, as a member of the Bar who has

5    been licensed not only in the federal court, but all the state

6    courts, that was -- the clarity of not being in that official

7    capacity, which we will consider as an interested party whether

8    I need to do that going forward, but that is why there was any,

9    you know, ambiguity or misunderstanding there.

10        But by the same reason that you have just announced that

11   you thought it was befitting for Mr. Henifin, I would ask that

12   the Court consider in future reference or in future occurrence

13   that as the mayor of the City of Jackson that I have a

14   multitude of responsibilities that I need to keep in contact

15   with people across the city as well.

16        **THE COURT:**  And I would not quarrel with you on that

17   at all.  Our rule is that permission has to be asked.  And on

18   this matter of the cell phone, I didn't know whether you were

19   looking at somebody else's or whether you had it or whether you

20   brought it in.  I didn't know.  And so had I been informed that

21   you needed a cell phone in the courtroom, then we would have

22   provided some guidance on how that was to be handled, and

23   certainly we then would have made some concessions on that.

24        **MR. LUMUMBA:**  I appreciate that, Judge.  I guess it's

25   to the duplicitous status of me being both attorney and mayor,

1    and there was confusion there.  That's why I didn't ask.

2           **THE COURT:**  Let me also explain something else.  You

3    might have seen me call my magistrate judge up here, and my

4    magistrate judge was sitting over there.  And you know her?

5           **MR. LUMUMBA:**  I'm certain that I've come in contact

6    with Judge Isaac at some point in time.

7           **THE COURT:**  That's Judge Isaac.  So I called her up

8    because I wanted to be sure that there was no confusion on this

9    matter in the federal court.  I know what my policy is, but

10   she's my magistrate judge, and she holds hearings all the time,

11   and so I called her up to ask her -- well, I didn't call her

12   up.  I sent Navketan over to ask what was her position on that.

13   And she says, Well, it's the same as your position.  If an

14   attorney is in the courtroom acting in a representative

15   capacity, the person can come to the courtroom with a

16   telephone, but if not in a representative capacity, the answer

17   is no.  And even if the person is in a representative capacity,

18   the person can't talk on that phone unless that individual gets

19   the judge's permission.

20     So I wanted to be sure that I was being as consistent with

21   the other members of my staff as I should be, and that's what

22   she had purveyed, which is what my position is.  But I thought

23   about it, and when I saw the cell phone and looked over at her,

24   it dawned on me that I had never had that conversation with

25   her.  I had the conversation with her predecessor, Magistrate

1   Judge Anderson.  So she knows -- she knew full well what mine

2   was, but I had never had the conversation with Judge Isaac.  So

3   I did not want to address the matter and then have her confused

4   as to how she should address the matter, because we had not had

5   the conversation, although I thought that she understood what

6   my position was since she works for me.

7        Well, she came up -- I keep saying came up, but anyway,

8   she responded to Navketan when she went over and spoke to her,

9   and she has the same position.  And I didn't tell her what I

10  intended to say or how I intended to pursue this matter.  I

11  just asked her what was her position on attorneys having cell

12  phones in a nonrepresentative capacity in the courtroom, and

13  she then provided to me what her position is, which is exactly

14  what mine is.

15       And so that's when I just turned and said that since you

16  did not know that, then the Court is not going to hold that

17  against you at all.  And I just want to make sure you know,

18  however, in the future what that rule is.

19       You also know that if you are ever in my court, and I

20  would imagine in the federal court, that if you want to bring

21  your own personal phone in, then you just need to tell them

22  it's for business purposes, and then they will make their own

23  rule concessions at that point.  So I certainly understand that

24  you need to stay in contact with the members of your staff.

25  You were over here all day yesterday and over here today.

RESPONSE OF TED HENIFIN

1    That's a long time to be out of the office with the city

2    affairs constantly going on.

