```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                         NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                        PLAINTIFF

 5   VERSUS                    CIVIL ACTION NO. 3:22-cv-686-HTW-LGI

 6   THE CITY OF JACKSON, MISSISSIPPI                  DEFENDANT

 7

 8                         STATUS CONFERENCE
 9          BEFORE THE HONORABLE HENRY T. WINGATE,
              UNITED STATES DISTRICT COURT JUDGE,
10                         JULY 7, 2023,
                        JACKSON, MISSISSIPPI
11

12

13

14                   (APPEARANCES NOTED HEREIN.)

15

16

17

18

19

20

21
     REPORTED BY:
22
          CAROLINE MORGAN, CCR #1957
23        OFFICIAL COURT REPORTER
          501 E. Court Street, Suite 2.500
24        Jackson, Mississippi  39201
          Telephone:  (601)608-4188
25        E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:      ANGELA GIVENS WILLIAMS, ESQ.
                              KARL J. FINGERHOOD, ESQ. (VIA ZOOM)
 3                            ANGELA MO, ESQ.  (VIA ZOOM)

 4    FOR THE DEFENDANT:      CATORIA PARKER MARTIN, ESQ.
                              TERRELL S. WILLIAMSON, ESQ.
 5
      ALSO PRESENT:           GERALD KUCIA
 6                            MALISSA WILSON
                              FRANK P. CALAMITA, III (VIA ZOOM)
 7                            TED HENIFIN (VIA ZOOM)
                              MAYOR CHOKWE ANTAR LUMUMBA
 8                            CITY COUNCIL PRESIDENT AARON BANKS

 9

10    APPEARING IN CIVIL ACTION NO. 3:12-cv-790-HTW-LGI

11
      FOR THE PLAINTIFF:      GRETCHEN L. ZMITROVICH
12                            DONNA J. HODGES

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

# TABLE OF CONTENTS

2    Style and appearances.................................... 1-2

3    Court Reporter's Certificate............................. 118

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  **IN OPEN COURT, JULY 7, 2023**

2

3           THE COURT:  All right.  Terri, call the case and

4     announce the parties, please.

5           THE COURTROOM DEPUTY:  Your Honor, this is United

6     States of America versus City of Jackson, civil action

7     number 3:22-cv-686-HTW-LGI.  Appearing here in the courtroom

8     we have for the plaintiff Angela Givens Williams, and in the

9     courtroom for the defendants, we have Catoria Martin and

10    Terrell Williamson.  For the State of Mississippi, Gerald

11    Kucia.  Appearing via Zoom, we have Mr. Karl Fingerhood and

12    Angela Mo.  Also here in the courtroom is interested party

13    attorney, Malissa Wilson.  Appearing on Zoom, Frank Calamita

14    and Mr. Henifin, our third-party manager.

15          In United States of America versus City of Jackson,

16    civil action number 3:12-cv-790-HTW-LGI, appearing here in

17    the courtroom we have Gretchen Zmitrovich and Donna Hodges.

18          We are here on -- before the Court for a status

19    conference.

20          THE COURT:  All right.  Thank you.  Good afternoon

21    again.

22          There are two cases that might be discussed, although I

23    believe that the one that is going to be discussed primarily

24    is what we call the water case.  That is the first case that

25    was before us.  And so with regard to that water case, I

 1    received a request from the City of Jackson asking that this

 2    Court hold a status conference.  And so the city attorney

 3    wrote the letter.  She is present, and so would she go to

 4    the podium, and explain then why you made this request?

 5             (An off-the-record discussion was held.)

 6        THE COURT:  Oh, excuse me.  Hold it.  Why don't you

 7    stand up and do it now.

 8        THE COURTROOM DEPUTY:  I did not acknowledge our mayor.

 9    Mayor Lumumba is here in the courtroom as well.

10        THE COURT:  All right.  Now then, would you proceed?

11        MS. MARTIN:  Yes, Your Honor.  Tori Martin on behalf of

12    the City of Jackson.

13        I am here today, because we requested a status

14    conference with regard to the drinking water case.  In the

15    drinking water case, you know, this order was executed last

16    November, and since that time, we believe great progress has

17    been made.  However, we have some issues around

18    communication and transparency that we believe are causing

19    issues in -- with regard to us advancing in the wastewater

20    case.  And so because we are still --

21        THE COURT:  One second.  Hold it.  Let's clarify that

22    in the wastewater case, that's otherwise called as the

23    sewage case?

24        MS. MARTIN:  Yes, Your Honor.

25        THE COURT:  There is a confidential order in that

1    particular case.

2        MS. MARTIN:  Correct.

3        THE COURT:  That's because the Court ordered that the

4    parties should conduct some conversations in confidence so

5    as to reach various agreements that would impact upon the

6    consolidation of those two cases.

7        The water case, Safe Water Drinking Act case, does not

8    have any such confidentiality concerns at this point, but it

9    is different from the sewage case in that respect.  I do not

10   want any topics raised in open court that might trespass

11   upon confidentiality matters.

12       Do you intend to say anything that could do that?

13       MS. MARTIN:  No, Your Honor.

14       THE COURT:  Okay.  So nothing that you say will be in

15   contravention of the Court's concern with the

16   confidentiality in the sewage case?

17       MS. MARTIN:  Correct, Your Honor.

18       THE COURT:  Okay.  Now, continue.

19       MS. MARTIN:  Okay.  What I was about to say is what has

20   already been communicated to Your Honor about the fact that

21   there has been a stop on the wastewater side and us

22   advancing on those communications and negotiations.  And so

23   on the drinking water side, the issue is transparency and

24   communication, and it's really two different sides to

25   transparency.

1          One, the first instance is really transparency and

2     communication between the third-party manager; the governing

3     authority, which is made up of the mayor and the city

4     council; and then the community at large.  And the issue

5     that our elected officials are facing is that there are

6     concerns that are being raised by the community at large

7     through several different organizations, and those concerns

8     have to do with the drinking water order that we entered

9     into and the way in which it has been implemented and the

10    way in which information has been given to the public.

11         And so I have a several examples I would like to talk

12    to the Court about.  The first example is really the call

13    center that's now located in Rankin County.  There was great

14    confusion within the community about whether or not the call

15    center meant -- being placed in Rankin County meant that the

16    public would have to travel to Rankin County to pay their

17    water bills.  There was confusion, because there's another

18    building that's actually located in Belhaven called the

19    Summit, and whether or not they would have to go there to

20    pay bills or whether they would be able to go to the

21    locations that already existed for paying bills.  And so

22    that is one example of, I think, the confusion that has been

23    created around communication.

24         The next example I would give you is the quality of

25    water.  We were here previously on this drinking water case

1    with respect to a press conference that had occurred, and

2    the issue that we are having is really unrelated to that

3    press conference.  But when we talk about quality of water,

4    we have had community groups that are concerned about us

5    having a situation where the ITPM is saying that the water

6    is safe to drink and that there are no issues with the

7    water, and then they have citizens that are coming to both

8    elected official and those community organizations saying

9    that they are still experiencing discoloration, they are

10   still experiencing odor.  And so they have the concerns

11   about what's being communicated to the Court versus what

12   their experience has actually been.

13        The next --

14        THE COURT:  Is there any particular area that you want

15   to call to my attention?

16        MS. MARTIN:  Not at this time.  What I would like to do

17   is maybe propose that on this aspect of transparency, that

18   potentially we could have a status conference where we

19   invite some of those organizations to come and address their

20   concerns directly with the Court.

21        I have brought council president Aaron Banks here

22   today.  I also have the mayor, Chokwe Antar Lumumba, here

23   with me today.  But on this aspect of transparency, many of

24   their concerns have come from the community communicating

25   their concerns to the elected officials.

```
 1          THE COURT:  Have these concerns been reduced to

 2   writing, or are they only oral and anecdotal?

 3          MS. MARTIN:  I would say what we have received is some

 4   in writing and some oral.  I have received both from the

 5   different organizations.

 6          THE COURT:  Has anyone sought to respond to those

 7   communications?

 8          MS. MARTIN:  I believe the city officials have

 9   responded, but what the community groups have advised us of

10   is that's not sufficient.  They would like --

11          THE COURT:  And -- go ahead.  And what?

12          MS. MARTIN:  They would like the opportunity to address

13   those concerns with the Court.

14          THE COURT:  And have those matters been sent to the

15   Court?

16          MS. MARTIN:  I did not understand the question.

17          THE COURT:  Have those concerns that's been generated

18   by these groups that you mentioned, have those concerns been

19   communicated to the -- the interim manager on these points?

20          MS. MARTIN:  I believe some of them have, but I will

21   say that I do not believe that all of the organizations have

22   actually expressed all of their concerns.  Some of them

23   have.  I have asked that question, Your Honor, of them if

24   they have communicated directly with the third-party

25   manager.  Some of them have communicated directly with him,
```

1    and some of them have not.  But for the ones who have

2    communicated with him, they were not satisfied with his

3    response.

4         THE COURT:  And do you have a notebook of those

5    matters?

6         MS. MARTIN:  A notebook of the issues?

7         THE COURT:  A notebook of the concerns and complaints.

8         MS. MARTIN:  I don't have a notebook, but I could -- I

9    could draft something for Your Honor.

10        THE COURT:  So at present, you don't have that so that

11   we could make this an exhibit, for instance?

12        MS. MARTIN:  I do not, Your Honor.

13        THE COURT:  Okay.  And so then who would have the full

14   listing of these concerns?

15        MS. MARTIN:  I would say my office could obtain a

16   list -- a full list of the concerns.  We've communicated

17   with the organizations as they have communicated with the

18   elected officials.

19            (An off-the-record discussion was held.)

20        THE COURT:  Okay.  And has this full list of concerns

21   been communicated to the third-party manager?

22        MS. MARTIN:  I am not aware of the full list being

23   communicated to him.  I know some of them have been

24   communicated to him, but I do not know if the full list has

25   been communicated.

1          THE COURT:  Would this have been the first time then

2     that you have mentioned that there is a listing of concerns

3     that may be larger than those he has seen already?

4          MS. MARTIN:  I would say that the majority -- the ones

5     that I plan to give as examples today -- I have five

6     examples.  I know for sure that three of the five have been

7     communicated to him.

8          THE COURT:  Are you saying that there are more than

9     five?

10          MS. MARTIN:  I believe that there are more than five

11     based on my meetings with those organizations.

12          THE COURT:  Do you have information as to whether he

13     has been made one way or the other of these concerns?

14          MS. MARTIN:  I am aware that of the five organizations,

15     at least two of them have met with him.

16          THE COURT:  Okay.  And -- but you are saying that three

17     may not have met with him.

18          MS. MARTIN:  Correct.

19          THE COURT:  And are you saying that there are more

20     organizations or concerns?

21          MS. MARTIN:  I believe if we open the door up to other

22     organizations, there would be other organizations.  But the

23     ones that I am talking about are the ones that have reached

24     my office.

25          THE COURT:  Okay.  And that was the second matter you

1    want to raise.  Is there a third matter?

2        MS. MARTIN:  So of the transparency issue between the

3    ITPM, the governing authority, and the community, I think

4    that that -- it was the call center, water quality, low

5    water pressure in areas that have consistently experienced

6    low water pressure.  And I believe the issue here is in the

7    past within that community where they have experienced low

8    water pressure, they would -- when they had low water

9    pressure in their homes, boil water notices would be issued.

10   And the concern that they have is they are experiencing low

11   water pressure, but there is no boil water notices being

12   issued.  And so that is one issue that has been raised to

13   us.

14       The future of the water system is another issue that

15   has been raised to us, and this one essentially comes

16   down --

17       THE COURT:  I'm sorry.  The future of what?

18       MS. MARTIN:  The future of the water system.

19       THE COURT:  What does that mean?

20       MS. MARTIN:  So the ITPM has had several community

21   meetings where he has talked about the future of the water

22   system, whether or not the water system will return back to

23   the City of Jackson, whether or not the water system will be

24   given to a new government structure, and there is concern in

25   the community about being -- participating in that

1    discussion and being a part of that decision.

2        And the City of Jackson has represented to the

3    community that this order does not actually cover the future

4    of the water system.  This order actually contemplates a

5    consent decree being put in place at the end of the ITPM's

6    term.  But that is a concern that has been consistently

7    raised to us through the community.

8        THE COURT:  Now, you say through the community.

9        MS. MARTIN:  Through these same organizations.

10       THE COURT:  So we are talking about more than one

11   organization?

12       MS. MARTIN:  Yes, Your Honor.

13       THE COURT:  Are they under the same umbrella, or are we

14   talking about just different manifestations of the same --

15       MS. MARTIN:  Different manifestations of the same

16   issue.  But different -- different entities, though.

17       THE COURT:  Well, but I'm asking are these entities

18   actually different, or are these entities all under the same

19   umbrella?

20       MS. MARTIN:  I would say they are all different.  I can

21   give you the list that I have so far.

22       THE COURT:  Well, can you also -- will you also be able

23   to tell me who runs the different organizations, what the

24   memberships would be?

25       MS. MARTIN:  I do not have that information with me at

1    this time, but I can compile it.

2         THE COURT:  I would like to know whether we are talking

3    about different organizations, different entities, or

4    whether we are talking about the same entity with just

5    simply different names.

6         All right.  Go to your next point.

7         MS. MARTIN:  Okay.  The last example I had was around

8    fire hydrants, and there was some issue with communication

9    around who was responsible for fire hydrants and ensuring

10   that they were performing the way that they were supposed to

11   perform.

12        I believe this was a discussion that was originated

13   between the third-party manager and the fire department, but

14   the community became concerned around this issue because

15   there have been issues where the fire hydrant had either

16   little -- little water pressure or no water pressure.  And

17   so there's a concern around the community that in the event

18   of a catastrophe, would the fire hydrant be working in the

19   way in which it's supposed to work?

20        THE COURT:  Okay.  I believe we touched on that at one

21   point, but I -- seems like I heard something before on that,

22   but we will hear something in just a few minutes.

23        All right.  Go to your next issue.

24        MS. MARTIN:  So those are the examples that I brought

25   today that I think are examples that are universal amongst

1    those organizations.  And I really -- what we would propose

2    today to the Court is on this issue of transparency, we --

3    we would offer a pair forward being instead of us proposing

4    any type of amendment or modification to the drinking water

5    order, that we allow those organizations the opportunity to

6    voice their concerns directly to the Court and to the

7    third-party manager before we move forward as the city with

8    any modifications.

9        THE COURT:  Okay.  Does that complete your list of

10    matters that you intended to discuss with the Court?

11        MS. MARTIN:  There is one other issue.  And so the

12    second aspect of transparency for the City of Jackson has

13    been the communication and the relationship between the

14    third-party manager, the Court, and the parties.

15        And I have two examples of this, the first one being

16    there was a list of contractors that Your Honor mentioned

17    during the last status conference, and the parties were not

18    aware of that list until Your Honor mentioned it.

19        The City of Jackson, according to the order, has no

20    authority in terms of who is awarded contracts.  However,

21    the city does have institutional knowledge of the

22    contractors that exist and the type of work that they are

23    capable of performing.  And the question that the City of

24    Jackson has for the Court is if it's possible that in the

25    future when there are discussions or when there are

1   documents that are transmitted between the third-party

2   manager and the Court, that if the parties will be given the

3   opportunity to either offer comments or offer institutional

4   knowledge or also receive a copy of any documents that are

5   distributed between the two -- between the Court and between

6   the third-party manager.

7       But the second example I would give of that is

8   discussions regarding the system.  We -- we talked

9   previously in the status conference about the press

10  conference that the mayor gave, and that is just one example

11  of confusion that occurs when the ITPM and the Court have

12  conversations that the parties are not involved in.

13      The example I would give you, Your Honor, is for the

14  City of Jackson, that was the first time that we have heard

15  that the Department of Health and the other entities, the

16  plaintiffs, make the statement that the water was safe to

17  drink without any precautions.

18      And in addition, the other concern that the city has

19  with that communication is we have gotten request from the

20  public for evidence that the water is safe to drink.  And I

21  believe Mr. Henifin in that hearing talked about testing

22  that had been completed, but the city was not really given

23  the opportunity to request copies of that testing so that we

24  can distribute that to the public.

25      And so to conclude, we believe that increased

1    communication and increased transparency will really instill

2    the confidence in the system that Your Honor and

3    Mr. Henifin, I think, has as a goal for the system going

4    forward.

5         And the mayor is here if the -- to offer comments about

6    both aspects of transparency along with the council

7    president, Mr. -- council president, Aaron Banks.

8         THE COURT:  On this matter of transparency and

9    communication, then are you saying that you expect the --

10   the manager and the Court to continue the same kind of

11   transparency and communication that the city has exhibited

12   over the years?

13        MS. MARTIN:  I don't understand your question, Your

14   Honor.

15        THE COURT:  You are saying that the city has been

16   transparent, are you not?

17        MS. MARTIN:  You mean in our communications to the

18   public?

19        THE COURT:  Yes.

20        MS. MARTIN:  Yes.

21        THE COURT:  So then some of these issues that have come

22   up where the Court has determined that matters were in grave

23   shape and where the budget did not reflect some of these

24   matters, you are saying that there was transparency?

25        MS. MARTIN:  Yes, Your Honor.  The city maintains that

1   it has consistently been subject to the Public Records Act,

2   and so all of our records have consistently been public

3   documents.

4        THE COURT:  Exactly.  And even that matter I mentioned

5   about the e-codes, you are saying that the city was open and

6   transparent about that?

7        MS. MARTIN:  Yes, Your Honor.  To my knowledge, we

8   were.

9        THE COURT:  So then you are saying that the city didn't

10  maintain any secrecy with regard to that?

11       MS. MARTIN:  To my knowledge, we did not.

12       THE COURT:  And that 5 million gallons of water,

13  processed water, that continued to flow for seven years, was

14  the city open to the public about that?

15       MS. MARTIN:  Your Honor, I would make a correction on

16  that.  I do not believe that the leak with millions of

17  gallons of water existed for a seven-year period.

18       THE COURT:  How long do you think it existed?

19       MS. MARTIN:  I do not know when it started.  But what

20  has been reported to us is that it started as a small leak

21  and that it grew over time.

22       THE COURT:  And so when you say reported to you, who

23  made the report?

24       MS. MARTIN:  The public works department.

25       THE COURT:  So you have a record that the public works

1    department made that report?

2        MS. MARTIN:  I do not have a written record.  But what

3    has been communicated to us from that department is that

4    they were aware of a small leak.  They did not know that it

5    had grew to the extent that it had.

6        THE COURT:  So when did you find it out that it had

7    grown to the extent that it did?

8        MS. MARTIN:  When Mr. Henifin discovered it.

9        THE COURT:  So but for his discovery, you are saying

10   the city would not have known it?

11       MS. MARTIN:  I don't know at what point the city would

12   have known, but I would also add that the public works

13   department has represented to us that it was a leak that

14   they were aware of but that the city did not have funding to

15   repair it.

16       THE COURT:  If it was a small leak, you are saying that

17   the city didn't have the funds to make a small repair?

18       MS. MARTIN:  That is what has been represented to me.

19       THE COURT:  And is that what you are communicating to

20   the Court, that that's the city's position?

21       MS. MARTIN:  That is our position, that it was a leak

22   that -- and I don't know who all within the city was aware

23   of it, but from our communications with the public works

24   department, there were individuals in the public works

25   department that were aware of it but that their awareness