3         So I didn't even notice at first.  In fact, it went right

4    over my head at first.  And then later when I looked at it, I

5    said, wait a minute.  That's a cell phone.  He's not

6    representing as an attorney.  And that's when I thought, well,

7    maybe I need to make sure he gets a warning.  But since

8    Magistrate Judge Isaac was here, I said let me just be sure

9    that this is consistent with the rule throughout the courthouse

10   so that I'm not coming up with a rule which is an outlier.  And

11   so then I wanted to be sure it was consistent.

12        So again, you were not advised.  You are an attorney.  And

13   ordinarily you would be able to bring it in in a representative

14   capacity, but I simply told you that here in this capacity, you

15   were not supposed to have the phone.  But I didn't know whether

16   it was your telephone or someone else had loaned it to you or

17   given it to you, because the rule would be different if

18   somebody had loaned it to you.  And if that's the case, even

19   that has to be approved by the Court because the other person

20   should not have had the telephone, unless that person got

21   permission.

22        Now, I have given various entities permission to have

23   computers as well as cell phones in the courtroom for special

24   occasions.  And so I will certainly look at all of those

25   various circumstances and parameters for you too.  So it

1    wouldn't be any different.  That is what I'm trying to make

2    clear that the Court is not holding it against you in the

3    least, that you didn't know that there was that rule.  And even

4    I had to make sure that my magistrate judge and I were on the

5    same train of thought on that matter, and so I think now we

6    understand what that is.  So I do not hold that against you

7    whatsoever.

8         **MR. LUMUMBA:**  Judge, I'm glad that I can be of some

9    use to establish some continuity between the Court and the

10   Magistrate.  As I stated before, I'm unaware because of my

11   status as an attorney.  Now that I have clarity, I accept the

12   information that the Court has now provided me.

13        I would ask, as the Court has somewhat indicated, by the

14   same rationale and reason, and we will reassert the request

15   that at any point that I'm in front of the Court, by the same

16   rationale and reason of the third-party administrator in his

17   capacity over water, that in my capacity over police, my

18   capacity over fire, my capacity over any number of things that

19   demand my time and attention, that it be considered that I have

20   a communication device such as a cell phone to be able to reach

21   those critical parts of the city services.

22        **THE COURT:**  I don't see any problems.  Just ask us

23   what Mr. Henifin asked us on yesterday.  So that's the

24   difference.

25        **MR. LUMUMBA:**  Understood, Judge.

1          THE COURT:  Thank you so much.  Now, Mr. Henifin, I

2    do have one or two more questions.

3          MR. HENIFIN:  Yes, Your Honor.

4          THE COURT:  The call system, we discussed that

5    before, that is being moved to -- is that Rankin County?

6          MR. HENIFIN:  Yes, Your Honor, I believe so, Pearl.

7          THE COURT:  Now, I just want you to explain again for

8    those who were not present at that last session where in open

9    court you explained why you moved it.  Explain it.

10         MR. HENIFIN:  Sure.  When I started out at the

11   effective date, we had a very small staff left behind to answer

12   the phone calls, and we were failing miserably, even into the

13   March time frame, meeting any normal expectation, 3 to 4-hour

14   wait times, people not getting through, people very frustrated.

15   But due to the lack of resources we had put into the existing

16   city call center, we didn't have the technology to expand it,

17   and we only worked during regular working hours.

18         So we looked for a contract option, and ideally one that

19   could service us 24/7 and do a variety of things for us.  We

20   were surprised to find there was one in central Mississippi.  I

21   didn't know we would find that.  We found that existed and we

22   went and met with them, toured their facility, talked with

23   their leadership and understood that they could handle what we

24   needed, and so we entered into an agreement with them.

25         As was pointed out by one of the speakers, it took longer

1  than we expected to make that happen.  I think originally we

2  were anticipating an April time frame.  We ended up starting

3  that up in June.  June 5th was the first date that it became

4  operational.

5         The extra benefit we had was we had some temps that were

6  working in our call center, and we had a couple of part-time

7  permanent city employees, and they all took positions with this

8  call center.  It was fortunate that it was within close range

9  so they could move from where they were working with us to work

10 for the contractor at the call center.