```
 1    was that it was a small leak, not that it had grown to the

 2    extent that it had under -- that Mr. Henifin discovered.

 3         THE COURT:  So you do give him credit for discovering

 4    that --

 5         MS. MARTIN:  Yes.  Discovering and repairing it.

 6         THE COURT:  Yeah.  But I'm not calling it a leak.  I am

 7    calling it almost a deluge.  So -- but you are giving him

 8    credit for discovering that?

 9         MS. MARTIN:  Yes.

10         THE COURT:  So but for his discovery, are you saying

11    that that matter would have continued unabated?

12         MS. MARTIN:  I would say but for his discovery and the

13    availability of funding, that matter would have continued

14    unabated.  Because but for the funding from the federal

15    government, we would not have had the -- the city did not

16    have sufficient funding when we entered into this order to

17    repair that leak.

18         THE COURT:  So while I have you on that particular

19    point, how much funding was expended to fix that matter?

20         MS. MARTIN:  I don't recall.  I think Mr. Henifin would

21    be able to give us exact numbers.  But I know it was

22    million -- over a million dollars.

23         MR. HENIFIN:  About 2.5 million, Your Honor.

24         THE COURT:  Okay.  And so then you are saying the city

25    didn't have the 2.5 million?
```

1        MS. MARTIN:  No.  The city did not have 2.5 million in

2    its budget to expend towards that leak.

3        THE COURT:  I had also asked at one point about some

4    trucks that could assist with the sewage matter, and I was

5    informed that the trucks that the city had that could

6    address that matter were all in the shop and that the city

7    couldn't get them out of the shop for failure to be able to

8    pay the bill.  So is that true?

9        MS. MARTIN:  That is not an accurate statement.

10       THE COURT:  What's the accurate statement?

11       MS. MARTIN:  There were some trucks that were in the

12   shop.  I think it was two.  It was not all of the trucks

13   that were in the shop.  And what has been represented to me

14   is not that the city could not get them out the shop because

15   we could not -- because we hadn't paid the bill.  It was

16   that -- well, I will say this:  What has been represented to

17   me is that the trucks that were in the shop were still in

18   the shop being repaired.  It was not that the city had the

19   invoice for the repair and had not paid it.

20       THE COURT:  There were three trucks, weren't they?

21       MS. MARTIN:  I think it ends up being four trucks, if

22   I'm not mistaken.  There were three used trucks, and then I

23   think we bought one additional truck that was used, but it

24   was in better shape.

25       THE COURT:  You bought the fourth truck, but weren't

1    three trucks in the shop at the same time?

2        MS. MARTIN:  That I'm not sure of.  Not that I'm aware

3    of.  But I would have to talk to the public works director,

4    Robert Lee, who might be on the line.

5        THE COURT:  And how long were these trucks in the shop

6    and -- during this time period when the city couldn't get

7    them out?

8        MS. MARTIN:  That I am not certain of.  I do not have

9    the amount of time that they were in the shop.  I would have

10   to defer to the public works department.

11       THE COURT:  Was there any period of time when these

12   trucks were in the shop and the city chose not to get them

13   out of the shop?

14       MS. MARTIN:  Not that I am aware of.  What's been

15   represented to me is that the trucks were in the shop and

16   they were being repaired.  But I am not aware of an invoice

17   being presented that the repair had been completed and that

18   the trucks remained in the shop because the city couldn't

19   afford to get them out.

20       THE COURT:  Could the city have afforded to get them

21   out anytime the city wanted?

22       MS. MARTIN:  I think depending on the invoice that was

23   submitted, yes.  But there is -- there is funding in the

24   public works department in the sewer division.

25       THE COURT:  So you are saying that there was funding

1    available to get those trucks out of the shop?

2        MS. MARTIN:  I am saying that there is a budget in the

3    public work departments in the sewer division for truck

4    repairs.

5        THE COURT:  But you didn't say whether you are telling

6    me that there was money in the budget that would allow the

7    city to rescue those trucks.

8        MS. MARTIN:  I don't -- I don't know for sure that

9    there was enough money for the invoices that were presented,

10   because I don't know that all of the trucks are out of the

11   shop.  What I do know is that there were -- there is a total

12   of, I think, four trucks, maybe three of which that have

13   been in the shop at some point.  But I do know that we have

14   trucks that are on -- we have at least one truck that is

15   fully operational that is out that is performing repairs.

16   And I know that we have gotten at least one truck out of the

17   shop that we paid the invoice for.

18       THE COURT:  Do you know how much you paid?

19       MS. MARTIN:  I do not.  I would have to defer to our

20   public works department for that information.

21       THE COURT:  Was it more than a thousand dollars?

22       MS. MARTIN:  I would assume it was more than a thousand

23   dollars, but I don't know the total.  I would assume it was

24   more than a thousand dollars just because I have never seen

25   a -- an invoice for a repair for a truck of that size that

1    has been less than a thousand dollars.

2         THE COURT:  And then on the fourth truck that you are

3    telling me about, that truck was purchased when the three

4    other trucks were in the shop; is that correct?

5         MS. MARTIN:  That is correct.

6         THE COURT:  And that fourth truck was expected to

7    perform in the manner in which it was designed, to go around

8    the city to help out on the sewage matter, correct?

9         MS. MARTIN:  Correct.

10        THE COURT:  How long did it take for that truck to

11   fail?

12        MS. MARTIN:  I do not know.  But during our last

13   hearing when that came up, I actually reached out to our

14   public works director.  And what he represented to me is

15   that in that industry with those types of trucks, it is

16   common for them to consistently be in and out of the shop

17   because of the type of work that they are performing.

18        So I don't know how long it took after we bought the

19   truck for it to be in the shop.  But what he represented to

20   me is that he was not surprised that -- when it went in the

21   shop because for trucks that perform that type of work, it's

22   common for them to be in and out of repair shops.

23        THE COURT:  So then at one time were all four trucks in

24   the repair shop?

25        MS. MARTIN:  Now, that I do not know to be certain.

1    What I do know is we had three in the shop.  We -- the

2    fourth one we purchased.  The fourth one did go into the

3    shop at some point.  And the third one, I guess we could

4    call it, got out of the shop.

5         So I do not believe that there was a time where all

6    four of them were in the shop at the same time, but I would

7    defer to our public works department to answer that

8    question.

9         THE COURT:  All right.  Counsel, I want to go back to

10   another matter concerning communication.  When we had this

11   leak or this deluge, as I describe it, when we had all of

12   that water lost, did that appear anywhere on the city's

13   budget?

14        MS. MARTIN:  No.  Because I believe we were not aware

15   that it had grown to that extent.  But in addition, what I

16   would say about our public works department is up until the

17   time that we entered into the agreement on the stipulated

18   order, I would represent that the City of Jackson did not

19   have sufficient funding to fund that department.  And so the

20   amount that -- and, I mean, Mr. Henifin can tell you this

21   himself.  The amount that's in the current Drinking Water

22   order is, I think, 15.9 million.  Mr. Henifin is spending --

23   he is on track to spend, I think, more than $15 million just

24   on the water treatment plan itself.

25        THE COURT:  Okay.  So back to my question then.  So was

1    this matter of the loss of water out there on, what's that,

2    Adkins Boulevard, was that reported to the city council?

3        MS. MARTIN:  That I am not sure of, because I -- the

4    mayor was not aware of it until after Mr. Henifin raised it

5    as a concern.  To our knowledge, there were people in the

6    public works department that were aware of it, but the mayor

7    himself was not aware of it.  And therefore, I was not aware

8    of it, so I do not believe it had been communicated to the

9    city council.

10       THE COURT:  Is there any written record to show when

11   you advised the city council --

12       MS. MARTIN:  Of the leak?

13       THE COURT:  -- if you ever did?

14       MS. MARTIN:  I'm trying --

15       THE COURT:  Of the leak.

16       MS. MARTIN:  -- to make sure I understand your

17   question.

18       THE COURT:  Of the leak.  Let's call it a leak.  Was

19   there -- do you have a written record as to when you advised

20   the city council of such?

21       MS. MARTIN:  No.  I do not believe we have a written

22   record of when we advised them of it.

23       THE COURT:  Well, do you have a council meeting report

24   of when you advised the city council of the gravity of that

25   matter?

 1          MS. MARTIN:  I do not.  But if I had to assume, I would

 2     say it was after the meeting that we had where we toured the

 3     facility, because that's when I was aware of the leak.

 4          THE COURT:  You toured the facility at the same time I

 5     did, didn't you?

 6          MS. MARTIN:  Correct, Your Honor.

 7          THE COURT:  Was that the first time that you knew

 8     anything about that?

 9          MS. MARTIN:  That was the first time that I became

10     aware of it.

11          THE COURT:  And was it the first time you had taken a

12     tour of it?

13          MS. MARTIN:  Correct.

14          THE COURT:  And what did you see?

15          MS. MARTIN:  I saw a lot of water.

16          THE COURT:  A bunch of water.

17          MS. MARTIN:  Uh-huh.

18          THE COURT:  And you saw the creation of an artificial

19     lake, didn't you?

20          MS. MARTIN:  Something to that effect, yes.

21          THE COURT:  And were you also there when there was an

22     attempt to see how deep that was?

23          MS. MARTIN:  I was not there, but I did -- I was there

24     when they described the attempt to see how deep it was.

25          THE COURT:  And what's your understanding as to how

1    deep it was?

2        MS. MARTIN:  That it was deeper than the longest stick

3    that they had available.

4        THE COURT:  That was, what, 18 feet?

5        MS. MARTIN:  I don't recall.

6        Is that correct?

7        I don't recall.

8        THE COURT:  And later did you discover that they

9    decided that it was about 35 feet deep?

10        MS. MARTIN:  I remember that from the last status

11    conference.

12        THE COURT:  All right.  When was that reported to the

13    city council?

14        MS. MARTIN:  That it was 35 feet?

15        THE COURT:  Yes.

16        MS. MARTIN:  The council president at the time was

17    actually here in that same meeting.

18        THE COURT:  Okay.

19        MS. MARTIN:  When it was reported from counsel -- I

20    mean from Mr. Henifin, the council president was here in

21    that meeting.

22        THE COURT:  So then the council president heard it for

23    the first time here in the courtroom?

24        MS. MARTIN:  Correct.  That's the same time I heard it

25    for the first time, that it was 35 feet.

```
 1          THE COURT:  What about that it was longer than -- that
 2    it was deeper than 18 feet?
 3          MS. MARTIN:  I don't know if in my discussions with
 4    them I would have talked about how deep the hole was.
 5          THE COURT:  When was the council informed about the
 6    artificial lake that was created?
 7          MS. MARTIN:  It would be sometime after I went with --
 8    I went on the trip with you.
 9          THE COURT:  And so before that, the council was not
10    informed that there was this tremendous loss of -- of
11    processed water occurring out there?
12          MS. MARTIN:  I would represent that neither the council
13    nor the mayor had been advised of the leak and the size of
14    the leak up to that point.
15          THE COURT:  Okay.  Thank you very much.
16          MS. MARTIN:  Uh-huh.
17          THE COURT:  Mr. Henifin, how are you doing today?
18          MR. HENIFIN:  Doing well.  Yourself?
19          THE COURT:  I'm doing fine, Mr. Henifin.
20          Mr. Henifin, I want to go through each one of these
21    matters that have been raised and give you an opportunity to
22    address these matters at this status conference.
23          MR. HENIFIN:  Yes, Your Honor.
24          THE COURT:  Were you aware of these matters that have
25    now been raised?
```

```
 1          MR. HENIFIN:  Pretty much, yes, Your Honor.

 2          THE COURT:  And how did you become aware?

 3          MR. HENIFIN:  So on the -- I have just -- so one of the

 4     groups came to meet with me, and I think that's one of the

 5     ones that you'll get in the list, and that's the only one I

 6     know that has come to meet with me and has been dissatisfied

 7     with all of the answers I provided.

 8          So I know they're out there talking, because they

 9     aren't satisfied with the information I provided.  I think

10     that was -- they represented themselves as part of the Rapid

11     Response Coalition.

12          THE COURT:  Rapid Response Coalition.  Do you know the

13     number of people who are a part of that organization?

14          MR. HENIFIN:  I do not.  Two -- two people were

15     present.  They came to my office to speak with me about

16     their concern.

17          THE COURT:  Two people.  Did they represent how many

18     people they spoke for?

19          MR. HENIFIN:  They said there were a large number.

20     That a -- that it was no actual number given.

21          THE COURT:  All right.  And how long did you meet with

22     them?