11        The call center is very well technically backed up.  It

12 has generation capacity to stay up and operating during power

13 failure.  It's got a tornado shelter built in so they can

14 continue to operate during tornado watches and warnings.  So it

15 is serving us well.  They have got metrics so they can start

16 tracking for us.  We are growing into that.  A little over a

17 month and a half in, I'm finding a lot of success in answering

18 phone calls and getting them the information they need, maybe

19 not immediately, but we will take the information and get back

20 to folks when we can.

21        **THE COURT:**  I have one other question, and it's not

22 going to require an answer, just a comment.  Several of the

23 speakers asked why a certain individual allegedly was

24 discharged.  Now, my initial impression on that question is

25 that that's a personnel matter.  I don't know.

1          **MR. HENIFIN:**  That is a personnel matter, and we

2     actually have a confidentiality settlement agreement, so I

3     can't even speak to it.

4          **THE COURT:**  Well, I don't want to get into a

5     personnel matter, because I don't know what the answer might

6     be, and I don't know whether the person who is involved in that

7     personnel matter would feel undressed in public if there is

8     some discussion of that person, and so I'm not going to get

9     into that.  But I might later get into it if I find it

10    necessary, but at present, I'm not going to get into it.  I'm

11    going to consider that a personnel matter, and I would consider

12    it a personnel matter at this juncture because you have

13    informed us on the racial composition of your staff, and the

14    racial composition of the 15 people who were involved in

15    billing.  And according to what you have told us, the vast

16    majority of these 20 people are African American.

17         **MR. HENIFIN:**  Yes, Your Honor.

18         **THE COURT:**  Well, when I heard the criticism of the

19    discharge of the individual, I took it into context of some

20    discharge revealing some racial animus.  Well, with 20 people

21    and the vast majority being African Americans, then I have to

22    pause in that matter.  However, if something comes up later

23    that makes that relevant, then I will revisit that subject.

24         **MR. HENIFIN:**  Yes, Your Honor.

25         **THE COURT:**  But as of right now, I don't see a need

1    to revisit it because I will see it as a personnel matter, and

2    the statistics just don't seem to bear out what the complaints

3    have been, because one person said that your staff was a

4    hundred percent white, and that was wrong.

5              **MR. HENIFIN:**  Yes, Your Honor.

6              **THE COURT:**  So then, Mr. Henifin, are there any other

7    matters that you wish to touch on that you feel that need to be

8    touched on?

9              **MR. HENIFIN:**  No, Your Honor.

10             **THE COURT:**  All right.  Thank you very much.

11        Now, in the very near future, I am to receive the next

12   installment, the next report; is that correct?

13             **MR. HENIFIN:**  Yes, Your Honor, by the end of the

14   month.

15             **THE COURT:**  By the end of the month, I am to receive

16   another full report on the situation involving us here with the

17   water dilemma.  The public is to be invited, and so what I need

18   to do then is ensure that the public knows that they can come

19   to the courthouse, to the courtroom when you tender that

20   report, because I intend, like the last time, to have read that

21   report before the status conference and to ask my questions in

22   front of the public, questions that I think the public might

23   want to ask, but questions in some regard they might not have

24   enough background to ask.  But I will break down my questions

25   so they will understand why I am asking a specific question.

1    So I will get that report and then thereafter set a status

2    conference and inform you and all the parties here of such so

3    that the public is invited to come to hear that status

4    conference and then to submit questions to me at the door that

5    I can look at and then respond to those questions during the

6    course of the status conference.  That is, when I say respond,

7    I'm talking about you, Mr. Henifin.

8         **MR. HENIFIN:**  Yes, Your Honor.

9         **THE COURT:**  Not I.  You.  So that's what I will be

10   doing.  So with that, then, I'm ready to go ahead and -- except

11   Mr. Kucia, you last time had a comment about what your client's

12   involvement here is and what your client's perspective is on

13   this matter.  Has that changed?

14        **MR. KUCIA:**  I don't believe so, sir.

15        **THE COURT:**  So then tell us, then, who your client is

16   so these good people over here and those still on the monitor

17   here would know.