23          MR. HENIFIN:  Little over an hour, Your Honor.

24          THE COURT:  And where did you meet with them?

25          MR. HENIFIN:  I met with them at our offices at the
```

1    Summit, which is on Greymont Avenue, Belhaven Heights, near

2    Fortification.

3        THE COURT:  And would you describe the outcome of the

4    meeting?

5        MR. HENIFIN:  I think they just -- they left

6    dissatisfied with the information they received from me.

7        THE COURT:  Okay.  And could you give me an overview of

8    the topics that you all discussed?

9        MR. HENIFIN:  Yeah.  We talked about the find-and-fix

10   concept that we have been going through the city and talked

11   about some of the places we are making patches.  They didn't

12   think we were doing that appropriately.

13       Based on their knowledge of the Yazoo clay -- I don't

14   know that either of them were geological engineers, but they

15   had a lot of opinions on how we were doing that work.

16       They had some strong opinions about -- what else they

17   were really focused on -- the use of minority contractors.

18   And I went through -- that's how we got on that paving

19   discussion, because one of the paving -- the only real

20   paving contractor we have got working for us is a very small

21   Jackson and Black business who has done over a million

22   dollars' worth of paving, and they do very, very good work.

23       I was pointing that out to them when they were

24   questioning the way at which they patch those -- or made

25   those patches.  So we agreed to disagree that that was

1    adequate what we were doing.  They continued to -- to say we

2    needed to do different outreach for minority contractors,

3    which we are doing some.  We are growing, and we are going

4    to do more.

5         But that was a big part of it was that the -- they

6    weren't satisfied with minority contractors.  They were

7    upset with --

8         THE COURT:  Did they -- one second before you go to the

9    next one.

10        MR. HENIFIN:  Yes, sir.

11        THE COURT:  Did they suggest any companies they wanted

12   to see used?

13        MR. HENIFIN:  No, Your Honor.

14        THE COURT:  They just simply said they were

15   dissatisfied at the number --

16        MR. HENIFIN:  Yes, Your Honor.

17        THE COURT:  -- of minority contractors?

18        MR. HENIFIN:  Yes, Your Honor.

19        THE COURT:  Did they then provide any percentages of

20   whom they suspected the time you were utilizing so as not to

21   be utilizing enough minority contractors?

22        MR. HENIFIN:  No, Your Honor.  There was -- we didn't

23   talk any actual numbers.

24        THE COURT:  Okay.  Go to your next point.

25        MR. HENIFIN:  So the next point was on the call center.

1      They were quite concerned that that went to Rankin County,

2      and I explained that was an existing call center, been in

3      business for 30 years, and we weren't creating our own.  We

4      were, you know, under contract to that call center to answer

5      our calls, because they have the capacity.  They have the

6      facilities.  They have the training.

7          And while they are in Rankin County, it's about seven

8      miles away, and seven of our people were actually able to go

9      to work at that call center.  So it's the only call center

10     we could find in Mississippi to take our business.  They

11     were quite upset that we didn't find a different solution to

12     that other than going to a call center that existed in

13     Rankin County.

14         There was, again, no satisfaction from them when I

15     explained the process, how we found them, what they do, that

16     they have been in business for 30 years, that they speak

17     Mississippian when you call, they answer the phone, you can

18     understand them.  We had this long discussion.  They were

19     still not happy that we didn't find a solution in Jackson.

20         THE COURT:  And did they submit themselves as possible

21     vendors on a matter like that?

22         MR. HENIFIN:  No, Your Honor.  They didn't have a

23     suggestion.

24         THE COURT:  They just had a complaint?

25         MR. HENIFIN:  Yes, Your Honor.

1            THE COURT:  And did they say how the calls were being

2      prejudiced by a call center being in Rankin?

3            MR. HENIFIN:  No, Your Honor.

4            THE COURT:  They just simply said they didn't want it

5      in Rankin?

6            MR. HENIFIN:  Yes, Your Honor.

7            THE COURT:  But other than that, they had no criticism?

8            MR. HENIFIN:  Not that I'm -- not that I recall.  I

9      don't believe they did.

10           THE COURT:  On this matter of minority contractors, you

11     said they did not pose any alternatives?

12           MR. HENIFIN:  No, Your Honor.

13           THE COURT:  Did they ask for the percentage of

14     contractors who had been utilized?

15           MR. HENIFIN:  No, Your Honor.

16           THE COURT:  Mr. Henifin, it sounds like they just came

17     in with naked complaints without any statistics.  Is that

18     correct?

19           MR. HENIFIN:  That's how it felt to me, Your Honor.

20           THE COURT:  So did they ever provide to you any

21     statistics on anything?

22           MR. HENIFIN:  No, Your Honor.

23           THE COURT:  Go to your next point.

24           MR. HENIFIN:  So I guess the last item that they were

25     concerned about was the way the employees of the city had

1    been treated through this and that -- the fact that I've

2    outsourced a number of those functions and several folks had

3    to leave employment with the city.  Many of them ended up

4    working for contractors that we were hiring, and others left

5    employment or were found other positions within the city.

6    They didn't think that was handled well, and they didn't

7    understand why we had to do that.

8        THE COURT:  Why don't you explain your position on

9    that.

10        MR. HENIFIN:  So the water maintenance folks -- well,

11    go back to the plant, actually.  We know the plants were

12    underresourced, understaffed, and we needed a professional

13    staff in there quickly with resources.  And that's why we

14    went with the contract with Jacobs and brought them in, and

15    that really has provided some stability.  They have been

16    able to hire additional folks.  They have got, you know, a

17    pretty full staff now the city was unable to put together at

18    that point.

19        Again, to Tori's point, Ms. Martin's point, they didn't

20    have a lot of resources, so, you know, that -- obviously

21    the -- having the some federal resources has made that

22    easier.  When it went to the water maintenance side for the

23    distribution system, we found a very similar situation where

24    understaffed, underresourced.  And we, to address this

25    urgent problem that has been put into the order and dropped

1    into my lap, needed to move quickly to make that happen.  So

2    as the ITPM, recognizing this as an emergency, the only --

3    I -- there was no time to rebuild the city's water

4    maintenance staff from zero or from the very thin staff they

5    had at that point, lacking reliable equipment, lacking

6    tools, lacking training, lacking people.

7        The only solution that appeared viable and fast to me

8    as the ITPM under my responsibility was to contract out to

9    contractors that had all of that, and to the extent we could

10   put those people to work from the city to those contractors,

11   we would retain their knowledge of the system within the

12   City of Jackson to help us fix the water system faster.

13       So that is why the contract option was really, from our

14   perspective, the only viable one.

15       THE COURT:  Where are we now?

16       MR. HENIFIN:  So we're -- we fixed, you know, almost

17   200 leaks up to this point.  The contractors work every day.

18   They are guided by some city employees that are currently

19   still city employees detailed full time to JXN Water.  Those

20   folks are managing that.  We have got some of the former

21   water maintenance folks leading the crews for the

22   contractors.  We are getting a lot of work done quickly.

23       Case in point might be the big break on Woodrow Wilson

24   early on the 4th of July.  We had that isolated and shut

25   down within four hours, and then we were working it that

1    morning to get it repaired.  A leak like that in the past

2    probably would have drained our system down, and we would

3    have lost pressure.  But we responded very quickly, and it

4    was a -- a great contractor response to make that happen.

5        We had a break later that same -- in that same area the

6    next day, and we responded to that and got that buttoned up

7    as well.  So I think our response time to get to the breaks,

8    isolate them, and repair them has -- are markedly improved

9    since JXN Water has taken over.  Again, got resources, got

10   funding.  There are reasons that happens.

11       But, Your Honor, I don't think anyone can point to our

12   work on the system and say that it's -- it's any worse than

13   it was.  I would say, anecdotally, I hear it's better than

14   it has ever been as far as response, getting out, fixing

15   leaks.  You just don't see water flowing out in the street.

16   We are still looking for a lot of leaks.  There are still

17   many more out there, but we are making great progress.

18       THE COURT:  Let's talk about the call center.

19   Approximately how many calls do you all get a day?

20       MR. HENIFIN:  We started out with a big volume, about

21   1100 a day that first few days.

22       THE COURT:  1100 per day?

23       MR. HENIFIN:  We are down in the 400 range.  Four to

24   500 depending on what's going on.

25       THE COURT:  What's that?

1          (An off-the-record discussion was held.)

2     THE COURT:  Okay.  Go back.  Now, so you were saying at

3     first you were getting 1100 a day.

4     MR. HENIFIN:  And we are down around the 4 to 500 range

5     now, Your Honor.

6     THE COURT:  How many persons do you have manning the

7     call center telephones?

8     MR. HENIFIN:  So it's a large call center.  It has, I

9     think at any given time, between 24 and 30 folks answering

10    the calls.  What we have -- the agreement we made with the

11    call center and the contract we are in, there is four

12    dedicated JXN Water folks in there from 8:00 to 5:00 on

13    weekdays.  When they cannot answer the calls, it rolls to

14    someone else who has got more general knowledge, not the

15    specific knowledge that those four do.

16         But over time, everyone in the call center gets more

17    knowledge and can answer more questions.  For the most part,

18    we are still in that training mode to get all of the

19    questions answered, but they escalate those, or we take

20    information and we research them and get back to folks with

21    their answers if we can't provide it directly when they call

22    in the call center.

23    THE COURT:  Before you put into effect this call

24    center, anecdotally, what did you hear about the public's

25    attempt to report matters?

1          MR. HENIFIN:  The public was very challenged, and part

2     of that, again, goes back to funding and what I inherited

3     when I took over the WSBA, which was the water, sewer,

4     billing, administration, which was the eleventh hour add to

5     the stipulated order.

6          I think there were three folks answering calls at that

7     point at the WSBA, and it was -- two of those were part

8     time.  They were overwhelmed and underresourced, and the

9     wait times would exceed multiple hours on some days.

10         THE COURT:  You said there were three?

11         MR. HENIFIN:  There were three, yes, Your Honor.

12         THE COURT:  And you said they were part time?

13         MR. HENIFIN:  Two of those were part time, yes, your

14    Honor.

15         THE COURT:  So there was only one-time person at that

16    time answering these calls.

17         MR. HENIFIN:  And we brought in some temps to try to

18    shore that up for a little while, but that wasn't working

19    very well for us, and that's when we started looking for a

20    contract option.

21         THE COURT:  So when you first came in, were you so

22    advised by the public that the call wait time was

23    intolerable?

24         MR. HENIFIN:  It was -- it was very long.  Intolerable.

25    People were just giving up calling for the most part.

1          THE COURT:  Do your call takers have a script that they

2     have to provide to the public when various questions are

3     asked?

4          MR. HENIFIN:  Yes, Your Honor.  And that continues to

5     develop as we learn more about the questions that come in,

6     but they do keep a script.  We also ask them for information

7     about their phone number.  We are trying to update our

8     customer records to get cell numbers, email accounts, other

9     ways to reach customers.  So when they call in, they get to

10    report whatever their problem is.  Our call takers may ask

11    them a number of questions to try to update our database at

12    the same time.

13         THE COURT:  Okay.  And have you had any congratulatory

14    calls --

15         MR. HENIFIN:  Yes, Your Honor.

16         THE COURT:  -- from the public since you have taken

17    over this point?

18         MR. HENIFIN:  Yes, Your Honor.  There is a number of

19    folks that have expressed thanks via email.  I can produce

20    those if we need to at some point.

21         THE COURT:  So you have a record of these

22    congratulatory responses?

23         MR. HENIFIN:  Of some of them.  Some of them that

24    actually put it in writing, yes, Your Honor.

25         THE COURT:  Could you put that in a notebook for me,

1    please?

2        MR. HENIFIN:  Yes, Your Honor.

3        THE COURT:  Now, let's go back to this call center.  So

4    who bears the cost of the call center?

5        MR. HENIFIN:  The citizens, the ratepayers ultimately.

6    Right now we are supplementing a lot of this with federal

7    dollars.  Part of the 1442(b) Safe Drinking Water Act grants

8    allows us to pay for operation and maintenance with some of

9    that money.  So we are essentially using a combination of

10   the city O&M dollars that they are providing and the -- the

11   federal O&M dollars that we are getting from EPA's grant.

12       THE COURT:  What alternative do you see to your call

13   center?  If that call center had to be shut down for any

14   reason, then what alternative would that be for a viable,

15   productive call center?

16       MR. HENIFIN:  You would be looking at other places,

17   largely outside of the United States.  Most of the call

18   centers exist in offshore areas.  India, Pakistan, and other

19   communities have made it a big part of their economy to

20   operate call centers for companies across the nat- -- across

21   the world, and they do it very well.

22       But it is just fortunate that -- and I -- we thought it

23   was fortunate to have one right here in Central Mississippi.

24   I think there is only a few in the United States that have

25   that kind of long-term relationship with their clients in

1    this part of the country.

2        THE COURT:  So then if you shut down your call center

3    over there, could you see the City of Jackson taking up the

4    slack on this point?

5        MR. HENIFIN:  They would have to develop their own call

6    center.  I think it's feasible that someone could do it.  I

7    don't think it would happen -- you would need a year or two

8    maybe to get the experience and develop it, but I think it's

9    possible.

10        THE COURT:  You said a year or two?

11        MR. HENIFIN:  I would think so.

12        THE COURT:  Why would it take a year or two?  I mean,

13    other than just simply getting some people to sit around by

14    the telephone and wait on some calls?

15        MR. HENIFIN:  It's actually pretty complex to get the

16    equipment to monitor the calls.  You've got to get the

17    scripting done for the various clients.  If they were just

18    doing the water, they could get the water scripting done.

19    But it takes -- it's not as simple of a project or a job as

20    just answering the phone.  And you got to direct the calls

21    the right way, dispatch -- if it's a water break, you got to

22    ask questions, understand how big it is, is it urgent, are

23    the people without water, are the neighbors without water.

24    I mean, there is a series of questions that need to be

25    asked.  So you need training to do that.  You got to set up

1    the infracture within the building to do it.

2        In this case, they have a tornado shelter built into

3    their facility.  So they don't even shut down during tornado

4    watches or warnings.  And heaven forbid that they actually

5    get hit by a tornado, but the rest of their building would

6    be wiped out and their tornado shelter would remain

7    standing, and they're committed to continue to function in

8    those situations.  So they are there all of the time.

9        THE COURT:  Before you arranged and contracted with

10   that center, what, again, was the City of Jackson doing?

11       MR. HENIFIN:  They had some folks answering the calls

12   in the WSBA building, which was in the old Metrocenter.

13       THE COURT:  How many?

14       MR. HENIFIN:  Three, I believe.

15       THE COURT:  That's the three we talked about before?

16       MR. HENIFIN:  Yes, Your Honor.

17       THE COURT:  That two were part time and only one was

18   full time?

19       MR. HENIFIN:  Yes, Your Honor.

20       THE COURT:  So then on a scale of 1 to 100, what would

21   you consider to be the efficiency rating of such a system

22   that the city had in force before that?

23       MR. HENIFIN:  I would say it was a -- you know, a guess

24   on that scale would be a 20 percent efficiency maybe.

25       THE COURT:  And that would be the best?

1          MR. HENIFIN:  I would think.

2          THE COURT:  And what kind of efficiency would you say

3     you have now?

4          MR. HENIFIN:  I would say we are -- because we are

5     having wait times of less than a minute and we are answering

6     all of the calls, I would say we are approaching, like, a

7     95 percent efficiency rating or plus.

8          THE COURT:  This group that came to see you, when they

9     complained about this call center, did you explain these

10    matters to them in the manner in which you are now

11    describing?

12         MR. HENIFIN:  I believe so, Your Honor, yes.

13         THE COURT:  And what was their response?

14         MR. HENIFIN:  They thought that a call center could --

15    I could have worked harder to find someone in Jackson that

16    could operate a call center and they could have stood one

17    up.

18         THE COURT:  They are saying they could've put one

19    together?

20         MR. HENIFIN:  Not they.  They thought there were others

21    in Jackson that probably could have done that.  They didn't

22    point out to anybody in particular, and I explained, again,

23    I didn't have the luxury of time to create a call center

24    from scratch.

25         THE COURT:  But they were -- they were championing the