18        **MR. KUCIA:**  I'm with the Attorney General's office

19   representing the Mississippi State Department of Health.

20        **THE COURT:**  Okay.  And who are the people there with

21   you?

22        **MS. ZMITROVICH:**  I'm Gretchen Zmitrovich representing

23   the Mississippi Department of Environmental Quality on the

24   sewer case.

25        **THE COURT:**  Okay.

1          **MS. HODGES:**  I'm Donna Hodges also representing the

2    Mississippi Department of Environmental Quality.  I note for

3    the record Gretchen and I are here as observers today.  We

4    actually are on what I would call the sewer case.  The

5    Department of Environmental Quality is not a party on the

6    drinking water case.

7          **THE COURT:**  Okay.  So then you all are observers, and

8    thus you will be waiting your time to say something.  Is that

9    it?

10         **MS. HODGES:**  There will be plenty of time later on, I

11   think, Your Honor.

12         **THE COURT:**  Oh, I know you will.  There will be

13   plenty of time to do that.

14       Mr. Kucia, I want to talk to you now.  On your client's

15   behalf, do you have anything you want to add?

16         **MR. KUCIA:**  No, sir.

17         **THE COURT:**  You asked some questions about this

18   notice -- or not a notice, but this "for your information."

19         **MR. KUCIA:**  The recommendation?

20         **THE COURT:**  That's right.  And tell us about that.

21         **MR. KUCIA:**  I believe the comment from last time was

22   that the recommendation was related to the corrosion control,

23   part of the lead and copper rule that had not been completed.

24         **THE COURT:**  And what was your client's position on

25   lead and copper in Jackson water?

1              **MR. KUCIA:**  That there is a safe level of lead and

2      copper, or lead, which was the actual element involved, and

3      that all guidelines are satisfactory.

4              **THE COURT:**  So then is it your client's position that

5      the Jackson water is safe?

6              **MR. KUCIA:**  Yes, sir.

7              **THE COURT:**  And notwithstanding these comments or

8      recommendations, you still are maintaining that?

9              **MR. KUCIA:**  Yes, sir.

10             **THE COURT:**  So then what are you saying about the

11     recommendation as it would address supposedly children under

12     five and pregnant women?

13             **MR. KUCIA:**  It's my understanding, and I can check

14     into this for purposes of certainty, but it's my understanding

15     that until the lead and copper rule is completely satisfied,

16     that being the corrosion control program is completed, that the

17     recommendation is required by federal regulation.

18             **THE COURT:**  Well, then, does Jackson water have a

19     lead and copper problem?

20             **MR. KUCIA:**  No, sir.  Again, it has to deal with the

21     corrosion control aspect of the program.

22             **THE COURT:**  And that program, when is that program

23     expected to be completed?

24             **MR. KUCIA:**  I believe that would be a question for

25     Ms. Martin and the City.

1              **THE COURT:**  She is standing.  She is ready for that

2   question.

3              **MS. MARTIN:**  Your Honor, I actually think that is a

4   question for Mr. Henifin, for what it's worth, but I do have a

5   question for Mr. Kucia.

6              **THE COURT:**  Ask your question of him, and then Mr.

7   Henifin can tell us about the other matter.

8              **MS. MARTIN:**  Mr. Kucia, is Mr. William "Bill" Moody

9   still employed by the Department of Health?

10             **MR. KUCIA:**  Last time I checked, he is.

11             **MS. MARTIN:**  Do you know what his position is?

12             **MR. KUCIA:**  Not off the top of my head.

13             **MS. MARTIN:**  Is he in an executive role?

14             **MR. KUCIA:**  I'm not certain.  I've met with Mr. Moody

15  several times, but I don't know if I've ever asked him if he's

16  an executive.

17             **MS. MARTIN:**  Do you recall whether or not Mr. Moody

18  was part of the unified command staff?

19             **MR. KUCIA:**  I'm sorry?

20             **MS. MARTIN:**  The unified command staff that existed

21  during the water crisis from August of '22?

22             **MR. KUCIA:**  I believe he was, but I might need to

23  check that for verification.