```
 1    creation of a brand-new call center from --
 2         MR. HENIFIN:  Yes, Your Honor.
 3         THE COURT:  -- from scratch upward.
 4         MR. HENIFIN:  Yes, Your Honor.
 5         THE COURT:  That is, having zero to try and put in
 6    something operation of that complexity.
 7         MR. HENIFIN:  Yes, Your Honor.
 8         THE COURT:  And you said you didn't think that you had
 9    the luxury of time to try and explore those kinds of things?
10         MR. HENIFIN:  Yes, Your Honor.
11         THE COURT:  And didn't you say a few minutes ago that
12    it would take, you think, one year to two years to be up and
13    running on something like that?
14         MR. HENIFIN:  Yes, Your Honor.
15         THE COURT:  Has that estimation changed since then?
16    Has you -- have you changed your estimation on that since
17    then?
18         MR. HENIFIN:  No, Your Honor.  I'm very pleased with
19    the contract decision we made and the response we have
20    gotten from that.
21         THE COURT:  And what you told me a few moments ago, you
22    have reduced the number of calls tremendously.  Now, do you
23    have any anecdotal proof other than what you have stated so
24    far that this reduction is because of satisfaction as
25    opposed to maybe the public giving up calling?
```

1          MR. HENIFIN:  I can put together some numbers, but I

2     don't have anything at this point other than the anecdotal,

3     and I know we have gotten some email congratulation or

4     surprises from a number of folks at the response they have

5     gotten and the satisfaction they had in reaching out to

6     someone in getting a response.

7          THE COURT:  Okay.  I want to go to another subject now.

8     Is there anything else, by the way, on the call center that

9     we have not covered?

10         MR. HENIFIN:  I don't believe so, Your Honor.

11         THE COURT:  Oh, let me ask this then:  Is there any

12    intentional plan to expand the call center?

13         MR. HENIFIN:  No, Your Honor.

14         THE COURT:  So are you happy with the number of people

15    you have already?

16         MR. HENIFIN:  Yes, Your Honor.

17         THE COURT:  And you told me how much has been reduced,

18    the calls.  Do you anticipate a further reduction, or is

19    this is a static number we reached?

20         MR. HENIFIN:  I would assume -- assuming we are at a

21    static point until we start actually shutting off water

22    again to try to get folks to pay their bills.  Experience

23    with utilities show that when you start disconnecting folks

24    for un- -- nonpayment, your call volume jumps up

25    significantly at that point, because people want to figure

1    out how to -- not to get the water cut off.  So when we

2    start that back up to try to get people back in the habit of

3    paying their bills, we would expect a significant increase

4    in call volume for some period of time after that.

5        THE COURT:  Let's talk now about the -- the bill

6    paying.  One time you told me that a number people weren't

7    even on the system; is that so?

8        MR. HENIFIN:  We still believe that's so.  We're still

9    working to try to identify specific addresses.  We believe

10   that's somewhere in the 7,000 range across the city.

11       THE COURT:  One time, I think one of the first status

12   conferences we had, I think you told me that you thought

13   there was somewhere upwards of 6,000 folk who were not on

14   the -- on the list.

15       MR. HENIFIN:  Somewhere in the six to seven is what we

16   think by matching rough numbers on the geographic

17   information system of the assessor's data and then our

18   customer information account data, and those aren't exact

19   match science.

20       We are working today with a consultant to try to get

21   better data to identify the specific addresses we need to go

22   look for, whether they have got water and whether they have

23   an account.  So we have still got a lot of cleanup to do.

24       THE COURT:  When you first took over your

25   responsibilities and looking over the system and its

1    problems and working with the city, were you advised by the

2    city that the city suspected that there were 6,000 to 7,000

3    people not on the bill list?

4        MR. HENIFIN:  I don't know that I was ever given a

5    number, but the city did -- many folks in the city told me

6    there is a group that was straight piping, essentially

7    bypassing meters.  So they were aware that this was a

8    practice within the city.

9        THE COURT:  Did the city officials with whom you were

10   working give you ever a number that there were some 6,000 or

11   7,000 folk who weren't in the system?

12       MR. HENIFIN:  No, Your Honor.

13       THE COURT:  Did they give you any number of people whom

14   they suspected were not in the system?

15       MR. HENIFIN:  No, Your Honor.  Just they knew that

16   there were evidence -- they had seen evidence of straight

17   piping where meters had been taken out or meters were never

18   put in.  And they were -- and so there was not an account,

19   because there was no meter.

20       THE COURT:  Now, what do you mean by no meters put in?

21       MR. HENIFIN:  So in some cases when new development was

22   built and the city was slow in putting a new meter in, the

23   building, the development, either a residential or

24   commercial building, would get tired of waiting and they

25   would actually illegally pipe from the city side to there --

1    there without a meter in.

2        So they would connect themselves to the water using

3    their own plumber without putting a meter in place.  And

4    then there was some, evidently -- anecdotally, I was told

5    that people did that on their own.  Take the meter out and

6    would pipe across from the city side to their side and

7    eliminate the fact they had a meter at all.  So it would

8    fall out of our account ultimately.

9        THE COURT:  How did you reach the number of 6,000 to

10   7,000?

11       MR. HENIFIN:  So we took a -- the information from the

12   assessor's database that had all the parcels for the city

13   that have improvements on the parcels.  So, you know, many

14   parcels might be vacant.  And, again, this isn't an exact

15   science, because you have to go out and see if the

16   improvement actually does have water.  It might be an

17   abandoned building.

18       But when you take all of the improved parcels and you

19   match them to our accounts that we have, there is about

20   7,000 improved parcels in the assessor's database that don't

21   have a corresponding water account in the water account

22   database.

23       THE COURT:  Well, that would seem to say that the

24   number is more than 7,000, then, because if it is just the

25   improved areas and you find that there are 7,000 missing,

1    what about the ones who are stealing water and those who are

2    transferring it across the street, et cetera, which you

3    state, or the plumbers who are coming in and doing things --

4        MR. HENIFIN:  Those should still show up, Your Honor,

5    because if they don't have an account in our system, they

6    should still show in the assessor's database as an improved

7    parcel.  They are getting water somehow, but they just

8    aren't in our system.  So they would be in that same number.

9        THE COURT:  So this 6,000 to 7,000, what are you doing

10   about that?

11       MR. HENIFIN:  We are working to get a better lockdown

12   on the data, because it's not all really clean.  So we have

13   hired Horne, a local consulting firm, to help us with the

14   data analytics and looking at various sources so they can

15   bring in other -- like, postal off- -- the post office has

16   databases they can get to.  There is other public databases.

17   They can verify addresses.  They can go back and look at the

18   assessor's data and make sure that all of that fits, go back

19   through our customer database and make sure we aren't

20   missing something or it was a mismatch, and then get a more

21   fine point on exactly which addresses they suspect may have

22   water service but are -- are not in our system.

23       And so as they work through that process this summer,

24   we should get a much better feel of the actual addresses,

25   and then it's a matter of hiring a consultant that has got

1    feet -- you know, people -- surveying company, basically,

2    local surveyors, to go out and look on those properties for

3    meters, for water, to try to understand which ones need to

4    have accounts, and then we would start this process of

5    adding those into the accounts and getting them metered and

6    getting them in place in the accounts so they start paying

7    the bill.

8        THE COURT:  Well, what progress has been made since you

9    started to reduce this number?

10       MR. HENIFIN:  Other than working on this mapping and

11   trying to figure out where it is, no actual efforts have

12   been made to go field-verify because we don't have that

13   clean data list yet.  That's -- we are working on that.

14   They are working as we speak.  But once we have that list,

15   we will start the -- the actual fieldwork was the hard work,

16   which -- getting out and verifying what's actually on each

17   of those pieces of -- of land in the city.

18       THE COURT:  What would you calculate, speculate,

19   estimate is a loss to the City of Jackson in revenue by this

20   6 to 7,000 people not on the bill-paying schedule?

21       MR. HENIFIN:  You could assume, you know, $50 a month

22   for each of those, and that's a -- just a number at this

23   point.  But if you had 6,000, $50 a month, you know, that's

24   3 million a month.  I'm doing my mental math very well

25   there, Your Honor.  But it's a -- it would be 6,000 times --

1    6,000 times -- say 6,000 times 60 -- $50 a month would be

2    300,000.  Thank you.  The mental math person behind me using

3    a pencil.  So 300,000 a month roughly, so that's 3.6 million

4    a year.

5          THE COURT:  $300,000 a month?

6          MR. HENIFIN:  Yes, Your Honor.

7          THE COURT:  Okay.  When you first came on, you told me

8    that you were not informed as to the number of people

9    suspected to be not paying the bills --

10         MR. HENIFIN:  Yes, Your Honor.

11         THE COURT:  -- or definitely was not in the same areas

12    you are talking about now.

13         MR. HENIFIN:  Yes, Your Honor.

14         THE COURT:  And you are telling me that that same

15    number is still existent right now.

16         MR. HENIFIN:  Yes, Your Honor.

17         THE COURT:  So you are telling me that the city is

18    still missing this kind of money.

19         MR. HENIFIN:  Yes, Your Honor.

20         THE COURT:  How much money is it going to cost to get

21    to the bottom of that?

22         MR. HENIFIN:  Well, the data work we are doing is in

23    the -- not to exceed a half a million dollars.  And then I

24    don't have an estimate yet on what it's going to take to

25    field-verify those locations.  But I would say it's in that

1    same range.  So we are probably spending about -- we will

2    ultimately spend about a million dollars to solve that

3    problem.

4         THE COURT:  Whose money will that be?

5         MR. HENIFIN:  The combination, again, of federal

6    dollars and the ratepayer dollars.

7         THE COURT:  And what would be the max -- the mix on

8    that?  How much from the federal government, and how much

9    otherwise?

10        MR. HENIFIN:  I don't have a concept yet.  I haven't

11   worked those numbers out.

12        THE COURT:  And even though you haven't worked all of

13   this out, if you have thought about the end of the road on

14   this point, how much time do you think it is going to take

15   before this matter is resolved?

16        MR. HENIFIN:  Our goal at the moment due to some other

17   issues we are doing around the billing system would be to

18   have this worked out by the end of this calendar year.  But

19   that's a -- that's a very optimistic date now that we are

20   standing here in front of you on July 7th.  Time seems to be

21   moving at an extraordinarily fast pace at this point.

22        THE COURT:  Do you need any special equipment for this?

23        MR. HENIFIN:  No, Your Honor.

24        THE COURT:  Is this just personnel, time, and study?

25        MR. HENIFIN:  It's going to be -- the data work is --

1      is computer scientist and data analytic folks that are doing

2      that.  And then on top of that, it's just putting people out

3      there in the field to go verify these properties one at a

4      time.

5          THE COURT:  Is the computer structure that's in place,

6      is it operative efficiently enough to resolve the problem

7      without the necessity to buy any additional equipment?

8          MR. HENIFIN:  Oh, yes.  I mean, we are essentially

9      using contractors to do this, so we don't need -- they don't

10     need to buy equipment.  We don't need to buy equipment.

11     They may be buying access to some of these other data

12     sources, but they -- they've got all the equipment they need

13     to make this happen.

14         THE COURT:  This group that came to see you, did they

15     discuss these problems with bills?

16         MR. HENIFIN:  No, Your Honor.

17         THE COURT:  Did you talk to them about it?

18         MR. HENIFIN:  I'm sure I discussed the overall

19     challenges of the revenue not being where it needs to be,

20     the fact that we're still putting meters in, we've had the

21     years and years of meter challenges here in Jackson.  That's

22     pretty much a standard discussion I have with almost anyone

23     that comes to visit with questions about the water system.

24         THE COURT:  And what did that group have to say about

25     that?

1        MR. HENIFIN:  I don't recall any specific comments or

2    suggestions.

3        THE COURT:  Did they complain that the meter groups

4    were not sufficiently diverse?

5        MR. HENIFIN:  I don't recall any complaints around the

6    meters.

7        THE COURT:  Did they quarrel with your numbers at all?

8        MR. HENIFIN:  I didn't really provide -- other than the

9    gross numbers of water loss, that was probably the number

10    that -- they didn't quarrel with it, as I recall.  You know,

11    it's just a -- it's a breathtaking number when you tell

12    people that you are putting almost 50 million gallons a day

13    into a system that a population should only need 15 to 20

14    million of that, maybe 25 if you really want to add some

15    other losses.

16        So the fact that we are putting out twice as much water

17    as the city should need is technically -- or it does tend to

18    make people stop and think and question.  But I don't recall

19    specifics with -- with that group.

20        THE COURT:  Could you say that again?  This city is

21    putting out twice as much water as a city this size should

22    need?

23        MR. HENIFIN:  Yes, Your Honor.

24        THE COURT:  And you contend that that is so because

25    bills not being paid, or is there some other reason?

1          MR. HENIFIN:  That's more leaks like the one we found

2     that you've referenced many times in your courtroom, Your

3     Honor.  So there's -- nothing as dramatic has been found,

4     but we are out looking daily to try to find where other

5     large leaks are, because we are losing water in places that

6     we aren't seeing water be lost.

7          So similar to the golf course, it was an abandoned golf

8     course.  No one knew to look there.  It wasn't obvious to

9     people.  Wasn't flowing down the street.  I think we've got

10    many leaks that are in similar situations where no one sees

11    them.

12         The next step we are taking is actually a satellite

13    leak detection company that will do multiple flyovers over a

14    period of time using satellite imagery.  They have presented

15    at a conference recently, and we have talked to them.  It's

16    not that expensive, and we get the entire city covered.  We

17    are holding out promise that that will identify some of

18    these large leaks that we are not seeing to the visible eye.

19         So, again, we are putting lots of effort into leak

20    detection in very many ways.  So satellite; acoustical leak

21    detection on the pipes; you know, walking right-of-way where

22    we can get to it; and, again, begging the community if they

23    see an unusual-looking leak to call us at (601)500-5200 and

24    let us know.  Shameless plug for our call center.

25         THE COURT:  And on this matter of the satellite

1     imagery, who will be paying for that?

2         MR. HENIFIN:  That will be the federal government and

3     our ratepayers.  Largely the federal government.  As part --

4     one of the projects we put in was leak detection as part of

5     the -- one of the projects that got grant funding.  And so

6     there -- we didn't necessarily know we were going to be

7     using satellite.  But we are using every method that we can

8     find that holds promise, and this is not a very expensive

9     method and gets us a lot of coverage and potentially we find

10    some big leaks that way.

11        THE COURT:  So far you have told me that there are some

12    heavy-duty items to be addressed in the future.

13        MR. HENIFIN:  Yes, Your Honor.

14        THE COURT:  And that the cost will be borne by the rate

15    that the taxpayers are paying and by monies from the federal

16    government.

17        MR. HENIFIN:  Yes, Your Honor.

18        THE COURT:  Is the rate structure presently in place

19    covering the number of rate-paying citizens enough to take