24             **MS. MARTIN:**  One last question.  The notices that we

25  are talking about, is it your position today that those notices

1    are not required, that the City is not required to issue those

2    notices?

3            **MR. KUCIA:**  No, I don't believe that's our position.

4    I believe those notices are required.

5            **MS. MARTIN:**  And are you saying that they are

6    required because we have not met the requirements of the

7    corrosion control plan?

8            **MR. KUCIA:**  That's my understanding, yes.

9            **MS. MARTIN:**  So there's a continuing requirement that

10   there's a precaution for pregnant women and children five and

11   under?

12           **MR. KUCIA:**  I'm not sure that I --

13           **MS. MARTIN:**  That's what the notice actually says.  I

14   know you don't have one in front of you, but that's what it

15   states.

16           **MR. KUCIA:**  I will take your word for that, but I

17   can't comment on that.

18           **MS. MARTIN:**  That's all I have, Your Honor.

19           **THE COURT:**  Mr. Henifin, straighten us out on that.

20           **MR. HENIFIN:**  It's a tough one to straighten.  First

21   of all, the corrosion control program is going to be put into

22   place.  It is underway but likely to change.  We have already

23   met with the state many times about what they are requiring.

24   We have moved to what is called water quality parameters in the

25   interim, and that's really why these quarterly notices have had

RESPONSE OF TED HENIFIN

1    to go out.  And the language in the notice, and we can debate

2    that somewhere else, that that precaution is not required, but

3    there is a notice that is required, so we are confusing a

4    couple of things here.  The notice is required if you don't

5    meet your water quality parameters.  I think I talked about

6    this last time.  It is alkalinity, pH, and dissolved inorganic

7    carbon.  And those indicators are great indicators of the

8    corrosiveness of the water.

9          In the past, since the 2016 action level exceedance, the

10   City's had to meet these water quality parameters and measure

11   them quarterly, and if they exceed more than nine times out of

12   the hundred times -- I think there's four parameters tested

13   for -- again, I don't have that in front of me -- and there are

14   a hundred tests that are done from these homes.  If nine

15   exceedances in a month, that means they are in violation of

16   their water quality parameter requirements, and they do have to

17   issue this letter, this notice about that, and that is the

18   rule.

19          I'm pleased to report, and I haven't shared this with

20   anybody, I just got it yesterday, for the first time in recent

21   history, over the last three-month period, we did not exceed

22   this water quality -- we met all of those water quality

23   parameter requirements within that, so we will be providing

24   that to the City and let them see it.  So we won't have to send

25   out the notice this quarter, which is the first time in a long

1    time that has happened.  And I'm sure we will have confusion,

2    and we will have to explain this to the public why they are not

3    getting the notice they have gotten in the past, because they

4    are going to think -- based on what we heard today, there will

5    be some element of the population that believes we are not

6    being transparent.  So we will be sending out the data so

7    everyone can see it and the rule that applies.

8         We will try to do our best to communicate the fact that

9    this is a positive for the city that we have been able to

10   control these water quality parameters within the type ranges

11   that we need to so that we are not in violation of that

12   agreement with the state.

13             **THE COURT:**  Okay, then.  Thank you very much.

14        Now, the Court has heard a lot in the last two days, and

15   there have been some requests made to the Court during the

16   course of these testimonies, a number of requests.  I'm going

17   to address those requests from my perspective because I was

18   asked to do certain things by certain people.  So I am going to

19   respond to those, and sometime between now and I guess probably

20   Tuesday, I am going to put on record my response to those

21   matters that came in front of us and what various requests were

22   made and what the Court feels about those requests.  So they

23   are going to be made a matter of record that I'm going to put

24   on the -- well, on the record sometime probably around Tuesday.

25        And the parties will be allowed to get a copy of it, and

1    of course, anybody in the audience that wants a copy of it,

2    they can go and ask the clerk's office for a copy, as simple as

3    that.

4        Finally, Ms. Williams, I spoke to you earlier.  Is there

5    anything else you would like to say as one of the parties in

6    the case, because you represent the plaintiffs in this case?