20    care of these matters, in your estimation?

21        MR. HENIFIN:  It -- I would say the rate structure if

22    you could collect, you know, 95 to 100 percent, we would

23    have enough revenue.

24        THE COURT:  95 to 100 percent.

25        MR. HENIFIN:  Which is a typical water utility

1    collection rate.  Most of them are closer to 99 percent,

2    because people pay their bill when you cut their water off.

3         Now, across the country, folks stopped doing that

4    during COVID.  Public health disaster, of course, you didn't

5    want people not to have water to wash hands and take care of

6    their health.  So utilities across the country stopped

7    shutting off, and we saw an immediate decline in collection

8    rates.  But as utilities have brought those back on across

9    the country, the collection rates have gone right back to

10   where they were pre-COVID.

11        Again, people -- it's a very disruptive method of

12   getting people to pay their bill when you shut their water

13   off.  It's -- it gets them to come pay their bill.  You like

14   getting -- you know, you're walking out of the grocery store

15   with a cartful of groceries and not checking out, you know,

16   someone is going to catch you in the parking lot, and you're

17   probably not going to do it again.

18        THE COURT:  So then what I was asking is currently, at

19   the percentage of payers we have and the rate that we have,

20   are we expected to have enough money to cover these projects

21   you're talking about?

22        MR. HENIFIN:  Well, not -- not if we don't make some

23   changes there to get the collection rate up, get some

24   confidence built in the billing system.  So there's -- there

25   is a proposal that you have yet to see and we haven't

1    revealed to anybody at this point.  But we are working on a

2    proposed change in the rate structure to make it easier,

3    more transparent, easier to understand your bill, and make

4    sure we get the revenue we need to continue to operate.  So

5    that will be forthcoming later this month, likely to you and

6    then to the public.

7         THE COURT:  The raw amount of revenue coming in

8    today --

9         MR. HENIFIN:  Yes, Your Honor.

10        THE COURT:  -- is that enough to cover?

11        MR. HENIFIN:  No.  What we are actually collecting

12   today is not.  We're getting -- we're getting behind every

13   month, because we are collecting roughly 56 to 60 percent of

14   what we're billing.  And, again, we're not even billing to

15   everybody as you talked earlier about the number of accounts

16   that are not even in the system.

17        So this has been a challenge for the city for months

18   and years, that they can't bring the revenue in they need to

19   survive.  And that's probably one of the reasons they are in

20   the position they're in today, is years and years of

21   declining revenue.  I think the last time they maybe had

22   enough revenue to operate the system was '18, '17, somewhere

23   in that range -- '14 or '15.  So it's been a long time since

24   they've been able to generate enough local revenue to pay

25   all of their bills.

1          THE COURT:  So you said that that is a declining

2     financial matter that every month then the -- the bills get

3     further behind?

4          MR. HENIFIN:  Essentially you can't keep up, so that's

5     why the -- you know, the federal government grant that we've

6     gotten will bridge this until we can get collection rates

7     up, rates established that are going to be self-supporting

8     going forward, and they're burdened with a tremendous amount

9     of debt, which is -- you know, you also have to collect

10    enough money to pay that debt service every month -- or

11    every -- every year.

12         So, you know, the financial plan I submitted to the

13    Court and to the parties calls for retiring that debt, and

14    we're working hard to try to figure out a way to get that

15    done.  That's $23 million a year you pay to debt.  So if

16    you're not collecting -- if you're only collecting

17    56 percent, you typically need all that money to operate the

18    sytem, and you don't have any left to pay the debt, which is

19    not an option.  And so I think they have been having to hit

20    their general fund and other sources to make up the

21    difference at the end of the year to balance the books on

22    the water system.  And that's been really the -- the cause

23    of this is this downward spiral in revenue and funding.

24         THE COURT:  Let's go back to why the problem has gotten

25    to where it is.  It's on the collection side; is that

1    correct?

2        MR. HENIFIN:  I think it -- you could trace a lot of

3    this probably back to the Siemens -- failed Siemens meter

4    project, which really impacted the ability to collect.  You

5    know, so they had a really challenging metering project that

6    failed.  I think the city sued Siemens and -- and got their

7    judgment.  So I think that -- whether they admitted guilt or

8    not in that, I would say that Siemens knew that they didn't

9    do what they were supposed to do and did settle for the full

10    amount that they paid -- that the city had paid Siemens.

11        And so that put them on this downward spiral of folks

12    not having meters, not having accurate meters, not being

13    able to get bills out.  They just haven't been able to

14    recover.  And so it's a very unusual situation, I think.

15    But it's one that's going to take, you know, the combination

16    of federal dollars, this drastic position we took here with

17    the -- the Court took with the stipulated order and the

18    parties all agreed to.  Those are all drastic steps to try

19    to turn this back around, and it's largely -- you could

20    trace it all the way back to that -- probably the Siemens

21    contract as the single biggest problem that has caused what

22    we are currently in.

23        THE COURT:  And so where are we on that right now?  How

24    far down the road are we on --

25        MR. HENIFIN:  So the new metering project has got about

1   73 percent of the meters in place.  We continue to put

2   meters in every week, so we're making progress.  But that's

3   largely going to be -- well, they will complete the known

4   accounts and the known meter locations probably this fall.

5        But a number of times we haven't been able to find

6   existing meters on existing properties, which, you know, you

7   got to go take the old meter out, put the new meter in.  You

8   got to find that.  So we have got work to do there.  We have

9   got to find these other ones that have no accounts.  There's

10  still a lot of work to be done.  I would say we would have

11  all of the meters in place and -- and be building a -- some

12  confidence level in the meter reads by this time next year.

13       THE COURT:  One year from now?

14       MR. HENIFIN:  Yes, Your Honor.

15       THE COURT:  And at that time, would you anticipate that

16  the water prices or water payments, water bills, would go

17  down?

18       MR. HENIFIN:  No, Your Honor.

19       THE COURT:  It'll still be the same?

20       MR. HENIFIN:  Yes, Your Honor.

21       THE COURT:  Because --

22       MR. HENIFIN:  Some will pay more.  Same will pay less.

23  But we need to get -- we need to generate a little over 70

24  million a year, and we are not generating that.  Even in

25  good years when they were doing all right, you know, costs

1    continued to escalate.  I think the -- the last great year

2    of collections was in the 65 -- 60 -- and I'm just -- I'm

3    guessing at this point.

4        THE COURT:  But it has not been sufficient?

5        MR. HENIFIN:  Correct.  It hasn't been sufficient for

6    many years.

7        THE COURT:  And that's a trickle-down effect, which

8    affects the facilities that could be purchased and equipment

9    that could be purchased?

10        MR. HENIFIN:  And pay you can pay your employees.  All

11    of those things have just compounded.

12        THE COURT:  Okay.

13        MR. HENIFIN:  It's a financial crisis as much as a

14    water crisis.

15        THE COURT:  And the amount of money coming in from the

16    federal government, you are saying it won't be enough?

17        MR. HENIFIN:  A lot of it is designated for certain

18    purposes.  So the 600 million that we got, 150 of that is

19    for a variety of purposes, which includes operation and

20    maintenance.  So we got 75 million of that approved for

21    operation and maintenance.

22        But that can offset some of these losses and the lack

23    of revenue on the near term, but that wouldn't be sufficient

24    to last very long on a system that needs 70 million a year.

25    So a combination of what we're collecting now locally,

1    improvements we can make on that, and use of that 75 million

2    for operation and maintenance will take us a long way.

3        Then the other dollars were really project-specific for

4    a lot of different projects that we've got.  You know, the

5    order included the 13 priority projects that I'm supposed to

6    execute, and we're moving those directions.  So most -- the

7    rest of the dollars are for that.

8        And then the debt retirement and the financial

9    management plan takes a chunk of the part of that 600

10   million out as well but gets us on firm footing going

11   forward, because we don't have the $23 million a year debt

12   service payment.  It's pretty important to get the debt

13   retired, get the revenue increase back to where it needs to

14   be, get people paying their bills.

15       And then if all that happens in this magic world that I

16   like to live in and we're moving forward, in five years the

17   system should be generating enough money to reinvest in

18   itself year after year about 20 million a year, and we

19   shouldn't need influx of federal dollars.

20       We wouldn't turn it away.  We'd always take federal

21   grants if we can get them, but we should be self-sufficient

22   in about five years.  But a lot of those things have to all

23   come together, and it's a lot of unknowns.  I'm trying to

24   piece all of that together.

25       THE COURT:  Okay.  Let's go to another matter.  Hang on

1    just one second.  I want to take up now the quality of the

2    water.

3        MR. HENIFIN:  Yes, Your Honor.

4        THE COURT:  We talked about this at the very last time

5    that all of us were together.

6        MR. HENIFIN:  Yes, Your Honor.

7        THE COURT:  So I just want you to iterate again, what

8    is the quality of the water?  The city attorney tells us

9    that some people have been complaining about the quality of

10   the water and discoloration of the water.  What about it?

11       MR. HENIFIN:  So the water meets Safe Drinking Water

12   Act and as a result is safe to drink.  There are, as I

13   explained last time, secondary standards around aesthetics

14   on the water.  It doesn't make it a health issue, but it

15   could be discoloration; it could be an odor; it could be a

16   taste.  Those are all secondary standards that do not pose a

17   health risk but doesn't make the water appetizing to drink.

18   And sometimes that's related to dead-end pipes, which,

19   again, you know, we found over 60 big valves shut, and we've

20   opened those.  Have we found them all?  Probably not.

21       They're also related to the small-diameter of water

22   mains throughout the city, and many of those are 2-inch

23   galvanized pipes, been in the ground for a long time.  They

24   tend to corrode on the inside.  And we are planning to

25   replace those over time, but that's 110 miles of pipes that

1  need to be replaced.

2       So folks that live on the streets with the

3  small-diameter pipes probably often see discoloration.  They

4  get a little odor out of those as well.  People that live at

5  a dead end or where we just opened a valve might see some

6  discoloration for -- off and on for periods.  No water

7  system, I believe, is ever a hundred percent crystal clear

8  and perfect every day.

9       The comment was made about the lack of boil water

10  notices.  That's not a -- you know, cities don't normally

11  have boil water notices every day or in large numbers, but

12  this population seems to be traumatized by the fact they've

13  had so many boil water notices over the years, so they

14  expect them regularly.

15       The standard is if you've got 20 pounds of pressure at

16  the meter, at the house, they don't need a boil water

17  notice.  A boil water notice is -- it's a precautionary boil

18  water notice, and when pressure drops way down below that

19  20 pounds per square inch at the meter, there is a chance

20  that you would actually suck things back into the system.

21  So as a vacuum would be created, potentially that could

22  actually pull bad material back in.

23       So all modern hose bibs at your house have a little air

24  gap basically built into them.  So if your hose is laying on

25  the ground in a puddle of, you know, water that might be

1    contaminated in some form or fashion, if you had an event

2    where the pressure was lost quickly in the system, your hose

3    can't suck that back in, and that's why you're always

4    concerned about pressure in the system.  You got to keep it

5    pressurized.

6         But it's 20 pounds at the meter, and in the past the

7    city didn't have that information.  They had a very -- the

8    only places they could measure pressure in the system were

9    at the two treatment plants.  And so they had their own

10   surrogate number that when it dropped below a certain level,

11   they assumed that some meters might be below 20 psi, but

12   they didn't have data to show that.

13        We got multiple pressure gauges in the system now.

14   We're keeping a very close track of where the pressure is at

15   any given time.  Opening all those valves has improved

16   pressure.  Are we perfect?  There's still two homes on

17   Forest Hill that have very, very low pressure almost all the

18   time.  They say they've had it for ten plus years.  I think

19   the mayor knows at least one of those people pretty closely,

20   because he tends to complain on a regular basis, Mr. Cole.

21        I'm on a first-name basis with him as well now, and

22   we're working hard to find a near-term solution.  We do have

23   a long-term solution for those, long term being sometime

24   this summer we will solve those two houses.  Those are the

25   only two homes in Jackson that I'm aware of that are having

1    a recurring low-pressure problem, and we're dealing with

2    them directly.  So the fact that folks are saying they're

3    not seeing boil water notices, we still issue them when we

4    have big pipe breaks.

5         THE COURT:  Slow down.

6         MR. HENIFIN:  Sorry.  Getting me going.  No, the boil

7    water notices are still being issued on areas where we have

8    pipe breaks, and those are still going out.  I know we're

9    getting one or so a week, very isolated around the people

10   directly impacted by that.  So we haven't had any citywide

11   or even large-scale boil water notices since January, and I

12   am jinxing myself, I believe.

13        THE COURT:  So in the main, the water in Jackson is

14   safe?

15        MR. HENIFIN:  Yes, Your Honor.

16        THE COURT:  So what percentage would you say

17   unqualifiedly that the water is safe?

18        MR. HENIFIN:  I would say a hundred percent based on

19   all the requirement -- all of the testing requirements and

20   all the results we've had -- we have -- we are -- the water

21   is safe.

22        THE COURT:  Are these tests that have been conducted

23   randomly done?

24        MR. HENIFIN:  No.  So there's a variety of tests.  You

25   know, there's daily tests at the treatment plants to make

1    sure the water is meeting the parameters it's supposed to

2    meet.  There's tests in the distribution system that are

3    done.  And then there's the lead and copper rule testing,

4    which is done semiannually at the hundred plus locations,

5    and those are the ones that have drawn a lot of the

6    attention.  And, again, we have not had -- exceeded the

7    required action level, 90th percentile, in the last six

8    years of testing every six months.

9         So that was the 1300 tests I referred to that have been

10   taken, and we have never exceeded the 90th percentile of the

11   action limit for lead.  A mouthful to say that we're meeting

12   Safe Drinking Water Act requirements.  By definition, Safe

13   Drinking Water, if you meet their requirements, the water is

14   safe to drink.

15        THE COURT:  Now, the water might be safe to drink, but

16   are you telling me that some water might be discolored?

17        MR. HENIFIN:  Yes, Your Honor.

18        THE COURT:  And discolored, are you saying that it is

19   brownish or brackish?

20        MR. HENIFIN:  Typically looks brownish from iron or

21   whatever has gotten into the -- the system at that point.

22   From the water standing still next to a closed valve or some

23   other issue in the system, it can pick up some brownish

24   color.  There's -- inside all of our pipes, there is

25   essentially buildup of scale and what they call tuberculosis

1    inside the pipes.

2        Not the -- it isn't the disease.  It's the stuff that

3    builds up inside the pipe.  It's just scale, and it does --

4    can cause some discoloration as water direction changes,

5    pressure fluctuates, those kinds of things.  But it's not

6    typical.  When we open a valve, we flush the hydrants nearby

7    until it runs clear, and that pretty much takes care of it.