7        **MS. WILLIAMS:**  No, Your Honor, and we appreciate your

8    time.

9        **THE COURT:**  All right.  Thank you.  So, then, I will

10   have Jeff over here, the court security officer, lead you all

11   downstairs.

12       **MS. MARTIN:**  Your Honor, if I may, we did have just

13   some closing, just brief, five minutes or less.

14       **THE COURT:**  For what?

15       **MS. MARTIN:**  I wanted to answer one of the questions

16   that you asked earlier that didn't come back up.

17       **THE COURT:**  What was the question?

18       **MS. MARTIN:**  It was a question about whether or not

19   the City could be helpful in assisting with the pipes on

20   people's property.  And I was going to let you know that that's

21   actually -- there's a statute that prohibits the City from

22   using public funds on private property, but what we have is a

23   program through our planning and development department where

24   they use CDBG funds for that purpose.  So there is a program

25   that allows individuals who have issues with pipes under their

377

1    house that's on their private property -- there is some funding

2    available.  It is not enough, based on the need, but there is

3    something that is available.

4        I did have some closing statements just about the City, if

5    I may.

6            **THE COURT:**  I don't need your closing statements.

7            **MS. MARTIN:**  Okay.

8            **THE COURT:**  Thank you so much, but I took copious

9    notes, got a great memory, and also I have the court reporter

10   here who is making a transcript of everything which is

11   occurring, and so I will have access to that.

12       But with regard to these pipes, Ms. Martin, that are on

13   private property, that's a matter that I think is in the works

14   to determine what avenues private property owners might have

15   towards receiving some kind of finance.  And so that matter is

16   still, I believe, in its early stages.  But later, if it comes

17   to fruition, then we will talk more about it.  But that is a

18   matter which is on the Court's radar, and so we will talk about

19   that at another point, Ms. Martin.  So all I want you to do is

20   put a pin on that point, and I'm going to respond to that in

21   more detail at a later time, because I'm investigating some

22   possibilities, and I will get back to you later when I have

23   moved further down the road along with Mr. Henifin on that

24   matter.

25       So when I have gotten to that point, then I will have much

1    more of an answer for you on some of that.  So just put a pin

2    on it, and I will come back to you.

3        Now, then, Jeff, what time is it?

4            **COURT SECURITY OFFICER:**  5:53.

5            **THE COURT:**  5:53 p.m.  Are they at this point

6    prisoners of the Court?  Can they get down on their own?

7            **COURT SECURITY OFFICER:**  Somebody is downstairs.

8            **THE COURT:**  How many folks are downstairs?

9            **COURT SECURITY OFFICER:**  At least one.  Probably two,

10   but at least one.

11           **THE COURT:**  All right.  Communicate with them and

12   tell them we have a number of people up here who need to have

13   egress from the building, and we need them to stay there until

14   everybody is gone.

15       Folks, he is your key to departure from the building, and

16   so you need to stay around him, because otherwise, this

17   building is going to be locked, and you might have to spend the

18   night with us.  It's a nice building to stay in.  I've spent

19   many a night here, except you won't have my couch.  But

20   nevertheless, you will have to spend the night.  So, Jeff,

21   could you lead them out now.

22       Thank you all so much.

23                       (HEARING CONCLUDED)

24

25

379

```
1

2

3                    CERTIFICATE OF COURT REPORTER

4

5        I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6   Reporter for the United States District Court for the Southern

7   District of Mississippi, appointed pursuant to the provisions

8   of Title 28, United States Code, Section 753, do hereby certify

9   that the foregoing is a correct transcript of the proceedings

10  reported by me using the stenotype reporting method in

11  conjunction with computer-aided transcription, and that same is

12  a true and correct transcript to the best of my ability and

13  understanding.

14       I further certify that the transcript fees and format

15  comply with those prescribed by the Court and the Judicial

16  Conference of the United States.

17

18

19

20  s/ Teri B. Norton
    TERI B. NORTON, RMR, FCRR, RDR
21  OFFICIAL COURT REPORTER

22

23

24

25
```