8        THE COURT:  But in the meantime, some water may come

9    out brown.

10        MR. HENIFIN:  Yes, Your Honor.

11        THE COURT:  But you're saying this is a temporary

12    matter?

13        MR. HENIFIN:  Most likely.  It should be in most cases.

14    If it's longer term, we ask, again, people call us and let

15    us know their water is brown.  Let us come out and look.

16    We'll test it.  We'll look for the reason it's there.  And

17    we've got scripts around brown water where our call center

18    takers will actually ask questions about the brown water,

19    have they checked their hot water heater, have they flushed

20    their own system.  There's lots of reason that the water

21    inside your house might be brown, and not all of them are

22    based on the city water coming to your house.

23        THE COURT:  But the water that comes to the house is

24    expected to be clear.

25        MR. HENIFIN:  Yes, Your Honor.

1          THE COURT:  And is expected to have no odor, correct?

2          MR. HENIFIN:  Yes, Your Honor.  That's our goal.

3          THE COURT:  And so that if waters comes to a house

4     which is brown and possessing some sort of odor, then are

5     you telling me that it was not like that when it left the

6     plant?

7          MR. HENIFIN:  No, it wasn't like that when it left the

8     plant.  It picked that up typically in the distribution

9     system, which, again, we're responsible for.  So it's a

10    hundred percent our -- our issue.  But we're responsible to

11    make sure it's safe to drink.  We also try to meet our

12    color, odor, and taste requirements as well across the

13    system.  But from time to time, it doesn't meet those, and I

14    think that's the same in every water system.

15         THE COURT:  So it's possible for some homeowner to

16    receive some water which is brown, has a taste, and odor?

17         MR. HENIFIN:  Yes, Your Honor.

18         THE COURT:  Is that correct?

19         MR. HENIFIN:  Yes, Your Honor.

20         THE COURT:  But you're saying that's all from the

21    distribution center -- system and not as how the water left

22    the plant.

23         MR. HENIFIN:  That is correct.

24         THE COURT:  One time, I think during one of these

25    sessions, I asked about the water that comes from the plant

1    to be directed to the houses and that it then, when it's in

2    the middle of the street, is on city property; that is, city

3    tubing and culverts and stuff.

4        MR. HENIFIN:  Yes, Your Honor.

5        THE COURT:  But then once it gets on the homeowner's

6    property, then it goes into a different system, which

7    belongs to the homeowner; is that correct?

8        MR. HENIFIN:  That is correct.

9        THE COURT:  How much of a concern is that and the cost

10   that a homeowner might one day have to pay to get all that

11   cleared unless some method is worked out for either federal

12   dollars or revenue water dollars would be directed to paying

13   for that so the homeowner won't have to bear the cost?

14       MR. HENIFIN:  There are federal dollars specifically

15   for the service line -- from the line in the street to the

16   line -- to the house itself, there are federal dollars

17   available for that service line replacement.  Not just lead.

18   It's -- in our city it appears that most of the service

19   lines, the majority are galvanized.  Again, similar to the

20   2-inch pipe I discussed.  So they tend to have rust buildup

21   inside them.  They might be restricted because they've built

22   up rust and it doesn't carry water as much.  And a good

23   number, I'd say well over half, of our residential houses

24   have galvanized service lines.

25       Those are eligible for replacement under a federal

1  program that was part of the Bipartisan Infrastructure Law.

2  And so we've applied for some special set-aside for some

3  service line replacement that just was announced by the

4  State, say, about two weeks ago, and it looks like we will

5  potentially get some money for that, and we'll continue to

6  look for other federal dollars on the service line

7  replacements, and that's priority of what we're doing.

8      If we find any lead, which, again, we have not found

9  any lead, we would do those as soon as we could.  The

10  galvanized ones will be put into a program to replace those

11  as we're doing a lot of the small-diameter pipe work across

12  the city.

13      THE COURT:  So there's an effort in place to try and

14  obtain funds --

15      MR. HENIFIN:  And that's --

16      THE COURT:  -- that will pay for these service lines

17  that otherwise will be the responsibility of the homeowner?

18      MR. HENIFIN:  Yes, Your Honor.  There's still

19  responsibility of the homeowner inside the house.  We

20  aren't -- there's no funding available, readily available,

21  for doing any work inside the house.  And that's an area

22  that we're exploring with some philanthropic organizations

23  to see if we can find some.  If someone is having some

24  issues interior to their home with plumbing, we don't have

25  any source of money for that, and that's a great place for

1    the philanthropic community to step up to help folks deal

2    with the plumbing that's in their walls, under their floors,

3    in their house, their fixtures.

4        But, again, we haven't identified any of those homes

5    that would be eligible, what problems they're having, and

6    what the repairs might be.  But that's another sort of dream

7    we've got in our planning at some point to address that.

8    You know, we're swimming up a lot of different directions

9    here in trying to keep everything moving with a relatively

10   short timeline and minimal staffing.  So we're getting what

11   we can done.  A lot of things will be added as we move

12   forward.

13       THE COURT:  Now, when you say "philanthropic

14   organizations," you mean charitable organizations?

15       MR. HENIFIN:  Foundations of some sort that -- there

16   are several that are interested in water, investing in

17   water.  So we're going to be reaching out to them to talk

18   about interior building plumbing for some homes.

19       THE COURT:  Have you gotten a lot of calls about water

20   which is brown?

21       MR. HENIFIN:  I don't know the number.  I know we get

22   those on occasion.  I'd say -- I couldn't even venture a

23   guess at how many.  We'll have better data as the call

24   center continues to build that database for us.  We'll be

25   able to see how many calls were actually for discolored

1    water.  So in the near future, we'll start having real

2    numbers to start bringing forward.

3         THE COURT:  Are you keeping a record book of those in

4    particular?

5         MR. HENIFIN:  Those -- well, it's a -- or it would be a

6    code in the system.  So putting everything into a

7    computerized system so we would see -- we could sort for the

8    brown water complaints and be able to pull all of those up.

9         THE COURT:  And what about water which simply has a bad

10   odor?

11        MR. HENIFIN:  If they called that in and that was their

12   complaint, we would log that as well.

13        THE COURT:  All right.  And the same thing with bad

14   taste?

15        MR. HENIFIN:  Yes, Your Honor.

16        THE COURT:  Are there any other categories besides

17   taste and odor and color?

18        MR. HENIFIN:  Those are the big three.  I think there's

19   two other aesthetic secondary limits, but I'm not -- I'm

20   not -- it's not coming to my head at the moment, Your Honor.

21        THE COURT:  Okay.  And you don't have any issues on

22   soft versus hard water?

23        MR. HENIFIN:  No, Your Honor.

24        THE COURT:  And so the water in Jackson would be

25   classified, I believe you said at one time, as soft water?

1          MR. HENIFIN:  Yes.  It's soft at this point, or

2     right -- about neutral.  I mean, it's not -- I don't think

3     on the calcium hardness scale it would be too far off one

4     way or the other.  We don't have a big issue one way or the

5     other.  It's definitely not very hard water.

6          THE COURT:  Now, soft water produces more bubbles,

7     right?

8          MR. HENIFIN:  Makes the soap feel like it sticks to

9     you.  That's right.

10         THE COURT:  Okay.  And the hard water is hard to

11    generate bubbles?

12         MR. HENIFIN:  I believe so.  I'm starting to lose my --

13         THE COURT:  Perspective on that?

14         MR. HENIFIN:  I am, yes, Your Honor.

15         THE COURT:  Okay.  Now, let's take a 12-minute recess.

16    I know you're tired.  Well, let's take a 12-minute recess.

17    I just have a few more questions.  All right?

18         MR. HENIFIN:  Yes, Your Honor.

19         THE COURT:  We're in recess for 12 minutes.

20                    (A recess was taken.)

21         THE COURT:  Mr. Henifin, I'm almost finished with my

22    list.  Now, I want to go to water pressure.  Talk to me

23    about water pressure.

24         MR. HENIFIN:  So water pressure is very important, as I

25    was describing on the -- maintaining at least 20 pounds at

1    each meter keeps us from having anything pulled back into

2    the system with a vacuum forming.  We've been making great

3    progress on water pressure with the valve openings that

4    we've found closed valves and opened.  We're over 60

5    large-diameter valves that have been opened since March when

6    we started this work.

7        We continue to have a contractor working on valve

8    assessments through the whole city.  That contract will

9    essentially touch every valve in the system to understand

10   all about the valve, what position it was in, get it open if

11   it can be; if it needs to be repaired, what kind of repairs

12   need to be made; if it needs to be replaced, we'll develop a

13   list and a capital project to follow on with valve

14   replacements.

15       That's Wachs Water.  They're a division of Xylem, one

16   of the largest companies that does work in water across the

17   world.  We awarded that contract in January, and they

18   started on-site in February on a small scale.  They are much

19   larger now.  They're also doing fire hydrants for us after

20   we get the valve work done.  So sometime later this summer,

21   they will start flow testing and fixing starting fire

22   hydrants throughout the system.

23       So the pressure is very important, I would say, for the

24   whole system.  We've had a long history of large portions of

25   the city with low or no pressure.  There's many -- the

1    disasters we've suffered both from years ago with the deep

2    freezes, the last summer's disaster, a lot of those resulted

3    in inadequate pressure to thousands of homes where they

4    didn't have enough water to shower or bathe or wash their

5    hands, run their dishwashers or their washing machines,

6    so -- or flush their toilets, which is even more important.

7         So those, we hope, are behind us just by opening valves

8    and keeping the plants running the way they are right now.

9    We should be able to sustain pressure using a combination of

10   the tanks.  We're doing an analysis of the distribution

11   system to understand if we need to create pressure zones so

12   that we can maintain pressure -- if we're having a problem

13   in one portion of the system, that we don't lose the

14   pressure in the rest of the system, and that's a typical way

15   a system is designed, a distribution system, especially for

16   a city this size.

17        You know, 110 square miles is a lot of area to try to

18   keep the same pressure throughout the system.  But we got a

19   combination of the elevated tanks.  So the tanks are all set

20   so that they are at an elevation that creates the right

21   pressure at that point.  And so the tanks fill at night when

22   people aren't using much water, and the pressure is

23   generally higher.  And then as people start using water, it

24   drains down a little bit during the day and gets filled back

25   up.

1       So they constantly float on the system if they're

2   working correctly.  And once we got a lot of those large

3   valves open, they're starting to operate the way they

4   should.  We've still got repairs to make on some of the

5   valving on those tanks, and we're working that project now.

6   So pressure itself, I think anecdotally I'm hearing it is

7   better than it's been in a long time.  Reality, we're seeing

8   that in our pressure gauges.

9       We don't have history, again, because there was no

10  visibility into the system pressure prior to us starting to

11  put pressure gauges out in the system.  So we get a better

12  feedback loop on what's going on in the system.  So I think

13  we're doing well on the pressure side.  We'll continue again

14  to fill in the gaps where we know we've had some challenges.

15      And then finally, you know, there are some specific

16  dollars that Hinds County allocated through their ARPA

17  program to make sure that if there is a specific project

18  that we can put in to help pressures in South Jackson,

19  they're paying for that as part of their American Rescue

20  Plan dollars that they put aside.  So they're very concerned

21  and interested in what we do for South Jackson.

22      We won't know those solutions until we have a fully

23  working hydraulic model.  We can model different scenarios

24  and understand what improvements need to be made, whether

25  it's booster pumps or tanks or pipes or pressure valves

1    or -- there's a variety of things that we could put in, but

2    we want to model that with an accurate model, ground truth,

3    with global positioning satellite positioning on every

4    asset, so we've got a very accurate model to work with, and

5    then we can develop solutions that decide what's the best

6    thing for pressure in South Jackson and the rest of the

7    system and start those projects to put those in place.  So

8    that work is all happening now.  We should have that

9    modeling and some of the solution sets identified this fall,

10   so we can start that construction this winter into next

11   year.

12       THE COURT:  Tell me about the metrics that go into the

13   standards.

14       MR. HENIFIN:  So the metrics on pressure are just

15   typically --

16       THE COURT:  On pressure.

17       MR. HENIFIN:  On all pressure?  It's typically in

18   the -- 60 pounds per square inch is what most water systems

19   operate, close around that number.  We put out about 80 to

20   90 at the plant.  Again, you're putting it into your large

21   transmission lines at that point.  It gets into smaller

22   pipes, you start losing pressure as you push water through a

23   system.  There's friction loss in the pipe.  Every time it

24   takes a turn, there's a loss.  Every time it goes through a

25   valve, there's a loss in pressure.

1          So as you continue to lose pressure in the system, you

2     either -- have to add energy back in to regain the pressure.

3     You try to make sure you pressurize it the right amount at

4     the plants.  And then the tanks are adding some pressure as

5     they fill and drain as part of the system.

6          So that's how our system is very simplistic.  It

7     operates just with those plant-pressurized pumping and the

8     tanks floating on the system.  It will probably be more

9     sophisticated when we figure out the solution set, whether

10    it's booster pumps or something else that might need to be

11    in place.  But that's -- so the goal is to try to keep the

12    system overly pressurized, generally around 50 to 60 pounds

13    per square inch, and then no meter below 20 pounds at any

14    time is the goal and the metric.

15         THE COURT:  50 to 60 pounds?

16         MR. HENIFIN:  Yes, Your Honor.

17         THE COURT:  That's the standard?

18         MR. HENIFIN:  That's typically what you see in a water

19    system in the United States.

20         THE COURT:  And where are we generally?

21         MR. HENIFIN:  We're -- I think we're in that same range

22    for most of our system.  There's parts of it that are below

23    that.  Again, that's what -- the modeling and solution will

24    try to get equalized pressure across the whole system.

25         THE COURT:  So what about the entire system?  A hundred

1    percent of the system, what percentage is at the standard

2    range?

3        MR. HENIFIN:  I'd say 70 percent maybe.  60 to

4    70 percent.

5        THE COURT:  Are there any outliers?

6        MR. HENIFIN:  Definitely the South Jackson area is the

7    biggest challenge, and they'll probably see the most

8    variation in the pressure.  But anecdotally, again, and from

9    what we're seeing in our pressure gauges out there, that's

10    become much more stable and much closer to the standard than

11    it's been in a long time.

12        THE COURT:  And of course by "outlier," you know what

13    I'm talking about.

14        MR. HENIFIN:  Yes, sir.

15        THE COURT:  I'm talking about some pressure which is

16    far beneath what the standard should be.

17        MR. HENIFIN:  And those two homes on Forest Hill are

18    definitely outliers.  And then the neighborhood across the

19    street from them, that's Shannon Dale, and that suffers more

20    than most, and they're an outlier.  And we've got a

21    solution.  We're looking -- we're working with the State to

22    put them back on -- put them on the well system.  They're

23    right where the surface water and well system come together.

24    And we've got adequate capacity in the well system.  The

25    process that has to happen to test the water, communicate

```
1    with the people, make sure everyone knows that their water

2    source is changing, make sure we're doing adequate testing,

3    that there are no unintended consequences from that.

4         But once we're able to do that and we're in that

5    process, talking to the State and making that happen, those

6    folks that are currently seeing more pressure -- lower

7    pressure and more pressure swings should be out of that

8    problem once we've converted them on to the well system.

9         THE COURT:  Now, these outliers that I mentioned, are

10   they primarily individual homes, or do we have whole

11   communities?

12        MR. HENIFIN:  There's one small neighborhood off

13   Shannon Dale.  I want to say that's a -- total, the number

14   of homes we're looking at switching over to the well system

15   is about 150 homes.

16        THE COURT:  Is about what?

17        MR. HENIFIN:  About 150 homes that we would be flipping

18   from the surface water system to the well system to solve

19   that long-standing pressure issue.

20        THE COURT:  So about 150 homes in that particular area

21   that are suffering fluctuating water pressures?

22        MR. HENIFIN:  Yes, Your Honor.

23        THE COURT:  Are they fluctuating, or are they

24   consistently low?

25        MR. HENIFIN:  They're -- you know, for the most part,
```

1    they're just a little bit low on most of them and very, very

2    low on two homes.

3    THE COURT:  Okay.  But to those who are fluctuating,

4    they are fluctuating between what and what?

5    MR. HENIFIN:  I don't have the exact numbers, but I

6    would say somewhere between 30 and 50.

7    THE COURT:  Between 30 and 50?  And what's the

8    practical effect of that in the home?

9    MR. HENIFIN:  So they just might see -- you know, they

10   would notice lower pressure when they take a shower.  If

11   they've got a second floor, they might see lower pressure at

12   their sinks.

13   THE COURT:  So shower effect?

14   MR. HENIFIN:  That would be the biggest impact would be

15   getting enough shower -- enough pressure to have a shower in

16   your upstairs bathroom if you had a two-story home.

17   THE COURT:  And the second floors, or upper floors?

18   MR. HENIFIN:  Yes, Your Honor.

19   THE COURT:  Any other demonstrable effect from the

20   lower water pressure?

21   MR. HENIFIN:  Not at -- not at those pressures.  Again,

22   the two homes I've referenced before on Forest Hill, they're

23   in the trickle range often.  They can't take showers.  They

24   can't run their clothes washers.  And, again, we're working

25   with an emergency water purveyor to try and find a solution

1    even before we get them flipped over to the well system.

2         THE COURT:  How long do you expect that to be?

3         MR. HENIFIN:  I think we can have -- so we're trying to

4    get something in there next week.

5         THE COURT:  Next week?

6         MR. HENIFIN:  For the -- those two homes?

7         THE COURT:  Yeah.

8         MR. HENIFIN:  The well flipping will happen some time

9    later this summer if we can get them on the well system.

10        THE COURT:  And the well system, will it provide

11   consistent water pressure?

12        MR. HENIFIN:  Yes, Your Honor, we believe so.  It's had

13   its inconsistencies in the past.  We found valves opened --

14   valves that weren't isolating it from the surface water

15   system, which were causing some of the problems.  We had

16   problems with -- there are six wells.  And this summer and

17   into the fall, we had to operate all six wells 24/7 to keep

18   the system pressurized and even get any gain in the tanks.

19        We're down to the point where we can operate with three

20   or four wells most of the time, have excess capacity, and

21   the tanks are holding water and storing it like they should.

22   And we were able to overcome the power failures during the

23   storms a couple of weeks ago, didn't lose our tanks

24   entirely.  We were able to maintain pressure and keep all

25   those folks in water because we had water in the tanks, and

1    we were able to get power restored to the wells that had

2    some power outages during the storms.

3        THE COURT:  Now, for those who do not understand what

4    the well system is all about, give a brief description of

5    how the well system works starting with where the water is

6    located and how it is drawn.

7        MR. HENIFIN:  So you've got an aquifer below the ground

8    here.  An aquifer is basically an underground storage of

9    water.  It's not really free water.  It's not like you go

10   down there and see a swimming pool in a cave.  It's in the

11   dirt and soils.  You have porous material that's, you know,

12   basically gravels that are -- allow water to fill in between

13   the voids.

14       You sink a deep well into that aquifer.  You test it

15   for figuring out where the best production can be.  And then

16   you run a well that essentially pulls that water out of

17   those soils, because, again, it's not just sitting under

18   there like a big pool.

19       You pull that water out, and you put it into the

20   distribution system for a well system.  And that's pretty

21   much what most of Mississippi has is a well, some piping

22   going out to serve the community.  You add a little bit of

23   chlorine typically to the well water.  So the treatment is

24   not anywhere near as complicated as surface water is.  You

25   add some chlorine to keep any bacteria from growing in the

1    water, and you distribute it.

2        Most well systems in Mississippi and elsewhere have

3    some sort of storage.  In our case ours is ground-level

4    storage for our well systems.  But you see it around.

5    Around the state you'll see an elevated tank and a well, and

6    those are all tied together with some piping and supplying

7    folks.  So it's a pretty simple process.  The groundwater

8    has usually got a lot more interesting taste, odor, and

9    color than surface water, but people like the fact that it's

10    largely unadulterated.  That water has been in the ground

11    for thousands -- depending on what aquifer it is and how

12    it's fed, that water could have been in the ground for

13    thousands of years untouched by humans.

14        And so you're getting water that's not like our surface

15    water sources where we get -- rainwater takes contaminants

16    into the surface water.  Much harder to do that in most

17    aquifers.  I'm not familiar with this aquifer we're sitting

18    on here.  I've got familiarity with the Coastal Plain

19    aquifers in Virginia and on the East Coast but don't know

20    much about this one.  Those are confined aquifers, which is

21    a whole different story.

22        But anyway, you're pulling water out of the ground,

23    you're putting a little bit of chlorine in it, and you're

24    sending it off to the customers from there.

25        THE COURT:  Is that the only chemical you add to the

1    water, chlorine?

2        MR. HENIFIN:  I believe that's all we are adding, yes,

3    Your Honor.

4        THE COURT:  And what else do you find in the water that

5    needs to be removed?  Anything?

6        MR. HENIFIN:  Well, a lot of people choose to have a

7    filter on their well system, because it has natural

8    impurities that are in the ground.  So you could have

9    minerals, which would add to the taste.  You could have some

10   discoloration.  A lot of times there's iron.  I don't know

11   exactly what we've got in the water here, in the

12   groundwater.

13       THE COURT:  But at the treatment center, that water is

14   tested?

15       MR. HENIFIN:  Correct.  So most -- most well water --

16   and, again, ours is a public well water system.  We've got

17   reason to test that to make sure that it's meeting -- it

18   doesn't have the same standards that have to be met for

19   surface water from a treatment perspective, but it is tested

20   regularly.

21       THE COURT:  Are those standards more onerous?

22       MR. HENIFIN:  Well, I think on the surface water

23   system, it's just more challenging to treat the water to

24   make sure that you're meeting all the standards than it is

25   on the well water system.

1      THE COURT:  And how can you determine how much well

2  water you can pull from the earth at a certain location?

3      MR. HENIFIN:  Well, normally when they're developing

4  wells, they would do a test to -- first, they do underground

5  analysis to understand where they want to put the well.  And

6  then you develop it by pumping it, you know, at maximum

7  capacity for a certain number of hours.

8      They make -- you know, the hydrogeologists make their

9  living on determining where the wells would be most

10  productive, how you would put in what size well, how much

11  water you can get out on a regular basis.  So there's a

12  whole science to that that I am not an expert on by any

13  stretch of the imagination.

14      THE COURT:  And these geologists, who employs these

15  geologists?

16      MR. HENIFIN:  Typically there's, you know,

17  well-drilling companies.  There's engineering consulting

18  firms.  I'm sure that the health department has some

19  hydrogeologists as well, because they regulate wells as well

20  across the state.  So it could be any number of, you know,

21  government agencies.  It could be consultants, engineering

22  firms.

23      THE COURT:  Now, let's move on to this discussion about

24  water pressure.  Over to the fire department and the fire

25  hydrants.  Any problems there?

1          MR. HENIFIN:  Well, I've always suspected that we were

2     on challenging thin ice maybe with our fire protection

3     system since I got here in September.  You know, we were

4     suffering from low pressure in the system for months last

5     summer, and there's a history of that over time.  Over the

6     last decade we've had, you know, many times when there's

7     been low pressure in the system.

8          Low pressure means that there could be hydrants that

9     don't have water for any period of time throughout the

10    system.  And the only way you would know that is the fire

11    department rolls up and opens it up and doesn't get enough

12    water.

13         And so I personally believe that Jackson's been

14    fortunate that we haven't had a major disaster when we've

15    had systemwide low pressure, which we've had a history of

16    for many, many years.  And so the fact that that hasn't been

17    a problem is -- maybe just fortunate that that hasn't been a

18    problem.

19         THE COURT:  You were talking about before you came?

20         MR. HENIFIN:  Before I -- when I first -- before I was

21    appointed and I came down as part of the U.S. Water

22    Alliance, I was very concerned about water pressure at

23    hydrants.  It's not something I've wanted to talk about in

24    public.  I didn't want to create fear.  But I was concerned.

25    And so, you know, all we were doing was trying to restore

1    pressure to the system so that maybe that fear could be

2    assuaged in some manner.

3        So the fact that originally -- in January, again, the

4    hydrant and valve contract we awarded, we recognized that

5    all those hydrants need maintenance.  They need to be looked

6    at.  They need to be tested.  The fire department has been

7    doing annual flow testing to the extent they've got funding

8    and staff to do that.

9        I don't know how much of a -- how many fire hydrants

10   were done every year, but they had a program, and they were

11   working it.  When they heard we were doing a contract to do

12   the same, they did come talk to us and we said here's our

13   schedule, here's what we're doing.  We didn't say don't

14   continue to do what you're doing, but they seemed pleased

15   that we were going to be doing this fire hydrant work.

16       I mean, they'll get repaired.  They'll be flow tested.

17   And it's just been coordinated from that perspective that

18   they knew we were going to be doing work.  We told them it

19   was going be toward the end of the summer.  So I don't know

20   that there's been any negative impact from that.

21       THE COURT:  Okay.  Well, I heard the city attorney say

22   that there was a problem with the fire hydrants.  Has the

23   city attorney spoken to you about this?

24       MR. HENIFIN:  Yes.  That there was a fire a month ago,

25   maybe, several weeks ago, where --

1        THE COURT:  Tell me about it.

2        MR. HENIFIN:  All I know is that the fire department

3    came.  Did not -- they connected to a hydrant that did not

4    have water pressure.  They had to move to another hydrant.

5    As I understand, this delayed their battling the fire by ten

6    minutes or so, and as a result, the structure was destroyed.

7    Luckily nobody was hurt, but the house was a loss.

8        THE COURT:  And could you tell me why there was no

9    pressure at that particular hydrant?

10        MR. HENIFIN:  I believe the hydrant was out of service,

11    and we didn't know that.  The city didn't know it.  It

12    hadn't been labeled.  I'm not sure why it was the way it

13    was.

14        THE COURT:  You said it was out of service?

15        MR. HENIFIN:  It just didn't have -- it couldn't get

16    water at that point.  So I don't know that it was a pressure

17    issue as much as it was a hydrant issue.

18        THE COURT:  Was that hydrant labeled as being out of

19    service?

20        MR. HENIFIN:  No, it was not.

21        THE COURT:  So did the fire department do a report on

22    this?

23        MR. HENIFIN:  I don't know.  I'm not aware of what they

24    reported.

25        THE COURT:  Did they talk to you about this?

1        MR. HENIFIN:  Not at the time.  I have yet to talk to

2   them directly about this.  I got a call from the mayor about

3   this.

4        THE COURT:  And what was that call about?

5        MR. HENIFIN:  Is that I might need to be worried that

6   the press has found that there was -- this hydrant didn't

7   work and a house was burned to the ground.

8        THE COURT:  But you say the hydrant did not work.

9        MR. HENIFIN:  Right.  They didn't have water at the

10  hydrant.  I don't know exactly the cause.

11       THE COURT:  You said the cause?

12       MR. HENIFIN:  I don't know the cause, whether it was no

13  pressure, bad hydrant.  I haven't investigated that.

14       THE COURT:  Okay.  And you don't know what the fire

15  department said about that?

16       MR. HENIFIN:  I know they said they didn't have -- they

17  couldn't use that hydrant.  So I don't know if the hydrant

18  was broken or just didn't have pressure.

19       THE COURT:  Okay.  I'm trying to understand exactly

20  what you're saying.  Do you know whether the hydrant was

21  operational?

22       MR. HENIFIN:  I don't believe it was.  But, again, I

23  don't have that information, Your Honor.

24       THE COURT:  So at this point, you don't know whether it

25  was water pressure or failure of the hydrant just to

1    operate?

2        MR. HENIFIN:  Correct.

3        THE COURT:  Now, you said the fire department went to

4    another hydrant.  Is that so?

5        MR. HENIFIN:  That's what I understand, yes, Your

6    Honor.

7        THE COURT:  And what was the distance between these two

8    hydrants?

9        MR. HENIFIN:  I don't know, Your Honor.  Typical

10   distance is 300 feet or 600 feet.  I mean, it's block by

11   block for insurance purposes.

12       THE COURT:  And so then the water -- so then the fire

13   department went to another hydrant?

14       MR. HENIFIN:  Yes, Your Honor.

15       THE COURT:  And did that hydrant work?

16       MR. HENIFIN:  As I understand, it did.

17       THE COURT:  And did it have adequate pressure?

18       MR. HENIFIN:  I believe it did.  They fought the fire

19   from that one, yes, Your Honor.

20       THE COURT:  But you said that the effort was in vain?

21       MR. HENIFIN:  That -- the loss of the structure.

22       THE COURT:  Did you get a report on that whole matter

23   as to what the status of the fire was at the time that the

24   fire department sought to use the first hydrant?

25       MR. HENIFIN:  I have not done that, Your Honor.

1        THE COURT:  Well, what about the second one?

2        MR. HENIFIN:  Well, I don't have any -- I haven't

3    gained any information.  I haven't even explored it.

4        THE COURT:  Has the water company sent you any

5    communication relative to this?

6        MR. HENIFIN:  No, Your Honor.  We just -- we -- again,

7    we've informed the fire department what we were going to

8    test for.  We reiterated with them after this to make sure

9    we all knew what we were doing, what schedule we were on.

10    And that was just exchanged in a document.

11        THE COURT:  Do you know how many fire hydrants there

12    are in Jackson?

13        MR. HENIFIN:  I believe there's around 4,000.

14        THE COURT:  Approximately 4,000?  What tests are being

15    run on these fire hydrants?

16        MR. HENIFIN:  So you do a -- when our contractor is

17    going to go out there and what the fire department has been

18    doing on their -- or as part of their job is to do a flow

19    test where you actually open the hydrant and measure the

20    pressure and volume of water that you get out of that

21    hydrant.  And then theoretically you color-code the cap of

22    the fire hydrant so that the fire department would know what

23    to expect when they got to that particular hydrant.

24        THE COURT:  And so what are variants on what to expect?

25        MR. HENIFIN:  The variants might be that, you know, we

1    got a closed mainline valve, a transmission valve that we

2    haven't found that might be closed so the water is having to

3    just make a circuitous route to get to that particular

4    hydrant.  So, again, the pressure loss to the pipe might be

5    significant by the time you get to the hydrant.

6        Then the hydrant itself has moving parts.  You know,

7    the valve in the hydrant is deep below the grade.  It's down

8    in the ground.  The cap you turn at the top with the nut on

9    it is opening that valve to bring it up to the points where

10   you see the fire department -- the three pieces that the

11   fire department might connect to.

12       And so that's got a long stem.  It's got a valve that

13   could potentially be not fully functional.  The stem might

14   have been broken, might be twisted.  There's lots of

15   different parts of the hydrant that may not be functional at

16   that point in time.

17       So on an annual basis, the fire department was using

18   their own force to go around and test those hydrants.

19   They'd do the flow test.  They'd see that the hydrant

20   opened.  But, again, they're, I'm sure, resource

21   constrained.  I don't know how many they got to every year.

22   I haven't talked to the fire department about that.

23       All I know is the contract we're putting out for this

24   year is to test every fire hydrant, clean and paint them,

25   fix whatever is broken on them, and make sure they're back

1    to full use with the appropriate color cap on the top so

2    that we know what pressure the fire hydrant -- the fire

3    department could expect at that hydrant anytime they come to

4    fight a fire.

5         THE COURT:  So you're telling me that all fire hydrants

6    are not created the same.

7         MR. HENIFIN:  Just based on where they are in the

8    system, that could be a difference.  It could be the hydrant

9    itself.  But, yeah, all fire hydrants are not the same

10   because they may be different distance from different

11   elevation.  All of those things impact the amount of

12   pressure that comes out of the hydrant.

13        THE COURT:  So when the fire truck rolls up next to a

14   fire hydrant, the fire truck might not know what the fire

15   hydrant can actually contribute?

16        MR. HENIFIN:  That's possible.  They should have

17   records of what their flow tests have been, so they should

18   know what they are.  That's why most cities follow the

19   American Water Works Association standard of color-coding

20   the hydrants so that they know what kind of pressure to

21   expect at the hydrant by -- the exterior paint on the top of

22   the hydrant typically can indicate what they can expect when

23   they hook up to that particular hydrant.

24        THE COURT:  So all of them are not red?

25        MR. HENIFIN:  No.  In an ideal world, they're not red

1    at all.  They're -- yellow is the desired color, which a lot

2    of communities don't like because the fire department says

3    they can see the yellow barrels.  So sort of the tall part

4    of the hydrant is typically painted yellow, and then top and

5    cap have a different color -- there's a whole color-coding

6    scheme based on the pressure.  And, again, many communities

7    haven't gotten to that level of detail for their fire

8    department.

9        THE COURT:  Has Jackson gotten to that level, Jackson

10    Fire Department?

11        MR. HENIFIN:  Not yet.  We're working with them.

12    They're on -- again, where we go around and test and fix and

13    paint these hydrants, we are agreeing to what colors we're

14    going to put in for the pressures.

15        THE COURT:  And what the code is going to be?

16        MR. HENIFIN:  Yes, Your Honor.

17        THE COURT:  Next, who is responsible for making these

18    tests?

19        MR. HENIFIN:  So the -- you know, it depends what

20    community.  I think here the fire department has assumed

21    that responsibility, and in some places it's the water

22    utility.  Many of them have contracts on an annual basis to

23    go test, clean, paint, and repair, you know, little repairs

24    on their hydrants.  That's a pretty common contracted

25    operation for most water utilities.

```
1          THE COURT:  So then in Jackson who has the

2    responsibility?

3          MR. HENIFIN:  I believe it's the fire department.

4          THE COURT:  Fire department?  And the actual hydrant

5    itself, is that city property?

6          MR. HENIFIN:  It's part of the water system, yes, Your

7    Honor.

8          THE COURT:  But it's owned by -- is it the water

9    system?  Or is it owned by the city in a separate budget?

10          MR. HENIFIN:  No.  It's owned by the water system.  I

11    don't know how they budget for the hydrants.  I'm assuming

12    it's all part of the water system.

13          THE COURT:  And you said there are approximately 4,000,

14    did you say?

15          MR. HENIFIN:  Yes, Your Honor.

16          THE COURT:  Have you inspected or your team inspected

17    any of these so far?

18          MR. HENIFIN:  I've just turned some off that were

19    running.  I haven't done any inspections.  I don't know

20    where -- I don't believe we've done any through our

21    contractor yet.  I don't think we've gotten to any of the

22    hydrants.

23          You know, from a prioritization standpoint, we were

24    trying to make sure there's pressure in the system so when

25    you go to test the hydrants, you actually get the real flow
```

1    test.  So you got to find all the valves that are closed,

2    open them back up if you're going to actually pressure-test

3    the hydrants and understand how they should operate.

4        So from a prioritization of hydrants and valves, valves

5    have to come first to make sure the system is all valved

6    correctly, the valves are open, you don't have closed

7    valves, and then you go pressure-test your fire hydrants,

8    and you should get an accurate pressure test that way.  Say

9    you had a system -- you know, a fire hydrant in a section

10   that wasn't fully opened valve-wise; you'd get a false low

11   pressure potentially at that point.

12       THE COURT:  So then these tests that are to be run on

13   the fire hydrants, is there any schedule of which you know?

14       MR. HENIFIN:  So the plan at the current time is

15   sometime in the September timeframe they should be able to

16   move to hydrants.  We're trying to see if they can do a

17   little bit of that earlier as they go through the areas

18   where they've already done all the valve work.

19       So they are moving through the city doing the valve

20   work, including, you know, you got to get into the

21   neighborhoods to make sure all those little valves are open

22   as well.  And then once they've finished a neighborhood on

23   the valve work and we've made whatever repairs need to be

24   made on the valve, then we can do the hydrant.

25       So, again, we were anticipating a September start for

1    the hydrant work and going into early next year before that

2    will be finished.

3         THE COURT:  Do you have federal money for that too?

4         MR. HENIFIN:  Yes.  That actually is all being paid

5    with federal dollars.

6         THE COURT:  All of it?

7         MR. HENIFIN:  Yes.  It's about a $5.4 million contract

8    to do the valves and hydrants.

9         THE COURT:  $5.4 million.  What kind of grant was that?

10        MR. HENIFIN:  That's part of the Safe Drinking Water

11   Act 1442(b), was part of the projects we put into that

12   funding.

13        THE COURT:  And how many people will be employed to

14   perform this work?

15        MR. HENIFIN:  So we have I think three or four crews.

16   They're from -- there's Wachs Water Company, which is out of

17   state.  There's two national firms that specialize in this,

18   and we invited both of them to provide a proposal in

19   January.  And based on the criteria, we selected Wachs

20   Water, which is out of South Carolina, I believe.

21        So they've had -- their crews typically have three

22   people on board.  So they've probably had 12 to 15 folks

23   here.  And then we're getting ramped up to even more

24   production, because a lot of this has been waiting on better

25   mapping to get them moving on a higher production rate.  I

1    think at max they'll have somewhere around six crews

2    working.  So maybe 18 folks.

3         THE COURT:  And you expect to get your estimations

4    when?

5         MR. HENIFIN:  They'll be finished sometime in the early

6    part of 2024.  So maybe late spring.

7         THE COURT:  Then I'll ask the question that maybe some

8    of the public would ask based on some of the answers:

9    Between now and then, where there has not been full

10   inspection, are we in some serious danger?

11        MR. HENIFIN:  I don't think so.  I mean, we're at --

12   there's obviously risk.  We don't know what the -- but we

13   haven't found a tremendous number of -- I haven't heard

14   anecdotally of many hydrants that they roll up to and

15   there's -- I understand our fire department here in Jackson

16   is very sophisticated and a great fire department, and they

17   anticipate often that they might not have pressure.

18        So you bring a pumper truck, you know, that's got some

19   storage on it to get the fires -- you know, get your fire

20   suppression working before you even have access to a

21   hydrant.  There's a number of things they can do as

22   professionals that can mitigate their chance of rolling up

23   to a fire that has no water available.

24        But I don't think it's a widespread problem.  Again,

25   we're having -- you know, the pressure in the system is

1    great.  They had regular testing.  I don't know what kind of

2    documentation of what they found in the past, but they had a

3    testing program.  And they can continue to do their own

4    testing while we're ramping up our program to do the testing

5    and repair work starting this -- late this summer, early

6    fall.

7         THE COURT:  And you all work together on this matter?

8         MR. HENIFIN:  I believe we are.

9         THE COURT:  Fire department and your people?

10        MR. HENIFIN:  Yes.

11        THE COURT:  Would that speed it up?

12        MR. HENIFIN:  They can't do the repair work, and I

13   don't know what their capacity is to do the testing on top.

14   We're not telling them to stop their testing capacity.  So

15   as far as testing to ensure hydrants are there, they could

16   continue to do that.  That would at least give us more peace

17   of mind that more hydrants have been tested on a regular

18   basis.

19        THE COURT:  4,000 is a lot of hydrants.

20        MR. HENIFIN:  That it is.

21        THE COURT:  So how many hydrants can be tested per day?

22        MR. HENIFIN:  I don't know exactly, Your Honor.  But

23   this company is very sophisticated and knows what they're

24   doing.  I can get a production run for you.  I'll get that

25   to you.  I'll get you the full schedule of how many hydrants

1    they think they'll get to.

2        THE COURT:  All right.  Could you get me that, please?

3        MR. HENIFIN:  I will.

4        THE COURT:  But you're telling me that there might be

5    some hydrants that are not pressured up.

6        MR. HENIFIN:  There's -- there's always that potential

7    probably in every system across the country.  The fact that

8    we've got system pressure restored pretty widely through the

9    system makes me feel that we're less likely to have that

10   problem.

11       THE COURT:  Less likely?

12       MR. HENIFIN:  Less likely, yes, Your Honor.

13       THE COURT:  And the one that occurred, was that down on

14   Farish Street?

15       MR. HENIFIN:  I don't know where that -- McDowell Road.

16       THE COURT:  McDowell?  And was that a house or a

17   business?

18       MR. HENIFIN:  I believe it was a house.

19       THE COURT:  Okay.  It was a house.  And that house was

20   totally destroyed?

21       MR. HENIFIN:  As I understand it, Your Honor.

22       THE COURT:  Now, also on this matter of pressure, was

23   there a problem down on Farish Street?

24       MR. HENIFIN:  I don't recall.

25       THE COURT:  Somebody called my office and said there

1    was some problem on Farish Street.

2         MR. HENIFIN:  Recently?

3         THE COURT:  Yes.

4         MR. HENIFIN:  May have been related to the big break at

5    Woodrow Wilson.  I don't know.

6         THE COURT:  It might have been in relationship to the

7    sewage, though.  But do you know anything about a water

8    problem on it?  Do you know of --

9         MR. HENIFIN:  Not aware of off the top of my head.  I'd

10   have to do some research.

11        THE COURT:  Okay.  They had a fire?  Was Johnny T's

12   destroyed?

13        MS. MARTIN:  No, Your Honor.  I believe the fire

14   department -- it was a grease fire.

15        THE COURT:  And was there a pressure problem?

16        MS. MARTIN:  That I am not certain of, because I

17   have --

18        MR. LUMUMBA:  Judge, we are not aware of any pressure

19   problem with that particular fire.

20        THE COURT:  All right.  Thank you.

21        MR. HENIFIN:  They weren't putting water on a grease

22   fire.  I'm just saying that's probably not the way they were

23   fighting that one.

24        THE COURT:  Okay.  So what we are looking at is -- is

25   competent pressure throughout the city by 2024?

1          MR. HENIFIN:  I would say before that, Your Honor.

2          THE COURT:  Before that?  So like when before that?

3          MR. HENIFIN:  Like right at the end of this year, we

4     should have -- we still will have areas that would need

5     additional work for pressure zones and things like that to

6     make it dependable and reliable all the time.  But, you

7     know, we're close to that now.  Once we get the Shannon Dale

8     and Forest Hill area off of the surface water, I think we

9     can stand here and say that we've got acceptable pressures

10    throughout the system by the end of this calendar year.

11         THE COURT:  Now, the last thing that the city attorney

12    mentioned of concern from some groups was the future.  Talk

13    to me about what you foresee for the future.

14         MR. HENIFIN:  So I've been clear that I'm not sure

15    where -- people ask -- you know, by title I am the interim

16    third-party manager.  The order is an interim order.  So

17    everyone asks when I'm in public what happens when you leave

18    or when the federal money runs out.

19         And so I said one of the things that I believe before

20    this order is really satisfied is we need to understand what

21    that future looks like.  Is it returning the system back to

22    the city and letting them run it and make sure they're

23    resourced correctly to do that?  Or is it looking for

24    another government structure that might be an authority that

25    the city -- you know, a spinoff of authority from the city,

 1    or it could be a co-op?  It could be any number of different

 2    water models that are used across the United States for a

 3    utility, assets still belonging to the city and somebody

 4    else operating it.

 5         Again, it could go back to the city if they had the

 6    right resources to make sure they could run it.  But I think

 7    ultimately the job is not done until we ensure there's a

 8    future, we're not just dropping in as the third-party

 9    manager, that my work is not in vain, that we fix it now and

10    walk away and it falls apart again.

11         So there needs to be some future plan on how this

12    utility continues to provide the water that's needed and

13    expected and should be provided to the 160,000 customers

14    that depend on this water every day.  A city shouldn't have

15    boil water notices and pressure problems and repetitive

16    problems.

17         And so, you know, the effort we're making to invest 600

18    million federal dollars wisely plus the 125 of Corps of

19    Engineer dollars and other dollars and all the work and time

20    that we're spending doing this, it needs to have a lasting

21    power.

22         So I think it's a fair question for someone to ask me

23    as an interim third-party manager what's next, and so I

24    leave all those options out there on the table, and we don't

25    know that, and there will be some community involvement to

1    try to understand what the community would want, and then

2    ultimately the parties, you, everyone has to agree to that.

3        I go home to my house in Virginia and, you know,

4    hopefully I'm not concerned that it's all falling apart

5    after I leave.

6        THE COURT:  All right.  Thank you so much.

7        MR. HENIFIN:  And during the break, Ms. Martin reminded

8    me there were some other groups that I've talked to that,

9    you know, other than the Rapid Response Coalition, none of

10   them that have directly been dissatisfied to my face.  I

11   understand there's been several that have been

12   dissatisfied -- she'll give you the list, I think, but there

13   are many other groups I've talked to over this period of

14   time that never had said directly that there were concerns

15   about my transparency and my ability to do the job.  You'll

16   hear from her.

17       THE COURT:  Go ahead.  Ms. Martin?

18       MS. MARTIN:  Yes, Your Honor.

19       THE COURT:  Would you approach the podium again?  You

20   said that you had some persons who wanted to appear before

21   the Court.

22       MS. MARTIN:  Yes, Your Honor.

23       THE COURT:  How many?

24       MS. MARTIN:  I would say maybe one representer from

25   each group, so that would give you five people.

1          THE COURT:  Five people?

2          MS. MARTIN:  Yes, Your Honor.

3          THE COURT:  Okay.  And these five people, could they be

4     prepared to provide whatever their statements of questions

5     are next week?

6          MS. MARTIN:  I don't see why not, Your Honor.  If you

7     gave us a date, we can ensure that they are prepared.

8          THE COURT:  All right.  Terri, give us a date.

9          THE COURTROOM DEPUTY:  What about July 12th at

10    9:30 a.m.?

11         MS. MARTIN:  I will communicate that information to

12    them.

13         THE COURT:  All right.  And then I will hear from these

14    five people as to what their complaints are.  And are any of

15    them present today?

16         MS. MARTIN:  No, Your Honor.  I will say, though, that

17    I do believe that the information that was provided today

18    was important, and it was informative.  And one of the

19    issues that we face with these hearings is we are put in a

20    difficult position, because we are hearing this information

21    from the ITPM, but unlike many of our public hearings, this

22    is not a public hearing.  So this information only gets

23    distributed to the public if we are then the third person

24    that is distributing this information to the public.

25         And so I do not know if there is an avenue for the

1    public to -- not necessarily for these hearings to be

2    streamed live as our other hearings are outside of federal

3    court, but if there is the opportunity for the public to

4    just be invited to sit in and listen during these hearings.

5    Many of the times when your hearings are noticed, we do not

6    have time on the city side to provide notice to the public

7    that a hearing is taking place and what will be discussed

8    and that Mr. Henifin will be here to talk about the status

9    of the system.

10        And so I do think in closing the gap of transparency,

11   it might be -- just going forward, an opportunity for us to

12   say to the public that when we have these status

13   conferences, that if people want to attend, they can just

14   sit here and listen, because I learned a lot today in the

15   hearing, which I think gets me to the point of some of the

16   issues we have had internally with transparency with the

17   third-party manager.

18        I will say, yes, there were other organizations.  That

19   was one misrepresentation that I noted.  The other

20   misrepresentation I noted was on the fire hydrants,

21   specifically to the point of the question about why the fire

22   hydrant was dry.

23        And what I will say, it's been represented to us from

24   the fire department, is there was a conversation that took

25   place between Mr. Henifin and the fire department in January

1    of this year.  During that discussion, what the fire

2    department understood was that Mr. Henifin and his team, his

3    contractor, would be performing the tests that the fire

4    department had traditionally been performing.  So they

5    assumed, incorrectly or correctly, that those tests were

6    being performed by Mr. Henifin's contractor.  They did not

7    notice that they were not being performed by the contractor

8    until they appeared in June, just last month, when they went

9    to respond to the house fire and the fire hydrant was dry.

10   And it is their representation that that hydrant was dry not

11   because of an issue with the hydrant itself but because they

12   believe a water valve had been shut off.

13        So they do perform annual tests.  All of their notes

14   and information said that that fire hydrant worked and that

15   it should have been spewing water.  The fact that it wasn't

16   led them to believe that the hydrant -- it was not an issue

17   with the hydrant, it was an issue with the water valve that

18   had been shut off.  So I did want to correct that for the

19   record.

20        The last thing I will say, Your Honor --

21        THE COURT:  On this matter of the fire department --

22        MS. MARTIN:  Yes, Your Honor?

23        THE COURT:  -- at the next session we have, you can

24   have someone capable of speaking to this issue come to

25   court.

1          MS. MARTIN:  I will do that, Your Honor.  I'll make

2     sure the fire chief is here.  And he did represent to us

3     that he has reached out to Mr. Henifin by email and has not

4     received a response.  But I will ensure that he is here next

5     week at 9:30 on -- or I wrote it down -- July 12th, I think

6     you told me.

7          THE COURT:  Okay.  And the last issue?

8          MS. MARTIN:  The last thing I will say, Your Honor, is

9     we really were here today to try to close the gap on

10    transparency and to ensure that we knew what direction we

11    should go in going forward.

12         Just based on what we heard today, some of the requests

13    that I think we have for the ITPM is, you know, we talk a

14    lot about water quality, but we have not had the benefit of

15    those test results.  And so one request that we have is to

16    obtain evidence of the test results that are being conducted

17    by JXN Water and the Department of Health that show that the

18    water is safe to drink.

19         Mr. Henifin testified today that he is conducting

20    numerous tests on the water, and so our request to him would

21    be that he provide the documentation for those tests so that

22    we can then distribute that to the public.

23         The second request we would have is Mr. Henifin -- we

24    talked a lot about the call center, and Mr. Henifin

25    represented today that the reduction in calls has gone from

1    1100 a day to between 4 and 500 a day.  We would request

2    that that data also be provided to the parties so that we

3    also have the benefit of that information, again, so we can

4    distribute it to the public.

5        The last requested document I think we have -- and,

6    actually, no, not a last requested document.  The last thing

7    I would ask, Your Honor, I think that what I am receiving

8    from you in terms of direction for the public with regard to

9    transparency is that we will have a hearing next week at

10   9:30 for those organizations to come and be able to present

11   their concerns directly to you and Mr. Henifin.

12       The second issue of transparency on the discussions

13   between the Court and Mr. Henifin and whether or not that

14   information is distributed to the parties, the question we

15   have is, is the Court agreeable to us modifying the

16   stipulated order to allow for the ITPM to communicate the

17   discussions between himself and the Court to the parties and

18   for him to distribute any documents that are provided to the

19   Court also to the parties?

20       THE COURT:  No.

21       MS. MARTIN:  Okay.  Thank you.  That is all I have,

22   Your Honor.

23       THE COURT:  Okay.  Hold it.  On this matter of the call

24   center, do you have your records to show the quantity of

25   calls that the City of Jackson received on water -- on the

1    water crisis?

2        MS. MARTIN:  I believe that we do.

3        THE COURT:  And its response times --

4        MS. MARTIN:  Oh, Mr. Henifin actually has the

5    documentation, because all of the documents were turned over

6    to him when he took over the system.

7        THE COURT:  So do you have copies?

8        MS. MARTIN:  I think we can obtain it if we get it from

9    him.

10        MR. HENIFIN:  I don't think there is any, but I will

11    look.

12        THE COURT:  So then I would like to see what record you

13    have of the volume of calls on the water matter that the

14    city experienced before Mr. Henifin came on duty and your

15    response times.  Can you give me that?

16        MS. MARTIN:  Like I said, I believe all of our

17    documentation is with WSBA, which is controlled by

18    Mr. Henifin.  So the city doesn't have any -- all of the

19    documents that we had -- when Mr. Henifin took over WSBA,

20    all of that information went to him.

21        THE COURT:  Okay.  And was all of that information

22    accurate?

23        MS. MARTIN:  That I do not know.  I think you would

24    have to check it for accuracy.  I think this is similar to

25    him having to research the e-codes.  It was all information

1    that was within the software that has been obtained by him

2    through the WSBA.

3        THE COURT:  Now, you mentioned e-codes.  Do you stand

4    by this statement you made earlier that Jackson didn't have

5    a problem with e-codes?

6        MS. MARTIN:  I don't think my statement was that we did

7    not have a problem with e-codes.  I said any information we

8    would have had on e-codes would have been a public document

9    that would have been available to the public.

10       THE COURT:  Are you saying that Jackson didn't have a

11   large quantity of persons on the e-codes?

12       MS. MARTIN:  To my knowledge, what we had as far as the

13   e-codes is the same as what Mr. Henifin represented, because

14   I do not believe he modified that information before he

15   distributed it.  But the individuals that were on e-codes,

16   based on what he has represented to us himself, is that the

17   individuals that were on the e-code were individuals who

18   had -- it was nursing homes and individuals with specific

19   medical concerns.  And so to my knowledge, there was no one

20   else that was discovered to have been on an e-code

21   improperly.

22       THE COURT:  So that is what you are representing as the

23   city's position, that nobody was on the e-code improperly?

24       MS. MARTIN:  To my knowledge, there was no one on the

25   e-code improperly.

1          THE COURT:  But are you speaking for the city on that

2     point?

3          MS. MARTIN:  I have not conducted any research --

4          THE COURT:  Excuse me.  But I -- I'm sorry.  But I know

5     that you are representing the city, but I am asking you on

6     that particular point, are you contending that nobody was on

7     e-code improperly?

8          MS. MARTIN:  I am contending that based on the

9     information available to me, no one was on the e-codes

10    improperly.  Based on the information that has been provided

11    to me, no one was on the e-codes improperly.

12         THE COURT:  Okay.  But are you speaking for the city or

13    just speaking for you?

14         MS. MARTIN:  I am speaking as an officer for the city

15    attorney based on the documents I have in my possession.

16         THE COURT:  And finally, after I mentioned the e-codes,

17    were any file cabinets moved from city offices on the

18    e-codes?

19         MS. MARTIN:  To my knowledge, there were not.  I don't

20    have knowledge of any file cabinets being moved from city

21    offices prior to Mr. Henifin taking control of the system.

22         THE COURT:  Okay.  Thank you so much.

23         MS. MARTIN:  Thank you, Your Honor.

24         THE COURT:  We will come back together on the date

25    announced, July 12 at 9:30 a.m., and at that time I will

1   hear from any disgruntled organizations or citizens as well

2   as the fire department on this matter.

3        And, Mr. Henifin, are there any persons whom you would

4   like to have present at this session?

5        MR. HENIFIN:  Nothing is coming to mind, Your Honor.

6   But I would like to reserve the right to bring a group if

7   there is anyone that wants to speak to some of the

8   improvements.

9        THE COURT:  Okay.  Then we will hear from that.

10       And all right then.  Well, good people, this building

11  is going to be shut down in just a few minutes, and so --

12  Terri, what time is it?  5:35.  So in 25 minutes this

13  building is going to be shut down.  All of the electronic

14  equipment and everything else is going to be shut down for

15  the weekend for some tests that are being run here in this

16  building.  So if you don't get out of here by 6:00, then you

17  will have to wait until Monday morning.  So I suggest you

18  all take your time but head to the exits.

19       All right.  Good.  I'll see you all at the next

20  occasion.  Thank you so much.  Everybody has been gracious.

21  Thank you.

22                  (Court adjourned at 5:36 p.m.)

23  **************************************************************

24

25

1                   **COURT REPORTER'S CERTIFICATE**

2

3        I, Caroline Morgan, Official Court Reporter for the

4  United States District Court for the Southern District of

5  Mississippi, do hereby certify that the above and foregoing

6  pages contain a full, true, and correct transcript of the

7  proceedings had in the forenamed case at the time and place

8  indicated, which proceedings were stenographically reported by

9  me to the best of my skill and ability.

10        I further certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13        THIS, the 18th day of August, 2023.

14

15                        /s/ Caroline Morgan, CCR

16                       Caroline Morgan CCR #1957
                            Official Court Reporter

17                       United States District Court
                            Caroline_Morgan@mssd.uscourts.gov

18

19

20

21

22

23

24

25